1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL NEWMAN
     Senior Assistant Attorney General
3    SARAH E. BELTON
     Supervising Deputy Attorney General
4    REBEKAH A. FRETZ
     JAMES F. ZAHRADKA II
5    GARRETT M. LINDSEY (SBN 293456)
     Deputy Attorneys General
6      300 South Spring Street, Suite 1702
       Los Angeles, CA 90013
7      Telephone:  (213) 269-6402
       E-mail:  Garrett.Lindsey@doj.ca.gov
8    *Attorneys for Plaintiff State of California*

9    (List of other Plaintiffs' counsel continued on next page)

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13   | | |
     |---|---|
14   | **STATE OF MICHIGAN, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF HAWAII, STATE OF MAINE, STATE OF MARYLAND, STATE OF NEW MEXICO, COMMONWEALTH OF PENNSYLVANIA, STATE OF WISCONSIN, THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, BOARD OF EDUCATION FOR THE CITY OF CHICAGO, CLEVELAND MUNICIPAL SCHOOL DISTRICT BOARD OF EDUCATION, and SAN FRANCISCO UNIFIED SCHOOL DISTRICT,** | Civil Case No. 3:20-cv-04478-SK |

     Plaintiffs,

     v.

     **ELISABETH D. DEVOS, IN HER OFFICIAL CAPACITY AS THE UNITED STATES SECRETARY OF EDUCATION, AND UNITED STATES DEPARTMENT OF EDUCATION,**

     Defendants.

     **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

First Amended Complaint for Declaratory and Injunctive Relief

DANA NESSEL
Attorney General of Michigan
FADWA A. HAMMOUD
Solicitor General
TONI L. HARRIS
NEIL GIOVANATTI
Assistant Attorneys General
  Michigan Department of Attorney General
  P.O. Box 30758
  Lansing, MI 48909
  (517) 335-7603
  HammoudF1@michigan.gov
  HarrisT19@michigan.gov
  GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KARL A. RACINE
Attorney General of the District of Columbia
KATHLEEN KONOPKA
Deputy Attorney General, Public Advocacy
Division
BRENDAN B. DOWNES
NICOLE HILL
Assistant Attorneys General, Public
Advocacy Division
  Office of the Attorney General for the
District of Columbia
  441 4th St., N.W. Suite 630S
  Washington, DC 20001
  (202) 724-6610
  Kathleen.Konopka@dc.gov
*Attorneys for Plaintiff District of Columbia*

CLARE E. CONNORS
Attorney General of Hawaii
HOLLY T. SHIKADA
KEVIN M. RICHARDSON
Deputy Attorneys General
  Education Division
  235 South Beretania Street, Suite 304
  Honolulu, HI 96813
  (808) 586-1255
  Kevin.M.Richardson@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

AARON M. FREY
Attorney General of Maine
SARAH A. FORSTER
Assistant Attorney General
  6 State House Station
  Augusta, ME 04333-0006
  (207) 626-8866
  sarah.forster@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General
  200 Saint Paul Place
  Baltimore, Maryland 21202
  (410) 576-6427
  sullivan@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

HECTOR BALDERAS
Attorney General of New Mexico
P. CHOLLA KHOURY
LISA GIANDOMENICO
Assistant Attorneys General
Consumer & Environmental Protection
Division
  New Mexico Attorney General's Office
  201 Third Street NW, Suite 300
  Albuquerque, NM 87102
  (505) 490-4846
  ckhoury@nmag.gov
  lgiandomenico@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

JOSH SHAPIRO
Attorney General of Pennsylvania
MICHAEL J. FISCHER
Chief Deputy Attorney General
  Impact Litigation Section
  Pennsylvania Office of Attorney General
  21 S. 12th Street, 3rd Floor
  Philadelphia, PA 19107
  (215) 560-2171
  mfischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

JOSHUA L. KAUL
Attorney General of Wisconsin
HANNAH S. JURSS
Assistant Attorney General
  Wisconsin Department of Justice
  Post Office Box 7857
  Madison, WI 53707
  (608) 266-8101
  jursshs@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*

1  JAMES E. JOHNSON
   Corporation Counsel of the City of New
2  York
   ERIC PROSHANSKY
3  HOPE LU
   GAIL RUBIN
4  Assistant Corporation Counsel
     100 Church Street
5    New York, NY 10007
     (212) 356-2032
6    eproshan@law.nyc.gov
     hlu@law.nyc.gov
7    grubin@law.nyc.gov
   *Attorneys for Plaintiff the Board of*
8  *Education of the City School District of the*
   *City of New York*
9
   BOARD OF EDUCATION, CITY OF CHICAGO
10 DEPARTMENT OF LAW
   JOSEPH MORIARTY
11 General Counsel
   J. ERNEST MINCY
12 Deputy General Counsel for Litigation
     1 North Dearborn Street, Suite 900
13   Chicago, IL 60602
     (773) 553-1693
14   jemincy1@cps.edu
   *Attorneys for Plaintiff Chicago Board of*
15 *Education*

16

17

18

SQUIRE PATTON BOGGS (US) LLP
GABRIEL COLWELL (CABN 216783)
COLIN R. JENNINGS (OHBN 0068704)
W. MICHAEL HANNA (OHBN 0020149)
EMILY R. SPIVACK (OHBN 0090777)
  555 South Flower Street, Suite 3100
  Los Angeles, CA 90071
  (213) 624-2500
  gabriel.colwell@squirepb.com
  colin.jennings@squirepb.com
  mike.hanna@squirepb.com
  emily.spivack@squirepb.com
CLEVELAND MUNICIPAL SCHOOL DISTRICT
BOARD OF EDUCATION
KEVIN J. BURTZLAFF (OHBN 0039648)
Board Attorney and Liaison
  1111 Superior Ave E
  Cleveland, OH 44114
  (216) 838-0032
  kevin.burtzlaff@clevelandmetroschools.org
*Attorneys for Plaintiff Cleveland Municipal*
*School District Board of Education*

SAN FRANCISCO UNIFIED SCHOOL DISTRICT
DANIELLE HOUCK
General Counsel
SUSANNE NAOMI STARECKI KIM
Sr. Deputy General Counsel
LEGAL DEPARTMENT
  555 Franklin Street, 3rd Floor
  San Francisco, CA 94102
  (415) 241-6216
  Kims1@sfusd.edu
*Attorneys for Plaintiff San Francisco Unified*
*School District*

19

20

21

22

23

24

25

26

27

28

---

First Amended Complaint for Declaratory and Injunctive Relief

## INTRODUCTION

1.      The State of Michigan, the State of California, the District of Columbia, the State of Hawaii, the State of Maine, the State of Maryland, the State of New Mexico, the Commonwealth of Pennsylvania, and the State of Wisconsin (collectively, Plaintiff States or the States), the Board of Education of the City School District of the City of New York (New York City Department of Education), Board of Education for the City of Chicago, Cleveland Municipal School District Board of Education, and San Francisco Unified School District (collectively, Plaintiff LEAs) (and collectively with Plaintiff States, Plaintiffs) bring this action to challenge a rule promulgated by Defendants Secretary Elisabeth D. DeVos and the United States Department of Education (the Department) (collectively, Defendants), unlawfully and erroneously interpreting the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law 116–136, 134 Stat. 281.  The Department's interpretation will deprive low-income and at-risk students, their teachers, and the public schools that serve them of critical resources to meet students' educational and social-emotional needs during and after pandemic-related school closures.  Plaintiffs will also be harmed by the loss of these critical resources at a time of severe crisis.

2.      The CARES Act was enacted on March 27, 2020, to address some of the financial challenges faced by Americans as businesses closed, employees lost their jobs, and schools closed their buildings and transitioned to remote learning in an unprecedented effort to slow the spread of the virus.  The statute authorizes the allocation of $30.75 billion for elementary and secondary schools and higher education in response to the COVID-19 pandemic, including assisting students to transition to distance learning.  The statute directs states to distribute CARES Act funds to local educational agencies (LEAs) in proportion to their allocation under part A of Title I of the Elementary and Secondary Education Act of 1965 (ESEA) in the previous fiscal year.  Title I-A funds are allocated to LEAs and schools based on the number of children who are economically disadvantaged.  These funds benefit many of the vulnerable students whom the Plaintiff States and LEAs serve, including children with disabilities, migrant children, English language learners, children in residential or day programs for students in the foster care or juvenile justice systems, and homeless children.

First Amended Complaint for Declaratory and Injunctive Relief

3.     Congress directed LEAs to use a portion of the funds they receive from the CARES Act to provide equitable services to eligible private-school students and teachers in the same manner as provided under Section 1117 of the ESEA.  CARES Act § 18005.  Under Section 1117, LEAs calculate the amount of Title I-A funds reserved for equitable services based on the number of low-income students who attend private schools as a percentage of the total number of low-income students in public and private schools combined.  Once the money is apportioned, the LEA then provides equitable services to private-school students who are academically at-risk.

4.     Section 1117 is clear that LEAs are to use Title I-A funds to provide services to *at-risk* private-school students, and neither Section 1117 nor the CARES Act allows the funds at issue to be used to provide equitable services to *all* students enrolled in private schools.  Yet, despite these clear mandates and contrary to the will of Congress, the Department grafted its own allocation and eligibility rules on Congress's directive.

5.     The Department first issued its interpretation of how LEAs should apportion the CARES Act moneys and which private-school students were eligible for equitable services on April 30, 2020, through a guidance document (Guidance Document).[1]  The Guidance Document—which was inconsistent with prior Title I guidance issued by the Department less than a year ago—provided that LEAs must apportion funds for equitable services using the total numbers of private and public-school students rather than only low-income students.  If every LEA receiving CARES Act funds were required to apportion CARES Act funds in this manner, millions of dollars in CARES Act funding would be diverted from their public schools to the private schools.  In addition, the Guidance Document directed LEAs to provide equitable services to all private-school students, regardless of whether the private-school students were low income, were academically at-risk of failing, or resided in Title I school attendance areas.  Neither of these mandates is consistent with Section 1117.

---

[1] The Guidance Document is attached hereto as Exhibit A.  The Department removed this original version of the Guidance Document from its website and has posted a different version of the Guidance Document, available at https://oese.ed.gov/files/2020/06/Providing-Equitable-Services-under-the-CARES-Act-Programs-Update-6-25-2020.pdf.

6.    After widespread pushback regarding the Department's incorrect and unlawful guidance, the Department doubled-down on its erroneous interpretation of the CARES Act with the publication of an interim final rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the Equitable Services Rule or Rule).[2]  The Rule was published as an interim final rule, which is effective upon publication.

7.    Contrary to the Act, the Department's Rule requires LEAs to make an untenable choice about how to apportion the CARES Act funds for private-school students, with neither option supported by the relevant statutes: (1) follow the same interpretation contained in the Guidance Document by apportioning funds for equitable services based on the number of *all* private school children enrolled, rather than *low-income* private school children as required by Section 1117; or (2) apportion funds for equitable services based on the number of *low-income* non-public school children, as required under Section 1117, but then incur strict, poison-pill requirements found nowhere in the CARES Act on how the public-school share of the funds can be used.  Under either option, all private-school students would still be eligible to receive equitable services, which negates the eligibility requirements for services in Section 1117.

8.    The first poison-pill "option" for LEAs prohibits them from using the public-school share of the funds for any non-Title I schools.  As a result, depending on the district, numerous schools—which, despite not being designated as Title I schools, serve many low-income and at-risk students—are excluded from receiving any funds.  This restriction cannot square with the flexibility Congress provided to LEAs to use the funds for all schools in their districts, not only Title I schools.  The second requirement cautions the LEAs from using the funds in a way that would result in other federal funds "supplant[ing]," rather than "supplement[ing]," traditional school funding from state and local sources.  In effect, this second requirement prohibits many LEAs from using CARES Act funds for existing expenditures, which is nonsensical since filling the gap created by reduced state and local funding is a key purpose of the CARES Act funding.  These two poison pill restrictions on the use of the CARES Act funds penalize LEAs for

---

[2] The Rule is attached hereto as Exhibit B.

3

following the proportional share calculation in Section 1117 (and required by the CARES Act), and push LEAs to apportion funds in accordance with the Department's Guidance Document—forcing LEAs to grant a higher proportion of funds to private schools, contrary to the CARES Act's clear mandate.  They also undermine the flexibility that Congress intended to grant LEAs when it enacted a broad set of permitted uses for CARES Act funds, which expressly include maintaining continuity of services and continuing to employ existing staff of the local educational agency.  *See* CARES Act §§ 18002(c)(1), 18003(d)(12).

9.     The Rule is thus inconsistent with and not in accordance with the law.  The discrepancy between the plain language of the CARES Act and the Department's inaccurate interpretations has led to widespread confusion for State Education Agencies (SEAs), LEAs, and private schools across the Nation.  The Rule strips funds Congress specifically directed to public schools to support their response to the COVID-19 pandemic and requires that those funds be reallocated, including to affluent private schools, with consideration neither of the private schools' needs or available resources nor the harms these reallocations cause to public schools.  While Congress intended to provide some assistance to private-school students and teachers through the inclusion of equitable services, it intended that assistance go to vulnerable students and used the Title I-A formula and equitable services requirement applicable to those funds to that end.

10.     The CARES Act does not expressly delegate to the Department the authority to promulgate administrative rules that interpret, let alone completely re-write, the Act's allocation requirements for moneys provided to private-school students.  Nor does the Department's general rulemaking authority, *see* 20 U.S.C. § 1221e-3, allow it to impose these restrictions.

11.     Because Congress unambiguously directed the allocation of money in accordance with Title I-A, Congress neither explicitly nor implicitly left any gaps in the statute that might justify rulemaking by the Department.  The Department's guidance and the Rule are accordingly entitled to no deference.

12.     The Rule is arbitrary and capricious in several respects.

4

13.     First, as discussed above, the Department failed to articulate how its position comports with the plain text of section 18005 of the CARES Act.  Thus, it must be set aside as based on an incorrect legal premise.  *See Safe Air for Everyone v. U.S. EPA,* 488 F.3d 1088, 1101 (9th Cir. 2007).

14.     Second, the Department failed to adequately explain—consistent with the evidence before it—why it was reversing its own Title I guidance regarding how equitable services under Section 1117 should be provided.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 52 (1983) (requiring agencies to "explain the evidence which is available, and . . . offer a rational connection between the facts found and the choice made . . . [including] justification for rescinding the regulation"); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1913 (2020) (requiring "reasoned analysis to support" rescission of prior policy) (quoting *State Farm*, 463 U.S. at 42) (punctuation omitted).

15.     Third, the Department ignored important aspects of the problem, *see State Farm*, 463 U.S. at 43, including, among others, the harms to students, States, and LEAs discussed herein. For example, the Department failed to consider that communities with Title I-eligible schools are likely to experience a greater concentration of difficulties relating to COVID-19, and that therefore Congress intended the flexible uses of the CARES Act funds to be concentrated in these communities' schools.

16.     Fourth, the Department took into account factors Congress did not intend it to consider.  *See id.*  For example, the Department's prioritization of support for all private-school students, even those not Title I-A eligible, appears to be based on the erroneous premise that Congress intended to direct these funds to affluent, economically secure private-school students on an equal basis as public schools that educate large populations of at-risk and low-income students.  Congress unambiguously expressed clear intent to the contrary by using the Title I-A allocation method, which tracks low-income students.

17.     Fifth, the Department failed to take into account the reliance interests that its former position generated.  The Plaintiff States and LEAs have relied on the Department's prior interpretations of Title I equitable services, and there is no indication that the Department took

1   this into account when making its decision. "When an agency changes course . . . it must be

2   cognizant that longstanding policies may have engendered serious reliance interests that must be

3   taken into account.  It would be arbitrary and capricious to ignore such matters." *Regents*, 140 S.

4   Ct. at 1913 (citations and punctuation omitted).

5       18.    Sixth, the Department's ever-changing position has generated an "[u]nexplained

6   inconsistency," and the Department has not shown any awareness of its changed position. *Nat'l*

7   *Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981 (2005).

8       19.    In addition, the Department flouted the procedural steps required under the

9   Administrative Procedure Act (APA) for the promulgation of the Rule, as the Department did not

10  have good cause for issuing the Rule as an interim final rule.  5 U.S.C. § 553(b)(B); *see, e.g.*,

11  *California v. Azar*, 911 F.3d 558, 576 (9th Cir. 2018) ("[A]n agency's desire to eliminate more

12  quickly legal and regulatory uncertainty is not by itself good cause.").

13      20.    The Rule also violates core separation of powers principles in the Constitution.

14  "[W]here previously appropriated money is available for an agency to perform a statutorily

15  mandated activity," separation of powers principles and the Spending Clause prevent agencies

16  from "ignor[ing] statutory mandates or prohibitions." *In re Aiken County*, 725 F.3d 255, 260

17  (D.C. Cir. 2013); *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir.

18  2018) (agencies are without "[the] unilateral authority" to "thwart congressional will by canceling

19  appropriations passed by Congress") (internal quotation marks and citations omitted).  Congress

20  intended to deliver LEAs "need[ed] funding flexibility due to the disruption in the academic year

21  from COVID-19."  166 Cong. Rec. H1856 (Mar. 27, 2020) (statement of Rep. Underwood).

22  Congress intended that LEAs have this funding to "help alleviate the challenges educators,

23  students and families are struggling with in light of school closures" particularly those "students

24  with disabilities, English language learners, and students experiencing homeless."  166 Cong.

25  Rec. E340 (Mar. 31, 2020) (statement of Rep. Jayapal).

26      21.    Relatedly, the Rule violates the Spending Clause: (1) it is contrary to Congress's

27  plainly expressed intent in the CARES Act; (2) Congress has not "unambiguously" imposed the

28  requirements of the Rule, *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal citations

6

omitted, brackets in original); and (3) it is an improper "post acceptance" restriction on the States'

and LEAs' use of the funds, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

22.     Further, the additional funding requirements on schools that the Department would

impose under one of the so-called "choices" provided in the Rule violate the plain language of the

CARES Act requiring that funds be allocated in the same manner as required in Section 1117 and

specifying that funds could be used to maintain existing operations and retain existing personnel.

The Department's allocation scheme will dilute the per-pupil amount available to all public

schools by directing CARES Act funds to support private-school students not eligible for

equitable services.

23.     To avert irreparable injury to the Plaintiff States, Plaintiff LEAs, and the students,

teachers, and schools within their states and school districts, Plaintiffs bring this suit to declare

unlawful and enjoin the Department's Guidance Document and the Rule.

## JURISDICTION AND VENUE

24.     This action arises under the APA, 5 U.S.C. §§ 553, 701-06, and the U.S. Constitution.

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.

25.     This Court has the authority to issue declaratory relief, injunctive relief, and other

relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the APA, 5 U.S.C. §§

702, 705-06.

26.     This is a civil action in which Defendants are agencies of the United States or officers

of such an agency.  Venue is proper in this Court because a substantial part of the events giving

rise to this action occurred in this district.  *See* 28 U.S.C. § 1391(e)(1).

## PLAINTIFFS

27.     Plaintiff State of Michigan is a sovereign state of the United States of America.  This

action is being brought on behalf of the State by Attorney General Dana Nessel pursuant to her

statutory authority.  Mich. Comp. Laws § 14.28.

28.      Plaintiff State of California is a sovereign state of the United States of America. This

action is being brought on behalf of the State by California Attorney General Xavier Becerra, the

State's chief law officer, Cal. Const., art. V, § 13, who has the duty to see that the laws of the

7

1   State are uniformly and adequately enforced, and Governor Gavin Newsom, the State's chief

2   executive officer, who is responsible for overseeing the operations of the State and ensuring that

3   its laws are faithfully executed, Cal. Const., art. V, § 1.

4       29.   Plaintiff District of Columbia is a sovereign municipal corporation organized under

5   the Constitution of the United States.  It is empowered to sue and be sued, and it is the local

6   government for the territory constituting the permanent seat of the federal government.  The

7   District is represented by and through its chief legal officer, the Attorney General for the District

8   of Columbia, Karl A. Racine.  The Attorney General has general charge and conduct of all legal

9   business of the District and all suits initiated by and against the District and is responsible for

10   upholding the public interest.  D.C. Code § 1-301.81.

11       30.   Plaintiff State of Hawaii is a sovereign state of the United States of America.  The

12   Attorney General is the chief legal officer and chief law enforcement officer of the State of

13   Hawaii.  The Attorney General's powers and duties include appearing for and representing the

14   State "in all the courts of record, in all cases criminal or civil in which the State may be a party, or

15   be interested, and may in like manner appear in the district courts in such cases."  Haw. Rev. Stat.

16   § 28-1.  Hawaii is represented by its Attorney General, Clare E. Connors, who is authorized to file

17   civil actions to protect Hawaii's rights and interests in state and federal courts.

18       31. Plaintiff State of Maine is a sovereign state of the United States of America.  The

19   Attorney General of Maine, Aaron M. Frey, is a constitutional officer with the authority to

20   represent the State of Maine in all matters and serves as its chief legal officer with general charge,

21   supervision, and direction of the State's legal business.  Me. Const. art. IX, § 11; Me. Rev. Stat.,

22   tit. 5, §§ 191 et seq.  The Attorney General's powers and duties include acting on behalf of the

23   State and the people of Maine in the federal courts on matters of public interest.  The Attorney

24   General has the authority to file suit to challenge action by the federal government that threatens

25   the public interest and welfare of Maine residents as a matter of constitutional, statutory, and

26   common-law authority.

27       32.   Plaintiff State of Maryland is a sovereign state of the United States of America.  The

28   State is represented by and through the Attorney General of Maryland, its chief legal officer with

8

general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and the welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

33.     Plaintiff State of New Mexico is a sovereign state of the United States of America.  New Mexico is represented by its Attorney General, Hector Balderas, who is authorized to assert the State's interests in state and federal courts.

34.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority under 71 Pa. Stat. § 732-204.

35.     Plaintiff State of Wisconsin is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests.  *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested."  *Id.*

36.     Plaintiff Board of Education of the City School District of the City of New York (a/k/a the New York City Department of Education and hereafter the NYCDOE) is a city school district governed by Article 52-A of New York Education Law.  NYCDOE is the largest public school district in the nation.  It serves about 1.1 million students in approximately 1,600 schools.  The NYCDOE has standing to bring this action because the Rule harms the NYCDOE's economic and proprietary interests, and inhibits its ability to provide its students, teachers, and

1 schools the essential support and services needed during and in response to the COVID-19

2 pandemic.

3       37.    Plaintiff Board of Education for the City of Chicago (CBOE), also known as the

4 Chicago Public Schools (CPS), is a city school district governed by the School Code of the State

5 of Illinois.  CBOE is the third largest public-school district in the nation.  It serves about 360,000

6 students in approximately 600 schools.  The CBOE has standing to bring this action because the

7 Rule harms the CBOE's economic and proprietary interests, and inhibits its ability to provide its

8 students, teachers, and schools the essential support and services needed during and in response to

9 the COVID-19 pandemic.

10       38.    Plaintiff Cleveland Municipal School District Board of Education (CMSD) is a

11 municipal school district governed by Title 33 of the Ohio Revised Code.  CMSD is the second-

12 largest school district in Ohio, serving approximately 37,700 students in 103 schools.  CMSD has

13 been a leader in innovating creative approaches to urban education, and has developed extensive

14 partnerships with its community to further its students' success.  CMSD has standing to bring this

15 action because the Rule harms CMSD's economic and proprietary interests, and interferes with its

16 ability to provide its students, teachers, schools and community the essential support and services

17 needed during and in response to the COVID-19 pandemic.

18       39.    Plaintiff San Francisco Unified School District (SFUSD or San Francisco) is a LEA

19 and one of the largest school districts in California, operating pursuant to the laws of the State of

20 California.  SFUSD serves approximately 52,468 students, of whom 28,556 are

21 socioeconomically disadvantaged, 15,028 are English Learners, 2,064 are homeless, 6,275 are

22 students with disabilities, and 254 are foster youth.  SFUSD oversees approximately 133 schools

23 of which about 53 qualify as Title I schools. SFUSD's offices are located on Franklin Street in

24 San Francisco, California.

25       40.    In filing this action, Plaintiffs seek to redress harms to their interests as recipients of

26 CARES Act emergency relief funding.  Plaintiffs are affected by the Department's interpretation

27 of the CARES Act through the Rule and Guidance Document, are directly injured by them, and

28 the relief requested will redress their injuries.

**DEFENDANTS**

41.     Defendant Elisabeth D. DeVos is Secretary of the United States Department of Education and is sued in her official capacity pursuant to 5 U.S.C. § 702.  Her principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

42.     Defendant the United States Department of Education is an executive agency of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702.  Its principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

43.     Secretary DeVos is responsible for carrying out the duties of the Department of Education under the Constitution of the United States of America and relevant statutes, including the CARES Act and the ESEA.

**FACTUAL ALLEGATIONS**

**I.     COVID-19 PANDEMIC**

44.     COVID-19 is a public health emergency that has caused and continues to have devastating impacts on countless individuals, families, communities, businesses, and governments.  Our Nation's educational agencies and school systems have had to respond urgently to the crisis and take drastic measures to protect the health and safety of their students and staff.

45.     Plaintiffs' educational agencies and school districts have been forced to transition to remote delivery of instruction, implement new health and safety guidelines, and meet the novel and challenging needs of their students arising from the pandemic, including supports for their vulnerable populations beyond the provision of core educational services.  These efforts include, but are not limited to, serving meals to qualifying students and families; providing special education and related services to students with disabilities remotely; enabling English learners and migrant students to access remote learning by providing accessible technology, online instruction and translations; and offering computing devices and connectivity to low-income students at no cost.

46.     Compounding the programmatic challenges in serving students during the pandemic is the uncertainty and economic stress caused by COVID-19 on the Plaintiff States, their SEAs, and LEAs.  Public education largely depends on state funding.  State budgets have been hit hard by dramatic reductions in revenues from state sales and income taxes caused by the COVID-19 pandemic, as well as increased expenditures necessary for the public health response.  This revenue decline inevitably impacts the amount of state aid available to school districts.  And yet, school districts have incurred and will incur significant costs related to the pandemic, including paying for deep-cleaning campuses, obtaining personal protective equipment for employees, purchasing distance learning materials as well as new software and hardware, and preparing and delivering meals to students and families.

## II.     THE CARES ACT

47.     In late March 2020, the United States Congress acted to address the fiscal impact of the COVID-19 outbreak.  It passed legislation, signed by the President, including appropriations to federal agencies with explicit direction for distributing the funding.

48.     The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116–136, 134 Stat. 281, enacted on March 27, 2020, appropriated funds for K-12 and higher education in response to the economic impact of the COVID-19 pandemic.

49.     Specifically, Congress created the Education Stabilization Fund to help educational entities across the country "prevent, prepare for, and respond to coronavirus," and appropriated $30.75 billion for the Fund.  CARES Act § 18001.

50.     Congress tasked the Department with allocating the moneys appropriated to the Education Stabilization Fund through the CARES Act.  The vast majority of the moneys in the Education Stabilization Fund are divided into three separate funds, each with its own rules for distribution and use: the Governor's Emergency Education Relief Fund (GEER), the Elementary and Secondary School Emergency Relief Fund (ESSER), and the Higher Education Emergency Relief Fund.  *Id.* §§ 18002-18004.  The funds are allocated as follows: 9.8% for GEER; 43.9% for ESSER; and 46.3% for the Higher Education Emergency Relief Fund.  *Id.* § 18001(b)(1)-(3).

51.     According to the Department's website, $2,953,230,000 was allocated for the GEER Fund and $13,229,265,000 for the ESSER Fund.[3]

**A.     The Governor's Emergency Education Relief (GEER) Fund**

52.     The CARES Act directs the Department to provide emergency grants from the GEER Fund to state governors.  CARES Act § 18002(a).

53.     The Department must allocate the GEER Fund moneys to governors as follows: (1) 60% based on the "relative population of individuals aged 5 through 24" in each state, and (2) 40% based on the state's "relative number of children counted under section 1124(c) of the [ESEA]."  *Id.* § 18002(b).  Section 1124(c) of the ESEA describes the children to be counted for purposes of distributing funds under Part A, Title I of the ESEA, commonly referred to as Title I-A funds.  Children to be counted in this section include children 5 to 17 who are "from families below the poverty level," "in institutions for neglected and delinquent children . . . or being supported in foster homes with public funds," and "from families above the poverty level" but who receive payments under the Social Security Act, Title IV, Part A (Temporary Assistance for Needy Families).  20 U.S.C. § 6333(c)(1)(A)-(C), (c)(4)(A).

54.     Governors, along with SEAs, may use GEER funds for three purposes:

(1)     To provide emergency support through grants to local educational agencies that the State educational agency deems have been most significantly impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their students and to support the on-going functionality of the local educational agency;

(2)     To provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus to support the ability of such institutions to continue to provide educational services and support the ongoing functionality of the institution; and

(3)     To provide support to any other institution of higher education, local educational agency, or education-related entity within the State that the Governor deems essential for carrying out emergency educational services to students for authorized activities . . . the provision of child care and early childhood education, social and emotional support, and the protection of education-related jobs.

---

[3] U.S. Dep't of Educ., Governor's Emergency Education Relief Fund, State Allocation Table, *available at* https://oese.ed.gov/files/2020/04/GEER-Fund-State-Allocations-Table.pdf; U.S. Dep't of Educ., Elementary and Secondary School Emergency Relief Fund, State Allocation Table, *available at* https://oese.ed.gov/files/2020/04/ESSER-Fund-State-Allocations-Table.pdf.

CARES Act § 18002(c)(1)-(3).

55.     While they are directed per the above criteria to focus the GEER funds on the most significantly impacted districts, governors may allocate moneys from the GEER Fund to any LEA, regardless of whether the LEA or its public schools receive Title I-A funds.  Moreover, there are no federal restrictions on the use of funds by the LEAs and any other restrictions on the use of funds is left to the discretion of each state.  The CARES Act provides broad flexibility to the LEAs to use the moneys "to provide educational services to their students and to support the on-going functionality of the local educational agency." *Id.* § 18002(c)(1), (3).

56.     Plaintiffs expect to receive the following amounts from the GEER Fund:[4]

    a.   Michigan: $89,432,673;

    b.   California: $355,227,235;

    c.   District of Columbia: $5,807,678;

    d.   Hawaii: $9,993,387;

    e.   Maine: $9,273,552;

    f.   Maryland: $45,657,990;

    g.   Pennsylvania: $104,418,240;

    h.   New Mexico: $22,262,663;

    i.   Wisconsin: $46,550,411;

    j.   New York City: $98,000,000; and

    k.   San Francisco: $3,300,000 (estimated).

At this time, it is unclear the amount of GEER funds, if any, that Chicago or Cleveland will receive.

**B.     Elementary and Secondary School Emergency Relief (ESSER) Fund**

57.     Through the CARES Act, Congress also directed the Department to provide emergency grants from the ESSER Fund to SEAs.  CARES Act § 18003(a).

---

[4] GEER State Allocation Table, *supra* note 3.

14

58.     The Department is required to allocate the ESSER Fund moneys to SEAs "in the same proportion as each State received under [Title I-A] in the most recent fiscal year." *Id.* § 18003(b).  Allocation of Title I-A funds to States is governed by the formulas included in 20 U.S.C. §§ 6332-39, and is based primarily on the numbers of children from low-income families and foster children in each state's LEAs.

59.     The CARES Act requires at least 90 percent of the moneys received by the SEAs from the ESSER Fund to be sub-granted to LEAs within the state. *Id.* § 18003(c).  Like the Department's allocation to the states, the SEAs are to sub-grant the funds to LEAs "in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under [Title I-A] in the most recent fiscal year." *Id.*

60.     The Department issued guidance on May 8, 2020 discussing the ESSER allocations and LEAs' eligibility, which acknowledged that LEAs are only eligible for the ESSER funding to the extent they participate in the Title I-A program.[5]  In other words, moneys from the ESSER Fund are designated, through the SEAs, for LEAs that receive Title I-A funds, which in turn support those public schools with populations of economically-disadvantaged children in each state.  LEAs that do not receive Title I-A funds (generally, LEAs without significant numbers of low-income students) are not eligible for the ESSER Funds.

61.     LEAs may use the moneys from the ESSER Fund for twelve broad purposes, as described in the CARES Act.  *See* CARES Act § 18003(d).  Like the GEER Fund, there are no restrictions in the statutory language on which schools within the eligible LEAs may receive the funds, regardless of whether the public school receives Title I-A funds.  These funds can be used for expressly broad purposes, including "[o]ther activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff of the [LEA]," i.e., to support any operation, service, or staff existing prior to the pandemic. *Id.* § 18003(d)(12).

---

[5] U.S. Dep't of Educ., Frequently Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER) (May 5, 2020), *available at* https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf.

62.     For the SEAs to receive the ESSER funds from the Department, the Plaintiff States'

SEAs were required to complete and submit a Certification and Agreement form.[6]

63.     Within the Certification and Agreement form, the Plaintiff SEAs are required to:

[A]cknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Certification and Agreement at 1.

64.     Within the specific assurances and certifications, the SEAs are required to ensure

that:

[] LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

[] [A]n LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

*Id.* at 2.

65.     Each of the Plaintiff States' SEAs submitted a Certification and Agreement to the

Department to secure the ESSER Funds for their states.

66.     The Department also requires SEAs to submit quarterly reporting regarding how the

SEA and the LEAs used the ESSER funds.  *Id.* at 3; *see also* CARES Act § 15011(b)(2).

67.     From the ESSER Fund, Plaintiffs each received or expect to receive the following

amounts:[7]

        a.   Michigan: $389,796,984;

        b.   California: $1,647,306,127;

---

[6] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D (Apr. 24, 2020), *available at* https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

[7] ESSER State Allocation Table, *supra* note 3.

c.  District of Columbia: $42,006,354;

d.  Hawaii: $43,385,229;

e.  Maine: $43,793,319;

f.  Maryland: $187,050,652;

g.  New Mexico: $108,574,786;

h.  Pennsylvania: $523,807,198;

i.  Wisconsin: $174,777,774;

j.  New York City: $619,000,000;

k.  Chicago: $206,000,000 (estimated);

l.  Cleveland: $31,200,000; and

m.  San Francisco: $10,511,000 (estimated).

**C.  Equitable Services for Private-School Students and Teachers Required by the CARES Act.**

68.  The CARES Act requires that LEAs that receive moneys from the GEER Fund and/or ESSER Fund must allocate some of the moneys to provide "equitable services" to students and teachers at private schools.  CARES Act § 18005(a).  Crucial to this action, the CARES Act specifies that each LEA "shall provide equitable services *in the same manner as provided under Section 1117 of the ESEA of 1965 to students and teachers in non-public schools.*"  *Id.* (emphasis added).

69.  Section 1117 of the ESEA, 20 U.S.C. § 6320, requires LEAs to allocate a portion of their Title I-A funds to provide equitable services to eligible students and teachers at private schools.  Section 1117 calculates the proportionate share of funds to be used for equitable services "based on the number of children from low-income families who attend private schools" and reside in the "participating school attendance areas" (i.e., the geographic area in which children are normally served by a Title I-A school).  20 U.S.C. § 6320(a)(4)(A); *see also* 20 U.S.C. § 6313(a)(2) (defining "school attendance area").  Services are then provided to those private-school students identified "as failing, or most at risk of failing, to meet State academic standards."  20 U.S.C. § 6320(a) (incorporating the definition of "eligible children" from 20

17

U.S.C. § 6315(c).  In other words, the LEAs must provide equitable services only to low-achieving children who attend private schools and reside in a Title I-A school attendance area. *Id.* §§ 6315(c), 6320(a).

70.     The Department's Title I-A guidance for providing equitable services under Section 1117 to private-school students—issued under the current administration less than a year ago—confirms that equitable services should only be provided to at-risk students who reside in Title I public school attendance areas.  As stated in that document: "to be eligible for Title I services, a private school child must reside in a participating Title I public school attendance area and must be identified by the LEA as low achieving on the basis of multiple, educationally related, objective criteria."[8]

71.     While *services* are based on low-achievement and residence in a Title I-A school attendance area, the amount of *money* LEAs are required to set aside under Section 1117 of the ESEA is based on the number of economically disadvantaged students attending private schools who reside in the LEA's attendance area.  20 U.S.C. § 6320(c).

72.     Again, it has been the Department's own position that, under Section 1117 of the ESEA, funding for equitable services should be based on the number of children in private schools who are economically disadvantaged or in foster care—the LEAs should "determine an accurate count of children from low-income families who attend public and private schools and reside in participating Title I public school attendance areas in order to allocate the proportional share."[9]

73.     Notably, the CARES Act does not require that LEAs provide equitable services in the same manner as Section 8501 of the ESEA, a general provision that measures equitable services based on proportional total enrollments.  20 U.S.C. § 7881(b).  Rather, the CARES Act specifically references Section 1117.  By referencing Section 1117, Congress explicitly and

---

[8] U.S. Dep't of Educ., Title I, Part A of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance (Oct. 7, 2019), p. 30, *available at* https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf.

[9] *Id.* at 19.

clearly directed LEAs to provide equitable services only based on the number of low-income private-school students, not all private-school students, as would have been required had the CARES Act instead referenced Section 8501.

### III.    THE DEPARTMENT'S APRIL 30, 2020 GUIDANCE DOCUMENT

74.    On April 30, 2020, the Department issued the Guidance Document, titled *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs.  See* Guidance Document, Ex. A.

75.    The Guidance Document advises LEAs to (i) determine the allocation of funds for equitable services based on all students enrolled in non-public schools, rather than only economically disadvantaged students, and (ii) ignore Section 1117's eligibility requirements for private-school students to receive services, including residence in a Title I-A school attendance area and low achievement.

**A.    Determining the Proportional Share of Funds to Be Reserved for Equitable Services**

76.    In section 10 of the Guidance Document, the Department incorrectly states that an LEA must calculate the proportional share available for equitable services from the comparative enrollments of *all students* in public and private schools in the district, rather than the comparative enrollments of *low-income students*, as required by Section 1117(a)(4)(A)(i). Guidance Document, Ex. A at 6-7; *see also* 20 U.S.C. § 6320(a)(4)(A)(i).

77.    Essentially, the guidance rejects the calculation of the proportionate share under Section 1117 that Congress specified in the CARES Act and instead adopts the calculation in Section 8501, which drastically inflates the amount of CARES Act funds required to be allocated for services for private-school students and decreases the amount of CARES Act funds available for public-school students.

78.    Under the Department's Guidance Document, the share of funds diverted from public schools to private schools in many LEAs is substantial.

19

1

**B.      Eligibility Requirements for Private-School Students to Receive CARES Act Equitable Services**

2

3      79.      In section 9 of the Guidance Document, the Department erroneously interprets the

4      CARES Act as requiring that "[a]ll students and teachers in a non-public school are eligible for

5      equitable services under the CARES Act programs."  Guidance Document, Ex. A at 5.

6      80.      The Department cites no section of the CARES Act that requires—or even suggests—

7      that all students and teachers at non-public schools are eligible for equitable services.

8      81.      The plain language of the CARES Act makes clear that LEAs that receive GEER or

9      ESSER funds must provide equitable services "*in the same manner* as provided under section

10     1117 of the ESEA."  CARES Act § 18005(a) (emphasis added).  And Section 1117 of the ESEA

11     requires LEAs to provide equitable services for eligible, at-risk children enrolled in non-public

12     schools who reside in attendance areas where public schools qualify for Title I-A funding, rather

13     than all students enrolled.  20 U.S.C. § 6320(a)(1).

14     82.      Section 7 of the Guidance Document misinterprets the requirement under § 18005(a)

15     of the CARES Act that equitable services be provided "in the same manner as provided under

16     section 1117 of the ESEA."  *See* Guidance Document, Ex. A at 3-5.  Contrary to the Act, this

17     section of the Guidance Document states that this requirement in the CARES Act "necessitates

18     that the Department interpret how the requirements of section 1117 apply to the CARES Act

19     programs" because "an LEA under the CARES Act programs may serve all non-public-school

20     students and teachers without regard to family income, residency, or eligibility based on low

21     achievement."  *Id.* at 3.  But Section 18005(a) of the CARES Act does not necessitate any

22     interpretation by the Department.  Instead, the plain language of the Act makes clear that, while

23     LEAs have discretion in spending money for public schools, Congress intended that the LEAs

24     should provide equitable services to private schools under the CARES Act "in the same manner"

25     as they do for at-risk students under Title I-A.

26     83.      Also, in section 7 of the Guidance Document, the Department purports to

27     "reconcile[]" various subsections of Section 1117 of the ESEA using an erroneous and

28     incongruous interpretation of the Act.  Guidance Document, Ex. A at 3.  For example, after noting

20

1    that Section 1117(a)(1) of the ESEA requires LEAs to "provide equitable services to low-

2    achieving students," the Department nevertheless states that "an LEA may provide equitable

3    services . . . to any students and teachers in non-public schools." *Id.* The Department provides no

4    explanation or basis for this distinction.

5         84.   The Guidance Document's conclusion that the non-public proportion must be

6    calculated based on total enrollments, rather than enrollment of low-income students, and its

7    interpretation of the requirements for equitable services under § 18005(a) of the CARES Act are

8    arbitrary and capricious, misstate and misapply the law as written, and exceed the Department's

9    authority.

10        **C.    Reaction to the Department's Guidance Document**

11        85.   The Guidance Document faced immediate backlash by Congressional leaders, SEAs,

12   and national education groups due to its incorrect interpretation of the CARES Act.

13        86.   On May 5, 2020, the Council of Chief State School Officers (CCSSO), a nationwide

14   organization of public officials who head SEAs, wrote a letter to urge Secretary DeVos to clarify

15   the Guidance Document to align it with the CARES Act's requirements for equitable services.[10]

16   The CCSSO's letter specifically requested that the Department issue new guidance to "advise

17   LEAs to look at the percentage of FY2019 Title I-A funds they set aside for equitable services

18   and apply that percentage to ESSER Funds."[11] Secretary DeVos responded to CCSSO's letter on

19   May 22, 2020, rejecting its request to clarify the Guidance Document in accordance with the plain

20   text of the CARES Act.[12] Secretary DeVos stated that if LEAs "insist on acting contrary to the

21   Department's stated position, they should, at a minimum, put into an escrow account the

22   difference between the amount generated by the proportional-student enrollment formula and the

23

24        [10] Letter from Carissa Moffat Miller, CCSSO, to Betsy DeVos, U.S. Sec'y of Educ. (May 5, 2020), *available at* https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

25        [11] *Id.*

26        [12] Letter from Betsy DeVos, U.S. Sec'y of Educ., to Carissa Moffat Miller, CCSSO (May 22, 2020), *available at* https://ccsso.org/sites/default/files/2020-

27   06/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%202020.pdf.

28

Title I, Part A formula."[13]  The instruction to put funds in escrow is nonsensical given the crisis, and clearly inconsistent with the intent of the CARES Act, which is to provide funding expeditiously to LEAs to address their immediate needs in light of the COVID-19 pandemic.

87.    Additionally, multiple SEAs published memoranda and guidance to their LEAs instructing the LEAs to follow the plain text of the CARES Act and not the Department's Guidance Document.[14]  For example, on May 12, 2020, the Indiana Department of Education published a memorandum for its LEAs, instructing the LEAs to disregard the Department's Guidance Document and "enact[] the CARES Act as written in the law . . . including the provision to administer equitable services according to Sec. 1117 of the [ESEA]."[15]  The memorandum described its decision as "ensur[ing] the funds are distributed according to Congressional intent and a plain reading of the law, which prioritizes communities and schools with high-poverty who are at most risk and in need of additional funds."[16]

88.    On May 20, 2020, Chairman Bobby Scott of the House Committee on Education and Labor; Chairwoman Rosa DeLauro of the House Subcommittee on Labor, Health, Human Services, and Related Agencies; and Ranking Member Patty Murray of the Senate Committee on Health, Education, Labor, and Pensions wrote to Secretary DeVos, to urge the Department to

---

[13] *Id.*

[14] *See, e.g.*, Penn. Dep't of Educ., Letter from Pedro Rivera, Sec'y of Educ., to Frank Brogan, Asst. Sec'y for Elementary and Secondary Educ. (May 7, 2020), *available at* https://www.education.pa.gov/Documents/K-12/Safe%20Schools/COVID/CARESAct/Letter%20to%20Secretary%20Brogan.pdf; Mem. from N.M. Pub. Educ. Dep't, Funds available under Coronavirus Aid, Relief and Economic Security (CARES) Act through the Elementary and Secondary School Education Relief Fund (ESSER), Index 24301 (May 14, 2020), *available at* https://webnew.ped.state.nm.us/wp-content/uploads/2020/05/CARES-Act-memo-ESSER-Funds-2020-05-14-Final.pdf; Miss. Dep't of Educ., CARES Act Equitable Services, EdUpdate (May 21, 2020), *available at* https://msachieves.mdek12.org/cares-act-equitable-services/; Maine Dep't of Educ., Priority Notice, CARES Act: Frequently Asked Questions (May 27, 2020), *available at* https://mailchi.mp/maine/cu5lemq6y0-1321452; Mem. from Ill. St. Board of Educ. (Mar. 31, 2020), *available at* https://www.isbe.net/Documents/CARES-Act-District-Info-3-31-20.pdf; Mem. from Conn. St. Board of Educ., (June 8, 2020), *available at* https://portal.ct.gov/-/media/SDE/Digest/2019-20/Equitable-services-under-ESSERF-CARES-Act-06082020.pdf.

[15] Mem. from Ind. Dep't of Educ., Final Language for Equitable Share of CARES Act Funds (May 12, 2020), *available at* https://www.doe.in.gov/sites/default/files/news/final-language-equitable-share-cares-act-funds.pdf.

[16] *Id.*

22

"immediately revise your April 30 guidance, including Question 10 of the guidance document to come into compliance with the CARES Act and section 1117 of ESEA."[17]  The bicameral letter also requested the Department's internal records related to the development of "its interpretation of the equitable services provision and its inconsistency with long-standing requirements related to equitable services."[18]

89.     On May 21, 2020, Senator Lamar Alexander, Chair of the Senate Committee on Health, Education, Labor, and Pensions, was quoted as disagreeing with the Department's Guidance Document: "My sense was that the money should have been distributed in the same way we distributed Title I money. . . . I think that's what most of Congress was expecting."[19]

90.     On June 4, 2020, fifty national education organizations, including the CCSSO, wrote to United States Senate and House leaders, asking for Congress to "pass[] legislation rescinding the equitable services [G]uidance [Document], preempting any future notice from [the Department] that is contrary to the legislation, and further clarifying the allocation requirements for equitable services for nonpublic schools consistent with Title I."[20]

## IV.   THE RULE

91.     On June 25, 2020, the Department published an unofficial version of the Rule on its website.  The Rule was officially published in the Federal Register on July 1, 2020.  85 Fed. Reg. 39,479.

92.     The Rule was published as an interim final rule and became effective when published.

---

[17] Letter from Robert C. "Bobby" Scott, Chair, Comm. on Educ. and Labor, U.S. H. Reps., et al., to Betsy DeVos, U.S. Sec'y of Educ. (May 20, 2020), *available at* https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf.

[18] *Id.*

[19] Nicole Gaudiano, Alexander, *DeVos split on stimulus support for private school kids*, Politico (May 22, 2020), *available at* https://www.politico.com/newsletters/morning-education/2020/05/22/alexander-devos-split-on-stimulus-support-for-private-school-kids-787837.

[20] Letter from national education organizations to congressional leadership (June 4, 2020), *available at* https://ccsso.org/sites/default/files/2020-06/Equitable%20Services%20Funding%20Letter%20-%20FINAL.pdf.

**A.    The Rule Conflicts with the Plain Language of the CARES Act.**

93.    Like the Department's Guidance Document, the Rule effectively rewrites both (1) the proportional share calculation that Congress established for LEAs to determine the amount of funds to be used for equitable services for private-school students, and (2) the eligibility criteria that Congress mandated to determine which private-school students are entitled to equitable services under the CARES Act.

94.    Neither the proportional share nor eligibility mandates in the Rule comport with the plain text of the CARES Act.

95.    The Rule will divert millions of dollars to private schools and away from public schools in direct contradiction of Congress's intent.

96.    For the proportional share calculation, the Rule provides two options to LEAs:

**Option #1 (Title I-Only Schools Option):**

An LEA using all its funds under a CARES Act program to serve only students and teachers in public schools participating under Title I, Part A of the ESEA may calculate the proportional share in accordance with paragraph (c)(1)(ii) of this section or by using—

(A) The proportional share of Title I, Part A funds it calculated under section 1117(a)(4)(A) of the ESEA for the 2019-2020 school year; or

(B) The number of children, ages 5 through 17, who attend each non-public school in the LEA that will participate under a CARES Act program and are from low-income families compared to the total number of children, ages 5 through 17, who are from low-income families in both Title I schools and participating non-public elementary and secondary schools in the LEA.

34 C.F.R. § 76.665(c)(1)(i).

97.    Functionally, this option is most similar to the ESEA, Section 1117 proportional share calculation.  *See* 20 U.S.C. § 6320(a)(4)(A); *see also id.* § 6320(c)(1).  The two sub-options allow the LEA to use the proportional share figures used for the 2019-2020 Title I-A distribution (34 C.F.R. § 76.665(c)(1)(i)(A)) or updated figures based on the current proportion of low-income students who attend private schools in the LEA (34 C.F.R. § 76.665(c)(1)(i)(B)).  By adopting the ESEA, Section 1117 proportional share calculation, Option #1 similarly adopts the proportional share calculation required by the CARES Act, as the funds would then be apportioned "in the

same manner" as Section 1117.  *See* CARES Act § 18005(a).  However, this option includes two

unsupported "poison pill" limitations on LEAs who choose this option, as discussed below.

**Option #2 (Private School Enrollment Option):**

> Any other LEA must calculate the proportional share based on enrollment in
> participating non-public elementary and secondary schools in the LEA compared to
> the total enrollment in both public and participating non-public elementary and
> secondary schools in the LEA.

34 C.F.R. § 76.665(c)(1)(ii).

98.    This option incorporates the Department's erroneous proportional share calculation

set forth in the Guidance Document, requiring LEAs to consider all private-school students when

they apportion funds, similar to the calculation used to determine funds for equitable services

under Section 8501 of the ESEA, which Congress did not adopt for CARES Act funds.  *See* 34

C.F.R. § 76.665(c)(1)(ii).  This option has no basis in the CARES Act and would allow the

Department to divert hundreds of millions of dollars of CARES Act funds intended for public

schools to private schools.

99.    As mentioned above, the Department included two poison pill requirements for using

Option #1 (Title I-Only Schools Option) to calculate the proportional share, with the obvious

effect of pushing LEAs to use Option #2.

100.   The poison pill restrictions would force the LEAs using Option #1 to calculate the

proportional share to (1) use the CARES Act funds reserved for public schools for Title I schools

only, and (2) use the CARES Act only for limited, supplemental costs to avoid a Title I

supplanting violation.  34 C.F.R. § 76.665(c)(1), (c)(3); 20 U.S.C. § 6321(b)(1) (Section 1118 of

ESEA).  This would effectively prohibit many LEAs from using CARES Act funds, for example,

to retain existing staff in Title I schools while using state and local dollars for the same purpose in

non-Title I schools.  This requires LEAs to treat CARES Act funds not as stimulus monies but as

additional funds, forcing them to choose between a less beneficial methodology or a requirement

that limits their ability to spend CARES Act dollars to most effectively meet their needs.

101.   Neither of these restrictions is found anywhere in the CARES Act.  Rather, they are

both contrivances of the Department, seemingly intended to force LEAs to use Option #2 for

apportioning the CARES Act funds.  The restrictions effectively punish LEAs that attempt to apportion the CARES Act funds as Congress intended.

102.   The Department has acknowledged "Congress . . . intended that grantees have substantial flexibility in the use of these [CARES Act] dollars."[21]  Yet, the Department arbitrarily imposes these restrictions on LEAs, significantly limiting their flexibility to use the funds.

103.   These poison pill requirements are contradicted by the plain language of the CARES Act, which specifies how the public schools' share of the funds should be used.

104.   The CARES Act grants LEAs that receive CARES Act funds flexibility to use the funds for all schools in the district, not only Title I schools.  *See* CARES Act §§ 18002(c)(1), (3), 18003(d)(1)-(12).

105.   For the ESSER funds, the CARES Act specifies the twelve "[u]ses of [f]unds" for the LEAs, including such broad uses as "[p]roviding principals and other school leaders with the resources necessary to address the needs of their individual schools" and "[o]ther activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff of the [LEA]."  CARES Act § 18003(d)(3), (12); *see also id.* § 18003(d)(1)-(12).  Likewise, LEAs can broadly use the GEER funds granted to LEAs at the Governor's discretion "to continue to provide educational services to their students and support on-going functionality of the [LEA]."  *Id.* § 18002(c)(1); *see also id.* § 18002(c)(3).  These broad uses of the ESSER and GEER funds as specified by Congress explicitly allow the LEAs and public schools to use the funds to "supplant" state and local funding that may have been lost due to the pandemic.  The Rule impermissibly exceeds the scope of the CARES Act by requiring LEAs to choose between two options that are contrary to the CARES Act's requirements and prohibiting LEAs from using funds consistent with those purposes if they use Option #1.

---

[21] Letter from Mitchell M. Zais, Ph.D., Deputy Sec'y, U.S. Dep't of Educ. to Gene Dodaro, Comptroller Gen., U.S. Gov't Accountability Off. (June 12, 2020), at p. 3 (available as pp. 375-389 of the U.S. Gov't Accountability Off., COVID-19 Opportunities to Improve Federal Response and Recovery Efforts, GAO-20-625 (June 2020), *available at* https://www.gao.gov/products/GAO-20-659T).

106.   Whether calculated under Option #1 (Title I-only schools Option) or Option #2 (Private school enrollment Option), CARES Act funds will be diverted from their intended recipients.

107.   Under Option #1, due to the poison pill restrictions, public-school students at non-Title I schools (many of whom are low-income or otherwise at-risk) will receive no funding whatsoever.  The ESSER funds and part of the GEER funds were specifically designed to assist *all* public schools in LEAs that receive CARES Act funds—not just the Title I schools within these LEAs.  And, even for the public-school students at Title I schools, the funds could only be used for supplemental costs or else risk a Title I supplanting violation.  Thus, the LEA would be prohibited from using the CARES Act funds for general educational expenses in Title I schools, such as teacher salaries, books, or general sanitation, among other uses, unless these services were supplemental to those provided by state and local funds.  This erroneous restriction is directly contradicted by many of the listed "Uses of Funds" for moneys from the ESSER Fund in the CARES Act.  *See* CARES Act § 18003(d)(2)-(11).  In addition, at-risk private-school students, who are eligible for equitable services under Section 1117, will receive fewer funds per student, and the funds reserved for private-school students will be used to provide services for all private-school students (both at-risk and not at-risk), diluting funding that Congress intended for vulnerable students.

108.   Under Option #2, private-school students will receive a significantly greater proportion of the funds than they are entitled to under the CARES Act, as all private-school students will be considered when apportioning the funds.  In turn, public schools will lose funding diverted to the private schools.  In addition, the money set aside for private-school students will be used to provide services to all private-school students, reducing the amount of money per student for the at-risk private-school students who are eligible for services under Section 1117.

109.   Under either proportional share option, the Rule—like the Guidance Document—requires LEAs to provide equitable services to all private-school students.  34 C.F.R. § 76.665(d)(2).  This requirement does not comport with the plain text of the CARES Act, which adopts the Section 1117 eligibility requirements, limiting equitable services to at-risk private-

27

school students.  *See* CARES Act § 18005(a); 20 U.S.C. § 6320(a) (incorporating the definition of "eligible children" from 20 U.S.C. § 6315(c)).

**B.    The Department Lacks Authority to Issue the Rule and Failed to Follow the Procedural Requirements of the APA.**

110.   The Rule cites 20 U.S.C. § 1221e-3 and 20 U.S.C. § 3474 as authority for rulemaking related to the CARES Act.  Neither of these statutes authorizes the Department to issue the Rule.

111.   Congress gave no authority to the Department to issue rules interpreting the CARES Act either generally, with regard to the GEER and ESSER Funds, or in particular to the distribution of appropriated funds for equitable services for private-school students.

112.   Nor did Congress authorize the Department to issue rules related to the provision of equitable services for private-school students without compliance with the notice and comment procedures of the APA.

113.   The Department issued the Rule as an interim final rule without demonstrating good cause that the notice and public procedures were impracticable, unnecessary, or contrary to the public interest.

114.   Because the Department cannot satisfy the requirements for issuing the Rule as an interim final rule, the Rule does not comply with the Administrative Procedure Act's procedural requirements.

**V.    THE RULE WILL CAUSE IMMEDIATE AND IRREPARABLE HARM TO PLAINTIFFS, SCHOOLS, AND STUDENTS.**

115.   The Rule and Guidance Document will cause immediate, irreparable harm to the interests of the Plaintiff States, Plaintiff LEAs, and the vulnerable students whom Congress meant to assist through the CARES Act.

**A.    Immediate and Irreparable Harm to the Plaintiff States**

116.   Plaintiff States, themselves and through their publicly administered educational institutions, are directly regulated by the Rule and will suffer direct harm because of the Rule.

117.   Each of the Plaintiff States is constitutionally required to administer a system of K-12 public education funded primarily by state moneys:

28

a. *Michigan*: The Michigan Constitution charges the Michigan Legislature with "maintain[ing] and support[ing] a system of free public elementary and secondary schools as defined by law."  Mich. Const. art. VIII, § 2.  The State Board of Education is vested with "[l]eadership and general supervision over all public education . . . ."  *Id.* § 3.  The State Board of Education further "serve[s] as the general planning and coordinating body for all public education . . . and shall advise the legislature as to the financial requirements in connection therewith."  *Id.*  Separate from any federal funding, Michigan provides more than $13 billion each year to its approximately 831 LEAs and 56 intermediate school districts.  The 3,400 school buildings in these districts educate almost 1.5 million students each year.  While the school districts exercise primary responsibility over budgetary and other decisions within their respective districts, the Michigan Department of Education (MDE) implements federal and state legislative mandates in education and carries out the policies of the State Board of Education.  *See* Mich. Comp. Laws § 388.1009.

b. *California*: The State of California is the legal and political entity with plenary responsibility for educating all California public-school students.  California has the constitutional responsibility to establish and maintain the system of common schools and a free education.  Cal. Const. art. IX, § 5.  California funds and oversees the operation of the largest common system of public schools in the nation, which serves nearly 6.8 million children in more than 10,500 schools.  In 2018–2019, California provided about $56.1 billion in General Funds to its 1,037 school districts and over 1,200 charter schools.  Under the California Constitution, "[t]he State itself has broad responsibility to ensure basic educational equality."  *Butt v. State of California*, 4 Cal. 4th 668, 681 (1992).  Emergency conditions causing inequitable conditions may create a duty for the State to intervene and provide supplementary support.

29

1   *See id.* at 688.  The California State Board of Education makes education

2   policy determinations, and adopts rules and regulations for the government of

3   elementary and secondary schools.  Cal. Educ. Code §§ 33000, 33030-33031.

4   The California State Board of Education is responsible for applying for

5   federal funds made available to state education agencies under federal law, is

6   responsible for directing the allocation and apportionment of those federal

7   funds to public schools, and is responsible for adopting implementing rules

8   and regulations governing those federal funds.  Cal. Educ. Code §§ 12000-

9   12001.  The California Superintendent of Public Instruction oversees the

10   schools within the state and is the executive officer of the California State

11   Board of Education and the California Department of Education.  Cal. Educ.

12   Code §§ 33112, 33301(b), 33302-33303.  The California Department of

13   Education is a state administrative agency responsible for administering and

14   enforcing laws related to education throughout California.  Cal. Educ. Code

15   §§ 33300, 33301, 33306, 33308.

16      c.   *District of Columbia*: The Office of the State Superintendent of Education

17   (OSSE) is the state education agency for the District of Columbia charged

18   with raising the quality of education for all DC residents.  OSSE serves as the

19   District's liaison to the Department and works closely with the District's

20   traditional and public charter schools to achieve its key functions.  D.C. Code

21   § 38-2601.  District of Columbia public schools received more than $902

22   million in state funding last year while charter schools in the District received

23   more than $904 million.  95,820 students attend either a public or charter

24   school in the District.

25      d.   *Hawaii*:  The Hawaii Constitution provides for the "establishment, support

26   and control of a statewide system of public schools."  Haw. Const. art. X, § 1.

27   The Hawaii Department of Education (HIDOE) is the state education agency

28   for Hawaii charged with administering programs of education and public

1  instruction throughout the State.  As a single state system of education,

2  HIDOE also assumes the responsibilities of a local education agency.

3  Separate from any federal funding, HIDOE received approximately $1.7

4  billion, or 82 percent of its total budget, in State General Funds for the 2019-

5  2020 fiscal year to be distributed amongst 256 public schools and 37 charter

6  schools.  Approximately 180,000 students in Hawaii attend either a public or

7  charter school.

8     e.  *Maine:* Maine's state policy on public education is that "[i]t is the intent of the

9  Legislature that every person within the age limitations prescribed by state

10  statute shall be provided an opportunity to receive the benefits of a free public

11  education."  Me. Rev. Stat. tit, 20-A, § 2(1).  The Maine Department of

12  Education is charged with "[s]upervis[ing], guid[ing] and plan[ning] for a

13  coordinated system of public education for all citizens of the State . . . ."  Me.

14  Rev. Stat., tit. 20-A, § 201(1).  The Commissioner of Education is responsible

15  for "[p]roviding educational public leadership for the State" and "[e]nforcing

16  applicable regulatory requirements for school administrative units."  Me. Rev.

17  Stat., tit. 20-A, § 251-A(1), (3).  The Commissioner determines the amount of

18  state funding for Maine's school administrative units through the Essential

19  Programs and Services Funding Act, Me. Rev. Stat., tit. 20-A, § 15670 et seq.

20  The Commissioner is responsible for the distribution of funds and the

21  oversight of the federal grants that the Department receives.  Separate from

22  any federal funding, Maine provides more than $1.2 billion each year to its

23  265 school administrative units (including public charter schools) and two

24  state magnet schools.  The 599 school buildings in these school administrative

25  units educate approximately 175,600 students each year.

26     f.  *Maryland*: The Maryland Constitution requires the Maryland Legislature to

27  "establish throughout the State a thorough and efficient System of Free Public

28  Schools" and "provide by taxation, or otherwise, for their maintenance."  Md.

31

Const. art. VIII, § 1.  By statute, the State Board of Education is vested with the general care and supervision of public education.  Md. Code Ann., Education §§ 2-201 and 2-205.  The State Board determines the educational policies of the State and enacts regulations for the administration of the public-school system.  The totality of statutory provisions gives the State Board the last word on any matter concerning educational policy or the administration of the system of public education.  Separate from any federal funding, Maryland provided its 24 LEAs with more than $7 billion in operating and capital funds for fiscal year 2020-21. The 1,582 school buildings in these districts educate 900,000 students each year.  While the school districts exercise primary responsibility over budgetary and other decisions within their respective districts, the Maryland State Department of Education (MSDE) implements federal and state legislative mandates in education and carries out the policies of the State Board of Education.  *See* Md. Code Ann., Education, Title 2.

g.  *New Mexico*: The New Mexico Constitution promises to establish and maintain a uniform, free public-school system "sufficient for the education of, and open to, all the children of school age."  N.M. Const. Art. 12, § 1.  In 2020, legislators appropriated $3.468 billion in state funds for public education from prekindergarten through secondary schools, or 45.5 percent of total recurring appropriations.  In 2019, the definition of "school-age" was revised to include students through age 22.  The Fiscal Year 2021 budget increased recurring appropriations by $216 million, or 6.6 percent, with significant additional funding to increase educator compensation, provide additional services to at-risk students, and provide professional development and mentorship support for early career teachers.

h.  *Pennsylvania*: The Pennsylvania Constitution charges the Pennsylvania General Assembly with "provid[ing] for the maintenance and support of a

32

thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. Art. III § 14.  The Commonwealth provides more than $12 billion each year to its 500 public school districts, which educate more than 1.72 million students each year in 2,865 schools.

    i.  *Wisconsin*: The Wisconsin Constitution requires the Wisconsin Legislature to establish district schools which are to be "as nearly uniform as practicable" and "free and without charge for tuition to all children."  Wis. Const. art. X, § 3.  The supervision of public instruction is vested in the Superintendent of Public Instruction (State Superintendent).  The State Superintendent is charged with the general supervision of public instruction and leads the Department of Public Instruction (DPI) in implementing policies and promulgating administrative rules.  Wis. Stat. § 15.37; *see also*, *e.g.*, Wis. Stat. § 115.28(1), (3), (7).  Her responsibilities also include accepting and administering federal funds.  Wis. Stat. § 115.28(9) and (19).  Wisconsin school district funding comes from state and federal aids, property taxes, and local revenue.  Wisconsin provides state aids to 443 LEAs, with a combined total student enrollment of 854,959.  In the 2019-2020 school year, DPI administered approximately $6.1 billion in state support for K-12 public schools.

118.  The CARES Act appropriates funds for the Plaintiffs to support public K-12 schools through the COVID-19 pandemic.  Plaintiffs are facing severe budgetary cuts due to the economic impact of the pandemic—cuts that the ESSER and GEER Fund moneys were designed to mitigate.  Under the Department's Rule and the Guidance Document, public schools in the Plaintiff States will lose a significant portion of the ESSER and GEER moneys that will be diverted to private schools.  This result is inconsistent with the clear language of the CARES Act, and inequitable because public schools do not qualify for other CARES Act funding available to private schools.  Accordingly, LEAs will look to States to bridge the gaps in their respective public-school budgets that the ESSER and GEER moneys were intended to fill.

33

119.   If LEAs in the Plaintiff States follow the Rule's Option #1 (Title I-schools only Option) when apportioning CARES Act funds, non-Title I schools across the Plaintiff States stand to lose significant emergency funding to support their schools, and LEAs stand to lose the ability to use the funds to maintain operations that are funded on an LEA-wide basis.  In addition, while Title I schools in the Plaintiff States will receive some CARES Act funds under Option #1, the Rule improperly limits how they can use the funds by effectively prohibiting them from using such funds for existing costs.  Thus, for both Title I and non-Title I schools in the LEAs that receive CARES Act funds, the effect of the Rule is to stymie the States and LEAs from using the funds for their intended purpose—to "support and prevent, prepare for, and respond to coronavirus."  CARES Act § 18001.  As a result, the Plaintiffs will be required to allocate moneys to help these schools weather the budgetary storm created by the pandemic.

120.   If LEAs in the Plaintiff States follow the Rule's Option #2 (Private school enrollment Option) when apportioning CARES Act funds, the Plaintiff States' LEAs and public schools will lose out on significant amounts of ESSER and GEER moneys, which will be diverted to private schools for students who would not otherwise qualify for Title I-A equitable services.

    a.   *Michigan*: If Michigan's LEAs are forced to follow Option #2 in the Rule for apportioning CARES Act funds, an estimated $21,604,649 in ESSER moneys would be diverted from public schools in order to provide equitable services to all private-school students.  If Michigan LEAs distribute the ESSER moneys in the same manner that Title I-A funds are usually distributed for equitable services based on low-income private-school students, as the plain language of the CARES Act requires, then only an estimated $5,107,921 will be distributed for equitable services to eligible private-school students.  Thus, if the Department's Rule stands and LEAs used Option #2 to apportion their CARES Act funds, an estimated total of $16,496,728 in ESSER moneys will be diverted from low-income public schools to private-school students who are not qualified for Title I-A funds—7% of the total ESSER moneys that Michigan received.  This would amount to $2,251,131 less for Detroit Public

34

1   School Community District students; $2,643,214 less for Grand Rapids Public

2   Schools students, and $1,474,676 less for Flint Community Schools students.

3      b.   *California*: If California's LEAs are forced to follow Option #2 in the Rule for

4   apportioning CARES Act funds, an estimated $60,249,538 in ESSER and

5   GEER moneys would be diverted from public schools in order to provide

6   equitable services to all private-school students.  If California's LEAs

7   distribute the ESSER and GEER moneys in the same manner that Title I-A

8   funds are usually distributed for equitable services based on low-income

9   private-school students, as the plain language of the CARES Act requires,

10   then only an estimated $5,449,992 of the ESSER and GEER moneys will be

11   distributed for equitable services to eligible private-school students.  Thus, if

12   the Department's Rule stands and LEAs used Option #2 to apportion their

13   CARES Act funds, an estimated $54,799,545 in ESSER and GEER moneys

14   will be diverted from low-income public schools to private-school students

15   who are not qualified for Title I-A funds.

16      c.   *District of Columbia:* If the District of Columbia Public Schools (DCPS) is

17   forced to follow Option #2 in the Rule for apportioning CARES Act funds,

18   approximately $5,002,441 in ESSER and GEER moneys would be diverted

19   from public school funds in order to provide equitable services to all private-

20   school students.  If DCPS distributes the ESSER and GEER moneys in the

21   same manner that Title I-A funds are usually distributed for equitable services

22   based on low-income private-school students, as the plain language of the

23   CARES Act requires, then only $1,435,483 will be distributed for equitable

24   services to eligible private-school students.  Thus, if the Department's Rule

25   stands and LEAs used Option #2 to proportion their CARES Act funds, a total

26   of $3,566,958 in ESSER and GEER moneys will be diverted from low-

27   income public schools to private-school students that are not qualified for

28   Title I-A funds—12% of the total ESSER/GEER moneys that DC received.

35

d.  *Hawaii*: If HIDOE is forced to follow Option #2 in the Rule for apportioning CARES Act funds, approximately $2,003,428 in ESSER moneys would be diverted from public school funds in order to provide equitable services to all private-school students.  If HIDOE distributes the ESSER moneys in the same manner that Title I-A funds are usually distributed for equitable services based on low-income private school students, as the plain language of the CARES Act requires, then only $1,555,931 will be distributed for equitable services to eligible private-school students.  Thus, if the Department's Rule stands, a total of $447,497 in ESSER money will potentially be diverted from low-income public schools to private-school students that are not qualified for Title I-A funds—1.03% of the total ESSER money that Hawaii received.

e.  *Maine*: If Maine's LEAs are forced to follow the Department's Rule and Guidance, the Maine Department of Education (MDOE) estimates that $2.1 million in ESSER money would be apportioned to provide equitable services to private-school students.  If Maine's LEAs distribute the ESSER money in the same manner that Title I-A funds are usually distributed for equitable services based on low-income private-school students, as the plain language of the CARES Act requires, then only $248,000 will be distributed for equitable services to eligible private-school students.  Thus, if the Department's Rule stands, a total of $1,852,000 in ESSER money will potentially be diverted from low-income public schools to private-school students that are not qualified for Title I-A funds—4.25% of the total ESSER money that Maine received.

f.  *Maryland*: If Maryland's LEAs follow Option #2 in the Rule for apportioning CARES Act funds, they would reserve an estimated $18,143,913 in ESSER funds to provide equitable services to private school students.   If Maryland LEAs distribute the ESSER moneys in the same manner that Title I-A funds are usually distributed for equitable services based on low-income private-

36

1   school students, as the plain language of the CARES Act requires, then only

2   an estimated $2,508,760 will be distributed for equitable services to eligible

3   private-school students. Thus, if the Department's Rule stands and LEAs use

4   Option #2 to apportion their CARES Act funds, approximately $15,000,000 in

5   ESSER moneys will be diverted from low-income public schools to private-

6   school students who are not qualified for Title I-A funds.

7       g.   *New Mexico*: If New Mexico's LEAs are forced to follow Option #2 in the

8            Rule for apportioning CARES Act funds, millions in ESSER and GEER

9            moneys would be diverted from public school funds in order to provide

10           equitable services to all private-school students.  If New Mexico's LEAs

11           distribute the ESSER and GEER moneys in the same manner that Title I-A

12           funds are usually distributed for equitable services based on low-income

13           private-school students, as the plain language of the CARES Act requires,

14           then a considerably smaller portion of the ESSER and GEER moneys will be

15           distributed for equitable services to eligible private-school students.  Thus, if

16           the Department's Rule stands and LEAs used Option #2 to apportion their

17           CARES Act funds, millions in ESSER and GEER moneys will be diverted

18           from low-income public schools to private-school students that are not

19           qualified for Title I-A funds.

20      h.   *Pennsylvania*: If Pennsylvania's LEAs are forced to follow Option #2 in the

21           Rule for apportioning CARES Act funds, millions in ESSER and GEER

22           funding would be diverted from public schools in order to provide equitable

23           services to all private-school students.  If Pennsylvania's LEAs distribute the

24           ESSER and GEER funds in the same manner that Title I-A funds are usually

25           distributed for equitable services based on low-income private-school

26           students, as the plain language of the CARES Act requires, then a

27           considerably smaller portion of the ESSER and GEER moneys will be

28           distributed for equitable services to eligible private-school students.  Thus, if

37

1    the Department's Rule stands and LEAs used Option #2 to apportion their

2    CARES Act funds, millions in ESSER and GEER moneys will be diverted

3    from low-income public schools to private-school students who are not

4    qualified for Title I-A funds.

5        i.    *Wisconsin*: If Wisconsin's LEAs are forced to follow Option #2 in the Rule

6    for apportioning CARES Act funds, $28,429,917 in ESSER and GEER

7    moneys would be diverted from public school funds in order to provide

8    equitable services to all private-school students.  If Wisconsin LEAs distribute

9    the ESSER and GEER moneys in the same manner that Title I-A funds are

10   usually distributed for equitable services based on low-income private-school

11   students, as the plain language of the CARES Act requires, then only

12   $24,245,401 will be distributed for equitable services to eligible private-

13   school students.  Thus, if the Department's Rule stands and LEAs used Option

14   #2 to apportion their CARES Act funds, a total of $4,184,516 in ESSER and

15   GEER moneys will be diverted from low-income public schools to private-

16   school students that are not qualified for Title I-A funds—approximately 2%

17   of the total ESSER/GEER moneys that Wisconsin will distribute to LEAs.

18       121.  In total, if every LEA receiving CARES Act funds in the Plaintiff States uses Option

19   #2 to apportion CARES Act funds, the Plaintiff States will be required to divert tens of millions

20   of dollars in CARES Act funding to provide services to private-school students.  The States'

21   public schools were expecting to receive these ESSER and/or GEER moneys.

22       122.  Many LEAs may also have to rework their methodologies for allocating State and

23   local funds to public schools to accommodate the new funds and ensure that CARES Act dollars

24   do not result in a violation of the Title I-A supplement, not supplant requirement.  This is a result

25   that was not contemplated by Congress and an administrative cost not taken into account in the

26   Rule.

27       123.  On top of the additional funding that each Plaintiff State will be required to expend in

28   lieu of the CARES Act funds diverted to private school services, the Department's Guidance

Document and Rule impose significant administrative burdens on SEAs, which have fielded and will continue to field numerous questions from LEAs about how ESSER and/or GEER Fund moneys should be apportioned in light of the Department's Rule, which is particularly confusing given its clear inconsistency with the CARES Act.

124.   The confusion caused by the Department has required the SEAs to divert resources to drafting and issuing memoranda, letters, and other technical assistance to assist LEAs in apportioning the moneys.

125.   While facing numerous remote learning-related challenges in the throes of the pandemic, the SEAs are now forced to redirect resources to assist LEAs in addressing the conflicting requirements generated by the Department's Rule that misinterprets the Act.

126.   In addition, the Department's Rule imposes strict restrictions on LEAs using Option #1 to apportion the funds, which will increase costs incurred by the SEAs and LEAs to administer equitable services and provide necessary oversight and control over funding, as required under CARES Act Section 18005(b).

127.   The additional time and work caused by the Department's confusing and erroneous interpretation of Section 18005 of the CARES Act will create a substantial burden on the SEAs. Since the COVID-19 pandemic enveloped the Nation, SEAs, LEAs, and schools in the Plaintiff States have been working tirelessly to transition to remote learning; secure computers and other electronic devices to facilitate students' continued learning; create health and safety plans for returning to school; and plan for the 2020-2021 school year.  The time, money, and effort SEAs have diverted to assisting LEAs with how to apportion ESSER/GEER moneys for equitable services for private-school students are directly caused by the Department's Guidance Document and the Rule.  The Department's estimate of administrative burden does not adequately capture the amount of administrative time that will be needed to implement this new Rule.

128.   The Department's inconsistent interpretations in the Guidance Document and the Rule have also caused a delay in distributing funds to students and teachers—the intended beneficiaries of these funds—which is contrary to the purpose of the CARES Act funding.

129.   Moreover, the Plaintiff States' SEAs are required to certify in their ESSER Fund applications that the SEAs and the LEAs will comply with the equitable service provision of the CARES Act (§ 18005) and "any other applicable law or regulation."[22]

130.   Because the Department's Rule contradicts the CARES Act's requirements, SEAs (and LEAs) cannot certify that they will comply both with the CARES Act and the Rule.

131.   The Department's Rule places the SEAs in a position where they would be in breach of the certification in the Certification and Agreement, subjecting the SEAs to "liability under the False Claims Act . . . [and the] OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Non-procurement)."[23]   Accordingly, SEAs may face potential legal consequences as a direct result of the Department's Rule.

132.   The Plaintiff States incurred, and will continue to incur, these financial, legal, and other harms vis-a-vis their SEAs, and the other state-supported K-12 educational institutions in the Plaintiff States.

**B.   Immediate and Irreparable Harm to the Plaintiff LEAs**

133.   The Rule's "Options," found nowhere in the CARES Act, either significantly decrease the amount of CARES Act emergency relief funds allocated to the Plaintiff LEAs or limit the use of those funds through restrictions.  Plaintiff LEAs will suffer direct harm because of the Rule.

134.   Each of the Plaintiff LEAs administers K-12 public education in their jurisdiction and was expecting to receive and use the CARES Act funds as set forth in the Act:

a.   *New York City*: The NYCDOE is the LEA of the City School District of the City of New York, except that for Title I-A purposes, each borough of the City is considered an LEA and receives a distinct allocation of Title I funding administered by the New York State Education Department.  The NYCDOE is the largest school district in the nation, with approximately 1,600 public schools that serve approximately 1.1 million students, of whom approximately

---

[22] Certification and Agreement for ESSER Fund, *supra* note 6.

[23] *Id.*

820,093 (72.8%) are economically disadvantaged, 927,110 (82.3%) are

minorities, 227,553 (20.2%) have a disability, and 148,696 (13.2%) are

English-Language Learners.  For many of these at-risk students, the City's

public schools are essential sources not only of education, but of food,

transportation, medical care, and emotional support.  Economically

disadvantaged students are at greater risk to the ravages of the COVID-19

pandemic.  These children are the intended recipients of the CARES Act

emergency funds.

b.  *Chicago*: The CBOE is the LEA for the City of Chicago school district.  It is

the third-largest school district in the nation with over 600 public schools,

serving approximately 360,000 K-12 students in the 2019-2020 school year.

Of those students, about 76% qualify as economically disadvantaged, almost

19% are English Learners, and about 15% have Individualized Education

Plans (i.e., have learning-related disabilities).  Over 46% of the district's

student body is Latino, 36% is African American, 11% is White, 4% is Asian,

and 1.3% is mixed race.  The foregoing at-risk groups served by CBOE are

the most vulnerable to the impact of the COVID-19 pandemic and are clearly

the intended recipients of the CARES Act emergency funds.  For many of

those students, the City's public schools are essential sources of education,

food, transportation, medical care, and other vital services.

c.  *Cleveland*: CMSD is the LEA for the City of Cleveland, including for

purposes of Title I under the ESEA.  CMSD has 103 public schools, serving

approximately 37,700 students.  All of CMSD's students are considered

economically disadvantaged.  Around 8.3% of those children are homeless;

84.6% are minorities; 23.5% have a disability; and 9.7% are English-

Language Learners.  These at-risk groups are the most vulnerable to the

impact of the COVID-19 pandemic and are clearly the intended recipients of

the CARES Act emergency funds.  For many of those students, the CMSD's

41

schools are essential sources of education, food, transportation, medical care, and other vital services.

d. *San Francisco*: SFUSD is a LEA and is one of the largest school districts in California, operating pursuant to the laws of the state of California. SFUSD's offices are located on Franklin Street in San Francisco, California. SFUSD serves approximately 52,468 students, of whom 28,556 are socioeconomically disadvantaged, 15,028 are English Learners, 2,064 are homeless, 6,275 are students with disabilities, and 254 are foster youth.[24] These at-risk groups are the most vulnerable to the impact of the COVID-19 pandemic and are the intended recipients of the CARES Act emergency funds. For many of those students, the SFUSD's public schools are essential sources of education, food, transportation, medical care, and other vital services. SFUSD receives a distinct allocation of Title I funding, which the California Department of Education (CDE) administers. SFUSD oversees approximately 133 schools of which about 53 qualify as Title I schools.

135. Pursuant to Title I, the Plaintiff LEAs designate schools eligible for Title I funds based on poverty percentages, as follows:

a. *New York City*: The NYCDOE designates schools eligible for Title I funding based on the poverty percentages of each borough. In the Bronx, Brooklyn, Manhattan, or Queens, Title I-school status is reached when no less than 60% of a school's students are from low-income families; the percentage is 52.13% in Staten Island. Although the statutory threshold for Title I-school status is set far lower, at a floor of 35%, see 20 U.S.C. 6313(b)(1), the NYCDOE exercises the discretion permitted by Title I to set a higher poverty threshold, ensuring that Title I funding adequately provides programs and services to schools with the greatest needs. Even with that far higher threshold, in the

---

[24] California School Dashboard, San Francisco Unified School District, *available at* https://www.caschooldashboard.org/reports/38684780000000/2019.

1    2019-2020 school year, the NYC school district was comprised of 1,314 Title

2    I schools and 269 non-Title I schools.

3    b. *Chicago*: CBOE uses the same methodology for calculating Title-I eligibility

4    for the entire district. Every school with a poverty index of 40 or above

5    receives Title I funding, with a few other schools qualifying for Title I status

6    based on waivers. Overall, about 89 percent of CPS schools qualify for Title I

7    discretionary funding.

8    c. *Cleveland*: In the 2019-2020 school year, 100 percent of CMSD's schools

9    were Title I schools.

10    d. *San Francisco*: SFUSD designates schools eligible for Title I funding based

11    on poverty percentages using the grade-span ranking option. SFUSD's

12    allocation understates actual eligibility, in that entitlements are calculated

13    based on county poverty rates, and students attending SFUSD are not

14    representative of the county's poverty rate, which is three times less. To

15    maximize the impact of a proportionally smaller entitlement to other

16    similarly-sized counties, SFUSD chooses not to fund high schools (below the

17    obligatory 75 percentile threshold). High schools receive supplemental

18    funding based on poverty percentages from other funding sources. To be

19    eligible for Title I funding, schools in the elementary or middle school span

20    must be at or above the poverty calculation for that grade span. For the 2020-

21    2021 school year, SFUSD has about 53 Title I-eligible schools.

22    136. Plaintiff LEAs fund their schools through a variety of means and methods, as follows:

23    a. *New York City*: In the NYCDOE, the Fair Student Funding formula ("FSF") is

24    the primary funding source for schools and consists of unrestricted state and

25    local funding that affords school leaders with the freedom to best determine

26    expenditures for their schools. FSF covers basic instructional needs and is

27    allocated based on the number and particular needs of students enrolled in

28    each school. After allocating a fixed amount for each student, the FSF

funding formula ascribes weights to each student to allocate greater funding for particular needs, such as grade level, academic intervention for at-risk students, and special programs for English Language Learners and students with disabilities.  FSF provides funds for about two-thirds of each school's budget; the remaining approximately one-third is comprised of funding restricted to specific purposes, including federal grants like Title I.  The NYCDOE also has a central budget that covers central administration costs and support services that are provided on a city-wide basis for all schools in the City, including, but not limited to, school facilities services, meals, school safety, pupil transportation, and energy and leases.  A significant portion of the NYCDOE's budget derives from New York State's allocation of school aid, known as Foundation Aid.  Faced with deep economic losses from the COVID-19 pandemic, New York State instituted a "pandemic adjustment" for fiscal year 2021, reducing the NYCDOE's Foundation Aid by $716,903,289, and purporting to offset this budget cut dollar-for-dollar by backfilling it with federal CARES Act funding, which itself is reduced by the Department's misinterpretation of the CARES Act.

b. *Chicago*: The CBOE annual budget for the 2020 school year is $6.9 billion. The CBOE derives about $3.8 billion of its funding through local sources, while the State of Illinois contributes almost $2.3 billion, and the federal government provides about $767 million.  CBOE estimates that it will receive about $245 million in Title I funding for the 2020 school year.  CBOE uses Student Based Budgeting (SBB) to fund schools.  SBB allocates funds to individual schools based on the total student population.  For fiscal year 2020, the SBB rate is about $4,500 per pupil.  Schools with low-income households also rely upon other funding sources, such as Supplemental Aid, Equity Grants, and federal funds provided according to Title I, Title II, Title III, Title IV, and Title VII.

44

c. *Cleveland*: CMSD receives funding from the State of Ohio and local property taxes, as well as through federal programs targeting specific student populations. State funding and local property taxes cover basic instructional needs and are allocated based on the number of students enrolled at each school and the needs of those students, weighted for various categories such as grade level, academic intervention for at-risk students, and special programs for English Language learners and students with disabilities. State support accounts for 55% of CMSD's revenues; local funding accounts for approximately 27%; and federal funds are approximately 14%. The largest category of the CMSD's funding is Foundation Funding, which CMSD receives from the State of Ohio. Faced with deep budgetary cuts because of the economic impact of the COVID-19 pandemic, Ohio reduced CMSD's Foundation Funding by more than $5.6 million. CMSD has been notified to prepare for similar cuts in Fiscal Year 2021 and also anticipates a drop in local property tax collections.

d. *San Francisco*: In SFUSD the Weighted Student Formula ("WSF") is the primary funding source for schools and consists of state funding with limited spending restrictions, excepting stipulations per the CDE. WSF covers basic instructional needs and is allocated based on the number of students enrolled at each school and the needs of those students, weighted for various characteristics such as academic proficiency of incoming students, at-risk factors such as Free-and-Reduced-Price Lunch ("FRL") eligibility and housing stability, English Learner status, and students with disabilities. Though variable across school sites, WSF accounts for about 80% of each school's budget; approximately 20% are funding allocations with spending restrictions, such as funds provided pursuant to Title I or local funds with stipulated uses. Sites may be allocated staffing supports funded by the central office, including academic and social emotional interventions for school

45

turnaround and specific programmatic offerings.  SFUSD also has a central budget that covers central administration and services for all schools, including school facilities, food, safety, pupil transportation, and energy and leases.  The largest category of SFUSD's school aid is Local Control Funding Formula ("LCFF"), which SFUSD receives from the state of California.  Faced with deep budgetary cuts because of the economic impact of the COVID-19 pandemic, California reduced the SFUSD's LCFF aid by approximately $12,000,000.  Additionally, SFUSD is losing local revenues necessary to support operations while also incurring new costs associated with providing services (i.e., digital learning (computers/WiFi), hand sanitizers) related to COVID-19.

137.   As described above, the CARES Act requires the Plaintiff LEAs receiving monies from the GEER and/or the ESSER Funds to allocate a portion of those funds to provide "equitable services" to students and teachers at nonpublic schools "in the same manner as provided under Section 1117 of the ESEA . . . ."  CARES Act § 18005(a).  If Plaintiff LEAs were to distribute these funds as mandated by the CARES Act, "in the same manner" as required by the equitable services provision in Section 1117 of the ESEA (i.e., based on the number of low-income private school students residing in a Title I school attendance area in the school district in relation to the total number of low-income private and public school students residing in a Title I school attendance area in the school district), then the proportional share to be provided for equitable services to students in nonpublic schools would be based on the number of low-income nonpublic school students residing in a Title I school attendance area.

138.   By contrast, the allocation of funds contemplated by the Rule effectively penalizes Plaintiff LEAs.  If the funds are allocated according to the Rule's Option #1 (Title I Only Schools Option) formula, the Rule imposes two additional requirements—found nowhere in the CARES Act—that restrict the use of CARES Act funds.  The restrictions are in effect a "poison pill" making Option #1 onerous, infeasible, and not a viable choice, and resulting in immediate and irreparable harm to the Plaintiff LEAs.

139.  The Rule's first "poison pill" for LEAs using the Option #1 calculation method prohibits the Plaintiff LEAs from using CARES Act funds for any purpose other than funding for a Title I school.  Non-Title I schools deprived of CARES Act funds will not be able to provide essential educational services to their students.[25]

      a.  *New York City*: NYCDOE's 269 non-Title I schools will be deprived of CARES Act funds.  The estimated impact on non-Title I schools would be a loss of approximately $100 million in desperately needed funds.

      b.  *Chicago*: The approximately 60 non-Title I schools within CBOE would be deprived of any CARES Act funds.

      c.  *San Francisco*: SFUSD's approximately 80 non-Title I schools will be deprived of thousands in desperately needed funds.

140.  The second "poison pill" for LEAs using Option #1 calculation method is that the Rule demands the funds be used only to supplement, not supplant, funding in the Title I schools' budgets, improperly importing Title I's "supplement-not-supplant" provision into the CARES Act—a restriction not found in the CARES Act.  Thus, the Rule purports to prohibit the Plaintiff LEAs from using CARES Act funds in place of state and local funds, permitting only that the CARES Act funds be used to supplements those funds.  This restriction contradicts the purpose of the CARES Act, which is to provide funding to address issues caused by the pandemic, such as maintaining continuity of services and continuing to employ existing staff, and to supplant city and local funds that have been eliminated due to fiscal constraints.

141.  Because the Rule precludes the Plaintiff LEAs from using CARES Act funds except in Title I schools, the funds are restricted from use to pay for essential central services, common to all public schools within the Plaintiff LEAs, such as transportation costs, facilities maintenance and improvements, school safety, food services (including staff to serve meals), technology platforms for remote learning, and custodial and cleaning supplies.  In many of the Plaintiff LEAs, these expenditures are made on a City/District-wide basis, and the additional

---

[25] All public schools within the CMSD are Title I schools.

1    administrative and financial burdens imposed by handling these expenditures on a per-school

2    basis in the context of the Plaintiff LEAs' highly complex budget processes makes it overly

3    burdensome and/or impossible to fund central services in the face of a restriction of CARES Act

4    funds to Title I schools alone.

5         142.   The USDOE's obvious intent is to force LEAs to follow the Rule's Option #2

6    (Private School Enrollment Option), knowing LEAs seek to use their share of CARES Act funds

7    to serve students and teachers in all of their public schools.  But, if the Plaintiff LEAs are forced

8    to use Option #2, their public schools stand to lose significant funding, as follows:

9         a.   *New York City*: If the NYCDOE were to use the Rule's Option #2

10             methodology for calculating the proportional share of equitable services to

11             nonpublic schools, the effect of including all private-school students in the

12             calculation of the proportional share for equitable services would be an 8%

13             increase in funding for nonpublic schools, which amounts to approximately

14             $53 million, and a concurrent decrease in that amount to NYC public schools

15             and students.  Instead of an allocation of $626 million to public schools and

16             $91 million to nonpublic schools, only $573 million would be available to

17             allocate to public schools, and $144 million would be allocated to nonpublic

18             schools.

19        b.   *Chicago*: If the CBOE were to use the Rule's Option #2 methodology for

20             calculating the proportional share of equitable services to nonpublic schools,

21             the CBOE would need to use the total enrollment of private school students.

22             The effect of including all nonpublic school students in the calculation of

23             proportional share is a 55% increase in funding ($18.5 to $28.5 million)

24             directed toward nonpublic schools to the detriment of Chicago public schools

25             and the students most vulnerable to the ravages of the pandemic. Under this

26             "Option," the CBOE would lose over $10 million in emergency relief funds.

27        c.   *Cleveland*: If CMSD were to use the Rule's Option #2 methodology for

28             calculating the proportional share of equitable services to nonpublic schools,

48

CMSD would need to use the total enrollment of private school students. The effect of including all nonpublic school students in the calculation of proportional share is a 19.1 percent increase in the nonpublic schools' allocation to the detriment of CMSD public schools and the students most vulnerable to the ravages of the pandemic. Under this "Option," based on currently available information CMSD would lose $822,045 in emergency relief funds.

d. *San Francisco*: If SFUSD were to use the Rule's Option #2 methodology for calculating the proportional share of equitable services to nonpublic/private schools, then SFUSD would need to use the total enrollment of private school students.  The effect of including all nonpublic/private school students in the calculation of proportional share is an almost 17% increase in funding directed toward nonpublic schools/private schools to the detriment of SFUSD and the students most vulnerable to the ravages of the pandemic.  Under this "Option," the SFUSD's public schools would lose about $1,736,417 in emergency relief funds.

143.   The "Options" under the Rule deny the Plaintiff LEAs and their public schools the allocation they are entitled to under the statute and, as a result, deny them the full use of CARES Act funds as intended by Congress.  Private schools, on the other hand, would reap a windfall, as their students would receive a far larger share of CARES Act funding for "equitable services" and would be able to use the funds without restriction.  The Plaintiff LEAs' public schools would face a shortfall, an inequitable result wholly at odds with congressional intent.

144.   Compounding the losses described above, for some of the Plaintiff LEAs, their state governments have already modified or signaled they would modify their state budgets for the coming fiscal years, incorporating the CARES Act Funds to fill the gaps in their public education budgets created by the pandemic.  As result of the Department's Rule, these gaps will not be able to be filled by state budgets, leaving holes in the Plaintiff LEAs' budgets.

a. *New York City*: The New York State Legislature enacted its Fiscal Year 2021 Budget and issued a "pandemic adjustment," reducing the NYCDOE's State Foundation Aid by approximately $717 million and backfilling it with CARES Act funding.  The Rule reduces the amount or flexible uses of this funding.

b. *Cleveland*: The Ohio Governor recently signaled the Fiscal Year 2021 Budget will reduce State Foundation Funding support to schools at similar rates as the state's last-minute cuts in Fiscal Year 2020.  The Governor made clear he considered the amount of CARES Act funding CMSD would receive in making cuts in state support, but that CARES Act funding cannot be relied upon under the Rule.  The result is a gap in funding for students and teachers in public schools who are in dire need.

145.   The Rule imposes significant burdens on the Plaintiff LEAs and greatly harms the students and teachers in their public schools.  The confusion arising from the Department's Guidance Document and the Rule has resulted in a delay in distribution of funds to students and teachers in the Plaintiff LEAs' public schools and has deprived them of the CARES Act funds to which they are entitled, including for continuing essential services and payment of staff salaries during the pandemic.

146.   The Rule will have a long-term negative impact on the millions of public-school students in the Plaintiff LEAs' schools affected by the COVID-19 pandemic.  If the amount of CARES Act funds is decreased for all public schools, the educational services in those schools will, of necessity, be curtailed.

147.   These outcomes are contrary to the very purpose and intent of the CARES Act, which Congress enacted to provide immediate services and support to school districts in response to the COVID-19 pandemic—such as new technology for distance learning, meals to students and families, increased sanitation and other facilities-related services—and assist with maintaining school staff and programs during the public health crisis.

### C.    Immediate and Irreparable Harms to Public Schools and Students

148.   The Plaintiff States and Plaintiff LEAs also have an interest in protecting the health, safety, education, and well-being of their residents and students.  The Department's interpretation severely impacts the use of the emergency ESSER/GEER funds for public-school students affected by the COVID-19 pandemic.  It therefore jeopardizes the education of the Plaintiff States' and LEAs' more than ten million public-school students.

149.   Indeed, above and beyond their state constitutional obligations to educate school-aged children, as set forth above, the States have made it a priority to ensure that vulnerable students like those who are served by Title I-A receive robust educational opportunities.  *See, e.g.*, Cal. Educ. Code §§ 8801 (Healthy Start Support Services for Children Act), 42920 (educational services for foster youth); Wis. Stat. §§ 118.43-44 (Achievement Gap Reduction Program), 121.136 (state aid for high-poverty school districts), 115.28(23) & 115.43-44 (Wisconsin Educational Opportunity Program); Md. Code Ann., Educ. §§ 5-216 (Maryland Early Literacy Initiative for qualifying Title I schools), 7-101.2 (Prekindergarten Expansion Grant Program and Fund), 7-602 (State Free Feeding Program); Md. Code Regs. 13A.01.06 (educational equity focus on marginalized student groups), 13A.08.07 (School Stability for Foster Students); Haw. Rev. Stat. § 302a-449 (Title I-Funded Prekindergarten).  The Rule undermines and frustrates these State policies.

150.   Option #2 (Private school enrollment Option) of the Rule harms the States' and LEAs' interest in providing educational opportunities for their most vulnerable students by requiring LEAs to divert moneys away from their public schools to private-school students who are not at-risk and therefore would not be eligible for equitable services under Title I-A.

151.   Even if LEAs in Plaintiff States and Plaintiff LEAs calculate the proportional share of CARES Act funds for private-school students under Option #1 in the Rule, public schools in the Plaintiff States and LEAs that were intended to receive money under the CARES Act will lose access to these funds.  Non-Title I schools will receive no funds.  And Title I schools will not be able to use the CARES Acts to cover existing, ongoing costs, even if related to the pandemic, as such allocation would lead to a violation of the LEA's Title I-A supplanting prohibition.

51

152.   Public school systems depend on state moneys.  The CARES Act education stabilization funding is intended to assist public school systems, including both Title I and non-Title I schools, to address the numerous issues created by the pandemic.  Private-school interests are addressed through eligibility for other stimulus funding within the CARES Act.

153.   Protecting and maintaining public-school education in the Plaintiff States and Plaintiff LEAs is imperative to ensuring the long-term success of students.  The loss of federal funding for public schools will have significant, adverse impacts on public-school students.  The States have an interest in ensuring that funds are not diverted from other vital state priorities and programs providing long-term assistance to public-school students who would otherwise have had access to a free and quality public education absent the Rule.

154.   The Rule will injure the States' interests by causing significant harm to their residents, including children and other students who attend K-12 public-school educational institutions within the States.

## CAUSES OF ACTION

### COUNT I
### Violation of Separation of Powers Principles

155.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

156.   Article I, Section 1 of the U.S. Constitution enumerates that "[a]ll legislative Powers herein granted shall be vested in . . . Congress."

157.   Article I, Section 8 of the U.S. Constitution vests exclusively in Congress the spending power to "provide for . . . the general Welfare of the United States."

158.   The executive branch's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes.").

159.   This principle is particularly strong in the spending context, because "[w]hen it comes to spending, the President has none of his own constitutional powers to rely upon." *California v.*

*Trump*, No. 19-16299, 2020 WL 3480841, at *16 (9th Cir. June 26, 2020) (quoting *San Francisco*, 897 F.3d at 1233–34).  Thus, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *See San Francisco*, 897 F.3d at 1235.  Nor may it impose conditions on funds appropriated by Congress without congressional authorization. *See id.* at 1233–34.

160.   The Department's Rule and Guidance Document require LEAs to allocate or use GEER and ESSER funds in a manner that is contrary to the plain language of Section 18005 of the CARES Act, thereby violating constitutional separation of powers principles by requiring distribution of funds based on conditions not provided for in the CARES Act.  Defendants did not have inherent authority to change the manner in which LEAs distribute the GEER and ESSER funds.  Nor did Congress afford Defendants any discretion or authority to issue rules governing the LEAs' allocation or use of these funds through the CARES Act.

161.   By unilaterally imposing its interpretation of Section 18005 of the CARES Act, the Department abrogated the significant discretion given to the SEAs and LEAs in the CARES Act and usurped Congress' power to legislate in violation of the principles of separation of powers.

162.   Absent injunctive and declaratory relief suspending and vacating the Rule and the Guidance Document, Plaintiffs and their residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

### COUNT II
**Ultra Vires Action**

163.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

164.   An agency acts ultra vires when it exceeds its statutory authority conferred by Congress.

165.   There is no provision in the CARES Act that imposes the proportional share calculations, use restrictions, or eligibility requirements in the Rule for CARES Act funds.  Further, Congress has not delegated to Defendants the authority to impose such requirements.

166.   Nothing in the CARES Act requires LEAs to calculate the private-school student share of CARES Act funds using the Section 8501 calculation; prohibits non-Title I schools from receiving funds; prohibits Title I schools from using CARES Act funds on any of the permissible uses in the statute; or requires LEAs to provide equitable services to all private-school students. Moreover, Congress explicitly required that LEAs follow Section 1117 when apportioning CARES Act funds for equitable services and determining which private students were eligible for such services.  Congress also explicitly listed permitted uses for the CARES Act funds and permitted both Title I and non-Title I schools to receive and use CARES Act funds.

167.   Through the CARES Act, Congress required the Department to issue ESSER funds to Plaintiff States' SEAs without conditioning the receipt of funds on Plaintiffs' agreement to require LEAs to calculate the proportional share for equitable services with the improper Section 8501 formula, prohibit non-Title I schools from receiving funds, prohibit Title I schools from using CARES Acts on any of the permissible uses in the statute, or require LEAs to provide equitable services to all private-school students.

168.   Absent injunctive and declaratory relief suspending and vacating the Rule and the Guidance Document, Plaintiffs and their residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

## COUNT III
### Spending Clause

169.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

170.   Article I, Section 8, Clause 1 of the United States Constitution, also known as the Spending Clause, states that "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States[.]"

171.   Under the Spending Clause, conditions may not be placed on federal funds that are (1) so coercive that they compel (rather than encourage) recipients to comply, (2) ambiguous, (3)

retroactive, or (4) unrelated to the federal interest in a particular program. *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 575–78 (2012); *South Dakota*, 483 U.S. at 206–08.

172.   To the extent that Congress delegated its authority to the Department to impose its own requirements on the allocation and use of GEER and ESSER funds (which it has not), the Department's Rule and Guidance Document violate the Spending Clause of the U.S. Constitution.

173.   The Department's interpretation of Section 18005 of the CARES Act in the Rule and Guidance Document violates the relatedness requirement under the Spending Clause because it is contrary to Congress's plainly expressed intent in the CARES Act to require SEAs and LEAs to follow Section 1117 when apportioning CARES Act funds for equitable services and determining which private-school students were eligible for such services, and to permit specific uses for the CARES Act funds by both Title I and non-Title I schools.

174.   The Department's Rule and Guidance Document also violate the "unambiguous" requirement under the Spending Clause.  Congress has not "unambiguously" imposed the requirement that LEAs calculate and set aside their GEER and ESSER Funds for equitable services to all private-school students and teachers, provide equitable services to all private-school students, limit their uses of funds, and limit their distribution of funds to Title I schools only.  *See Pennhurst*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

175.   In addition, the Department's interpretation was an improper "post-acceptance" restriction.  *Id.* at 17, 25.  States and LEAs "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).  Accordingly, the Spending Clause does not permit what the Department has improperly done here through unauthorized rulemaking: "surprising participating States with post acceptance or 'retroactive' conditions" on congressionally appropriated funds.  *Pennhurst*, 451 U.S. at 25; *see also NFIB*, 567 U.S. at 519.

176.   Plaintiff States and Plaintiff LEAs did not know of the Department's interpretation at the time they applied for and received emergency financial aid grants from the GEER and ESSER

funds.  Therefore, they were unable to exercise their choice knowingly, cognizant of the consequences of their participation, and they were surprised with post acceptance or retroactive conditions.

177.   Absent injunctive and declaratory relief suspending and vacating the Rule and the Guidance Document, Plaintiffs and their residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

**COUNT IV**
**Violation of the Administrative Procedure Act**
**(Agency Action in Excess of Statutory Authority, Short of Statutory Right, or Not in Accordance with Law)**

178.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

179.   The APA requires that a court hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory authority, short of statutory right, or not in accordance with law.  5 U.S.C. § 706(2)(A), (C).

180.   Congress did not grant the Department authority to interpret or make rules regarding Section 18005 of the CARES Act.  The Department's Rule and the Guidance Document are unauthorized by and contrary to Section 18005 of the CARES Act.  They therefore are in excess of statutory authority, short of statutory right, and not in accordance with law.

181.   To the extent the Department claims that its Guidance Document is merely an interpretation contained in a policy statement, agency manual, or enforcement guideline that lacks the force of law, the Department's interpretation is entitled to no or only limited deference.  The Guidance Document is not persuasive, nor does it reflect thorough consideration, and is contrary to the plain language of the statute it purports to interpret.  Congress's intent in the CARES Act is clear that equitable services are to be provided by LEAs to private-school students and teachers in the same manner as required under Section 1117 of the ESEA.

182.   Absent injunctive and declaratory relief suspending and vacating the Rule and the Guidance Document, Plaintiffs and their residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

**COUNT V**
**Violation of the Administrative Procedure Act**
**(Arbitrary and Capricious Agency Action)**

183.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

184.   The APA requires that a court hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).

185.   A rule is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

186.   The Department's interpretation of Section 18005 of the CARES Act in the Rule and the Guidance Document is arbitrary and capricious agency action because, among other reasons, the Department failed to articulate how its position comports with the plain text of Section 18005 of the CARES Act and why it was reversing its own guidance regarding how equitable services under Section 1117 should be provided, generating an unexplained inconsistency in the Department's position of which it appears to be unaware.  Further, the Department ignores important aspects of the problem, and its decision to enact the Rule runs counter to the evidence before the Department.  The Department also took into account factors Congress did not intend it to consider.  Finally, the Department failed to take into account the reliance interests that its former position generated.

187.   Absent injunctive and declaratory relief suspending and vacating the Rule and the Guidance Document, Plaintiffs and their residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

<u>COUNT VI</u>
**Violation of the Administrative Procedure Act**
**(Agency Action Without Observance of Procedure Required by Law)**

188.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

189.   The APA requires that a court hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

190.   The agency must publish a "[g]eneral notice of proposed rulemaking" in the Federal Register.  5 U.S.C. § 553(b).  That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).

191.   The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

192.   The Rule is a legislative rule adopted without complying with the notice and comment requirements of the APA.

193.   The Rule was issued on an interim final basis without good cause.

194.   The Department failed to establish good cause to waive the notice and public procedures required under the APA due to these procedural requirements being impracticable, unnecessary, or contrary to the public interest.  5 U.S.C. § 553(b).

195.   Absent injunctive and declaratory relief suspending and vacating the Rule and the Guidance Document, Plaintiffs and their residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and grant the following relief:

1        a.     Declare the Rule and all versions of the Guidance Document unlawful within the

2  meaning of 5 U.S.C. § 706(2)(A), (C), & (D);

3        b.     Preliminarily and permanently enjoin the Department and its officers, employees, and

4  agents from applying and enforcing the Rule or all versions of the Guidance Document;

5        c.     Vacate and set aside the Rule and all versions of the Guidance Document;

6        d.     Award Plaintiffs reasonable costs and expenses, including attorneys' fees; and

7        e.     Grant such other and further relief as the Court deems just and proper.

8  Dated:  July 17, 2020                Respectfully Submitted,

9

10  DANA NESSEL                   XAVIER BECERRA
Attorney General of Michigan          Attorney General of California

11  */s/ Toni L. Harris*               MICHAEL NEWMAN
Senior Assistant Attorney General

12  *FADWA A. HAMMOUD          SARAH E. BELTON
Solicitor General              Supervising Deputy Attorney General

13  *TONI L. HARRIS
*NEIL GIOVANATTI            */s/ Garrett M. Lindsey*

14  Assistant Attorneys General
*Attorneys for Plaintiff State of Michigan*   GARRETT M. LINDSEY

15  **Appearing pro hac vice*         JAMES F. ZAHRADKA II
REBEKAH A. FRETZ

16                            Deputy Attorneys General
*Attorneys for Plaintiff State of California*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

KARL A. RACINE
*Attorney General of District of Columbia*

*/s/ Kathleen Konopka*

3

4

5

6

KATHLEEN KONOPKA
Deputy Attorney General, Public Advocacy Division
*Attorneys for Plaintiff District of Columbia*
*Appearing pro hac vice (application forthcoming)*

7

8

CLARE E. CONNORS
*Attorney General of Hawaii*

9

*/s/ Kevin M. Richardson*

10

11

12

13

HOLLY T. SHIKADA
KEVIN M. RICHARDSON
Deputy Attorneys General
*Attorneys for Plaintiff State of Hawaii*
*Appearing pro hac vice (application forthcoming)*

14

15

AARON M. FREY
*Attorney General of Maine*

*/s/ Sarah A. Forster*

16

17

18

SARAH A. FORSTER*
Assistant Attorney General
*Attorneys for Plaintiff State of Maine*
*\*Appearing pro hac vice*

19

20

BRIAN E. FROSH
*Attorney General of Maryland*

21

*/s/ Steven M. Sullivan*

22

23

24

25

26

STEVEN M. SULLIVAN
Solicitor General
*Attorneys for Plaintiff State of Maryland*
*Appearing pro hac vice (application forthcoming)*

HECTOR BALDERAS
*New Mexico Attorney General*

*/s/ Lisa Giandomenico*

P. CHOLLA KHOURY
LISA GIANDOMENICO*
Assistant Attorneys General
*Attorneys for Plaintiff State of New Mexico*
*\*Appearing pro hac vice*

JOSH SHAPIRO
*Attorney General of Pennsylvania*

*/s/ Michael J. Fischer*

MICHAEL J. FISCHER
Chief Deputy Attorney General
*Attorneys for Plaintiff Commonwealth of Pennsylvania*
*Appearing pro hac vice (application forthcoming)*

JOSHUA L. KAUL
*Attorney General of Wisconsin*

*/s/ Hannah S. Jurss*

HANNAH S. JURSS
Assistant Attorney General
*Attorneys for Plaintiff State of Wisconsin*
*Appearing pro hac vice (application forthcoming)*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

*/s/ Eric Proshansky*

ERIC PROSHANSKY
HOPE LU
GAIL RUBIN
Assistant Corporation Counsel
*Attorneys for Plaintiff the Board of Education of the City School District of the City of New York*
*Appearing pro hac vice (application forthcoming)*

27

28

60

1

BOARD OF EDUCATION, CITY OF CHICAGO
DEPARTMENT OF LAW

2

*/s/ Joseph Moriarty*

3

JOSEPH MORIARTY
General Counsel

4

J. ERNEST MINCY

5

Deputy General Counsel for Litigation
*Attorneys for Plaintiff Chicago Board of*

6

*Education*
*(pro hac vice applications forthcoming)*

7

8

SAN FRANCISCO UNIFIED SCHOOL DISTRICT

9

*/s/ Danielle Houck*

10

DANIELLE HOUCK
General Counsel

11

SUSANNE NAOMI STARECKI KIM
Sr. Deputy General Counsel

12

Legal Department
*Attorneys for Plaintiff San Francisco Unified*

13

*School District*

SQUIRE PATTON BOGGS (US) LLP

*/s/ Gabriel Colwell*

GABRIEL COLWELL (CABN 216783)
COLIN R. JENNINGS (OHBN 0068704)
W. MICHAEL HANNA (OHBN 0020149)
EMILY R. SPIVACK (OHBN 0090777)

KEVIN J. BURTZLAFF (OHBN 0039648)
Cleveland Municipal School District Board
of Education
*Attorneys for Plaintiff Cleveland Municipal*
*School District*
*Appearing pro hac vice (application*
*forthcoming)*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint for Declaratory and Injunctive Relief

1

**ATTESTATION OF SIGNATURES**

2       I, Garrett M. Lindsey, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

3   District of California that concurrence in the filing of this document has been obtained from each

4   signatory hereto.

5   Dated:  July 17, 2020                                  */s/ Garrett M. Lindsey*

6                                                          GARRETT M. LINDSEY
                                                           Deputy Attorney General
7                                                          *Attorney for State of California*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint for Declaratory and Injunctive Relief

Exhibit A

# PROVIDING EQUITABLE SERVICES TO STUDENTS AND TEACHERS IN NON-PUBLIC SCHOOLS UNDER THE CARES ACT PROGRAMS



**U.S. Department of Education**
**Washington, D.C. 20202**

**April 30, 2020**

**Purpose of this Document**

The purpose of this document is to provide information about equitable services for students and teachers in non-public schools under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law 116-136, 134 Stat. 281 (Mar. 27, 2020). The CARES Act authorized the Education Stabilization Fund (ESF), which is a new appropriation of approximately $30.75 billion that creates funding streams for several distinct education programs that address the impact of the Novel Coronavirus Disease 2019 (COVID-19) on educational services across the Nation. Under these programs, the U.S. Department of Education (Department) will make awards to Governors, State educational agencies (SEAs), and institutions of higher education (IHEs) to help States to prevent, prepare for, and respond to the devastating effects of COVID-19. The provisions of the CARES Act relevant to the ESF and other Department programs are available on the Department's website at https://oese.ed.gov/offices/education-stabilization-fund/.

Two programs in the ESF require a local educational agency (LEA) that receives funds to provide equitable services to students and teachers in non-public schools:
- The Governor's Emergency Education Relief Fund (GEER Fund) totaling $2,953,230,000 (Section 18002 of the CARES Act).
- The Elementary and Secondary School Emergency Relief Fund (ESSER Fund) totaling $13,229,265,000 (Section 18003 of the CARES Act).

Other than statutory and regulatory requirements included in the document, such as those pursuant to the authorizing statute and other applicable laws and regulations, the contents of the guidance do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. In addition, it does not create or confer any rights for or on any person.

The Department will provide additional or updated information as necessary on the Department's COVID-19 webpage: https://www.ed.gov/coronavirus. If you have questions that are not answered in this document, please e-mail COVID-19@ed.gov.

# Table of Contents

1. Does the requirement to provide equitable services to students and teachers in non-public schools apply to any programs under the CARES Act? .........................................1

2. What is a "non-public school" under the CARES Act programs?................................1

3. Is a for-profit non-public school eligible to receive equitable services for its students and teachers under the CARES Act programs? .................................................................1

4. Which LEA is responsible for providing equitable services to non-public school students and teachers under the CARES Act programs? ...................................................1

5. Must an LEA or another public agency maintain control of CARES Act funds used to provide equitable services? ...........................................................................................2

6. Who is responsible for initiating the consultation process and how should it begin? ...2

7. How does an LEA that receives funds under the CARES Act programs provide equitable services "in the same manner as provided under section 1117 of the ESEA"? .3

8. Must an LEA offer to provide equitable services under the CARES Act programs to students and teachers in all non-public schools located in the LEA, even if a non-public school has not previously participated in equitable services under Title I, Part A or Title VIII of the ESEA?...........................................................................................................5

9. Are all students and teachers in a non-public school eligible to receive equitable services under the CARES Act programs? ....................................................................5

10. How does an LEA determine the proportional share of funds that must be reserved to provide equitable services to non-public school students and teachers under the CARES Act programs? ...............................................................................................................6

    A.  What is the base amount on which the proportional share is determined? ............6

    B.  What data does an LEA use to determine the proportional share?........................6

    C.  How does an LEA calculate the proportional share? ...............................................6

11. After an LEA has determined the proportional share of funds for equitable services under each CARES Act program, how does it then determine the amount of funds available for services to students and teachers in individual non-public schools? ...........7

12. Do the requirements in 34 C.F.R. § 200.66 apply to equitable services under the CARES Act programs? ...................................................................................................7

13. Is a non-public school whose students and teachers receive equitable services under the CARES Act programs a "recipient of Federal financial assistance"?.........................8

14. What services and benefits under the CARES Act programs are available to non-public school students and teachers?..................................................................................8

## Providing Equitable Services to Students and Teachers
## in Non-Public Schools under the CARES Act Programs

**1. Does the requirement to provide equitable services to students and teachers in non-public schools apply to any programs under the CARES Act?**

Yes. The CARES Act establishes two new funds to which equitable services requirements apply. Specifically, a local educational agency (LEA) that receives funds under either the Governor's Emergency Education Relief Fund (GEER Fund) (section 18002 of the CARES Act) or the Elementary and Secondary School Emergency Relief Fund (ESSER Fund) (section 18003 of the CARES Act) ("CARES Act programs" for purposes of this document) to provide equitable services to students and teachers in non-public schools in the same manner as provided under section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA). (Section 18005(a) of the CARES Act).

An institution of higher education or education-related entity that receives funds under the GEER Fund is not required to provide equitable services to students and teachers in non-public schools.

**2. What is a "non-public school" under the CARES Act programs?**

A "non-public school" means a non-public elementary or secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and (B) was in existence prior to the date of the qualifying emergency for the CARES Act programs. For purposes of this definition, the date of the qualifying emergency is March 13, 2020. (Section 18007(6) of the CARES Act).

**3. Is a for-profit non-public school eligible to receive equitable services for its students and teachers under the CARES Act programs?**

No. A for-profit non-public school is not eligible to receive equitable services for its students and teachers under the CARES Act programs. Section 18007(6) of the CARES Act defines a "non-public school" as a non-public elementary or secondary school. Section 18007(8) of the CARES Act incorporates the definitions in ESEA section 8101 for any terms not defined in the CARES Act. ESEA section 8101(19) and (45) defines "elementary school" and "secondary school," respectively, and specifies that they must be non-profit.

**4. Which LEA is responsible for providing equitable services to non-public school students and teachers under the CARES Act programs?**

The Department has determined that, under the CARES Act programs, the LEA in which a non-public school is located is responsible for providing equitable services to students and teachers in the school, as it is under most ESEA programs that require an LEA to provide equitable services. Outside of Title I, Part A, the responsibility typically falls on the LEA in which a non-public school is located because equitable services are generally available

to all students or teachers in the non-public school in the LEA and the LEA in which the school is located is closest and best able to meet the needs of students and teachers.

Title I, Part A of the ESEA is different; ESEA section 1117 sets forth a student residency requirement, rather than a school location requirement, for receipt of equitable services under Title I, Part A. Only low-achieving students who live in a participating Title I public school attendance area are eligible for services and, therefore, the LEA where students reside is responsible for providing equitable services. The CARES Act programs have no such residency requirement for eligibility for services. Rather, the CARES Act programs provide LEAs full discretion, unless funds are targeted for a specific purpose or population of public and non-public school students by the Governor under the GEER Fund or by an SEA through the SEA reserve under the ESSER Fund (see section 18003(e) of the CARES Act), to use CARES Act funds to provide educational services to students in public and non-public schools in the LEA through a broad range of allowable activities. Thus, providing equitable services with CARES Act funds is similar to other ESEA programs where equitable services are provided by the LEA in which a non-public school is located.

### 5. Must an LEA or another public agency maintain control of CARES Act funds used to provide equitable services?

Yes. Control of funds for services and assistance provided to non-public school students and teachers under the CARES Act programs, and title to materials, equipment and property purchased with such funds, must be in a public agency, and a public agency must administer such funds, materials, equipment, and property. In other words, no funds may go directly to a non-public school. In addition, services for non-public school students and teachers must be provided by a public agency directly or through contract with another public or private entity. (Section 18005(b) of the CARES Act).

### 6. Who is responsible for initiating the consultation process and how should it begin?

Similar to how an LEA provides equitable services under the ESEA, an LEA is responsible for initiating the consultation process. It must contact officials in all non-public schools in the LEA to notify them of the opportunity for their students and teachers to obtain equitable services under the CARES Act programs. Through this initial contact, the LEA can explain the services available under the CARES Act programs and how non-public school students and teachers can participate. If non-public school officials have not been contacted, they may contact the LEA or the State ombudsman to inquire about equitable services under the CARES Act programs.

If non-public school officials want equitable services for their students and teachers, the LEA must consult with those officials during the design and development of the LEA's programs and before the LEA makes any decision that affects the opportunity of non-public school students and teachers to participate in the activities funded under the CARES Act programs. If a non-public school declines to participate in the CARES Act programs or does not respond to an LEA's good-faith effort to make contact, the LEA has no further responsibility to provide equitable services to students or teachers in that school. The LEA, however, must be able to demonstrate that it made a good faith effort to contact all the non-public schools in the LEA.

**7. How does an LEA that receives funds under the CARES Act programs provide equitable services "in the same manner as provided under section 1117 of the ESEA"?**

An LEA that receives funds under the CARES Act programs must provide equitable services to students and teachers in a non-public school in the same manner as provided under section 1117 of the ESEA, as determined in consultation with representatives of non-public schools. (Section 18005(a) of the CARES Act). This requirement, on its face, necessitates that the Department interpret how the requirements of section 1117 apply to the CARES Act programs, given that an LEA under the CARES Act programs may serve all non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement. Unless the requirements of section 1117 would limit equitable services under the CARES Act programs, we conclude they apply as outlined below.

We have interpreted "in the same manner as under section 1117" in light of the significantly broader eligibility and uses of funds authorized under the CARES Act as compared to Title I, Part A, reasonably reconciling differences. In doing so, we gave meaning to section 1117(a)(3), which requires educational services and other benefits for students in non-public schools to be equitable in comparison to those for public school students. The services that an LEA may provide under the CARES Act programs are clearly available to *all* public school students and teachers, not only low-achieving students and their teachers as under Title I, Part A. Similarly, there is no limitation on residence in a participating Title I public school attendance area for services provided in public schools under the CARES Act programs. For CARES Act services to be equitable in comparison to public school students and teachers, it follows that the same principles must apply in providing equitable services to non-public school students and teachers.

The following describes how the provisions of ESEA section 1117 apply, reconciled, when necessary, to meet the purposes of the CARES Act programs:

- 1117(a)(1) – Under Title I, Part A, an LEA must provide equitable services to low-achieving students as defined in ESEA section 1115(c) who reside in a participating Title I public school attendance area and attend a non-public school and their teachers. Under the CARES Act programs, an LEA may provide equitable services with CARES Act funds to any students and teachers in non-public schools, unless limited by a Governor under section 18002 of the CARES Act or an SEA through the SEA's reserve under section 18003(e) of the CARES Act. (See Questions #8 and #9).
- 1117(a)(2) – Under both Title I, Part A and the CARES Act programs, an LEA must provide equitable services and other benefits, including materials and equipment, that are secular, neutral, and nonideological.
- 1117(a)(3)(A) – Under both Title I, Part A and the CARES Act programs, an LEA must provide services and other benefits for non-public school students and teachers in a timely manner that are equitable in comparison to the services and benefits provided for public school students and teachers.

3

- 1117(a)(3)(B) – Under Title I, Part A, an SEA must designate an ombudsman to monitor and enforce the equitable services requirements. An SEA must use the ombudsman also to monitor and enforce the requirements of the CARES Act programs that an LEA provide equitable services to students and teachers in non-public schools.

- 1117(a)(4)(A) – Under both Title I, Part A and the CARES Act programs, an LEA must determine the proportional share available to provide equitable services to students and teachers in non-public schools based on the total amount of funds an LEA receives prior to any allowable expenditures or transfers. Under the CARES Act programs, the LEA calculates the proportional share based on the number of children enrolled in each non-public school whose students or teachers participate in the CARES Act programs compared to the number of students enrolled in public schools in the LEA. The LEA makes this determination under each CARES Act program separately. (See Question #10).

- 1117(a)(4)(B) – Under Title I, Part A, an LEA must obligate funds available for equitable services in the fiscal year for which the funds are received by the LEA. An LEA must obligate CARES Act funds for equitable services in the fiscal years for which those funds are intended for services to address the impact of COVID-19.

- 1117(a)(4)(C) – Under both Title I, Part A and the CARES Act programs, an SEA must provide notice in a timely manner to appropriate non-public school officials in the State of the allocation of funds for educational services and other benefits that each LEA has determined are available for non-public school students and teachers.

- 1117(b)(1) – Under both Title I, Part A and the CARES Act programs, an LEA must consult with appropriate non-public school officials during the design and development of the LEA's activities on relevant issues such as those contained in this section of Title I, Part A. The LEA and non-public school officials shall both have the goal of reaching agreement on how to provide equitable and effective services and the LEA must transmit the results of that agreement to the ombudsman.

- 1117(b)(2) – Under both Title I, Part A and the CARES Act programs, if an LEA disagrees with the views of non-public school officials during consultation, the LEA must provide in writing to the non-public school officials the reasons why the LEA disagrees.

- 1117(b)(3) – Under both Title I, Part A and the CARES Act programs, consultation must occur before an LEA makes any decision that affects the opportunities of non-public students and teachers to receive equitable services. Meetings between the LEA and non-public school officials need not occur in person if they cannot be conducted due to closed schools or social distancing rules. In this case, the Department recommends LEAs and non-public school officials consult remotely.

- 1117(b)(4) – Under both Title I, Part A and the CARES Act programs, consultation must include discussion of service delivery mechanisms an LEA may use to provide equitable services.

- 1117(b)(5) – Under both Title I, Part A and the CARES Act programs, an LEA must maintain and provide to the SEA written affirmation signed by non-public

school officials that timely and meaningful consultation has occurred and, if non-public school officials do not provide such affirmation, the LEA must forward to the SEA the documentation that such consultation has, or attempts at such consultation have, taken place.

- 1117(b)(6) – Under both Title I, Part A and the CARES Act programs, non-public school officials have a right to file a complaint with the SEA; the SEA must provide services directly or through contracts if requested to do so by non-public school officials and the SEA determines that the LEA did not meet applicable requirements.

- 1117(c)(1) – Under Title I, Part A, to determine the proportional share, an LEA must calculate the number of children, ages 5 through 17, who are from low-income families and reside in a participating Title I public school attendance area. Because an LEA determines the proportional share based on enrollment in public and non-public schools under the CARES Act programs, the LEA need not collect poverty data from non-public schools (see Question #10 for information on determining the proportional share of CARES Act funds the LEA must reserve to provide equitable services to non-public school students and teachers).

- 1117(c)(2) – Under Title I, Part A, non-public school officials may file a complaint with the SEA if they dispute the count of children from low-income families. Because an LEA need not collect poverty data to determine the proportional share available for equitable services under the CARES Act programs, there would be no reason for non-public school officials to file a complaint regarding poverty data with the SEA.

- 1117(d) – Under Title I, Part A, control of funds and title to materials, equipment, and property must be in public agency. With respect to the CARES Act programs, this provision is superseded by section 18005(b) of the CARES Act, which also requires public control of funds. (See Question #5).

**8. Must an LEA offer to provide equitable services under the CARES Act programs to students and teachers in all non-public schools located in the LEA, even if a non-public school has not previously participated in equitable services under Title I, Part A or Title VIII of the ESEA?**

Yes. An LEA must offer to provide equitable services under the CARES Act programs to students and teachers in all non-public schools located in the LEA, even if a non-public school has not previously participated under Title I, Part A or Title VIII of the ESEA.

**9. Are all students and teachers in a non-public school eligible to receive equitable services under the CARES Act programs?**

Yes. All students and teachers in a non-public school are eligible to receive equitable services under the CARES Act programs, unless a Governor (under the GEER Fund) or an SEA (through the SEA reserve under the ESSER Fund) targets funds for a specific purpose or population of public and non-public school students. Unlike Title I, Part A, equitable services under the CARES Act programs are not based on residence in a participating Title

I public school attendance area and are also not limited only to low-achieving students and their teachers.

**10. How does an LEA determine the proportional share of funds that must be reserved to provide equitable services to non-public school students and teachers under the CARES Act programs?**

### A.  What is the base amount on which the proportional share is determined?

Under ESEA section 1117(a)(4)(A)(ii), an LEA must determine the proportional share available for equitable services from the total amount of Title I, Part A funds it receives prior to reserving funds for allowable expenditures such as administrative costs or districtwide expenditures, and before making allocations to participating public schools. Because section 18005(a) of the CARES Act requires an LEA to provide equitable services under the CARES Act programs "in the same manner as provided under section 1117," an LEA must use the total allocation it receives under each CARES Act program to determine the proportional share available for equitable services before reserving funds for other purposes.

### B.  What data does an LEA use to determine the proportional share?

An LEA uses enrollment data in non-public schools whose students and teachers will participate under the CARES Act programs compared to enrollment in public schools in the LEA to determine the proportional share. Under the CARES Act programs, services are available for all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area. An LEA that receives CARES Act funds uses those funds to provide educational services to students in both public and non-public schools through a broad range of allowable activities. Using enrollment to determine the proportional share from which to provide equitable services will contribute to the equitable treatment of children and teachers within the statutory universe of permissible uses for CARES Act dollars by allowing all students and teachers in a non-public school to receive services that are equitable compared to those available to all public school students and teachers. (See ESEA section 1117(a)(3)).

### C.  How does an LEA calculate the proportional share?

To calculate the proportional share for equitable services under the CARES Act programs, an LEA determines the overall number of children who are enrolled in public schools and non-public schools in the LEA that wish to participate under one or both CARES Act programs. Using the proportion of students who are enrolled in participating non-public schools, the LEA determines the amount of funds available for equitable services based on that proportional share of the LEA's total allocation under each CARES Act program separately. For example, an LEA receiving $100,000 under the GEER Fund and $900,000 under the ESSER Fund, and with 1,350 public school students and 150 non-public school students, would determine the proportional share as follows:

6

| EXAMPLE – DETERMINING THE PROPORTIONAL SHARE | | | |
|---|---|---|---|
| | **Public** | **Non-Public\*** | **Total** |
| Enrollment | 1,350 | 150 | 1,500 |
| Proportion | 90% | 10% | 100% |
| Proportional Share GEER Fund | $90,000 | $10,000 | $100,000 |
| Proportional Share ESSER Fund | $810,000 | $90,000 | $900,000 |

\*Non-public schools participating under the CARES Act programs.

**11. After an LEA has determined the proportional share of funds for equitable services under each CARES Act program, how does it then determine the amount of funds available for services to students and teachers in individual non-public schools?**

For consultation purposes, in order to determine what equitable services to provide to students and teachers in a given non-public school, an LEA, after reserving funds that are reasonable and necessary for administering equitable services under the CARES Act programs, would divide the remainder of the proportional share of funds available for equitable services by the total enrollment in non-public schools whose students and teachers will participate in each of the CARES Act programs to obtain a per-pupil amount. The LEA would then multiply that per-pupil amount by the enrollment in an individual non-public school to determine the amount of services the LEA can provide to students and teachers in that school. With agreement between the LEA and appropriate non-public school officials, the LEA may pool funds among a group of non-public schools and provide equitable services to students and teachers in non-public schools within the pool based on need without regard to how the funds were generated. (See ESEA section 1117(b)(1)(J)(i)).

**12. Do the requirements in 34 C.F.R. § 200.66 apply to equitable services under the CARES Act programs?**

No. The requirements in 34 C.F.R. § 200.66 do not apply to equitable services under the CARES Act programs. 34 C.F.R. § 200.66 is a Title I, Part A regulation that requires an LEA to provide Title I, Part A services that (1) supplement, and in no case supplant, the services that would, in the absence of Title I, Part A services, be available to participating non-public school students; and (2) only meet the needs of participating non-public school students and not the needs of the non-public school or the general needs of children in the non-public school. These provisions are necessary in the Title I, Part A context because equitable services must be supplemental to what non-public students otherwise receive and may only be provided to low-achieving students who reside in a participating Title I public school attendance area and attend a non-public school.

Equitable services under the CARES Act programs are much broader than under Title I, Part A. Equitable services under the CARES Act programs, by definition, may benefit a non-public school, such as purchasing supplies to sanitize and clean the facility, or all students in a non-public school, such as any activity authorized under the ESEA. Unlike Title I, they are not based on residence in a participating Title I public school attendance

area or limited only to low-achieving students. Moreover, the CARES Act does not have a supplement not supplant requirement.

**13. Is a non-public school whose students and teachers receive equitable services under the CARES Act programs a "recipient of Federal financial assistance"?**

No. A non-public school whose students and teachers receive equitable services under the CARES Act programs is not a "recipient of Federal financial assistance." A public agency must control and administer the CARES Act funds; in other words, no funds may go directly to a non-public school. (See Question #5). Thus, a non-public school is not a recipient of Federal financial assistance by virtue of its students and teachers receiving equitable services from an LEA under a CARES Act program. As a result, certain Federal requirements that apply to a recipient of Federal financial assistance are not directly applicable to a non-public school whose students or teachers receive equitable services under the CARES Act programs, unless the school otherwise receives Federal financial assistance for other purposes.

**14. What services and benefits under the CARES Act programs are available to non-public school students and teachers?**

In general, the services and benefits available to non-public school students and teachers are the same as those available to public school students and teachers. Specifically, the ESSER funds that flow to LEAs by formula may be used for a broad range of allowable activities. (See section 18003(d) of the CARES Act). The ESSER funds that an SEA may reserve for State purposes may also be used for a broad range of activities to address issues responding to COVID-19, unless the SEA decides to target them for a specific purpose or population of public and non-public school students. For example, an SEA could target the SEA reserve to provide technology to support distance learning for public and non-public school students from low-income families. (See section 18003(e) of the CARES Act). Similarly, a Governor may target GEER funds that it makes available to an LEA for a specific purpose or population of public and non-public school students. (See section 18002(c)(1) or (3) of the CARES Act).

In sum, equitable services permitted under sections 18002(c)(1) or (3), as applicable, and 18003(d) of the CARES Act must be available to best meet the needs of non-public school students and teachers, as determined through timely and meaningful consultation and consistent with any specific purposes established by a Governor under the GEER Fund or SEA through the SEA reserve under the ESSER Fund, regardless of the specific uses determined by the LEA to meet its own students' and teachers' particular needs.

As noted in Question #5, the control of any services or assistance provided to students and teachers in a non-public school, and title to materials, equipment, and property purchased with CARES Act funds, must be in a public agency and a public agency must administer those funds, materials, equipment, and property. A public entity must provide those services either directly or through a contract with a public or private entity.

Exhibit B


Dated: June 25, 2020.

**Lowell J. Schiller,**

*Principal Associate Commissioner for Policy.*

[FR Doc. 2020–14082 Filed 6–30–20; 8:45 am]

**BILLING CODE 4164–01–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Part 76

**[Docket ID ED–2020–OESE–0091]**

**RIN 1810–AB59**

### CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools

**AGENCY:** Office of Elementary and Secondary Education, Department of Education.

**ACTION:** Interim final rule with request for comments.

**SUMMARY:** The U.S. Department of Education (Department) issues this interim final rule to clarify the requirement in the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) that local educational agencies (LEAs) provide equitable services to students and teachers in non-public schools under the Governor's Emergency Education Relief Fund (GEER Fund) and the Elementary and Secondary School Emergency Relief Fund (ESSER Fund) (collectively, the CARES Act programs).

**DATES:**

*Effective Date:* This interim final rule is effective July 1, 2020.

*Comment Due Date:* We must receive your comments on or before July 31, 2020.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov,* including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "How to use *Regulations.gov.*"

• *Postal Mail, Commercial Delivery, or Hand Delivery:* If you mail or deliver your comments about this interim final rule, address them to Amy Huber, U.S.

Department of Education, 400 Maryland Avenue SW, Room 3W219, Washington, DC 20202.

*Privacy Note:* The Department's policy for comments received from members of the public is to make these submissions available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Amy Huber, U.S. Department of Education, 400 Maryland Avenue SW, Room 3W219, Washington, DC 20202. Telephone: (202) 453–6132. Email: *EquitableServices.CaresAct@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Invitation to Comment:* We invite you to submit comments on this interim final rule. We will consider these comments in determining whether to take any future action. See **ADDRESSES** for instructions on how to submit comments.

During and after the comment period, you may inspect all public comments about this interim final rule by accessing *Regulations.gov.* Once the LBJ building reopens to the public, you may also inspect the comments in person in Room 3W219, 400 Maryland Avenue SW, Washington, DC, between the hours of 8:30 a.m. and 4:00 p.m., Eastern time, Monday through Friday of each week except Federal holidays. If you want to schedule time to inspect comments, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals with Disabilities in Reviewing the Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public record for this interim final rule. If you want to schedule an appointment for this type of aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Background:* This rulemaking resolves a critical ambiguity in section 18005(a) of Division B of the CARES Act, Public Law 116–136, 134 Stat. 281 (Mar. 27, 2020) with respect to the equitable services obligation owed by LEAs that receive CARES Act funds to students and teachers in non-public schools. Section 18005(a) of the CARES Act,

titled "Assistance to Non-public Schools," requires an LEA to "provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 [Elementary and Secondary Education Act of 1965 (ESEA)] to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools." Section 18005(b) lodges control of funds for the services and assistance mandated in section 18005(a) in a "public agency."

The Department must construe the CARES Act based on plain meaning, context, and coherence within the overall statutory structure. We are obliged to interpret the CARES Act coherently, and fit, if possible, all its parts into a harmonious whole. Finally, we must give meaning to each element of the statute so that no language is surplus.

The CARES Act is a special appropriation to combat the effects of the novel Coronavirus Disease 2019 (COVID–19). The pandemic has harmed *all* our Nation's students by disrupting their education. Nothing in the CARES Act suggests Congress intended to differentiate between students based upon the public or non-public nature of their school with respect to eligibility for relief.

Construing the phrase "provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965" as if Congress simply incorporated the entirety of section 1117 by reference requires a wholly inappropriate disregard for statutory text and for controlling legal authorities requiring us to harmonize all relevant statutory provisions. It would create significant and unnecessary interpretative conflicts and ambiguity. Finally, a mechanistic application of section 1117 detached from the relevant CARES Act text would disadvantage some students based simply on where they live. Therefore, exercising our interpretive authority under *Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984), and relying on statutory language and context to develop a harmonious construction faithful to all relevant CARES Act text and to the entire statutory structure, *see Food and Drug Admin.* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132–33 (2000), we have concluded the phrase "in the same manner as provided under section 1117" does not simply mean "as provided under section 1117" and that we must implement section 1117 in a fashion fully consistent with *all* relevant CARES Act text, purposes, and requirements.

On April 30, 2020, the Department issued guidance titled *Providing Equitable Services to Students and Teachers in Non-Public Schools under the CARES Act Programs* (Equitable Services guidance), available at *https:// oese.ed.gov/files/2020/04/FAQs-Equitable-Services.pdf*. Specifically, the Department concluded that the provision of equitable services under the CARES Act "in the same manner as provided under section 1117" of Title I requires the application of, among other provisions, section 1117(a)(3)(A) as outlined in Question #7 of the Equitable Services guidance. Because services under the CARES Act programs can be available for all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area, the Department instructed LEAs to use enrollment data in non-public schools that will participate under the CARES Act programs compared to the total enrollment in all public schools and participating non-public schools in the LEA to determine the proportional share of CARES Act funds available to provide equitable services.

A number of States took issue with the Department's guidance with respect to using total non-public school enrollment to determine the proportional share of CARES Act funds for equitable services.[1] The Council of Chief State School Officers (CCSSO), in particular, expressed concern on behalf of its members. According to CCSSO, Congress "intended to concentrate ESSER funds in areas of the most need, where the educational and social impacts of the COVID crisis will be most extreme and difficult to overcome with limited local funds."

The text of the CARES Act is inconsistent with CCSSO's assertion that Congress intended a rigid application of section 1117. Rather, the CARES Act affords LEAs more flexibility. In light of concerns expressed, as discussed below, we are affording flexibility to an LEA that helps poor children by spending its CARES Act funds *only* in its Title I schools to

use the proportional share it calculated under section 1117(a)(4)(A) for the 2019–2020 school year or to use the number of children, ages 5 through 17, who attend a non-public school in the LEA that will participate under a CARES Act program and who are from low-income families compared to the total number of children, ages 5 through 17, who are from low-income families in both Title I schools and participating non-public schools in the LEA. However, if an LEA spends *any* funds from a CARES Act program on students and teachers in non-Title I public schools, then the law requires equity for students and teachers in participating non-public schools, achieved by using enrollment to determine the proportional share.

*Discussion:*

## I. Legal Framework

It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989). We must interpret the CARES Act "as a symmetrical and coherent regulatory scheme," *Gustafson* v. *Alloyd Co.,* 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an harmonious whole." *FTC* v. *Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959). When Congress has not supplied a definition, a statutory term generally has its ordinary meaning. *See, e.g., Schindler Elevator Corp.* v. *United States ex rel. Kirk,* 563 U.S. 401, 407 (2011). The plainness or ambiguity of statutory language is determined not only by reference to the language itself, but also by the specific context in which that language is used, and the broader context of the statute as a whole. *Yates* v. *United States,* 135 S.Ct. 1074, 1081 (2015). Constructions creating surplus language are disfavored as the Department is "obliged to give effect, if possible, to every word Congress used." *Reiter* v. *Sonotone Corp.,* 442 U.S. 330, 339 (1979); *see also Nat'l Ass'n of Mfgs* v. *Dep't of Defense,* 138 S.Ct. 617, 632 (2018).

## II. Analysis

### A. The CARES Act

The CARES Act authorizes new Federal education programs to "prevent, prepare for, and respond to" COVID–19. Three of those programs—the GEER Fund (section 18002(c)(1), (3)), the ESSER Fund formula grants to LEAs (section 18003(c)), and the ESSER State educational agency (SEA) Reserve

(section 18003(e))—make funds potentially available to LEAs.

GEER funds are available to, among other eligible entities, LEAs that the SEA deems have been "most significantly impacted" by COVID–19 to continue to provide educational services and to support the on-going functionality of the LEA (section 18002(c)(1)) or to LEAs that the Governor "deems essential" for carrying out emergency educational services authorized under section 18003(d)(1) of the ESSER Fund; provision of child care and early childhood education; social and emotional support; and the protection of education-related jobs (section 18003(c)(3)).[2]

Ninety percent or more of ESSER funds are awarded by formula to LEAs (including charter schools that are LEAs) in proportion to the amount of funds such LEAs "received under part A of title I of the ESEA of 1965 in the most recent fiscal year" (section 18003(c)). An LEA may allocate the ESSER funds it receives without restriction and use them for "any" activity in a long list, including any activity authorized under the ESEA, the Individuals with Disabilities Education Act, the Adult Education and Family Literacy Act, the Carl D. Perkins Career and Technical Education Act, and the McKinney-Vento Homeless Assistance Act (section 18003(d)(1)).

From the SEA Reserve under the ESSER Fund, an SEA may allocate those funds to LEAs, among other entities, for emergency needs determined by the SEA to address issues responding to COVID–19 (section 18003(e)).[3]

The CARES Act programs do not favor students based on public or non-public school attendance. *Any* student attending a public or non-public school may receive a broad array of services irrespective of where the student resides or whether he or she is low achieving or from a low-income family.

Section 18005(a) of the CARES Act requires an LEA receiving funds under sections 18002 or 18003 of the CARES Act to "provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools."

Section 1117 is a provision of Title I, Part A (Title I) of the ESEA, a program whose purpose is to improve the

---

[1] *See, e.g.,* letter from Carissa Moffat Miller, Executive Director, Council of Chief State School Officers, to Betsy DeVos, U.S. Secretary of Education (May 5, 2020), available at *https:// ccsso.org/sites/default/files/2020-05/ DeVosESLetter050520.pdf*; letter from Pedro A. Rivera, Secretary of Education, Pennsylvania Department of Education, to Frank T. Brogan, Assistant Secretary for Elementary and Secondary Education, U.S. Department of Education (May 7, 2020), available at *https://www.education.pa.gov/ Documents/K-12/Safe%20Schools/COVID/ CARESAct/Letter%20to%20 Secretary%20Brogan.pdf*.

[2] A Governor may target GEER funds for a specific purpose or population of students, in which case an LEA would need to use the funds accordingly.

[3] An SEA may target ESSER SEA Reserve funds for a specific purpose or population of students, in which case an LEA would need to use the funds accordingly.

academic achievement of low-achieving students who reside in public school attendance areas with a high concentration of poverty (Title I schools) (20 U.S.C. 6301 *et seq.*). Section 1117 requires an LEA that receives Title I funds to provide equitable services to non-public school students (20 U.S.C. 6320; 34 CFR 200.62–200.68). Under Title I, funds for equitable services are generated by students from low-income families who reside in a participating Title I public school attendance area and attend a non-public school (20 U.S.C. 6320(a)(4)(A)(i); 34 CFR 200.64(a)). Using these funds, the LEA provides services to low-achieving students who reside in a participating Title I public school attendance area and attend a non-public school, regardless of the location of the non-public school (*i.e.,* inside or outside the public school attendance area or the LEA in which the student resides) (20 U.S.C. 6320(a)(1); 34 CFR 200.62(b)(1)).

The same framework applies for public school students under Title I. An LEA must identify eligible public school attendance areas and rank them on the basis of concentration of poverty (20 U.S.C. 6313(a)(2), (b); 34 CFR 200.78(a)). The LEA then selects areas to participate in Title I services in rank order of poverty, either for the LEA as a whole or within a grade span—*e.g.,* all elementary schools (20 U.S.C. 6313(a)(3)–(4); 34 CFR 200.78(a)). Eligible public school students must live in a school attendance area selected to participate under Title I and be low achieving (20 U.S.C. 6314(b)(6), 6315(c)). Thus, for both public and non-public school students, generation of Title I funds and eligibility for Title I services depend on residence in a participating Title I public school attendance area; that is, similarly situated students receive the same benefits under Title I (*i.e.,* are treated "equitably") whether they attend a public Title I school or a non-public school.

*B. Resolving Ambiguity in Section 18005(a)*

Section 18005(a) of the CARES Act is facially ambiguous. To begin with, Congress did not need to add the words "in the same manner" if it simply intended to incorporate "section 1117 of the ESEA of 1965" by reference in the CARES Act. The unqualified phrase "as provided in" alone would have been sufficient.

Furthermore, Congress included a separate consultation requirement in section 18005(a) of the CARES Act, and a public control of funds provision in section 18005(b), notwithstanding the

fact that section 1117 contains precisely parallel provisions. *Compare* section 18005(a) and (b) of the CARES Act *with* section 1117(b) and (d) of Title I, respectively. If Congress intended to incorporate "section 1117 of the ESEA of 1965" wholesale into the CARES Act, and to have the Department mechanistically apply it, then these provisions in sections 18005(a) and (b) must be deemed superfluous and other key CARES Act text ignored. *Compare, e.g.,* section 1117(a)(1) (meeting the needs of non-public school students who are low-achieving and reside in a participating Title I public school attendance area) *with* sections 18002(c)(1) (emergency support for LEAs significantly impacted by COVID–19 to continue education services to their students and to support on-going functionality of the LEAs) and 18003(d) (support any activity from a broad array of permissible purposes for any student and staff without limitation on income, residence, or school attendance).

Finally, the CARES Act is a separate appropriation allowing separate permissible uses of taxpayer funds. By definition, the provisions in section 1117 relating to funding and eligibility for services, *e.g.,* section 1117(a)(1) and (4) and (b)(1)(E) and (J)(ii), are inapposite in a CARES Act frame. However, the provisions in section 1117 relating to the "manner" in which services are delivered, *e.g.,* section 1117(a)(2), (3), and (b)(1)(A)–(D), (F)–(I), and (K), arguably do fit within and can be applied under the CARES Act.

These facts must be acknowledged and should drive construction of section 18005(a)'s operative phrase "in the same manner as provided under section 1117" of Title I. Accordingly, in the exercise of our interpretative discretion, the Department has resolved the ambiguity by permitting LEAs flexibility to provide equitable services, particularly with respect to determining the proportional share, based on the services it provides to public school students. An LEA that spends funds from a CARES Act program *only* on students and teachers in Title I schools may determine the proportional share on the basis of enrollment or by either using the LEA's Title I proportional share for the 2019–2020 school year or by using the number of students from low-income families in participating non-public schools compared to the total number of students from low-income families in Title I and participating non-public schools in the LEA. All other LEAs must determine the proportional share based on enrollment in public and participating non-public schools.

We believe this flexibility is a reasoned and consistent construction giving effect to all relevant statutory text. Any other construction renders the words of section 18005(a) "in the same manner" to be denuded of meaning, the consultation and public use of funds provisions of section 18005(a) and (b) to be discarded as surplus language, and, paradoxically, the equity mandate of section 1117(a)(3) to be ignored.

Significant Regulations

To carry out functions vested in the Secretary by law, she is "authorized to make, promulgate, issue, rescind, and amend rules and regulations . . . governing the applicable programs administered by, the Department." 20 U.S.C. 1221e–3; *see also* 20 U.S.C. 3474 (Secretary is "authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department"). A "rule" is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy." 5 U.S.C. 551(4).

We discuss substantive issues under the sections of the interim final rule to which they pertain. There are no current regulations.

In General

*Statute:* Section 18005(a) of the CARES Act requires an LEA that receives funds under the GEER Fund or the ESSER Fund to provide equitable services in the same manner as provided under section 1117 of the ESEA to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

*New Regulations:* Section 76.665(a)(1) incorporates the statute. Section 76.665(a)(2) identifies the CARES Act programs to which this section applies: The GEER Fund, the ESSER Fund formula grants to LEAs, and the ESSER SEA Reserve.

*Reasons:* It is necessary to include the statutory requirement that an LEA provide equitable services "in the same manner" as provided under section 1117 of the ESEA to students and teachers in non-public schools to provide context and authorization for the remaining provisions.

Consultation

*Statute:* Section 18005(a) of the CARES Act requires an LEA to provide equitable services "as determined in consultation with representatives of non-public schools."

*New Regulations:* Consultation must be "in the same manner" as conducted under section 1117 of the ESEA. Section 76.665(b)(1) incorporates section 1117's requirement that consultation must occur during the design and development of the LEA's plans to spend CARES Act funds and before the LEA makes any decision affecting the opportunities of students and teachers in non-public schools to benefit from those funds. As provided in section 1117(b)(1) of the ESEA, the LEA and private school officials shall both have the goal of reaching timely agreement on how to provide equitable and effective programs for private school students and teachers.

Section 76.665(b)(2) makes clear that the requirements for consultation in section 1117(b) of the ESEA apply to the CARES Act programs unless they are inconsistent with the CARES Act statutory provisions. For example, sections 1117(b)(1)(E) and (J)(ii), which deal with calculating the proportional share in accordance with section 1117(a)(4)(A) of the ESEA, would not apply if an LEA chooses the measure in § 76.665(c)(1)(i)(B) or (ii).

*Reasons:* Consultation is the foundation on which equitable services are provided and is mandated by section 18005(a). The regulations clarify that section 1117(b) of the ESEA, including the due process safeguards it contains, applies to the CARES Act programs, unless certain provisions are inconsistent with the CARES Act. We have identified two provisions that, on their face, are inconsistent with two of the measures these regulations permit for determining the proportional share because they refer to the proportional share as calculated under Title I. The CARES Act is an emergency appropriation to address exigent circumstances caused by responses to the pandemic. Although section 18005(a) does not specify how consultation is to occur, the Department believes using the section 1117(b) framework (to the extent consistent with the CARES Act itself), which is very familiar to schools and families, is a highly effective approach for the speedy provision of equitable services.

## Determining Proportional Share

*Statute:* Section 18005(a) of the CARES Act requires an LEA to provide equitable services "in the same manner as provided under section 1117 of the ESEA" to students and teachers in non-public schools.

*New Regulations:* Section 76.665(c) sets out measures that an LEA may use to determine the proportional share of funds available under each CARES Act

program to provide equitable services to students and teachers in non-public schools. An LEA need not use the same measure for each CARES Act program; however, it must use only one measure for a single program.

Section 76.665(c)(1)(i) addresses an LEA that allocates *all* its funds under a CARES Act program *only* to students and teachers in Title I schools. In that case, the LEA has two options in addition to using enrollment to determine the proportional share: (1) By using the proportional share it calculated under section 1117(a)(4)(A) for the 2019–2020 school year; or (2) by using the number of children, ages 5 through 17, who attend a non-public school in the LEA that will participate under a CARES Act program and who are from low-income families compared to the total number of children, ages 5 through 17, who are from low-income families in both Title I schools and participating non-public schools in the LEA. If an LEA uses one of these options, then the LEA must take care to ensure that it does not violate the supplement not supplant requirement in section 1118(b)(2) of the ESEA by allocating CARES Act funds to Title I schools and redirecting State and local funds from those schools to non-Title I schools. See § 76.665(c)(3).

For all other LEAs, § 76.665(c)(1)(ii) applies. This requires the LEA to calculate the proportional share based on enrollment in participating non-public elementary and secondary schools in the LEA compared to the total enrollment in both public and participating non-public elementary and secondary schools in the LEA.

Section 76.665(c)(2) requires an LEA to calculate the proportional share of CARES Act funds off the top of the LEA's total CARES Act allocation for each program under which it receives funds prior to any expenditures or transfers by the LEA in accordance with section 1117(a)(4)(A)(i) of the ESEA.

*Reasons:* Under § 76.665(c)(1)(i), an LEA spending *all* its funds under a CARES Act program *only* in its Title I schools may determine the proportional share for equitable services based on enrollment or in two additional ways based on the share of students from low-income families attending participating non-public schools within the LEA. One path permits an LEA to use the proportional share it calculated for Title I purposes in the 2019–2020 school year. This approach has the obvious advantage of simplicity because it is a known proportion. Alternatively, if an LEA believes an actual poverty count would better meet respective needs, then it may count students, ages 5

through 17, from low-income families in Title I and participating non-public schools using one of the poverty measures in section 1117(c)(1) of the ESEA.

Given that the purpose of the CARES Act is to "prevent, prepare for, and respond to" the effects of COVID–19, timely provision of services to both public and non-public students and teachers is critical. To the extent collecting poverty data from non-public school families under § 76.665(c)(1)(i)(B) would delay services, we encourage an LEA to use proportionality, wherein the LEA would apply the poverty percentage of its Title I schools as a whole to the enrollment in non-public schools that will participate in a CARES Act program. Whichever path an LEA chooses, it achieves the equity required under section 1117(a)(3) of the ESEA—that is, educational services and other benefits for students in non-public schools must be equitable in comparison to those for public school students.

For all other LEAs, equity requires comparable treatment for non-public school students and teachers, which is achieved by basing the proportional share on enrollment in both public and participating non-public schools in the LEA.

Congress has already taken poverty into consideration in allocating CARES Act funds to LEAs. An LEA receives ESSER funds based on its proportionate share of Title I funds (section 18003(c) of the CARES Act). The Department allocates Title I funds to LEAs through four statutory formulas, all of which are based on poverty counts that include both public and non-public school children.[4] An LEA's Title I allocation is generally the sum it receives through each formula less any required or authorized reservations by the State. Similarly, 40 percent of the GEER funds a Governor receives is based on the State's share of Title I formula children (section 18002(b)(2) of the CARES Act). Thus, Congress targeted both ESSER and GEER funds to high-poverty areas to reflect their need.

However, once this allocation is made, the CARES Act authorizes an LEA to serve all students—public and non-public—who have been affected by COVID–19. If the CARES Act does not limit services based on residence and

---

[4] Title I's four formulas direct funds to LEAs based primarily on an LEA's relative share of formula children, 97 percent of whom are children ages 5 through 17 in public and non-public schools as determined annually by the Census Bureau. In varying degrees, the formulas address concentrations of poverty. 20 U.S.C. 6333–6337.

poverty, then it stands to reason that an LEA should not use residence and poverty to determine the proportional share of available funds for equitable services to non-public school students. In this context, only the use of enrollment data ensures that sufficient CARES Act funds are reserved to provide services to non-public school students and teachers that are equitable in comparison to their public school counterparts.[5] In fact, this is the only way to give meaning to the phrase "in the same manner" consistent with section 1117(a)(3) of the ESEA, which requires that benefits for "private school children shall be equitable in comparison to services and other benefits for public school children." In other words, if an LEA elects to use CARES Act funds to serve all its students, then only a calculation of proportional share based on all students—*i.e.,* enrollment—satisfies the requirements of section 1117(a)(3).

To best meet its needs, an LEA may choose to use funds from one CARES Act program (*e.g.,* ESSER formula-grant funds) to serve students and teachers only in its Title I schools and funds from another CARES Act program (*e.g.,* GEER funds) to serve students and teachers in any school. In this case, the LEA would use the appropriate measure in § 76.665(c)(1) to determine the proportional share under each program.

In sum, the measures in § 76.665(c)(1)ensure the equitable treatment of non-public school students and teachers compared to their public school counterparts. The measures are also reasonable from the standpoint of administrative efficiency, minimizing LEA and parent burden, and carrying out the CARES Act's mandate to provide funds in response to the COVID–19 pandemic promptly and to do so in a way providing for equitable treatment of all students and teachers.

Equity

*Statute:* Section 18005(a) of the CARES Act requires an LEA to provide equitable services "in the same manner

as provided under section 1117 of the ESEA" to students and teachers in non-public schools.

*New Regulations:* Section 76.665(d)(1) implements section 1117(a)(3) of the ESEA, which requires educational services and other benefits for students and teachers in non-public schools be equitable in comparison to services and other benefits for public school students and teachers. Section 76.665(d)(2) makes clear that, irrespective of the measure an LEA uses to determine the proportional share under paragraph (c)(1), the LEA still has the obligation to afford students and teachers in any non-public school in the LEA the opportunity to receive CARES Act services.

*Reasons:* As explained above, section 1117(a)(3) of the ESEA mandates *equity* in equitable services. Only if services and other benefits to students and teachers in non-public schools are comparable to those provided to public school students and teachers can they be equitable.

Under § 76.665(d)(2), each non-public school in an LEA may request CARES Act services for its students and teachers. A non-public school, however, is not required to accept equitable services. In fact, the Department particularly discourages the small number of financially well-resourced non-public K–12 schools from accepting CARES Act-funded equitable services. Such schools include non-public boarding and day schools with tuition and fees comparable to those charged by the most highly selective postsecondary institutions. These schools tend to serve families from the highest income brackets, although they sometimes offer a limited number of scholarships to low- and middle-income students each year. The Department believes such non-public schools have ample resources to serve their students and teachers during the COVID–19 national emergency and should not rely on taxpayer funds to do so.

Secular, Neutral, and Nonideological

*Statute:* Section 18005(a) of the CARES Act requires an LEA to provide equitable services "in the same manner as provided under section 1117 of the ESEA" to students and teachers in non-public schools. Section 1117(a)(2) of the ESEA requires educational services or other benefits, including materials and equipment, be secular, neutral, and nonideological.

*New Regulations:* Section 76.665(e) implements section 1117(a)(2) of the ESEA.

*Reasons:* Section 76.665(e) makes clear that the services and benefits an

LEA provides under the CARES Act programs must be secular, neutral, and nonideological.

Public Control of Funds

*Statute:* Section 18005(b) of the CARES Act requires the control of CARES Act funds for services and assistance to students and teachers in non-public schools and title to materials, equipment, and property must be in a public agency and a public agency must administer those funds, materials, equipment, and property. An LEA must provide services directly or contract for the provision of services with a public or private entity.

*New Regulations:* Section 76.665(f) implements section 18005(b) of the CARES Act.

*Reasons:* Section 76.665(f) emphasizes the importance of the statutory requirements that control of CARES Act funds and title to materials, equipment, and property for equitable services to students and teachers in non-public schools be in a public agency and that the LEA or public agency continuously administers the funds, materials, equipment, and property.

**Waiver of Proposed Rulemaking and Delayed Effective Date**

Under the Administrative Procedure Act (APA) (5 U.S.C. 553), the Department generally offers interested parties the opportunity to comment on a proposed rule. However, the APA provides that an agency is not required to conduct notice and comment rulemaking when the agency, for good cause, finds that the requirement is impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. 553(b)(B). There is good cause here for waiving rulemaking. The CARES Act programs were enacted to address the immediate effects of COVID–19. The statute requires an LEA to provide services for students and teachers in non-public schools that are equitable in comparison to services provided to public school students and teachers. Before an LEA makes any decision that affects the opportunity of non-public school students and teachers to participate, it must consult with appropriate non-public school representatives. Thus, an LEA cannot begin services for public or non-public school students and teachers without consulting on determining the amount of funds available for those services. Therefore, in light of the current national emergency, its disruption on education in both public and non-public schools, and the immediate need for certainty regarding applicable requirements, the normal rulemaking process would be

[5] About 4.9 million students or 9.1 percent of all elementary and secondary school students in the Nation are enrolled in non-public schools. Broughman, S.P., Kincel, B., and Peterson, J. (2019). Characteristics of Private Schools in the United States: Results From the 2017–18 Private School Universe Survey First Look (NCES 2019–071), U.S. Department of Education. Using enrollment to determine the share of CARES Act funds for equitable services and assuming that every private elementary and secondary school chose to participate in the CARES Act programs, less than 10 percent of the CARES Act funding nationwide would be provided for equitable services for non-public school students and teachers, with more than 90 percent of the funding directed to public school students and teachers nationwide.

impracticable and contrary to the public interest because time is of the essence. However, the Department is providing a 30-day comment period and invites interested persons to participate in this rulemaking by submitting written comments. The Department will consider the comments received and may conduct additional rulemaking based on the comments.

The APA also generally requires that a final or interim final rule be published at least 30 days before its effective date, unless the agency has good cause to implement its regulations sooner (5 U.S.C. 553(d)(3)). Again, this interim final rule is necessary immediately to address the effects of COVID–19 on both public and non-public school students and teachers. In response to the pressing need for States and LEAs to have clear guidance on the use of funds under the CARES Act programs so that they can help all schools address the disruption created by COVID–19 and ensure that learning continues for all students, consistent with the purposes of the CARES Act, it is impracticable and contrary to the public interest to delay the effective date. Accordingly, we make this rule effective on the day it is published.

## Executive Orders 12866, 13563, and 13771

### Regulatory Impact Analysis

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a significant regulatory action as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy; productivity; competition; jobs; the environment; public health or safety; or State, local, or Tribal governments or communities in a material way (also referred to as "economically significant" regulations);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This regulatory action is an economically significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866. Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as a "major rule," as defined by 5 U.S.C. 804(2).

Under Executive Order 13771, for each new regulation that the Department proposes for notice and comment or otherwise promulgates that is a significant regulatory action under Executive Order 12866 and that imposes total costs greater than zero, it must identify two deregulatory actions. For FY 2020, any new incremental costs associated with a new regulation must be fully offset by the elimination of existing costs through deregulatory actions. The designation of this rule under Executive Order 13771 will be informed by public comments.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only upon a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account, among other things, and to the extent practicable, the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or providing information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

The Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action, and we are issuing this interim final rule only on a reasoned determination that its benefits justify its costs. In choosing among alternative regulatory approaches, we selected those approaches that would maximize net benefits. Based on the analysis that follows and the reasons stated elsewhere in this document, the Department believes that this interim final rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In this regulatory impact analysis, we discuss the need for regulatory action, the potential costs and benefits, net budget impacts, assumptions, limitations, and data sources, as well as regulatory alternatives we considered.

Elsewhere, under *Paperwork Reduction Act of 1995*, we identify and explain burdens specifically associated with information collection requirements.

## 1. Need for Regulatory Action and Analysis of Benefits

The Department is issuing this interim final rule to clarify the provision of equitable services under section 18005 of the CARES Act. More specifically, this interim final rule specifies the measures that LEAs may use to determine the proportional share of CARES Act funds available for equitable services to students and teachers in non-public schools. This interim final rule is meant to provide flexibility and clarify administration for SEAs and LEAs so that the equitable services provisions are implemented consistent with the requirements of the CARES Act and that funds may be used to provide services to both public and non-public students and teachers in a timely manner while imposing as little burden and costs on program participants as possible. In doing so, it reconciles applicable equitable services provisions of the CARES Act in a manner that is reasonable, offers appropriate flexibility, and ensures that CARES Act programs serve public and non-public school students equitably. In particular, the rule expands the options available for determining the proportional share of CARES Act funds that must be made available for equitable services by allowing an LEA to

select a measure based on the students and schools it will serve with CARES Act funds. The Department believes that these benefits outweigh any associated costs.

As discussed elsewhere in this preamble, in light of the current national emergency and the importance of ensuring that LEAs provide services immediately under the CARES Act to students and teachers in schools—both public and non-public—consistent with the requirements of law, the normal rulemaking process would be impracticable and contrary to the public interest. Moreover, in light of clear evidence that a significant number of SEAs have indicated their intention to implement the equitable services provisions of the CARES Act in a manner that the Department deems contrary to statutory requirements, which means that thousands of LEAs in these States may be in the process of violating the CARES Act as it pertains to equitable services, it is essential to clarify those requirements as soon as possible.

2. Analysis of Costs

Section 18005 of the CARES Act is intended to ensure that LEAs receiving funds under the GEER Fund or ESSER Fund provide equitable services to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools. In accordance with OMB Circular A–4 (available at *www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf*), we are evaluating the costs and benefits of this interim final rule compared to a pre-statutory baseline. This rule defines the measures that may be used to determine the proportional share of funds that LEAs must reserve for equitable services but does not interpret or otherwise alter other statutory requirements related to equitable services. Affected LEAs will likely face some administrative costs to implement these statutory requirements, but the Department largely lacks data to quantify these costs. However, the Department expects that these entities will largely experience benefits exceeding these administrative costs. Because an LEA has flexibility in the manner in which it provides equitable services under the CARES Act programs, including the extent to which it relies on processes and procedures previously established to consult with non-public school officials and provide services under ESEA programs, and because the Department lacks data on the extent to which non-public schools may choose to participate in equitable

services under the CARES Act, the Department does not know the exact costs attributable to the statutory requirements. Moreover, LEAs are permitted to reserve funds, from the proportional share determined in accordance with this interim final rule, to pay the reasonable and necessary costs of administering equitable services under the CARES Act.

In the following paragraphs, we estimate the costs of determining the proportional share in accordance with the interim final rule, while recognizing that those costs may be financed using CARES Act program funds.[6]

**Implementation Costs for SEAs, LEAs, Affected Schools, and the Government**

*Costs of Determining the Proportional Share for LEAs Serving Students and Teachers in Both Title I and Non-Title I Schools*

For LEAs using CARES Act funds to serve students and teachers in both Title I and non-Title I schools, the interim final rule requires the use of enrollment data to determine the proportional share. For the majority of these LEAs, enrollment data should already be available for non-public schools that participate in equitable services under ESEA programs other than Title I. Equitable services under those programs are governed by section 8501 of the ESEA, which requires in determining expenditures for equitable services that an LEA take into account the number of non-public school students to be served. In complying with this requirement, an LEA customarily obtains enrollment data from participating non-public schools. For such LEAs, complying with the interim final rule accordingly imposes no additional burden with respect to those schools.

If an LEA does not already obtain enrollment data in this manner from a non-public school that will participate in equitable services under the CARES Act programs, we expect that, in a majority of States, the LEA can obtain the data immediately from the SEA, particularly the approximately 35 SEAs that collect enrollment data from their non-public schools on an annual basis.[7] For LEAs in this circumstance, the interim final rule similarly imposes no burden, and it imposes a negligible burden on affected SEAs, which would merely need to share previously collected enrollment data through long-

established means of communication with their LEAs.

For LEAs that do not already have enrollment data for one or more participating non-public schools and that cannot obtain such data from the SEA, complying with the interim final rule entails obtaining the data directly from those schools through the consultation process. The Department believes this will be minimally burdensome on these LEAs, which we estimate to include 20 percent of affected LEAs. Specifically, we estimate that an LEA will have on average two non-public schools for which enrollment data are needed and that it will take on average 0.5 total hours to obtain the data from those schools. At $35 per hour for LEA staff, the average cost is an estimated $18 per LEA. Assuming that 10,125 LEAs (or 75 percent of an estimated 13,500 LEAs with attendance areas) are subject to the equitable services provisions of the CARES Act and that 7,595 (or 75 percent) of these LEAs will choose to serve students and teachers in both Title I and non-Title I schools, approximately 1,520 LEAs (20 percent of 7,595 affected LEAs) would bear this cost, for a total estimated cost of $27,360.

*Costs of Determining the Proportional Share for LEAs Serving Title I Schools Only*

For LEAs using CARES Act funds to serve students and teachers only in Title I schools, the interim final rule provides the option to determine the proportional share using one of two poverty alternatives. The first is simply to use as the proportional share for CARES Act purposes the proportional share of Title I funds available for equitable services under section 1117(a)(4)(A) of the ESEA, which is determined based on residence of students from low-income families in participating Title I public school attendance areas. Using this pre-existing alternative would of course impose no additional burden on LEAs.

The second alternative is to determine the proportional share for equitable services using data on the number of students from low-income families who attend participating Title I schools and participating non-public elementary and secondary schools in the LEA. Under this alternative, an LEA may choose to obtain poverty counts for students in non-public schools that wish to participate. We estimate that 12.5 percent of affected LEAs will implement this alternative by obtaining poverty counts and that it will take an LEA on average 240 hours to obtain those counts. At $35 per hour for LEA staff, the average cost is an estimated $8,400

---

[6] For the purpose of this analysis, we assume that an LEA receiving funds under the GEER Fund and ESSER Fund will use the same measure to determine the proportional share for each program.

[7] See *https://www2.ed.gov/about/inits/ed/non-public-education/regulation-map/index.html*.

per LEA. Assuming that 2,530 LEAs (or 25 percent of the estimated 10,125 LEAs subject to the equitable services provisions of the CARES Act) will choose to serve students and teachers in Title I schools only, approximately 315 LEAs (12.5 percent of 2,530 affected LEAs) would bear this cost, for a total estimated cost of $2,646,000.

As discussed elsewhere in this document, LEAs may also implement this poverty alternative using a proportionality method, wherein the LEA applies the average poverty rate of its Title I schools to the enrollment in non-public schools that will participate in a CARES Act program to generate poverty estimates for those schools. LEAs that choose to implement this alternative using a proportionality method would accordingly need to have enrollment data from participating non-public schools, but not poverty data—that is, the same enrollment data required of LEAs serving students and

teachers in both Title I and non-Title I schools to determine the proportional share. As discussed elsewhere in this analysis with respect to those LEAs, enrollment data are generally already available. We estimate that only 20 percent of affected LEAs would need to obtain those data from one or more participating non-public schools, and that it would take on average 0.5 hours to obtain the data. At $35 per hour for LEA staff, the average cost is an estimated $18 per LEA. Assuming that 315 LEAs (or 12.5 percent of the estimated 2,530 LEAs that will choose to serve students and teachers in Title I schools only) will choose to implement this poverty alternative using a proportionality method or, as permitted, use enrollment data to determine the proportional share, approximately 65 LEAs (20 percent of 315 affected LEAs) would bear this cost, for a total estimated cost of $1,170.

### 3. Net Budget Impacts

We estimate that the discretionary elements of this interim final rule will not have an impact on the Federal budget. This rule specifies the measures that LEAs may use to determine the proportional share of funds for equitable services under the CARES Act programs but does not change the amount of funding available for such programs. We anticipate that $16.2 billion in CARES Act funds will be disbursed in 2020, and therefore estimate $16.2 billion in transfers in 2020 relative to a pre-statutory baseline.

### 4. Accounting Statement

As required by OMB Circular A–4, in the following table we have prepared an accounting statement showing the classification of the impacts associated with the provisions of these regulations in 2020. Impacts classified as transfers are from the Federal Government to LEAs.

### ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED IMPACTS

[In millions]

| Category | Benefits |
|---|---|
| Clarity and flexibility in administration of equitable services ............................................................................................. | Not Quantified. |
| | Costs |
| Determining proportional share for equitable services ........................................................................................................ | $2.7. |
| | Transfers |
| Providing educational services in preparation for and response to COVID–19, including for students and teachers in non-public schools. | $16,182. |

### 5. Regulatory Alternatives Considered

As an alternative to the options for determining the proportional share provided in this interim final rule, the Department considered requiring all LEAs subject to equitable services requirements in the CARES Act to determine the proportional share using enrollment data. Ultimately, we determined that such a requirement could be inequitable if an LEA chooses to serve only its Title I schools and therefore uses its Title I proportional share as the proportional share for CARES Act purposes.

### Clarity of the Regulations

Executive Order 12866 and the Presidential memorandum "Plain Language in Government Writing" require each agency to write regulations that are easy to understand.

The Secretary invites comments on how to make these regulations easier to understand, including answers to questions such as the following:

• Are the requirements in the regulations clearly stated?

• Do the regulations contain technical terms or other wording that interferes with their clarity?

• Does the format of the regulations (grouping and order of sections, use of headings, paragraphing, etc.) aid or reduce their clarity?

• Would the regulations be easier to understand if we divided them into more (but shorter) sections? (A "section" is preceded by the symbol "§" and a numbered heading; for example, § 76.665.)

• Could the description of the regulations in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the regulations easier to understand? If so, how?

• What else could we do to make the regulations easier to understand?

To send any comments that concern how the Department could make these regulations easier to understand, see the instructions in the **ADDRESSES** section.

### Regulatory Flexibility Act Certification

The Regulatory Flexibility Act does not apply to this rulemaking because there is good cause to waive notice and comment under 5 U.S.C. 553.

The Secretary certifies that these interim final requirements would not have a significant economic impact on a substantial number of small entities. Under the U.S. Small Business Administration's Size Standards, small entities include small governmental jurisdictions such as cities, towns, or school districts (LEAs) with a population of less than 50,000. Although the majority of LEAs that receive CARES Act funds and are subject to CARES Act equitable services requirements would qualify as small entities under this definition, this rule will benefit small entities by providing multiple options for determining the proportional share of funds that must be reserved for equitable services and clarifying that such entities have discretion to select the option that

minimizes costs and burdens. As discussed in the Regulatory Impact Analysis, unless an LEA seeks to serve only Title I schools and determine the proportional share for equitable services by obtaining poverty counts based on student enrollment, the costs associated with the interim final rule are minimal. We estimate that the vast majority of LEAs (9,810 LEAs out of an estimated 10,125 LEAs subject to equitable services requirements) will choose to employ a minimally burdensome option in determining the proportional share. Moreover, for any small-entity LEA that chooses to serve only Title I schools and determine the proportional share for equitable services by obtaining poverty counts based on student enrollment, we presume the benefit of obtaining accurate poverty counts outweighs any associated costs. Finally, we note that all costs entailed in administering the equitable services provisions of the CARES Act may be paid for with funds received under the respective CARES Act programs; consequently, neither the statutory CARES Act equitable services requirements nor the provisions of this interim final rule impose any uncompensated costs on small entities.

*Paperwork Reduction Act of 1995*

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that the public understands the Department's collection instructions, respondents provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of the law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

Information collections related to the CARES Act programs are included in paperwork clearances OMB control numbers 1810–0741 and 1810–0743. The Department is currently requesting

public comment on these clearances. Those clearances do not address the information collection applicable to this rule. Accordingly, the Department is requesting a separate emergency paperwork clearance from OMB on the data collections associated with this interim final rule and will add the burden to the clearances currently out for public comment.

As discussed in the Analysis of Costs and Benefits section of the Regulatory Impact Statement in these interim final regulations, for LEAs that do not already have enrollment data for one or more participating non-public schools and that cannot obtain such data from the SEA, complying with the interim final regulations entails obtaining the data directly from those schools through the consultation process. The Department believes this will be minimally burdensome on these LEAs, which we estimate to include 20 percent of affected LEAs. Specifically, we estimate that an LEA will have on average two non-public schools for which enrollment data are needed and that it will take on average 0.5 total hours to obtain the data from those schools. At $35 per hour for LEA staff, the average cost is an estimated $18 per LEA. Assuming that 10,125 LEAs (or 75 percent of an estimated 13,500 LEAs with attendance areas) are subject to the equitable services provisions of the CARES Act and that 7,595 (or 75 percent) of these LEAs will choose to serve students and teachers in both Title I and non-Title I schools, approximately 1,520 LEAs (20 percent of 7,595 affected LEAs) would bear this cost, for a total estimated cost of $27,360.

For LEAs using CARES Act funds to serve students and teachers only in Title I schools, the interim final regulations provide the option to determine the proportional share using one of two poverty alternatives; however, only one of these alternatives would impose additional burden. For the alternative that imposes additional burden, LEAs would determine the proportional share for equitable services using data on the number of students from low-income families who attend participating Title I schools, which are already available, and participating non-public elementary and secondary schools in the LEA. Under this alternative, an LEA may choose to obtain poverty counts for students in non-public schools that wish to participate. We estimate that 12.5 percent of affected LEAs will implement this alternative by obtaining poverty counts and that it will take an LEA on average 240 hours to obtain those counts. At $35 per hour for LEA staff, the average cost is an estimated

$8,400 per LEA. Assuming that 2,530 LEAs (or 25 percent of the estimated 10,125 LEAs subject to the equitable services provisions of the CARES Act) will choose to serve students and teachers in Title I schools only, approximately 315 LEAs (12.5 percent of 2,530 affected LEAs) would bear this cost, for a total estimated cost of $2,646,000.

As discussed elsewhere in this document, LEAs may also implement this poverty alternative using a proportionality method, wherein the LEA applies the average poverty rate of its Title I schools to the enrollment in non-public schools that will participate in a CARES Act program to generate poverty estimates for those schools. LEAs that choose to implement this alternative using a proportionality method would accordingly need to have enrollment data from participating non-public schools, but not poverty data—that is, the same enrollment data required of LEAs serving students and teachers in both Title I and non-Title I schools to determine the proportional share. With respect to those LEAs, enrollment data are generally already available. We estimate that only 20 percent of affected LEAs would need to obtain those data from one or more participating non-public schools, and that it would take on average 0.5 hours to obtain the data. At $35 per hour for LEA staff, the average cost is an estimated $18 per LEA. Assuming that 315 LEAs (or 12.5 percent of the estimated 2,530 LEAs that will choose to serve students and teachers in Title I schools only) will choose to implement this poverty alternative using a proportionality method or, as permitted, use enrollment data to determine the proportional share, approximately 65 LEAs (20 percent of 315 affected LEAs) would bear this cost, for a total estimated cost of $1,170.

*Intergovernmental Review*

The CARES Act programs covered by the interim final rule are not subject to Executive Order 12372 and the regulations in 34 CFR part 79.

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can

view this document, as well as all other documents of this Department published in the **Federal Register**, in text or portable document format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.*

Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

## List of Subjects in 34 CFR Part 76

Accounting, Administrative practice and procedure, American Samoa, Education, Grant programs—education, Guam, Northern Mariana Islands, Pacific Islands Trust Territory,Prisons, Private schools, Reporting and recordkeeping requirements, Virgin Islands, Youth organizations.

**Betsy DeVos,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends title 34 of the Code of Federal Regulations by revising part 76 to read as follows:

## PART 76—STATE-ADMINISTERED PROGRAMS

■ 1. The authority citation for part 76 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3 and 3474, unless otherwise noted.

### §§ 76.663 and 76.664   [Reserved]

■ 2. Add reserved §§ 76.663 and 76.664.
■ 3. Add an undesignated center heading after reserved § 76.664 to read as follows:

## Equitable Services Under the CARES Act

■ 4. Section 76.665 is added to read as follows:

### § 76.665   Providing equitable services to students and teachers in non-public schools.

(a) *In general.* (1) A local educational agency (LEA) receiving funds under a CARES Act program must provide equitable services to students and teachers in non-public elementary and secondary schools in the LEA "in the same manner" as provided under section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA), as determined in consultation with representatives of non-public schools.

(2) For purposes of this section, the CARES Act programs are the Governor's Emergency Education Relief (GEER) Fund (Section 18002), formula grants to LEAs under the Elementary and Secondary School Emergency Relief (ESSER) Fund (Section 18003(c)), and ESSER SEA Reserve (Section 18003(e)).

(b) *Consultation.* (1) An LEA must promptly consult with representatives of non-public elementary and secondary schools during the design and development of the LEA's plans to spend funds from a CARES Act program and before the LEA makes any decision affecting the opportunities of students and teachers in non-public schools to benefit from those funds. As provided in section 1117(b)(1) of the ESEA, the LEA and non-public school officials shall both have the goal of reaching timely agreement on how to provide equitable and effective programs for non-public school students and teachers.

(2) Consultation must occur in accordance with section 1117(b) of the ESEA, except to the extent inconsistent with the CARES Act and this section, such as section 1117(b)(1)(E) and (J)(ii).

(c) *Determining proportional share.* (1) To determine the proportional share of funds for equitable services to students and teachers in non-public elementary and secondary schools for each CARES Act program, an LEA must use one of the following measures. The LEA need not use the same measure for each CARES Act program.

(i) An LEA using *all* its funds under a CARES Act program to serve *only* students and teachers in public schools participating under Title I, Part A of the ESEA may calculate the proportional share in accordance with paragraph (c)(1)(ii) of this section or by using—

(A) The proportional share of Title I, Part A funds it calculated under section 1117(a)(4)(A) of the ESEA for the 2019–2020 school year; or

(B) The number of children, ages 5 through 17, who attend each non-public school in the LEA that will participate under a CARES Act program and are from low-income families compared to the total number of children, ages 5 through 17, who are from low-income families in both Title I schools and participating non-public elementary and secondary schools in the LEA.

(ii) Any other LEA must calculate the proportional share based on enrollment in participating non-public elementary and secondary schools in the LEA compared to the total enrollment in both public and participating non-public elementary and secondary schools in the LEA.

(2) An LEA must determine the proportional share of funds available for services for students and teachers in non-public elementary and secondary

schools based on the total amount of CARES Act funds received by the LEA under a CARES Act program prior to any allowable expenditures or transfers by the LEA.

(3) An LEA using funds from a CARES Act program in Title I schools under paragraph (c)(1)(i) of this section must comply with the supplement not supplant requirement in section 1118(b) of the ESEA, which would prohibit the LEA from allocating CARES Act funds to Title I schools and then redirecting State or local funds to non-Title I schools, among other things.

(d) *Equity.* (1) Educational services and other benefits for students and teachers in non-public elementary and secondary schools must be equitable in comparison to services and other benefits for public school students and teachers participating in CARES Act programs, and must be provided in a timely manner.

(2) The measure an LEA uses to determine the proportional share under paragraph (c)(1) of this section does not limit the obligation of the LEA to provide the opportunity to receive services to students and teachers in any non-public elementary or secondary school in the LEA.

(e) *Secular, neutral, and nonideological.* Educational services and benefits, including materials and equipment, an LEA provides to students and teachers in non-public elementary and secondary schools under the CARES Act programs must be secular, neutral, and nonideological.

(f) *Public control of funds.* An LEA must—

(1) Maintain control of CARES Act funds;

(2) Keep title to and exercise continuing administrative control of all materials, equipment, and property purchased with CARES Act funds; and

(3) Provide services with CARES Act funds directly or through a contract with a public or private entity.

(*Authority:* 20 U.S.C. 6320, 6321(b); section 18005 of the CARES Act)

### §§ 76.666 through 76.669   [Reserved]

■ 5. Add reserved §§ 76.666 through 76.669.

[FR Doc. 2020–14224 Filed 6–30–20; 8:45 am]

**BILLING CODE 4000–01–P**