XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
REBEKAH A. FRETZ
JAMES F. ZAHRADKA II
GARRETT M. LINDSEY (SBN 293456)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6402
  E-mail: Garrett.Lindsey@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF MICHIGAN, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF HAWAII, STATE OF MAINE, STATE OF MARYLAND, STATE OF NEW MEXICO, COMMONWEALTH OF PENNSYLVANIA, STATE OF WISCONSIN, THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, BOARD OF EDUCATION FOR THE CITY OF CHICAGO, CLEVELAND MUNICIPAL SCHOOL DISTRICT BOARD OF EDUCATION, and SAN FRANCISCO UNIFIED SCHOOL DISTRICT,** | Case No. 3:20-cv-04478-SK **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Plaintiffs, | Judge: Hon. Sallie Kim Trial Date:     None set Action Filed:   July 7, 2020 |
| v. | |
| **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

| | Page |
|---|---|

Introduction ................................................................................................................ 1

Background ................................................................................................................. 3

    I.     The Pandemic's Effect on Public Elementary and Secondary Education.............. 3

    II.    ESSER and GEER Funds to Assist Public Schools ................................................ 5

    III.   The Department's Guidance and the Rule ............................................................... 6

    IV.   The Impact of the Department's Actions on Plaintiffs ........................................... 9

Legal Standard ............................................................................................................ 9

Argument .................................................................................................................... 10

    I.     Plaintiffs Are Likely to Succeed on their Claims that the Rule and the
             Guidance Are Unlawful and Unconstitutional ........................................................ 10

        A.   The Rule and the Guidance Are Ultra Vires, Violate the Separation
              of Powers, and Exceed ED's Statutory Authority ..................................... 10

            1.    ED Has No Rulemaking Authority under Sections 18002,
                  18003, and 18005 of the CARES Act ........................................... 10

            2.    ED Has No Authority to Attach a Supplement-Not-Supplant
                  Condition to ESSER or GEER Funds ........................................... 11

            3.    ED Does Not Have Implicit Authority to Issue the Rule ............. 12

        B.   The Funding Conditions in the Rule and the Guidance Violate the
              Spending Clause ........................................................................................ 16

        C.   ED's Actions Are Arbitrary and Capricious in Violation of the APA ...... 20

        D.   The Rule Is Procedurally Defective Under the APA as ED Did Not
              Have Good Cause to Issue the Rule as an Interim Final Rule. ................. 25

    II.    Plaintiffs Will Suffer Irreparable Harm ................................................................. 27

    III.   The Public Interest Weighs Heavily in Favor of Provisional Relief .................... 29

Conclusion .................................................................................................................. 30

i

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

# TABLE OF AUTHORITIES

**Page**

**CASES**

*All. for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)........................................................................9

*Am. Trucking Ass'ns v. City of Los Angeles*
    559 F.3d 1046 (9th Cir. 2009)......................................................................29

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
    548 U.S. 291 (2006)......................................................................................17

*Azar v. Allina Health Servs.*
    139 S. Ct. 1804 (2019)..................................................................................11

*California v. Azar*
    911 F.3d 558 (9th Cir. 2018)..........................................................25, 26, 28

*City & Cty. of San Francisco v. Sessions*
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ........................................................20

*City & Cty. of San Francisco v. Trump*
    897 F.3d 1225 (9th Cir. 2018)..............................................................10, 30

*City of Los Angeles v. Barr*
    941 F.3d 931 (9th Cir. 2019)........................................................................12

*City of Los Angeles v. McLaughlin*
    865 F.2d 1084 (9th Cir. 1989)......................................................................12

*Cty. of Santa Clara v. Trump*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ........................................................28

*Cty. of Santa Clara v. Trump*
    275 F. Supp. 3d 1196 (N.D. Cal. 2017) ......................................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
    140 S. Ct. 1891 (2020)............................................................................21, 22

*E. Bay Sanctuary Covenant v. Trump*
    950 F.3d 1242 (9th Cir. 2020)......................................................................24

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009)................................................................................21, 22

ii

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Gonzales v. Oregon*
    546 U.S. 243 (2006) ..................................................................................................12

*In re Aiken Cty.*
    725 F.3d 255 (D.C. Cir. 2013) ..................................................................................10

*Kollaritsch v. Mich. State Univ. Bd. of Trs.*
    944 F.3d 613 (6th Cir. 2019) .....................................................................................16

*La. Pub. Serv. Comm'n v. FCC*
    476 U.S. 355 (1986) ..................................................................................................10

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*
    752 F.3d 755 (9th Cir. 2014) .....................................................................................29

*Meyer v. Nebraska*
    262 U.S. 390 (1923) ..................................................................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) .............................................................................................20, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
    132 S. Ct. 2566 (2012) ........................................................................................13, 18

*New York v. HHS*
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) .....................................................................18

*Nken v. Holder*
    556 U.S. 418 (2009) ..................................................................................................29

*Paulsen v. Daniels*
    413 F.3d 999 (9th Cir. 2005) .....................................................................................25

*Pennhurst State Sch. & Hosp. v. Halderman*
    451 U.S. 1 (1981) ........................................................................................10, 16, 17

*Russello v. United States*
    464 U.S. 16 (1983) ....................................................................................................11

*Safe Air for Everyone v. EPA*
    488 F.3d 1088 (9th Cir. 2007) .............................................................................20, 21

*SEC v. Chenery Corp.*
    318 U.S. 80 (1943) ....................................................................................................21

iii

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

*Sequoia Orange Co. v. Yeutter*
    973 F.2d 752 (9th Cir. 1992).....................................................................................26

4

*Sierra Club v. Trump*
    No. 19-16102, 2020 WL 3478900 (9th Cir. June 26, 2020) ......................................30

5

6

*South Dakota v. Dole*
    483 U.S. 203 (1987) .................................................................................................16

7

*Texas v. United States*
    809 F.3d 134 (5th Cir. 2015).....................................................................................28

8

9

*Trump v. Int'l Refugee Assistance Project*
    137 S. Ct. 2080 (2017) ...............................................................................................9

10

*United States v. Timilty*
    148 F.3d 1 (1st Cir. 1998) .........................................................................................14

11

12

*United States v. Valverde*
    628 F.3d 1159 (9th Cir. 2010)...................................................................................26

13

14

*United States v. Youssef*
    547 F.3d 1090 (9th Cir. 2008)...................................................................................11

15

*Wilder's S.S. Co. v. Low*
    112 F. 161 (9th Cir. 1901).........................................................................................13

16

17

*Winter v. NRDC*
    555 U.S. 7 (2008).................................................................................................9, 29

18

19

**FEDERAL STATUTES**

20

5 United States Code
    § 553...................................................................................................................25, 26
    § 706...................................................................................................................20, 27

21

22

20 United States Code
    § 1232.......................................................................................................................26
    § 6313.........................................................................................................................6
    § 6315.........................................................................................................................6
    § 6320...............................................................................................................6, 7, 19
    § 6321.........................................................................................................................8
    §§ 6332-6339 .............................................................................................................5
    § 7881...................................................................................................................7, 15

23

24

25

26

27

28

1

### TABLE OF AUTHORITIES
(continued)

2

Page

3

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134
    Stat. 281 (attached as Appendix) ....................................................... *passim*

4

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, 133 Stat.
    2534...................................................................................................................13

5

6

OTHER AUTHORITIES

7

34 Code of Federal Regulations
    § 76.665..................................................................................................8, 11, 19

8

9

166 Congressional Record
    E340 (daily edition March 31, 2020) (statement of Representative Jayapal)..........................24
    H1856 (daily edition March 27, 2020) (statement of Representative
    Underwood) ....................................................................................................23

10

11

12

CARES Act Programs; Equitable Services to Students and Teachers in Non-Public
    Schools, 85 Federal Register 39,479 (July 1, 2020) ........................................ *passim*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that Plaintiffs hereby move the Court under Federal Rule of Civil Procedure 65 for entry of a preliminary injunction prohibiting Defendants from imposing or enforcing an equitable services requirement under Section 18005 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or Act) in a manner not wholly and explicitly described by Section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA). Defendants have promulgated a guidance document and interim final rule in violation of the U.S. Constitution and the Administrative Procedure Act. Plaintiffs seek an order from the Court prohibiting Defendants from imposing or enforcing unlawful limitations or requirements on the use of funds allocated under Sections 18002 and 18003 of the CARES Act. This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the accompanying declarations and Request for Judicial Notice (RJN), as well as the papers, evidence and records on file, and any other written or oral evidence or arguments as may be presented.

### **MEMORANDUM OF POINTS AND AUTHORITIES**

### **INTRODUCTION**

Plaintiffs bring this motion to seek provisional relief to stop the U.S. Department of Education's (ED) unlawful attempt to divert hundreds of millions of dollars of emergency assistance, intended by Congress to enable public schools to prepare for and respond to the COVID-19 pandemic, for services to private-school students. In the CARES Act, H.R. 748, 116th Cong. (2020), Congress appropriated approximately $16 billion for elementary and secondary schools, funneling the money through well-established Title I allocation formulas—directing the funding to local educational agencies (LEAs) (i.e., school districts) with significant populations of students from low-income families. Congress directed that a portion of this funding be reserved by recipient LEAs to provide "equitable services" to at-risk private-school students in their districts, consistent with Title I's requirements. Rather than follow Congress's clear directive, ED essentially rewrote this equitable services provision of the CARES Act through a guidance document and, subsequently, an interim final rule, in a manner that favors private schools and contradicts the statute's plain language and congressional intent.

1

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

ED's guidance document directed LEAs to allocate CARES Act funds based on the total number of *all* private-school students, rather than the total number of *low-income* private-school students as provided under the Title I equitable services requirement that Congress referenced in the CARES Act, and then to provide equitable services to *all* private school students, rather than only those *at risk* as also required under the Title I equitable services requirement that Congress referenced in the CARES Act. ED's rewrite of the allocation method and eligibility of private-school students shifts a significantly higher percent of LEAs' CARES Act funding to private schools, leaving the public schools with less funding to respond to the pandemic.

After significant push back from numerous stakeholders, including state educational agencies, ED doubled down on its erroneous interpretation of the CARES Act with the publication of an interim final rule. The rule—which was effective immediately and did not provide for any notice and comment—followed ED's original guidance, pushing LEAs to divert their CARES Act funds away from public schools to fund services for all private school students. The Rule offered LEAs an untenable choice: follow ED's guidance or be subjected to punitive restrictions on the use of the funds for public schools. Both options are unsupported by the plain language of the statute, and the so-called "choice" appears to be an attempt to force LEAs to follow ED's original scheme and divert more funding to private schools.

The Department's guidance and interim final rule are *ultra vires* and violate separation of powers principles and the Spending Clause because the CARES Act neither requires LEAs to divert funding from public schools to provide equitable services for *all* private-school students, nor delegates authority to Defendants to impose any such allocation requirements. To the contrary, the Department's guidance and interim final rule directly conflict with the plain language of the statute, which manifests Congress's intent to: (a) allocate funding for equitable services for private-school students based on the number of low-income private-school students within the LEA, and (b) provide LEAs flexibility to use the CARES Act funding for their public schools. The Department's guidance and interim final rule violate the Administrative Procedure Act (APA) because they are in excess of statutory authority, are arbitrary and capricious, and were issued without complying with notice and comment requirements.

2

1    ED's guidance and rule will irreparably harm Plaintiffs and their public-school students

2    by diverting funding away from the public schools at a time when such emergency relief is

3    urgently needed and when state and local government budgets are stretched thin by the effects of

4    the pandemic. Congress appropriated these funds for the express purpose of quickly providing

5    emergency support for public-educational agencies' response to the fallout from the COVID-19

6    pandemic. Plaintiffs require such funding not only to assist their public schools' transition to

7    remote learning, obtain personal protective equipment (PPE) for students and staff, and deep-

8    clean their schools, among other emergency needs, but also to provide supports for their

9    vulnerable populations beyond the provision of core educational services. ED seeks to force

10   LEAs to divert hundreds of millions of dollars that Congress directed to these public schools and

11   targeted at vulnerable students, for services to all private-school students—regardless of need—

12   despite private schools having access to other funding sources in the CARES Act, which are

13   unavailable to traditional public schools. Immediate relief is required as Plaintiff States and LEAs

14   must have a clear understanding of how to allocate and use the emergency CARES Act funding

15   as they prepare for the start of the 2020-2021 school year.

16   Plaintiffs respectfully request that the Court grant their motion and enjoin ED's erroneous

17   and unauthorized guidance and rule.

18   **BACKGROUND**

19   **I.    THE PANDEMIC'S EFFECT ON PUBLIC ELEMENTARY AND SECONDARY EDUCATION**

20   The effect of COVID-19 on elementary and secondary education has been swift,

21   multifaceted, and unsparing. Schools across the county were forced to suspend in-person

22   instruction to slow the spread of the virus and protect the health of students, staff, and their

23   families. *See* Guerrant Decl. ¶ 13; Constancio Decl. ¶ 11; Goldson Decl. ¶ 11; Gordon Decl. ¶ 13;

24   Hoffmann Decl. ¶ 10; Jackson Decl. ¶ 12; Jones Decl. ¶ 9; Kaneshiro-Erdmann Decl. ¶¶ 10, 12;

25   Salmon Decl. ¶ 8; Stem Decl. ¶ 10; Stewart Decl. ¶ 14; Wallace Decl. ¶ 10. Many schools then

26   transitioned quickly to remote learning. *See* Guerrant Decl. ¶¶ 13-14; Constancio Decl. ¶¶ 11-13;

27   Baca Decl. ¶ 10; Goldson Decl. ¶ 11; Gordon Decl. ¶ 13; Hoffmann Decl. ¶ 9; Jackson Decl. ¶

28   12; Jones Decl. ¶ 10; Makin Decl. ¶¶ 11-13; Salmon Decl. ¶ 8; Stewart Decl. ¶ 14; Wallace Decl.

3

¶ 11. This transition required significant expenditures on computer software, internet-connected devices for students, and other technologies to ensure learning could continue remotely. *See* Constancio Decl. ¶ 13; Goldson Decl. ¶ 11; Gordon Decl. ¶ 13; Hoffmann Decl. ¶¶ 10, 12; Jackson Decl. ¶¶ 12-13, 17; Jones Decl. ¶ 14; Kaneshiro-Erdmann Decl. ¶¶ 10-11; Makin Decl. ¶ 15; Oates Decl. ¶ 24; Salmon Decl. ¶ 9; Stewart Decl. ¶ 26; Wallace Decl. ¶ 11.

In addition to the ongoing costs associated with transitioning to remote learning, to prepare for the 2020-2021 school year, LEAs and schools have sought to procure PPE, deep-clean schools, and take other proactive measures to allow for safer in-person instruction. *See* Guerrant Decl. ¶ 28; Gordon Decl. ¶ 24; Jackson Decl. ¶ 15; Jones Decl. ¶¶ 14, 29; Kaneshiro-Erdmann Decl. ¶ 25; Makin Decl. ¶¶ 16-17, 29; Oates Decl. ¶ 24; Salmon Decl. ¶ 22; Stem Decl. ¶ 14; Stewart Decl. ¶ 26. Most States and LEAs are still determining how and if in-person instruction could restart for the 2020-2021 school year and what the additional costs would be if remote learning continued. *See* Guerrant Decl. ¶ 13; Constancio Decl. ¶¶ 13-14; Goldson ¶ 11; Jackson Decl. ¶ 18; Jones Decl. ¶ 11; Kaneshiro-Erdmann Decl. ¶ 10; Makin Decl. ¶ 13; Oates Decl. ¶ 24; Stem Decl. ¶ 13; Stewart Decl. ¶ 15.

While ED emphasizes that "[t]he pandemic has harmed all our Nation's students by disrupting their education," the health and economic impacts of the virus have been concentrated among the Nation's low-income families, especially families of color. RJN Ex. G; *see* Jones Decl. ¶ 12. These are, in many cases, the same students who will need more assistance when school returns, including remedial instruction, mental health services, free and reduced-price meals, and other supports. States and LEAs must ensure that meals are served to qualifying students and families; special education and related services are provided to students with disabilities; English learners and migrant students have access to appropriate instruction and supports; and public education is free and accessible to all students, including economically disadvantaged students. Public schools are financially responsible for providing these supports; private schools are not.

As they take on the financial challenges of transitioning to remote learning and preparing for the 2020-2021 school year, State Education Agencies' (SEAs) and LEAs' budgets have been substantially impacted by the economic effects of the pandemic on state and local tax revenues.

4

1   *See* Guerrant Decl. ¶¶ 12, 15, 26; Constancio Decl. ¶ 16; Goldson ¶¶ 10, 13; Gordon Decl. ¶ 12;

2   Hoffmann Decl. ¶ 13; Jackson Decl. ¶ 26; Jones Decl. ¶ 14; Kaneshiro-Erdmann Decl. ¶¶ 15, 25;

3   Oates Decl. ¶ 10; Salmon Decl. ¶ 11; Stem Decl. ¶ 27; Wallace Decl. ¶ 12. In short, the States and

4   their public schools are facing a perfect storm caused by COVID-19 and the economic impact of

5   efforts to combat it.

6   **II.     ESSER AND GEER FUNDS TO ASSIST PUBLIC SCHOOLS**

7   To address the described needs in public schools, on March 27, Congress enacted the

8   CARES Act, under which it appropriated $30.75 billion to ED "to prevent, prepare for, and

9   respond to coronavirus, domestically or internationally." Coronavirus Aid, Relief, and Economic

10  Security Act (CARES Act or Act), P.L. No. 116-136, 134 Stat. 281, 564. Within that amount,

11  relevant here, Congress created two programs, the Governor's Emergency Education Relief Fund

12  (GEER) and the Elementary and Secondary School Emergency Relief Fund (ESSER), and

13  appropriated approximately $16 billion for public elementary and secondary education for these

14  programs. *Id.* §§ 18001(b)(1), (3), 18002-18003.

15  In the CARES Act, Congress directed ED to provide emergency grants from the GEER

16  fund to state governors; in turn, governors are to distribute the funds to LEAs and other

17  educational entities that "have been most significantly impacted by coronavirus." *Id.* § 18002(a),

18  (c). The funds may then be used to support the LEAs "to continue to provide educational services

19  to their students and to support the on-going functionality of the [LEA]." *Id.* § 18002(c)(1).

20  Congress instructed ED to distribute the ESSER funds to SEAs "in the same proportion as

21  each State received under [Title I, Part A] in the most recent fiscal year." *Id.* § 18003(b).

22  Allocation of Title I-A funds to states is based primarily on the numbers of children from low-

23  income families and foster children in each state's LEAs. *See* 20 U.S.C. §§ 6332-6339. The SEAs

24  must then sub-grant 90 percent of the ESSER funds to LEAs in the state "in proportion to the

25  amount of funds such [LEAs] and charter schools that are local educational agencies received

26  under [Title I-A] in the most recent fiscal year." CARES Act § 18003(c). Thus, only LEAs that

27  participate in the Title I-A program—because they have a high proportion of economically-

28  disadvantaged children—are eligible to receive ESSER local subgrants. *See* RJN Ex. A at 4.

5

Through the CARES Act, Congress provided LEAs that receive ESSER funds wide latitude to use the funds, listing twelve authorized uses in the Act, including for broad purposes such as "activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff of the [LEA]," i.e., to support any operation, service, or staff existing prior to the pandemic. *Id.* § 18003(d)(12); *see also id.* § 18003(d)(1)-(12).

Congress required LEAs that receive GEER and/or ESSER funds to reserve a portion of these funds to provide "equitable services" to private-school students "*in the same manner* as provided under Section 1117 of the ESEA of 1965." *Id.* § 18005(a) (emphasis added). Section 1117 of the ESEA, 20 U.S.C.§ 6320, which is part of Title I-A, sets both the method of apportioning funds for equitable services and the eligibility for such services. For allocation, the LEA calculates the "proportional share" of the funds for equitable services "based on the number of children from low-income families who attend private schools" and reside in the "participating school attendance areas" (i.e., the geographic area in which children are normally served by a Title I-A school). 20 U.S.C. § 6320(a)(4)(A); *see also* 20 U.S.C. § 6313(a)(2) (defining "school attendance area"). Once the LEA has calculated the proportional share for equitable services, it uses those funds to provide services to at-risk private-school students after consultation with the private schools. 20 U.S.C. § 6320(a) (incorporating definition of "eligible children" from 20 U.S.C. § 6315(c)). ED confirmed the Section 1117 proportional share calculation and the eligibility for equitable services under Section 1117 in a guidance document issued in October 2019. *See* RJN Ex. B at 30.

### III.   THE DEPARTMENT'S GUIDANCE AND THE RULE

Despite ED reiterating the well-established proportional share calculation and eligibility requirements for equitable services under Section 1117 just months ago, ED decided to modify these requirements for CARES Act funds, contradicting Congress's clear instruction in the CARES Act that equitable services be provided "*in the same manner* as provided under Section 1117." CARES Act § 18005(a) (emphasis added).

On April 30, 2020, the Department issued a guidance document, titled *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act*

6

1    *Programs* (Guidance), interpreting Section 18005 of the CARES Act. RJN Ex. C. In the

2    Guidance, ED instructs LEAs to calculate the proportional share of their CARES Funds for

3    equitable services by the comparative enrollments of *all students* in public and private schools in

4    the district, rather than the comparative enrollments of *low-income students*, as required by

5    Section 1117(a)(4)(A)(i). *Compare* RJN Ex. C at 6-7 *with* 20 U.S.C. § 6320(a)(4)(A)(i). In

6    essence, ED rejects the calculation of the proportionate share under Section 1117 that Congress

7    specified in the CARES Act and instead adopts the calculation under a different section of the

8    ESEA, Section 8501 (found at 20 U.S.C. § 7881). By changing the calculation method to

9    determine the proportional share of CARES Act funding for equitable services, the amount of

10   CARES Act funds allocated for private schools is drastically inflated because low-income

11   students generally comprise a relatively smaller share of their overall enrollment than at public

12   schools. *See, e.g.*, Hoffmann Decl. ¶ 33. In addition to changing the proportional share

13   calculation, ED instructed LEAs to provide equitable services to all private-school students,

14   rather than only the at-risk private-school students in the participating school attendance area.

15   RJN Ex. C at 5. This aspect of the Guidance ignores Section 1117's eligibility requirements

16   providing that only at-risk private-school students are entitled to services. 20 U.S.C. § 6320(a).

17        The Guidance generated significant push back from Congressional leaders and multiple

18   educational associations. *See, e.g.*, RJN Ex. D. Secretary DeVos responded to a letter from an

19   organization representing chief state school officers nationwide with a letter of her own in which

20   she accused those who opposed the Guidance of seeking to "improperly discriminate against an

21   entire class of children," and implied that LEAs have a "reflex to share as little as possible with

22   students and teachers outside of their control" and a lack of "concern[]" for private school

23   students "concentrated in low-income and middle-class communities." RJN Ex. E.

24        ED published the interim final rule (the Rule) in the Federal Register on July 1, 2020. 85

25   Fed. Reg. 39,479. The Rule was published without notice and comment and was effective

26   immediately.

27        While the Rule reflects ED's general position in the Guidance, ED added language under

28   which LEAs are ostensibly presented with two choices regarding how to calculate the

7

proportional share of CARES Act funds for equitable services—neither of which comports with the CARES Act requirements and each of which relies on an interpretation of the reference to Section 1117 in the underlying statutory text that is irreconcilable with the other. Under Option #1 (Title I-Only Schools Option), the LEA could use the Section 1117 proportional share calculation; as directed by the plain language of Section 18005, however, they would then be subject to two "poison pill" requirements, severely restricting the LEA's use of the public-school share of the funds. 34 C.F.R. § 76.665(c)(1)(i). Under Option #2 (Private School Enrollment Option), the LEA would calculate the proportional share of CARES Act funds for equitable services using the Guidance's calculation, which apportions the funds between public and private schools based on the *total* number of students in each group, contrary to Section 1117. 34 C.F.R. § 76.665(c)(1)(ii).

For LEAs that calculate the proportional share of CARES Act funds for equitable services using Option #1 (Title I-Only Schools Option), the LEA would incur two poison pills: (1) the public-school share of the CARES Act funds must be used exclusively at Title I schools, thereby excluding districts' non-Title I schools; and (2) the public-school share of the CARES Act funds could only be used for costs that were not previously covered by state and local funds to avoid a violation of Title I's "supplement not supplant" requirements for federal funding under Section 1118 of the ESEA. 34 C.F.R. § 76.665(c)(1), (c)(3); 20 U.S.C. § 6321(b)(1). Under Option #1, the LEA's hands are tied; it cannot use the funds as explicitly stated in the CARES Act to assist all of its schools in responding to the pandemic nor address the severe diminution of state and local funding.

Regardless of how the LEA calculates the proportional share of CARES Act funds, the Rule still requires eligibility for all private-school students to receive equitable services, ignoring the Section 1117 eligibility requirements that only at-risk private-school students are eligible for services. 34 C.F.R. § 76.665(d)(2). This results in less equity even for private schools and their at-risk students, as private schools that serve large numbers of at-risk students will receive a diminished allocation of CARES Act funds and the services for at-risk students could be diluted. *See, e.g.*, Hoffmann Decl. ¶¶ 32, 43.

8

The proportional share calculation methods, the poison pill requirements, and the eligibility requirements in the Rule are all nowhere to be found in the CARES Act. ED, through the Rule, has rewritten Section 18005 to drive emergency moneys away from public schools and at-risk students when they need the money most.

## IV.   THE IMPACT OF THE DEPARTMENT'S ACTIONS ON PLAINTIFFS

Plaintiffs estimate that their LEAs will be forced to divert over $150 million in CARES Act funds from public schools to provide equitable services to all private-school students if they follow Option #2 (Private School Enrollment Option). *See* Guerrant Decl. ¶¶ 23, 37; Constancio Decl. ¶¶ 27, 35; Goldson Decl. ¶¶ 18, 21; Gordon Decl. ¶¶ 19, 31; Hoffmann Decl. ¶¶ 22, 42; Jackson Decl. ¶¶ 22, 26, 36; Jones Decl. ¶¶ 25, 27, 39; Kaneshiro-Erdmann Decl. ¶ 22; Makin Decl. ¶¶ 26, 41; Oates Decl. ¶ 20; Salmon Decl. ¶ 18; Stem Decl. ¶¶ 25, 35; Stewart Decl. ¶ 24; Wallace Decl. ¶¶ 16, 21. And, as described further below, many of the LEAs in the Plaintiff States and the Plaintiff LEAs will be forced to follow Option #2, as Option #1 would impose too strict a requirement on their usage of the funds to be practically effective. *See* Hoffmann Decl. ¶ 29; Oates Decl. ¶¶ 15, 19. Put simply, if the Department's Rule and Guidance are allowed to stand, hundreds of millions of dollars will be diverted away from public schools to private schools, seriously impeding public schools' ability to respond to and prepare for education during the pandemic. Additional impacts to the Plaintiffs are described below. *See infra* Argument, § II.

## LEGAL STANDARD

A preliminary injunction is appropriate when the plaintiffs establish that they are likely to succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in their favor, and an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A preliminary injunction is "often dependent as much on the equities of [the] case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction," so long as the other preliminary injunction factors are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

9

1

**ARGUMENT**

2   **I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT THE RULE AND THE GUIDANCE ARE UNLAWFUL AND UNCONSTITUTIONAL**

3         **A.   The Rule and the Guidance Are Ultra Vires, Violate the Separation of Powers, and Exceed ED's Statutory Authority**

4

5       The U.S. Constitution "exclusively grants the power of the purse to Congress, not the

6   President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

7   "[B]ecause Congress has the exclusive power to spend," if Congress "has not delegated authority

8   to the Executive to [impose funding] condition[s]," the executive branch lacks the authority to

9   impose the conditions. *Id.* at 1233. Also, when "Congress intends to impose a condition on the

10  grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v.

11  Halderman*, 451 U.S. 1, 17 (1981). The executive branch, thus, cannot coopt Congress's spending

12  power by imposing a condition that Congress did not unambiguously impose or delegate authority

13  to impose. *Cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally

14  has no power to act . . . unless and until Congress confers power upon it."). Furthermore, the

15  executive branch "may not decline to follow a statutory mandate . . . simply because of policy

16  objections." *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). As discussed below, the Rule

17  and the Guidance cannot survive under these foundational constitutional principles.

18              **1.   ED Has No Rulemaking Authority under Sections 18002, 18003, and 18005 of the CARES Act**

19

20      The absence of rulemaking authority in Sections 18002, 18003, and 18005 is in contrast to

21  other portions of the Act where Congress clearly delegated rulemaking authority to federal

22  agencies. For example, Congress: granted "emergency rulemaking authority" to the Small

23  Business Administration to carry out the Paycheck Protection Program, CARES Act § 1114, H.R.

24  748-32; directed the Bureau of Prisons to engage in rulemaking to provide for video visitations

25  for inmates (and exempted those rules from notice and comment requirements), CARES Act

26  § 12003(c), H.R. 748-236; and delegated authority to the ED Secretary to "waive the application

27  of . . . negotiated rulemaking" under the Higher Education Act of 1965 to suspend collection of

28  student loans, CARES Act § 3513(f), H.R. 748-124.

10

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) (applying this principle to grants of rulemaking authority). So too here. Congress expressly delegated rulemaking authority in other sections of the Act, but did not include it with respect to the GEER and ESSER funds. Accordingly, this Court should find that Congress did not delegate rulemaking authority to ED to interpret Section 18005 of the Act, and that ED therefore lacks authority to promulgate the Rule.

        **2.**     **ED Has No Authority to Attach a Supplement-Not-Supplant Condition to ESSER or GEER Funds**

Elsewhere in the Act, Congress chose to expressly include supplement-not-supplant requirements, similar to the supplement-not-supplant condition that ED attaches to ESSER and GEER funds through the Guidance and Rule. The CARES Act requires that federal funds from the "Payments to States for the Child Care Development Block Grant" "shall be used to supplement, not supplant State . . . general revenue funds for child care assistance for low-income families," and that funds allocated for "carrying activities under the Runaway and Homeless Youth Act . . . shall be used to supplement, not supplant, existing funds." H.R. 748-277. Because Congress expressly attached supplement-not-supplant conditions on other allocations in the CARES Act, it can be presumed Congress intended to exclude ESSER and GEER funds from such conditions, and ED exceeded its statutory authority in attaching such conditions in the Rule, 34 C.F.R. § 76.665(c)(3). *See also United States v. Youssef*, 547 F.3d 1090, 1094 (9th Cir. 2008) (omission of a requirement in one statutory provision combined with the requirement's inclusion in a similar provision is "evidence of Congress's expressed intent not to impose" the requirement). Additionally, Congress expressly authorized uses of GEER and ESSER funds that are incompatible with a supplement-not-supplant requirement, CARES Act § 18002(c)(1) (funds "support the ability of such local educational agencies to continue to provide educational services

11

to their students and to support the on-going functionality of the local educational agency"; *id.* § 18003(d)(12) (funds can be used "to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency"), further underscoring congressional intent *not* to create such a requirement that ED purports to impose.

### 3.     ED Does Not Have Implicit Authority to Issue the Rule

ED claims that it has implicit interpretive authority to impose restrictions and requirements on the formula grants funds received by LEAs in the CARES Act. 85 Fed. Reg. at 39,481, 39,488. Courts have been skeptical of claims of implicit authority, as well as claims of broad authority to impose conditions on formula grants and interpret general appropriation statutes. The U.S. Supreme Court held the Attorney General lacked authority to issue a rule interpreting the meaning of a law, even when Congress had delegated the authority to ensure compliance with the law to the Attorney General. *Gonzales v. Oregon*, 546 U.S. 243, 263-64 (2006). Similarly, the Ninth Circuit held that an executive agency's broad interpretation of its authority to impose grant conditions without specific authority "would be antithetical to the concept of a formula grant[.]" *City of Los Angeles v. Barr*, 941 F.3d 931, 942 (9th Cir. 2019); *see also City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("formula grants," unlike discretionary ones, "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula"). Thus, Plaintiffs are entitled to their share of the GEER and ESSER funds, and ED is prohibited from redirecting these funds or placing additional conditions on the grants.

In the CARES Act, Congress chose to adopt proportional allocation under Title I-A of the ESEA, and the method and procedure of Section 1117 of the ESEA for equitable services, but chose not to incorporate or involve the ESEA itself. *See* CARES Act § 18003(b)-(c). Instead of simply making an additional appropriation under the existing Title I-A program of the ESEA with conditions specific to address the COVID-19 pandemic, Congress instead directed the funds in such a way that they are not a part of the Title I-A program and thus not subject to Title I-A

restrictions. Therefore, because the CARES Act funds are not Title I-A funds, any authority ED maintains to administer the Title I-A program does not provide authority to impose rules on CARES Act funds.

Congress' actions in this area contrast with how Congress made a number of other CARES Act appropriations and reflect a deliberate policy choice. For example, to carry out section 4631 of the ESEA, Congress simply made an additional appropriation for the established "Safe Schools and Citizen Education" fund. *Compare* 133 Stat. 2534, 2589 (appropriating funds for the "Safe Schools and Citizenship Education" program to carry out activities authorized by Title IV-F of the ESEA) *with* CARES Act, H.R. 748-289 (appropriating an additional amount for "Safe Schools and Citizenship Education" as part of the CARES Act). ED lacks authority to override Congress's decision that LEAs provide equitable services "in the same manner" as an ESEA program, but not as part of an ESEA program, and similarly cannot override Congress's decision that ESSER and GEER funds be distributed outside an established ESEA program.

Nor did the language of the Act leave any interpretative gap for ED to fill. ED points to the supposed facial ambiguity in the language "in the same manner as provided under Section 1117 of the ESEA." 85 Fed. Reg. 39,481.[1] However, "in the same manner" has a well-understood meaning in the statutory context, and that meaning applies to the procedure or methods used to effect the statutorily prescribed act. *See, e.g.*, *Wilder's S.S. Co. v. Low*, 112 F. 161, 164 (9th Cir. 1901) ("[T]he phrase 'in the same manner' has a well-understood meaning in legislation, and that meaning is not one of restriction or limitation, but of procedure."). The Supreme Court found a legislative direction to collect a penalty "in the same manner" as under a set of statutes was "best read" as a directive to an agency to use "the same 'methodology and procedures'" as within the referenced statutes. *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 132 S. Ct. 2566, 2583-84

---

[1] ED promulgated a grant requirement that education systems in the outlying territories provide equitable services "in the same manner as provided under section 8501 of the ESEA" in order to receive CARES Act education funding grants. Section 8501 is referenced nowhere in the Act. Thus, ED clearly does not regard the phrase "in the same manner as provided under" as ambiguous, since it used this phrase itself. RJN Ex. F at 4. ED has not promulgated any guidance or rules to clarify this grant requirement. ED's position that this language is ambiguous in Section 18005(a) is fatally inconsistent with ED's own actions.

13

1   (2012); *see also United States v. Timilty*, 148 F.3d 1, 3, 5 (1st Cir. 1998) (federal law allowing

2   restitution order to be enforced "in the same manner as a judgment in a civil action," meant the

3   judgment was enforced by same procedural mechanism as a judgment in civil action). Here,

4   Congress has used well-understood language to directly instruct LEAs receiving ESSER and

5   GEER funds to adopt the established methodology and procedures used to administer equitable

6   services as they would for services attached to Title I-A allocations, while unequivocally

7   declining to impose programmatic requirements of Title I-A, such as use of funds and

8   supplement-not-supplant restrictions. There is no ambiguity.[2]

9           The final clause of Section 18005(a) instructs LEAs to determine the provision of

10  equitable services "in consultation with representatives of [private] schools." ED argues that

11  Congress did not intend to completely incorporate Section 1117 because Section 1117 requires

12  consultation with representatives of private schools, thus rendering the final clause of Section

13  18005(a) "superfluous." 85 Fed. Reg. at 39,481. However, because Section 18005(a) only applies

14  to LEAs, the language to "determine[] in consultation with representatives of non-public schools"

15  is best read as excluding other parties from the consultation process. In particular, this reasonably

16  excludes SEAs from consultation procedure, as Section 18005(a)'s requirement to provide

17  equitable services only applies to LEAs but SEAs may be required to provide equitable services

18  under Section 1117(b)(6)(C) of the ESEA. Section 18005(b) requires that the control of funds and

19  property provided by equitable services be retained by a public agency, similar to the requirement

20  of Section 1117(d) of the ESEA. ED again claims that a reading which incorporates wholesale

21  Section 1117 renders Section 18005(b) surplusage. *See* 85 Fed. Reg. at 39,481. The well-

22  understood meaning of "in the same manner" incorporates methodology and procedure, so this

23  
_____

24        [2] Leaving aside the threshold ambiguity question, ED's proposed resolution to the
    purported ambiguity of the phrase "in the same manner" is also flawed because it creates multiple
25  "manners" from whole cloth, an interpretation at odds with Congress' intent. ED provides no
    reasoned analysis of how Congress' instruction that LEAs are to provide equitable services "in
26  the same manner" as under Section 1117 can be read to empower ED to create two entirely
    different methods of doing so, still less how ED is justified in putting forth two methods that
27  diverge so dramatically (a divergence caused in large part by the fact that they derive from two
    distinct provisions of the ESEA). As a basic matter of statutory construction, it strains credulity
28  for ED to interpret the singular term "manner" to mean two entirely distinct and divergent
    "manners," further underscoring the arbitrary and capricious nature of its action.

14

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

1   reasserted non-procedural restraint is not surplusage. In any event, ED does not provide a

2   reasoned explanation as to how its reading does not render the final clause of Section 18005(a)

3   and all of Section 18005(b) surplusage.

4          Instead of adopting the well-understood meaning of "in the same manner"—and without

5   providing a reasoned or supportable alternative meaning for this phrase—ED has decided that

6   Congress did not intend Sections 1117(a)(1), (b)(1)(E), (J)(ii), and (c) to be applied to CARES

7   Act funds because "the CARES Act is a separate appropriation allowing separate permissible uses

8   of taxpayer funds" than a Title I-A appropriation. 85 Fed. Reg. 39,481. However, these

9   provisions—which describe methods or procedures to apportion funding for equitable services to

10   private schools based on the relative population of low-income children, or to consider the

11   proportion of low-income children when apportioning funding for equitable services—are

12   squarely within the accepted definition of "manner." As a section of Title I, Part A of the ESEA,

13   Section 1117 *only* applies to a provision of equitable services proportioned on low-income

14   children; applying convoluted logic to somehow apply Section 1117 in a manner which ignores

15   these provisions aimed at ensuring that fundamental congressional purpose is carried out is

16   nonsensical. Without providing reasoning, ED argues that because Title I-A fund's permissible

17   uses differ from those of ESSER or GEER funds, Section 1117's funding and eligibility criteria

18   are "inapposite" of the CARES Act. However, Congress was aware of these broader uses when it

19   explicitly instructed the LEAs to provide equitable services in the same manner as provided by

20   Section 1117. CARES Act § 18003(d)(1)-(12) (allowing the use of ESSER funds for any activity

21   authorized by the ESEA and eleven other categories of activities).

22          Rather than follow the Congressional directive that LEAs provide equitable services in the

23   same manner as under Section 1117 of the ESEA, ED is attempting to substitute the agency's

24   choice; namely, ED effectively requires LEAs to follow section 8501 from the ESEA. Section

25   8501 of the ESEA is the general rule for equitable services under the ESEA, and Section 1117 is

26   an exception only applicable to Title I-A. See 20 U.S.C. § 7881(a)(1), (b)(1) (stating that Section

27   8501 governs "[e]xcept as otherwise provided in this act" and is expressly applicable to Titles I-

28   C, II-A, III-A, IV-A, and IV). The key difference in the operation of the two statutes is that while

15

Section 1117(a)(1) calculates the expenditures for equitable services based on the proportion of private-school students from low-income families residing in the LEA's public school attendance area, Section 8501 calculates expenditures for equitable services based on the proportion of all eligible children in the LEA's area. RJN Ex. K at 34-35.

Congress decided that equitable services expenditures under ESSER and GEER funds should be proportional and provided to typical Title I-A eligible private school students, and DOE decided this was "inapposite." An agency's disagreement with Congress's policy cannot be permitted to serve as a source of ambiguity. ED should not be permitted to rely on an invented ambiguity to override the will of Congress as reflected in the text of the Act.

**B.      The Funding Conditions in the Rule and the Guidance Violate the Spending Clause**

Under the Spending Clause of the U.S. Constitution, funding conditions may only be imposed if they are "unambiguous[]" and related "to the federal interest in particular . . . programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal quotations omitted). The funding conditions in the Rule violate both of these criteria.

The Rule violates the Spending Clause's clear and settled requirements in three respects. First, the Rule's funding conditions were not "unambiguously" imposed by Congress. *Pennhurst*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."); *see also Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 629 (6th Cir. 2019) ("Congress ha[s] to identify any condition on its funding 'unambiguously.'"). The CARES Act "in no way suggests that the grant of . . . funds is 'conditioned'" on the requirement that LEAs calculate and set aside their GEER and ESSER Funds for equitable services to all private-school students and teachers, provide equitable services to all private-school students, limit LEAs' uses of funds, or limit their distribution of funds to Title I schools only. *See Pennhurst*, 451 U.S. at 23. Congress, therefore, did not in "clear terms" authorize the Rule's proportional share and eligibility requirements as required to satisfy the Spending Clause. *See id.* at 17, 23 (Congress must "speak with a clear voice" to impose conditions under the Spending Clause). To the contrary, Congress explicitly and clearly directed LEAs to follow

Section 1117 of the ESEA when apportioning CARES Act funds for equitable services and determining which private-school students were eligible for such services, and specified twelve broad purposes for which ESSER funds can be used by both Title I and non-Title I schools. CARES Act § 18003.

Second, the inconsistencies between the CARES Act and the Rule, as well as between the 2019 guidance, RJN Ex. B., and the Guidance (*see infra* at 6-7.), did not "enable the [Plaintiffs] to exercise their choice knowingly, cognizant of the consequences of their participation" in CARES Act funding. *Pennhurst*, 451 U.S. at 17. While the plain language of the CARES Act requires that funds be apportioned in the same manner as Section 1117 of the ESEA, the Rule and Guidance impose proportional share and eligibility conditions that are contrary to and irreconcilable with the language of the CARES Act. These inconsistencies have created considerable confusion among SEAs and LEAs in the Plaintiff States and unforeseen consequences. Gordon Decl. ¶ 28; Hoffmann Decl. ¶¶ 35-37, Jackson Decl. ¶ 25; 40-41; Jones Decl. ¶¶ 28, 33, 36; Salmon Decl. ¶ 25; Stewart Decl. ¶ 35. ED's interpretation of Section 18005 of the CARES Act has created unanticipated administrative and financial burdens on SEAs and LEAs, has delayed the distribution of funds to students and teachers, and placed SEAs and LEAs in potential legal jeopardy. Guerrant Decl. ¶¶ 29-34; Constancio Decl. ¶¶ 29-30; Baca Decl. ¶ 21; Gordon Decl. ¶¶ 26-27; Hoffmann Decl. ¶¶ 30, 35-36, 40; Jackson Decl. ¶¶ 29-33; Jones Decl. ¶¶ 30-36; Kaneshiro-Erdmann Decl. ¶¶ 27, Makin Decl. ¶¶ 30-34, 36, 38, 43; Oates Decl. ¶ 23; 31; Salmon Decl. ¶¶ 23-25; Stem Decl. ¶¶ 28-30; Stewart Decl. ¶¶ 27-33, 35.

Third, the Rule's funding conditions violate the Spending Clause's prohibition on "post acceptance" conditions. *Pennhurst*, 451 U.S. at 25 (1981). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract." *Id.* at 17. Like with contracts, States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As such, the federal government cannot "surpris[e]" states with funding conditions after acceptance of congressionally appropriated funds. *Pennhurst*, 451 U.S. at

17

25; *see also NFIB*, 567 U.S. at 584. That is exactly what ED has done here. Plaintiff States did not know of ED's interpretation of Section 18005 at the time they applied for grants from the GEER and ESSER funds. Guerrant Decl. ¶ 18; Constancio Decl. ¶ 19; Baca Decl. ¶ 13; Gordon Decl. ¶ 16; Jones Decl. ¶ 18; Jackson Decl. ¶ 20; Kaneshiro-Erdmann Decl. ¶ 18; Makin Decl. ¶ 20; Salmon Decl. ¶ 14; Stewart Decl. ¶ 19. To receive CARES Act funds, the Plaintiff States' SEAs and some LEAs were required to certify, and did certify, that they would comply with the equitable service provision of the CARES Act and "any other applicable law or regulation," and ensure that LEAs receiving ESSER funds "will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA." RJN Ex. H. Guerrant Decl. ¶¶ 16-17; Constancio Decl. ¶¶ 17-18; Baca Decl. ¶¶ 11-12; Makin Decl. ¶¶ 18-19; Goldson Decl. ¶¶ 14-15; Gordon Decl. ¶¶ 14-15; Jones Decl. ¶¶ 16-17; Kaneshiro-Erdmann Decl. ¶¶ 16-17; Salmon Decl. ¶¶ 12-13; Stem Decl. ¶¶ 16-17; Stewart Decl. ¶¶ 17-18. The Rule's post-application funding conditions effectively force the Plaintiff States to violate Section 18005 of the CARES Act, placing them at risk of breaching the certification. The States also relied on express assurances from ED that an LEA could use CARES Act funds for any schools in the district or target funds based on poverty, school needs, and other targeting measures without regard to Title I eligibility or funding, and without the funds being subject to a supplanting prohibition. RJN Ex. A at 5; Jones Decl. ¶ 28; *see* Constancio Decl. ¶ 34. The States "had no way to know at the time [they] accepted such funds" that ED would later impose conditions on the use of those funds that were inconsistent with the CARES Act. *See New York v. HHS*, 414 F. Supp. 3d 475, 568 (S.D.N.Y. 2019) *appeal docketed*, No. 20-32 (2nd Cir. Jan. 3, 2020).

Separately, ED's interpretation of Section 18005 of the CARES Act in the Rule and Guidance violates the Spending Clause's relatedness requirement because the Rule's proportional share and eligibility conditions do not have any "nexus" to the key purpose of Section 18005 of the CARES Act—filling the gap created by reduced state and local funding due to the COVID-19 pandemic. *See Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1214 (N.D. Cal. 2017), *aff'd*

18

*in part, vacated in part for unrelated reasons, remanded sub. nom. San Francisco*, 897 F.3d 1225 (9th Cir. 2018). Instead, the Rule's funding mandates are in direct contradiction to Congress's plainly expressed intent to require SEAs and LEAs to follow Section 1117, and the Title I-A allocation formula generally, when apportioning CARES Act funds for equitable services, and undermine the purpose of the CARES Act. *Compare* 20 U.S.C. § 6320(a)(4)(i) (determining proportional share of expenditures for equitable services based on enrollment of children from low-income families) *with* 34 C.F.R. § 76.665(c)(ii) (determining proportional share of funds for equitable services based on enrollment of all children.). Under either proportional share option in the Rule, public schools stand to lose out on substantial emergency funding, which is not only unrelated to, but directly contrary to the central purpose of the Education Stabilization Fund. If LEAs follow the Rule's Title I-schools only option when apportioning CARES act funds, non-Title I schools across the States will receive no emergency funding to support their schools, and LEAs will lose the ability to use the funds to maintain operations that are funded on an LEA-wide basis. Guerrant Decl. ¶ 36; Constancio Decl. ¶¶ 32-33; Baca Decl. ¶ 24; Gordon Decl. ¶ 30; Hoffmann Decl. ¶¶ 30-31, 39; Jackson Decl. ¶¶ 27, 35; Jones Decl. ¶ 38; Kaneshiro-Erdmann Decl. ¶ 28; Makin Decl. ¶ 40; Oates Decl. ¶¶ 16-17; Salmon Decl. ¶¶ 20-21; Stem Decl. ¶ 32; Stewart Decl. ¶ 37; Wallace Decl. ¶ 20. If LEAs follow the second option to apportion funds based on total private school enrollment, LEAs and public schools will lose out on significant amounts of ESSER and GEER funds, which will be diverted to private schools for students who would not otherwise qualify for Title I-A equitable services. Guerrant Decl. ¶¶ 23, 27; Constancio Decl. ¶¶ 27, 35; Baca Decl. ¶ 20; Goldson Decl. ¶¶ 18, 21, 23; Gordon Decl. ¶¶ 19, 31; Hoffmann Decl. ¶¶ 22, 31-33, 42, 49; Jackson Decl. ¶¶ 22, 36; Jones Decl. ¶¶ 25, 27, 39; Kaneshiro-Erdmann Decl. ¶ 22; Makin Decl. ¶¶ 26, 41; Oates Decl. ¶¶ 20-21; Salmon Decl. ¶ 18; Stem Decl. ¶¶ 24, 33; Stewart Decl. ¶¶ 24, 38; Wallace Decl. ¶¶ 16, 21. This loss of emergency funding will have significant negative impacts on public schools, including to services for students and potential loss of jobs for teachers and staff. Guerrant Decl. ¶¶ 38-39; Jones Decl, ¶ 40; Goldson Decl. ¶¶ 24-25; Gordon Decl. ¶¶ 32-33; Oates Decl. ¶¶ 24-25; Stem Decl. ¶ 34; Wallace Decl. ¶¶

19

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

22-23. The funding conditions imposed by the Rule thus undermine the key purpose of the Education Stabilization Fund; *a fortiori*, they are unrelated to that purpose and are invalid under the Spending Clause. *See City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 959 (N.D. Cal. 2018) (immigration requirements were unrelated to grant's purpose to provide flexibility to the states through formula grants), *aff'd in part, vacated in part for unrelated reasons sub. nom. City & Cty. of San Francisco v. Barr*, Nos. 18-17308, 18-17311 (9th Cir. July 13, 2020) (affirming requirements were unlawful but narrowing geographic scope of injunction).

**C.    ED's Actions Are Arbitrary and Capricious in Violation of the APA**

Even if Congress had somehow granted discretion to the Secretary to conduct rulemaking as to the implementation of the GEER and ESSER Funds (it did not), ED's actions are also "arbitrary, capricious, [and] an abuse of discretion" and must be set aside under the APA. 5 U.S.C. § 706(2)(A).[3] ED has failed to meet the APA's requirements that an agency "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It has offered a legally erroneous rationalization for its misconduct, failed to articulate a reasoned explanation for its reversal of its prior position, acted contrary to statutory language and congressional intent, and failed to consider the reliance interests implicated by its actions and other important aspects of the problem.

First, as discussed above, Defendants did not and cannot articulate how their position comports with the plain text of Section 18005 of the CARES Act. Thus, their action must be set aside as based on an incorrect legal premise. *See Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007). ED's basic argument for the Guidance and Rule—that "the phrase 'provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965'" should not be construed "as if Congress simply incorporated the entirety of section 1117 by

---

[3] For the same reasons that their actions are ultra vires, violate separation of powers principles, and exceed ED's statutory authority, *supra* at 10-20, these requirements and limitations also violate the APA's prohibition on agency action "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-(C).

20

1    reference," 85 Fed. Reg. 39,479—is incorrect. *Supra* at 12-16. Because "that flawed premise is

2    fundamental" to ED's agency action, the action must be set aside. *Safe Air for Everyone*, 488 F.3d

3    at 1101; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("an order may not stand" if

4    based on agency's mistake of law).

5           Second, ED failed to adequately explain (or explain at all) why it was reversing its own

6    prior guidance and other instructions to SEAs and LEAs regarding how equitable services under

7    Section 1117 should be provided. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

8    516 (2009) (where agency changes policy, "a reasoned explanation is needed for disregarding

9    facts and circumstances that underlay . . . the prior policy"); *see also Dep't of Homeland Sec. v.*

10   *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (requiring "reasoned analysis to

11   support" rescission of prior policy) (quoting *State Farm*, 463 U.S. at 52) (punctuation omitted).

12   As a predicate to fulfilling this requirement, an agency must "display awareness that it *is*

13   changing position" and "may not, for example, depart from a prior policy *sub silentio*." *Fox*

14   *Television*, 556 U.S. at 515.

15          It is clear that Defendants have materially changed their position. *First*, ED's Title I-A

16   guidance for providing equitable services under Section 1117 to private-school students—issued

17   under the current administration less than a year ago—confirmed that equitable services should

18   only be provided to at-risk students who reside in Title I public school attendance areas. As stated

19   in that document: "[T]o be eligible for Title I services, a private school child must reside in a

20   participating Title I public school attendance area and must be identified by the LEA as low

21   achieving on the basis of multiple, educationally related, objective criteria." RJN Ex. B at 30. But

22   in the 2020 Guidance and the Rule, ED requires LEAs to provide equitable services to *all* private

23   school children, rather than only "low achieving" students in a Title I-A school attendance area.

24   *Second*, in the 2019 guidance, ED specified that, under Section 1117, funding for equitable

25   services should be based on the number of children in private schools who are economically

26   disadvantaged or in foster care. It instructed LEAs to "determine an accurate count of children

27   from low-income families who attend public and private schools and reside in participating Title I

28   public school attendance areas in order to allocate the proportional share." RJN Ex. B at 30. But

21

the 2020 Guidance and Rule instruct LEAs to ignore Section 1117's proportional share calculation based on the number of low-income students, and proportion the funds based on the total number of students—regardless of income. *Third*, in May 2020, ED published a "Frequently Asked Questions" document which explicitly stated that "supplement not supplant" rules did not apply to CARES Act funds. RJN Ex. A at 5. But one of the poison pill restrictions on "Option #1" would apply "supplement not supplant" restrictions to CARES Act funds. ED has failed to even acknowledge its changed positions on these crucial issues regarding the equitable services requirements, much less provide a "reasoned explanation" for them.

Relatedly, ED failed to take into account the reliance interests that its former position generated on the part of the States and LEAs. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters." *Regents*, 140 S. Ct. at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)) (punctuation omitted); *see also Fox Television*, 556 U.S. at 515-16 (requiring agencies to "provide a more detailed justification than what would suffice for a new policy created on a blank slate" under such circumstances). The "serious reliance interests" engendered by ED's prior policies include school districts' reliance on the May 2020 FAQ document when they developed their budgets; as discussed above, in that document, ED explicitly stated that "supplement and not supplant" rules did *not* apply to CARES Act funds. RJN Ex. A at 5. The new "supplement not supplant" requirement of Option #1 represents an unexplained about-face, which will require school districts which choose (or, for LEAs with only Title I schools, are forced to use) this option to revamp their budgets to reflect their significantly curtailed flexibility to use these funds to address COVID-19. *See* Jones Decl. ¶ 28; Hoffmann Decl. ¶ 40.

ED's rewrite of the equitable services requirements is also arbitrary and capricious because, in imposing the Rule, ED "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," and "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm,* 463 U.S. at 43. ED ignored "important aspect[s] of the problem," including, among others, the myriad harms to

22

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

students, States, and LEAs discussed herein. These harms include: (1) the impact on LEAs from

loss of ESSER and GEER moneys diverted to private schools, and the predictable adverse impact

on the States' and LEAs' fiscs as they fill the gap created by these diversions; (2) for LEAs that

choose Option #1 (Title I-schools only Option), (a) the loss of all CARES Act emergency funding

for LEAs' non-Title I schools, (b) those LEAs' inability to use the funds to maintain operations

that are funded on an LEA-wide basis, and (c) those LEAs' Title I schools' inability to use

CARES Act funds for existing costs (due to the application of "supplement not supplant"); (3) for

LEAs that choose Option #2 (Private-school enrollment Option) when apportioning CARES Act

funds, the LEAs' and public schools' loss of millions of ESSER and GEER moneys, which will

be diverted to private schools for students who would not otherwise qualify for Title I-A equitable

services; (4) significant added administrative burdens on LEAs and SEAs;[4] (5) diversion of SEA

resources to provide technical assistance to LEAs regarding the Guidance and Rule; and (6) the

delay in distributing funds to students and teachers caused by Defendants' inconsistent

interpretations, contrary to the core purpose of the CARES Act to quickly deploy these urgently

needed funds. *See supra* at 9, 17-19; *infra* at 27-29.

Further, the imposition of this burden runs contrary to Congress's intent. Congress intended

SEAs and LEAs to have a great deal of flexibility in their uses of CARES Act funds. *See, e.g.*,

CARES Act §§ 18002(c)(1), 18003(d)(12) (setting forth broad set of permitted uses for CARES

Act funds, expressly including maintaining continuity of services and continuing to employ

existing LEA staff); Congress intended to deliver LEAs "need[ed] funding flexibility due to the

disruption in the academic year from COVID-19." 166 Cong. Rec. H1856 (daily ed. Mar. 27,

2020) (statement of Rep. Underwood). ED's awareness of Congress's intent was made manifest

---

[4] The Rule contains a brief discussion of "implementation costs," 85 Fed. Reg. 39,485-86, but this discussion focuses only on data collection and not the numerous other administrative burdens discussed herein. Indeed, in the Rule ED acknowledges that "[a]ffected LEAs will likely face some administrative costs to implement these statutory requirements, but ED largely lacks data to quantify these costs," 85 Fed. Reg. 39,485, demonstrating ED's utter failure to gather and examine the relevant data before enacting the Rule. (Such information may well have been supplied had ED followed the APA's notice and comment requirements.) The Rule goes on to assert, without any support: "However, ED expects that these entities will largely experience benefits exceeding these administrative costs." *Id.*

23

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

1    in a letter sent on June 12, 2020, acknowledging that "Congress . . . intended that grantees have

2    substantial flexibility in the use of these [CARES Act] dollars." RJN Ex. I at 3, as well as the

3    Rule itself, *see* 85 Fed. Reg. 39,480 ("the CARES Act affords LEAs . . . flexibility"). Defendants'

4    imposition of these restrictions on LEAs, significantly limiting their flexibility to use the funds, is

5    "contrary to plain congressional intent," and thus arbitrary and capricious.[5] *E. Bay Sanctuary*

6    *Covenant v. Trump*, 950 F.3d 1242, 1277 (9th Cir. 2020).

7          Another way in which the Rule is incompatible with congressional intent is its failure to

8    follow Congress' unambiguously expressed directive that CARES Act funds should be used to

9    support the most vulnerable students. Congress made this clear by using the Title I-A allocation

10   method, which tracks low-income students; statements by members of Congress further support

11   this intent. *See, e.g.*, 166 Cong. Rec. E340 (daily ed. Mar. 31, 2020) (statement of Rep. Jayapal)

12   (Congress intended that LEAs have this funding to "help alleviate the challenges educators,

13   students and families are struggling with in light of school closures" particularly those "students

14   with disabilities, English language learners, and students experiencing homelessness"). ED's

15   repeated insistence that Congress actually intended to prioritize support for all private-school

16   students, *see, e.g.*, 85 Fed. Reg. 39,479 ("The pandemic has harmed *all* our Nation's students by

17   disrupting their education. Nothing in the CARES Act suggests Congress intended to differentiate

18   between students based upon the public or non-public nature of their school with respect to

19   eligibility for relief"), 39,480 ("services under the CARES Act programs can be available for all

20   students—public and non-public—without regard to poverty, low achievement, or residence in a

21   participating Title I public school attendance area"), 39,482 ("the CARES Act authorizes an LEA

22   to serve all students—public and non-public—who have been affected by COVID-19"), reflects

23   its erroneous premise that Congress intended to direct these funds to all private-school students—

24

25          [5] Ironically, Defendants list "flexibility in administration of equitable services" as one of
     the positive impacts of the Rule, 85 Fed. Reg. 39,486, and repeatedly claim that they are
26   providing LEAs with flexibility through the Rule. 85 Fed. Reg. 39,480 ("we are affording
     flexibility to . . . LEA[s]"); 39,481 ("ED has resolved the ambiguity by permitting LEAs
27   flexibility to provide equitable services"); 39,484 ("This interim final rule is meant to provide
     flexibility . . . for SEAs and LEAs"), (the Rule "offers appropriate flexibility").

28

24

many of whom are affluent or at least economically secure[6]—on an equal basis with public schools that educate large populations of at-risk and low-income students.[7] Further, private schools appear to have been able to receive significant financial support from the CARES Act's Paycheck Protection Program, CARES Act § 1102, H.R. 748-6, far exceeding what is guaranteed to LEAs from the ESSER fund. *See* Hoffman Decl. ¶¶ 44-49.

### D. The Rule Is Procedurally Defective Under the APA as ED Did Not Have Good Cause to Issue the Rule As an Interim Final Rule.

"The APA requires that, prior to promulgating rules, an agency must issue a general notice of proposed rulemaking." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018); 5 U.S.C. § 553(b); *see also Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005) ("[I]t is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later."). Here, Defendants issued the Rule as an interim final rule, making the Rule effective immediately and circumventing the notice and comment requirements of the APA. *See* 85 Fed. Reg. 39,479.

Pursuant to 5 U.S.C. § 553(b)(B), an agency may publish a rule without prior notice and comment only "for good cause" when the "notice and public procedure . . . are impracticable, unnecessary, or contrary to the public interest." This good cause exception is "usually invoked in emergencies" and the agency "must overcome a high bar if it seeks to invoke the good cause

---

[6] ED recognizes that some "financially well-resourced" private schools have "tuition and fees comparable to those charged by the most highly selective postsecondary institutions," and "tend to serve families from the highest income brackets," but dismisses these as small in number and notes that such private schools are "not required to accept equitable services." 85 Fed. Reg. 39,483. Further, ED says that it "particularly discourages" such schools from accepting CARES Act funds, and proclaims its belief that "such non-public schools have ample resources to serve their students and teachers during the COVID-19 national emergency and should not rely on taxpayer funds to do so." *Id.* First, it should be noted that according to the most recent Census data, almost 600,000 students attend non-sectarian private schools, with an average annual tuition of over $22,000. *See* RJN Ex. J. And ED's "discourage[ment]" and "belie[f]," of course, do not impact those schools' *eligibility* for CARES Act funds under the Rule.

[7] In the Rule, ED briefly discusses CCSSO's position that Congress "'intended to concentrate ESSER funds in areas of the most need, where the educational and social impacts of the COVID crisis will be most extreme and difficult to overcome with limited local funds,'" but summarily dismisses this view as a "rigid" interpretation not supported by the text of the CARES Act. 85 Fed. Reg. 39,480. ED points to its Option #1 (Title I-schools only Option) as a means to address the needs of an "LEA that helps poor children by spending its CARES Act funds only in its Title I schools," ignoring the fact that ED then imposes draconian restrictions on the use of funds under this option which are completely untethered from the CARES Act's text.

25

1   exception to bypass the notice and comment requirement." *Azar*, 911 F.3d at 575; *United States v.*

2   *Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010).[8]

3        In the Rule, ED states that there is good cause to waive these notice and comment

4   procedures because of "the immediate need for certainty regarding applicable requirements" for

5   "determining the amount of funds available for [equitable] services." 85 Fed. Reg. at 39,483. This

6   rationale cannot satisfy good cause for multiple reasons.

7        First, remedying uncertainty in a statute "is not a reasonable justification for bypassing

8   notice and comment." *Valverde*, 628 F.3d at 1166. As the Ninth Circuit has adopted, "if 'good

9   cause' could be satisfied by an Agency's assertion that 'normal procedures were not followed

10  because of the need to provide immediate guidance and information[,] . . . then an exception to

11  the notice requirement would be created that would swallow the rule." *Id.* (quoting *Zhang v.*

12  *Slattery*, 55 F.3d 732, 746 (2d Cir. 1995)).

13       Further, the Rule allows for a 30-day post-promulgation comment period, *see* 85 Fed. Reg.

14  at 39,484, which "casts further doubt upon the authenticity and efficacy of the asserted need to

15  clear up potential uncertainty." *Valverde*, 628 F.3d at 1166; *see also Azar*, 911 F.3d at 576.

16  "[A]llowing for post-promulgation comments implicitly suggests that the rules will be

17  reconsidered and that the 'level of uncertainty is, at best, unchanged.'" *Azar*, 911 F.3d at 576

18  (quoting *United States v. Reynolds*, 710 F.3d 498, 510 (3d Cir. 2013)).

19       And, most damning here, the ostensible uncertainty regarding the calculation of the

20  proportional share of CARES Act funds for equitable shares is a phantom "problem" of ED's

21  invention. The CARES Act clearly adopts the Section 1117 proportional share calculation as

22  discussed above—ED is the only entity that seems to dispute the plain language of the CARES

23  Act, and its indefensible position is what has created the uncertainty for SEAs and LEAs across

24

25       [8] 5 U.S.C. § 553(a)(2) exempts some regulatory actions from the requirements of 5 U.S.C.
     § 553, but ED is generally prohibited from using this exemption for actions governing formula
26  grants or existing grants. 20 U.S.C. § 1232(d) (restricting ED's use of the 5 U.S.C. § 553(a)(2)
     exemption only to regulatory actions "that govern the first grant competition under a new or
27  substantially revised program authority"). Additionally, ED has stated in the notice it published
     with the Rule in the federal register that it would comply with 5 USC § 553, 85 Fed. Reg. 39,483,
28  and it is bound by that commitment. *See Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 (9th
     Cir. 1992).

the Nation. ED should not be permitted to create uncertainty, and then leverage that uncertainty to justify promulgating a rule without following notice and comment procedures.

The APA requires courts to hold unlawful and set aside agency actions that fail to comply with the procedures required by law. 5 U.S.C. § 706(2)(D). Because Defendants promulgated the Rule without following the APA's notice and comment requirements and failed to demonstrate good cause for dispensing with them, the Rule should be held unlawful.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM

The Rule threatens imminent and irreparable harm to the States, LEAs, their public schools, and the students they serve. The public schools will lose significant CARES Act funds to private schools or be unable to use the funds for their response to the pandemic. With state and local budgets stretched, students will lose out where sufficient resources are simply not available to make up the shortfalls caused by the diversion of CARES Act funds caused by the Guidance and Rule. As a result of ED's rewriting of the requirements under Section 18005 of the CARES Act, Plaintiffs also face adverse legal action against them no matter which option their LEAs choose.

The financial harm to the public schools and LEAs from the Guidance and the Rule is enormous. In sum, for the Plaintiff States and Plaintiff LEAs, if their LEAs choose to utilize Option #2 to calculate the proportional share of CARES Act funds for equitable services, the LEAs and their public schools will lose over $150 million, compared to if the LEAs follow the CARES Act's explicit instruction to use the Section 1117 calculation method. *See* Guerrant Decl. ¶¶ 23, 37; Constancio Decl. ¶¶ 27, 35; Goldson Decl. ¶¶ 18, 21; Gordon Decl. ¶¶ 19, 31; Hoffmann Decl. ¶¶ 22, 42; Jackson Decl. ¶¶ 22, 26, 36; Jones Decl. ¶¶ 25, 27, 39; Kaneshiro-Erdmann Decl. ¶ 22; Makin Decl. ¶¶ 26, 41; Oates Decl. ¶ 20; Salmon Decl. ¶ 18; Stewart Decl. ¶ 24; Stem Decl. ¶¶ 25, 35; Wallace Decl. ¶¶ 16, 21. Plaintiff States and LEAs will be required to backfill this lost funding for their public schools. *See* Guerrant Decl. ¶ 26; Jackson Decl. ¶ 26; Jones Decl. ¶ 29; Kaneshiro-Erdmann Decl. ¶ 25; Makin Decl. ¶ 27; Oates Decl. ¶ 22; Stem Decl. ¶ 27; Stewart Decl. ¶¶ 25-26. If the LEAs in the Plaintiff States and Plaintiff LEAs follow Option #1 under the Rule to calculate the proportional share of CARES Act funds for equitable services, the LEAs would only be able to use the funds to support their Title I schools. *See* Guerrant Decl.

27

1   ¶¶ 27, 36; Constancio Decl. ¶ 33; Baca Decl. ¶ 24; Hoffmann Decl. ¶¶ 29-30, 39; Jones Decl. ¶

2   38; Jackson Decl. ¶¶ 27, 35; Kaneshiro-Erdmann Decl. ¶¶ 26, 28; Makin Decl. ¶¶ 28, 40; Oates

3   Decl. ¶ 16; Salmon Decl. ¶ 20; Stem Decl. ¶¶ 28, 34; Stewart Decl. ¶¶ 25, 37; Wallace Decl. ¶ 20.

4   The thousands of non-Title I schools in LEAs that would otherwise receive CARES Act funds

5   will receive zero funding to address the many problems created by the pandemic. *See* Guerrant

6   Decl. ¶¶ 27, 36; Constancio Decl. ¶ 33; Baca Decl. ¶ 24; Hoffmann Decl. ¶¶ 29, 39; Jones Decl. ¶

7   38; Jackson Decl. ¶¶ 27, 35; Kaneshiro-Erdmann Decl. ¶¶ 26, 28; Makin Decl. ¶¶ 28, 40; Oates

8   Decl. ¶ 16; Salmon Decl. ¶ 20; Stem Decl. ¶¶ 28, 34; Stewart Decl. ¶¶ 25, 37; Wallace Decl. ¶ 20.

9   To make matters worse, the Title I public schools receiving funds will be unable to use the

10   CARES Act funds where they are needed most. *See* Guerrant Decl. ¶¶ 27, 36; Constancio Decl. ¶

11   33; Baca Decl. ¶ 24; Gordon Decl. ¶ 30; Hoffmann Decl. ¶¶ 29-31, 39-41; Jackson Decl. ¶¶ 27,

12   35; Jones Decl. ¶ 28; Kaneshiro-Erdmann Decl. ¶¶ 26, 28; Makin Decl. ¶¶ 28, 40; Oates Decl. ¶

13   18; Salmon Decl. ¶ 21; Stem Decl. ¶ 34; Stewart Decl. ¶¶ 25, 37; Wallace Decl. ¶ 20. Thus, even

14   if all LEAs utilize Option #1 in the Rule, the Plaintiff States and LEAs will need to allocate

15   hundreds of millions of dollars to the schools that will no longer be eligible to receive CARES

16   Act funds and to assist schools that cannot use the CARES Act funds for their intended purposes.

17       This significant monetary loss to the SEAs, LEAs, public schools, and public-school

18   students constitutes irreparable harm. *Azar*, 911 F.3d at 581 (states could establish irreparable

19   harm where they suffer economic harm and "will not be able to recover monetary damages

20   connected to the IFRs" (citing 5 U.S.C. § 702 (permitting relief "other than money damages"));

21   *see also Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (federal

22   executive order interfering with counties' ability to budget, plan for the future, and properly serve

23   their residents constituted a basis for irreparable harm); *Texas v. United States*, 809 F.3d 134, 186

24   (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (impact on state's

25   resources caused by federal program enabling certain immigrants to obtain drivers' licenses

26   constituted irreparable harm)).

27       Alternatively, if LEAs—either unilaterally or with a State's permission—calculate the

28   proportionate share of CARES Act funds for equitable services as required by the Act, i.e., using

28

1   the Section 1117 calculation and using the funds for the purposes expressly provided for in the

2   Act, both the Plaintiff States and Plaintiff LEAs will face legal jeopardy as they cannot comply

3   with certifications verifying that they will abide by both the CARES Act and ED's regulations.

4   *See* Guerrant Decl. ¶ 33; Baca Decl. ¶ 21; Constancio Decl. ¶ 30; Gordon Decl. ¶ 26; Jackson

5   Decl. ¶ 32; Jones Decl. ¶ 34; Kaneshiro-Erdmann Decl. ¶ 27; Makin Decl. ¶ 36; Stem Decl. ¶ 31;

6   Stewart Decl. ¶ 33. This leaves Plaintiff States and LEA in an untenable position in which,

7   regardless of what their LEAs choose, they will be in violation of either the CARES Act's

8   requirements or the Rule's requirements. Whatever choice Plaintiffs make, they will be harmed.

9   *See Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009) (a party

10  faces an irreparable injury when it is harmed no matter what choice it makes).

11       Finally, as the Guidance and Rule impinge on constitutional separation of powers principles

12  and the Spending Clause, Defendants' "constitutional violation alone, coupled with the damages

13  incurred," from loss of public-school funding "suffice to show irreparable harm." *Am. Trucking*

14  *Ass'ns, Inc.*, 559 F.3d at 1058-59.

15  **III.   THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF PROVISIONAL RELIEF**

16       The "balance of the equities" and "public interest" factors of the *Winter* test merge when

17  the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing these factors,

18  courts consider the impacts of the injunction on nonparties as well. *See League of Wilderness*

19  *Defenders/Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 766 (9th Cir.

20  2014).

21       The public interest in allowing schools to respond to the myriad urgent challenges posed by

22  the COVID-19 pandemic weighs overwhelmingly in favor of an injunction here. As discussed

23  *supra* at 3-4, the challenges caused by the pandemic have contributed to heightened need for

24  public-school funding, particularly for schools with a high proportion of low-income and at-risk

25  children. Congress specifically responded to this crisis by making GEER and ESSER funds

26  available to public schools that needed assistance to respond to the pandemic and provided

27  flexibility to the SEAs and LEAs in using these funds to best serve students. An injunction is

28  needed to preserve this congressional intent, as the "public . . . has an interest in ensuring that

29

Pls.' Notice of Mot. and Mot. for Prelim. Inj. (3:20-cv-4478-SK)

statutes enacted by their representatives are not imperiled by executive fiat." *Sierra Club v. Trump*, No. 19-16102, 2020 WL 3478900, at *16 (9th Cir. June 26, 2020) (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)) (punctuation omitted); *see also San Francisco*, 897 F.3d at 1244 (upholding injunction regarding federal grants because "the public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services").

Supporting public schools' continued ability to provide their students with an education is also in the public interest. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted."). Diverting funding to private schools and away from public schools, when private schools can access, and have accessed, other funding sources under the CARES Act that are unavailable to public schools, leaves public schools without the emergency relief funding Congress sought to provide them during the pandemic.

Conversely, Defendants "cannot suffer harm 'from an injunction that merely ends an unlawful practice'." *Sierra Club*, 2020 WL 3478900, at *16 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). In fact, an injunction here would only require that the ESSER and GEER funds be utilized in the manner that Congress intended—making assistance available for public schools and at-risk private-school students, and providing flexibility to SEAs and LEAs to use the funds. *See id.* ("[t]he public interest favors enforcing" Congress's "calculated choice").

COVID-19 has had particularly insidious effects on low-income communities, and Congress recognized this effect by directing the majority of the ESSER and GEER funds to those LEAs particularly harmed by the pandemic. Private schools have access to other avenues of funding under the CARES Act. ED should not divert funding from public schools to private schools contrary to the plain language of the CARES Act, Congress' clear intent, and in the face of this public health crisis's crushing blow to public education.

## CONCLUSION

For the foregoing reasons, Plaintiffs request this Court grant their Motion.

30

1    Dated: July 17, 2020                          Respectfully Submitted,

2                                                  XAVIER BECERRA
                                                   Attorney General of California
3                                                  MICHAEL L. NEWMAN
                                                   Senior Assistant Attorney General
4                                                  SARAH E. BELTON
                                                   Supervising Deputy Attorney General
5
                                                   */s/ Garrett Lindsey*
6
                                                   GARRETT LINDSEY
7                                                  JAMES F. ZAHRADKA II
                                                   REBEKAH A. FRETZ
8                                                  Deputy Attorneys General
                                                   *Attorneys for Plaintiff State of California*
9

10                                                 DANA NESSEL
                                                   Attorney General of Michigan
11                                                 FADWA A. HAMMOUD
                                                   Solicitor General
12                                                 TONI L. HARRIS*
                                                   NEIL GIOVANATTI*
13                                                 Assistant Attorneys General
                                                   *Attorneys for Plaintiff State of Michigan*
14                                                 *Appearing Pro Hac Vice

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

KARL A. RACINE
*Attorney General of District of Columbia*
KATHLEEN KONOPKA
Deputy Attorney General, Public Advocacy
Division
*Attorneys for Plaintiff District of Columbia*
*Appearing pro hac vice (application*
*forthcoming)*

CLARE E. CONNORS
*Attorney General of Hawaii*
HOLLY T. SHIKADA
KEVIN M. RICHARDSON
Deputy Attorneys General
*Attorneys for Plaintiff State of Hawaii*
*Appearing pro hac vice (application*
*forthcoming)*

AARON M. FREY
*Attorney General of Maine*
SARAH A. FORSTER*
Assistant Attorney General
*Attorneys for Plaintiff State of Maine*
**Appearing pro hac vice*

BRIAN E. FROSH
*Attorney General of Maryland*
STEVEN M. SULLIVAN
Solicitor General
*Attorneys for Plaintiff State of Maryland*
*Appearing pro hac vice (application*
*forthcoming)*

HECTOR BALDERAS
*New Mexico Attorney General*
P. CHOLLA KHOURY
LISA GIANDOMENICO*
Assistant Attorneys General
*Attorneys for Plaintiff State of New Mexico*
**Appearing pro hac vice*

JOSH SHAPIRO
*Attorney General of Pennsylvania*
MICHAEL J. FISCHER
Chief Deputy Attorney General
*Attorneys for Plaintiff Commonwealth of*
*Pennsylvania*
*Appearing pro hac vice (application*
*forthcoming)*

JOSHUA L. KAUL
*Attorney General of Wisconsin*
HANNAH S. JURSS
Assistant Attorney General
*Attorneys for Plaintiff State of Wisconsin*
*Appearing pro hac vice (application*
*forthcoming)*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*
ERIC PROSHANSKY
HOPE LU
GAIL RUBIN
Assistant Corporation Counsel
*Attorneys for Plaintiff the Board of*
*Education of the City School District of the*
*City of New York*
*Appearing pro hac vice (application*
*forthcoming)*

BOARD OF EDUCATION, CITY OF CHICAGO
DEPARTMENT OF LAW
JOSEPH MORIARTY
General Counsel
J. ERNEST MINCY
Deputy General Counsel for Litigation
*Attorneys for Plaintiff Chicago Board of*
*Education*
*Appearing pro hac vice (application*
*forthcoming)*

SAN FRANCISCO UNIFIED SCHOOL DISTRICT
DANIELLE HOUCK
General Counsel
SUSANNE NAOMI STARECKI KIM
Sr. Deputy General Counsel
Legal Department
*Attorneys for Plaintiff San Francisco Unified*
*School District*

SQUIRE PATTON BOGGS (US) LLP
GABRIEL COLWELL (CABN 216783)
COLIN R. JENNINGS (OHBN 0068704)
W. MICHAEL HANNA (OHBN 0020149)
EMILY R. SPIVACK (OHBN 0090777)
KEVIN J. BURTZLAFF (OHBN 0039648)
Cleveland Municipal School District Board
of Education
*Attorneys for Plaintiff Cleveland Municipal*
*School District*
*Appearing pro hac vice (application*
*forthcoming)*

32

CARES Act Appendix

H. R. 748

# One Hundred Sixteenth Congress
## of the
# United States of America

**AT THE SECOND SESSION**

*Begun and held at the City of Washington on Friday,*
*the third day of January, two thousand and twenty*

## An Act

To amend the Internal Revenue Code of 1986 to repeal the excise tax on high
cost employer-sponsored health coverage.

*Be it enacted by the Senate and House of Representatives of*
*the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Coronavirus Aid, Relief, and
Economic Security Act" or the "CARES Act".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE
SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION

TITLE I—KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT

Sec. 1101. Definitions.
Sec. 1102. Paycheck protection program.
Sec. 1103. Entrepreneurial development.
Sec. 1104. State trade expansion program.
Sec. 1105. Waiver of matching funds requirement under the women's business center program.
Sec. 1106. Loan forgiveness.
Sec. 1107. Direct appropriations.
Sec. 1108. Minority business development agency.
Sec. 1109. United States Treasury Program Management Authority.
Sec. 1110. Emergency EIDL grants.
Sec. 1111. Resources and services in languages other than English.
Sec. 1112. Subsidy for certain loan payments.
Sec. 1113. Bankruptcy.
Sec. 1114. Emergency rulemaking authority.

TITLE II—ASSISTANCE FOR AMERICAN WORKERS, FAMILIES, AND
BUSINESSES

Subtitle A—Unemployment Insurance Provisions

Sec. 2101. Short title.
Sec. 2102. Pandemic Unemployment Assistance.
Sec. 2103. Emergency unemployment relief for governmental entities and nonprofit organizations.
Sec. 2104. Emergency increase in unemployment compensation benefits.
Sec. 2105. Temporary full Federal funding of the first week of compensable regular unemployment for States with no waiting week.
Sec. 2106. Emergency State staffing flexibility.
Sec. 2107. Pandemic emergency unemployment compensation.
Sec. 2108. Temporary financing of short-time compensation payments in States with programs in law.
Sec. 2109. Temporary financing of short-time compensation agreements.

H. R. 748—2

Sec. 2110. Grants for short-time compensation programs.
Sec. 2111. Assistance and guidance in implementing programs.
Sec. 2112. Waiver of the 7-day waiting period for benefits under the Railroad Unemployment Insurance Act.
Sec. 2113. Enhanced benefits under the Railroad Unemployment Insurance Act.
Sec. 2114. Extended unemployment benefits under the Railroad Unemployment Insurance Act.
Sec. 2115. Funding for the DOL Office of Inspector General for oversight of unemployment provisions.
Sec. 2116. Implementation.

Subtitle B—Rebates and Other Individual Provisions

Sec. 2201. 2020 recovery rebates for individuals.
Sec. 2202. Special rules for use of retirement funds.
Sec. 2203. Temporary waiver of required minimum distribution rules for certain retirement plans and accounts.
Sec. 2204. Allowance of partial above the line deduction for charitable contributions.
Sec. 2205. Modification of limitations on charitable contributions during 2020.
Sec. 2206. Exclusion for certain employer payments of student loans.

Subtitle C—Business Provisions

Sec. 2301. Employee retention credit for employers subject to closure due to COVID–19.
Sec. 2302. Delay of payment of employer payroll taxes.
Sec. 2303. Modifications for net operating losses.
Sec. 2304. Modification of limitation on losses for taxpayers other than corporations.
Sec. 2305. Modification of credit for prior year minimum tax liability of corporations.
Sec. 2306. Modifications of limitation on business interest.
Sec. 2307. Technical amendments regarding qualified improvement property.
Sec. 2308. Temporary exception from excise tax for alcohol used to produce hand sanitizer.

TITLE III—SUPPORTING AMERICA'S HEALTH CARE SYSTEM IN THE FIGHT AGAINST THE CORONAVIRUS

Subtitle A—Health Provisions

Sec. 3001. Short title.

PART I—ADDRESSING SUPPLY SHORTAGES

SUBPART A—MEDICAL PRODUCT SUPPLIES

Sec. 3101. National Academies report on America's medical product supply chain security.
Sec. 3102. Requiring the strategic national stockpile to include certain types of medical supplies.
Sec. 3103. Treatment of respiratory protective devices as covered countermeasures.

SUBPART B—MITIGATING EMERGENCY DRUG SHORTAGES

Sec. 3111. Prioritize reviews of drug applications; incentives.
Sec. 3112. Additional manufacturer reporting requirements in response to drug shortages.

SUBPART C—PREVENTING MEDICAL DEVICE SHORTAGES

Sec. 3121. Discontinuance or interruption in the production of medical devices.

PART II—ACCESS TO HEALTH CARE FOR COVID–19 PATIENTS

SUBPART A—COVERAGE OF TESTING AND PREVENTIVE SERVICES

Sec. 3201. Coverage of diagnostic testing for COVID–19.
Sec. 3202. Pricing of diagnostic testing.
Sec. 3203. Rapid coverage of preventive services and vaccines for coronavirus.

SUBPART B—SUPPORT FOR HEALTH CARE PROVIDERS

Sec. 3211. Supplemental awards for health centers.
Sec. 3212. Telehealth network and telehealth resource centers grant programs.
Sec. 3213. Rural health care services outreach, rural health network development, and small health care provider quality improvement grant programs.

H. R. 748—3

Sec. 3214. United States Public Health Service Modernization.
Sec. 3215. Limitation on liability for volunteer health care professionals during COVID–19 emergency response.
Sec. 3216. Flexibility for members of National Health Service Corps during emergency period.

SUBPART C—MISCELLANEOUS PROVISIONS

Sec. 3221. Confidentiality and disclosure of records relating to substance use disorder.
Sec. 3222. Nutrition services.
Sec. 3223. Continuity of service and opportunities for participants in community service activities under title V of the Older Americans Act of 1965.
Sec. 3224. Guidance on protected health information.
Sec. 3225. Reauthorization of healthy start program.
Sec. 3226. Importance of the blood supply.

PART III—INNOVATION

Sec. 3301. Removing the cap on OTA during public health emergencies.
Sec. 3302. Priority zoonotic animal drugs.

PART IV—HEALTH CARE WORKFORCE

Sec. 3401. Reauthorization of health professions workforce programs.
Sec. 3402. Health workforce coordination.
Sec. 3403. Education and training relating to geriatrics.
Sec. 3404. Nursing workforce development.

Subtitle B—Education Provisions

Sec. 3501. Short title.
Sec. 3502. Definitions.
Sec. 3503. Campus-based aid waivers.
Sec. 3504. Use of supplemental educational opportunity grants for emergency aid.
Sec. 3505. Federal work-study during a qualifying emergency.
Sec. 3506. Adjustment of subsidized loan usage limits.
Sec. 3507. Exclusion from Federal Pell Grant duration limit.
Sec. 3508. Institutional refunds and Federal student loan flexibility.
Sec. 3509. Satisfactory academic progress.
Sec. 3510. Continuing education at affected foreign institutions.
Sec. 3511. National emergency educational waivers.
Sec. 3512. HBCU Capital financing.
Sec. 3513. Temporary relief for federal student loan borrowers.
Sec. 3514. Provisions related to the Corporation for National and Community Service.
Sec. 3515. Workforce response activities.
Sec. 3516. Technical amendments.
Sec. 3517. Waiver authority and reporting requirement for institutional aid.
Sec. 3518. Authorized uses and other modifications for grants.
Sec. 3519. Service obligations for teachers.

Subtitle C—Labor Provisions

Sec. 3601. Limitation on paid leave.
Sec. 3602. Emergency Paid Sick Leave Act Limitation.
Sec. 3603. Unemployment insurance.
Sec. 3604. OMB Waiver of Paid Family and Paid Sick Leave.
Sec. 3605. Paid leave for rehired employees.
Sec. 3606. Advance refunding of credits.
Sec. 3607. Expansion of DOL Authority to postpone certain deadlines.
Sec. 3608. Single-employer plan funding rules.
Sec. 3609. Application of cooperative and small employer charity pension plan rules to certain charitable employers whose primary exempt purpose is providing services with respect to mothers and children.
Sec. 3610. Federal contractor authority.
Sec. 3611. Technical corrections.

Subtitle D—Finance Committee

Sec. 3701. Exemption for telehealth services.
Sec. 3702. Inclusion of certain over-the-counter medical products as qualified medical expenses.
Sec. 3703. Increasing Medicare telehealth flexibilities during emergency period.
Sec. 3704. Enhancing Medicare telehealth services for Federally qualified health centers and rural health clinics during emergency period.

H. R. 748—4

Sec. 3705. Temporary waiver of requirement for face-to-face visits between home dialysis patients and physicians.
Sec. 3706. Use of telehealth to conduct face-to-face encounter prior to recertification of eligibility for hospice care during emergency period.
Sec. 3707. Encouraging use of telecommunications systems for home health services furnished during emergency period.
Sec. 3708. Improving care planning for Medicare home health services.
Sec. 3709. Adjustment of sequestration.
Sec. 3710. Medicare hospital inpatient prospective payment system add-on payment for COVID–19 patients during emergency period.
Sec. 3711. Increasing access to post-acute care during emergency period.
Sec. 3712. Revising payment rates for durable medical equipment under the Medicare program through duration of emergency period.
Sec. 3713. Coverage of the COVID–19 vaccine under part B of the Medicare program without any cost-sharing.
Sec. 3714. Requiring Medicare prescription drug plans and MA–PD plans to allow during the COVID–19 emergency period for fills and refills of covered part D drugs for up to a 3-month supply.
Sec. 3715. Providing home and community-based services in acute care hospitals.
Sec. 3716. Clarification regarding uninsured individuals.
Sec. 3717. Clarification regarding coverage of COVID–19 testing products.
Sec. 3718. Amendments relating to reporting requirements with respect to clinical diagnostic laboratory tests.
Sec. 3719. Expansion of the Medicare hospital accelerated payment program during the COVID–19 public health emergency.
Sec. 3720. Delaying requirements for enhanced FMAP to enable State legislation necessary for compliance.

Subtitle E—Health and Human Services Extenders

PART I—MEDICARE PROVISIONS

Sec. 3801. Extension of the work geographic index floor under the Medicare program.
Sec. 3802. Extension of funding for quality measure endorsement, input, and selection.
Sec. 3803. Extension of funding outreach and assistance for low-income programs.

PART II—MEDICAID PROVISIONS

Sec. 3811. Extension of the Money Follows the Person rebalancing demonstration program.
Sec. 3812. Extension of spousal impoverishment protections.
Sec. 3813. Delay of DSH reductions.
Sec. 3814. Extension and expansion of Community Mental Health Services demonstration program.

PART III—HUMAN SERVICES AND OTHER HEALTH PROGRAMS

Sec. 3821. Extension of sexual risk avoidance education program.
Sec. 3822. Extension of personal responsibility education program.
Sec. 3823. Extension of demonstration projects to address health professions workforce needs.
Sec. 3824. Extension of the temporary assistance for needy families program and related programs.

PART IV—PUBLIC HEALTH PROVISIONS

Sec. 3831. Extension for community health centers, the National Health Service Corps, and teaching health centers that operate GME programs.
Sec. 3832. Diabetes programs.

PART V—MISCELLANEOUS PROVISIONS

Sec. 3841. Prevention of duplicate appropriations for fiscal year 2020.

Subtitle F—Over-the-Counter Drugs

PART I—OTC DRUG REVIEW

Sec. 3851. Regulation of certain nonprescription drugs that are marketed without an approved drug application.
Sec. 3852. Misbranding.
Sec. 3853. Drugs excluded from the over-the-counter drug review.
Sec. 3854. Treatment of Sunscreen Innovation Act.
Sec. 3855. Annual update to Congress on appropriate pediatric indication for certain OTC cough and cold drugs.

H. R. 748—5

Sec. 3856. Technical corrections.

PART II—USER FEES

Sec. 3861. Finding.
Sec. 3862. Fees relating to over-the-counter drugs.

TITLE IV—ECONOMIC STABILIZATION AND ASSISTANCE TO SEVERELY
DISTRESSED SECTORS OF THE UNITED STATES ECONOMY

Subtitle A—Coronavirus Economic Stabilization Act of 2020

Sec. 4001. Short title.
Sec. 4002. Definitions.
Sec. 4003. Emergency relief and taxpayer protections.
Sec. 4004. Limitation on certain employee compensation.
Sec. 4005. Continuation of certain air service.
Sec. 4006. Coordination with Secretary of Transportation.
Sec. 4007. Suspension of certain aviation excise taxes.
Sec. 4008. Debt guarantee authority.
Sec. 4009. Temporary Government in the Sunshine Act relief.
Sec. 4010. Temporary hiring flexibility.
Sec. 4011. Temporary lending limit waiver.
Sec. 4012. Temporary relief for community banks.
Sec. 4013. Temporary relief from troubled debt restructurings.
Sec. 4014. Optional temporary relief from current expected credit losses.
Sec. 4015. Non-applicability of restrictions on ESF during national emergency.
Sec. 4016. Temporary credit union provisions.
Sec. 4017. Increasing access to materials necessary for national security and pan-
demic recovery.
Sec. 4018. Special Inspector General for Pandemic Recovery.
Sec. 4019. Conflicts of interest.
Sec. 4020. Congressional Oversight Commission.
Sec. 4021. Credit protection during COVID–19.
Sec. 4022. Foreclosure moratorium and consumer right to request forbearance.
Sec. 4023. Forbearance of residential mortgage loan payments for multifamily prop-
erties with federally backed loans.
Sec. 4024. Temporary moratorium on eviction filings.
Sec. 4025. Protection of collective bargaining agreement.
Sec. 4026. Reports.
Sec. 4027. Direct appropriation.
Sec. 4028. Rule of construction.
Sec. 4029. Termination of authority.

Subtitle B—Air Carrier Worker Support

Sec. 4111. Definitions.
Sec. 4112. Pandemic relief for aviation workers.
Sec. 4113. Procedures for providing payroll support.
Sec. 4114. Required assurances.
Sec. 4115. Protection of collective bargaining agreement.
Sec. 4116. Limitation on certain employee compensation.
Sec. 4117. Tax payer protection.
Sec. 4118. Reports.
Sec. 4119. Coordination.
Sec. 4120. Direct appropriation.

TITLE V—CORONAVIRUS RELIEF FUNDS

Sec. 5001. Coronavirus Relief Fund.

TITLE VI—MISCELLANEOUS PROVISIONS

Sec. 6001. COVID–19 borrowing authority for the United States Postal Service.
Sec. 6002. Emergency designation.

DIVISION B—EMERGENCY APPROPRIATIONS FOR CORONAVIRUS HEALTH
RESPONSE AND AGENCY OPERATIONS

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

# DIVISION A—KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION

## TITLE I—KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT

**SEC. 1101. DEFINITIONS.**

In this title—

(1) the terms "Administration" and "Administrator" mean the Small Business Administration and the Administrator thereof, respectively; and

(2) the term "small business concern" has the meaning given the term in section 3 of the Small Business Act (15 U.S.C. 636).

**SEC. 1102. PAYCHECK PROTECTION PROGRAM.**

(a) IN GENERAL.—Section 7(a) of the Small Business Act (15 U.S.C. 636(a)) is amended—

(1) in paragraph (2)—

(A) in subparagraph (A), in the matter preceding clause (i), by striking "and (E)" and inserting "(E), and (F)"; and

(B) by adding at the end the following:

"(F) PARTICIPATION IN THE PAYCHECK PROTECTION PROGRAM.—In an agreement to participate in a loan on a deferred basis under paragraph (36), the participation by the Administration shall be 100 percent."; and

(2) by adding at the end the following:

"(36) PAYCHECK PROTECTION PROGRAM.—

"(A) DEFINITIONS.—In this paragraph—

"(i) the terms 'appropriate Federal banking agency' and 'insured depository institution' have the meanings given those terms in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

"(ii) the term 'covered loan' means a loan made under this paragraph during the covered period;

"(iii) the term 'covered period' means the period beginning on February 15, 2020 and ending on June 30, 2020;

"(iv) the term 'eligible recipient' means an individual or entity that is eligible to receive a covered loan;

"(v) the term 'eligible self-employed individual' has the meaning given the term in section 7002(b) of the Families First Coronavirus Response Act (Public Law 116–127);

"(vi) the term 'insured credit union' has the meaning given the term in section 101 of the Federal Credit Union Act (12 U.S.C. 1752);

"(vii) the term 'nonprofit organization' means an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and that is exempt from taxation under section 501(a) of such Code;

"(viii) the term 'payroll costs'—

"(I) means—

"(aa) the sum of payments of any compensation with respect to employees that is a—

"(AA) salary, wage, commission, or similar compensation;

"(BB) payment of cash tip or equivalent;

"(CC) payment for vacation, parental, family, medical, or sick leave;

"(DD) allowance for dismissal or separation;

"(EE) payment required for the provisions of group health care benefits, including insurance premiums;

"(FF) payment of any retirement benefit; or

"(GG) payment of State or local tax assessed on the compensation of employees; and

"(bb) the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation and that is in an amount that is not more than $100,000 in 1 year, as prorated for the covered period; and

"(II) shall not include—

"(aa) the compensation of an individual employee in excess of an annual salary of $100,000, as prorated for the covered period;

"(bb) taxes imposed or withheld under chapters 21, 22, or 24 of the Internal Revenue Code of 1986 during the covered period;

"(cc) any compensation of an employee whose principal place of residence is outside of the United States;

"(dd) qualified sick leave wages for which a credit is allowed under section 7001 of the Families First Coronavirus Response Act (Public Law 116–127); or

"(ee) qualified family leave wages for which a credit is allowed under section 7003 of the Families First Coronavirus Response Act (Public Law 116–127); and

"(ix) the term 'veterans organization' means an organization that is described in section 501(c)(19) of the Internal Revenue Code that is exempt from taxation under section 501(a) of such Code.

"(B) PAYCHECK PROTECTION LOANS.—Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection.

"(C) REGISTRATION OF LOANS.—Not later than 15 days after the date on which a loan is made under this paragraph, the Administration shall register the loan using the TIN (as defined in section 7701 of the Internal Revenue Code of 1986) assigned to the borrower.

"(D) INCREASED ELIGIBILITY FOR CERTAIN SMALL BUSINESSES AND ORGANIZATIONS.—

"(i) IN GENERAL.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of—

"(I) 500 employees; or

"(II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

"(ii) INCLUSION OF SOLE PROPRIETORS, INDEPENDENT CONTRACTORS, AND ELIGIBLE SELF-EMPLOYED INDIVIDUALS.—

"(I) IN GENERAL.—During the covered period, individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals shall be eligible to receive a covered loan.

"(II) DOCUMENTATION.—An eligible self-employed individual, independent contractor, or sole proprietorship seeking a covered loan shall submit such documentation as is necessary to establish such individual as eligible, including payroll tax filings reported to the Internal Revenue Service, Forms 1099–MISC, and income and expenses from the sole proprietorship, as determined by the Administrator and the Secretary.

"(iii) BUSINESS CONCERNS WITH MORE THAN 1 PHYSICAL LOCATION.—During the covered period, any business concern that employs not more than 500 employees per physical location of the business concern and that is assigned a North American Industry Classification System code beginning with 72 at the time of disbursal shall be eligible to receive a covered loan.

"(iv) WAIVER OF AFFILIATION RULES.—During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived with respect to eligibility for a covered loan for—

"(I) any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System code beginning with 72;

"(II) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; and

"(III) any business concern that receives financial assistance from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681).

"(v) EMPLOYEE.—For purposes of determining whether a business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) employs not more than 500 employees under clause (i)(I), the term 'employee' includes individuals employed on a full-time, part-time, or other basis.

"(vi) AFFILIATION.—The provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor thereto, shall apply with respect to a nonprofit organization and a veterans organization in the same manner as with respect to a small business concern.

"(E) MAXIMUM LOAN AMOUNT.—During the covered period, with respect to a covered loan, the maximum loan amount shall be the lesser of—

"(i)(I) the sum of—

"(aa) the product obtained by multiplying—

"(AA) the average total monthly payments by the applicant for payroll costs incurred during the 1-year period before the date on which the loan is made, except that, in the case of an applicant that is seasonal employer, as determined by the Administrator, the average total monthly payments for payroll shall be for the 12-week period beginning February 15, 2019, or at the election of the eligible recipient, March 1, 2019, and ending June 30, 2019; by

"(BB) 2.5; and

"(bb) the outstanding amount of a loan under subsection (b)(2) that was made during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available to be refinanced under the covered loan; or

"(II) if requested by an otherwise eligible recipient that was not in business during the period beginning on February 15, 2019 and ending on June 30, 2019, the sum of—

"(aa) the product obtained by multiplying—

"(AA) the average total monthly payments by the applicant for payroll costs incurred during the period beginning on January 1, 2020 and ending on February 29, 2020; by

"(BB) 2.5; and

"(bb) the outstanding amount of a loan under subsection (b)(2) that was made during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available to be refinanced under the covered loan; or

"(ii) $10,000,000.

"(F) ALLOWABLE USES OF COVERED LOANS.—

"(i) IN GENERAL.—During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for—

"(I) payroll costs;

"(II) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;

"(III) employee salaries, commissions, or similar compensations;

"(IV) payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation);

"(V) rent (including rent under a lease agreement);

"(VI) utilities; and

"(VII) interest on any other debt obligations that were incurred before the covered period.

"(ii) DELEGATED AUTHORITY.—

"(I) IN GENERAL.—For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph.

"(II) CONSIDERATIONS.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—

"(aa) was in operation on February 15, 2020; and

"(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or

"(BB) paid independent contractors, as reported on a Form 1099–MISC.

"(iii) ADDITIONAL LENDERS.—The authority to make loans under this paragraph shall be extended to additional lenders determined by the Administrator and the Secretary of the Treasury to have the necessary qualifications to process, close, disburse and service loans made with the guarantee of the Administration.

"(iv) REFINANCE.—A loan made under subsection (b)(2) during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available may be refinanced as part of a covered loan.

"(v) NONRECOURSE.—Notwithstanding the waiver of the personal guarantee requirement or collateral under subparagraph (J), the Administrator shall have no recourse against any individual shareholder, member, or partner of an eligible recipient of a covered loan for nonpayment of any covered loan, except to

H. R. 748—11

the extent that such shareholder, member, or partner uses the covered loan proceeds for a purpose not authorized under clause (i).

"(G) BORROWER REQUIREMENTS.—

"(i) CERTIFICATION.—An eligible recipient applying for a covered loan shall make a good faith certification—

"(I) that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient;

"(II) acknowledging that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments;

"(III) that the eligible recipient does not have an application pending for a loan under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan; and

"(IV) during the period beginning on February 15, 2020 and ending on December 31, 2020, that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan.

"(H) FEE WAIVER.—During the covered period, with respect to a covered loan—

"(i) in lieu of the fee otherwise applicable under paragraph (23)(A), the Administrator shall collect no fee; and

"(ii) in lieu of the fee otherwise applicable under paragraph (18)(A), the Administrator shall collect no fee.

"(I) CREDIT ELSEWHERE.—During the covered period, the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 3(h), shall not apply to a covered loan.

"(J) WAIVER OF PERSONAL GUARANTEE REQUIREMENT.— During the covered period, with respect to a covered loan—

"(i) no personal guarantee shall be required for the covered loan; and

"(ii) no collateral shall be required for the covered loan.

"(K) MATURITY FOR LOANS WITH REMAINING BALANCE AFTER APPLICATION OF FORGIVENESS.—With respect to a covered loan that has a remaining balance after reduction based on the loan forgiveness amount under section 1106 of the CARES Act—

"(i) the remaining balance shall continue to be guaranteed by the Administration under this subsection; and

"(ii) the covered loan shall have a maximum maturity of 10 years from the date on which the borrower applies for loan forgiveness under that section.

"(L) INTEREST RATE REQUIREMENTS.—A covered loan shall bear an interest rate not to exceed 4 percent.

H. R. 748—12

"(M) LOAN DEFERMENT.—

"(i) DEFINITION OF IMPACTED BORROWER.—

"(I) IN GENERAL.—In this subparagraph, the term 'impacted borrower' means an eligible recipient that—

"(aa) is in operation on February 15, 2020; and

"(bb) has an application for a covered loan that is approved or pending approval on or after the date of enactment of this paragraph.

"(II) PRESUMPTION.—For purposes of this subparagraph, an impacted borrower is presumed to have been adversely impacted by COVID–19.

"(ii) DEFERRAL.—During the covered period, the Administrator shall—

"(I) consider each eligible recipient that applies for a covered loan to be an impacted borrower; and

"(II) require lenders under this subsection to provide complete payment deferment relief for impacted borrowers with covered loans for a period of not less than 6 months, including payment of principal, interest, and fees, and not more than 1 year.

"(iii) SECONDARY MARKET.—During the covered period, with respect to a covered loan that is sold on the secondary market, if an investor declines to approve a deferral requested by a lender under clause (ii), the Administrator shall exercise the authority to purchase the loan so that the impacted borrower may receive a deferral for a period of not less than 6 months, including payment of principal, interest, and fees, and not more than 1 year.

"(iv) GUIDANCE.—Not later than 30 days after the date of enactment of this paragraph, the Administrator shall provide guidance to lenders under this paragraph on the deferment process described in this subparagraph.

"(N) SECONDARY MARKET SALES.—A covered loan shall be eligible to be sold in the secondary market consistent with this subsection. The Administrator may not collect any fee for any guarantee sold into the secondary market under this subparagraph.

"(O) REGULATORY CAPITAL REQUIREMENTS.—

"(i) RISK WEIGHT.—With respect to the appropriate Federal banking agencies or the National Credit Union Administration Board applying capital requirements under their respective risk-based capital requirements, a covered loan shall receive a risk weight of zero percent.

"(ii) TEMPORARY RELIEF FROM TDR DISCLOSURES.—Notwithstanding any other provision of law, an insured depository institution or an insured credit union that modifies a covered loan in relation to COVID–19-related difficulties in a troubled debt restructuring on or after March 13, 2020, shall not be required to comply with the Financial Accounting Standards Board

H. R. 748—13

Accounting Standards Codification Subtopic 310–40 ('Receivables – Troubled Debt Restructurings by Creditors') for purposes of compliance with the requirements of the Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.), until such time and under such circumstances as the appropriate Federal banking agency or the National Credit Union Administration Board, as applicable, determines appropriate.

"(P) REIMBURSEMENT FOR PROCESSING.—

"(i) IN GENERAL.—The Administrator shall reimburse a lender authorized to make a covered loan at a rate, based on the balance of the financing outstanding at the time of disbursement of the covered loan, of—

"(I) 5 percent for loans of not more than $350,000;

"(II) 3 percent for loans of more than $350,000 and less than $2,000,000; and

"(III) 1 percent for loans of not less than $2,000,000.

"(ii) FEE LIMITS.—An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator.

"(iii) TIMING.—A reimbursement described in clause (i) shall be made not later than 5 days after the disbursement of the covered loan.

"(iv) SENSE OF THE SENATE.—It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years.

"(Q) DUPLICATION.—Nothing in this paragraph shall prohibit a recipient of an economic injury disaster loan made under subsection (b)(2) during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available that is for a purpose other than paying payroll costs and other obligations described in subparagraph (F) from receiving assistance under this paragraph.

"(R) WAIVER OF PREPAYMENT PENALTY.—Notwithstanding any other provision of law, there shall be no prepayment penalty for any payment made on a covered loan.".

(b) COMMITMENTS FOR 7(A) LOANS.—During the period beginning on February 15, 2020 and ending on June 30, 2020—

(1) the amount authorized for commitments for general business loans authorized under section 7(a) of the Small Business Act (15 U.S.C. 636(a)), including loans made under paragraph (36) of such section, as added by subsection (a), shall be $349,000,000,000; and

H. R. 748—14

(2) the amount authorized for commitments for such loans under the heading "BUSINESS LOANS PROGRAM ACCOUNT" under the heading "SMALL BUSINESS ADMINISTRATION" under title V of the Consolidated Appropriations Act, 2020 (Public Law 116–93; 133 Stat. 2475) shall not apply.

(c) EXPRESS LOANS.—

(1) IN GENERAL.—Section 7(a)(31)(D) of the Small Business Act (15 U.S.C. 636(a)(31)(D)) is amended by striking "$350,000" and inserting "$1,000,000".

(2) PROSPECTIVE REPEAL.—Effective on January 1, 2021, section 7(a)(31)(D) of the Small Business Act (15 U.S.C. 636(a)(31)(D)) is amended by striking "$1,000,000" and inserting "$350,000".

(d) EXCEPTION TO GUARANTEE FEE WAIVER FOR VETERANS.—Section 7(a)(31)(G) of the Small Business Act (15 U.S.C. 636(a)(31)(G)) is amended—

(1) by striking clause (ii); and

(2) by redesignating clause (iii) as clause (ii).

(e) INTERIM RULE.—On and after the date of enactment of this Act, the interim final rule published by the Administrator entitled "Express Loan Programs: Affiliation Standards" (85 Fed. Reg. 7622 (February 10, 2020)) is permanently rescinded and shall have no force or effect.

### SEC. 1103. ENTREPRENEURIAL DEVELOPMENT.

(a) DEFINITIONS.—In this section—

(1) the term "covered small business concern" means a small business concern that has experienced, as a result of COVID–19—

(A) supply chain disruptions, including changes in—

(i) quantity and lead time, including the number of shipments of components and delays in shipments;

(ii) quality, including shortages in supply for quality control reasons; and

(iii) technology, including a compromised payment network;

(B) staffing challenges;

(C) a decrease in gross receipts or customers; or

(D) a closure;

(2) the term "resource partner" means—

(A) a small business development center; and

(B) a women's business center;

(3) the term "small business development center" has the meaning given the term in section 3 of the Small Business Act (15 U.S.C. 632); and

(4) the term "women's business center" means a women's business center described in section 29 of the Small Business Act (15 U.S.C. 656).

(b) EDUCATION, TRAINING, AND ADVISING GRANTS.—

(1) IN GENERAL.—The Administration may provide financial assistance in the form of grants to resource partners to provide education, training, and advising to covered small business concerns.

(2) USE OF FUNDS.—Grants under this subsection shall be used for the education, training, and advising of covered small business concerns and their employees on—

and unsecured debts in an amount greater than $7,500,000 (excluding debt owed to 1 or more affiliates or insiders);

"(ii) any debtor that is a corporation subject to the reporting requirements under section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)); or

"(iii) any debtor that is an affiliate of an issuer, as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c).".

(2) APPLICABILITY OF CHAPTERS.—Section 103(i) of title 11, United States Code, is amended by striking "small business debtor" and inserting "debtor (as defined in section 1182)".

(3) APPLICATION OF AMENDMENT.—The amendment made by paragraph (1) shall apply only with respect to cases commenced under title 11, United States Code, on or after the date of enactment of this Act.

(4) TECHNICAL CORRECTIONS.—

(A) DEFINITION OF SMALL BUSINESS DEBTOR.—Section 101(51D)(B)(iii) of title 11, United States Code, is amended to read as follows:

"(iii) any debtor that is an affiliate of an issuer (as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c)).".

(B) UNCLAIMED PROPERTY.—Section 347(b) of title 11, United States Code, is amended by striking "1194" and inserting "1191".

(5) SUNSET.—On the date that is 1 year after the date of enactment of this Act, section 1182(1) of title 11, United States Code, is amended to read as follows:

"(1) DEBTOR.—The term 'debtor' means a small business debtor.".

(b) BANKRUPTCY RELIEF.—

(1) IN GENERAL.—

(A) EXCLUSION FROM CURRENT MONTHLY INCOME.—Section 101(10A)(B)(ii) of title 11, United States Code, is amended—

(i) in subclause (III), by striking "; and" and inserting a semicolon;

(ii) in subclause (IV), by striking the period at the end and inserting "; and"; and

(iii) by adding at the end the following:

"(V) Payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19).".

(B) CONFIRMATION OF PLAN.—Section 1325(b)(2) of title 11, United States Code, is amended by inserting "payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19)," after "other than".

(C) MODIFICATION OF PLAN AFTER CONFIRMATION.—Section 1329 of title 11, United States Code, is amended by adding at end the following:

"(d)(1) Subject to paragraph (3), for a plan confirmed prior to the date of enactment of this subsection, the plan may be modified upon the request of the debtor if—

"(A) the debtor is experiencing or has experienced a material financial hardship due, directly or indirectly, to the coronavirus disease 2019 (COVID–19) pandemic; and

"(B) the modification is approved after notice and a hearing.

"(2) A plan modified under paragraph (1) may not provide for payments over a period that expires more than 7 years after the time that the first payment under the original confirmed plan was due.

"(3) Sections 1322(a), 1322(b), 1323(c), and the requirements of section 1325(a) shall apply to any modification under paragraph (1).".

(D) APPLICABILITY.—

(i) The amendments made by subparagraphs (A) and (B) shall apply to any case commenced before, on, or after the date of enactment of this Act.

(ii) The amendment made by subparagraph (C) shall apply to any case for which a plan has been confirmed under section 1325 of title 11, United States Code, before the date of enactment of this Act.

(2) SUNSET.—

(A) IN GENERAL.—

(i) EXCLUSION FROM CURRENT MONTHLY INCOME.—Section 101(10A)(B)(ii) of title 11, United States Code, is amended—

(I) in subclause (III), by striking the semicolon at the end and inserting "; and";

(II) in subclause (IV), by striking "; and" and inserting a period; and

(III) by striking subclause (V).

(ii) CONFIRMATION OF PLAN.—Section 1325(b)(2) of title 11, United States Code, is amended by striking "payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19),".

(iii) MODIFICATION OF PLAN AFTER CONFIRMATION.—Section 1329 of title 11, United States Code, is amended by striking subsection (d).

(B) EFFECTIVE DATE.—The amendments made by subparagraph (A) shall take effect on the date that is 1 year after the date of enactment of this Act.

**SEC. 1114. EMERGENCY RULEMAKING AUTHORITY.**

Not later than 15 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code.

# TITLE II—ASSISTANCE FOR AMERICAN WORKERS, FAMILIES, AND BUSINESSES

## Subtitle A—Unemployment Insurance Provisions

**SEC. 2101. SHORT TITLE.**

This subtitle may be cited as the "Relief for Workers Affected by Coronavirus Act".

**SEC. 2102. PANDEMIC UNEMPLOYMENT ASSISTANCE.**

(a) DEFINITIONS.—In this section:

(1) COVID–19.—The term "COVID–19" means the 2019 Novel Coronavirus or 2019-nCoV.

(2) COVID–19 PUBLIC HEALTH EMERGENCY.—The term "COVID–19 public health emergency" means the public health emergency declared by the Secretary of Health and Human Services on January 27, 2020, with respect to the 2019 Novel Coronavirus.

(3) COVERED INDIVIDUAL.—The term "covered individual"—

(A) means an individual who—

(i) is not eligible for regular compensation or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 2107, including an individual who has exhausted all rights to regular unemployment or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 2107; and

(ii) provides self-certification that the individual—

(I) is otherwise able to work and available for work within the meaning of applicable State law, except the individual is unemployed, partially unemployed, or unable or unavailable to work because—

(aa) the individual has been diagnosed with COVID–19 or is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

(bb) a member of the individual's household has been diagnosed with COVID–19;

(cc) the individual is providing care for a family member or a member of the individual's household who has been diagnosed with COVID–19;

(dd) a child or other person in the household for which the individual has primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID–19 public health emergency and such school or facility care is required for the individual to work;

(ee) the individual is unable to reach the place of employment because of a quarantine imposed as a direct result of the COVID–19 public health emergency;

the Committee on Education and Labor of the House of Representatives, and the Committee on Appropriations of the House of Representatives of such waiver.

(3) PUBLICATION.—Not later than 30 days after granting a waiver under this section, the Secretary shall publish a notice of the Secretary's decision (including which waiver was granted and the reason for granting the waiver) in the Federal Register and on the website of the Department of Education.

(4) REPORT.—Not later than 30 days after the date of enactment of this Act, the Secretary shall prepare and submit a report to the Committee on Health, Education, Labor, and Pensions and the Committee on Appropriations of the Senate, and the Committee on Education and Labor and the Committee on Appropriations of the House of Representatives, with recommendations on any additional waivers under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.), the Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.), the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.), and the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) the Secretary believes are necessary to be enacted into law to provide limited flexibility to States and local educational agencies to meet the needs of students during the emergency involving Federal primary responsibility determined to exist by the President under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191(b)) with respect to the Coronavirus Disease 2019 (COVID–19).

(e) TERMS.—In this section, the term "State educational agency" includes the Bureau of Indian Education, and the term "local educational agency" includes Bureau of Indian Education funded schools operated pursuant to a grant under the Tribally Controlled Schools Act of 1988 (25 U.S.C. 2501 et seq.), or a contract under the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5301 et seq.).

**SEC. 3512. HBCU CAPITAL FINANCING.**

(a) DEFERMENT PERIOD.—

(1) IN GENERAL.—Notwithstanding any provision of title III of the Higher Education Act of 1965 (20 U.S.C. 1051 et seq.), or any regulation promulgated under such title, the Secretary may grant a deferment, for the duration of a qualifying emergency, to an institution that has received a loan under part D of title III of such Act (20 U.S.C. 1066 et seq.).

(2) TERMS.—During the deferment period granted under this subsection—

(A) the institution shall not be required to pay any periodic installment of principal or interest required under the loan agreement for such loan; and

(B) the Secretary shall make principal and interest payments otherwise due under the loan agreement.

(3) CLOSING.—At the closing of a loan deferred under this subsection, terms shall be set under which the institution shall be required to repay the Secretary for the payments of principal and interest made by the Secretary during the deferment, on a schedule that begins upon repayment to the lender in full on the loan agreement, except in no case shall repayment

H. R. 748—124

be required to begin before the date that is 1 full fiscal year after the date that is the end of the qualifying emergency.

(b) TERMINATION DATE.—

(1) IN GENERAL.—The authority provided under this section to grant a loan deferment under subsection (a) shall terminate on the date on which the qualifying emergency is no longer in effect.

(2) DURATION.—Any provision of a loan agreement or insurance agreement modified by the authority under this section shall remain so modified for the duration of the period covered by the loan agreement or insurance agreement.

(c) REPORT.—Not later than 180 days after the date of enactment of this Act, and every 180 days thereafter during the period beginning on the first day of the qualifying emergency and ending on September 30 of the fiscal year following the end of the qualifying emergency, the Secretary shall submit to the authorizing committees (as defined in section 103 of the Higher Education Act of 1965 (20 U.S.C. 1003)) a report that identifies each institution that received assistance under this section.

(d) FUNDING.—There is hereby appropriated, out of any money in the Treasury not otherwise appropriated, $62,000,000 to carry out this section.

**SEC. 3513. TEMPORARY RELIEF FOR FEDERAL STUDENT LOAN BOR-ROWERS.**

(a) IN GENERAL.—The Secretary shall suspend all payments due for loans made under part D and part B (that are held by the Department of Education) of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.; 1071 et seq.) through September 30, 2020.

(b) NO ACCRUAL OF INTEREST.—Notwithstanding any other provision of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), interest shall not accrue on a loan described under subsection (a) for which payment was suspended for the period of the suspension.

(c) CONSIDERATION OF PAYMENTS.—Notwithstanding any other provision of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), the Secretary shall deem each month for which a loan payment was suspended under this section as if the borrower of the loan had made a payment for the purpose of any loan forgiveness program or loan rehabilitation program authorized under part D or B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.; 1071 et seq.) for which the borrower would have otherwise qualified.

(d) REPORTING TO CONSUMER REPORTING AGENCIES.—During the period in which the Secretary suspends payments on a loan under subsection (a), the Secretary shall ensure that, for the purpose of reporting information about the loan to a consumer reporting agency, any payment that has been suspended is treated as if it were a regularly scheduled payment made by a borrower.

(e) SUSPENDING INVOLUNTARY COLLECTION.—During the period in which the Secretary suspends payments on a loan under subsection (a), the Secretary shall suspend all involuntary collection related to the loan, including—

(1) a wage garnishment authorized under section 488A of the Higher Education Act of 1965 (20 U.S.C. 1095a) or section 3720D of title 31, United States Code;

(2) a reduction of tax refund by amount of debt authorized under section 3720A of title 31, United States Code, or section 6402(d) of the Internal Revenue Code of 1986;

(3) a reduction of any other Federal benefit payment by administrative offset authorized under section 3716 of title 31, United States Code (including a benefit payment due to an individual under the Social Security Act or any other provision described in subsection (c)(3)(A)(i) of such section); and

(4) any other involuntary collection activity by the Secretary.

(f) WAIVERS.—In carrying out this section, the Secretary may waive the application of—

(1) subchapter I of chapter 35 of title 44, United States Code (commonly known as the "Paperwork Reduction Act");

(2) the master calendar requirements under section 482 of the Higher Education Act of 1965 (20 U.S.C. 1089);

(3) negotiated rulemaking under section 492 of the Higher Education Act of 1965 (20 U.S.C. 1098a); and

(4) the requirement to publish the notices related to the system of records of the agency before implementation required under paragraphs (4) and (11) of section 552a(e) of title 5, United States Code (commonly known as the "Privacy Act of 1974"), except that the notices shall be published not later than 180 days after the date of enactment of this Act.

(g) NOTICE TO BORROWERS AND TRANSITION PERIOD.—To inform borrowers of the actions taken in accordance with this section and ensure an effective transition, the Secretary shall—

(1) not later than 15 days after the date of enactment of this Act, notify borrowers—

(A) of the actions taken in accordance with subsections (a) and (b) for whom payments have been suspended and interest waived;

(B) of the actions taken in accordance with subsection (e) for whom collections have been suspended;

(C) of the option to continue making payments toward principal; and

(D) that the program under this section is a temporary program.

(2) beginning on August 1, 2020, carry out a program to provide not less than 6 notices by postal mail, telephone, or electronic communication to borrowers indicating—

(A) when the borrower's normal payment obligations will resume; and

(B) that the borrower has the option to enroll in income-driven repayment, including a brief description of such options.

## SEC. 3514. PROVISIONS RELATED TO THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE.

(a) ACCRUAL OF SERVICE HOURS.—

(1) ACCRUAL THROUGH OTHER SERVICE HOURS.—

(A) IN GENERAL.—Notwithstanding any other provision of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4950 et seq.) or the National and Community Service Act of 1990 (42 U.S.C. 12501 et seq.), the Corporation for National and Community Service shall allow an individual described in subparagraph (B) to accrue other service hours

H. R. 748—235

RELATED AGENCIES

LEGAL SERVICES CORPORATION

PAYMENT TO THE LEGAL SERVICES CORPORATION

For an additional amount for "Payment to the Legal Services Corporation", $50,000,000, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That none of the funds appropriated under this heading in this Act to the Legal Services Corporation shall be expended for any purpose prohibited or limited by, or contrary to any of the provisions of, sections 501, 502, 503, 504, 505, and 506 of Public Law 105–119, and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions set forth in such sections, except that all references in sections 502 and 503 to 1997 and 1998 shall be deemed to refer instead to 2019 and 2020, respectively, and except that sections 501 and 503 of Public Law 104–134 (referenced by Public Law 105–119) shall not apply to the amount made available under this heading: *Provided further*, That for the purposes of this Act, the Legal Services Corporation shall be considered an agency of the United States Government: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS—THIS TITLE

SEC. 12001. Amounts provided by the Consolidated Appropriations Act, 2020, (Public Law 116–93) for the Hollings Manufacturing Extension Partnership under the heading "National Institute of Standards and Technology—Industrial Technology Services" shall not be subject to cost share requirements under 15 U.S.C. 278(e)(2): *Provided*, That the authority made available pursuant to this section shall be elective for any Manufacturing Extension Partnership Center that also receives funding from a State that is conditioned upon the application of a Federal cost sharing requirement.

SEC. 12002. (a) Funds appropriated in this title for the National Science Foundation may be made available to restore amounts, either directly or through reimbursement, for obligations incurred by the National Science Foundation for research grants and other necessary expenses to prevent, prepare for, and respond to coronavirus, domestically or internationally, prior to the date of enactment of this Act.

(b) Grants or cooperative agreements made by the National Science Foundation under this title, to carry out research grants and other necessary expenses to prevent, prepare for, and respond to coronavirus, domestically or internationally, shall include amounts to reimburse costs for these purposes incurred between January 20, 2020, and the date of issuance of such grants or agreements.

BUREAU OF PRISONS

SEC. 12003. (a) DEFINITIONS.—In this section—
    (1) the term "Bureau" means the Bureau of Prisons;

H. R. 748—236

(2) the term "covered emergency period" means the period beginning on the date on which the President declared a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID–19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates; and

(3) the term "Secretary" means the Secretary of Health and Human Services.

(b) SUPPLY OF PERSONAL PROTECTIVE EQUIPMENT AND TEST KITS TO BUREAU OF PRISONS; HOME CONFINEMENT AUTHORITY.—

(1) PERSONAL PROTECTIVE EQUIPMENT AND TEST KITS.—

(A) FINDINGS.—Congress finds the following:

(i) There is an urgent need for personal protective equipment and test kits to the Bureau based on the density of the inmate population, the high traffic, the high volume of inmates, the high rate of turnover of inmates and personnel, and the number of high-security areas, within the facilities of the Bureau.

(ii) The inability of the Bureau to secure the purchase of infectious disease personal protective equipment and related supplies now and in the future is a vulnerability.

(iii) The Bureau is currently competing in and engaging the same landscape of vendors as all other Federal agencies and private entities.

(iv) The ability of the Bureau to purchase needed equipment and supplies is currently subject to an individual manufacturer's specific recognition of the Bureau as a priority and subsequent allocation of the inventory of the manufacturer to the Bureau.

(B) CONSIDERATION.—The Secretary shall appropriately consider, relative to other priorities of the Department of Health and Human Services for high-risk and high-need populations, the distribution of infectious disease personal protective equipment and COVID–19 test kits to the Bureau for use by inmates and personnel of the Bureau.

(2) HOME CONFINEMENT AUTHORITY.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

(c) VIDEO VISITATION.—

(1) IN GENERAL.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau shall promulgate rules regarding the ability of inmates to conduct visitation through video teleconferencing and telephonically, free of charge to inmates, during the covered emergency period.

(2) EXEMPTION FROM NOTICE-AND-COMMENT RULEMAKING REQUIREMENTS.—Section 553 of title 5, United States Code, shall not apply to the promulgation of rules under paragraph (1) of this subsection.

H. R. 748—237

(d) EMERGENCY REQUIREMENT.—The amount provided by this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

TEMPORARY AUTHORITY OF DIRECTOR OF THE USPTO DURING THE COVID–19 EMERGENCY.

SEC. 12004. (a) IN GENERAL.—During the emergency period described in subsection (e), the Director may toll, waive, adjust, or modify, any timing deadline established by title 35, United States Code, the Trademark Act, section 18 of the Leahy-Smith America Invents Act (35 U.S.C. 321 note), or regulations promulgated thereunder, in effect during such period, if the Director determines that the emergency related to such period—

(1) materially affects the functioning of the Patent and Trademark Office;

(2) prejudices the rights of applicants, registrants, patent owners, or others appearing before the Office; or

(3) prevents applicants, registrants, patent owners, or others appearing before the Office from filing a document or fee with the Office.

(b) PUBLIC NOTICE.—If the Director determines that tolling, waiving, adjusting, or modifying a timing deadline under subsection (a) is appropriate, the Director shall publish publicly a notice to such effect.

(c) STATEMENT REQUIRED.—Not later than 20 days after the Director tolls, waives, adjusts, or modifies a timing deadline under subsection (a) and such toll, waiver, adjustment, or modification is in effect for a consecutive or cumulative period exceeding 120 days, the Director shall submit to Congress a statement describing the action taken, relevant background, and rationale for the period of tolling, waiver, adjustment, or modification.

(d) OTHER LAWS.—Notwithstanding section 301 of the National Emergencies Act (50 U.S.C. 1631), the authority of the Director under subsection (a) is not contingent on a specification made by the President under such section or any other requirement under that Act (other than the emergency declaration under section 201(a) of such Act (50 U.S.C. 1621(a))). The authority described in this section supersedes the authority of title II of the National Emergencies Act (50 U.S.C. 1621 et seq.).

(e) EMERGENCY PERIOD.—The emergency period described in this subsection includes the duration of the portion of the emergency declared by the President pursuant to the National Emergencies Act on March 13, 2020, as a result of the COVID–19 outbreak (and any renewal thereof) beginning on or after the date of the enactment of this section and the 60 day period following such duration.

(f) RULE OF CONSTRUCTION.—Nothing in this section may be construed as limiting other statutory authorities the Director may have to grant relief regarding filings or deadlines.

(g) SUNSET.—Notwithstanding subsection (a), the authorities provided under this section shall expire upon the expiration of the 2-year period after the date of the enactment of this section.

(h) DEFINITIONS.—In this section:

H. R. 748—278

that CCDBG State plans do not need to be amended prior to utilizing existing authorities in the CCDBG Act for the purposes provided herein: *Provided further*, That States, Territories, and Tribes are authorized to use funds appropriated under this heading in this Act to provide child care assistance to health care sector employees, emergency responders, sanitation workers, and other workers deemed essential during the response to coronavirus by public officials, without regard to the income eligibility requirements of section 658P(4) of such Act: *Provided further*, That funds appropriated under this heading in this Act shall be available to eligible child care providers under section 658P(6) of the CCDBG Act, even if such providers were not receiving CCDBG assistance prior to the public health emergency as a result of the coronavirus, for the purposes of cleaning and sanitation, and other activities necessary to maintain or resume the operation of programs: *Provided further*, That payments made under this heading in this Act may be obligated in this fiscal year or the succeeding two fiscal years: *Provided further*, That funds appropriated under this heading in this Act may be made available to restore amounts, either directly or through reimbursement, for obligations incurred to prevent, prepare for, and respond to coronavirus, domestically or internationally, prior to the date of enactment of this Act: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

CHILDREN AND FAMILIES SERVICES PROGRAMS

For an additional amount for "Children and Families Services Programs", $1,874,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, which shall be used as follows: (1) $1,000,000,000 for carrying out activities under sections 674 through 679 of the Community Services Block Grant Act, including for federal administrative expenses, and of which no part shall be subject to section 674(b)(3) of such Act: *Provided*, That to the extent Community Services Block Grant funds are distributed as grant funds by a State to an eligible entity as provided under such Act, and have not been expended by such entity, they shall remain with such entity for carryover into the next two fiscal years for expenditure by such entity consistent with program purpose: *Provided further*, That for services furnished under such Act during fiscal years 2020 and 2021, States may apply the last sentence of section 673(2) of such Act by substituting "200 percent" for "125 percent"; (2) $750,000,000 for making payments under the Head Start Act, including for Federal administrative expenses, and allocated in an amount that bears the same ratio to such portion as the number of enrolled children served by the agency involved bears to the number of enrolled children by all Head Start agencies: *Provided further*, That none of the funds appropriated in this paragraph shall be included in the calculation of the "base grant" in subsequent fiscal years, as such term is defined in sections 640(a)(7)(A), 641A(h)(1)(B), or 645(d)(3) of the Head Start Act: *Provided further*, That funds appropriated in this paragraph are not subject to the allocation requirements of section 640(a) of the Head Start Act: *Provided further*, That up to

H. R. 748—279

$500,000,000 shall be available for the purpose of operating supplemental summer programs through non-competitive grant supplemental to existing grantees determined to be most ready to operate those programs by the Office of Head Start; (3) $2,000,000 for the National Domestic Violence Hotline as authorized by section 303(b) of the Family Violence Prevention and Services Act: *Provided further*, That the Secretary may make such funds available for providing hotline services remotely; (4) $45,000,000 for Family Violence Prevention and Services formula grants as authorized by section 303(a) of the Family Violence and Prevention and Services Act with such funds available to grantees without regard to matching requirements under section 306(c)(4) of such Act: *Provided further*, That the Secretary may make such funds available for providing temporary housing and assistance to victims of family, domestic, and dating violence; (5) $25,000,000 for carrying out activities under the Runaway and Homeless Youth Act: *Provided further*, That such amounts shall be used to supplement, not supplant, existing funds and shall be available without regard to matching requirements; (6) $45,000,000 shall be used for child welfare services as authorized by subpart 1 of part B of title IV of the Social Security Act (other than sections 426, 427, and 429 of such subpart), with such funds available to grantees without regard to matching requirements under section 424(a) of that Act or any applicable reductions in federal financial participation under section 424(f) of that Act; and (7) $7,000,000 for Federal administrative expenses: *Provided further*, That funds appropriated under this heading in this Act may be made available to restore amounts, either directly or through reimbursement, for obligations incurred to prevent, prepare for, and respond to coronavirus, domestically or internationally, prior to the date of enactment of this Act: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

ADMINISTRATION FOR COMMUNITY LIVING

AGING AND DISABILITY SERVICES PROGRAMS

For an additional amount for "Aging and Disability Services Programs", $955,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That of the amount made available under this heading in this Act to prevent, prepare for, and respond to coronavirus, $820,000,000 shall be for activities authorized under the Older Americans Act of 1965 ("OAA"), including $200,000,000 for supportive services under part B of title III; $480,000,000 for nutrition services under subparts 1 and 2 of part C of title III; $20,000,000 for nutrition services under title VI; $100,000,000 for support services for family caregivers under part E of title III; and $20,000,000 for elder rights protection activities, including the long-term ombudsman program under title VII of such Act: *Provided further*, That of the amount made available under this heading in this Act, $50,000,000 shall be for aging and disability resource centers authorized in sections 202(b) and 411 of the OAA to prevent, prepare for, and respond to coronavirus: *Provided further*, That of the amount made available under this

heading in this Act to prevent, prepare for, and respond to coronavirus, $85,000,000 shall be available for centers for independent living that have received grants funded under part C of chapter I of title VII of the Rehabilitation Act of 1973: *Provided further*, That to facilitate State use of funds provided under this heading in this Act, matching requirements under sections 304(d)(1)(D) and 373(g)(2) of the OAA shall not apply to funds made available under this heading in this Act: *Provided further*, That the transfer authority under section 308(b)(4)(A) of the OAA shall apply to funds made available under this heading in this Act by substituting "100 percent" for "40 percent": *Provided further*, That the State Long-Term Care Ombudsman shall have continuing direct access (or other access through the use of technology) to residents of long-term care facilities during any portion of the public health emergency relating to coronavirus beginning on the date of enactment of this Act and ending on September 30, 2020, to provide services described in section 712(a)(3)(B) of the OAA: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## OFFICE OF THE SECRETARY

### PUBLIC HEALTH AND SOCIAL SERVICES EMERGENCY FUND

#### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Public Health and Social Services Emergency Fund", $27,014,500,000, to remain available until September 30, 2024, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including the development of necessary countermeasures and vaccines, prioritizing platform-based technologies with U.S.-based manufacturing capabilities, the purchase of vaccines, therapeutics, diagnostics, necessary medical supplies, as well as medical surge capacity, addressing blood supply chain, workforce modernization, telehealth access and infrastructure, initial advanced manufacturing, novel dispensing, enhancements to the U.S. Commissioned Corps, and other preparedness and response activities: *Provided*, That funds appropriated under this paragraph in this Act may be used to develop and demonstrate innovations and enhancements to manufacturing platforms to support such capabilities: *Provided further*, That the Secretary of Health and Human Services shall purchase vaccines developed using funds made available under this paragraph in this Act to respond to an outbreak or pandemic related to coronavirus in quantities determined by the Secretary to be adequate to address the public health need: *Provided further*, That products purchased by the Federal government with funds made available under this paragraph in this Act, including vaccines, therapeutics, and diagnostics, shall be purchased in accordance with Federal Acquisition Regulation guidance on fair and reasonable pricing: *Provided further*, That the Secretary may take such measures authorized under current law to ensure that vaccines, therapeutics, and diagnostics developed from funds provided in this Act will be affordable in the commercial market: *Provided further*, That in carrying out the previous proviso, the Secretary shall not take actions that

H. R. 748—284

to the Committees on Appropriations of the House of Representatives and the Senate on obligation of funds, including obligations to such eligible health care providers summarized by State of the payment receipt: *Provided further*, That such reports shall be updated and submitted to such Committees every 60 days until funds are expended: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## DEPARTMENT OF EDUCATION

### EDUCATION STABILIZATION FUND

For an additional amount for "Education Stabilization Fund", $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### GENERAL PROVISIONS

### EDUCATION STABILIZATION FUND

SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—

(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;

(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and

(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.

(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:

(1) 9.8 percent to carry out section 18002 of this title.

(2) 43.9 percent to carry out section 18003 of this title.

(3) 46.3 percent to carry out section 18004 of this title.

### GOVERNOR'S EMERGENCY EDUCATION RELIEF FUND

SEC. 18002. (a) GRANTS.—From funds reserved under section 18001(b)(1) of this title, the Secretary shall make Emergency Education Relief grants to the Governor of each State with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and shall approve or deny applications not later than 30 days after receipt.

(b) ALLOCATIONS.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State as follows:

H. R. 748—285

(1) 60 percent on the basis of their relative population of individuals aged 5 through 24.

(2) 40 percent on the basis of their relative number of children counted under section 1124(c) of the Elementary and Secondary Education Act of 1965 (referred to under this heading as "ESEA").

(c) USES OF FUNDS.—Grant funds awarded under subsection (b) may be used to—

(1) provide emergency support through grants to local educational agencies that the State educational agency deems have been most significantly impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their students and to support the on-going functionality of the local educational agency;

(2) provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus to support the ability of such institutions to continue to provide educational services and support the on-going functionality of the institution; and

(3) provide support to any other institution of higher education, local educational agency, or education related entity within the State that the Governor deems essential for carrying out emergency educational services to students for authorized activities described in section 18003(d)(1) of this title or the Higher Education Act, the provision of child care and early childhood education, social and emotional support, and the protection of education-related jobs.

(d) REALLOCATION.—Each Governor shall return to the Secretary any funds received under this section that the Governor does not award within one year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND

SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.

(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.

(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965 in the most recent fiscal year.

(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

H. R. 748—286

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) ("IDEA"), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) ("the Perkins Act"), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational

H. R. 748—287

agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

HIGHER EDUCATION EMERGENCY RELIEF FUND

SEC. 18004. (a) IN GENERAL.—The Secretary shall allocate funding under this section as follows:

(1) 90 percent to each institution of higher education to prevent, prepare for, and respond to coronavirus, by apportioning it—

(A) 75 percent according to the relative share of full-time equivalent enrollment of Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency; and

(B) 25 percent according to the relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency.

(2) 7.5 percent for additional awards under parts A and B of title III, parts A and B of title V, and subpart 4 of part A of title VII of the Higher Education Act to address needs directly related to coronavirus, that shall be in addition to awards made in section 18004(a)(1) of this title, and allocated by the Secretary proportionally to such programs based on the relative share of funding appropriated to such programs in the Further Consolidated Appropriations Act, 2020 (Public Law 116–94) and which may be used to defray expenses (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll) incurred by institutions of higher education and for grants to students for any component of the student's cost of attendance (as defined under section 472 of the Higher Education Act), including food, housing, course materials, technology, health care, and child care.

(3) 2.5 percent for part B of title VII of the Higher Education Act for institutions of higher education that the Secretary determines have the greatest unmet needs related to coronavirus, which may be used to defray expenses (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll) incurred by institutions of higher education and for grants to students for any component of the student's cost of attendance (as defined under section 472 of the Higher Education Act), including food,

H. R. 748—288

housing, course materials, technology, health care, and child care.

(b) DISTRIBUTION.—The funds made available to each institution under subsection (a)(1) shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under title IV of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.).

(c) USES OF FUNDS.—Except as otherwise specified in subsection (a), an institution of higher education receiving funds under this section may use the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus, so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship. Institutions of higher education shall use no less than 50 percent of such funds to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care).

(d) SPECIAL PROVISIONS.—(1) In awarding grants under section 18004(a)(3) of this title, the Secretary shall give priority to any institution of higher education that is not otherwise eligible for funding under paragraphs (1) and (2) of section 18004(a) of this title of at least $500,000 and demonstrates significant unmet needs related to expenses associated with coronavirus.

(2) A Historically Black College and University or a Minority Serving Institution may use prior awards provided under titles III, V, and VII of the Higher Education Act to prevent, prepare for, and respond to coronavirus.

(e) REPORT.—An institution receiving funds under this section shall submit a report to the Secretary, at such time and in such manner as the Secretary may require, that describes the use of funds provided under this section.

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under "Education Stabilization Fund", shall to the greatest extent practicable,

H. R. 748—289

continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

### DEFINITIONS

Sec. 18007. Except as otherwise provided in sections 18001–18006 of this title, as used in such sections—

(1) the terms "elementary education" and "secondary education" have the meaning given such terms under State law;

(2) the term "institution of higher education" has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term "Secretary" means the Secretary of Education;

(4) the term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term "cost of attendance" has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term "Non-public school" means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and (B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term "public school" means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

### MAINTENANCE OF EFFORT

Sec. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need-based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

### SAFE SCHOOLS AND CITIZENSHIP EDUCATION

For an additional amount for "Safe Schools and Citizenship Education", $100,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, to supplement funds otherwise available for "Project SERV", including to help elementary, secondary and postsecondary schools clean and disinfect affected schools, and assist in counseling and distance learning and associated costs: *Provided*, That such amount is designated by the Congress as being for

H. R. 748—290

an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### GALLAUDET UNIVERSITY

For an additional amount for "Gallaudet University", $7,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including to help defray the expenses directly caused by coronavirus and to enable grants to students for expenses directly related to coronavirus and the disruption of university operations: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### STUDENT AID ADMINISTRATION

For an additional amount for "Student Aid Administration", $40,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for carrying out part D of title I, and subparts 1, 3, 9 and 10 of part A, and parts B, C, D, and E of title IV of the HEA, and subpart 1 of part A of title VII of the Public Health Service Act: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### HOWARD UNIVERSITY

For an additional amount for "Howard University", $13,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including to help defray the expenses directly caused by coronavirus and to enable grants to students for expenses directly related to coronavirus and the disruption of university operations: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### DEPARTMENTAL MANAGEMENT

#### PROGRAM ADMINISTRATION

For an additional amount for "Program Administration", $8,000,000, to remain available through September 30, 2021 to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### OFFICE OF THE INSPECTOR GENERAL

For an additional amount for "Office of the Inspector General", $7,000,000, to remain available through September 30, 2022, to prevent, prepare for, and respond to coronavirus, domestically or