XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
REBEKAH A. FRETZ
JAMES F. ZAHRADKA II
GARRETT LINDSEY (SBN 293456)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6402
 E-mail: Garrett.Lindsey@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF MICHIGAN, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF HAWAII, STATE OF MAINE, STATE OF MARYLAND, STATE OF NEW MEXICO, COMMONWEALTH OF PENNSYLVANIA, STATE OF WISCONSIN, THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, BOARD OF EDUCATION FOR THE CITY OF CHICAGO, CLEVELAND MUNICIPAL SCHOOL DISTRICT BOARD OF EDUCATION, and SAN FRANCISCO UNIFIED SCHOOL DISTRICT,** | Civil Case No. 3:20-cv-04478-SK <br><br> **APPENDIX IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br><br> Judge: Hon. Sallie Kim <br> Trial Date:     None set <br> Action Filed:   July 7, 2020 |
| Plaintiffs, | |
| v. | |
| **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| Defendants. | |

# APPENDIX OF DECLARATIONS

| Exhibit Number | Declarant | |
|---|---|---|
| 1 | MI | Kyle Guerrant, Deputy Superintendent, Michigan Department of Education |
| 2 | CA | Lisa Constancio, Deputy Superintendent of Public Instruction, Operations and Administration Branch, California Department of Education |
| 3 | CA | Johanna Hoffmann, Strategic Resource Planning Specialist, Oakland Unified School District |
| 4 | DC | Nikki Stewart, Assistant Superintendent, Division of Systems and Supports, K-12, Office of the State Superintendent of Education |
| 5 | HI | Wanelle Kaneshiro-Erdmann, Director, Policy, Innovation, Planning and Evaluation Branch, Office of Strategy Innovation and Performance, Hawaii Department of Education |
| 6 | ME | A. Pender Makin, Commissioner of Education, Maine Department of Education |
| 7 | MD | Karen B. Salmon, Ph.D., State Superintendent of Schools, Maryland State Department of Education |
| 8 | MD | Dr. Monica E. Goldson, Chief Executive Officer, Prince George's County Public Schools |
| 9 | NM | Gabriel C. Baca, Director, Student, School and Family Support Bureau, New Mexico Public Education Department |
| 10 | PA | Matthew Stem, Office of Elementary Education, Pennsylvania Department of Education |
| 11 | WI | Benjamin R. Jones, Chief Legal Counsel, Wisconsin Department of Public Instruction |
| 12 | Chicago | Dr. Janice K. Jackson, Chief Executive Officer, Chicago Board of Education |
| 13 | Cleveland | Eric S. Gordon, Chief Executive Officer, Cleveland Municipal School District |
| 14 | New York City | Lindsey Oates, Chief Financial Officer, New York City Department of Education |
| 15 | SFUSD | Meghan Wallace, Chief Financial Officer, San Francisco Unified School District |

1

# EXHIBIT 1

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6   300 South Spring Street, Suite 1702
    Los Angeles, CA 90013
7   Telephone: (213) 269-6402
    E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                     IN THE UNITED STATES DISTRICT COURT

10                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **STATE OF MICHIGAN, STATE OF**          Civil Case No. 3:20-cv-04478-SK
    **CALIFORNIA, et al.,**
15
                              Plaintiffs,
16                                            **DECLARATION OF KYLE GUERRANT**

17            v.

18  **ELISABETH D. DEVOS, in her official**
    **capacity as the United States Secretary of**
19  **Education, and UNITED STATES**
    **DEPARTMENT OF EDUCATION,**
20
                              Defendants.
21

22

23

24

25

26

27

28

**DECLARATION OF KYLE GUERRANT**

I, KYLE GUERRANT, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Deputy Superintendent for Finance & Operations at the Michigan Department of Education (MDE), located in Lansing.  My educational background includes a Bachelors of Arts degree in psychology from Long Island University, and a Master of Social Work degree from the University of Michigan.  I have been employed as Deputy Superintendent since April of 2014, and have been employed in other roles at the Michigan Department of Education since August 2005.

2.      My responsibilities in this role include providing leadership, direction, and oversight for the Office of Financial Management (OFM), Office of Health and Nutrition Services (OHNS), the Library of Michigan (LOM), and Office of Administrative Law (OAL). For the purposes of this declaration, it is important to note the OFM is responsible for the accounting and auditing all federal and state funds MDE receives, and allocates to sub-recipients (local education agencies (LEA), schools, child care providers, etc.), including Title I, Part A funding.

3.      I submit this Declaration in support of the State of Michigan's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department") (collectively, Defendants) regarding the Department's April 30, 2020 guidance document, as updated June 25, 2020, entitled "Providing Equitable Services Under the CARES Act Programs" (Guidance Document), and the recently issued interim final rule, entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through MDE personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me.  I have also familiarized myself with the Guidance Document and the Rule in order to understand its immediate impact on MDE and schools in Michigan.

1

**MDE's Role in K-12 Education in Michigan**

4.     The Michigan Constitution charges the Michigan Legislature with "maintain[ing] and support[ing] a system of free public elementary and secondary schools as defined by law." Mich. Const. art. VIII, § 2.

5.     The State Board of Education is vested with "[l]eadership and general supervision over all public education." *Id.* § 3.  The State Board of Education "serve[s] as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith." *Id.*

6.     While the LEAs exercise primary responsibility over budgetary and other decisions within their respective districts, MDE implements federal and state legislative mandates in education and carries out the policies of the State Board of Education.  *See* Mich. Comp. Laws § 388.1009.

7.     Michigan provides more than $13 billion each year to its approximately 836 public school districts and 56 intermediate school districts.  The 3,400 public school buildings in these districts educate more than 1.5 million students each year.

8.     For the 2019-2020 school year, Michigan received $470,143,688 from the Department in Title I-A funds, which are designated for districts and schools with a high proportion of low-income students.  In Michigan, 813 LEAs received Title I-A funds during the 2019-2020 school year.  Within these LEAs, 1,840 schools received Title I-A funds ("Title I schools").  These Title I schools educate approximately 731,500 students.

9.     Within the Michigan LEAs that receive Title I-A funds, approximately 105,000 students attend private schools, in which 4,580 students were free and reduced lunch eligible.  And while all of these private-school students are eligible for services under Title II of the ESEA, only 4,580 of private school students were eligible to receive equitable services from Title I-A funds during the 2019-2020 school year.

**Effects of the COVID-19 Pandemic on Education in Michigan**

10.     The COVID-19 pandemic has drastically impacted K-12 education in Michigan.

2

11.     The State of Michigan closed all of its state-owned buildings to employees and the public towards the end of March 2020 due to the COVID-19 pandemic.  All state employees were to work from home.  MDE obtained security access to SOM-owned IT systems to continue budgeting, programming, accounting, purchasing, payment activities and other activities associated with MDE's responsibilities. MDE is also experiencing temporary layoff days.  The vast majority of MDE employees are required to take one temporary layoff day each week for ten weeks, the week of July 25, 2020.

12.     Michigan is facing severe revenue shortfalls in both fiscal years 2020 and 2021.  MDE and all other state departments expect further administrative reductions to account for the fiscal years 2020 and 2021 revenue declines.

13.     Michigan schools were forced to take action to protect the health and safety of students from the COVID-19 pandemic.  Governor Whitmer closed Michigan schools to in-person learning on March 16, 2020, and subsequently signed Executive Order 2020-35 suspending in-person learning K-12 instruction for the remainder of the 2019-2020 school year. [1] Educators faced the unprecedented challenge to educate all students, with a wide spectrum of learning needs, who were required to stay in their home.  The transition to learning at a distance was difficult for most school districts, and required a significant transformation to provide educational services to students. That included providing instruction to students in homes without internet service, limited access to a digital device, and parents who worked during the day.  Schools continue to address these complex challenges for summer programming, as well as planning for the 2020-2021 school year.  Schools are planning for hybrid instructional models that will blend in-person and learning at a distance instruction, as well as meeting the physical and social-emotional needs of their students.  The American Association of School Administrators (AASA) and Association of School Business Officials (ASBO) estimate the average school district may incur $1,778,139 to reopen this fall to in-person instruction.

---

[1] *Available at* http://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-35.pdf.

3

14.   Per Executive Order 2020-35, LEAs were required to submit a Continuity of Learning Plan (COL) on or before April 28, 2020 to ensure continuation of credits earned for the remainder of the 2019-2020 school year.  Instructions for developing and implementing the COL Plans were included in Executive Order 2020-65.[2]  Subject matter experts throughout MDE, who have assisted LEAs with questions and concerns since the pandemic started, helped LEAs develop their COL Plans.  MDE continues to provide guidance and assistance to LEA's planning for the 2020-2021 school year.

15.   Michigan uses official revenue estimates to create its budget.  Under normal circumstances, revenue estimates approved in January and May of each year are used to create the budgets.  But at the State Legislature's May 2020 revenue conference, revenue estimates, which were significantly decreased, were deemed not reliable based on all of the unknowns created by the COVID-19 pandemic.  The Legislature decided to recalculate revenue estimates in August 2020.  It is expected that the estimates will show severe declines in revenues for both fiscal years 2020 and 2021.

**CARES Act Funds Received by Michigan for K-12 Education**

A.  Elementary and Secondary School Emergency Relief (ESSER) Funds

16.   In order to receive the ESSER funds designated for Michigan and as required by the Department, I executed a Certification and Agreement form and submitted it to the Department on behalf of MDE on April 27, 2020.[3]  A true and correct copy of the Certification and Agreement completed by MDE and submitted to the Department is attached hereto as Exhibit A.

17.   Within this Certification and Agreement, MDE agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of

---

[2] *Available at* http://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-65.pdf.

[3] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, *available at* https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

4

the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

. . .

4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

. . .

5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

[Ex. A at pp. 1-2.].

18.     At the time that I executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule.  Accordingly, MDE was unaware that the Department would subsequently change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

19.     The Department distributed $389,796,984 in ESSER funds to MDE on April 29, 2020.

20.     MDE announced the ESSER formula grant application on May 8, 2020 for the purpose of providing LEAs, including charter schools, with emergency relief funds to address the impact that COVID-19 has had, and continues to have, on elementary and secondary schools across Michigan.  Eligible applicants are those school districts that received a 2019-20 Title I, Part A allocation from the Michigan Department of Education.  The ESSER formula application consists of assurances, certifications, and narrative statements on the use of funds.  Eligible applicants must initiate an application in the Michigan Electronic Grants System Plus (MEGS+) and either accept or refuse ESSER funds.  Upon successful submission of an ESSER application, designated MDE staff review each application.  Once the application has been reviewed and all

1    portions of the grant are satisfactory, it is approved.  Once approved, the grant is made "Grant

2    Funds Available" and an approval file is forwarded to the Cash Management System (CMS).  The

3    system then notifies the sub-recipient that the federal funds are available.  Funds must be spent on

4    approved budget items and the funds are drawn by the sub-recipients on a reimbursement basis.

5    As of July 1, 2020, MDE has approved $82,236,042 to 263 eligible LEAs within Michigan,

6    which represents 32.1% of LEA eligible to receive ESSER Funds.

7        21.    Of the 817 eligible applicants there are 554 that have either not completed an

8    application or not yet been approved.  Of these 544, 106 districts have not yet initiated the

9    application, while another 427 districts are still working on their applications.  Upon information

10   and belief, many districts have not yet submitted their applications as they wait on state budget

11   details for the 2020-21 school year.  Districts have had to determine where their greatest needs

12   are, include which instructional model(s) the district will implement in the Fall of 2020, as they

13   consider submitting their ESSER fund application.

14       22.    Using the proportional share calculation set forth in Section 1117 of the

15   Elementary and Secondary Education Act (ESEA), LEAs in Michigan would reserve $5,107,921

16   in ESSER funds to provide equitable services to private-school students and teachers.

17       23.    However, using the proportional share calculation set forth in the Department's

18   Guidance Document and in Option #2 in the Rule, see 34 C.F.R. § 76.665(c)(1)(ii), LEAs in

19   Michigan would reserve $21,604,648.63 in ESSER funds to provide equitable services to private

20   school students and teachers.  Thus, under the Department's preferred proportional share

21   calculation, private school students in Michigan would have access to an additional

22   $16,497,727.63, and public schools would lose this same amount of funds.

23   B.  Governor's Emergency Education Relief (GEER) Funds

24       24.    Michigan received $89,432,673 from the GEER Fund on May 19, 2020.

25       25.    GEER funding has not yet been distributed to LEAs in Michigan as MDE is

26   awaiting direction from the Governor's office.

27

28

**The Department's Rule Significantly Harms MDE**

26.     For every dollar that is diverted from public schools to private schools by LEAs following the Department's Guidance Document and the Rule, MDE will be required to backfill these dollars in the LEAs budgets.  At a time when MDE faces an estimated $611,065,000 hole in its education budget for public education as a result of the pandemic, MDE will need to assist LEAs find $16,497,727.63 to fill the budgets of public schools that the CARES Act funds were supposed to fill.

27.     Even if every LEA in Michigan followed Option #1 (Title I-schools only Option) in proportioning the CARES Act funds for equitable services, MDE will need to assist LEAs with significant funding for the over 2,000 of non-Title I schools in Michigan that were expecting to receive CARES Act funds.  In addition, MDE will need to assist LEAS with significant funding for Title I schools that may risk supplanting violations if they use CARES Act funds to supplant their budgets, which have been slashed due to the pandemic.

28.     This increase in funding for public schools will be required immediately.  As Michigan remains in the throes of the pandemic, public schools remain desperate for funding as they continue to transition to remote learning and preparing for next school year.  Policies and procedures must be developed for remote learning; teachers must be trained to use remote learning techniques; technologies must be purchased and provided to students and staff to enable certain remote learning plans; school buildings must be thoroughly sanitized; and personal protection equipment (PPE) must be purchased.  The costs of reacting to this pandemic are drastic for public schools and without the funds the CARES Act was intended to provide, MDE must immediately assist the LEAs adjust to the new realities presented by the pandemic.

29.     Beyond the additional funding that Michigan will be required to expend in lieu of the designated CARES Act funds, the Department's Guidance Document and Rule have imposed signification administrative burdens on MDE directly.

30.     MDE has issued drafted and issued six memoranda to LEAs regarding proportioning of CARES Act funds. Ten staff members spent approximately 80 hours developing these memoranda to date.

31.     MDE staff provided and continue to provide LEAs and schools with extensive technical assistance, problem solving, and other assistance with completing applications for funds.  Over ten MDE staff were dedicated part-time to this effort.

32.     MDE will assign a manager to be responsible for developing the ESSER funds monitoring team.  The team will be responsible for developing procedures and checklists for all monitoring activities, including ensure compliance with the Office of Management and Budget 2 CFR 200 Uniform Administrative Requirements, Cost Principles, and Audit requirements for federal awards, 34 CFR the Education Department General Administrative Regulations, and the terms and conditions of the ESSER grant award notification.  MDE will use its current monitoring processes for all ESSER grants.  The effort for the first year will focus on the ESSER formula grants.  This will include reviewing the delivery of equitable services as it is required in the CARES Act.  While some monitoring requirements are ESSER specific, the program and fiscal monitoring is standard for all federal grants.  MDE's ESSER subrecipient monitoring program will serve several important purposes:

   a.  To ensure that subrecipients of ESSER grants, especially ESSER formula grants, have appropriate internal controls; promote operating efficiency; and achieve compliance with applicable statutory and regulatory requirements.

   b.  To track MDE's progress in implementing goals of the grant programs.

   c.  To ensure LEAs/PSAs provide equitable access to students and teachers in non-public schools as required under the CARES Act, and in accordance with USED guidance.

   d.  To identify potential or existing problem areas or weaknesses.

   e.  To identify areas where additional technical assistance is warranted.

   f.  To identify areas of strength, as state assets, to build a network to share best practices, lessons learned, and resources.

Both program and fiscal monitoring will be designed to be conducted as desk reviews.  MDE will develop monitoring protocols with check sheets for each grant program.  MDE will request specific documents to be uploaded into GEMS/MARS for review.

8

33.     Finally, the Department's Guidance Document and Rule place MDE in legal jeopardy.  MDE was required to certify in its ESSER Fund application that it will comply, and will ensure that LEAs comply, with the equitable services provision of the CARES Act (§ 18005) and "any other applicable law or regulation."  (Ex. A at p. 1.)  Because the Guidance Document and the Rule require LEAs to calculate the proportional share for equitable services and determine eligibility of private school students for equitable services contrary to the proportional share calculation and eligibility requirements in the CARES Act, MDE (and its LEAs) cannot satisfy both the Rule and the CARES Act.  Accordingly, the Department's Rule forces MDE choose whether to comply with Section 18005 of the CARES Act or the Guidance Document and the Rule, either way placing MDE in breach of the certification in the Certification and Agreement and subjecting MDE to "liability under the False Claims Act, . . . [and the] OMB Guidelines to agencies on Governmentwide Debarment and Suspension (Nonprocurement)."  (Ex. A at p. 1.)

34.     As the LEAs in Michigan need to use the ESSER funds as soon as possible to assist with the numerous pandemic-related challenges, this legal jeopardy will impact MDE immediately.

**The Department's Rule Significantly Harms Michigan's K-12 Students**

35.     The Department's Guidance and Rule will result in less funding being distributed to public K-12 schools in Michigan.

36.     If LEAs in Michigan calculate the proportional share of CARES Act funds for private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving CARES Act funds will receive no funds.  In Michigan, there are over 2000 non-Title I schools in LEAs that are eligible to receive CARES Act funds that would not receive any funding.  Like all schools in Michigan, these schools are equally impacted by the COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them through the pandemic.  In addition, there are approximately 1840 Title I schools in Michigan that would risk supplanting violations—and future Title I-A funding—if they use CARES Act funds to respond to and prepare for the pandemic, as the schools cannot supplant State and local funding sources under

9

the Rule.  This would significantly impact the Title I schools, as many are in desperate need of additional funding to cope with the pandemic, and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

37.     If LEAs in Michigan calculate the proportional share of CARES Act funds for private school students under Option #2 in the Rule, approximately $16,496,727.63 will be diverted from public schools to private school students, which represents 7% of Michigan's total ESSER funding for education.

    a.   In Detroit, this amounts to $2,251,130.61 less for public school students, or 2.64 of the total ESSER funds available to the Detroit Community School District;

    b.   In Grand Rapids, this amounts to $2,643,213.87 less for public school students, or 33.08% of the total ESSER funds available to Grand Rapids Public Schools;

    c.   In Flint, this amounts to $1,474,676.48 less for public school students, or 15.60% of the total ESSER funds available to Flint Public School District.

38.     For every $259 diverted from the public schools (Title I or non-Title I schools), a public-school student in Michigan loses out on a needed Chromebook that could allow the student to access online learning while schools are closed due to the pandemic.

39.     For every $35,339 diverted from the public schools (Title I or non-Title I schools), a public-school teacher in Flint, Michigan may lose their position and, leaving the district with fewer resources to provide students with access to learning during the pandemic.

40.     Regardless of how LEAs proportion the CARES Act funds in Michigan, the Rule requires that all private school students receive equitable services.  In Michigan, during the 2019-2020 school year, approximately 4,580 private school students were eligible to receive equitable services under Title I-A as they were at-risk students within a LEA receiving Title I-A funds.  As the Rule requires all private school students to receive equitable services, the approximately 4,580 private-school students who received equitable services under Title I-A last year will receive less services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

10

1  I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and

2  correct.

3

4  Executed on this 16 day of July, 2020, at Lansing, Michigan

5

6  _____

7  KYLE GUERRANT
   Deputy Superintendent
8  Michigan Department of Education

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

Declaration of Kyle Guerrant (3:20-cv-04478-SK)

# EXHIBIT A

# ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State: Michigan

CFDA Number: 84.425D

Legal Name: Michigan Department of Education

DUNS Number: 80-533-6641

Chief State School Officer:

Mailing Address:

Dr. Michael F. Rice, Ph.D

P.O Box 30008, Lansing, MI 48909

---

State Contact for Elementary and Secondary School Emergency Relief Fund: Mr. Kyle L. Guerrant

Position and Office: Deputy Superintendent, Finance and Operations

Mailing Address: P.O Box 30008.
Lansing, MI  48909

Telephone: 517-241-0062

Email address: guerrantk@michigan.gov

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct.  I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):          Telephone:

Dr. Michael F. Rice, Ph.D                                                      517-241-0494

Signature of Chief State School Officer or Authorized Representative:          Date: 04/27/2020

*[signature]*

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1.  The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2.  The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3.  The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
    The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4.  The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5.  The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
    -   The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
    -   The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
    -   The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6.  The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7.  The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: _Michael O'Rice_ | Date: 04/27/2020 |
|---|---|

**PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS**

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA.

The Michigan Department of Education will request the following information from eligible LEAs applying for ESSER funds:

- How the LEA will determine its most important educational needs as a result of COVID19.
- The extent to which the LEA intends to use ESSER funds in the 12 allowable use-of funds categories (Section 18003(d) of Division B of the CARES Act).  Eligible LEAs will submit a budget indicating allowable uses, function codes, and accounting classifications.
- In accordance with Section 427 of the General Education Provisions Act (GEPA), information on how the LEA will provide equitable access to students, teachers, parents and families in non-public schools located within the LEA boundary in the same manner as provided in their consolidated application.
- Required assurances and certifications based on ESSER Fund requirements and guidance to include compliance with any LEA reporting requirements that will be subsequently determined by USED.  This includes all assurance requirements from section 442 of the General Education Provisions Act (GEPA).

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:

The Michigan Department of Education intends to reserve up to 10 percent of the ESSER Fund to establish an educational equity fund. These dollars will be allocated to LEAs through subgrant applications. The primary purpose of the reserve fund is to reduce the digital divide in Michigan's highest-need school communities. Eligible LEAs include those with documented limited technological capacity and access, and a high number of students who qualify as economically disadvantaged. Eligible LEA applications may also include requests to use reserve funds in the 12 allowable use of funds categories (Section 18003(d) of Division B of the CARES Act).

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: *Michael Rice* | Date: 04/27/2020 |
| --- | --- |

# EXHIBIT 2

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL NEWMAN
    Senior Assistant Attorney General
3   SARAH E. BELTON
    Supervising Deputy Attorney General
4   REBEKAH A. FRETZ
    JAMES F. ZAHRADKA II
5   GARRETT LINDSEY (SBN 293456)
    Deputy Attorneys General
6     300 South Spring Street, Suite 1702
      Los Angeles, CA 90013
7     Telephone: (213) 269-6402
      E-mail:  Garrett.Lindsey@doj.ca.gov
8   *Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |
| Plaintiffs, | |
| v. | **DECLARATION OF LISA CONSTANCIO** |
| **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| Defendants. | |

## DECLARATION OF LISA CONSTANCIO

I, Lisa Constancio, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am a resident of the State of California and over eighteen years of age, am competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2.     I am the Deputy Superintendent of Public Instruction over the Operations and Administration Branch at the California Department of Education (CDE). My educational background includes a Bachelor of Science degree in Psychology from California State University, Sacramento and a Master's degree in Organizational Management from the University of Phoenix. I have been employed by CDE since 2006 and have been in my current position as Deputy Superintendent since December 1, 2019.  While at CDE I have also held Director positions with the Charter Schools Division and School Fiscal Services Division.

3.     In my role as Deputy Superintendent, I oversee the Charter Schools Division, Fiscal and Administrative Services Division, Human Resources Division, School Facilities and Transportation Division, and School Fiscal Services Division.

4.     I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education (the Department); and the United States of America regarding the recently issued Rule entitled *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools*, 85 Fed. Reg. 39479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule").  I have also familiarized myself with the Rule in order to understand its immediate impact on the CDE and public schools in California.

**CDE's Work in Education and State's Education Programs**

5.      The State of California is the legal and political entity with plenary responsibility for educating all California public school students.  California has the constitutional responsibility to establish and maintain the system of common schools and a free education.  Under the California Constitution, the State is responsible for ensuring basic educational equity.

6.      The CDE is a state administrative agency responsible for administering and enforcing laws related to education throughout California.  Cal. Educ. Code §§ 33300, 33301, 33306 & 33308.

7.      California funds and oversees the operation of the largest common system of public schools in the nation, which serves over 6.2 million children in more than 11,800 schools.  In state fiscal year (FY) 2018–2019, California provided $55.9 billion in General Funds to its 944 public school districts, 1,277 charter schools, and 58 county offices of education.

8.      For FY 2019-2020, 866 local public school districts, 727 independent charter schools, and 46 county offices of education were allocated $1.8 billion dollars in Title I-A funds.  In FY 2018-2019, Title I-A funds were expended at 7,074 California public schools.

9.      There are about 2,895 private schools in California, of which at least 1,277 nonprofit private schools are located in the 157 LEAs which received Title I-A funds and provided Title I equitable services.  Some of the private schools located in Title I-A-recipient LEAs have annual tuition comparable to private four-year colleges.

**The Effect of the COVID-19 Pandemic on Education in California**

10.      The COVID-19 pandemic has caused enormous upheaval in California's K-12 education system.

11.      On March 4, 2020, Governor Newsom declared a state of emergency in California in response to the COVID-19 pandemic.  On March 13, 2020, Governor Newsom signed an executive order that would allow school districts to shift from a physical classroom environment to a distance-

2

learning environment.  On March 19, 2020, Governor Newsom issued a stay at home order for the entire state.

12.     Against this backdrop, on March 17, 2020, the California Department of Public Health, in collaboration with CDE, issued guidance to schools shifting to distance learning environments.

13.     During this period, numerous school districts quickly shifted to distance learning environments across the state.  California school districts have had to rapidly create distance learning environments for teachers and students; deploy technology, internet access, or instructional material to students learning at home; provide meals to students who depend on free or reduced price meals from schools for nutrition; provide suitable special education services to students learning at home; and respond to the needs of children experiencing trauma or disturbance from the effects of the COVID-19 pandemic.  A limited number of schools have continued to operate or resumed physical classroom teaching during the pandemic, but many of California's classroom schools continue to utilize distance learning.  While school districts had broadly planned to resume some level of normal classroom learning in the coming school year, the recent surge of COVID-19 cases in California jeopardizes these plans.

14.     CDE continues to monitor the COVID-19 pandemic and is working closely with school districts and other state agency partners to meet the challenges of the moment.  Every week, CDE has been issuing new updates and guidance to school districts to respond to a rapidly changing situation.  Among other activities, CDE has published guidance documents and conducted webinars to aid other education partners in addressing subjects like providing distance learning, providing internet access to students, providing special education in a distance learning setting, and providing mental health in response to the crisis.

3

15.     California's fiscal year begins on July 1 of each year, and the State must prepare a budget for its operations in advance of the fiscal year.  Typically, the budget process begins with a proposal by the Governor in January, a revision in May, and a budget enacted by July 1.  The budget is developed in negotiation with the Legislature.

16.     The COVID-19 pandemic has severely impacted the state's economy and reduced the California's General Fund revenues, which are derived from income tax and sales tax.  Section 8 of Article XVI of the California constitution sets forth rules calculating a minimum annual funding level for K-12 and community college education in California, based on a number of factors including state tax revenues.  Reflecting the sudden economic decline brought about by the COVID-19 pandemic, the funding provided by this formula dropped $13.9 billion.  The Governor and the Legislature developed a budget to protect local K-12 LEAs by, in part, allocating flexible federal funding from the CARES Act, including substantial funding not specifically directed to education by the CARES Act.

**CARES Act Funds Received by California For K-12 Education**

A.  <u>Elementary and Secondary School Emergency Relief (ESSER) Funds</u>

17.     In order to receive the ESSER funds designated for California and as required by the Department, Dr. Linda Darling-Hammond, President of the California State Board of Education (SBE) executed a Certification and Agreement form which was jointly submitted by CDE and SBE to the Department on April 28, 2020.[1]  A true and correct copy of the Certification and Agreement is attached hereto as Exhibit A.

18.     Within this Certification and Agreement, SBE agreed to the following terms:

---

[1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, available at https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

4

I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

. . .

4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

. . .

5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

[Ex. A at pp. 1-2.]

19.     At the time that the SBE President executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule.  Accordingly, California was unaware that the Department would subsequently issue rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

20.     The Department awarded $1,647,306,127 from the ESSER Fund to California on May 1, 2020. Under Cal. Education Code sections 12033 and 12034, the State Treasurer is the custodian of federal grant funds, which are paid out on warrants drawn by the State Controller. Cal. Const., Article 16, § 7 provides that "[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." Therefore, the CDE lacked authority to expend or distribute any ESSER funds, including subgrants to LEAs, until the

5

Legislature enacted a specific appropriation and authorization for that purpose in the budget for the fiscal year beginning July 1, 2020.

21.     In California, of the ten percent of ESSER funds not distributed to the local entities by the formula described in section 18003(c) of the CARES Act ("State Reserved ESSER Fund"), approximately $112.2 million is budgeted to provide up to $0.75 for each breakfast and lunch provided by LEAs to eligible children due to unanticipated school closures related to COVID-19. California LEAs participating in the National School Lunch Program, School Breakfast Program, Summer Seamless Option or Summer Food Service Program that continue to serve meals between March and August of 2020 are eligible for this funding to help ensure access to nutritious meals. The federal Child Nutrition Programs provide free and reduce-priced, nutritionally sound meals to students from low-income families.  These funds will enable LEAs to address food insecurity in their communities due to unanticipated school closures.  During the pandemic, some LEAs consolidated operations within their school districts and with other LEAs to better support their community in providing meals.

22.     About $45 million of the State Reserved ESSER Fund is budgeted to provide LEAs with grants to coordinate or expand community schools to increase access to health, mental, health, and social support for high-need students.  These funds will enable improved delivery of mental health and social-emotionally supportive services for students experiencing the stress, anxiety, and trauma caused by the COVID-19 pandemic.

23.     About $6 million of the State Reserved ESSER Fund is budgeted to provide educator professional development for providing high-quality distance learning and addressing learning loss in mathematics, science, and English language arts due to the COVID-19 pandemic.

6

24.     Per section 18003(e) of the CARES Act, up to one-half of one-percent of the ESSER funds may be retained by CDE to administer the CARES Act education funds.  CDE will retain about one-tenth of one-percent for this purpose.

25.     Specific to Section 18003(c) ESSER funds, as part of California's Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund, California made assurances that funds will be used for "allowable purposes in accordance with cash management principals". In addition, prior to receiving Section 18003(c) ESSER funds, LEAs were required to submit assurances to CDE and the application deadline to be included in the first apportionment of ESSER was July 15, 2020. To comply with federal cash management principals, LEAs that submit assurances by July 15, 2020 to the CDE will receive funding equal to 25 percent of the LEA's allocation. CDE estimates that LEAs should receive funds around early September 2020. Thereafter funds will be released consistent with cash management principals to LEAs as expenditure data is reported to CDE.  LEAs that didn't apply by July 15, 2020 or newly operational charter schools commencing instruction in the 2020-21 school year may apply after the initial deadline and will receive funding consistent with the apportionment methodology outlined previously.

26.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), LEAs in California would reserve approximately $5,449,992 in ESSER funds to provide equitable services to private school students.

27.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, LEAs in California would reserve approximately $60,249,538 in ESSER funds to provide equitable services to private school students.  Thus, under the Department's proportional share calculation, private school students in California would have

7

access to an additional $54,799,545 in services, and public schools would lose this same amount of funds.

B. GEER Funds

28.    California was awarded $355,227,235 from the GEER Fund on May 13, 2020.

29.    In response to the expected negative impact of learning loss from the COVID-19 pandemic and associate school closures, the Governor and Legislature combined the GEER funds with more than $4.4 billion in Coronavirus Relief Funds provided under section 5001 of the CARES Act, and $540 million from the State's general fund, to establish Learning Loss Mitigation Block Grants.  These grants are intended to be distributed to LEAs based on a formula that prioritizes students expected to be the most heavily impacted by school closures and the pandemic, and are to be used in a way that is expected to mitigate the negative impact of the pandemic on learning.  The grants may be used to provide instructional support, increase instructional minutes or days, provide additional academic services for pupils, and provide other integrated supports to address barriers to learning.  A large portion of these funds will be allocated to LEAs based on the number of students with disabilities requiring instruction outside a regular school program, and another large portion will be allocated to LEAs based on the concentration of students from low-income families, English learners, and foster youth.  While these funds are directed to LEAs based on a critical need, some of the students that are intended to be served by the grants may not attend Title I-A eligible schools. As part of California's Certification and Agreement for Funding under the Education Stabilization Fund Program Governor's Emergency Education Relief Fund, California made assurances that funds will be used for "allowable purposes in accordance with cash management principals". In addition, LEAs will be required to submit assurances to CDE in order to receive an apportionment from the GEER fund. The assurances are still under development but when available the apportionment process will

8

follow a similar structure as the ESSER, Section 18003(c) funding to comply with federal cash management principals.

**The Department's Rule Significantly Harms California**

30.     The Department's Guidance Document and Rule place California in legal jeopardy. California was required to certify in its ESSER Fund application that California LEAs will comply with the equitable service provision of the CARES Act (§ 18005) and "any other applicable law or regulation." (Ex. A at p. 1.)  Because the Guidance Document and the Rule require LEAs to calculate the proportional share for equitable services and determine eligibility of private school students for equitable services contrary to the proportional share calculation and eligibility requirements in the CARES Act,  California (and its LEAs) cannot satisfy both the Rule and the CARES Act.  Accordingly, the Department's Rule forces California to violate Section 18005 of the CARES Act, placing California in breach of the certification in the Certification and Agreement and subjecting California to "liability under the False Claims Act, . . . [and the] OMB Guidelines to agencies on Governmentwide Debarment and Suspension (Nonprocurement)." (Ex. A at p. 1.)

31.     As the LEAs in California may wish to use the ESSER and GEER funds as soon as possible to assist with the numerous pandemic-related challenges, this legal jeopardy will impact California schools immediately.

**The Department's Rule Significantly Harms California's K-12 Students**

32.     The Department's Guidance and Rule will result in less funding being allocated to public K-12 schools in California.

33.     If LEAs in California calculate the proportional share of CARES Act funds for private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving CARES Act funds will receive no funds.  In California, there are approximately 3,057 non-Title I schools in LEAs that are eligible to receive CARES Act funds that would receive no funding.  Like all schools

9

in California, these schools are equally impacted by the COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them through the pandemic.  In addition, there are approximately 7,043 Title I schools in California that would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule.  This would significantly impact the Title I schools as many are in desperate need of additional funding to cope with the pandemic, and to assist students with online, distance learning tools that students often cannot afford within these Title I schools.

34.     California has allocated a portion of the ESSER program fund retained by the state to be directed to supplement school meal programs operated during the pandemic. Some of these moneys will be directed towards supporting school meal programs that support students attending non-Title I schools.

35.     If LEAs in California calculate the proportional share of CARES Act funds for private school students under Option #2 in the Rule, approximately $54,799,545 will be diverted from public schools to private school students.

36.      Regardless of how LEAs proportion the CARES Act funds in California, the Rule requires that all private school students receive equitable services.  In California, during the 2019-2020 school year, approximately 14,296 private school students were eligible to receive equitable services under Title I-A as they were at-risk students within a LEA receiving Title I-A funds.  As the Rule requires all private school students receiving equitable services, the approximately 14,296 private school students who received equitable services under Title I-A last year will receive fewer services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

1    I declare under penalty of perjury under the laws of the United States and the State of

2    California that the foregoing is true and correct and of my own personal knowledge.

3    Executed on this 17th day of July, 2020, at Sacramento, California

4

5                                    Lisa Constancio
                                     Deputy Superintendent of Public Instruction
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
# for Funding under the
# Education Stabilization Fund Program
# Elementary and Secondary School Emergency Relief
# Fund (ESSER Fund)

## CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpos**e

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

**ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)**

**STATE EDUCATIONAL AGENCY**

**PART A: CERTIFICATION AND AGREEMENT COVER SHEET**

State: California

CFDA Number: 84.425D

Legal Name: California Department of Education

DUNS Number:  807480843

Chief State School Officer:

Dr. Linda Darling-Hammond

Mailing Address:

1430 N Street, Room 5111 Sacramento, CA 95814

| | |
|---|---|
| State Contact for Elementary and Secondary School Emergency Relief Fund: Joseph Saenz | |
| Position and Office: Federal Policy Liaison/ California Department of Education/Government Affairs | |
| Mailing Address: | 1430 N Street, Suite 5602 Sacramento, CA 95814 |
| Telephone: | (916) 591-6391 |
| Email address: | jsaenz@cde.ca.gov |

To the best of my knowledge and belief, all the information and data in this agreement are true and correct.  I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):          Telephone:

Dr. Linda Darling-Hammond                                                                                 (916) 319-0827

Signature of Chief State School Officer or Authorized Representative:          Date:

*Linda Darling-Hammond* (signature)

04/28/2020

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    • A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    • An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: 4/28/2020 |
|---|---|

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
    - How the LEA will determine its most important educational needs as a result of COVID-19.
    - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
    - The extent to which the LEA intends to use ESSER funds to promote remote learning.
    - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

Given the pressing needs our LEAs face in light of COVID-19, we intend to use a streamlined application process.

We will collect assurances that LEAs will comply with all applicable federal requirements, including allowable uses of funds, reporting, financial management, and recordkeeping requirements.

2.  The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:

    - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
    - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

*We are still working with stakeholders, the Governor, and the Legislature to determine how best to deploy our state-level activities funds given the emergency needs in in our state.*

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature:<br>*Lisa D. g. Haamn* | Date:<br>04/28/2020 |
| --- | --- |

**Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations**

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

7

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.



**California Department of Education**

**Tony Thurmond**, *State Superintendent of Public Instruction*
1430 N Street, Sacramento, CA 95814-5901
916-319-0800

**California State Board of Education**

**Linda Darling-Hammond**, *State Board President*
1430 N Street, Room 5111, Sacramento, CA 95814
916-319-0827

April 28, 2020

The Honorable Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202-6100

Dear Secretary DeVos:

RE: Elementary and Secondary School Emergency Relief Fund Grant

On behalf of the California State Board of Education and the California Department of Education (CDE), we respectfully request grant funding under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact of the Novel Coronavirus Disease 2019 (COVID-19).

On March 19, 2020, California Governor Gavin Newsom issued Executive Order N-33-20, a statewide "shelter in place" to protect the health and well-being of all Californians and to establish consistency across the state in order to slow the spread of COVID-19. Since then, the CDE and SBE have worked tirelessly to ensure that we are giving our schools as many resources as possible in order to guarantee the success of all California students.

California is appreciative of the grant application and awards being released by the U.S. Department of Education in such a streamlined manner. The State will comply with all Assurances and Certifications listed in the ESSER Fund Certification and Agreement application. The $1,647,306,127 grant award will be used to give much needed relief to our students, families, and schools.

The current public health crisis is unprecedented in scale and scope. We look forward to working with your staff to ensure that California's future needs can be addressed.

If additional information regarding this request is needed, please contact Joseph Saenz, Federal Policy Liaison, Government Affairs Division, by telephone at 916-591-6391 or by email at jsaenz@cde.ca.gov.

Sincerely,

April 28, 2020
Page 2

Tony Thurmond
State Superintendent of Public Instruction
California Department of Education

Linda Darling-Hammond
President
California State Board of Education

TT/LDH:js

EXHIBIT 3

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14  **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |
| 15                              Plaintiffs, | |
| 16                                          | **DECLARATION OF JOHANNA HOFFMANN** |
| 17     v. | |
| 18  **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of** | |
| 19  **Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| 20                              Defendants. | |
| 21 | |
| 22 | |

23

24

25

26

27

28

1

**DECLARATION OF JOHANNA HOFFMANN**

2

I, Johanna Hoffmann, pursuant to 28 U.S.C. § 1746, hereby declare that the following is

3

true and correct:

4

1.     I am a resident of California and over the age of 18, competent to testify as to

5

the matters herein, and make this declaration based on my personal knowledge and

6

information.

7

2.     I submit this declaration in support of a motion for preliminary injunction

8

against enforcement by the United States Department of Education (the "Department") of its

9

interim final rule issued on July 1, 2020 (the "IFR" or "Rule"), which changes how funding is

10

distributed under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  I

11

have compiled the information in the statements below through my personal knowledge or

12

based on documents that I have reviewed.  In the course of my work, I have attempted to

13

become familiar with the information contained in the CARES Act sections regarding

14

elementary school, secondary school and non-public school funding, the Department's written

15

guidance pre-dating the IFR ("Guidance Document"), and the IFR.

16

3.     I have served as a Strategic Resource Planning Specialist for the middle school

17

network and private school equitable services within the Oakland Unified School District

18

(OUSD) since September 2019.  My responsibilities include preparation and oversight of

19

OUSD's provision of services to private schools funded by federal money under Title I of the

20

Elementary and Secondary Education Act of 1965, as amended most recently in December

21

2015 as the Every Student Succeeds Act.  I survey private schools to determine their intention

22

to seek to participate in OUSD's equitable services program and oversee the determination of

23

which schools will participate and how many students in those schools meet the criteria for

24

eligibility.  I am involved in calculating the amount of funds that OUSD allocates for equitable

25

services to private schools.  I participate in communications with the California Department of

26

Education (CDE) and the United States Department of Education on equitable services to

27

private schools as well as training provided by the same.

28

**GENERAL OVERVIEW OF DISTRICT**

4.       OUSD serves approximately 35,865 K-12 public school students at approximately 83 district-run public schools.

5.       Of that number, 31,043 students (including students who were themselves Title I eligible and other students) attended 71 schools that received Title I-A funds.  OUSD received $17,598,916 in Title I-A funds received for 2019-20 school year.  The number of students who met the eligibility criteria for Title I-A was 24,461.

6.       According to information submitted by private schools in their annual affidavit to the CDE and published by the CDE, in 2019-20 there were 5,948 private school students attending 29 non-profit private schools within the OUSD boundary.

7.       OUSD supports eligible Title I students with Programs through the central office and at school sites.  Centrally, OUSD programs include Summer School, Saturday School, and Early Childhood Education Programs during the 2019-20 school year.  Each school operating a Schoolwide Title I Program receives an allocation of grant funds with which to design programs.  The School Site Council guides and approves the programs at the school site on an annual basis.

**EFFECTS OF THE COVID-19 PANDEMIC ON EDUCATION IN OUSD**

8.       The COVID-19 pandemic has drastically affected K-12 education in OUSD.

9.       The transition to distance learning has been particularly challenging for OUSD's lower income students and, because of the high percentage of low-income students within our district, OUSD is significantly impacted by these challenges.  Low-income students lack technology access, which prevents them from accessing remote learning materials. OUSD serves a large number of students that lack access to devices and high-speed internet at home, leaving the students unable to learn remotely without the District or a District-partner providing them with the necessary devices and internet access.  From what we have seen, private school students are more likely to live in homes with good internet access and computers.  That is supported by survey information such as at https://parents-together.org/parentstogether-survey-reveals-remote-learning-is-failing-our-most-vulnerable-

students/?referringSource=articleShare.  Additionally, of the 24 private schools interested in participating in CARES-related equitable services, two schools listed technology purchases related to supporting distance learning as their lowest need and seven schools did not indicate a need to technology purchases whatsoever.

10.     Because of COVID-19, distance learning began with the closure of all OUSD schools on March 16.  One of the biggest challenges faced by our students and families has been the inequitable access to technology and the internet.  OUSD schools loaned out more than 18,000 Chromebooks to students who need them at home, along with hotspots to give them access to the internet and their education.  The majority of students who received these devices were lower income students.

11.     Since the shelter in place began, and so many families lost jobs, another major challenge for them has been access to food.  OUSD Nutrition Services team has been supplying meals to OUSD students and their families as well as children in Oakland since day one.  In the past four months, the team has distributed more than 3.5 million student meals, 450,000 adult meals, nearly 900,000 pounds of groceries, more than 400,000 diapers, and 13 tons of pet food, among many other things.  Here are details from a June press release: https://t.e2ma.net/message/9due5c/hkkxog.

12.     To make the impact of the pandemic more concrete, I have obtained information about one public school in the district, Oakland International High School.  It serves Newcomer Immigrant and Refugee students, which is a population of students who are much more densely situated in Oakland public schools than in neighboring private schools.  Currently, 1 in 7 high school students in Oakland Unified School district is a Newcomer who has arrived in the United States in the last 3 years. There are virtually no Newcomer students who are being served by local private schools.

**Technology Access Inequities:** At the onset of shelter in place, 94% of OIHS's students either lacked internet connectivity at home, lacked a computer or tablet, or both.  Three staff members worked throughout shelter in place to ensure that students got donated computers, loaner computers, and hotspots.  Once the supply

chain for internet hotspots was disrupted/overloaded, OIHS supported families with direct cash assistance in order to upgrade their phones to serve as internet hotspots.

**Food Insecurity:** 152 OIHS families requested additional emergency food from Oakland International High School, citing that the food provided by the district's federal food program was not sufficient to meet their needs, and they could not afford to buy food due to job losses.

**Transportation Access:** OIHS conducted 118 individual food dropoffs for families who had no reliable or safe transportation access during shelter in place. Because public transportation is limited to 25% capacity for safety reasons, our families have a very limited ability to access school, work, food, and social services.

**Income Insecurity:** Of OIHS's 387 enrolled students, 188 families (many of whom had two or more students at our school), were referred for income insecurity support during the Spring Semester because they had lost their jobs. These families were in immediate need of money to buy food, pay their phone bills, and pay rent (until the rent moratorium was issued. OIHS devoted a tremendous amount of human resources to fundraise and manage a direct-assistance fund to ensure that students could eat and had a roof over their head.

13.     The disruption of California's economy has caused a contraction of the State's budget, and the State's funding for K-12 public schools will be reduced by a substantial amount that remains to be determined.   The disruption is expected to last for the foreseeable future.  Because State funding will be reduced and the cost of providing an education to students in public schools has substantially increased, the COVID-19 crisis has magnified the impact of the reduction in the federal funding for public schools that would occur if OUSD distributes equitable services to private schools based on total student enrollment.

**CARES ACT FUNDS ALLOCATED TO OUSD FOR K-12  EDUCATION**

A   Elementary and Secondary School Emergency Relief (ESSER) Funds

14.     OUSD applied for money from the California Department of Education (CDE) for all ESSER funds available on July 13, 2020.

15.     CDE has provided a preliminary ESSER fund allocation of $14,493,191.00 to OUSD based upon the proportional share of our Title I award for the 2019-20 school year.

16.     According to the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), using 2019-20 enrollment for both OUSD district schools (24,461 eligible students) and eligible private schools (268 eligible students at 4 schools), the proportional share for equitable services for the 2019-2020 school year was 1.08% or $190,068.00.  Applying this share to OUSD's anticipated ESSER fund allocation, the allocation for ESSER equitable services is $156,526.46.

17.     However, the above number does not include consideration of the private school students (435 at 8 schools) that want to participate in Title I, Part A equitable services during the 2020-21 school year that did not participate in 2019-2020 nor does it include private school students (936 at 24 schools) interested in participating only in CARES-related equitable services.

18.     OUSD had already completed the notification and scheduled initial consultation with private schools for the 2020-21 school year by the time the CARES Act became effective.  Consequently, we notified private schools within our boundary of the CARES-related equitable services opportunity after we determined which private schools would participate during the 2020-21 school year.

19.     As part of my role as Specialist, I initiated the notification and consultation process with private schools within our district boundary, receiving confirmation from 24 private schools interested in receiving ESSER fund-related equitable services.  The estimated enrollment of low-income students at these 24 schools is 936 for the 2020-21 school year.  We have not yet verified enrollment or low-income eligibility with the 24 private schools interested in CARES-related equitable services.

20.     OUSD's ESSER allocation is based upon our 2019-20 Title I award.  It would be consistent for CARES-related equitable services to be based on 2019-20 data, meaning that OUSD would provide equitable services in the amount of $156,526.46.

21.     OUSD  would  reserve  $156,526.46  in  ESSER  funds  to  provide  equitable

services to private school students.

22.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, OUSD would reserve $2.160 million in ESSER funds to provide equitable services to private school students. Thus, under the Department's preferred proportional share calculation, private school students within OUSD boundary would have access to services amounting to an additional $2.160M; an amount that would be diverted from district schools. I do not believe this was the intent of Congress and public schools would lose this same amount of funds.

B   Governor's Emergency Education Relief (GEER) Funds

23.     OUSD has not yet received the amount of its allocation from the Learning Loss Mitigation Block Grant Fund/GEER Fund. It is my understanding that OUSD's allocation of GEER funds would be subject to the same rules as ESSER funds, meaning that if OUSD is bound by the Department's guidance and interim rule, a greater portion of our allocation would be diverted to private school students than would be if OUSD followed the language in the CARES Act.

**USE OF TITLE I FUNDS TO EQUITABLE SERVICES FOR NON-PUBLIC SCHOOLS**

24.     Before the IFR, it was my responsibility to plan for OUSD's allocation and use of Title I funding for equitable services to private schools.

25.     When I started working at OUSD, the funding allocations for the 2019 school year were completed and my role was to assist with management of equitable services. As part of my role, I began preparing the equitable services program for the 2020-21 school year. To do so, OUSD sent out notices to eligible private schools. We identified schools by looking at a directory annually distributed by the State of California and identifying schools within and bordering our district. Of the 80 schools that received notices, around 8 schools opted to participate in Title I and 11 total schools opted to participate in at least one of the programs offered through Titles I-IV.

26.     As part of OUSD's annual budget development process, which begins in the

early Spring, I assist with determining the equitable services allocation. The allocation calculation is determined once a year and is based on the number of eligible Title I private school students as a percentage of Title I public and private school combined enrollment of eligible students. We use the enrollment data from the previous year and apply the percentage to total Title I funding.  For example, for the 2020-21 school year, around $300,000 was set aside for equitable services under Title I. However, administration expenses of around $45,000 were deducted from this amount, so approximately $255,000 was available for Title I equitable services for the 2020-21 school year.

27.     In order to receive their allocated equitable services, individuals at a private school (staff and/or teachers) submit requests seeking reimbursement or funding for activities identified in their needs assessments. Title I private schools must seek approval from OUSD prior to engaging in the activity and submit verification of participation and/or expenditures within 10 days after its completion in order to be reimbursed. As the fiscal agent for equitable services, OUSD cannot provide public funds to any private schools, but rather OUSD contracts directly with service providers and is only able to reimburse individual teachers and/or staff for pre-approved and allowable expenditures.

28.     When my colleagues and I initially read the CARES Act, we thought we could use CARES Act funding to serve any district schools, and that the portion of funding available for equitable services would be based on Title I eligible students attending private schools in OUSD's boundary.  We envisioned distributing CARES Act funding to private schools as described above. Given that our budget development process had already begun, myself and others planning for the 2020-21 school year relied on the language in the CARES Act for approximately a month until the Department's written guidance pre-dating the IFR and the IFR drastically changed our initial understanding.

29.     In the IFR the Department appears to be giving us additional options for distributing CARES Act funding between private and public schools, when in fact, the restrictions in Option 2 essentially swallow any benefit it may purport to provide. The Department gives us the option to choose to distribute funds either based on Title I low-income

student proportion ("Option 1") or in proportion to total student enrollment ("Option 2") as long as all CARES funds are used to serve only students and teachers in public schools participating under Title I. However, if we use any portion of the Act's funding for non-Title I schools, then we must distribute funds based on enrollment, irrespective of income. If we elect to distribute funds based on Title I proportional share, we must comply with supplement not supplant requirements, which imposes additional restrictions on how we spend the funds.

30.     One example of how the supplement not supplant restriction swallows the Title I distribution option can be illustrated by OUSD's efforts to purchase PPE supplies.  Under Option #1 of the IFR, OUSD could use Elementary and Secondary School Emergency Relief ("ESSER") funds at our Title I schools only, and we would be unable to use them for the same materials at our non-Title I schools. Additionally, if anything was paid for with state and/or local funds during the 2020-21 school year, we cannot then pay for the same thing with Title I funds during the 2021-22 school year. That the Department waited until April 30, 2020 to issue guidance and until July 2, 2020 to publish the IFR significantly burdens OUSD since our budget development process for the 2020-21 school year was complete by that time.

31.     The election to distribute CARES Act funding based on Title I low-income student proportion also affects our ESSER and GEER funding as it imposes supplement not supplant restrictions that would not otherwise exist. ESSER and GEERS funds help us assist all public schools not just Title I schools. Under the Department's restrictions, low-income students that are not at a Title I school would be not able to access this funding. Alternatively, if we elect to distribute equitable services based on total student enrollment, then ESSER and GEER funding will be diverted from low-income public schools to private school students to the tune of approximately $2 million. Moreover, the application of the supplement not supplant restriction in the IFR is in direct contradiction to the Department's own guidance documents.

**ENFORCEMENT OF THE IFR WOULD CAUSE SUBSTANTIAL HARM TO OUSD**

32.     If we were to distribute the CARES Act funds based on low-income private school pupils, each pupil would receive around $452; however, if we were to distribute the

CARES Act funds to all private school pupils, then each pupil would receive around $24. Low-income private school students would receive significantly less funding, which simply cannot be the result that Congress intended.

33.    Because of the restrictions imposed by the Department in its written guidance pre-dating the IFR, and the IFR, OUSD has set aside approximately $2.2 million dollars of ESSER funds for equitable services.  Whereas for the 2019-20 school year, 268 of a total of 5,136 pupils from private schools participated in Title I-A, under the restrictions imposed by the Department, we must allocate equitable services based on total private school pupil enrollment.  This means funding will be diverted from public schools and the distribution per pupil at private schools will be diluted leaving, the most vulnerable pupils with less assistance.

34.    For every dollar that is diverted from public schools in OUSD as a result of the Department's Guidance Document and IFR, OUSD will have fewer dollars to serve district schools.

35.     The Department's Guidance and IFR interpretation of the equitable service requirements represent such a departure from OUSD's interpretation as well as the guidance OUSD has received from the CDE and Alameda County Office of Education, we are unsure how to proceed. While setting aside the $2.2 million difference between two enrollment counts of eligible private school students participating in equitable services with ESSER funds is an attempt to ensure we are able to comply with the grant provisions should a final determination be made that the total private school enrollment count be used, the impact on OUSD students is immediate. With access to the full amount of the ESSER funds we believe Congress intended to distribute, OUSD would be able to support our schools and students by immediately having access to $2.2 million rather than holding those funds in limbo for an undetermined amount of time.

36.    Enforcement of the IFR also would impose substantial harm on OUSD in the form of increased effort and expense for administration. Servicing a greater number of private schools is an administrative burden, which takes time away from servicing public schools. Similarly, ensuring compliance with supplement not supplant restrictions is administratively

burdensome and costly. This is time that is being taken away from securing resources and aiding students. Although the administrative burdens have increased, we are uncertain as to what percentage of the CARES Act funding we are entitled to set aside to cover administrative fees.

37.     Administrative fees are not the only aspect of the Department's guidance that lacks clarity. In fact, the Department is constantly changing the restrictions on CARES Act funding to address what they claim to be ambiguities, but instead of addressing actual ambiguities, the Department has confused what was otherwise clear direction. Doing so is creating even more uncertainties. We are concerned that auditors will fine us for spending Title I time on CARES Act funding issues. Instead of addressing issues related to the pandemic, we are wasting even more time attempting to address auditing concerns.

38.     The Department's Guidance and IFR will result in less funding being distributed to public K-12 schools in OUSD.

39.     If OUSD calculates the proportional share of CARES Act funds for private school students under Option #1 in the IFR, non-Title I schools in OUSD receiving CARES Act funds will receive no funds.  In OUSD, there are approximately 10 non-Title I schools that are eligible to receive CARES Act funds that would not receive any funding.  Like all schools in OUSD, these schools are affected by the COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them through the pandemic.

40.     In addition, there are 71 schools in OUSD receiving Title I-A funding that would be prohibited under the IFR from using CARES Act funds to respond to and prepare for the pandemic in ways that would supplant State and local funding sources.  For example, OUSD has relied on other funds and philanthropic gifts for part of the finding for COVI-19 technology response.  Supplement not supplant restrictions might be interpreted to apply to such uses of CARES-Act funding.  This would significantly reduce the flexibility of the Title I schools to meet the specific need created by COVID-19.

41.     The new supplement not supplant requirement of Option #1 has created significant confusion and administrative burdens for the OUSD, as prior to issuing the IFR, the

1    Department had explicitly communicated that supplement not supplant rules did not apply to

2    CARES Act funds.[1]  The OUSD budget developed without this requirement in mind will need

3    to be revamped, and the flexibility in how school districts may use these funds to address

4    COVID-19 has been significantly curtailed.

5          42.    For example, if we wanted to buy disinfecting wipes for our schools, we fear that

6    supplement not supplant restrictions could be interpreted to only be able to spend out of the

7    ESSER funds and for the other non-Title I schools we would need to look elsewhere for funding.

8          43.    If OUSD calculates the proportional share of CARES Act funds for private

9    school students under Option #2 in the IFR, approximately $2.2 million will be diverted from

10   public schools to private school students, which represents 14.9% of OUSD's total CARES Act

11   funding for education.

12   **SUBSTANTIAL CARES ACT FUNDING IS AVAILABLE TO PRIVATE
     SCHOOLS BUT NOT TO PUBLIC SCHOOLS**

13

14         44.    The Department's stated purpose for equally apportioning CARES Act funding

15   between public and private schools is that it would be unfair to exclude private schools who

16   have also been affected by the pandemic. However, non-public entitles, including private

17   schools, are eligible for a range of support under the CARES Act, including the Paycheck

18   Protection Program (PPP) loans OUSD cannot benefit from many of the provisions of the

19   CARES Act that private schools are able to receive. It is my belief that private schools already

20   receive a greater benefit through PPP loans and various tax credits than OUSD receives via

21   ESSER and GEER. The scales are already tipped in favor of private schools with the

22   previously referenced support and would be further and significantly tipped in favor of private

23   schools should OUSD be required to provide equitable services based on the total number of

24   students enrolled at private schools within our boundary. Nine of the private schools within

25   OUSD that are interested in equitable services from CARES Act applied for PPP loans. These

26   _____

27   [1] U.S. Dep't of Educ., Elementary and Secondary School Emergency Relief Fund, Frequently
     Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER
     Fund), *available at* https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-

28   Questions.pdf.

nine schools are eligible to receive between 5.5M and 13.7M in PPP loans. Importantly, these 9 schools serve a total of around 2,500 students, which means that they are receiving almost as much money as OUSD was allocated in its ESSER fund ($14M) to serve less than a tenth of the students OUSD serves.

45.     I have read the published IFR, including the Department's statement that "Nothing in the CARES Act suggests Congress intended to differentiate between students based upon the public or non-public nature of their school with respect to eligibility for relief." If this statement is understood to suggest that without the IFR's diversion of money, the non-public schools would receive too little CARES Act relief compared with public schools, it cannot be accepted as true. Major categories of CARES ACT relief are available to non-public schools and denied to public schools. One example is that private schools in OUSD's geographic area have obtained loans, which may be forgiven based on meeting requirements aimed at maintaining employment, under the Payroll Protection Program (PPP).

46.     The United States Department of the Treasury maintains a website at https://home.treasury.gov/policy-issues/cares-act/assistance-for-small-businesses/sba-paycheck-protection-program-loan-level-data. It contains listings of the recipients of PPP loans to date, including one list of recipients of loans less than $150,000 and one of recipients of loans over $150,000. For loans of over $150,000, the names of the borrowers are disclosed, along with their NAICS industry codes, locations, and other descriptive information. The specific loan amounts are not disclosed. Instead, each loan is classified as within a range of amounts: $150,000-350,000; $350,000-1 million; $1-2 million; $2-5 million; and $5-10 million.

47.     I have reviewed both lists, paying particular attention to recipients of PPP loans of $150,000 or more located in Oakland, California and classified as NAICS code 611110, which designates "Elementary and Secondary Schools." (See https://www.naics.com/naics-code-description/?code=611110). Public schools are not eligible for PPP loans, so the loan recipients listed are private schools in Oakland, California. Twenty-seven entities in Oakland are listed.  I have checked the names on the list to remove charter schools and three entities that

are not primary or secondary schools.  The remaining PPP recipients are private (including parochial and religious) primary and secondary schools that  have received at least $7,850,000 in PPP loans. That is the total of the low-end amounts of each reported range for a private, non-charter school in Oakland that received a loan over $150,000 in NAICS code 611110. Using the amount in the middle of each reported range, the total would be $13,300,000. The total of the high-end amounts from the ranges would be $18,750,000.  As a reminder, OUSD anticipates receiving a total of just over $14 million dollars in ESSER funds *before* equitable services are calculated and a portion is allocated to private schools.

48.     I have checked for the names of the 24 private schools that have applied for CARES-funded equitable services on the list of names of recipients of PPP loans of $150,000 or more. Nine of the schools that wish to receive CARES-funded equitable services are listed as having received a minimum of $5,700,000 in PPP funding. If the actual loan amounts averaged the midpoint of the reported ranges, the total is $9,700,000.  At the top end of the reported ranges, the PPP funding to these private schools would have been $13,700,000.

49.     For comparison, the entire amount of CARES-Act ESSER funding that OUSD will receive — for both public and private schools — is $14,492,191. As I have explained above, under the formula of Section 1117 private schools would receive $157,000 of that funding, but if the full enrollment of participating private schools is used, we estimate that the amount would be $2,160,000 —resulting in a diversion of $2 million from funds for OUSD public schools.

50.     These amounts demonstrate that there is no basis for contending that Congress made not distinctions between public and non-public schools, and no basis to say that the proportion of equitable services to private schools pursuant to Section 1117 would leave privates schools with too little relief under the CARES Act, compared with private schools.

I declare under penalty of perjury pursuant to 28 U.S. Code § 1746 that the foregoing

1   is true and correct.  This Declaration was executed this 16th day of July, 2020 in Oakland,

2   California.

3

4   Johanna Hoffmann
    Strategic Resource Planning Specialist
5   Oakland Unified School District

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **STATE OF MICHIGAN, STATE OF**          Civil Case No. 3:20-cv-04478-SK
    **CALIFORNIA, et al.,**
15
                              Plaintiffs,
16                                            **DECLARATION OF NIKKI STEWART**

17            v.

18  **ELISABETH D. DEVOS, in her official**
    **capacity as the United States Secretary of**
19  **Education, and UNITED STATES**
    **DEPARTMENT OF EDUCATION,**
20
                              Defendants.
21

22

23

24

25

26

27

28

**DECLARATION OF NIKKI STEWART**

I, Nikki Stewart, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Assistant Superintendent of the Division of Systems and Supports, K-12 (SSK12) at the Office of the State Superintendent of Education (OSSE) located in the District of Columbia. My educational background includes a Bachelor of Arts from Spelman College, a Master of Arts from the University of Maryland, a Master of Science from Full Sail University, and a Certification in Public Management from the George Washington University. I have been employed as Assistant Superintendent of the Division of K-12 Systems and Support since September 2019. I am an education leader in the District of Columbia, having previously served as a master teacher, local education agency leader, and statewide assessment developer.

2. As the Assistant Superintendent of Division of Systems and Supports, K-12 (SSK12), I manage a diverse portfolio of work streams in K-12, overseeing all K-12 federal education programs and related grants administered in the District of Columbia including the Title programs under the Elementary and Secondary Education Act, and the Individuals with Disabilities in Education Act.

3. I submit this Declaration in support of the District of Columbia's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department"); and the United States of America regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through OSSE personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the Office of the State Superintendent of Education and public schools in the District of Columbia.

4. Historically, the District of Columbia Board of Education was the central policymaking entity on education matters for traditional public schools in DC. The DC School

1

Reform Act of 1995 (SRA) established public charter schools in the District of Columbia, authorized by the DC Public Charter School Board (PSCB), an independent body governed by the SRA. The State Education Office Establishment Act of 2000 created the office of the State Superintendent of Education, a state level education agency serving as the District's liaison to the U.S. Department of Education and working closely with the District's traditional and public charter schools to ensure compliance with local and federal law.  In 2007, the Public Education Reform Amendment Act of 2007 (PERAA) effectuated mayoral control of the District of Columbia public school system, including the District of Columbia Public Schools (DCPS) and OSSE.  Under the PERAA, DCPS and OSSE are cabinet-level, subordinate agencies under the Mayor.  At the executive level, the Deputy Mayor for Education (DME) provides additional oversight and partnership for the education sector by working closely with DCPS, PCSB and OSSE to promote equity and implement District-wide education program goals.

     5.     OSSE is the state education agency (SEA) for the District of Columbia charged with raising the quality of education for all DC residents. As DC's SEA, OSSE works urgently and purposefully, in partnership with education and related systems, to sustain, accelerate, and deepen progress for DC students.  OSSE's vision is to close the achievement gap and ensure people of all ages and backgrounds are prepared to succeed in school and in life.  OSSE's functions include: overseeing all federal education programs and related grants administered in the District of Columbia; developing state-level standards aligned with school, college, and workforce readiness expectations; ensuring access to high-quality child care and universal pre-kindergarten for eligible District families; providing resources and support to assist the District's most vulnerable student populations; administering the annual Partnership for Assessment of Readiness for College and Careers (PARCC), the statewide student academic achievement exam; providing regional, door-to-door transportation to school for District children with special needs; awarding higher education financial assistance to eligible District students at public and private colleges and universities in DC and across the country; increasing health and physical education awareness as well as ensuring access to free meals year-round; providing common, comparable information for families and educators about all public schools in the District of Columbia through the DC School Report Card.

2

6.      The FY 2020 budget for DCPS is $918 million.  The FY 2020 budget for public charter schools is $905 million.  School funding starts with a base amount per student, which varies by grade.  Schools receive additional resources for students who are English Language Learners, special education students, or students at risk of academic failure.  The school funding formula— known as the Uniform Per Student Funding Formula (UPSFF)—applies both to DCPS and public charter schools.

7.      The District of Columbia has 67 local education agencies (LEAs), including the DCPS and 66 public charter LEAs serving 93,708 students in 240 schools.  17 percent of students receive specialized education services; 11 percent of students receive English learner services; and 52.8 percent of students attend DCPS.  DCPS served approximately 47,100 pre-kindergarten to grade 12 students across 108 schools.  About half of D.C.'s public school students were considered to be "at-risk" for academic failure (a local statutory designation covering students receiving public benefits, experiencing homelessness, being in the foster care system, or being over-age in high school).

8.      Title I is the largest source of federal funding for public education.  Schools receive Title I funds as part of the Elementary and Secondary Education Act, as amended by Every Student Succeeds Act (ESSA).  Title I funds are used solely to help ensure that children, regardless of family income, can acquire an equitable and quality education that will allow students to become academically proficient.  A DCPS school is eligible to become a Title I School-wide Program if 40% or more of the students qualify for free or reduced lunch.  Eligible schools are permitted to use Title I, Part A funds in combination with state and local resources and other federal education program funds to enhance the educational program of the school and raise the academic achievement of all students.  A DCPS school is eligible to become a Title I Targeted Assistance Program if 35-40% of the students qualify for free or reduced lunch.  The term "targeted assistance" means that services are provided to a select group of children, identified as academically failing or most at risk of failing, rather than to all students for overall school improvement.  Schools with fewer than 35% of students eligible for free or reduced lunch

3

1   are considered Non-Title I.  DCPS has 87 Title I Schools (86 schoolwide and 1 Targeted

2   Assistance) and 26 Non-Title I Schools.

3        9.      The District of Columbia is a unique jurisdiction due to its political status as a

4   District as opposed to a state.  In terms of its relationship with the U.S. Department of Education,

5   DC is a state but unlike most other states, DC only has one LEA that has an obligation to provide

6   equitable services to private schools, as the school reform act exempts public charter schools from

7   this requirement.

8        10.     DC received $45,198,598.00 of Title I-A funds received for 2019-20 school year.

9   43 LEAs in DC received Title I-A funds in school year 2019-20 (with 79,587 K-12 students at

10  those schools, including 52,232 low-income K-12 students).

11       11.     For the 2020 school year, there were 108 private schools in Washington, District

12  of Columbia, serving 19,305 students.

13                 **Effects of the COVID-19 Pandemic on Education in the District of Columbia**

14       12.     The COVID-19 pandemic has drastically impacted K-12 education in the District

15  of Columbia.

16       13.     Due to the COVID-19 pandemic, OSSE has effectuated remote operations, with a

17  majority of staff moving to telework, as schools also shifted to distance learning.  OSSE has

18  worked closely with DCPS, PSCB, and DME to engage in robust stakeholder engagement to

19  ensure continued public education service delivery, even in the remote learning environment,

20  including promulgating emergency regulations, developing policy guidance, and establishing new

21  health and safety requirements in response to the public health emergency.

22       14.     The COVID-19 pandemic has had a significant impact on K-12 schools in DC.

23  School buildings were closed and transportation services discontinued.  DCPS deployed distance

24  learning, and DC public charter schools followed suit.  OSSE waived the requirements for in-seat

25  attendance for the 2019-20 school year by requiring schools to submit distance learning plans that

26  outlined how schools intended to provide for students' educational needs in a remote learning

27  environment, including serving students who may be experiencing challenges with access to

28  technology, students with disabilities, English language learners and other vulnerable populations.

4

15.     OSSE is working closely with the DME, DCPS and the charter sector on developing policies and plans to support the safe re-opening of schools, with a focus on recovery of learning loss, which poses a significant risk to vulnerable student populations.  OSSE has issued guiding principles for continuous education that will provide LEAs with resources to create a coherent academic foundation within their continuous education model in order to uphold existing academic standards across all grade levels and core content areas while ensuring continuous use of rigorous curricula and ongoing assessment of student progress.

16.     Due to the economic impact of the pandemic, many of the risk factors experienced by students and families (employment, poverty, homelessness, etc.) have increased.  As of July 6, 2020, DC has 44,312 at risk students, which is nearly a 4% increase since April 6, 2020.  This means that many DCPS students are more vulnerable than ever and any funding intended to support these students is critical to support their educational stability and success and should be made available without restriction.

**CARES Act Funds Received by District of Columbia for K-12 Education**

17.     In order to receive the ESSER funds designated for the District of Columbia and as required by the Department, the Office of the State Superintendent of Education executed a Certification and Agreement form and submitted it to the Department on May 6, 2020.[1]  A true and correct copy of the Certification and Agreement completed by OSSE and submitted to the Department is attached hereto as Exhibit A.

18.     Within this Certification and Agreement, the Office of the State Superintendent of Education agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

---

[1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, *available at* https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

. . .

4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

. . .

5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

[Ex. A at pp. 1-2.].

19.     At the time that OSSE executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule.  Accordingly, OSSE was unaware that the Department would subsequently issue rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

20.     The Department distributed $42,006,354.00. from the ESSER Fund to OSSE on May 7, 2020.

21.     Of the ESSER funds received by OSSE, 10% is available for the state to award at its discretion, based on locally determined needs. For D.C., this is $4,200,635.40. OSSE intends to use 9.95% of these funds contractual needs to be determined in the 2020-21 school year to support recovery learning in accordance with OSSE's principles for continuous education. The remainder, a 0.05% administrative set aside permitted by the CARES Act, will be used for data systems and informational technology infrastructure development.

22.     OSSE provided all eligible LEAs with preliminary CARES-ESSER allocations by May 14, 2020.  DCPS is the only DC LEA subject to equitable services.  DCPS's preliminary allocation is $21,749,742.49.  On July 9, 2020, OSSE awarded DCPS 30 percent of its total award, $6,524,922.75.  Later this summer, OSSE will provide LEAs with final allocations based

6

1   on updates for new and expanding charter schools.  LEAs will complete an application later this

2   summer for FY2021 funds and then in summer 2021 for FY2022 funds, if applicable.

3       23.     Using the proportional share calculation set forth in Section 1117 of the

4   Elementary and Secondary Education Act (ESEA), the DCPS would reserve $1,435,483 in

5   ESSER funds to provide equitable services to private school students.

6       24.     However, using the proportional share calculation set forth in the Department's

7   Guidance Document and in Option #2 in the Rule, DCPS would reserve $5,002,440.77 in ESSER

8   funds to provide equitable services to private school students.  Thus, under the Department's

9   preferred proportional share calculation, private school students in DC would have access to an

10  additional $3,566,957.77 and public schools would lose this same amount of funds.

11              **The Department's Rule Significantly Harms the District of Columbia**

12      25.     COVID-19 places unprecedented operational and fiscal strain on DCPS, and an

13  effective government response that prioritizes student health and safety, as well as maintains our

14  academic gains, is required.  The $3.6M loss of funding exacerbates that problem at a time when

15  there is a growing number of at-risk students who are in need of additional educational,

16  technological, and social/emotional supports.  This will require increased resources, including

17  funding, being directed toward programs supporting vulnerable students and families in the

18  District.  This loss of funding due to the Department's proposed rule will significantly reduce

19  DCPS's ability to adequately serve these students.  Even if DCPS followed Option #1 (Title I-

20  schools only Option) in proportioning the CARES Act funds for equitable services, DC will be

21  required to provide significant funding to the 26 non-Title I schools in District of Columbia that

22  were expecting to receive CARES Act funds.  In addition, the District would have to identify

23  local funding to Title I schools impacted by the pandemic that are not allowed to use the CARES

24  Act funds to supplant their budget.

25      26.     This increase in funding for public schools will be required immediately.  As DC

26  remains in the throes of the pandemic, public schools remain desperate for funding as they

27  continue to transition to remote learning and prepare for next school year.  Policies and

28  procedures must be developed for remote learning; teachers must be trained to use remote

7

learning techniques; school buildings must be thoroughly sanitized, protective equipment must be procured, and physical changes to school buildings must be implemented.  The costs of reacting to this pandemic are drastic for public schools and without the funds the CARES Act was intended to provide, OSSE must immediately assist LEAs to adjust to the new realities presented by the pandemic.

27.     Beyond the additional funding that the District will be required to expend in lieu of the designated CARES Act funds, the Department's Guidance Document and Rule have imposed signification administrative burdens on OSSE directly.

28.     OSSE staff have collectively spent hundreds of hours navigating communications, discussing programmatic effects, considering legal implications and participating in inter-agency engagement regarding CARES Act funding, and the confusing and shifting equitable services guidance in particular.  DCPS has looked to OSSE for clarification and guidance and OSSE SSK-12 leadership has coordinated closely with the Office of the General Counsel to develop a rational and legally defensible position that could be communicated to DCPS and discussed with DCPS, DME and other education stakeholders.

29.     Staff time is a limited, non-renewable resource particularly in the face of staff shortages due to the hiring freeze imposed because of the pandemic-related budget shortfalls.  Thus, the hours of OSSE staff time that has been dedicated to navigating the equitable services issue thus far has diverted this precious resource from other pandemic-related challenges including developing polices for childcare, issuing school re-opening guidance, and finalizing emergency regulations for other subject matter areas.

30.     As the SEA for the District of Columbia, OSSE is responsible for the distribution and oversight of state-administered federal education funds.  As such, OSSE is responsible for providing sub-grantees with clear guidance, policies, and technical assistance related to the local and federal statutes, regulations, and non-regulatory guidance governing its federal education funds.

31.     As the oversight agency for federal education programs, OSSE uses a risk-based monitoring process to ensure that LEAs or other sub-recipients meet the requirements of federal

8

and local laws and regulations, as applicable and in alignment with OSSE's Sub-recipient Monitoring Policy.  Each year, OSSE conducts on-site and desktop compliance monitoring for a select group of sub-recipients, based on a calculation of risk as aligned with OSSE's Sub-recipient Monitoring Policy.  This process includes record reviews, document reviews, and interviews which are intended to identify any noncompliance, assess progress toward federal and local targets, and provide recommendations intended to support continuous improvement. OSSE's risk-based monitoring takes two forms: 1) on-site monitoring and 2) desktop monitoring. OSSE's monitoring of Title I, Part A includes monitoring for the provision of equitable services, which involves collecting evidence that DCPS consulted with appropriate private school officials during the design and development of the program to deliver equitable services on topics including: (A) how the children's needs will be identified; (B) what services will be offered; (C) how, where, and by whom the services will be provided; (D) how the services will be academically assessed and how the results of that assessment will be used to improve those services; (E) the size and scope of the equitable services to be provided to the eligible private school children, and the proportion of funds that is allocated under subsection (a)(4) for such services; (F) the method or sources of data that are used under subsection (c) and section 1113(c)(1) of Title I, Part A to determine the number of children from low-income families in participating school attendance areas who attend private schools; (G) how and when the agency will make decisions about the delivery of services to such children, including a thorough consideration and analysis of the views of the private school officials on the provision of services through a contract with potential third-party providers; and (H) how, if the agency disagrees with the views of the private school officials on the provision of services through a contract, the local educational agency will provide in writing to such private school officials an analysis of the reasons why the local educational agency has chosen not to use a contractor.  In addition to compliance, OSSE's monitoring process is designed to provide sub-grantees with meaningful feedback to improve the quality and implementation of their educational programs and to ultimately raise student achievement in the District of Columbia.

32.     OSSE will be required to develop and deploy a monitoring tool for CARES Act funding that will also include equitable services similar to the Title I, Part A monitoring protocol. Because a greater number of private schools are eligible for funding under the Department's rule than would be otherwise, DCPS will be obligated to engage in increased consultation with private schools that have not participated in Title I, Part A, and OSSE will be required to monitor DCPS for compliance.

33.     Finally, the Department's Guidance Document and Rule place OSSE in legal jeopardy.  OSSE was required to certify in its ESSER Fund application that the SEAs and the LEAs will comply with the equitable service provision of the CARES Act (§ 18005) and "any other applicable law or regulation."  (Ex. A at p. 1.)  Because the Guidance Document and the Rule require LEAs to calculate the proportional share for equitable services and determine eligibility of private school students for equitable services contrary to the proportional share calculation and eligibility requirements in the CARES Act, OSSE and DCPS cannot satisfy both the Rule and the CARES Act.  Accordingly, the Department's Rule forces OSSE to violate Section 18005 of the CARES Act, placing OSSE in breach of the certification in the Certification and Agreement and subjecting OSSE  to "liability under the False Claims Act, . . . [and the] OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement)." (Ex. A at p. 1.)

34.     As DCPS needs to use the ESSER funds as soon as possible to assist with the numerous pandemic-related challenges, this legal jeopardy will impact OSSE immediately.

**The Department's Rule Significantly Harms the District of Columbia's K-12 Students**

35.     Due to the confusion created by the Department's interpretation of the equitable services requirement, DCPS could not immediately plan for CARES-ESSER funds or submit its application for FY20 funding, which creates pressure and risk for spending funds in fiscal year 2020.

36.     The Department's Guidance and Rule will result in less funding being distributed to DCPS.

10

37.     If LEAs in the District of Columbia calculate the proportional share of CARES Act funds for private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving CARES Act funds will receive no funds.  In the District of Columbia, there are approximately 26 non-Title I schools in LEAs that are eligible to receive CARES Act funds that would not receive any funding.  Like all public schools in DC, these schools are equally impacted by the COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them through the pandemic.  In addition, there are approximately 87 Title I DCPS schools that would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule.  This would significantly impact the Title I schools as many are in desperate need of additional funding to cope with the pandemic, and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

38.     If DCPS is forced to follow Option #2 in the Rule for proportioning CARES Act funds, approximately $3,566,957.77 in ESSER funds would be diverted from public school funds in order to provide equitable services to all private school students.  If DCPS distribute the ESSER moneys in the same manner that Title I-A funds are usually distributed for equitable services based on low-income private school students, as the plain language of the CARES Act requires, then only $1,435,483 will be distributed for equitable services to eligible private school students.  Thus, if the Department's Rule stands and LEAs used Option #2 to proportion their CARES Act funds, a total of $3,566,957.77 in ESSER moneys will be diverted from low-income public schools to private school students that are not qualified for Title I-A funds - 12% of the total ESSER moneys that DC received.

39.     Regardless of how LEAs proportion the CARES Act funds in the District of Columbia, the Rule requires that all private school students receive equitable services.  In DC, during the 2019-2020 school year, approximately 2,142 private school students were eligible to receive equitable services under Title I-A as they were at-risk students within a LEA receiving Title I-A funds.  As the Rule requires all private school students receiving equitable services, the approximately 2,142 private

11

school students who received equitable services under Title I-A last year will receive less services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __15th__ day of July, 2020, at ___Washington, DC_____

_____
Nikki Stewart
Assistant Superintendent
Division of Systems and Supports, K-12
Office of the State Superintendent of Education
District of Columbia

12

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
# for Funding under the
# Education Stabilization Fund Program
# Elementary and Secondary School Emergency Relief
# Fund (ESSER Fund)

## CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpos**e

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

## ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State: District of Columbia

CFDA Number: 84.425D

Legal Name: Office of the State Superintendent of

DUNS Number:   603893657

Chief State School Officer:

Mailing Address:

Hanseul Kang

1050 First St. NE, Washington DC 20002

---

State Contact for Elementary and Secondary School Emergency Relief Fund: Nikki Stewart

Position and Office:  Assistant Superintendent, Systems and Supports, K-12

Mailing Address:   1050 First St. NE, Washington, DC 20002

Telephone:   (202) 899-6142

Email address:   nikki.stewart@dc.gov

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):    Telephone:

Hanseul Kang    (202) 355-8088

Signature of Chief State School Officer or Authorized Representative:    Date:

*Hanseul Kang*    05/06/2020

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

2

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: *Hanseul Kang* | Date: 05/06/2020 |

3

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1.  Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
    -   How the LEA will determine its most important educational needs as a result of COVID-19.
    -   The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
    -   The extent to which the LEA intends to use ESSER funds to promote remote learning.
    -   How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

    The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

    We are developing a streamlined application to allow LEAs to access funds quickly and developing coordinated resources to support LEAs in planning for their current needs as well as projected needs for the 2020-21 school year and into the future.

    In our ESSER application, we will ask LEAs to describe how they plan to spend ESSER funds and categorize their budgets to allow for tracking and reporting based on state priorities and allowable costs (e.g., distance learning, recovery learning, support for students with disabilities, wrap-around services, organizational capacity building, infrastructure, academic interventions, talent).

    We will also collect assurances that LEAs will comply with all applicable federal requirements, including allowable uses of funds, reporting, financial management, equitable services, and recordkeeping requirements.

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

OSSE is currently collecting plans from LEAs that describe their approaches to distance learning implementation during school closures during the 2019-20 school year. These plans serve as an important input into assessing needs, including those around instructional continuity, supporting special populations, and continuing to support students after the emergency. OSSE plans to use these plans and continue to engage stakeholders to finalize how best to deploy our ESSER state-level activities funds given the emergency needs in in our state.

Based on engagement to date, these plans may include additional strategic investments to pilot innovative models to maximize teaching and learning in this new and challenging environment; support educator effectiveness; provide instructional supports to students with disabilities; partner with families and communities; and create and manage secure technology infrastructure for learning outside the school building.

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: *Hanseul Kang* | Date: 05/06/2020 |
|---|---|

**Appendix A: Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations**

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.


GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.


ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

# APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

# EXHIBIT 5

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14  **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |
| 15                                   Plaintiffs, | |
| 16                     v. | **DECLARATION OF WANELLE KANESHIRO-ERDMANN** |
| 17 | |
| 18  **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| 19 | |
| 20                              Defendants. | |
| 21 | |
| 22 | |

23

24

25

26

27

28

## DECLARATION OF WANELLE KANESHIRO-ERDMANN

I, Wanelle Kaneshiro-Erdmann, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am an official with the Hawaii Department of Education (HIDOE) and my duties are with its Policy, Innovation, Planning and Evaluation Branch, Office of Strategy Innovation and Performance.  I have been employed with the HIDOE in this current position since June 10, 2019.

2.      My duties include ensuring compliance with federal and state laws involving the HIDOE.

3.      I submit this Declaration in support of the State of Hawaii's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule").  I have compiled the information in the statements set forth below through personal knowledge, through HIDOE personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided to and/or reviewed by me.  I have also familiarized myself with the Rule in order to understand its immediate impact on HIDOE and public schools in Hawaii.

4.      The HIDOE is an executive branch agency of the State of Hawaii.  Under article X, section 1 of the Hawaii Constitution and chapter 302A of the Hawaii Revised Statutes, the HIDOE, under the supervision of its superintendent, Dr. Christina M. Kishimoto, has jurisdiction over the internal organization, operation, and management of the public school system, as provided by law, and administers programs of education and public instruction throughout the State, including education at the preschool, primary, and secondary school levels.  Article X, section 3 of the Hawaii Constitution provides that a board of education is established to have powers, as provided by law, to formulate statewide educational policy and appoint the superintendent of education as the chief executive officer of the public school system.

1

5.      The HIDOE is a single statewide system of education that performs the functions of the State Educational Agency (SEA) and the Local Educational Agency (LEA) and is responsible for managing, regulating, supporting and overseeing the provision of student educational programs, support programs, the provision of guidance, the applying for and managing of deferral grants, and the overall day-to-day activities of its public schools.  The HIDOE manages a statewide public school system of over 22,000 employees, with responsibility for recruiting, hiring, training and providing professional development of its staff to meet the needs of its public school students.   It is involved in all phases of operations from managing the HIDOE's budget, seeking federal and state appropriations, compliance with all grants and other federal and state requirements.

6.      The state funding of K-12 education for the State of Hawaii is accomplished by annual appropriations made by the Hawaii State Legislature.  For fiscal year 2019-2020, the State appropriated 1.7 billion dollars to the HIDOE.

7.      The HIDOE consists of 294 public schools, organized into 15 complex areas and the Hawaii State Public Charter School Commission.  There are approximately 180,000 students served by the HIDOE.

8.      The HIDOE constitutes one singular SEA/LEA and receives Title I-A funds for 62,451 students and 181 schools for fiscal year 2019-2020.  For school year 2019-2020 that amount was $51,229,565.

9.      There are 120 private schools within Title I-A LEAs.

10.      The COVID-19 pandemic has drastically impacted K-12 education in Hawaii.  It has caused the premature closure of the 2019-2020 school year and the emergency provision of alternative educational services.  It has required changes to the educational environment in response to the Governor's emergency proclamations requiring stay at home-work at home requirements.  Providing distance learning to all students required expenditures of resources to address students who do not have Internet and other telecommunication capabilities.  Planning for the reopening of schools on August 4, 2020, includes modification of teaching modalities to include face-to-face, blended and online (virtual) education.

2

11.     The COVID-19 pandemic has required the diversion of resources to support statewide remote distance learning, an unanticipated additional cost.

12.     As a result of the pandemic, all schools were closed on March 30, 2020.

13.     Because HIDOE is a unitary SEA and LEA, the impacts mentioned above to the SEA affected the HIDOE as a LEA, similarly.

14.     The HIDOE as the SEA, provided transition services to its LEA by providing equipment, training, professional development, and continues to provide meals to all students, public and private, during this pandemic.

15.     HIDOE is expecting a budget shortfall of state general fund and a probable restriction of funds imposed by the Governor of Hawaii.

**CARES Act Funds Received by HIDOE For K-12 Education**

A. Elementary and Secondary School Emergency Relief (ESSER) Funds

16.     In order to receive the ESSER funds designated for Hawaii and as required by the Department, HIDOE executed a Certification and Agreement form and submitted it to the Department on May 13, 2020.[1]   A true and correct copy of the Certification and Agreement completed by HIDOE and submitted to the Department is attached hereto as Exhibit A.

17.     Within this Certification and Agreement, HIDOE agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.
>
> . . .
>
> 4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

---

[1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, *available at* https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

. . .

> 5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

[Ex. A at pp. 1-2.].

18.     At the time that HIDOE executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule.  Accordingly, HIDOE was unaware that the Department would subsequently issue rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

19.     The Department distributed $43,385,229 from the ESSER Fund to HIDOE on May 14, 2020.

20.     Of the ESSER funds received by HIDOE, HIDOE will not be reserving funds for administrative costs.

21.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), Hawaii would reserve $1,555,931 in ESSER funds to provide equitable services to private school students.

22.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, Hawaii would reserve $2,003,428 in ESSER funds to provide equitable services to private school students.  Thus, under the Department's preferred proportional share calculation, private school students in Hawaii would have access to an additional $447,797 and public schools would lose this same amount of funds.

B.  <u>Governor's Emergency Education Relief (GEER) Funds</u>

23.     Hawaii received $9,993,387 from the GEER Fund on May 5, 2020.

24.     To this date, HIDOE has not received any GEER funds.

Declaration of Wanelle Kaneshiro-Erdmann (3:20-cv-04478-SK)

**The Department's Rule Significantly Harms HIDOE**

25.     For every dollar that is diverted from public schools as a result of the Department's Guidance Document and Rule, HIDOE will be required to backfill these dollars in the HIDOE's budget.  At a time when Hawaii faces a $100.2 million deficit in its education budget as a result of the pandemic, HIDOE will be required to find $100.2 million to fill the budgets of public schools that the CARES Act funds were supposed to fill.  This increase in funding for public schools will be required immediately.  As Hawaii remains in the throes of the pandemic, and its main revenue stream, tourism, closed, public schools remain desperate for funding as they continue to prepare for the opening of schools.  Policies and procedures must be developed for multiple learning options; teachers must be trained to use remote learning techniques; and school buildings must be inspected and sanitized.   All of these initiatives require moneys not available by present appropriations.  The costs of reacting to this pandemic are drastic for public schools and without the funds the CARES Act was intended to provide the HIDOE will not be able to provide appropriate educational services for its students.

26.     HIDOE will be required to provide significant funding to the 113 non-Title I schools in Hawaii that were expecting to receive CARES act funds. In addition, the HIDOE will be required to provide significant funding to Title I schools that are not allowed to use the CARES Act funds to supplant their budgets, which have been slashed due to the pandemic.

27.     The Department's Guidance Document and Rule places the HIDOE in legal jeopardy.  HIDOE was required to certify in its ESSER Fund application that the HIDOE, as the States SEA and LEA will comply with the equitable service provision of the CARES Act ( Section 18005) and "any other applicable law or regulation." (Ex. A at pg. 1.)  Because the Guidance Document and the Rule require LEAs to calculate the proportional share for equitable services and determine eligibility of private school student for equitable services contrary to the proportional share calculation and eligibility requirements  in the CARES Act, HIDOE, as the SEA and LEA, cannot satisfy both the Rule and the CARES Ac.  Accordingly the Department's Rule forces the HIDOE to violate Section 18005 of the CARES Act, placing the HIDOE in breach of the certification in the Certification and Agreement and subjecting the HIDOE to

5

"liability under the False Claims Act and the OMB Guidelines to agencies on Governmentwide Debarment and Suspension (Nonprocurement)." (Ex. A at p. 1.)

28.     If HIDOE calculate the proportional share of CARES Act funds for private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving CARES Act funds will receive no funds.  In Hawaii, there are approximately 113 non-Title I schools in the LEA that are eligible to receive CARES Act funds that would not receive any funding.  Like all schools in Hawaii, these schools are equally impacted by the COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them through the pandemic.  In addition, there are approximately 164 Title I schools that would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule.  This would significantly impact the Title I schools as many are in desperate need of additional funding to cope with the pandemic and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

29.     Regardless of how LEAs proportion the CARES Act funds in Hawaii, the Rule requires that all private school students receive equitable services.  In Hawaii, during the 2019-2020 school year, approximately 2,323 private school students were eligible to receive equitable services under Title I-A as they were at-risk students within the LEA receiving Title I-A funds.  As the Rule requires all private school students receiving equitable services, the approximately 2,323 private school students received equitable services under Title I-A last year will receive less services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

30.     HIDOE has received a letter from the Hawaii Association of Independent Schools demanding their fair share of the CARES Act funds.

31.     Beyond the additional funding that Hawaii will be required to expend in lieu of the designated CARES Act funds, the Department's Guidance Document and Rule have imposed significant unbudgeted administrative burdens on HIDOE directly.

**The Department's Rule Significantly Harms Hawaii's K-12 Students**

32.    The Department's Guidance and Rule will result in less funding being distributed to public K-12 schools in Hawaii.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __16__ day of July, 2020

Wanelle Kaneshiro-Erdmann
Director

7

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
## for Funding under the
## Education Stabilization Fund Program
## Elementary and Secondary School Emergency Relief
## Fund (ESSER Fund)

### CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

EXHIBIT A

# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

iii

# ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State: Hawaii

CFDA Number: 84.425D

Legal Name: Hawaii State Department of Education

DUNS Number: 809935513

Chief State School Officer:

Dr. Christina M. Kishimoto

Mailing Address:

P.O. Box 2360; Honolulu, HI 96804

---

State Contact for Elementary and Secondary School Emergency Relief Fund: Brian Hallett

Position and Office: Interim Assistant Superintendent and Chief Financial Officer, Office of Fiscal Services

| | |
|---|---|
| Mailing Address: | P.O. Box 2360<br>Honolulu, HI 96804 |
| Telephone: | (808) 586-3737 |
| Email address: | brian.hallett@k12.hi.us |

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):

Dr. Christina M. Kishimoto

Telephone:

(808) 784-6161

Signature of Chief State School Officer or Authorized Representative:

Date:

05/13/2020

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act. In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8. The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9. The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: |
|---|---|
| | 05/13/2020 |

3

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
   - How the LEA will determine its most important educational needs as a result of COVID-19.
   - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
   - The extent to which the LEA intends to use ESSER funds to promote remote learning.
   - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

---

As a unitary State Educational Agency (SEA) and Local Educational Agency (LEA), the Hawaii State Department of Education (HIDOE) intends to use the grant received under the Elementary and Secondary School Emergency Relief (ESSER) Fund to continue to provide educational services to all public and public charter school students statewide through targeted strategies that will mitigate the disruptive impact of the COVID-19 pandemic on educational programming and equitable access.

As an island state, one of our greatest challenges during the current COVID-19 pandemic has been providing enhanced learning activities for all students, particularly those who belong to a disadvantaged population or live in a remote area. HIDOE will leverage the funds received through this grant to ensure equity in access. HIDOE will provide (1) a robust statewide Summer 2020 learning program with learning opportunities for remediation, intervention, credit advancement, credit recovery, and access to early college credits; (2) an online learning management system statewide for blended and online learning, utilizing our recently-adopted Google suite to serve as an instructional tool for educators to employ a breadth of online courses that integrates opportunities for project-based learning, collaboration, and demonstrations for students whether schools continue to be closed or are reopened for in-class instruction; (3) devices and computer-based programs appropriate for our economically-disadvantaged students, Native Hawaiian students, English learners, students who are homeless, and students with disabilities (including assistive technology, adaptive equipment, and programs in the Hawaiian language); (4) better internet access to students in rural and remote areas; (5) training for parents and caregivers on how to support their child with distance learning; (6) professional development for educators on differentiated instructional strategies, including project-based designs through effective uses of technology, using asynchronous and synchronous distance learning approaches for educators and students; and (7) an internship program to allow high school students whose Career and Technical Education (CTE) coursework was disrupted due to the school closure an opportunity to obtain and refine their skills in a work-based setting to earn CTE and other applied learning career readiness credits and, for students who graduate on time but need career advice, to transition into college or the workplace.

This grant will also allow HIDOE to provide outreach and deliver services, such as mental health and other wraparound services, to our vulnerable students during the school closures to ensure these students are able to participate in the educational activities provided.

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

As an SEA-LEA, HIDOE will use the funds received from the ESSER Fund to support statewide efforts to provide effective distance learning programs and to ensure access to education for all students enrolled in our public and public charter schools.

This grant will support the reopening of schools and HIDOE's transition to School Year 2020-2021, including the assessment of students as they return. HIDOE's intention is to protect the 180 days of instruction for School Year 2020-2021 by establishing the programs and infrastructure needed to provide uninterrupted educational services.

Finally, this grant will support HIDOE's efforts to coordinate with other state agencies, including the Hawaii State Department of Health and the Hawaii Emergency Management Agency, to ensure the health and safety of HIDOE's students, employees, and communities. This includes ensuring HIDOE has adequate cleaning supplies, personal protective equipment, and other materials and supplies needed to comply with the Centers for Disease Control and Prevention guidance as HIDOE prepares for the reopening of school facilities.

HIDOE will continue to provide equitable services to students and staff in non-public schools.

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date:<br>05/13/2020 |
|---|---|

6

**Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations**

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under "Education Stabilization Fund", shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms "elementary education" and "secondary education" have the meaning given such terms under State law;

(2) the term "institution of higher education" has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term "Secretary" means the Secretary of Education;

(4) the term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term "cost of attendance" has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term "Non-public school" means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term "public school" means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B: STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

---

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

12

**DAVID Y. IGE**
GOVERNOR



**DR. CHRISTINA M. KISHIMOTO**
SUPERINTENDENT

**STATE OF HAWAI'I**
**DEPARTMENT OF EDUCATION**
P.O. BOX 2360
HONOLULU, HAWAI'I 96804

OFFICE OF THE SUPERINTENDENT

May 13, 2020

The Honorable Frank T. Brogan
Assistant Secretary for Elementary and Secondary Education
Office of Elementary and Secondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Dear Assistant Secretary Brogan:

Thank you for the assistance from the United States Department of Education during this unprecedented national crisis caused by the Coronavirus Disease 2019 (COVID-19).

Attached you will find Hawaii's Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund.

Thank you very much for your consideration.

Sincerely,

Dr. Christina M. Kishimoto
Superintendent

CMK:wk
Attachment:   Certification and Agreement for Funding under the Education Stabilization
              Fund Program Elementary and Secondary School Emergency Relief Fund

AN AFFIRMATIVE ACTION AND EQUAL OPPORTUNITY EMPLOYER

# EXHIBIT 6

1   XAVIER BECERRA
Attorney General of California
2   MICHAEL NEWMAN
Senior Assistant Attorney General
3   SARAH E. BELTON
Supervising Deputy Attorney General
4   REBEKAH A. FRETZ
JAMES F. ZAHRADKA II
5   GARRETT LINDSEY (SBN 293456)
Deputy Attorneys General
6     300 South Spring Street, Suite 1702
Los Angeles, CA 90013
7     Telephone: (213) 269-6402
E-mail:  Garrett.Lindsey@doj.ca.gov
8   *Attorneys for Plaintiff State of California*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14   **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |
| 15 | |
| Plaintiffs, | |
| 16 | **DECLARATION OF A. PENDER MAKIN** |
| 17   **v.** | |
| 18   **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of** | |
| 19   **Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| 20 | |
| Defendants. | |
| 21 | |
| 22 | |

23

24

25

26

27

28

## DECLARATION OF A. PENDER MAKIN

I, A. Pender Makin, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Commissioner of Education for the State of Maine.  My office is located at the Maine Department of Education in Augusta, Maine.  My educational background includes a Master's Degree in Education Leadership.  I have been employed as Commissioner since January 2019.  Prior to becoming Commissioner, I served as the Assistant Superintendent of Schools in Brunswick, Maine.  My responsibilities included:  management of federal programs, McKinney-Vento liaison, districtwide emergency preparedness and response planning, budget development, and policy development with the local school board.   From 2003-2015, I served as principal of a regional special education secondary school.

2.      Section 251-A of Title 20-A of the Maine Revised Statutes describes the duties and responsibilities of the Commissioner as follows:

> The commissioner is the chief executive officer of the department [of Education].  In that capacity, the commissioner has primary responsibility for the following:
>
> **1.  Enforcing regulatory requirements.** Enforcing applicable regulatory requirements for school administrative units;
>
> **2.  Providing technical assistance.**  Providing technical assistance to school administrative units; and
>
> **3.  Providing educational leadership.**  Providing educational public leadership for the State.

Among the Commissioner's specific duties, the Commissioner determines the amount of state funding for Maine's school administrative units through the Essential Programs and Services Funding Act, 20-A M.R.S. § 15670 *et seq.*  The Commissioner is responsible for the distribution of funds to Maine's school administrative units (SAUs) and for the oversight of the federal grants that the Department receives.

3.      I submit this Declaration in support of the State of Maine's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States

1  Department of Education (the "Department") regarding the recently issued Rule entitled

2  *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg.

3  39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule").  I have compiled the

4  information in the statements set forth below through personal knowledge, through Maine

5  Department of Education personnel who have assisted me in gathering this information from our

6  institution, and on the basis of documents that have been provided to and/or reviewed by me.  I

7  have also familiarized myself with the Rule in order to understand its immediate impact on the

8  Maine Department of Education and public schools in Maine.

9  **Public Education in Maine**

10        4.        The Constitution of Maine states, in pertinent part:

11              A general diffusion of the advantages of education being essential to the
                preservation of the rights and liberties of the people:  to promote this
12              important object, the Legislature are authorized, and it shall be their duty to
                require, the several towns to make suitable provision, at their own expense,
13              for the support and maintenance of public schools; . . .

14

15  Me. Const. Art. VIII, pt.1, 1.

16        5.        "It is the intent of the Legislature that every person within the age limitations

17  prescribed by state statutes shall be provided an opportunity to receive the benefits of a free

18  public education."  20-A M.R.S. § 2(1).

19        6.        The purpose of the Department of Education is to

20              **1.  Supervise public education.**  Supervise, guide and plan for a
                coordinated system of public education for all citizens of the State . . . ;
21

22              **2. Interrelation with other programs.**  Interrelate public education with
                other social, economic, physical and governmental activities, programs and
23              services; and

24                                            . . .

25              **4. Advancement of education.**  Encourage and stimulate public interest
                in the advancement of education.
26

27        7.        The Department of Education's role includes approving, regulating, and

28  overseeing public schools as well as certain private schools, developing state curriculum

standards, certifying educators, providing guidance and technical assistance to school administrative units, applying for and managing federal grants, overseeing the implementation of federal educational programs, collecting and analyzing data, administering student support programs, and distributing state education funding.

8.     Despite the constitutional delegation of funding responsibility to the "several towns," and separate from any federal funding, the State of Maine provides more than $1.2 billion each year to its 265 school administrative units (including charter schools) (SAUs) and two state magnet schools. The 599 school buildings in these SAUs educate 175,621 students each year.

9.     During the 2019-2020 school year, $49,616,687 of Title I-A funds were allocated to 192 LEAs in Maine.  There were 290 Title I schools.

10.     During the 2019-2020 school year, 19 private schools within Title I-A LEAs were eligible for Title I-A equitable services in the amount of $267,392.

**Effects of the COVID-19 Pandemic on Education in Maine**

11.     The COVID-19 pandemic has drastically impacted K-12 education in Maine.

12.     The Maine Department of Education immediately mobilized to provide technical assistance and professional development to educators across Maine to help support the shift to remote learning beginning the week of March 16, 2020 in all the content areas of Maine's Learning Results as well as in trauma informed instruction.  The Department deployed our School Safety Center to coordinate emergency supports.

13.     Maine's SAUs have been providing remote instruction since March.  The Department has developed the Maine Schools Reintegration Framework to provide guidance as schools prepare for the 2020-2021 school year.  This was a collaborative partnership with education leaders across the state, is a work in progress and will be refined as the group gains a sense of the data metrics that will need to be examined by school leaders in each of the regions of the state.  The Department foresees SAUs using multiple methods of instruction in the fall, including in-person instruction and remote instruction. The ultimate decisions about what methods of instruction will be used will be made locally by each SAU.

3

14.     Maine SAUs continue to examine and explore innovative approaches to supporting students eligible to receive Title I-A interventions. Due to the rural nature of the State of Maine (more than 64% of Maine students live in rural areas), general best-practice strategies for small and individualized instruction may be limited due to connectivity, accessibility, and capacity of available staff.  Due to concerns surrounding the safety of in-person instruction over the summer, traditional Title I-A summer programs have either transitioned to a remote model, or, as schools prepare for the fall, summer programs have not been implemented. This may further impact "summer slide" and a student's academic performance. This will have a significant impact on instruction in the fall as educators navigate supporting students with increased learning loss as a result of the pandemic and loss of summer programming.

15.     Through stakeholder feedback the Department determined that lack of internet connectivity was the most significant barrier for students to access remote, online learning opportunities during the suspension of classroom-based instruction. With $ 9.2 million in GEER funds, the Department has met the connectivity needs of 84 percent of public schools (23,805 students).   The Department's intent is to address 100% of the needs in the state.  SAUs are applying for ESSER funds at this time and are including supplies for increasing their capacity for distance learning and health and safety measures for in person instruction, not knowing what the school landscape may look like during the next school year.

16.     As the Department looks to the future we realize there are significant COVID-related expenses that will continue to occur:  increased costs for child nutrition staff which are not fully offset by program revenue; unexpected and costly PPE and tools to ensure social distancing for students, staff, and visiting community members; increased costs for professional learning for teachers and supplies for staff members to adapt to new instructional modalities; addressing staffing shortages and the costs for substitutes and long-term substitutes; and additional support for before and aftercare.

17.     As the result of work done by Department staff as well as the Maine Center for Disease Control, and in order to address the many components of the CDC guidance, it is estimated that it will cost an additional $327 million to reopen Maine's public schools.

4

1  **CARES Act Funds Received by Maine for K-12 Education**

2      A. Elementary and Secondary School Emergency Relief (ESSER) Funds

3          18.      In order to receive the ESSER funds designated for Maine and as required by the

4  Department, the Maine Department of Education executed a Certification and Agreement form

5  and submitted it to the Department on April 24, 2020.[1]  A true and correct copy of the

6  Certification and Agreement completed by Maine Department of Education and submitted to the

7  Department is attached hereto as Exhibit A.

8          19.      Within this Certification and Agreement, the Maine Department of Education agreed

9  to the following terms:

10              I acknowledge and agree that the failure to comply with all Assurances and
11              Certifications in this Agreement, all relevant provisions and requirements of
               the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other
12              applicable law or regulation may result in liability under the False Claims
               Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on
13              Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR
               part 180, as adopted and amended as regulations of the Department in 2 CFR
14              part 3485; and 18 USC § 1001, as appropriate.

15              . . .

16
               4. LEAs receiving ESSER funds will provide equitable services to students
17              and teachers in non-public schools as required under 18005 of Division B
               of the CARES Act.
18

19              . . .

20              5. LEA receiving ESSER funds will provide equitable services to students
               and teachers in non-public schools located within the LEA in the same
21              manner as provided under section 1117 of the ESEA, as determined
               through timely and meaningful consultation with representatives of non-
22              public schools.

23              [Ex. A at pp. 1-2.]

24

25

26

27  _____
    [1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education
    Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER
28  Fund), CFDA Number 84.425D, April 24, 2020, *available at*
    https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

20.    At the time that the Maine Department of Education executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule. Accordingly, the Maine Department of Education was unaware that the Department would subsequently issue guidance or rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

21.    The Department distributed 91% of the funds received, or $43,793,319, from the ESSER Fund to the Maine Department of Education on April 29, 2020.

22.    Of the ESSER funds received by the Maine Department of Education, the Maine Department of Education intends to retain $3,941,398 as permitted by the CARES Act to be utilized for administration and State Reserve to be used for the Maine Online Opportunities for Sustained Education (MOOSE).

23.    The Maine Department of Education developed an online electronic application for ESSER funds to be submitted on a rolling basis by the school administrative units. The Department approved the first applications and began distributing the money on June 4, 2020 and the Department's ESSER team is reviewing the applications on a daily basis and approving them as quickly as possible.  Upon approval a GAN is sent to the SAU.

24.    To date, the Maine Department of Education has distributed $11,560,354 to 51 eligible LEAs within Maine which represents 29% of LEAs eligible to receive ESSER funds.

25.    Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), LEAs in Maine would reserve $248,000 in ESSER funds to provide equitable services to private school students.

26.    However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, LEAs in Maine would reserve $ 2.1 million in ESSER funds to provide equitable services to private school students.  Thus, under the Department's preferred proportional share calculation, private school students in Maine would have access to an additional $1,852,000, and public schools would lose this same amount of funds.

6

**The Department's Rule Significantly Harms the Maine Department of Education**

27.     For every dollar that is diverted from public schools as a result of the Department's Guidance Document and Rule, the Maine Department of Education will attempt to backfill these dollars in the SAUs budgets or, at a minimum, identify additional funds to assist all SAUs to ensure they have the appropriate resources in place to provide instruction in the fall.

28.     Even if every LEA in Maine followed Option #1 (Title I-schools only Option) in proportioning the CARES Act funds for equitable services, the Maine Department of Education will attempt to identify and/or provide funding to the 223 non-Title I schools in Maine that were expecting to receive CARES Act funds.  In addition, the Department will attempt to identify or provide funding to Title I schools that are not allowed to use the CARES Act funds to supplant their budgets, which have been slashed due to the pandemic.

29.     This increase in funding for public schools will be required immediately.  As Maine remains in the throes of the pandemic, public schools remain desperate for funding as they continue to transition to remote learning and prepare for the next school year.  Policies and procedures must be developed for remote learning; teachers must be trained to use remote learning techniques; school buildings must be thoroughly sanitized; and additional staff will have to be hired due to limitations on class sizes and to cover for staff who are unable to return to in person instruction or who contract the disease.  The costs of reacting to this pandemic are drastic for public schools and without the funds the CARES Act was intended to provide, the Maine Department of Education must immediately assist Maine's school administrative units to adjust to the new realities presented by the pandemic.

30.     Beyond the additional funding that Maine will be required to expend in lieu of the designated CARES Act funds, the Department's Guidance Document and Rule have imposed signification administrative burdens on the Maine Department of Education.

31.     The Department's ESSER team prepared the electronic application and worked with the software developer to put it online in less than a week.  The team offered three full weeks of daily ESSER Office Hours to articulate the allowable use of these funds and to answer questions, which were then posted as FAQs on the Department's COVID web page.  For the first four weeks

7

1  of this work the Department would estimate that at least four staff members each spent over 40
2  hours per week on this work.  Reviewing applications has taken at least four staff members 10-12
3  hours each, each week.

4        32.     As the Department staff endeavored to consider how to address the equitable
5  services, multiple runs of the scenarios were undertaken by program and data staff, which took
6  time away from other pandemic-related work.

7        33.     The Maine Department of Education staff developed a detailed monitoring Master
8  Protocol on the State and local levels, as well as refining the risk assessment protocols to
9  determine the threshold for desk or onsite monitoring. All of these will need to be modified based
10  on any impacts the Rule will have on these requirements.

11        34.     If Maine's SAUs are forced to follow the Rule/Guidance, the Department's
12  monitoring burden will increase.  Both Option #1 and Option #2 will cause additional schools to
13  be included in the monitoring process, and Option #1 will cause schools that have previously
14  been receivers to be disqualified, requiring a heightened level of review to ensure that only
15  eligible schools participate.  The additional requirements of the Rule and the inclusion of private
16  schools that are unfamiliar with the federal grant requirements will require a greater level of
17  review of compliance documentation relating to reimbursement requests.

18        35.     After the Department of Education provided guidance to the field that school
19  administrative units should follow the language of the CARES Act, and not the Department's
20  Guidance, Maine's Governor, the Commissioner, and the Department of Education all received
21  complaints alleging that the Department and the school administrative units were not acting
22  legally by not following the Guidance.  The Commissioner, Department staff, and the
23  ombudsman under ESSA have had to respond to these complaints.  In addition, after the Rule was
24  announced, a complainant filed a second complaint demanding that the Commissioner follow the
25  Rule, even though the Rule specifically places the decision between Option #1 and Option #2 on
26  the SAUs.

27        36.     Finally, the Department's Guidance Document and Rule place the Maine Department
28  of Education in legal jeopardy.  The Maine Department of Education was required to certify in its

8

1  ESSER Fund application that the SEAs and the LEAs will comply with the equitable service

2  provision of the CARES Act (§ 18005) and "any other applicable law or regulation." (Ex. A at p. 1.)

3  Because the Guidance Document and the Rule require LEAs to calculate the proportional share for

4  equitable services and determine eligibility of private school students for equitable services contrary

5  to the proportional share calculation and eligibility requirements in the CARES Act, the Maine

6  Department of Education (and its LEAs) cannot satisfy both the Rule and the CARES Act.

7  Accordingly, the Department's Rule forces the Maine Department of Education to violate Section

8  18005 of the CARES Act, placing the Maine Department of Education in breach of the certification

9  in the Certification and Agreement and subjecting the Maine Department of Education "liability

10  under the False Claims Act, . . . [and the] OMB Guidelines to agencies on Governmentwide

11  Debarment and Suspension (Nonprocurement)." (Ex. A at p. 1.)

12       37.     As the LEAs in Maine need to use the ESSER funds as soon as possible to assist

13  with the numerous pandemic-related challenges, this legal jeopardy will impact the Maine

14  Department of Education immediately.

15  **The Department's Rule Significantly Harms the Maine's K-12 Students**

16       38.     The Guidance delayed the roll out of the online electronic application for ESSER

17  funds by over two weeks while the ESSER Team conferred with legal counsel and the

18  Commissioner as to the position that the Maine Department of Education would take. This

19  delayed the ability of the school administrative units to be approved for expenditures already

20  incurred as of March 13, 2020. The Rule complicates the application process currently underway

21  and the Department's ability to advise the school administrative units going forward.

22       39.     The Department's Guidance Document and Rule will result in less funding being

23  distributed to public K-12 schools in Maine.

24       40.     If Maine's SAUs calculate the proportional share of CARES Act funds for private

25  school students under Option #1 in the Rule, non-Title I schools in LEAs receiving CARES Act

26  funds will receive no funds. In Maine, there are approximately 223 non-Title I schools in LEAs

27  that are eligible to receive CARES Act funds that would not receive any funding. Like all

28  schools in Maine, these schools are equally impacted by the COVID-19 pandemic and would

9

greatly benefit from the influx of CARES Act funds to assist them through the pandemic. In addition, there are approximately 290 Title I schools in Maine that would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule. This would significantly impact the Title I schools as many are in desperate need of additional funding to cope with the pandemic, and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

41.     If LEAs in Maine calculate the proportional share of CARES Act funds for private school students under Option #2 in the Rule, approximately $1,852,000 will be diverted from public schools to private school students, which represents 4.7 % of Maine's total CARES Act funding for education.

   a.   In Portland, Maine's largest city, following the Rule/Guidance would cause 18% of Portland's ESSER money to flow to private school students ($346,373 of $1,924,299).

   b.   In tiny, rural East Machias, following the Rule/Guidance would divert 70% of East Machias' ESSER money to students at a large private secondary school ($38,828 of $51,110).

42.     Regardless of how SAUs proportion the CARES Act funds in Maine, the Rule requires that all private school students receive equitable services. In Maine, during the 2019-2020 school year, approximately 250 private school students in 19 private schools were eligible to receive equitable services under Title I-A as they were at-risk students within a LEA receiving Title I-A funds. As the Rule requires all private school students receiving equitable services, the approximately 250 private school students received equitable services under Title I-A last year will receive decreased funding and services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

43.     The Rule will place additional administrative burdens on Maine's SAUs. They will need to consult with additional private schools in their geographic area. They will have to provide technical assistance and administer the provision of services for private schools that may not have

1  ever received services under ESEA or IDEA.  They will have to track and monitor the distribution

2  of funds and services across additional private schools.  Finally, if they choose Option #1, they will

3  need to carefully document how the funding is distributed in Title I schools only and not used to

4  supplant, rather than supplement.

5

6  I declare under penalty of perjury under the laws of the United States and the State of California

7  that the foregoing is true and correct and of my own personal knowledge.

8

9  Executed on this 13ᵗʰ day of July, 2020 at 6:18 pm Augusta , Maine

10

11

12  A. Pender Makin
    Commissioner of Education
13  Maine Department of Education

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
## for Funding under the
## Education Stabilization Fund Program
## Elementary and Secondary School Emergency Relief
## Fund (ESSER Fund)

### CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

#### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

## ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State: Maine

CFDA Number: 84.425D

Legal Name: Maine Department of Education

DUNS Number:   809045545

Chief State School Officer:

Pender Makin, Commissioner

Mailing Address:

Me. Dept. of Education, 23 SHS, Augusta, ME  04333

---

State Contact for Elementary and Secondary School Emergency Relief Fund: Chelsey Fortin

Position and Office: Director of Policy & Government Affairs

Mailing Address:

Maine Department of Education
23 State House Station
Augusta, ME  04333-0023

Telephone:

(207) 446-2503

Email address:

chesley.a.fortin@maine.gov

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct.  I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):          Telephone:

Pender Makin                                                                            (207) 446-6847

Signature of Chief State School Officer or Authorized Representative:          Date:

Pender Makin

Digitally signed by Pender Makin
DN: cn=Pender Makin, o=Maine Department of Education,
ou=Commissioner, email=pender.makin@maine.gov, c=US
Date: 2020.04.24 18:48:05 -04'00'

04/24/2020

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

# PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8. The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9. The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: Pender Makin | Date: 4/24/2020 |
|---|---|

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
   - How the LEA will determine its most important educational needs as a result of COVID-19.
   - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
   - The extent to which the LEA intends to use ESSER funds to promote remote learning.
   - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

# PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: Pender Makin | Date: 04/24/2020 |
|---|---|

## Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

# EXHIBIT 7

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL NEWMAN
    Senior Assistant Attorney General
3   SARAH E. BELTON
    Supervising Deputy Attorney General
4   REBEKAH A. FRETZ
    JAMES F. ZAHRADKA II
5   GARRETT LINDSEY (SBN 293456)
    Deputy Attorneys General
6     300 South Spring Street, Suite 1702
      Los Angeles, CA 90013
7     Telephone: (213) 269-6402
      E-mail:  Garrett.Lindsey@doj.ca.gov
8   *Attorneys for Plaintiff State of California*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14  **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |
| 15 | |
| 16                  Plaintiffs, | **DECLARATION OF KAREN B. SALMON, PH.D.** |
| 17          v. | |
| 18  **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| 19 | |
| 20 | |
| 21                  Defendants. | |
| 22 | |

23

24

25

26

27

28

### DECLARATION OF KAREN B. SALMON, PH.D.

I, Karen B. Salmon, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the State Superintendent of Schools at the Maryland State Department of Education ("MSDE") located in Maryland. I have been employed as State Superintendent of Schools since July 1, 2016.

2.      I am responsible for the administration of the MSDE and have general supervision of all professional and clerical assistants of the MSDE.  I carry out the educational policies of the State Board of Education, call and conduct conferences of county boards of education and professional personnel on the condition, needs, and improvement of the schools; and prepare and publish pamphlets to stimulate public interest in education, promote the work of education and foster professional insight and efficiency in teachers.  I approve contracts for local school systems to purchase school sites, buildings, remodeling costs, and plans for construction of new school buildings.  My responsibilities include certificating professional personnel in each public school, and I approve instructional programs in State institutions.  I established an Early Childhood Division within MSDE.   I am a member of the Governor's Executive Council.

3.      I submit this Declaration in support of the State of Maryland's litigation regarding the recently issued U.S. Department of Education ("Department") Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule").  I have compiled the information in the statements set forth below through MSDE personnel who have assisted me in gathering this information on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the MSDE and public schools in Maryland.

4.      The Maryland Constitution requires the Maryland Legislature to "establish throughout the State a thorough and efficient System of Free Public Schools" and "provide by taxation, or otherwise, for their maintenance."  Md. Const. art. VIII, § 1.  By statute, the State Board of Education is vested with the general care and supervision of public education.  Md.

Code Ann., Education §§ 2-201 and 2-205.  The State Board determines the educational policies of the State and enacts regulations for the administration of the public school system. The totality of statutory provisions gives the State Board the last word on any matter concerning educational policy or the administration of the system of public education.

5.      Separate from any federal funding, the Maryland General Assembly provided its 24 LEAs with more than $7 billion in operating and capital funds for fiscal year 2020-21. The 1,428 school buildings in these districts educate 909,414 students. While the school districts exercise primary responsibility over budgetary and other decisions within their respective districts, the MSDE implements federal and State legislative mandates in education and carries out the policies of the State Board of Education.  *See* Md. Code Ann., Education, Title 2.

6.      MSDE distributed $219,807,962 of Title I-A funds received for 2019-20 school year to its LEAs.  In Maryland's 24 LEAs 414 schools, educating 201,777 students are identified as Title I schools and receive Title I-A funds.

7.      Maryland has 236 private schools, serving 62,204 students, that participate in Maryland's nonpublic textbook and technology program and are eligible to participate in Title I-A equitable services.  Maryland has a total of 855 pre-K-12 private and church exempt schools serving 108,313 students.  Under Option #2 of the Department's rule, Maryland LEAs must provide equitable services to all 855 private schools and not just for the 236 schools eligible to participate in Title I-A equitable services.

8.      The COVID-19 pandemic has drastically impacted public education in Maryland. The closure of schools, starting on March 16, 2020, to slow the spread of the Novel Coronavirus (COVID-19) in school communities around the State, created challenges for local school systems. Initially, all schools were closed from Monday, March 16 through Friday, March 27, 2020. Beginning Monday, March 30, school systems began to implement their continuity of learning plans.  The State Board of Education waived regulations regarding graduation, assessments, service learning, number of school days, and athletics to allow LEAs flexibility to transition to continuity of learning environments.

Declaration of Karen B. Salmon (3:20-cv-04478-SK)

9.      Families and students throughout the State, and particularly in low income areas, lacked home computers and devices to access on-line learning.  Internet connectivity in poor urban and rural areas was lacking.  Schools needed to purchase devices and access to internet services.  Schools worked around the clock to ensure continuity of learning continued.  To meet student nutrition needs, schools served millions of meals.

10.      MSDE provided LEAs technical assistance and guidance for developing continuity of learning plans.  I met with each of the LEA superintendents regularly to ensure the transition to on-line and virtual instruction.  MSDE personnel worked tirelessly to ensure the 24 LEAs had timely and accurate guidance to implement continuity of learning.  I am part of the Maryland Governor's team to ensure a unified response and strategy to addresses the pandemic.

11.      The economic crisis resulting from the pandemic cannot be overstated.  MSDE is expecting the Maryland Department of Budget and Management to propose a $200,000,000 reduction in education funding for fiscal year 2021.

**CARES Act Funds Received by Maryland For K-12 Education**

A. <u>Elementary and Secondary School Emergency Relief (ESSER) Funds</u>

12.      In order to receive the ESSER funds designated for Maryland and as required by the Department, the MSDE executed a Certification and Agreement form and submitted it to the Department on April 24, 2020.  A true and correct copy of the Certification and Agreement completed by the MSDE and submitted to the Department is attached hereto as Exhibit A.

13.      Within this Certification and Agreement, the MSDE agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.
>
> . . .
>
> 4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

3

. . .

> 5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

[Ex. A at pp. 1-2.].

14.     At the time that the MSDE executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule.  Accordingly, the MSDE was unaware that the Department would subsequently issue rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

15.     The Department approved MSDE's application and distributed $207,834,058 from the ESSER Fund to the MSDE on April 29, 2020.   MSDE intends to retain $20,783,406 as permitted by the CARES Act to improve the virtual learning opportunities in Maryland.  To accomplish this, Maryland will develop on-line courses for students, on-line professional development for teachers, collaborate with regional stakeholder in developing virtual schools.

16.     To obtain ESSR funds, LEAs were required to submit an application to MSDE for review and approval before receipt of Notice of Grant Award.  To date, the MSDE has distributed $185,043,226 to 23 eligible LEAs within Maryland, which represents 99% of the funds to the LEAs eligible to receive ESSER Funds.  Corrections to the remaining school system's application is expected shortly, and the funds will be released pending the corrections.

17.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), LEAs in Maryland would reserve an estimated $2,508,760 in ESSER funds to provide equitable services to private school students in the 236 private schools eligible to participate.

18.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, LEAs in Maryland would reserve approximately $18,143,913 in ESSER funds to provide equitable services to private school

4

1   students in the 855 private schools in the State.  Thus, under the Department's preferred

2   proportional share calculation, private school students in Maryland would have access to an

3   additional approximately $15,000,000 of ESSER funds, and public schools would lose this same

4   amount of funds.  These amounts could change based on the actual number of participating

5   private schools.

6       B.  Governor's Emergency Education Relief (GEER) Funds

7       19.   Maryland received $45,700,000 from the GEER Fund on April 22, 2020.  MSDE

8   received $10,000,000 to be distributed to LEAs for technology projects.  Other funds are expected

9   to be distributed for additional technology projects.   Those funds have not yet been distributed to

10   the LEAs in Maryland.

11       20.   If LEAs in Maryland calculate the proportional share of CARES Act funds for

12   private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving

13   CARES Act funds will receive no funds.  In Maryland, within LEAs that are eligible to receive

14   CARES Act funds, there are approximately 1,014 non-Title I schools that would not receive any

15   funding under Option #1.  Like all schools in Maryland, these schools are equally impacted by the

16   COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist

17   them through the pandemic.

18       21.   Even if every LEA in Maryland followed Option #1 (Title I-schools only Option)

19   in proportioning the CARES Act funds for equitable services, the non-Title I schools are not

20   allowed to use other State or local funds to supplant or supplement their budgets.  Non-Title I

21   schools will suffer increased harms because they cannot add any additional funding to help them

22   deal with the expenses resulting from the pandemic.

23       22.   In the face of expected $200,000,000 finding cuts from the State and anticipated

24   cuts by local governments, Maryland's public schools remain desperate for funding as they

25   continue to prepare for next school year.  The costs of reacting to this pandemic are drastic for

26   public schools and without the funds the CARES Act was intended to provide, essential funding

27   may not be available for all of the additional equipment, training, and staff needed to reopen

28   schools in the midst of the pandemic.

5

23.     Beyond the additional funding that Maryland will be required to expend in lieu of the designated CARES Act funds, the Department's Guidance Document and Rule have imposed significant administrative burdens on the MSDE directly.  MSDE fiscal policy personnel spent a minimum of 100 hours of time developing technical assistance guidance, providing LEAs data, training materials, memoranda, letters, webinars, and sample documents regarding proportioning the CARES Act funds. MSDE personnel gave technical assistance to LEAs through webinars, guidance documents, sample documents, and individual assistance through email and telephone calls.

24.     MSDE fiscal policy personnel worked over and above the responsibilities in their normal job descriptions to ensure LEAs were given timely and accurate information in an ever changing and complex environment.  They completed this work in addition to other priorities necessitated by the pandemic and normal business operations.

25.     MSDE delayed for a month distributing funding due to confusion created by the Department's interpretation of the equitable service requirements.  Now that the ESSR funds have been distributed, MSDE personnel will coordinate monitoring and oversight of the CARES funds. MSDE will have to collect and maintain the documents submitted by the LEAs.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __17__ day of July, 2020

_Karen B. Salmon, Ph.D._
_____
Karen B. Salmon
State Superintendent of Schools

6

EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
## for Funding under the
## Education Stabilization Fund Program
## Elementary and Secondary School Emergency Relief
## Fund (ESSER Fund)

### CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

Exhibit A

# PROGRAM BACKGROUND INFORMATION

**Purpos**e

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

# ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State: **Maryland**  CFDA Number: **84.425D**

Legal Name:  DUNS Number:

**Maryland State Department of Education**  **001969443**

Chief State School Officer:  Mailing Address:

**Karen B. Salmon, Ph.D.**  **200 West Baltimore Street**

  **Baltimore, Maryland 21201**

---

State Contact for Elementary and Secondary School Emergency Relief Fund:  **Amalie Brandenburg**

Position and Office:  **Deputy Superintendent, Office of Finance**

Mailing Address:  **200 West Baltimore Street**
  **Baltimore, Maryland 21201**

Telephone:  **410-767-0011**

Email address:  **amalie.brandenburg@maryland.gov**

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):  Telephone:

  **Karen B. Salmon, Ph.D.**  **410-767-0462**

Signature of Chief State School Officer or Authorized Representative:  Date:

*Karen B Salmon, Ph.D.*  **April 24, 2020**

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

**Karen B. Salmon, Ph.D.**

| Signature: *Karen B. Salmon, Ph.D.* | Date:  **April 24, 2020** |

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA.

   **Local School Systems (LSS) in Maryland are implementing the State's Continuity of Learning plan and have identified a number of priorities necessary to support continued delivery of education services to all students. Maryland's draft LSS ESSER Application will focus on the LSS's implementation of the Continuity of Learning Plan, require the LSS to identify their priorities and provide specific details on the process for identifying those priorities. LSSs will be asked to include the plans for assessing and addressing student learning gaps as a result of the school closure. Finally, the application will include a budget and budget narrative that describes the planned use of ESEER funds as well as a timeline for implementing the identified priorities.**

   **The above considerations will be in addition to the application information requirements from   sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).**

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

   **Maryland will issue additional grants to LSSs for initiatives and activities necessary to implement the State's Continuity of Learning Program for all students. The primary focus will be on procuring devices to increase access to remote learning. A secondary focus will include initiatives that support a remote learning infrastructure. These activities could include purchasing remote help desk and network management installation tools and services to effectively manage security and software updates on devices distributed to staff and students; purchasing subscription services that allow teachers to communicate with students and team members, and that will enable therapists to deliver services to students virtually.  A third focus will include initiatives that support increased access to remote learning through professional development for staff, parent outreach and family technology training. A fourth focus includes initiatives that support a return to traditional delivery of education services. Activities could include the repair, replacement, refurbishing, and sanitizing of devices purchased and utilized to enable remote learning so that these devices**

4

can be re-deployed to classrooms when schools reopen.

Local school systems have identified the several areas of need to continue implementing the State's Continuity of Learning Plan. These include, but are not limited to:

- Internet Access
- Devices for students and staff
- Security upgrades
- Learning Management System upgrades, new content
- Professional Development for teachers and staff
- Outreach and communication to families, technology training
- Expanded Summer Learning Programs
- Compensatory services for students with disabilities
- Academic Intervention programs
- Additional extended learning programs

# PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

**Karen B. Salmon, Ph.D.**

| Signature: *Karen B Salmon, Ph.D.* | Date:  **April 24, 2020** |

## Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

the details in the Statutory LEA Distribution, Maximum SEA Reservation and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

---

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

## APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

# EXHIBIT 8

1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL NEWMAN
     Senior Assistant Attorney General
3    SARAH E. BELTON
     Supervising Deputy Attorney General
4    REBEKAH A. FRETZ
     JAMES F. ZAHRADKA II
5    GARRETT LINDSEY (SBN 293456)
     Deputy Attorneys General
6      300 South Spring Street, Suite 1702
       Los Angeles, CA 90013
7      Telephone: (213) 269-6402
       E-mail:  Garrett.Lindsey@doj.ca.gov
8    *Attorneys for Plaintiff State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14   **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |
| 15                                          Plaintiffs, | |
| 16                       v. | **DECLARATION OF DR. MONICA E. GOLDSON** |
| 17 | |
| 18   **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | |
| 19 | |
| 20                              Defendants. | |
| 21 | |
| 22 | |

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF DR. MONICA E. GOLDSON**

I, Dr. Monica E. Goldson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

     1.     I am the Chief Executive Officer of Prince George's County Public Schools (PGCPS) located in the state of Maryland. My educational background includes a bachelor's degree in Mathematics from Florida A&M University, a master's degree in Elementary and Secondary School Administration from Bowie State University, and a doctorate in Educational Administration and Policy from Howard University. I have been employed as Chief Executive Officer since July 1, 2019. Prior to becoming Chief Executive Officer, I most recently served as Interim Chief Executive Officer and Deputy Superintendent of Teaching and Learning. However, as a product of the county schools, I have spent my entire career in PGCPS, starting as a mathematics teacher and steadily climbing the ranks from the classroom to district leadership as Assistant Principal, Principal, Associate Superintendent for High Schools, and Chief Operating Officer to the preceding roles noted above.

     2.     PGCPS is one of the nation's 25 largest school districts and the second largest school district in Maryland, with 208 schools and centers, nearly 136,000 students and 19,000 employees. The school system serves a diverse student population from urban, suburban and rural communities located in the Washington, D.C. suburbs. PGCPS is nationally recognized for innovative programs and initiatives that provide students with unique learning opportunities, including arts integration, environmental and financial literacy, and language immersion.

     3.     I submit this Declaration in support of the State of Maryland's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule"). I have compiled the information in the statements set forth below through PGCPS personnel who have assisted me in gathering this information from our institution and on the basis of documents that have been

1

provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on PGCPS and public schools in Maryland.

**Background - Maryland Public Schools**

4.      Article VIII, Section 1, of the Maryland Constitution mandates that the General Assembly "shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance." The authority of the Maryland State Board of Education is broadly set forth in Maryland Code, Education Article section 2-205. Courts have consistently found over a century of case precedents that Section 2-205 confers comprehensive "visitatorial power" upon the State Board of Education. *See, e.g.*, *Bd. of Educ. of Heister*, 392 Md. 140 (2006) (citing *Wiley v. School Comm'rs*, 51 Md. 401 (1879)).

5.      The State Board of Education oversees the Maryland State Department of Education (MSDE), a principal department of State government established by statute for the purpose of exercising "authority over: (1) Matters of elementary and secondary education that affect this State; and (2) The general care and supervision of public elementary and secondary education." Md. Code Ann., Ed. Art. sec. 2-101 and 2-106. The State Superintendent of Schools is appointed by the State Board of Education to oversee the administration of MSDE and has the powers provided in Subtitle 3 of the Education Article. Part of MSDE's oversight includes coordinating the pursuit, acquisition, and management of external funds from public and private sources to support state and local education programming.

6.      Maryland aid to local governments for public education exceeds $7 billion for the fiscal year ending June 30, 2021.

7.      The State Board of Education and Maryland State Department of Education oversee the work of 24 local education agencies (LEAs) or school districts, which together served over 900,000 students across more than 1,420 public schools for the 2020 school year.

8.      All Maryland LEAs received varying levels of Title I-A funding, totaling more than $221.7 million for FY 2020. PGCPS received an estimated $34.8 million for Title I-A

2

funding in FY 2020.  Across the state, 423 schools were identified as Title I schools for the 2019-2020 school year.

### Effects of the COVID-19 Pandemic on Education in Prince George's County

9. The COVID-19 pandemic has drastically impacted K-12 education in Maryland. Prince George's County has been disproportionately impacted due to the high rates of infection and COVID-19 related complications and deaths for thousands of county residents.

10. As a result of the pandemic and in accordance with a directive from Governor Larry Hogan, MSDE implemented a budget and hiring freeze and stopped discretionary purchases of items or services unrelated to addressing the COVID-19 pandemic. Further, MSDE is subject to additional budget cuts, along with all state agencies, based on the substantial budget deficit projected for FY 2021.

11. As a result of the COVID-19 pandemic and orders by the State Superintendent and State Board of Education, PGCPS schools were shut down from March 16, 2020 to the end of the academic year. During that time, PGCPS transitioned to a distance learning plan to complete the academic year with online teaching, lessons broadcast on PGCPS-TV, and enrichment learning packets. PGCPS has distributed over 65,000 devices—mostly chromebooks—and given traditional laptops to staff and some iPads to our youngest students and some special needs students. We estimate that we will be spending approximately $100,000 per month on Internet access to support families in need, as we continue to add additional families to Comcast's Internet Essentials program and continue to hand out hotspots from Verizon. We are in the process of reviewing stakeholder feedback and formulating our recovery plan for the start of the 2020-2021 school year to determine whether instruction will resume in school buildings, remain virtual, or become a combination of both approaches.

12. The Maryland State Board of Education, Maryland State Department of Education, and State Superintendent have undertaken several efforts to assist LEAs and schools transition to distance learning, and other pandemic related assistance. Those efforts include the provision of child care services to essential personnel at more than 3,700 State-funded sites across Maryland;

3

supporting student access to nutritious meals with more than 13 million meals served since the start of school closures; professional development focused on supporting educators to provide effective distance learning; and waivers from multiple provisions in state regulations governing academic requirements that cannot reasonably be met during school closures and the pending pandemic.

13.     In May 2020, the Maryland Board of Revenue Estimates projected a $900 million to $1.1. billion loss in general fund revenues for FY 2020. In addition, the Maryland Board of Public Works recently approved Governor Larry Hogan's request to cut $413.17 million from the state's FY 2021 budget, which represents a 2% reduction from general fund appropriations.  More than $200 million in additional proposed cuts are scheduled to be considered by the General Assembly during the 2021 Legislative Session, cuts that will directly impact education and pay raises for state employees, among other things.

**CARES Act Funds Received by PGCPS for K-12 Education**

A.  Elementary and Secondary School Emergency Relief (ESSER) Funds

14.     In order to receive the ESSER funds designated for PGCPS and as required by the Department and the Maryland State Department of Education, PGCPS executed a Certification and Agreement form and submitted it to the Maryland State Department of Education on June 12, 2020. A true and correct copy of the Certification and Agreement completed by PGCPS and submitted to the Maryland State Department of Education is attached hereto as Exhibit A.

15.     Within this Certification and Agreement, PGCPS agreed to the following terms:  (1) the local school system (LSS) will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA), as determined through timely and meaningful consultation with representatives of non-public schools; (2) the LSS will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund; (3) the LSS will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds; and (4) the LSS will

4

1
2
ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

3
4
5
6
7
8
9
16.     At the time that PGCPS executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule. Accordingly, neither PGCPS nor the Maryland State Department of Education was aware that the Department would subsequently issue rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

10
11
17.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), PGCPS would reserve $1,508,655 in ESSER funds to provide equitable services to private school students.

12
13
14
15
16
17
18.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, PGCPS would reserve $2,415,474 in ESSER funds to provide equitable services to private school students. Thus, under the Department's preferred proportional share calculation, private school students in Prince George's County would have access to an additional $906,819, and public schools would lose this same amount of funds.

18
B.   Governor's Emergency Education Relief (GEER) Funds

19
20
19.     PGCPS anticipates receiving $2,137,208 from the GEER Fund based on the application submitted to the Maryland State Department of Education on July 10, 2020.

21
22
23
20.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), PGCPS would reserve $107,363 in GEER funds to provide equitable services to private school students.

24
25
26
27
28
21.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, PGCPS would reserve $171,897 in GEER funds to provide equitable services to private school students. Thus, under the Department's preferred proportional share calculation, private school students in Prince George's County would have access to an additional $64,533, and public schools would lose this same amount of funds.

5

**The Department's Rule Significantly Harms Prince George's County's K-12 Students**

22.     The Department's Guidance and Rule will result in less funding being distributed to public K-12 schools in Maryland.

23.     PGCPS must calculate the proportional share of CARES Act funds for private school students under Option #2 in the Rule. As a result, approximately $1.0 million will be diverted from public schools to private school students.

24.     For every $246 diverted from the public schools, a public-school student loses out on a needed internet-connected device that could allow the student to access online learning while schools are closed due to the pandemic.

25.     For every $91,735 diverted from the public schools, a public-school teacher in Prince George's County, Maryland may lose their position and be unable to provide students with access to learning during the pandemic.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _15th_ day of July, 2020, at _____7:44 p.m._____

_Monica G. Goldson_
Dr. Monica E. Goldson
Chief Executive Officer

6

# Exhibit A

**PROGRAMMATIC, FISCAL, REPORTING, AND OTHER ASSURANCES**

1. The Local School System (LSS) will use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The following is not considered to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the LSS or 2) expenditures related to state or local teacher or faculty unions or associations.

2. The LSS will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The LSS will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The LSS will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The LSS will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

3. The LSS will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

4. The LSS will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the United States Department of Education (USDE) and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

5. The LSS will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

6. LSS will submit the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, upon request.

7. The LSS will sign and return the Assurances page of the Notice of Grant Award (NOGA) which includes a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

8. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

9. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

10. The LSS and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement) in 2 CFR part180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the USDE in 2 CFR part 3474.

**LSS ESSER Fund Contact/Title:**  Chief Executive Officer

**Contact Email:**     ceo@pgcps.org          **Contact Phone:** (301) 952-6008

**Local School System Superintendent (Printed Name):**  Dr. Monica Goldson

*Monica E. Goldson*                                6/12/2020

**Signature:**                                              **Date:**

**USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS**
**Elementary and Secondary School Emergency Relief (ESSER) Fund Maryland Local School System Application**

**Part I – Planned Use of ESSER Funds**

1. **Please describe the Local School System's (LSSs) process for determining the most important education needs as a result of the COVID-19 Pandemic. Please identify the most important education needs revealed through this process.**

Prince George's County Public Schools (PGCPS) is guided in its decisions by its mission to provide a great education that empowers all students and contributes to thriving communities. Five strategic pillars undergird this mission and framed the prioritization of educational needs in the environment created by the COVID-19 pandemic. Each pillar (Academic Excellence, Safe and Supportive Environments, High-Performing Workforce, Family & Community Engagement, and Operational Effectiveness) is addressed in the context of six critical actions:  communicate, prevent, protect, equip, educate, and support.

Discussions of PGCPS education needs under the threat of COVID-19 began in early March 2020. With an abundance of caution for the safety and health of the PGCPS community, CEO Dr. Monica Goldson, the Board of Education and the local government collaboratively engaged in discussions on ways to support the PGCPS community with the looming impact of COVID-19.

During the first week of March, all principals and building services personnel were instructed to use procedures aligned with virus prevention as part of their daily cleaning of facilities. Schools were equipped with additional supplies such as soap, paper towels and hand sanitizer dispensers. As a safety precaution, Dr. Goldson canceled all student local and international field trips and nonlocal travel for staff. Preventative measures included scheduled hand washings for students and a prescribed disinfection of schools and buildings.  Within a few short weeks, the viral outbreak was worldwide and required prompt intervention at the federal and state levels to control.

Following strict guidance offered by state and local government and health officials, PGCPS' Executive Leadership Team (ELT) engaged in daily command meetings to stay abreast of new information as well as to discuss and make decisions on immediate actions to address protective alternatives to standard educational operations as a result of the pandemic.  The core ELT is comprised of district's executive leadership who are responsible for every aspect of the organization. Meetings include the discovery of new information through updates from the State and local governments, updates from the internal Incident Command Center, as well as information from the Communications Office who continuously monitors stakeholder needs through social media, emails and phone inquiries. Through the deliberation of the ELT, the most important education needs can be grouped into the following four categories:

- Student and staff safety and building readiness
- Continuity of learning
- Access to technology – the need for devices and internet access
- Communications – the ability to reach all parents and relevant stakeholders

In keeping with its mission to provide quality instruction to advance student achievement, PGCPS prioritized equipping students/families, and instructional staff with the materials, tools, technologies, and training to sustain instruction and creative distance learning opportunities. In addition, surveys were administered to the PGCPS community to identify the unique needs of students and families surrounding technology device availability, internet/wifi access, CATV viewing opportunity, etc.  Internal needs assessments combined with survey results were used to inform and confirm the prioritization of the most critical education needs which included 1:1 student/device technology gap; universal access to instructional materials and online learning opportunities; sustaining student achievement momentum in core content areas during 4Q and summer periods, fortifying social and emotional support for students, families, and staff; and ongoing maintenance and disinfection of facilities. In addition, discussions surrounding SY2020 close-out for seniors and student performance accountability impacts were salient factors in systemic needs assessment efforts.

Given these priorities, delivery of 3rd and 4th quarter academic standards in core content R/ELA and Mathematics was confirmed as an academic priority with well-rounded education opportunities capping the weekly distance learning schedule.  Particular attention was given to ensuring multiple ways of accessing learning opportunities and related instructional materials and that ease of access to needed student and family supports is afforded to high-needs student/school populations (i.e., FARMS, SWD, ELs).  Monitoring and supporting the engagement of students in the continuity of learning effort is of equal importance and is led by the Office of Information and Technology through the tracking and reporting of daily updates on both the access and usage of technology throughout the district.  Finally, maintaining an equity focus consistent with its Local ESSA Consolidated Strategic Plan, a robust Continuity of Learning Plan (see response #2) guided and continues to guide PGCPS' priorities and decisions surrounding education needs in the ongoing COVID-19 environment and beyond.

2. **Please provide a summary of the LSS's Continuity of Learning (COL) plan. Please identify new initiatives or activities that have been instituted in order to implement the LSS COL plan; i.e. professional development, family outreach, learning management system content, new or additional streaming capability to deliver educational services via cable television or other platforms, and student and staff devices and hotspots to improve internet connectivity. Please identify the major issues encountered in implementing the LSS COL plan.**

PGCPS' Continuity of Learning plan unfolded in two phases, Phase One included preparation, distribution, training, and collaboration. This phase of the plan focused on the design and delivery of professional learning to educators in various online platforms, provided the opportunity for teachers to set up virtual classrooms, and distributed laptops to students and staff as needed. During phase two educators began to deliver virtual lessons, established communication with families and students, and provided virtual support for students in need of assistance.

While distance learning is not be structured like a typical school day, the district plans to maintain key aspects of the classroom experience: collaboration with peers, daily lessons, and experimentation with individualized and innovative techniques. PGCPS' model of distance learning is inclusive of a blend of approaches to learning activities; independent, self-paced work; virtual office hours to check for understanding, and submission of assignments. This was designed to maintain an academic connection and flexibility for students, teachers, and families. The plan was strategically developed to support distance learning in the case of short- or long-term closures of school buildings.

The chart below outlines the new initiatives or activities that have been instituted in order to implement Continuity of Learning plan.

| Continuity Plan Components | Description of Component |
|---|---|
| Professional Development | The Continuity of Learning Plan includes an at-a-glance overview for high school, middle school, elementary school teachers/school staff, and central office staff. Additional guidance for the training process and course offerings are provided below: <br><br> Registration:  The schedule and registration information was posted for each specific audience on the Remote Teaching Site (bit.ly/pgcpsremoteteaching) <br><br> Course Selection:  During their grade span (elementary, middle, and high) professional development day, teachers/school staff attended one session to learn Google Classroom and one session to learn video conferencing Google Meet or Zoom and the Teaching at a Distance session. Additionally, teachers/school staff had the option to choose to attend a session to learn Screencastify. <br><br> Platform Information:  All virtual professional development sessions were presented via WebEx, allowing up to 900 participants to register in each session. |

| Continuity Plan Components | Description of Component |
|---|---|
| | School Administrators:  School Administrators joined the training for their respective level with teachers and school staff. School administrators also attend a GoGuardian session to learn how to monitor instructional sites being used and students' inappropriate use online.<br>Central Office Staff Training: Separate sessions were designated for Central Office Staff to receive training.<br>Instructional Focus Documents:  Teachers/School Staff have access to instructional focus documents that provide grade-level instructional focus topics and standard alignment that should be used weekly to guide instruction. |
| Learning Management System | Instructional focus guides have been created for every course in order to provide teachers with direction on how to implement the curriculum within a distance-learning format.  Teachers primarily use a combination of google classroom, google meet, and zoom to deliver instruction. |
| Television Streaming | The district is providing daily access to Reading and Math PreK-5 lessons on PGCPS-TV (channels 96 Comcast and 38 Verizon). If families do not have cable, they are also able to watch shows on-demand using the online schedule with links to programming. This schedule is available at  http://vod.pgcps.org/CablecastPublicSite/schedule. Additionally, there is a rotation of Music, Art, Dance, Physical Education, Montessori, and Immersion on Fridays. |
| Device Distribution | In an effort to identify student access to a computing device and broadband access at home, the district created a survey sent to all students/families to identify those in need of a computing device and home internet access. Parents were asked to evaluate:<br>Which broadband Internet service provider is used in the home?<br>Is there a device that connects to the Internet at home for your student(s) to use?<br>What type of device(s) would your student(s) be able to use at home?<br>Is the student having to share a device?<br><br>The data received back identified students with and without a device.   The survey also identified students with broadband access at home and their provider, as well as students currently without broadband access.<br><br>**Preparation of Chromebooks and Student Equipment Agreements**<br>To prepare for the deployment of so many devices, a social distancing distribution plan was put in place to ensure safety for staff and families. This plan also ensured a way to capture an appropriate inventory of all devices being handed out to parents. The paperwork identifies which device was given to which student. The information, once the paperwork is collected from the schools, will be entered into our Asset Management System for our electronic record. |
| Internet Connectivity | **In-Home Connectivity**<br>PGCPS has partnered with Internet Essentials from Comcast to bring families affordable, high-speed Internet that makes it easier for low-income households to get |

| Continuity Plan Components | Description of Component |
|---|---|
| | connected so they can more easily work from home, access educational resources, and stay in contact with friends and family. New Internet Essentials customers may be eligible for two months of free Internet service.<br>**Wifi Access Points**<br>Drive-up wifi access points at several schools will be available starting Tuesday, April 14 for anyone with a PGCPS email account to log on from the school parking lot or within close proximity to the school. |
| Family Outreach | PGCPS designed a website (https://www.pgcps.org/coronavirus/distance-learning/) to inform families of the Distance Learning plan and resources available for students and families.  This page includes information on the following:<br><br>Distance Learning Plan PreK-12<br>Phase 1: Preparation<br>Phase 2: Distance Learning Plan<br>PreK-Grade 5 Lessons TV Schedule<br>Teacher/Student Weekly Schedule<br>Distance Learning Packets<br>Technology<br>Special Education<br>Calendar and Grading<br>Resources |
| **Major Issues Encountered in Implementing the Continuity of Learning Plan** ||
| <ul><li>Supporting students who did not have access to digital devices before Chromebook distribution</li><li>Supporting students who do not have access to the internet</li><li>Students who have not logged on to interact with the classroom teacher during the distance learning period</li></ul> ||

To sustain the supports introduced by PGCPS' Continuity of Learning and those instructional opportunities provided during summer programming, PGCPS will extend its school day when it re-opens it doors to students and staff for SY21.

In so doing, PGCPS understands that there are many factors to consider. One in particular, is compensating for any learning loss associated with school closures. Our goal is to extend the school day versus adding additional days to the school year.  All teachers and students, PreK-12, will have an extra 30 minutes per day for 30 days that will be used for academic interventions designed to deliver 4th quarter and 1st quarter content.

According to a January 2020 report from the Education Commission of the States, Md. Code Ann., Educ. § 7-103, requires Maryland schools to provide instruction for a minimum of 3 hours each day. The current school schedule in PGCPS far exceeds the minimum with six hours and 10

minutes for elementary and special schools K-12, and six hours and 40 minutes for K-8 academies, middle school, and high school. An additional 30 minutes would increase the daily instructional time to six hours and 40 minutes and seven hours and 10 minutes, respectively.  The additional minutes for the first thirty days is reflected in the chart below.

| PGCPS School Type | PGCPS Current School Day Time Allotment | PGCPS Proposed School Day Time Allotment (30 days) |
|---|---|---|
| Elementary Schools | 6 hours 10 minutes | 6 hours 40 minutes |
| Dedicated Specialty K-6 | 6 hours 10 minutes | 6 hours 40 minutes |
| Special Schools K-12 | 6 hours 10 minutes | 6 hours 40 minutes |
| Middle Schools | 6 hours 40 minutes | 7 hours 10 minutes |
| K-8 Academies and Dedicated Specialty K-8 | 6 hours 40 minutes | 7 hours 10 minutes |
| High Schools | 6 hours 40 minutes | 7 hours 10 minutes |
| Academy of Health Science at Prince George's Community College & Annapolis Road Academy Alternative High School | 6 hours 40 minutes | 7 hours 10 minutes |

Hanover Research and Washington Association of School Administrators (2020) asserted that when learning loss occurs due to a traumatic event such as the COVID- 19 school closure, establishing a sense of constancy and predictability with schedules and routines that communicate a clear set of expectations (p. 4) can support students when they return to the school setting. Additionally, Canady and Rettig (1995) found a well-crafted schedule to result in more effective use of time, space and resources, as well as improve instructional climate (p. 4) as PGCPS dedicates an additional 30 minutes to address predetermined skills and concepts.

According to Walker (2016), more school districts across the country have stretched the school day.  In fact, the Rochester Teachers Association implemented an extended learning initiative that won positive reviews from district leaders, educators, and parents.  However, the plan was designed and implemented *with* educators, not *to* educators.  Thus, the following will be reviewed as stakeholders collaborate on the use of the additional 30 minutes per day:

- PGCPS will identify and support student groups most affected by distance learning
- Fluency standards that are most beneficial as students progress
- Specific skills and concepts that students really need to be successful in future years
- A schedule for teachers to work vertically across grade levels for the purpose of deciding upon critical areas that must be addressed as students move from one grade to the next
- Rearranging course content to focus on the progression of standards that may have been missed

3. **Please describe how the LSS intends to assess and address student learning gaps resulting from the disruption in educational services.**

PGCPS recognizes the potential gaps in student learning outcomes in 4Q20 performance stemming from the disruption of the instructional environment due to COVID-19. As a result, a comprehensive and robust systemic summer virtual learning plan is being implemented to assess and address any gaps in 4Q20 learning at each grade band (preK, elementary, middle, and high school). In accordance with the state Superintendent's recommendations, PGCPS is actively engaged in planning to determine the extent to which additional learning supports will be carried forward into the start of SY21.

During the PGCPS summer program, PGCPS will continue to offer virtual learning platforms for students in prek-12. This summer experience will commence on July 1st through July 31st, and will be monitored throughout to ensure ongoing learning for students. In addition to designated online learning and the provision of learning via PGCPS television stations, 38 and 96 respectively, instructional enrichment learning packets will be available for student use. Funding will be utilized to ensure the continued provision of educational services, via Edgenuity, television stations and to support staffing needed for program implementation.

Elementary students in K-5 will receive online instruction via *iRead* and *iReady*® for reading and *DreamBox*© for mathematics. Cool Spring ES, Rosa L. Parks ES and Cherokee Lane ES will host virtual Learning in Extended Academic Programs (LEAP) Virtual Summer Program for students. Judy Hoyer Early Learning Center will offer a two-week program for rising pre-kindergarten students. Scheduled content specific learning experiences will be scheduled daily where PGCPS teachers provide direct instruction for K-5 students via television channels. Content teachers will be tasked with planning and teaching lessons that are aligned to fourth quarter instructional standards.

All middle school students will engage in virtual learning experiences to include participation in Edgenuity. Edgenuity is an online instructional program that is available through the purchase of licenses. Students will utilize the intervention model, a student adaptive component, and courseware lessons, developed and aligned to fourth quarter content standards during their participation. Students participating in the courseware model are selected due to failure in reading and mathematics and for students where classrooms were covered by a long term substitute during the school year. Unique learning paths, online tutors and teacher support will serve as a compliment to this virtual experience. Content areas of focus will be mathematics and RELA.

PGCPS will offer a Credit Recovery Program approach for high school students in grades 9-12. Course offerings will provide students the opportunity to retake courses where they have been unsuccessful. In order that this provision is offered for students to accommodate their instructional needs, there will be a need to ensure the procurement of licenses needed.

4. **Please provide the LSS's plan for meeting the equitable services requirement in Section 18005 of the CARES Act.**

Annually, PGCPS ESSA Program Offices connect with our Non-Public partners to initiate an intent to participate and provide meaningful and follow-up consultation. During this collaborative dialogue, the Program Offices explain/review equitable services as outlined by the relevant Department of Education authority.

To maintain relative consistency and continuity with our non-public partners, PGCPS will utilize similar processes to ensure equitable services are provided to all students in private schools in connection with CARES Act Elementary and Secondary School Emergency Relief (ESSER) program funding. Following is the process to be utilized by PGCPS. In light of the timing of the ESSER application relative to school closings, PGCPS will exercise increased flexibility in these process steps, to the extent possible, to meet the needs of the non-public partners while adhering to the guidelines for meaningful consultation.

- PGCPS will contact all Private schools in Prince George's County that are identified on the MSDE website via email and US mail. This contact provides private school officials with the opportunity to convey their request to participate in equitable services provided via ESSER funding. Private school officials will be asked to submit their interest for participation in addition to student and staff counts as is standard in ESSA Title program requirements, in addition to providing required student data used to determine proportional allocations.
- Schools will be asked to respond and indicate their intention to participate for SY21 within one week of form dissemination.
- Upon receipt of interest letters, PGCPS will invite all interested private school officials to attend a Prince George's County Public Schools (PGCPS) ESSER Consultation Meeting (to be scheduled virtually).
- The purpose of the consultation meeting is to provide an opportunity for Nonpublic officials to consult with PGCPS' program personnel and to receive an explanation and clarification regarding eligible CARES Act ESSER-funded services and programs. The PGCPS personnel representing each funded component of the ESSER program will provide an overview of the regulatory and program requirements for each aspect of the program within the district.
- To document agreement, during the consultation meeting, nonpublic representatives will be provided an document (via online tools) to verify all nonpublic consultation program topics were discussed.
- PGCPS will propose a start date for services to commence with private school children consistent with program start timeframes for PGCPS students. In addition, should parental permission be required for participation in any program, PGCPS will establish a date for non-public schools to provide such documentation.
- To ensure that consultation is ongoing throughout the school year, a collaboratively developed schedule of consultation meeting dates throughout the program service period will be developed in the initial consultation meeting.
- Consultation meetings (virtual unless otherwise communicated) allows the inclusion of representatives from all participating private schools and PGCPS program staff to be a part

of the process. During each meeting, updates will be provided regarding the implementation of services, student progress, and attendance of parent and family engagement activities when applicable. During the school year, PGCPS Program Offices will also work with the participating private schools to assist in spending their funds and ensure accurate reporting and compliance timelines are met.

5. **Please provide the LSS's planned use of ESSER funds, including the timeline for implementing activities funded through this grant.**

PGCPS will utilize funds received through ESSER grant award to address thirteen (13) discrete activities to include: *administrative cost, equitable services, operations, virtual summer school through edgenuity, curriculum writing, curriculum writing/instructional video, technology, communications, additional instruction time, trauma informed care supports, ESY enrollment expansion, academic materials and food services supplies.* Additionally, PGCPS' approved indirect costs are factored into the budget.

The activities and associated budgets are presented in the chart below. Also, a timeline of the activities and associated start and end dates is found the preceding pages.

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| Administrative Cost | **Activity Summary:**<br>Hire a Part-Time Project Manager that will be dedicated to administering activities associated with the CARES/ESSA grant, and be responsible for the day-to-day management of the project.<br><br>The Project Manager will monitor and track project timelines; ensure that all key deliverables are met; manage communication across all key project-related internal stakeholders; manage the project budget; give direction as and when required; make decisions or recommendations during the project's life cycle; and coordinate, assemble and submit all project interim and final reports to MSDE in a timely manager.<br><br>**Budget Narrative:**<br>Part-time temporary grant administrative support:<br>Salary - $68,400<br>Fringes:<br>FICA (.0765 x 68,400) = 5,232<br>Workers Compensation (.02 x 68,400) = 1,368 | $75,000 |
| Equitable Services Non-Public Schools | Estimated Equitable Services Set-Aside for Participating Non-Public Schools | $1,508,655 |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| Operations | **Activity Summary:**<br>Prince George's County Public Schools will be providing the necessary labor and supplies/materials to reduce the risk of exposure to COVID-19 by thoroughly cleaning and disinfecting all of the district's facilities.  Additional disinfectant machines, personal protective equipment (PPE), sanitation supplies, and overtime are the key components that will be used to complete this ongoing task.<br><br>**Budget Narrative:**<br>**A.  Overtime - Total: $1,958,687**<br>To support the sanitation of schools and facilities throughout the district.<br>~$64.49/hour x 27,699 hours = $1,786,309<br>FICA (7.65%) = $136,652 and Workers Compensation (2.00%) = $35,726<br><br>**B.        Supplies – Total: $1,084,601**<br><br>Hand Sanitizer: Increase supply to proactively provide alcohol-based hand sanitizer when washing hands with soap and water is not readily available.<br>3,715 cases x $41.76/case = $155,138<br><br>Hand Soap: Increase supplies to comply with hand washing of at least 20 seconds per CDC guidelines.<br>3,173 cases x $43.25/case = $137,232<br><br>General Masks: Increase supply of general to protect against dust and air pollutants<br>9 cases (20,800 masks/case) x $25,000/case = $225,000<br><br>N95 Masks: Increase supply of N95 masks that protect up to 95% of all bacteria, virus, and fungi<br>550 boxes (20/box) x $62.40 = $34,320<br><br>Other Building Services Supplies - $532,911<br><br>**C.  Equipment – Total: $40,000**<br>Clorox 360 System Machines: Purchase additional disinfectant machines to clean and disinfect throughout the |  |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| | district in efforts to meet EPA N-List recommendations for use against SARS CoV-2.<br>10 machines x $4,000 = $40,000 | |
| **Sub Total** | | **$3,083,288** |
| **Virtual Summer School through Edgenuity** | **Activity Summary:**<br>The Prince George's County Area Office reviewed the programs used by high schools and chose Edgenuity. The Edgenuity MyPath and Courseware programs provide intervention and enrichment resources to support skill attainment aligned to Maryland State Standards.  The funds will be used to purchase site licenses for students.<br><br>All middle school students will engage in virtual learning experiences to include participation in Edgenuity. Edgenuity is an online instructional program that is available through the purchase of licenses. Students will utilize the intervention model, a student adaptive component, and courseware lessons, developed and aligned to fourth quarter content standards during their participation. Students participating in the courseware model are selected due to failure in reading and mathematics and for students where classrooms were covered by a long-term substitute during the school year. Unique learning paths, online tutors and teacher support will serve as a compliment to this virtual experience. Content areas of focus will be mathematics and RELA.<br><br>**Budget Narrative:**<br>$16 per unit license x 18,750 middle school students $300,000 + $17,600 in non-license costs = $317,600. | |
| **Sub Total** | | **$317,600** |
| **Curriculum Writing/Instruction** (Summer Curriculum Writing for 1st quarter for 2020-2021 content) | **Activity Summary:**<br>Prince George's County Public Schools will be adjusting the first quarter curriculum to ensure that critical standards from the previous quarter 4 are addressed during the first several weeks of the new year.  These skills/standards will spiral through the 2020-2021 school year.  Additionally, with adding these to the beginning of the documents, the current First Quarter curriculums need to be adjusted and ready for students by August 31, 2020. | |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
|  | **Budget Narrative:**<br>**Salary – Total: $281,600**<br>**Workshop Pay:**<br>64 Curriculum Writers will be paid the curriculum writing rate, per the labor contract, for the creation of the curriculum guides.  As the system ensures learning of essential quarter 4 standards and/or skills and processes, curriculum documents for quarter 1 2020-2021 will need to be readjusted.  Content curriculum writers will be adjusting quarter 1 instructional documents to reflect these changes to the beginning of the document and then adjusting the remaining weeks within the quarter. This will occur across the Division of Academics.  Writing activities will occur between June 1 - August 15, 2020.<br><br>Approximately 22 (days), x 64 (2 FTE per 32 contents) x $200 a day = approximately $281,600<br>**Fringes – Total: $21,542**<br>FICA will be paid for all salaries: $281,600 x .0765 = $21,542 |  |
| **Sub Total** |  | **$303,142** |
| Curriculum Writing/Instructional Videos | **Activity Summary:**<br>Prince George's County Public Schools is providing daily access to Reading and Math PreK-5 lessons on PGCPS-TV (channels 96 Comcast and 38 Verizon). If families do not have cable, they are also able to watch shows on-demand using the online schedule with links to programming. Additionally, there is a rotation of Music, Art, Dance, Physical Education, Montessori, and Immersion on Fridays.<br><br>**Budget Narrative:**<br>**A. Salary – Total: $58,800**<br>**Workshop Pay:**<br>Curriculum Writers will be paid the curriculum writing rate, per the labor contract, for each video created. Teachers are asked to create videos aligned to the instructional focus for each week established.  Each week there are seven reading, seven math, three electives, one Montessori, and three Immersion videos each week.  This totals 21 videos a week.  The date span for this activity is April 14 - July 31, 2020. |  |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| | Approximately 14 weeks, x 21 videos a week @ $200 per video = $58,800<br>**B. Fringes – Total: $4,498**<br>FICA will be paid for all salaries: $58,800 x .0765 = $4,498. | |
| **Sub Total** | | **$63,298** |
| **Technology** | | |
| Student Devices to create 1 to 1 (Purchase of student Chromebooks will be in preparation of start of the 2020-2021 School Year) | **Activity Summary:**<br>Prince George's County Public Schools has provided a student device (Chromebook) to students who have indicated that they did not have access at home. A total of 65,000 devices have been distributed and counting. The school district has been investing in Chromebooks with the expectation of the device lasting four years. To date, more than 25% of our devices need replacement.  Pre-k and Kindergarten will be receiving iPads.  Grades 1 - 12 will be receiving Chromebooks.<br>**Budget Narrative:**<br>**Total - 20,000 Chromebooks x $312.49ea $6,249,800 + 206 iPads @ $1,000ea $206,000 = $6,455,800** | |
| Classroom Management System Software - Web Filtering, Classroom Management, and Instructional Software (Purchase will be made in July 2020, in preparation for start of the 2020-2021 School Year) | **Activity Summary:**<br>In support of the delivery of instruction remotely, student access to devices and wifi broadband a cloud-based instructional classroom management system that focuses on instruction of students and is capable of monitoring and reporting interactions between teachers and their students when students are logged into Google Chrome or the Chrome OS using their PGCPS Google accounts. The classroom management system is needed to manage and monitor approximately 136,000 student devices and additional estimated cost for outdoor Wi-Fi antennas.<br>**Budget Narrative:**<br>**Total - 136,000 students x $7.35 per user $999,600 + Wi-Fi antennas $313,282 = $1,312,882** | |
| Wifi Cost (This purchase was made in May 2020) | **Activity Summary:**<br>A total of 5,000 hotspots have been purchased.  Monthly cost for hotspots is $15.00 per device per month.  In addition, the school system is paying for families that qualified for Comcast's Internet Essentials and will be paying for the monthly cost. | |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| | **Budget Narrative:**<br>Total: 7,625 devices x $200 per hotspot unit = $1,525,000 | |
| Sub Total | | **$9,293,682** |
| Communications | **Activity Summary:**<br>The Office of Communications develops and maintains Distance Learning and COVID-19 webpages to share the latest information on these topics with families, community members and staff. Communications staff also develops publications, posts updates on social media, sends mass emails and hosts tele town hall events to share updates and field questions on distance learning and COVID-19. Communications works closely with Academics staff to create instructional videos for distance learning and provide daily access to distance learning content through the school system's cable television channels (Comcast Channel 96 and Verizon Channel 38).<br><br>**Budget Narrative:**<br>**A. Tele Town Halls – Total: $44,000**<br>An external contractor will provide tele town hall dial-in services approximately every other month<br><br>Tele Town Hall Hosting Services – $11,000K per event x 4 = $44,000<br>Staffing – Moderating and call-in screening will be provided at no additional cost by PGCPS volunteers<br><br>**B. External Graphics and Video Production Support – Total: $149,079**<br>External contractors will provide approximately 12 videos and 10 graphic design projects to help meet messaging needs to PGCPS families, community members or staff.<br>Videography Fees – $6K per video x 4 = $24,000<br>Graphic Design Fees – $2,500 per project x 4 = $10,000;<br>TV Lessons - $53,200; Community Communications - $61,879.<br><br>**C. Digital and Video Equipment Upgrades – Total: $221,300**<br>Upgrade On-Air system to improve remote operations, increase streaming capabilities, and have the ability to broadcast zoom meetings. Current system is at end of life, and can't be updated. | |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| | Equipment and Installation $75,000<br><br>Upgrade Main Production Control Room to allow remote location technologies like Skype, Zoom and other online services to become a part of the studio production process.<br><br>Equipment & Installation – $146,300<br><br>**D. Website Software – Total: $21,000**<br>To support distance learning and move to online distribution of all content, this software is necessary to maintain website accessibility requirements for Section 508 compliance and monitor school and office websites for accuracy and updated content.<br><br>Site-improve Software – $21,000<br>**Total: $320,300** | |
| **Sub Total** | | $435,379 |
| **Additional Instruction Time–** 30 days of additional instruction for 30 minutes | **Activity Summary**:<br>There are many factors to consider as PGCPS prepares to open its doors to staff and students. One in particular, is compensating for any learning loss associated with school closures. Our goal is to extend the school day versus adding additional days to the school year.  All teachers and students, PreK-12, will have an extra 30 minutes per day for 30 days that will be used for academic interventions designed to deliver 4th quarter and 1st quarter content.<br><br>The current school schedule in PGCPS far exceeds the minimum with six hours and 10 minutes for elementary and special schools K-12, and six hours and 40 minutes for K-8 academies, middle school, and high school. An additional 30 minutes would increase the daily instructional time to six hours and 40 minutes and seven hours and 10 minutes, respectively.  The additional minutes for the first thirty days is reflected in the chart below. | |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|

| PGCPS School Type | PGCPS Current School Day Time Allotment | PGCPS Proposed School Day Time Allotment (30 days) |
|---|---|---|
| Elementary Schools | 6 hours 10 minutes | 6 hours 40 minutes |
| Dedicated Specialty K-6 | 6 hours 10 minutes | 6 hours 40 minutes |
| Special Schools K-12 | 6 hours 10 minutes | 6 hours 40 minutes |
| Middle Schools | 6 hours 40 minutes | 7 hours 10 minutes |
| K-8 Academies and Dedicated Specialty K-8 | 6 hours 40 minutes | 7 hours 10 minutes |
| High Schools | 6 hours 40 minutes | 7 hours 10 minutes |
| Academy of Health Science at Prince George's Community College & Annapolis Road Academy Alternative High School | 6 hours 40 minutes | 7 hours 10 minutes |

**Budget Narrative:**

**A. Salary - $10,073,528**
The below amounts cover the salary of all full-time and part-time school-based employees (excluding 12-month school administrators) and bus drivers for an additional 900 minutes of work (30 minutes/day * 30 school days):

Mid-Level Administration (202):  $419,324
Instructional Salaries and Wages (203): $6,645,740
Special Education (206): $1,923,429
Student Personnel Services (207): $127,724
Student Health Services (208): $134,274
Student Transportation Services (209): $495,176
Operation of Plant Services (210): $80,892
Food Service (213): $216,039
Community Services (214): $30,930

**B. Fringe Benefits - $972,095**
FICA (7.65%) and Workers Compensation (2.00%) employer payments for the above salaries.
$10,073,527*(7.65% + 2.00%) = $972,095

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| | **C. Utility Costs - $319,694**<br>Additional utility costs associated with additional 900 minutes:<br><br>Water & Sewer: $56,461<br>Fuel Oil: $33,201<br>Electricity: $92,137<br>Natural Gas: $137,142<br>Propane Gas: $753 | |
| **Sub Total** | | **$11,365,317** |
| **Trauma-Informed Care Supports** for Teachers, Students and their Families due to COVID-19 | **Activity Summary:**<br>PGCPS will provide training to teachers and administrators on the components of trauma and its impact as experienced by students during COVID-19.  This training will also provide insight to educators on how student's learning and their behavior is affected by trauma. Lastly, the training will help schools develop safe environments for schools in supporting students whose trauma may manifest in ways previously met with school exclusion. Additionally, insight is intended to support staff's mental health, increase student engagement and reduce incidences of suspension as a result of student infraction.<br><br>**Budget Narrative:**<br>**A. Trauma Organization/Trainer/Model - $145,000**<br>($100/teacher x 1,450 teachers) = $145,000<br><br>**B. Workshop Pay to Staff - $253,750**<br>($250/day x1,450 teachers = $362,500)<br><br>**C. Fringe Benefits:**<br>FICA (7.65%) and Workers Compensation (2.00%)<br>362,500 x .0765 = $27,732<br>362,500 x .02 = $7,250<br><br>**Total Project: $145,000 Trainer + $362,500 Workshop Pay + $34,982 Fringes = $542,482**<br>Sessions will be offered during the summer (one day). Sessions will also be offered during the school year where participants will attend two (3.5-hour sessions) afternoon sessions. | |
| **Sub Total** | | **$542,482** |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| **ESY Enrollment Expansion** | **Activity Summary:**<br>ESY is a program that is legally mandated under the Individuals with Disability Education Act (IDEA) to maintain a free and appropriate public education (FAPE). The ESY program provides special education and related service to students with disabilities beyond the regular school year in accordance with his/her Individual Education Program (IEP).  ESY will serve appropriately 3,800 students during the extended school year program. The number of students exceeded last year's student count by 1,675 students due to COVID-19 school closure. The increased number of students attending ESY is based on IEP team eligibility determination decisions due to loss of instructional time and regression.<br><br>**Budget Narrative:**<br>**Salary – Total: $1,355,092**<br><br>**Teachers and Related Service Personnel:**<br>**Classroom Teachers** will provide online distance learning and complete IEPs and required documentation. **Related Service Personnel** to include speech, occupational and hearing therapists will provide supplementary aids and services outlined in a student's IEP for ESY. Teachers and related service personnel will work a 4-hour 4-day workweek over 4 weeks during the Extended School Year Program.<br>285 Teachers X $61.29 Rate X 4 hours X 4 days per week X 4 weeks = $1,117,930<br>51 Related Service Staff X $72.66 Rate X 4 hours X 4 days per week X 4 weeks = $237,162.<br>**Fringes – Total: $130,766**<br>FICA (7.65%) and Workers Compensation (2.00%) will be paid for all salaries:<br>$1,355,092 x .0765 = $103,664<br>$1,355,092 x .02 = 27,102 | |
| **Sub Total** | | **$1,485,858** |
| **Academic Materials** | Printing Cost for Student Instructional Materials:<br>Academic Packets to Students - $111,717<br>Other Academic Expenses: - $26,625 | |
| **Sub Total** | | **$138,342** |
| **Food Service** | Food Service Supplies to Serve Student Meals - $505,046 | |

| ACTIVITIES | BUDGET NARRATIVE DESCRIPTION | TOTALS |
|---|---|---|
| **Supplies** | | |
| **Sub Total** | | **$505,046** |
| **Total Direct Costs** | | **$29,117,089** |
| **Indirect Cost** | FY20 Indirect Cost - 3.37% (Total Grant – Equipment – Transfers / 1+rate x rate) $30,031,745 – 467,300 – 1,508,655 /1.0337 x .0337 | **$ 914,656** |
| | | |
| **TOTAL** | | **$30,031,745** |

| PGCPS CARES/ESSER Timeline of Activities | FY20 | | | | FY21 | | | | | | | | | | | | | | FY22 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q3-SY20 | | Q4-SY20 | | Q1-SY21 | | | Q2-SY21 | | | Q3-SY21 | | | Q4-SY21 | | | Q1-SY22 | | | Q2-SY22 | | | Q3-SY22 | | | Q4-SY22 | | |
| | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 |
| Project Manager (Administrative) | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Equitable Services (non-public schools) | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **Operations** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Thermometers | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| PPE | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Overtime | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Sanitation Supplies | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Additional Disinfectant Machines | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Virtual Summer School through Edgenuity | X | X | X | | X | | | | | | | | | | | | | | | | | | | | | | | |
| Instruction (Summer curriculum) | | | X | X | X | | | | | | | | | | | | | | | | | | | | | | | |
| Instruction (ES Instructional videos for TV station) | X | X | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | |
| **Technology** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Technology (wi-fi) | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | | | | | | | | | | |
| Technology (student devices) | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | | | | | | | | | | |
| Technology Software | | | X | X | X | | | | | | | | | | | | | | | | | | | | | | | |
| **Communications** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tele Town Hall platform | X | X | | | X | | | X | | X | | | | | | | | | | | | | | | | | | |
| External graphics and video production support | X | X | X | X | X | | | X | X | | | | | | | | | | | | | | | | | | | |
| Upgrades to digital and video equipment (i.e., Sitemprove software | | | | | | | | | | | | | | | | X | X | | | | | | | | | | | |
| Additional Instruction Time | X | X | | | X | X | | | | | | | | | | | | | | | | | | | | | | |
| ESY Enrollment Expansion | | | X | X | X | | | | | | | | | | | | | | | | | | | | | | | |
| Trauma-Informed Care | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | |
| Academic Materials | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Food Service | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Part II – Budget Documents**

**Please submit a completed C125 workbook with the application.**

The MSDE C-1-25 budget workbook that aligns with the activities identified in Question #5 of the application. The completed MSDE C-1-25 budget workbook accompanies the application.

# EXHIBIT 9

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **STATE OF MICHIGAN, STATE OF**        Civil Case No. 3:20-cv-04478-SK
    **CALIFORNIA, et al.,**
15
                                 Plaintiffs,
16                                          **DECLARATION OF GABRIEL C. BACA**

17            v.

18  **ELISABETH D. DEVOS, in her official**
    **capacity as the United States Secretary of**
19  **Education, and UNITED STATES**
    **DEPARTMENT OF EDUCATION,**
20
                                 Defendants.
21

22

23

24

25

26

27

28

## DECLARATION OF GABRIEL C. BACA

I, Gabriel C. Baca, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Student, School and Family Support Bureau (Title I) Director at the New Mexico Public Education Department (PED) located in New Mexico.  My educational background includes an Ed.D. in Educational Administration and an M.A. in Secondary Education, both from the University of New Mexico.  I have been employed as Title I Director since June 2018.  I have worked 28 years in education, 14 of these years have been at PED in Title I, Special Education and other federal programs, and the balance have been at the district and classroom level, administering federal programs and teaching.

2.      Currently, my duties at PED include management and oversight of all programmatic and fiscal aspects of the Title I-A and Title I-D programs, the Rural, Low-income Schools program, CARES Act ESSER Fund, and the agency's planning for and implementation of the Multi-Layered System of Supports, PED's adaptation of Response to Intervention.

3.      I submit this Declaration to provide information for the State of New Mexico's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39479 (July 1, 2020), (the "Equitable Services Rule" or the "Rule").  I have compiled the information in the statements set forth below through personal knowledge, through PED personnel who have assisted me in gathering this information, and on the basis of documents that have been provided to and/or reviewed by me.  I have also familiarized myself with the Rule in order to understand its immediate impact on PED and public schools in New Mexico.

4.      Article 12 of the New Mexico Constitution addresses education; Section 6 establishes the Public Education Department, a cabinet-level agency, headed by the Secretary of Public Education.  The department has such powers and duties as are provided by law.  The secretary has administrative and regulatory powers and duties as provided by law, including all

1

functions related to the distribution of school funds and financial accounting for the public schools.

The Public School Code – Chapter 22 of the New Mexico Statutes Annotated (1973) – is the body of New Mexico law that primarily addresses public education.  Sections 22-2-1 and 22-2-2 NMSA 1978 provide for the general powers of the secretary and department.  The remainder of the Code addresses particular public school programs, the public school funding formula, school standards and graduation standards, school personnel, charter schools, vocational education, school transportation, and diverse other matters related to the administration, regulation, and oversight of public education in New Mexico.

Title 6 of the New Mexico Administrative Code, Primary and Secondary Education, contains the many rules promulgated by the Public Education Department, either explicitly or implicitly required by law, to properly administer public education in the state.

The *Martinez and Yazzie v. New Mexico*[1] consolidated lawsuit primarily addresses the education in New Mexico of those students considered at-risk: Native American students, students with disabilities, English learners, and economically disadvantaged students. The court found in that case that New Mexico had failed its constitutional duty to provide these students with an education sufficient to prepare them for college and career.  Since the ruling, numerous legislation, appropriations, regulations, and policies have been amended and adopted in an attempt to address the deficiencies noted by the court and offer our most at-risk students the opportunities to which they are constitutionally entitled.

5.     The agency's primary responsibility is for K-12 education, though it also shares some authority over prekindergarten instruction with the newly created Early Childhood Education and Care Department.  With the legislature, PED helps prepare education-related legislation and policy.  PED, based on legislative appropriations, sets the per-pupil funding value for the public schools, holds an annual convention to assist schools in developing their budgets, and is generally responsible for

---

[1] *Yazzie v. State,* No. D-101-CV-2014-02224, 2017 WL 3780960 (N.M. Dist. filed June 5, 2017) (consolidated with, *Martinez v. State*, whereby plaintiffs contended a lack of sufficient means to receive a proper education for Native American, Hispanic, and English Learner students).

administering the public school funding formula.  The department is responsible, at least as a pass-through if not as the actual agent, for the administration of most federal grants and programs, though some of those relationships are fostered directly between the federal government and local educational agencies.  PED sets curriculum standards and benchmarks for student proficiency and high school graduation, and is responsible for determining which standardized assessments are administered and for setting end-of-course evaluations. Apropos, the department tracks, compiles, and analyzes student achievement data.

The Public Education Department is the agency that licenses teachers and other certified school personnel, such as administrators and educational assistants. As such, it investigates licensure complaints and potential violations, and administers penalties.  The department's advisory panel on the administration of the special education, required by the Individuals with Disabilities Education Act, provides guidance for special education and related services for students with disabilities.  The department also provides technical assistance to school districts related to capital outlay funding and procedures.  It reviews and approves all potential lease-purchase arrangements between the public schools and potential lessors, as well as requests from school districts and schools to dispose of certain kinds of property within constitutional and statutory parameters.

Related to the Martinez and Yazzie consolidated lawsuit, PED maintains advisory panels for and oversees the implementation of the Hispanic Education Act, the Indian Education Act, and the Multicultural and Bilingual Education Act, requiring culturally and linguistically relevant instruction and support for the state's diverse student body.  The agency is the general primary authority for providing students with the educational foundation to prepare them for college and career, and includes oversight of career and technical education, next step plans for students approaching secondary education and graduation, and working in partnership with the Higher Education Department and the Workforce Solutions Department to help recent and rising graduates to prepare for life after the completion of their secondary education.

Generally, the Public Education Department is the main authority for the administration, oversight, and fiscal direction of the public schools in New Mexico.

3

6.      In 2020, legislators appropriated $3.468 billion in state funds for public education from prekindergarten through secondary schools.

7.      PED oversees 89 school districts and 50 state-authorized charter schools, for a total of 139 LEAs.  These LEAs serve 328,821 students in grades preK through 12.

8.      In New Mexico, for the 2020-21 school year, 137 LEAs (87 districts and 50 state-authorized charter schools) will receive Title I-A funds.  These 87 districts contain 638 Title I schools serving approximately 241,065 students.  The total of 2019-20 Title I final awards to LEAs in New Mexico was $119,542,263.00.

9.      There are approximately 190 private schools within the boundaries of 34 New Mexico Title I Districts.[2]

**Effects of the COVID-19 Pandemic on Education in New Mexico**

10.      The COVID-19 pandemic has drastically impacted K-12 education in New Mexico. In mid-March 2020, schools abruptly shifted to an online instructional model.  PED has engaged in frequent communication with superintendents and charter school leaders.  The Secretary and Deputy Secretaries have provided extensive guidance and have held weekly and twice weekly Zoom meetings with leaders.  PED required all LEAs to submit Continuous Learning Plans (https://webnew.ped.state.nm.us/continuous-learning-plan-support/) describing how they will continue to provide education during the time schools are closed.  PED has made Reentry and school guidance resources available to schools and families (https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/).

**CARES Act ESSER Funds Received by New Mexico For K-12 Education[3]**

11.      In order to receive the CARES Act ESSER funds designated for New Mexico and as required by the Department, PED executed a Certification and Agreement form and submitted

---

[2] New Mexico does not maintain a list of names or an accurate count of all of the private schools within the state.

[3] To my knowledge, as of July 15, 2020, final decisions regarding GEER funds for New Mexico have not be made.

4

it to the Department on April 30, 2020.[4]  A true and correct copy of the Certification and

Agreement completed by [SEA] and submitted to the Department is attached hereto as Exhibit A.

12.     Within this Certification and Agreement, [SEA] agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.
>
> . . .
>
> 4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.
>
> . . .
>
> 5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
>
> [Ex. A at pp. 1-2.]

13.     At the time that PED executed the Certification and Agreement form, the

Department had not yet published its Guidance Document or the Rule.  Accordingly, PED was

unaware that the Department would subsequently issue rules to change the required proportional

share calculation for equitable services required under the CARES Act.

14.     The Department distributed $108,574,786 from the ESSER Fund to PED on May

4, 2020.

15.     Of the ESSER funds received by PED, PED has retained $10,857,479, or 10

percent of the award, as permitted by the CARES Act to administer the fund (one-half of one

percent) and make awards (nine and one-half percent) to educational entities including LEAs for

---

[4] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, available at https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

the following COVID-19 related purposes: Closing the Digital Divide (mobile devices, internet connectivity, professional development for online learning, and related purposes); Social and Emotional Learning supports; Supporting students with disabilities and students in need of at-risk services (during a building closure or during a transition back into the school building); PPE, building sanitization and cleaning supplies; and Other (to be determined as needs emerge during the return to school and during the school year).

16.     In order to receive the ESSER 90 percent award, LEAs were required to submit an application, with assurances, to PED.  On May 14, 2020, PED released a six-page guidance memo with the application as well as application instructions.  Along with the application, LEAs were required to submit a budget for the fund that was consistent with the application.  After an LEA's application and budget are approved, the LEA may submit a request for reimbursement (RFR) against the ESSER 90 percent funds to PED.  PED staff approve the RFR for payment after they have reviewed the expenses and found them to be allowable per the CARES Act and the approved LEA application.

17.     To date, PED has distributed $97,086,484.70 in ESSER funds to all 136 eligible LEAs within New Mexico.

18.     PED held back $630,822.30 from the ESSER 90 percent award for "new charter school LEAs or charter school LEAs that will significantly expand in school year 2020-2021" per the ESSER Fund Frequently Asked Questions guidance document (https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/).

19.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), districts in New Mexico have designated $792,430.85 in ESSER funds to provide equitable services to private school students.[5]

---

[5] The amount of $792,430.85 will change, as Albuquerque Public Schools (APS), which is New Mexico's largest district (approx.. 27.13% of students in the state) recently decided to follow the Department's Guidance Document.

20.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, Districts in New Mexico would have designated a larger dollar amount to provide equitable services to private school students.  If all districts choose to calculate equitable services amounts using this methodology, more private schools may opt to participate in receiving these services under the CARES Act, and this would result in additional funds being designated for equitable services in these schools and less funds benefiting public schools.

21.     The Department's Guidance Document and Rule place PED in legal jeopardy. PED was required to certify in its ESSER Fund application that the SEA and the districts will comply with the equitable service provision of the CARES Act (§ 18005) and "any other applicable law or regulation."  (Ex. A at p. 1.)  Because the Guidance Document and the Rule require districts to calculate the proportional share for equitable services and determine eligibility of private school students for equitable services contrary to the proportional share calculation and eligibility requirements in the CARES Act, PED (and its districts) cannot satisfy both the Rule and the CARES Act.  Accordingly, the Department's Rule forces PED to violate Section 18005 of the CARES Act, placing PED in breach of the certification in the Certification and Agreement and subjecting PED to "liability under the False Claims Act, . . . [and the] OMB Guidelines to agencies on Governmentwide Debarment and Suspension (Nonprocurement)."  (Ex. A at p. 1.)

22.     As the districts in New Mexico are already using ESSER funds to assist with the numerous pandemic-related challenges, this legal jeopardy will impact PED immediately.

23.     The Department's Guidance and Rule may result in less funding being distributed to public K-12 schools in no fewer than 34 New Mexico districts.

24.     If districts in New Mexico calculate the proportional share of CARES Act funds for private school students under Option #1 in the Rule, non-Title I schools in up to 18 districts receiving CARES Act funds will receive no funds.  In New Mexico, there are approximately 119 non-Title I schools in these 18 districts (that contain private schools in their boundaries) that would not receive any CARES Act funding under this option.  In addition, under this option, there are approximately 142 Title I schools in 16 New Mexico districts that would have restrictions on

7

1   their spending of their CARES Act awards as they would need to comply with the supplement,

2   not supplant requirement in their use of these funds if eligible non-public schools elect to receive

3   supplemental services.

4         25.    All LEAs that received the CARES Act 90 percent ESSER funds currently have

5   budget authority for these funds.  Because PED moved quickly to make funds available, districts

6   have already calculated equitable services amounts.  PED initially directed districts to follow

7   Title I methodology in calculating these amounts.  PED subsequently issued a memo to districts,

8   advising them to follow Title I methodology, but allowing them to decide between the Title I

9   methodology and the methodology in the Department's Guidance Document.  Per the

10  Department's Guidance Document, the affected districts will have to recalculate equitable

11  services amounts for participating private schools, and adjust and/or eliminate CARES Act

12  budgets for some of their public schools.

13

14  I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and

15  correct.

16

17  Executed on this _15_ day of July, 2020, at _____4:45 pm MDT_____

18

19                                 _____

20                                 Gabriel C. Baca

21                                 Director
                               Student, School and Family Support Bureau

22                                 New Mexico Public Education Department

23

24

25

26

27

28

Declaration of Gabriel C. Baca  (3:20-cv-044 78-SK)

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
## for Funding under the
## Education Stabilization Fund Program
## Elementary and Secondary School Emergency Relief
## Fund (ESSER Fund)

### CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpos**e

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

**ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)**

**STATE EDUCATIONAL AGENCY**

**PART A: CERTIFICATION AND AGREEMENT COVER SHEET**

State: New Mexico                          CFDA Number: 84.425D

Legal Name: New Mexico Public Education Dept.   DUNS Number: 808561690

Chief State School Officer:                Mailing Address:

Ryan Stewart, Ed.L.D.                      300 Don Gaspar, Santa Fe, NM 87501

| | |
|---|---|
| State Contact for Elementary and Secondary School Emergency Relief Fund: Adán Delgado | |
| Position and Office: Deputy Cabinet Secretary, Finance and Operations | |
| Mailing Address: 300 Don Gaspar, Santa Fe, NM 87501 | |
| Telephone: 505-690-5412 | |
| Email address: adan.delgado@state.nm.us | |

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):       Telephone:

Ryan Stewart, Ed.L.D, New Mexico Secretary of Education                     505-795-1009

Signature of Chief State School Officer or Authorized Representative:        Date:

Ryan Stewart    Digitally signed by Ryan Stewart
                Date: 2020.04.30 08:44:40 -04'00'                            04/30/2020

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

2

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA

does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name): Ryan Stewart, Ed.L.D,

New Mexico Secretary of Education

| Signature:<br>Ryan Stewart | Digitally signed by Ryan Stewart<br>Date: 2020.04.30 08:45:05 -04'00' | Date:<br>4/30/20 |
| --- | --- | --- |

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
   - How the LEA will determine its most important educational needs as a result of COVID-19.
   - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
   - The extent to which the LEA intends to use ESSER funds to promote remote learning.
   - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

---

Given the pressing needs our LEAs face in light of COVID-19, we intend to use a streamlined application process.

We will collect assurances that LEAs will comply with all applicable federal requirements, including allowable uses of funds, reporting, financial management, and recordkeeping requirements.  We will also ask LEAs to provide budgets describing how they intend to spend ESSER funds.

---

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

The New Mexico Public Education Department proposes to allocate the 9.5% of ESSER funds available for distribution at the discretion of the SEA to education entities, including LEAs, for the following purposes:

- Closing the Digital Divide (mobile devices, internet connectivity, professional development for online learning, and related purchases): 60%
- Social and Emotional Learning Supports: 19%
- Supporting students with disabilities and students in need of at-risk services (during a building closure or during a transition back into the school building): 10%
- PPE, Building Sanitization and Cleaning Supplies: 2%
- Other, to be determined as needs emerge during the return to school and during the school year: 9%

Any funds not fully expended from a category will be shifted to other categories as needed.

NMPED will distribute funds via grants.  Education entities' eligibility for these grants will be based in part on their percentage and/or number of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth.

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §  §200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.
   Chief State School Officer or Authorized Representative (Printed Name): Ryan Stewart, Ed.L.D, New Mexico Secretary of Education

| Signature:<br>Ryan Stewart | Digitally signed by Ryan Stewart<br>Date: 2020.04.30 08:45:52 -04'00' | Date:<br>04/30/2020 |
| --- | --- | --- |

## Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

9

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

---

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

# EXHIBIT 10

1    XAVIER BECERRA
Attorney General of California
2    MICHAEL NEWMAN
Senior Assistant Attorney General
3    SARAH E. BELTON
Supervising Deputy Attorney General
4    REBEKAH A. FRETZ
JAMES F. ZAHRADKA II
5    GARRETT LINDSEY (SBN 293456)
Deputy Attorneys General
6     300 South Spring Street, Suite 1702
   Los Angeles, CA 90013
7     Telephone: (213) 269-6402
   E-mail:  Garrett.Lindsey@doj.ca.gov
8    *Attorneys for Plaintiff State of California*

9

10               IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14 | **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,** | Civil Case No. 3:20-cv-04478-SK |

15

16                  Plaintiffs,       **DECLARATION OF MATTHEW STEM**

17       **v.**

18    **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,**

19

20

21                Defendants.

22

23

24

25

26

27

28

## DECLARATION OF MATTHEW STEM

I, Matthew Stem, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the Deputy Secretary for the Office of Elementary and Secondary Education for the Pennsylvania Department of Education ("PDE"). I have served in this role since 2015. Prior to joining PDE, I worked in school systems for more than 20 years, serving as a teacher, principal and assistant superintendent. I have a Bachelor's Degree in Elementary Education from Millersville University and a Master's Degree in Educational Administration from Temple University.

2.     In my role as Deputy Secretary for the Office of Elementary and Secondary Education, I am responsible for the management and oversight of programs related to Pre-K to 12 education for students in Pennsylvania.

3.     I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through PDE personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on PDE and public schools in Pennsylvania.

### Public Education in Pennsylvania

4.     The Pennsylvania Constitution requires the General Assembly to "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. Art. III § 14.

5.     PDE is responsible for overseeing Pennsylvania's public school districts, more than 170 public charter schools, public cyber charter schools, public Career and Technical

1

Centers/Vocational Technical schools, public Intermediate Units, the education of youth in State Juvenile Correctional Institutions, Head Starts and publicly funded preschools, as well as institutions of higher education.

6.      Pennsylvania has 500 public school districts, ranging in size from approximately 200 students to more than 140,000 students. There are 2,865 schools in these 500 districts, which educate more than 1.72 million students each year.

7.      Funding for Pennsylvania schools is provided by a mix of federal, state, and local sources. PDE oversees the distribution of state funding to local school districts. The Commonwealth provides more than $12 billion each year to Pennsylvania's public school districts.

8.      While PDE has broad oversight responsibility, primary authority for administering public school districts in Pennsylvania is vested in local school boards, which consist of elected or appointed directors who serve set terms. *See* 24 P.S. §3-301. These local school boards are responsible for setting policies and regulations governing the schools in their districts.

**Effects of the COVID-19 Pandemic on Education in Pennsylvania**

9.      The COVID-19 pandemic has had an unprecedented impact on schools across the country, including those in Pennsylvania.

10.     In March 2020, Governor Tom Wolf ordered schools across Pennsylvania closed on an interim basis. On April 9, 2020, Secretary of Education Pedro A. Rivera ordered all schools to remain closed for the remainder of the 2019-2020 school year.

11.     Pennsylvania ended the 2019-2020 fiscal year with $32.3 billion in General Fund collections, $3.2 billion, or 9.1 percent, below estimate.

12.     Under the direction of Governor Tom Wolf, PDE has provided guidance for local schools as they address whether and how to reopen this fall.

13.     On June 3, 2020, PDE issued a 13-page document entitled "Preliminary Guidance for Phased Reopening of Pre-K to 12 Schools."

14.     That guidance required each school district or other school entity to create a Health and Safety Plan to "serve as the local guidelines for all school reopening activities." These plans

2

"must be tailored to the unique needs of each school entity and should be created in consultation with local health agencies, if possible." Each school entity's Health and Safety Plan must be approved by its governing body.

15.     Reopening will not be an easy process for our schools. For many, reopening will require renovations or reconfiguration of physical spaces in order to ensure appropriate social distancing. Beyond steps to protect the physical health of students and staff, school entities must also be prepared to address the impact that the pandemic and accompanying closures have had on students and families.

**CARES Act Funds Received by Pennsylvania For K-12 Education**

16.     In order to receive the ESSER funds designated for Pennsylvania and as required by the Department, PDE executed a Certification and Agreement form and submitted it to the Department on May 4, 2020.[1]  A true and correct copy of the Certification and Agreement completed by PDE and submitted to the Department is attached hereto as Exhibit A.

17.     Within this Certification and Agreement, PDE agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.
>
> . . .
>
> 4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.
>
> . . .
>
> 5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the

---

[1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, *available at* https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

Declaration of Matthew Stem (3:20-cv-04478-SK)

ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

- The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.

- The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.

- The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

Ex. A at pp. 1-2.

18.     At the time that PDE executed the Certification and Agreement form, the Department had not yet published the Rule. It had, on April 30, 2020, issued a nonbinding document entitled, "Providing Equitable Services to Students and Teachers under the Coronavirus Aid, Relief, and Economic Security (CARES) Act Programs" (the "Guidance Document").

19.     On May 7, 2020, Pennsylvania Secretary of Education Pedro A. Rivera wrote to Assistant Secretary for Elementary and Secondary Education Frank T. Brogan expressing concern regarding the Guidance Document. This letter is attached hereto as Exhibit B.

20.     That letter noted that the Guidance Document was "inconsistent with the CARES statute; the fiscal year 2019 Title I-A administration that serves as the basis of CARES Act allocations; and, crucially, our shared goal of ensuring that limited, one-time, emergency funding reaches our most vulnerable students, wherever they attend school."

21.     The Department distributed $523,807,198 from the ESSER Fund to PDE on May 5, 2020.

22.     PDE opened its application for LEAs to apply for and receive ESSER funds on May 13, 2020. The process involves a streamlined application and prompt action by PDE to move complete applications through the federally required approval process.

23.     To date, PDE has distributed $111,280,869 to 284 eligible LEAs within Pennsylvania, which represents 42% of LEAs eligible to receive ESSER Funds.

4

24.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), LEAs in Pennsylvania would reserve $19,202,578 in ESSER funds to provide equitable services to private school students. However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, LEAs in Pennsylvania would reserve more than double this amount to provide equitable services to private school students.

**The Department's Rule Significantly Harms PDE**

25.     At a time when Pennsylvania faces a $3.2 billion hole in its education budget as a result of the pandemic, and local revenues are estimated to fall by another $1 billion, PDE will be required to find more than $20,000,000 to support emergency needs of public schools that the CARES Act funds were supposed to fill.

26.     In addition, the SEA will be required to provide significant funding to Title I schools that are not allowed to use the CARES Act funds to supplant their budgets, which have been slashed due to the pandemic.

27.     This increase in funding for public schools will be required immediately.  As Pennsylvania remains in the throes of the pandemic, public schools remain desperate for funding as they continue to transition to remote learning and preparing for next school year.  The costs of reacting to this pandemic are drastic for public schools and without the funds the CARES Act was intended to provide, PDE must immediately assist the LEAs adjust to the new realities presented by the pandemic.

28.     Beyond the additional funding that Pennsylvania will be required to expend in lieu of the designated CARES Act funds, the Department's Guidance Document and Rule have imposed signification administrative burdens on PDE directly.

29.     Finally, the Department's Guidance Document and Rule place PDE in legal jeopardy.  PDE was required to certify in its ESSER Fund application that the SEAs and the LEAs will comply with the equitable service provision of the CARES Act (§ 18005) and "any other applicable law or regulation."  (Ex. A at p. 1.)  Because the Guidance Document and the Rule require LEAs to calculate the proportional share for equitable services and determine

5

1   eligibility of private school students for equitable services contrary to the proportional share

2   calculation and eligibility requirements in the CARES Act, PDE (and its LEAs) cannot satisfy

3   both the Rule and the CARES Act.  Accordingly, the Department's Rule forces PDE to violate

4   Section 18005 of the CARES Act, placing PDE in breach of the certification in the Certification

5   and Agreement and subjecting PDE "liability under the False Claims Act, . . . [and the] OMB

6   Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)."

7   (Ex. A at p. 1.)

8       30.     As the LEAs in Pennsylvania need to use the ESSER funds as soon as possible to

9   assist with the numerous pandemic-related challenges, this legal jeopardy will impact PDE

10  immediately.

11              **The Department's Rule Significantly Harms Pennsylvania's K-12 Students**

12      31.     The Department's Guidance and Rule will result in less funding being distributed

13  to public K-12 schools in Pennsylvania.

14      32.     If LEAs in Pennsylvania calculate the proportional share of CARES Act funds for

15  private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving

16  CARES Act funds will receive no funds.  In Pennsylvania, there are approximately 1140 non-

17  Title I schools in LEAs that are eligible to receive CARES Act funds that would not receive any

18  funding.  Like all schools in Pennsylvania, these schools are equally impacted by the COVID-19

19  pandemic and would greatly benefit from the influx of CARES Act funds to assist them through

20  the pandemic.  In addition, there are approximately 1,700 Title I schools in Pennsylvania that

21  would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as

22  the schools cannot supplant State and local funding sources under the Rule.  This would

23  significantly impact the Title I schools, as many are in desperate need of additional funding to

24  cope with the pandemic, and to assist students with online, remote learning tools that students

25  often cannot afford within these Title I schools.

26      33.     If LEAs in Pennsylvania calculate the proportional share of CARES Act funds for

27  private school students under Option #2 in the Rule, approximately $20,000,000 will be diverted from

28  less advantaged public school students to more advantaged private school students.

6

a.   This increase in support flowing from the most disadvantaged to more advantaged students impacts districts of every type—urban, suburban, and rural.

b.   Estimated impacts include: Philadelphia: 53%; Pittsburgh: 124%; Altoona: 605%; Scranton: 797%; Northeast Bradford: 932%; Upper Darby: 1104%; Manheim Township: 1617%; Bristol Borough: 2324%; Blue Ridge: 3873%; York Suburban: 4084%; and Rose Tree Media: 4634%.

34.     For every $3 diverted from the public schools (Title I or non-Title I schools), a public-school student loses out on systems to access online learning while schools are closed due to the pandemic.

35.     Regardless of how LEAs proportion the CARES Act funds in Pennsylvania, the Rule requires that all private school students receive equitable services.  In Pennsylvania, during the 2019-2020 school year, approximately 26,202 private school students were eligible to receive equitable services under Title I-A as they were at-risk students within a LEA receiving Title I-A funds.  As the Rule requires all private school students receiving equitable services, the approximately 23,796 private school students who received equitable services under Title I-A last year will receive fewer services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 16 day of July 2020

_Matthew S. Stem_

_____
Matthew S. Stem
Deputy Secretary

7

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
# for Funding under the
# Education Stabilization Fund Program
# Elementary and Secondary School Emergency Relief
# Fund (ESSER Fund)

## CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds SEAs:**

The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs**:

LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

**ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)**

**STATE EDUCATIONAL AGENCY**

**PART A: CERTIFICATION AND AGREEMENT COVER SHEET**

| | |
|---|---|
| **State**: Pennsylvania | **CFDA Number**: 84.425D |
| **Legal Name**: Pennsylvania Department of Education | **DUNS Number**: 795145705 |
| **Chief State School Officer**: Pedro A. Rivera | **Mailing Address**:<br>Pennsylvania Department of Education<br>333 Market Street<br>10th Floor<br>Harrisburg, PA 17126-0333 |

| **States Contact for Elementary and Secondary School Emergency Relief Fund**: | |
|---|---|
| Susan McCrone<br>Chief, Division of Federal Programs<br>333 Market Street<br>5th Floor<br>Harrisburg, PA 17126-0333<br>717 579-7168<br>smccrone@pa.gov | Adam Schott<br>Special Advisor to the Secretary<br>333 Market Street<br>10th Floor<br>Harrisburg, PA 17126-0333<br>717 439-0623<br>adschott@pa.gov |

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

| **Chief State School Officer**: Pedro A. Rivera | **Telephone**: 717 783-9780 |
|---|---|
| **Signature of Chief State School Officer**:<br><br>*[signature]* | **Date**: May 4, 2020 |

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B: PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The Pennsylvania Department of Education and Secretary Pedro A. Rivera assure the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

2

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act. In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

**Chief State School Officer or Authorized Representative**: Pedro A. Rivera

| | |
|---|---|
| **Signature**: *Pedro Rivera* | **Date**: May 4, 2020 |

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
   - How the LEA will determine its most important educational needs as a result of COVID- 19.
   - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
   - The extent to which the LEA intends to use ESSER funds to promote remote learning.
   - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.
   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

Pennsylvania will finalize a streamlined CARES subgrant application in consultation with key stakeholders, including its State Board of Education, statewide education organizations, the state's Title I Committee of Practitioners, and representatives of a purposeful sample of local education agencies. The application will require LEAs to describe procedures for evaluating local COVID-19 impacts in relation to education programming and delivery. Areas of emphasis may include:
- Documenting learning loss associated with extended school closure;
- Outlining the development of local continuity of education plans over the course of emergency response efforts; and
- Detailing supports for vulnerable student populations and families.

LEAs will be asked to identify a core set of strategies that can guide local investment of CARES funding, associated with short-range (*i.e.*, remainder of the 2019-20 school year) and long-range (2020-21 and 2021-22 school years) time horizons.

These strategies may entail the establishment, scale-up, refinement, or evaluation of remote learning, as well as strategies for school-based teaching and learning responsive to conditions related to the pandemic. LEAs will be asked to outline how limited, one-time CARES funding may support these initiatives and how CARES funding might interact with other federal funding, including enhanced Title IV flexibility, to ensure strategic and sustainable use of one-time funds.

Subgrant applications will require LEAs to identify specific plans, measures, and longer-term evaluative strategies concerning student learning gaps—as well as opportunity to learn factors—stemming from COVID-19.

Finally, Pennsylvania will secure assurances that LEAs will comply with all applicable federal requirements, including equitable services provisions, allowable uses of funds, reporting, fiscal management, and recordkeeping requirements.

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - Technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

Pennsylvania plans to utilize its SEA reserve (10 percent, inclusive of 0.5 percent for SEA administration) to support initiatives, including remote learning, that can be designed, implemented, and resourced with greater economy of scale at the state level than would be possible or practical for LEAs to pursue individually.

It is important to note that Pennsylvania uses remote learning to describe a range of modalities that connect educators, students, and high-quality instruction outside the traditional school building. This may involve distance learning via large-scale or nationally sourced platforms, locally constructed virtual systems, partnerships between institutions of higher education and LEAs, public broadcast systems, enhanced educator and family engagement, and other means. A broadened definition of remote learning honors Pennsylvania's strong tradition of local control, reflects the diversity of the state's education landscape, and acknowledges the need for a mix of appropriate delivery methods in the context of long-term school closures.

More specifically, Pennsylvania's reservation plans include:
- Expanding access to equitable statewide online blended, and offline learning platforms, with particular attention to access for students with disabilities, English learners, students in concentrated poverty, and other at-risk student populations;
- Strengthening support and accountability for full-time virtual schools while building local capacity to design, deliver, and evaluate the efficacy of online and blended learning;
- Supporting intensive teacher and school leader professional development on remote delivery and pedagogy;
- Providing direct resources and technical assistance to close learning and non-academic gaps stemming from extended school closures;

- Providing direct resources and technical assistance on mental health and trauma-informed practices, including those with demonstrated efficacy in distance learning settings;
- Identifying and implementing practices that foster remote collaboration among core content teachers and teachers of students with disabilities and English learners;
- Supporting partnerships between LEAs and IHEs to ensure an explicit focus on remote learning in preservice student teaching experiences; and
- Recognizing the role of parents in supporting remote learning through focused family engagement strategies.

## PART D: OTHER ASSURANCES AND CERTIFICATIONS

The Pennsylvania Department of Education and Secretary Pedro A. Rivera assure or certify the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEA will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

**Chief State School Officer or Authorized Representative**: Pedro A. Rivera

| | |
|---|---|
| **Signature**: *Pedro Rivera* | **Date**: May 4, 2020 |

## Appendix A: Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B: STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

---

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

---

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

# EXHIBIT B



May 7, 2020

The Honorable Frank T. Brogan
Assistant Secretary for Elementary and Secondary Education
Office of Elementary and Secondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Dear Assistant Secretary Brogan:

Thank you for your leadership in ensuring timely, clear communication from the U.S. Department of Education (USDE) as states respond to the immediate effects of the COVID-19 pandemic, implement state-level waivers granted by your agency, and work to administer emergency funding under the Coronavirus Aid, Relief, and Economic Security (CARES) Act.

As Pennsylvania's CARES planning unfolds, I am seeking clarification concerning USDE's "Providing Equitable Services to Students and Teachers under the Coronavirus Aid, Relief, and Economic Security (CARES) Act Programs" document issued April 30, 2020.  While I understand that this guidance does not have the force and effect of law, the document has created confusion as Pennsylvania works to ensure timely allocation of CARES Act funds.

Under the CARES Act statute and USDE's longstanding interpretation of equitable participation, local education agency (LEA) reservations for services to nonpublic schools are based on the number of low-income children in each participating non-public school in the LEA. USDE's guidance, suggesting that LEAs should instead base these calculations on the total number of nonpublic students, is inconsistent with the CARES statute; the fiscal year 2019 Title I-A administration that serves as the basis of CARES Act allocations; and, crucially, our shared goal of ensuring that limited, one-time, emergency funding reaches our most vulnerable students, wherever they attend school.

Initial analysis by the Pennsylvania Department of Education over the past 24 hours, using data derived from approximately 45 percent of the commonwealth's school districts, indicates that USDE's April 30 guidance would roughly double Equitable Services reservations, compared with the statutorily defined calculation.  These sharply increased reservations would impact districts of every type—large urban, small urban, suburban, and rural; please see below for a sampling of these impacts.

| School districts | Increase in support flowing from most disadvantaged to more advantaged students |
|---|---|
| Large Urban | |
| Philadelphia | 53% |
| Pittsburgh | 124% |
| Small Urban | |
| Altoona | 605% |
| Erie City | 104% |
| Greater Johnstown | 110% |
| Scranton | 797% |
| Williamsport Area | 564% |
| York City | 354% |
| Suburban | |
| Bristol Borough | 2324% |
| Manheim Township | 1617% |
| Rose Tree Media | 4634% |
| Upper Darby | 1104% |
| York Suburban | 4084% |
| Rural | |
| Blue Ridge | 3873% |
| Clarion Area | 735% |
| Mifflin County | 335% |
| Northeast Bradford | 932% |
| Warren County | 248% |

These outcomes, observed in districts and communities of every type, are clearly inequitable. Accordingly, I urge USDE to clarify the April 30 guidance, outline data elements and procedures for calculating equitable services consistent with the CARES Act, and encourage LEAs to use the percentage of FY 2019 Title I funds set aside for equitable services and apply that percentage to ESSER allocations and any GEER funds.  This approach will ensure that critical CARES support is provided in a consistent, transparent, and equitable manner.


Sincerely,

Pedro A. Rivera
Secretary of Education



cc:  Council of Chief State School Officers

# EXHIBIT 11

XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
REBEKAH A. FRETZ
JAMES F. ZAHRADKA II
GARRETT LINDSEY (SBN 293456)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6402
  E-mail:  Garrett.Lindsey@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **STATE OF MICHIGAN, STATE OF CALIFORNIA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,**<br><br>Defendants. | Civil Case No. 3:20-cv-04478-SK<br><br>**DECLARATION OF BENJAMIN R. JONES** |

## DECLARATION OF BENJAMIN R. JONES

I, Benjamin R. Jones, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Chief Legal Counsel at the Wisconsin Department of Public Instruction (DPI). My educational background includes a Bachelor of Arts in Political Science and a Juris Doctor from the University of Wisconsin Law School. I have been employed as Chief Legal Counsel since January 20, 2019.

2. I oversee the DPI Office of Legal Services which provides legal advice to the Wisconsin State Superintendent of Public Instruction ("State Superintendent") and the DPI on all matters of state and federal law, including administrative rule development, interpretation, and implementation.

3. I submit this Declaration in support of the State of Wisconsin's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule"). I have compiled the information in the statements set forth below through DPI personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand its immediate impact on DPI and public schools in Wisconsin.

**Background about Agency's Work in Education and State's Education Programs**

4. The Wisconsin Constitution requires the state legislature to establish district schools which are to be "as nearly uniform as practicable" and "free and without charge for tuition to all children." Wis. Const. art. X § 3. The supervision of public instruction is vested in the State Superintendent who is elected on a nonpartisan spring ballot for a term of four years. The State Superintendent is charged under Wisconsin statutes with the general supervision of public instruction and leads DPI in implementing policies and promulgating administrative rules.

5. The general duties of the State Superintendent include developing and disseminating information to the public on all matters relating to preschool, elementary and

1

1    secondary education.  Wis. Stat. § 115.28.  These duties include making rules to establish

2    standards of attainment and procedures for the examination and licensing of teachers, reviewing

3    teacher licensing applications, conducting complaint investigations, and making

4    recommendations for revocation of licenses if necessary.  Responsibilities also include accepting

5    and administering federal funds, developing and implementing a statewide assessment and

6    accountability system, which includes publishing annual accountability report cards per state law

7    and accountability reports under the Elementary and Secondary Education Act of 1965 ("ESEA").

8    DPI has staff throughout the agency responsible for meeting data reporting requirements under

9    state and federal law.  In order to meet many of these reporting requirements, the department has

10   established and implements a WISE data system, which is a data collection system that allows

11   local educational agencies (LEAs) to submit data to DPI from the student information system

12   (SIS) vendor of their choice.  DPI is responsible for administering the United States Department

13   of Agriculture (USDA) nutrition programs, Institute of Museum and Library Sciences grants,

14   Centers for Disease Control Youth Risk Behavior Surveys, the Carl D. Perkins Career and

15   Technical Education Act, the Individuals with Disabilities Education Act ("IDEA"), and ESEA.

16        6.      In the 2019-2020 school year, DPI administered approximately $6.1 billion in state

17   support for K-12 public schools; $4.8 billion of that involved general school aids and the

18   remaining $1.3 billion involved categorical aids and grants for special education, transportation,

19   class size reduction, and other targeted priorities.  Additionally, DPI is responsible for monitoring

20   compliance with levy limits on $4.4 billion in local school property taxes and administering

21   penalties as required by law.

22        7.      DPI oversees 443 LEAs, comprised of 517 high schools, 22 junior high schools,

23   347 middle schools, 1,217 elementary schools, 87 combined elementary and secondary schools,

24   209 charter schools, and 26 non-district charter schools, with a combined total student enrollment

25   of 854,959.  In the 2018-19 school year, 14% of students were students with disabilities, 6% of

26   students were English learners, 40.7% of students were considered economically disadvantaged;

27   69.3% of students were white, 9.1% of students were black or African American, and 12.3% were

28   Hispanic.  In the 2019-20 school year, 435 LEAs in Wisconsin received federal funds under Title

I, Part A of the ESEA ("Title I-A"), which allocates funding to schools based on the number of low-income students; 1171 schools received Title I-A funds; and 430,048 students attended schools receiving Title I-A funds.  In the 2019-20 school year, Wisconsin had 809 private schools located within the boundaries of Title I-A LEAs.

### Effects of the COVID-19 Pandemic on Education in the State

8.     The COVID-19 pandemic has drastically impacted K-12 education in Wisconsin.

9.     Wisconsin closed all schools beginning on March 23, 2020, through the end of the school year (June 30, 2020).  Schools were allowed to continue to provide meals to students as well as virtual instruction.  Local school districts were allowed to designate essential staff to complete essential government functions.  School board meetings were also allowed either virtually or in-person while following health guidelines.

10.     The 421 school districts were each responsible for developing and implementing their own remote educational program.  Each school district and independent charter school has done the best they can to ensure the safety of their staff and students, based on the resources available to them.  This resulted in a wide variety of remote and virtual learning opportunities.  Without time to prepare, study, test, and revise remote learning models, school districts and independent charter schools were faced with immense challenges: navigating a regulatory framework that does not suitably address the circumstances of the current pandemic; providing students from all socioeconomic backgrounds with equitable access to curriculum; enabling teachers to deliver curriculum in an entirely different and unfamiliar space; keeping staff safe while performing essential services; and adjusting policies and procedures to address the needs of students, families, and local communities.

11.     Moving into the next school year, schools will need to evaluate students and address any learning loss.  They will need to determine if additional education is required for special education students if goals were not met in individualized education plans.  They also need to plan for a very different school year full of new health procedures and multiple health scenarios.  They need to address how they will provide learning if they have to operate in a virtual environment for part or all of a year for some or all of their students.  They need to have back up

3

1    plans in place if they are closed.  They need to plan for educational models that fit the unique

2    situation of the school and evolving health scenarios.  Having to plan for all of these unknown

3    variables and contingencies is extremely taxing on public and private schools.

4          12.     The pandemic has had an even more severe impact on Title I-A LEAs.  For

5    example, three of the four Wisconsin school districts with the highest rates of COVID-19 cases as

6    of June 2, 2020, were large school districts in Green Bay, Racine and Milwaukee, where 63%,

7    66% and 82% of the districts' students, respectively, are economically disadvantaged.

8          13.     DPI has provided guidance and support to districts, requested and has been granted

9    waivers from the federal government under the ESEA and USDA school nutrition programs, and

10   has made policy decisions to help support school districts in the provision of educational services

11   during the health emergency.  DPI is also authorized under Wis. Stat. § 118.38 to grant school

12   districts waivers from certain statutory and regulatory requirements upon request.  DPI has

13   approved school district requests for waivers around the annual minimum number of school

14   hours, civics test graduation requirement, and educator effectiveness requirements.  DPI has

15   provided policy guidance regarding special education under the IDEA, and policies under state

16   law related to graduation, attendance, course completion, and grades.  DPI has also coordinated

17   with the Wisconsin Department of Health Services, in providing health-related guidance for

18   schools.  DPI has developed return-to-school guidance to keep students and staff safe, providing

19   models for school operations, and illustrating best practices around teaching and learning to

20   address new models of learning and learning losses related to the extended closure.  This is a

21   monumental amount of planning, representing a change to the entire way in which school districts

22   approach school operations—and it needs to occur in a short timeframe.

23         14.     COVID-19 is expected to have a significant impact on school district budgets due

24   to unanticipated costs to: ensure access to virtual instruction for all students, sanitize school

25   facilities, train teachers and staff for new learning environments, increase transportation capacity

26   to maintain social distancing, address staff shortages from decisions to self-quarantine, and other

27   expenditures that are necessary to ensure an environment that is as safe as possible and to provide

28   learning that is outside the traditional format.  These costs, combined with the economic impact

4

1   of COVID-19 on the state of Wisconsin and decreases in state and local government revenues,

2   will create difficult budget decisions for school districts across the state.

3        15.    Almost all DPI staff have moved to a telework environment.  This has caused a

4   significant shift in agency practices as all school district conferences and support typically done

5   in person have had to be transitioned to a virtual environment.  At the same time, DPI has

6   reprioritized its time and focus across the agency.  DPI created a common website and portal to

7   receive and respond to questions related to COVID-19.  DPI has issued guidance on a nearly daily

8   basis to address a rapidly changing situation.  Statutes and administrative rules that failed to

9   anticipate this pandemic and its effects continue to create significant challenges for school

10  operations.  DPI has had to create new processes and solutions with stakeholders to effectively

11  meet the needs of schools.  All agency staff and divisions have been affected by COVID-19 and

12  its implications.

13                    **CARES Act Funds Received by Wisconsin for K-12 Education**

14      A.  Elementary and Secondary School Emergency Relief (ESSER) Funds

15       16.    In order to receive the ESSER funds designated for Wisconsin and as required by

16  the Department, DPI executed a Certification and Agreement form and submitted it to the

17  Department on May 15, 2020.[1]  A true and correct copy of the Certification and Agreement

18  completed by DPI and submitted to the Department is attached hereto as Exhibit A.

19       17.    Within this Certification and Agreement, Wisconsin agreed to the following terms:

20         I acknowledge and agree that the failure to comply with all Assurances and
    Certifications in this Agreement, all relevant provisions and requirements of

21         the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other
    applicable law or regulation may result in liability under the False Claims Act,

22         31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide
    Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted

23         and amended as regulations of the Department in 2 CFR part 3485; and 18
    USC § 1001, as appropriate.

24  

25         . . .

26         4. LEAs receiving ESSER funds will provide equitable services to students

             ————————————

27      [1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education
    Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER
    Fund), CFDA Number 84.425D, April 24, 2020, *available at*

28  https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

. . .

5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.

[Ex. A at pp. 1-2.]

18.     At the time that DPI executed the Certification and Agreement form, the Department had not yet issued the Rule.

19.     The Department distributed $174,777,774 from the ESSER Fund to DPI on May 18, 2020.

20.     Of the ESSER funds received by DPI, DPI intends to retain $16,233,474 as permitted by the CARES Act to provide statewide services, including building capacity for, and expanding access to, high quality online instructional resources; providing training for educators in the provision of online and remote instruction; expanding and building capacity of school staff to provide mental health services to better support students; and to cover administrative costs.

21.     Wisconsin will use its federal grants portal, WISEgrants, for LEAs to apply for and receive ESSER funds.  This portal allows LEAs to budget-in allowable categories and serves as the first level of DPI monitoring of these funds.  The process is very similar to the process used by LEAs to apply for and receive other federal funds, including ESEA Title I, Part A; Title II, Part A; Title III, Part A; Title IV, Part A; and IDEA.

22.     To date, DPI has not distributed any funds to eligible LEAs within Wisconsin.

23.     LEAs are currently preparing grant applications.

24.     Using the proportional share calculation set forth in in Title I-A, LEAs in Wisconsin would reserve approximately $18,739,938 in ESSER funds to provide equitable services to private school students.

25.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, LEAs in Wisconsin would reserve

6

1   approximately $21,974,242 in ESSER funds to provide equitable services to private school

2   students.  Thus, under the Department's preferred proportional share calculation, private school

3   students in Wisconsin would have access to an additional $3,234,304, and public schools would

4   lose this same amount of funds.

5        B.  Governor's Emergency Education Relief (GEER) Funds

6        26.   Wisconsin was awarded $46,550,411 from the GEER Fund on June 1, 2020.

7        27.   The Wisconsin Governor's Office has determined that LEAs will receive

8   $46,550,411 from the GEER fund.  The Governor's Office has requested DPI to help distribute

9   these funds through DPI's existing systems.  Equitable participation applies to these funds

10  similarly and DPI will make a similar adjustment to these funds to assure the funds are set aside

11  for equitable participation.  When the list of districts is determined, a share will be set aside based

12  on the number of low-income students.  DPI estimates that under the Department's preferred

13  proportional share calculation, private school students in Wisconsin would have access to an

14  additional estimated $950,211.64, and public schools would lose this same amount of funds.

15                    **The Department's Rule Significantly Harms DPI**

16        28.   If every LEA in Wisconsin followed Option #1 (Title I-A-schools only Option) in

17  proportioning the CARES Act funds for equitable services, the new supplement and not supplant

18  requirement of Option #1 will create significant confusion among school districts.  Prior to

19  issuing the Rule, the Department had explicitly communicated that supplement and not supplant

20  rules did not apply to CARES Act funds.[2]  DPI will have to advise school districts that budgets

21  developed without this requirement in mind will need to be revamped, and that the flexibility in

22  how school districts may use these funds to address COVID-19 has been significantly curtailed.

23        29.   As Wisconsin remains in the throes of the pandemic, public schools remain

24  desperate for funding as they continue to transition to remote learning and preparing for next

25  school year.  Policies and procedures must be developed for remote learning; teachers must be

26  _____

     [2] U.S. Dep't of Educ., ELEMENTARY AND SECONDARY SCHOOL EMERGENCY
     RELIEF FUND, Frequently Asked Questions about the Elementary and Secondary School
27   Emergency Relief Fund (ESSER Fund), #20, *available at*
     https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf.

28

7

1    trained to use remote learning techniques; school buildings must be thoroughly sanitized; and

2    school districts have to prepare to provide remote learning for students who will not return to

3    school.  The procedures and considerations for districts are many and can be seen in the DPI's

4    guidance to school districts.[3]  The costs of reacting to this pandemic are drastic for public schools

5    and without the funds the CARES Act was intended to provide, DPI must immediately assist the

6    LEAs adjust to the new realities presented by the pandemic.

7        30.    The Department's Guidance Document and Rule have imposed significant

8    administrative burdens on DPI: DPI staff have spent over 180 hours publishing a webpage, FAQ

9    document and guidance on allowable costs, programming WISEgrants, answering questions and

10   attempting to interpret the Department's interpretation of the CARES Act and how funds are

11   meant to be allocated and used.  Of that 180 hours, approximately one-third of that time was spent

12   trying to understand the Department's guidance and the Rule, resolve conflicts between the Rule

13   and the CARES Act, and address confusion created by the Rule among stakeholders.  DPI

14   estimates that its staff will dedicate approximately 3,500 hours to administering the ESSER Fund

15   from July 1, 2020, through September 30, 2020.

16       31.    DPI has finite staff and resources, and the amount of time necessary to interpret

17   and address the Department's guidance and Rule for CARES Act fund allocation has diverted

18   resources that could be dedicated to the many other priorities created by COVID-19.

19       32.    If the rule applies, DPI would have to develop two monitoring systems, one for

20   LEAs that chose Option #1 and a separate system for Option #2.  Very little of the systems would

21   be applicable to the other, due to differences in allowable costs and services, so it would require a

22   very significant amount of additional work.  If DPI is required to administer two options for

23   LEAs to allocate and use ESSER Funds as provided by the Rule, then DPI estimates a substantial

24   increase—potentially double—in the necessary hours for administering these funds.

25       33.    A number of private schools are refusing to certify that LEAs are providing timely

26   and meaningful consultation as required by Section 1117 of Title I-A.  Due to the confusion

27   ───────────────
         [3] Wisconsin Dep't of Pub. Instruction, EDUCATION FORWARD, Reopening
     Wisconsin's Schools, *available at*
28   https://dpi.wi.gov/sites/default/files/imce/sspw/pdf/Education_Forward_web.pdf.

1    caused by the Department's guidance and Rule, several private schools are refusing to certify that

2    the LEA's program design is equitable with respect to private school students. A number of other

3    private schools are refusing to certify LEAs are providing timely and meaningful consultation as

4    required by Section 1117 of Title I-A.

5         34.    Finally, the Department's Guidance Document and Rule place DPI in potential

6    legal jeopardy. DPI was required to certify in its ESSER Fund application that DPI and the LEAs

7    will comply with the equitable service provision of the CARES Act (§ 18005) and "any other

8    applicable law or regulation." (Ex. A at p. 1.) Because the Guidance Document and the Rule

9    require LEAs to calculate the proportional share for equitable services and determine eligibility of

10   private school students for equitable services contrary to the proportional share calculation and

11   eligibility requirements in the CARES Act, it is hard to see how DPI (and its LEAs) can

12   seemingly satisfy both the Rule and the CARES Act. Accordingly, the Department's Rule forces

13   DPI to effectively violate Section 18005 of the CARES Act, potentially placing DPI at risk of

14   breaching the certification in the Certification and Agreement and subjecting DPI to "liability

15   under the False Claims Act, . . . [and the] OMB Guidelines to Agencies on Governmentwide

16   Debarment and Suspension (Nonprocurement)." (Ex. A at p. 1.)

17        35.    As the LEAs in Wisconsin need to use the ESSER funds as soon as possible to

18   assist with the numerous pandemic-related challenges, this legal jeopardy will impact DPI

19   immediately.

20              **The Department's Rule Significantly Harms Wisconsin's K-12 Students**

21        36.    Due to the confusion created by the Department's interpretation of the equitable

22   service requirements, DPI has needed to take additional time to determine the distribution and use

23   of funds. This would not have been necessary with clear and lawful guidance from the

24   Department.

25        37.    The Department's Guidance and Rule will result in less funding being distributed

26   to public K-12 schools in Wisconsin.

27        38.    If LEAs in Wisconsin calculate the proportional share of CARES Act funds for

28   private school students under Option #1 in the Rule, non-Title I schools in LEAs receiving

                                             9

1    CARES Act funds will receive no funds.  In Wisconsin, there are approximately 1044 non-Title I

2    public schools in LEAs that are eligible to receive CARES Act funds that would not receive any

3    funding.  Like all public schools in Wisconsin, these schools are equally impacted by the COVID-

4    19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them

5    through the pandemic.  In addition, there are approximately 1171 Title I-A public schools in

6    Wisconsin that would be limited in their ability to use CARES Act funds to respond to and

7    prepare for the pandemic, as, per the Department's Rule, the schools cannot supplant State and

8    local funding sources.  This would significantly impact the Title I-A schools, as many are in

9    desperate need of additional funding to cope with the pandemic, and to assist students with

10   online, remote learning tools that students often cannot afford within these Title I-A schools.

11   Option #1 also would restrict district-wide activities which may be necessary to respond to this

12   global pandemic.  For example, LEAs may not be able to use these funds to properly clean and

13   disinfect school buses, if those buses are used to transport students in both Title I-A and non-Title

14   I-A schools.  An LEA would not be able to fund a district-wide, or even grade-level wide,

15   professional learning on remote instruction if not all schools received Title I-A funds.  The

16   administrative barriers would be increased, and the practical uses of the funds would be

17   significantly restricted in manners far less than what is explicitly permitted in the statute.

18          39.     If LEAs in Wisconsin calculate the proportional share of CARES Act funds for

19   private school students under Option #2 in the Rule, approximately $4,184,515.64 of ESSER and

20   GEER funds will be diverted from public schools to private school students, which represents

21   roughly 2% of Wisconsin's total ESSER/GEER fund award.  As an example, in Wisconsin's

22   second largest school district, the Madison Metropolitan School District, using the proportional

23   share formula in Title I-A would result in an estimated $121,866 for equitable services.  Using the

24   total enrollment formula would result in an estimate of $621,938, a difference of $500,072, or

25   9.5% of the total allocation.  This would have a major impact.

26          40.     Additionally, for every $78,627 diverted from the public schools (Title I-A or non-

27   Title I-A schools), a public school teacher in Milwaukee, WI may lose their position and be

28   unable to provide students with access to learning during the pandemic.

10

41.     Regardless of how LEAs proportion the CARES Act funds in Wisconsin, the Rule requires that all private school students receive equitable services.  In Wisconsin, during the 2018-2019 school year, approximately 11,714 private school students were eligible to receive equitable services under Title I-A, as they were at-risk students within a LEA receiving Title I-A funds.  As the Rule requires all private school students to receive equitable services, the Rule will shift funds away from private schools that have higher low-income populations and towards schools with higher enrollment, but less low-income students.  The approximately 11,714 private school students who received equitable services under Title I-A last year will receive less services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _15th_ day of July, 2020, at _Monona, Wisconsin_

Benjamin R. Jones
Chief Legal Counsel

11

# EXHIBIT A

# U.S. Department of Education

# Certification and Agreement
# for Funding under the
# Education Stabilization Fund Program
# Elementary and Secondary School Emergency Relief
# Fund (ESSER Fund)

## CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

### Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

## ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State: Wisconsin                                    CFDA Number: 84.425D

Legal Name: Wisconsin Department of Public Instr    DUNS Number:  809611254

Chief State School Officer:                         Mailing Address:

 Carolyn Stanford Taylor                            125 S. Webster Street, Madison, WI 53703

| | |
|---|---|
| State Contact for Elementary and Secondary School Emergency Relief Fund: Jonas Zuckerman | |
| Position and Office: Director, Title I | |
| Mailing Address:     125 S. Webster Street, Madison, WI 53703 | |
| Telephone:     608-267-9136 | |
| Email address:     jonas.zuckerman@dpi.wi.gov | |

To the best of my knowledge and belief, all the information and data in this agreement are true and correct.  I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

| Chief State School Officer or Authorized Representative (Typed Name): | Telephone: |
|---|---|
| Jennifer Kammerud | (608) 266-7073 |

| Signature of Chief State School Officer or Authorized Representative: | Date: |
|---|---|
| Jennifer A. Kammerud   Digitally signed by Jennifer A. Kammerud  Date: 2020.05.15 12:52:28 -05'00' | 05/15/2020 |

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1.  The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2.  The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3.  The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
    The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4.  The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5.  The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
    - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
    - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
    - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6.  The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7.  The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act. In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8. The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9. The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: Jennifer A. Kammerud | Digitally signed by Jennifer A. Kammerud Date: 2020.05.15 12:53:24 -05'00' | Date: 05/15/2020 |
|---|---|---|

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
   - How the LEA will determine its most important educational needs as a result of COVID-19.
   - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
   - The extent to which the LEA intends to use ESSER funds to promote remote learning.
   - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

See response on attached.

4

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

See response on attached.

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature:<br>Jennifer A. Kammerud   Digitally signed by Jennifer A. Kammerud<br>Date: 2020.05.15 12:53:59 -05'00' | Date:<br>05/15/2020 |
|---|---|

6

## Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for "Education Stabilization Fund", $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

9

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B: STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|-------|------------|---------------------------|-------------------------|-----------------------------------|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

---

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ⅓ of 1 percent of the total allocation for administrative costs.



Carolyn Stanford Taylor, State Superintendent

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

**Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:**

**1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:**
- **How the LEA will determine its most important educational needs as a result of COVID19.**
- **The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.**
- **The extent to which the LEA intends to use ESSER funds to promote remote learning.**
- **How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.**

**The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and §1228a).**

The Wisconsin Department of Public Instruction uses a department-developed federal grants management system, WISEgrants, which aligns with the 2 CFR 200 Federal Uniform Grant Guidance, the Education Department's General Administrative Regulations, and Wisconsin's Uniform Financial Accounting Requirements. WISEgrants is developed and managed by dedicated WDPI staff, so the ability to distribute and monitor ESSER funds will be streamlined and executed with expediency.

Currently, Wisconsin LEAs have a signed paper copy of GEPA assurances on record with WDPI. This GEPA assurance was last collected from existing LEAs in SFY 2009-2010. As part of the WISEgrants ESSER web-based application, WDPI will have electronic versions of the GEPA assurances digitally signed by district administrators or independent charter school administrators to ensure that subrecipients have easy access to this document in the future (from paper to web-based accessibility).

WDPI will provide technical assistance to LEAs regarding the many varied purposes allowed under the law. WDPI will also provide technical assistance and information on ESSERF set aside funds to address issues related to supporting remote learning for all students, including historically underserved populations. LEAs will be made fully aware of the reporting requirements that will be part of the ESSERF application process.

The following will be the ESSERF application steps for eligible Wisconsin subrecipients:

1. Digitally sign assurances that the LEA will comply with the provisions of all applicable statutes and regulations, including an assurance about maintaining staff to the extent practicable.

2. Digitally sign a current copy of the assurances that meet the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

3. Upload an affirmation of consultation form from each private school located within the school district's boundaries confirming or denying their participation in CARES Act services.

4. Provide a description of the steps the LEA proposes to take to ensure equitable access to, and participation in, its Federally-assisted program for students, teachers, and other program beneficiaries who may experience any of these barriers: gender, race, national origin, color, disability, and age as required under GEPA Section 427.

5. Develop separate budgets, under a single grant, for regular education, special education and private school equitable services. The WISEgrants web-based budget software has the capability of:

   o Tying each detailed budget item to an allowable activity under Section 18003(d); including:

      I.    Preparedness and Response to COVID-19
      II.   Outreach & Service Delivery to Special Populations
      III.  Addressing Long-term School Closure
      IV.   Educational Technology
      V.    Mental Health Services and Supports
      VI.   Addressing Afterschool and Summer Learning

   o Tying detailed budget items to specific private schools served by the LEA.

   o Collecting staff FTE to determine the LEA's need to use federal funds to continue employing existing staff.

   o Tracking carryover amounts for each budget type (regular education, special education and private school services).

6. Reviewing ESSER applications will be a WDPI priority in order to ensure subrecipients have expedited access to funds. The staff completing the review will also provide LEAs with technical assistance on allowable costs.

7. LEAs will be able to claim funds based on DPI-approved applications. Funds will be claimed by budget type (general education, special education, private school services) and by allowable ESSER activity.

**2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:**
- **technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and**
- **remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators**.

WDPI plans to use its SEA reserve monies to assist schools statewide in response to the COVID-19 pandemic. This plan prioritizes the needs of all students, especially students most in need who are described in Section 18003(d)(4) of the CARES Act. WDPI was required under state statutes to get approval for its plan to use CARES Act funds from the state legislature's Joint Committee on Finance. The provisions below were part of the plan submitted related to this application questions. WDPI received approval of our plan on May 13, 2020.

*Building capacity for, and expanding access to, high quality online instructional resources.*

WDPI will collaborate with three strategic state partners to support online, blended, and remote instructional delivery systems. Examples of existing partnerships the department could build upon include:

- The Wisconsin Digital Learning Collaborative (WDLC). This is a partnership between WDPI, the Wisconsin Virtual School out of Cooperative Education Service Agency (CESA) 9, and the eSchools Network, and is Wisconsin's state-designated web academy. The WDLC partners currently support over 300 schools with online and blended courses. They are well-positioned to increase both leadership capacity for planning around online instruction, and access to online and blended learning courses for students in grades 6-12.
- The CESA Instructional Technology Network. The Network will help implement local training and leadership planning assistance.
- The Institute for Personalized Learning (IPL). A division of CESA 1, the Institute assists districts in creating and delivering learner-centered, instructional design principles, and technology-rich learning experiences. The Institute has a wealth of resources to assist schools in creating blended and digitally rich learning experiences.

The department plans to focus on providing additional capacity to facilitate access to online and blended courses and support for schools to build out their own high-quality online or blended instruction. An additional focus will be placed on areas of need as expressed by stakeholders. For example, addressing literacy and math needs for any loss of learning or credit recovery due to the COVID-19 pandemic.

*Providing training for educators in the provision of online and remote instruction.*

DPI will work with educator preparation programs to prepare educators for delivering instruction in online and remote settings. Educator preparation programs almost exclusively make use of face-to-face, pre-clinical and clinical placements for prospective teachers. K-12 education in Wisconsin has been primarily delivered in physical classrooms with teachers present. Thus, teachers are generally not prepared for teaching in an online or a blended environment as part of their formal training.

Providing extensive training to educators in online and remote teaching techniques this summer and next fall would help schools prepare to address statewide or localized school closures during the 2020-21 school year, as well as how to work with students who are not able to attend school for health reasons.

Additionally, educator preparation programs for School Counselors, School Social Workers, and School Psychologists typically do not include training on how to provide teleservices to students. LEAs need recommendations for best practices in implementing teleservices for K-12 students, as well as training in how to use available technology.

# EXHIBIT 12

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **STATE OF MICHIGAN, STATE OF**          Civil Case No. 3:20-cv-04478-SK
    **CALIFORNIA, et al.,**
15
                                  Plaintiffs,
16                                             **DECLARATION OF DR. JANICE K.**
            v.                                 **JACKSON**
17

18  **ELISABETH D. DEVOS, in her official**
    **capacity as the United States Secretary of**
19  **Education, and UNITED STATES**
    **DEPARTMENT OF EDUCATION,**
20
                                  Defendants.
21

22

23

24

25

26

27

28

## DECLARATION OF DR. JANICE K. JACKSON

I, Dr. Janice K. Jackson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Chief Executive Officer of the Board of Education of the City of Chicago (referred to herein as "CBOE") located in Chicago, Illinois.  My educational background includes a Master of Education degree with a field of study in leadership and administration, as well as a Doctor of Education degree with a field of study in urban education leadership, both from the University of Illinois at Chicago.  Prior to becoming CEO, I was the District's Chief Education Officer.  I also held positions within CBOE as a network chief, principal, and teacher.

2.      The CBOE is the local educational agency ("LEA') for the City of Chicago.

3.      I submit this Declaration in support of the CBOE's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule").  I have compiled the information in the statements set forth below through personal knowledge and through CBOE personnel who have assisted me in gathering this information from our institution.  I have also familiarized myself with the Rule in order to understand its immediate impact on CBOE and public schools in Chicago.

### CBOE'S EDUCATION PROGRAMS

4.      The Illinois School Code created the CBOE, also known as City of Chicago School Dist. #299 or the Chicago Public Schools ("CPS"), and charged it with responsibility for public schools within the territorial limits of the City of Chicago.  The Board currently consists of seven members who, pursuant to the School Code, 105 ILCS 5/34-3, are appointed by the Mayor of the City of Chicago.  The Board's CEO is also appointed by the Mayor.

5.      CBOE is the third largest school district in the United States, with over 355,000 students at over 600 different schools.  Most schools in the district, whether prekindergarten-8th grade, elementary, middle, or secondary, have attendance boundaries restricting student enrollment to within a given area.  CBOE offers a broad array of alternative educational programs for its

1

1 students, including magnet schools, cluster programs, public military academies, career academies,

2 and charter schools.

3       6.     Of the approximately 355,000 students served by the Board, about 76% qualify as

4 economically disadvantaged, almost 19% are English Learners, 3.5% are homeless, and about 15%

5 have IEPs. Over 46% of the district's student body is Latino, 36% is African American, 11% is

6 White, 4% is Asian, and 1.3% is mixed race.

7       7.     To meet its objectives, the CBOE relies upon funds from local, state, and federal

8 sources. The CBOE's annual budget for the 2020 school year is $6.9 billion. The CBOE derives

9 about $3.8 billion of its funding through local sources, while the State of Illinois contributes almost

10 $2.3 billion, and the federal government provides about $767 million.

11       8.     CPS estimates that it will receive about $245 million in Title I funding for the 2020

12 school year. Pursuant to Title I, the CBOE designates schools eligible for Title I funding based on

13 poverty percentages. CBOE uses the same methodology for the entire district. Every school with a

14 poverty index of 40 or above receives Title I funding, with a few other schools qualifying for Title I

15 status based on waivers. Overall, about 89% of CPS schools qualify for Title I discretionary

16 funding.

17       9.     CBOE estimates that it will receive approximately $206 million under the CARES

18 Act.

19       10.     In the 2019 school year, there were approximately 213 non-public schools in the

20 territorial limits of the City of Chicago. Out of those schools, about 129 had Title I programs. Non-

21 public schools are affiliated with one of five different organizations, referred to as their affiliate

22 representatives: Catholic Archdiocese of Chicago, Chicagoland Lutheran Education Foundation

23 Association, Independent Schools, Associated Talmud Torahs (ATT), and the Christian Schools.

24       **EFFECTS OF THE COVID-19 PANDEMIC ON EDUCATION IN CHICAGO**

25       11.     The COVID-19 pandemic has drastically impacted K-12 education in Chicago.

26       12.     In response to the pandemic, the CBOE curtailed in-person instruction on March 17,

27 2020. Given CBOE's student population, CBOE had to take additional steps and incur additional

28 expenses to ensure all students had access to the technology necessary to participate in remote

1  learning.  CBOE also had to devote substantial resources to converting its free breakfast and lunch

2  program to a takeout/delivery model, as 77.9% of CBOE students qualify for free or reduced meals

3  at school.

4      13.    Early on in the pandemic, CBOE recognized that (1) remote learning was the only

5  means to safely continue education during the pandemic, and (2) the "digital divide" prevented may

6  CPS students from partaking in remote learning.  CBOE estimates indicated that in excess of

7  100,000 students did not have digital learning tools necessary to participate in remote learning.  In

8  response, CBOE embarked on an unprecedented and ambitious program to distribute over 100,000

9  devices to needy students.  The Board adopted a plan to ensure that all homeless students received

10  such a device as well as a 4G LTE internet hotspot.

11      14.    Since the advent of the pandemic, CBOE also recognized the on-going importance of

12  nutrition to student learning.  Hence, CBOE has offered "Grab and Go" meals at 270 locations

13  within the City of Chicago.  For many low-income residents of the City, these meals are an essential

14  service.  To date, the Board has served over 17.5 million meals.

15      15.    CBOE also incurred considerable expenses in purchasing personal protective

16  equipment and conducting rigorous cleansing on all of its facilities, so as to decrease the spread of

17  COVID-19.

18      16.    CBOE also incurred expenses for premium pay awarded to the essential workers who

19  provided services to the most at-risk populations during the pandemic.

20      17.    All told, CBOE expended over $76 million to date on expenses directly related to the

21  pandemic.

22      18.    CBOE expects to incur additional substantial expenses associated with reopening its

23  schools in the Fall for the 2020 school year.  In particular, CBOE staff have undertaken the process

24  of designing systems and protocols to be implemented at every school designed to diminish the

25  chances of COVID-19 transmissions.  The Illinois State Board of Education recently published

26  guidelines to assist Illinois school districts in reopening, and those guidelines include temperature

27  checks, social distancing to the extent possible, masks, and staff training.

28

1          **CARES ACT FUNDS RECEIVED BY CHICAGO FOR K-12 EDUCATION**

2      A. <u>Elementary and Secondary School Emergency Relief (ESSER) Funds</u>

3          19.      In order to receive the ESSER funds designated for Chicago and as required by the

4 Department (and the Illinois State Board of Education ("ISBE"), Chicago executed a Certification

5 and Agreement form and submitted it to ISBE on June 29, 2020.[1]  A true and correct copy of the

6 Program Assurances completed by Chicago and submitted to the ISBE (SEA), as part of the ESSER

7 Grant application, is attached hereto as Exhibit A.  In conjunction with the receipt of ESSER funds

8 from the Illinois State Board of Education, the CBOE certified as follows:

9
10            By checking this box, the applicant hereby certifies that he or she has read, understood and will comply with the assurances listed below, as applicable to the program for which funding is requested.

11
12            1. Entities that receive Elementary and Secondary Emergency Relief Funds must provide nonpublic equitable services consistent with Title I, Part A requirements.

13
14            2. Entities that receive Elementary and Secondary Emergency Relief Funds must retain control of CARES Act funds and items purchased with such funds for private school.

15
16            3. Entities that receive Elementary and Secondary Emergency Relief Funds can provide equitable services directly or contract with a public or private entity to do so.

17
18
19            4. Entities that receive Elementary and Secondary Emergency Relief Funds that choose to use CARES funds for population(s) normally served in one or more of the following federal programs will comply with requirements of those programs: ESSA, IDEA, Perkins, McKinney Vento, and/or Adult Education and Family Literacy.

20
21            5. The applicant will cooperate in carrying out any evaluation of the program conducted by or for the State Educational Agency, the Secretary, or other Federal officials.

22
23            6. The applicant will use such fiscal control and fund accounting procedures to ensure proper disbursement of, and accounting for, federal funds paid to the applicant under each such program.

24          20.      At the time that Chicago executed the Certification and Agreement form, the

25 Department had not yet published the Rule.  Moreover, it was the understanding within CBOE that

---

26        [1] Upon information and belief, the State of Illinois, as the SEA, executed a Certification with the U.S. Department of Education.  U.S. Dep't of Educ., Certification and Agreement for

27 Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, *available at*

28 https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

1  amendments to the Heroes Act could impact the Department's proposed rule.  The CBOE was not

2  aware that the Department would subsequently issue rules to change the required proportional share

3  calculation for equitable services required under the CARES Act and the private-school students

4  eligible to receive equitable services under the CARES Act.

5      21.    Using the proportional share calculation set forth in Section 1117 of the Elementary

6  and Secondary Education Act (ESEA), the CBOE, as the LEA for Chicago, would reserve $18.5

7  million in ESSER funds to provide equitable services to private school students.

8      22.    However, using the proportional share calculation set forth in the Department's

9  Guidance Document and in Option #2 in the Rule, CBOE would reserve $28.67 million in ESSER

10  funds to provide equitable services to private school students.  Thus, under the Department's

11  preferred proportional share calculation, private school students in Chicago would have access to an

12  additional $10.17 million, and public schools would lose this same amount of funds.

13      B.  Governor's Emergency Education Relief (GEER) Funds

14      23.    Chicago has not yet received any GEER Fund revenues for fiscal year 2020.

15      24.    The Governor's Office is responsible for distributing the GEER funds, and has not

16  yet advised CBOE about the availability, amount, or proper allocation of those funds.

17          **THE DEPARTMENT'S RULE SIGNIFICANTLY HARMS CHICAGO**

18      25.    In considering the harms introduced by the Rule, it bears emphasis that the Rule was

19  released mere weeks before the beginning of the school year, magnifying the harms described below

20  because of the haste demanded to adapted to the new, unexpected provisions required by the Rule.

21      26.    For every dollar that is diverted from public schools as a result of the Department's

22  Guidance Document and Rule, the CBOE will be required to backfill these dollars in its budget.  At a

23  time when Chicago faces a substantial deficit in its education budget as a result of the pandemic, the

24  CBOE will be required to find $10 million to fill the budgets of public schools that the CARES Act

25  funds were intended to fill.

26      27.    Even if Chicago, as the LEA, followed Option #1 (Title I-schools only Option) in

27  proportioning the CARES Act funds for equitable services, about sixty non-Title I schools in

28  Chicago that were expecting to receive CARES Act funds cannot be funded under the Rule.  In

1    addition, Chicago will be required to provide significant funding to Title I schools that risk

2    supplanting violations under Title I if they use the CARES Act funds to supplant their budgets.

3          28.     These shortfalls in funding for public schools in Chicago will be experienced

4    immediately.  As Chicago remains in the throes of the pandemic, public schools remain desperate for

5    funding as they prepare for next school year.  The CBOE is in the process of devising a plan for the

6    2020 school year that will ensure the safety of staff and students, while also facilitating learning.

7    That plan will include, amongst other things, personal protective equipment, social distancing, and

8    some continued remote learning.

9          29.     Beyond the funding shortfalls that Chicago will sustain as a result of the loss of the

10   intended CARES Act funds, the Department's Guidance Document and Rule have imposed

11   significant administrative burdens on Chicago directly at a time those burdens can least be afforded.

12         30.     The CBOE Budget Director is charged with responsibility for assisting school and

13   department leaders to maximize and align funds to their programmatic priorities supporting staff,

14   students, and school communities.  The uncertainty in funding levels complicates this mission.  In

15   addition, the staff at the Office of Budgets and Grant Management has dedicated time and resources

16   to evaluating the Rule and Guidance Document from the U.S. Department of Education, so as to

17   ensure proper planning and compliance.

18         31.     Staff from the Office of Budgets and Grant Management meet with the affiliated

19   private schools on a regular basis.  The Rule issued by the U.S. Department of Education has created

20   friction in the CBOE's relationship with the non-Title I private schools in that the representatives of

21   those affiliations contend that the CBOE did not engage in timely and meaningful consultation

22   before the LEA made any decision that affected the equitable participation of eligible private school

23   children in the CARES Emergency Relief Grant program.  These certifications of non-compliance

24   reference the U.S. Department of Education's revised equitable share calculation formula.

25         32.     The Department's Guidance Document and Rule place Chicago in legal jeopardy.

26   Chicago was required to certify in its ESSER Fund application that the CBOE will "ensure proper

27   disbursement of, and accounting for, federal funds . . . ."  (Exh. A).  Because the Guidance

28   Document and the Rule require LEAs to calculate the proportional share for equitable services and

6

---

1    determine eligibility of private-school students for equitable services contrary to the proportional

2    share calculation and eligibility requirements in the CARES Act, Chicago cannot satisfy both the

3    Rule and the CARES Act.  Accordingly, the Department's Rule forces Chicago to violate Section

4    18005 of the CARES Act.  As the CBOE and other Title I schools in Chicago need to use the

5    ESSER funds as soon as possible to assist with the numerous pandemic-related challenges, this legal

6    jeopardy will impact Chicago immediately.

7               **THE RULE SIGNIFICANTLY HARMS CHICAGO'S K-12 STUDENTS**

8         33.    The Department's interpretation of the equitable service requirements has injected

9    delay in the CBOE's distribution of much needed coronavirus relief funds to schools.

10        34.    The Department's Guidance and Rule will result in less funding being distributed to

11    public K-12 schools in Chicago.

12        35.    If CBOE, as the LEA in Chicago, calculates the proportional share of CARES Act

13    funds for private school students under Option #1 of the Rule, 66 non-Title I public schools in

14    Chicago will receive no funds under the CARES Act.  In addition, there are approximately 434 Title

15    I public schools in Chicago that would risk a supplanting violation under Title I if CBOE uses

16    CARES Act funds to respond to and prepare for the pandemic as it cannot supplant State and local

17    funding sources under the Rule.

18        36.    If LEAs in Chicago calculate the proportional share of CARES Act funds for private

19    school students under Option #2 in the Rule, approximately $10 million will be diverted from public

20    schools to 84 non-Title I eligible private schools.  This diversion of resources represents about 5% of

21    Chicago's total CARES Act funding for education.

22        37.    Regardless of how CBOE proportions the CARES Act funds in Chicago, the Rule

23    requires that all private school students receive equitable services.  In Chicago, during the 2019-2020

24    school year, approximately 17,367 private school students were eligible to receive equitable services

25    under Title I-A as they were at-risk students within a LEA receiving Title I-A funds.  As the Rule

26    requires all private school students receiving equitable services, the approximately 17,367 private

27    school students who received equitable services under Title I-A last year will receive less services as

28

7

---

1  the CARES Act funds proportioned for equitable services will be spread amongst all private school

2  students.

3

4  I declare under penalty of perjury under the laws of the United States and State of California that

5  the foregoing is true and correct.

6

7  Executed on this 15th day of July, 2020

8

9  _____

10  Dr. Janice K. Jackson
    CEO, Chicago Board of Education

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

# EXHIBIT A

7/14/2020                                          Grant Application

CBOE Exhibit A
Decl. of Dr. Janice K. Jackson

[ Close Printer Friendly Page ]

**Applicant:** CITY OF CHICAGO SD 299          **County:** Cook          [ Elementary and Secondary School Emergency Relief Grant ⌄ ]
**Application:** 2019-2020 Elementary and Secondary
School Emergency Relief Grant - ER
**Cycle:** Original Application                                          <u>Click to Return to Application Select</u>

**Project Number:** 20-4998-ER-15-016-2990-25-
Emergency Relief

| <u>Program Assurances</u> | <u>State Assurances</u> | <u>Debarment</u> | <u>Lobbying</u> | <u>GEPA  442</u> | <u>GATA Assurances</u> | <u>Assurances</u> |
|---|---|---|---|---|---|---|

**Specific Terms of the Grant**                                          [ <u>Instructions</u> ]

☑ By checking this box, the applicant hereby certifies that he or she has read, understood and will comply with the assurances listed below, as applicable to the program for which funding is requested.

1. Entities that receive Elementary and Secondary Emergency Relief Funds must provide nonpublic equitable services consistent with Title I, Part A requirements.

2. Entities that receive Elementary and Secondary Emergency Relief Funds must retain control of CARES Act funds and items purchased with such funds for private school.

3. Entities that receive Elementary and Secondary Emergency Relief Funds can provide equitable services directly or contract with a public or private entity to do so.

4. Entities that receive Elementary and Secondary Emergency Relief Funds that choose to use CARES funds for population(s) normally served in one or more of the following federal programs will comply with requirements of those programs:  ESSA, IDEA, Perkins, McKinney Vento, and/or Adult Education and Family Literacy.

5. The applicant will cooperate in carrying out any evaluation of the program conducted by or for the State Educational Agency, the Secretary, or other Federal officials.

6. The applicant will use such fiscal control and fund accounting procedures to ensure proper disbursement of, and accounting for, federal funds paid to the applicant under each such program.

7. The applicant will:

   A. submit such reports to the Illinois State Board of Education and the Secretary as the State Educational Agency and Secretary may require, including quarterly expenditure and performance reports.

   B. maintain such records, provide such information, and afford such access to the records as the Illinois State Board of Education or the Secretary may reasonably require to carry out the duties of the State Educational Agency or the Secretary.

8. Any summer school or extended year activities will take place in a safe and easily accessible facility. The grantee will ensure that any program to be located in a facility other than an elementary or secondary school is at least as accessible to the students to be served as if the program were located in an elementary or secondary school.

9. The LEA addresses both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations.

10. The LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act. In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

11. The uses of funds by the LEAs or other entities demonstrates compliance with Section 18003(d), such as any use of funds addresses the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

12. Every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department

Grant Application

and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

13. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

EXHIBIT 13

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                IN THE UNITED STATES DISTRICT COURT

10             FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **STATE OF MICHIGAN, STATE OF**          Civil Case No. 3:20-cv-04478-SK
    **CALIFORNIA, et al.,**
15
                               Plaintiffs,
16                                              **DECLARATION OF ERIC S. GORDON**

17          v.

18  **ELISABETH D. DEVOS, in her official**
    **capacity as the United States Secretary of**
19  **Education, and UNITED STATES**
    **DEPARTMENT OF EDUCATION,**
20
                               Defendants.
21

22

23

24

25

26

27

28

## <u>DECLARATION OF ERIC S. GORDON</u>

I, Eric S. Gordon, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Chief Executive Officer of the Cleveland Municipal School District (CMSD) located in Cleveland, Ohio.  CMSD is the school district operated and maintained by the Cleveland Municipal School District Board of Education.  My educational background includes a Bachelor's of Science in Secondary Mathematics and a Master's Degree in Education Administration and Supervision, both from Bowling Green State University.  I have been employed as CEO since June 2011.  In my role as CEO, I have led development of the Cleveland Plan, a collaborative process that has transformed public education in the City of Cleveland.  I have also been active nationally in the implementation of the Common Core State Standards curriculum and in the implementation of Social and Emotional Learning Standards for children.

2.      As CEO, I am responsible for overseeing all aspects of District operations, including curriculum, employment, facilities and budgeting.

3.      I submit this Declaration in support of CMSD's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule").  I have compiled the information in the statements set forth below through personal knowledge, through CMSD personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me.  I have also familiarized myself with the Rule in order to understand its immediate impact on CMSD and public schools in Ohio.

**Background about CMSD's Work in Education and State's Education Programs**

4.      CMSD is the second largest school district in Ohio.  For many years, CMSD has faced a variety of challenges relating to its operations, finances, academics, and enrollment,

1

among other things.  While other Ohio school districts may face similar challenges, the persistence of the problems at CMSD is exceptional and unique.  Accordingly, over the past 15 years, CMSD has engaged in a comprehensive effort to confront these and other systemic challenges and improve the quality of educational opportunities available to all of our students.  In 2006 and 2007, the District adopted and began implementing a Portfolio School Strategy for testing new models of education in a small number of schools to demonstrate that high quality schools in Cleveland could attract and retain students.  Among other things, these test schools were provided increased autonomy in exchange for local accountability.  In 2010, the District adopted and began implementing its Academic Transformation Plan, a comprehensive approach to central office redesign and school-by-school improvement.  Increased autonomy and accountability for individual schools was likewise a focus of the Academic Transformation Plan.

5.      The barriers to transformative change remained substantial, and could not be surmounted by the District acting on its own.  Many were a function of statutory or decisional law; others collective bargaining agreements; and others longstanding practices and customs.  I therefore began working with others on the development of a statutory plan to update, modernize, streamline and create flexibility within the statutory law applicable to CMSD.  Among other things, our work focused on identifying outdated, inefficient and burdensome practices that continued to stand as a barrier to change.  We then brought in and worked with the various stakeholders to create, and achieve consensus with respect to, more efficient and up-to date alternatives specifically tailored to meet CMSD's unique needs.  These efforts ultimately led to the drafting and enactment of The Cleveland Plan for Transforming Schools (the "Cleveland Plan").

6.      In 2013, the District was faced with the prospect of being taken over by the State because of low student achievement.  Following the passage of the Cleveland Plan, CMSD requested a waiver of the establishment of an academic distress commission, which would have restructured the District and put all District operations under State control.  The Ohio Department of Education ("ODE") granted CMSD's request for a waiver based on the Cleveland Plan, stating that because the Cleveland Plan was a coordinated effort to improve student achievement, the

2

1    appointment of an academic distress commission would be duplicative and could interfere with

2    the Cleveland Plan.

3        7.    Ohio school districts are funded primarily through local property taxes and state

4    support.  In Fiscal Year 2020, CMSD budgeted for $425.7 million in local support, $541.2 million in

5    state support, and $113.2 million in federal support.  CMSD did not realize these full revenues due to

6    the COVID-19 pandemic.

7        8.    CMSD comprises 103 public schools and serves approximately 37,700 K-12

8    students.  All of CMSD's students are considered economically disadvantaged.

9        9.    All of CMSD's 103 schools receive Title I funding.

10       10.    In addition, 35 private schools within Cleveland's city limits qualify for Title I

11   equitable services funds, and 31 participate.  Fifty-one private schools outside the city's limits

12   qualify through CMSD, and 23 of those participate.

13                **Effects of the COVID-19 Pandemic on Education in Ohio**

14       11.    The COVID-19 pandemic has drastically impacted K-12 education in Ohio.

15       12.    The largest category of the CMSD's funding is Foundation Funding, which CMSD

16   receives from the State of Ohio.  Faced with deep budgetary cuts because of the economic impact

17   of the COVID-19 pandemic, Ohio reduced CMSD's Foundation Funding in Fiscal Year 2020 by

18   more than $5.6 million.  CMSD will experience similar cuts in Fiscal Year 2021 and also

19   anticipates a drop in local property tax collections.

20       13.    COVID-19 also had substantial non-economic impacts on school districts in Ohio.

21   The Governor ordered all schools to close effective March 17, and most districts transitioned to

22   online learning.  Given CMSD's student population, CMSD had to take additional steps and incur

23   additional expenses to ensure all students had access to the technology necessary to participate in

24   remote learning.  CMSD also had to devote substantial resources to converting its free breakfast

25   and lunch program to a takeout/delivery model, as 100 percent of CMSD students qualify for free

26   or reduced meals at school.

27                **CARES Act Funds Received by CMSD for K-12 Education**

28   A.  Elementary and Secondary School Emergency Relief (ESSER) Funds

3

14.     In order to receive the ESSER funds designated for Ohio and as required by the Department, ODE executed a Certification and Agreement form and submitted it to the Department on May 5, 2020.[1]  A true and correct copy of the Certification and Agreement completed by ODE and submitted to the Department is attached hereto as Exhibit A.

15.     Within this Certification and Agreement, ODE agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.
>
> . . .
>
> 4. LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.
>
> . . .
>
> 5. LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
>
> [Ex. A at pp. 1-2.]

16.     At the time that ODE executed the Certification and Agreement form, the Department had not yet published its Guidance Document or the Rule.  Accordingly, ODE and CMSD were unaware that the Department would subsequently issue rules to change the required proportional share calculation for equitable services required under the CARES Act and the private school students eligible to receive equitable services under the CARES Act.

17.     ODE distributed $31.2 million from the ESSER Fund received from the Department to CMSD on May 26, 2020.

---

[1] U.S. Dep't of Educ., Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund), CFDA Number 84.425D, April 24, 2020, *available at* https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

4

18.     Using the proportional share calculation set forth in Section 1117 of the Elementary and Secondary Education Act (ESEA), CMSD would reserve $26.9 million in ESSER funds to provide equitable services to private school students.

19.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 in the Rule, CMSD would reserve $26.1 million in ESSER funds to provide equitable services to private school students.  Thus, under the Department's preferred proportional share calculation, private school students in Cleveland would have access to an additional $822,045, and public schools would lose this same amount of funds.

B.  Governor's Emergency Education Relief (GEER) Funds

20.     Ohio received $104.9 million from the GEER Fund.

21.     The Ohio Governor's Office is responsible for distributing the GEER funds, working in collaboration with ODE.

22.     CMSD has not yet received any GEER funding, nor is it clear if will receive GEER funding.

**The Department's Rule Significantly Harms CMSD**

23.     CMSD is unlikely to be able to backfill any of the dollars diverted from public schools as a result of the Department's Guidance Document and Rule.  At a time when Ohio faces a $300 million hole in its education budget as a result of the pandemic, CMSD will see further cuts rather than relief that the CARES Act funds were supposed to bring.

24.     As Ohio remains in the throes of the pandemic, public schools remain desperate for funding as they continue to transition to remote learning and preparing for next school year. Policies and procedures must be developed for remote learning; teachers must be trained to use remote learning techniques; school buildings must be thoroughly sanitized; and students and families must be educated on their learning options.  The costs of reacting to this pandemic are drastic for public schools and without the funds the CARES Act was intended to provide, CMSD is put at a disadvantage in adjusting to the new realities presented by the pandemic.

25.     The State of Ohio mandated that each district seek out the economically disadvantaged numbers from private schools outside the city limits, along with all non-taxed/non-

5

1   chartered schools within the city limits and document those numbers in order to calculate

2   equitable services allocations.  CMSD then had to calculate and create separate equitable services

3   scenarios.  This slowed the process for the public CARES funds to be allocated because CMSD

4   had to determine the proper non-public set-aside first.

5         26.     Finally, the Department's Guidance Document and Rule place CMSD in legal

6   jeopardy.  Ohio was required to certify in its ESSER Fund application that ODE, CMSD and

7   other schools in the state will comply with the equitable service provision of the CARES Act (§

8   18005) and "any other applicable law or regulation." (Ex. A at p. 1.) Because the Guidance

9   Document and the Rule require CMSD to calculate the proportional share for equitable services

10  and determine eligibility of private school students for equitable services contrary to the

11  proportional share calculation and eligibility requirements in the CARES Act, CMSD cannot

12  satisfy both the Rule and the CARES Act.  Accordingly, the Department's Rule forces CMSD to

13  violate Section 18005 of the CARES Act, placing CMSD in breach of the certification in the

14  Certification and Agreement and subjecting ODE and CMSD to "liability under the False Claims

15  Act, . . . [and the] OMB Guidelines to Agencies on Governmentwide Debarment and Suspension

16  (Nonprocurement)." (Ex. A at p. 1.).

17        27.     As CMSD needs to use the ESSER funds as soon as possible to assist with the

18  numerous pandemic-related challenges, this legal jeopardy will impact CMSD immediately.

19       **The Department's Rule Significantly Harms CMSD's K-12 Students**

20        28.     There remains confusion at the state level regarding CARES funding, which

21  makes it difficult for CMSD to be confident in allocating its resources.  CMSD was originally

22  told the funds would follow Title I-A guidance (i.e. the economically disadvantaged count).  Then

23  CMSD was told the funds were Title I-A, but that CMSD must use the Title II-A calculation (i.e.

24  full ADM) for equitable service allocations, which provided a much larger set-aside to the non-

25  public schools.  Then, CMSD was told to calculate the non-public allocation both ways and begin

26  spending using the economically disadvantaged count until a final decision is made by USDOE.

27  While CMSD may now spend the funds, it does so at the risk of penalty from USDOE.

28

29.     The Department's Guidance and Rule will result in less funding being distributed to public K-12 schools in Cleveland.

30.     If CMSD calculates the proportional share of CARES Act funds for private school students under Option #1 in the Rule, CMSD's schools would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule.  This would significantly impact the Title I schools as many are in desperate need of additional funding to cope with the pandemic, and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

31.     If CMSD calculates the proportional share of CARES Act funds for private school students under Option #2 in the Rule, based on currently available information an additional $822,045 will be diverted from public schools to private school students, which represents a 3.1 percent increase out of CMSD's total CARES Act funding for education.

32.     For every $580 diverted from the public schools (Title I or non-Title I schools), a public-school student loses out on a needed internet-connected device that could allow the student to access online learning while schools are closed due to the pandemic.

33.     For every $100,000 diverted from the public schools (Title I or non-Title I schools), a public-school teacher in Cleveland may lose their position and be unable to provide students with access to learning during the pandemic.

34.     Regardless of how CMSD proportions the CARES Act funds, the Rule requires that all private school students receive equitable services.  In Cleveland, during the 2019-2020 school year, approximately 5,000 private school students were eligible to receive equitable services under Title I-A as they were at-risk students within an LEA receiving Title I-A funds.  As the Rule requires all private school students receiving equitable services, the approximately 5,000 private school students received equitable services under Title I-A last year will receive less services as the CARES Act funds proportioned for equitable services will be spread amongst all private school students instead of only those students most at-risk.

7

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of July, 2020, at Cleveland, Ohio.

Eric S. Gordon
CEO, Cleveland Municipal School District

8

EXHIBIT A

# Ohio Department of Education ESSER Application to the U.S. Department of Education

May 5, 2020

# Certification and Agreement
# for Funding under the
# Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund
# (ESSER Fund)

**CFDA Number: 84.425D**



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

**Paperwork Burden Statement**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

iii

**ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)**

**STATE EDUCATIONAL AGENCY**

**PART A: CERTIFICATION AND AGREEMENT COVER SHEET**

State:  Ohio

CFDA Number: 84.425D

Legal Name:  Ohio Department of Education

DUNS Number:  809174378000

Chief State School Officer:

Paolo DeMaria

Mailing Address:

25 S. Front Street, Columbus, Ohio 43215

---

State Contact for Elementary and Secondary School Emergency Relief Fund:  Jeremy Marks

Position and Office:  Director, Office of Federal Programs

Mailing Address:   25 S. Front Street
Columbus, Ohio 43215

Telephone:   614-466-4161

Email address:   Jeremy.Marks@education.ohio.gov

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):        Telephone:

Jeremy Marks                                                                                    614-466-4161

Signature of Chief State School Officer or Authorized Representative:        Date:

05/05/2020

Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1. The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2. The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3. The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
   The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4. The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5. The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
   - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
   - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
   - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6. The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7. The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: May 5, 2020 |
|---|---|

3

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
   - How the LEA will determine its most important educational needs as a result of COVID-19.
   - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
   - The extent to which the LEA intends to use ESSER funds to promote remote learning.
   - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

The Ohio Department of Education has developed a streamlined LEA application that will be shared with the LEAs and hard coded into our e-grant system, known as the CCIP. We will ask for basic information on the most important education needs as a result of COVID19, their timeline for providing services and supports to public and nonpublic schools and the extent to which the LEA plans to use ESSER funds to promote remote learning. The Department plans to provide districts who need the emergency funds during the 2019-2020 school year with access to the funds as soon as they submit an approved application. The application will require all applicable assurances including the requirement to provide timely and meaningful consultation with nonpublic schools and to provide equitable services to nonpublic students and teachers. The application will require a budget for intended uses of funds and assurance to they the subgrantee will meet all reporting and compliance requirements for managing and administering federal education grants.

4

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

The Ohio Department of Education is still working with all stakeholders, including nonpublic officials, to determine the best approach to use our state-level activities. The Department plans to use the full amount for state-level activities including the maximum amount reserved for state administration.

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1.  The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2.  With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3.  Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4.  To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5.  The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6.  The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: 05/05/2020 |
| --- | --- |

## Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

11

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

# EXHIBIT 14

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  REBEKAH A. FRETZ
   JAMES F. ZAHRADKA II
5  GARRETT LINDSEY (SBN 293456)
   Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
7    Telephone: (213) 269-6402
     E-mail:  Garrett.Lindsey@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9                  IN THE UNITED STATES DISTRICT COURT

10               FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **STATE OF MICHIGAN, STATE OF**          Civil Case No. 3:20-cv-04478-SK
    **CALIFORNIA, et al.,**
15
                              Plaintiffs,
16                                            **DECLARATION OF LINDSEY OATES**

17        v.

18  **ELISABETH D. DEVOS, in her official**
    **capacity as the United States Secretary of**
19  **Education, and UNITED STATES**
    **DEPARTMENT OF EDUCATION,**
20
                              Defendants.
21

22

23

24

25

26

27

28

1

**<u>DECLARATION OF LINDSEY OATES</u>**

2  I, Lindsey Oates, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

3  correct:

4         1.      I am the Chief Financial Officer ("CFO") of the Board of Education for the City

5  School District of the City of New York (a/k/a the New York City Department of Education)

6  ("NYCDOE"), which oversees and manages the New York City school district, located in New

7  York, New York.  My educational background includes a Bachelor's of Arts degree in Political

8  Science and Sociology from Syracuse University and a Master's Degree in Public Administration

9  from Cornell University. I have been employed as CFO of the NYCDOE since July 2018.  Prior to

10  that, I served as Deputy CFO commencing in July 2014.  In my role as CFO, I am responsible for

11  overseeing all aspects of financial operations in the school district, including school allocations and

12  funding for central-based programs and services.  I oversee the Department of Education's $34

13  billion expense budget, as well as its payroll, accounting, financial IT services, contracts,

14  procurement, and revenue operations.

15         2.      I submit this Declaration in support of the NYCDOE's litigation against Elisabeth D.

16  DeVos, in her official capacity as Secretary of Education, and the United States Department of

17  Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable*

18  *Services to Students and Teachers in Non-Public Schools,* 85 Fed. Reg. 39,479 (July 1, 2020) (the

19  "Rule").  The information set forth below is based upon my personal knowledge, information

20  provided to me by other NYCDOE employees, and documents provided to and reviewed by me.  I

21  have reviewed the Rule in order to understand its requirements and its impact on the New York City

22  public schools.

23  **The NYC School District and its Funding**

24         3.      The NYCDOE is the largest school district in the nation, with approximately 1,600

25  public schools that serve approximately 1.1 million students, of whom approximately 820,093

26  (72.8%) are economically disadvantaged, 927,110 (82.3%) are minorities, 227,553 (20.2%) have a

27  disability, and 148,696 (13.2%) are English Language Learners.  For many of these at-risk students,

28  the City's public schools are essential sources not only of education, but of food, transportation,

1

medical care, and emotional support.  These students are particularly vulnerable to the effects of the COVID-19 pandemic and require extensive supports.

4.      The NYCDOE is the local educational agency ("LEA") of the New York City school district, except that, for purposes of Title I, Part A ("Title I") of the Elementary and Secondary Education Act ("ESEA"), each borough of the City is considered an LEA and receives a distinct allocation of Title I funding administered by the New York State Education Department.

5.      Pursuant to Title I, the NYCDOE designates schools eligible for Title I funding based on the poverty percentages of each borough.  In the Bronx, Brooklyn, Manhattan or Queens, Title I-status for a school is reached when no less than 60% of its students are from low-income families; the percentage is 52.13% in Staten Island.  Although the statutory threshold for Title I-school status is set far lower, at a floor of 35% (20 U.S.C. 6313(b)(1)), the NYCDOE exercises the discretion permitted by Title I to set a higher poverty threshold to ensure that the funding provided to Title I-schools is sufficient to provide adequate programs and services to those schools with the greatest needs.  Even with those far higher thresholds, in the 2019-2020 school year, the NYC school district was comprised of 1,314 Title I schools and 269 non-Title I schools.

6.      The NYCDOE budget is comprised of federal, state and local funding sources. Based on the City's Fiscal Year ("FY") 2021 Adopted Budget, 57% derives from City tax levy funding, 36% from State funding, 6% from federal funding, and less than 1% from other funding sources.

7.      The NYCDOE funds its schools through various means.  The Fair Student Funding Formula ("FSF") is the primary funding source for schools, and consists of unrestricted state and local funding that affords school leaders with discretion to determine how to make expenditures for their schools.  FSF covers basic instructional needs and is allocated based on the number and particular needs of students enrolled in each school.  After allocating a fixed amount for each student, the FSF funding formula ascribes weights to each student to allocate greater funding for particular needs, such as grade level, academic intervention for at-risk students, and special programs for English Language Learners and students with disabilities.

2

8.      FSF provides funds for about two-thirds of a school's budget.  The remaining approximate one-third is comprised of funding restricted to specific purposes, including federal grants like Title I.

9.      The NYCDOE also has a central budget that covers central administration costs and support services that are provided on a citywide basis for all schools in the City, including, but not limited to, school facilities services, meals, school safety, pupil transportation, and energy and leases.

10.      A significant portion of NYCDOE's budget derives from New York State's allocation of school aid, known as Foundation Aid.  Due to deep economic losses caused by the COVID-19 pandemic, New York State instituted a "pandemic adjustment" for FY 2021, reducing the NYCDOE's Foundation Aid by $716,903,289, and offsetting this budget cut dollar-for-dollar by backfilling it with federal CARES Act funding.  The Department's misinterpretation of the Education Stabilization Fund section of the CARES Act only intensifies the impact of these cuts by reducing the flexibility or amount of this funding (as explained in paragraphs 16-18 and 20 below).

11.      The CARES Act requires LEAs receiving monies from the GEER and/or ESSER funds to allocate a portion of those funds to provide "equitable services" to students and teachers at nonpublic schools "in the same manner as provided under Section 1117 of the ESEA…."  CARES Act § 18005(a).

12.      If NYCDOE were to distribute these funds as required by the statutory language of the CARES Act, "in the same manner" as required by the equitable services provision in Section 1117 of the ESEA, the allocation would be based on the number of low-income nonpublic school students who reside in a Title I school attendance area in relation to the total number of low-income nonpublic and public school students who reside in a Title I attendance area.  Under this methodology, the proportional share to be provided to nonpublic schools for equitable services is based on the number of *low-income* nonpublic school students who *reside in a Title I school attendance area*. This would result in a total CARES Act allocation of $626 million to public schools and $91 million to nonpublic schools.

//

//

3

**The Harm to the NYCDOE Caused by the Department's Rule**

13.     In contrast to the methodology for computing the equitable share required by Title I, and described above, the Department's Rule penalizes NYCDOE by providing options that decrease the amount of CARES Act funding to be allocated to NYCDOE or restrict the use of those funds.

14.     Under Rule Option #1, funds are allocated according to either: (1) the proportional share calculated under Title I for the 2019-2020 school year; or (2) an updated calculation using the Title I formula of low-income students from nonpublic schools in relation to the number of low-income students in public and nonpublic schools based on current data.

15.     However, if NYCDOE were to use either of these methods given by Option #1, the Rule imposes two additional requirements that would severely restrict the use of CARES Act funds. These restrictions are in effect a "poison pill" that makes Option #1 onerous and harmful.

16.     The first "poison pill" would require the NYCDOE to use CARES Act funds only in Title I schools, thereby rendering 269 non-Title I schools (which still serve many low-income and at-risk students) in NYC ineligible for much-needed CARES Act funding at a time of declining State and local revenues. Since State and local revenues feed FSF, the requirement to only allocate CARES Act funding to Title I schools would necessitate the creation of a new methodology for this funding that excludes non-Title I schools only weeks prior to the beginning of the school year. We estimate the impact of this provision on non-Title I schools would be a loss of approximately $100 million.

17.     In addition, by limiting use of CARES Act funding to Title I schools only, the Rule prevents NYCDOE from using the funds to pay for essential central services provided to all schools in New York City, such as nursing and medical supplies, transportation, facilities maintenance and improvements, food services (including staff to serve meals), technology platforms to facilitate distance learning, and custodial services and cleaning supplies.  These expenditures are made via central budgets on behalf of schools and are difficult, if not impossible, to disaggregate by Title I eligibility. This process allows NYCDOE to maximize its purchasing power and reduce the burden on school principals, who can thereby more extensively focus on instructional services for their school community.

4

18.     The second "poison pill" is the Rule's requirement that CARES Act funds may only be used to supplement, not supplant, State and local funding in Title I schools.  The Rule thereby imports to the CARES Act the supplement not supplant provision found in Title I, even though there is no such provision in the CARES Act statute.  The Rule's requirement would harm NYCDOE by preventing it from using CARES Act funds in place of declining State and local funds, which is particularly necessary in light of across-the-board budget cuts.  This restriction contradicts the purpose of the CARES Act, which is to provide funding to address issues caused by the pandemic, such as maintaining continuity of services and continuing to employ existing staff, and to replace city and local funds that have been eliminated due to fiscal constraints.

19.     These poison pills would severely curtail NYCDOE's use of CARES Act funds, and make it impossible to use the funding for the pressing needs that exist in the school district.

20.     The Rule's Option #2 would also harm the NYCDOE.  Rule Option #2 requires that, in calculating the proportional share for equitable services for nonpublic schools, all nonpublic school students must be counted, rather than only nonpublic school students who are low-income and reside in a Title I attendance zone.  Under this methodology, the proportional share for nonpublic school students would increase by 58%, which amounts to approximately $53 million, with a concurrent decrease in that amount to New York City public schools and students. Instead of an allocation of $626 million to public schools and $91 million to nonpublic schools, only $573 million would be available to allocate to public schools, and $144 million would be allocated to nonpublic schools.

21.     The Rule's "options" deprive New York City public schools and students of the full amount and flexible use of CARES Act funds, and, at the same time, bestow a windfall on nonpublic schools, including wealthy private schools, giving them a far larger share of funding for "equitable services", while reducing the share provided to schools with large numbers of low-income students.

22.     The Rule's injuries are illustrated by the budget cuts to NYCDOE in the FY21 State Enacted Budget, in which those cuts were backfilled with CARES Act funds which will not be available under the Rule's draconian and unsupportable limitations and restrictions.

5

23.     The Rule imposes significant burdens on NYCDOE and greatly harms the students in New York City public schools.  There is significantly less funding available to students in the public schools, contrary to congressional intent.  In addition, the confusion arising from the Department's Guidance and the Rule has resulted in a delay in the distribution of funds to students and teachers. To date, New York City has not yet received any ESSER or GEER CARES Act funds.

24.     The Rule's Options not only decrease the amount of funding allocated to NYCDOE, they impermissibly restrict the use of those funds.  This comes at a time when NYCDOE urgently needs more funding to address novel problems caused by the COVID-19 pandemic.  Since the onset of the pandemic, NYCDOE has spent significant sums to assist students and families impacted by the pandemic, including more than $300 Million on LTE enabled devices to give low-income students access to remote learning, approximately $150 million on Regional Education Centers that provided emergency child-care to essential workers during school closures, and approximately $40 million to provide meals to students.  The urgent need for resources and federal support continues. To re-open schools safely in the fall, additional funding will be needed for personal protective equipment, improvement of ventilation systems in school buildings, disinfection and cleaning of school facilities, and installation of digital platforms and technology for remote learning.

25.     The Rule's reduction and/or restriction of CARES Act funds for New York City public schools would impede NYCDOE's efforts to provide these supports and services and other educational services, and is contrary to the purpose of the CARES Act, which is to fund immediate pandemic-related services and supports to school districts.  The Rule will have a long-term negative impact on hundreds of thousands of public school students affected by COVID-19, including those most vulnerable to the ravages of the pandemic.

//

//

//

//

//

6

1   I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and

2   correct.

3

4   Executed on this 15 day of July, 2020, at  Gardener, New York

5

6

7   Lindsey Oates
    CFO, Board of Education for the
8   City School District of the
    City of New York

9

EXHIBIT 15

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL NEWMAN
    Senior Assistant Attorney General
3   SARAH E. BELTON
    Supervising Deputy Attorney General
4   REBEKAH A. FRETZ
    JAMES F. ZAHRADKA II
5   GARRETT LINDSEY (SBN 293456)
    Deputy Attorneys General
6     300 South Spring Street, Suite 1702
      Los Angeles, CA 90013
7     Telephone: (213) 269-6402
      E-mail:  Garrett.Lindsey@doj.ca.gov
8   *Attorneys for Plaintiff State of California*

9                  IN THE UNITED STATES DISTRICT COURT

10               FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14   **STATE OF MICHIGAN, STATE OF**        Civil Case No. 3:20-cv-04478-SK
     **CALIFORNIA, et al.,**
15
                                Plaintiffs,
16                                            **DECLARATION OF MEGHAN**
                                              **WALLACE**
17          v.

18   **ELISABETH D. DEVOS, in her official**
     **capacity as the United States Secretary of**
19   **Education, and UNITED STATES**
     **DEPARTMENT OF EDUCATION,**
20
                                Defendants.
21

22

23

24

25

26

27

28

I, **MEGHAN WALLACE**, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am a resident of the State of California and over eighteen years of age, am competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2.      I am the Chief Financial Officer ("CFO") at SAN FRANCISCO UNIFIED SCHOOL DISTRICT ("SFUSD" or the "District") located in San Francisco, California. My educational background includes a Bachelor of Arts in Policy Studies & Environmental Studies from Dickinson College (2001), and a Master of Public Policy from the University of Maryland (2007). I have been employed as the CFO of SFUSD since 2019. Prior to becoming SFUSD's CFO, I worked for the City & County of San Francisco between 2008 and 2019 serving in several roles including: Senior Fiscal and Policy Analyst for the Mayor's Office of Public Policy and Finance, Budget Manager for the Port of San Francisco, Finance & Procurement Manager for the Port of San Francisco, and Finance Director for the Port of San Francisco.

3.      In my role as the CFO, I am the senior leader in the District responsible for the overall financial operations of the District, with oversight of the District's strategic deployment of financial resources. I play a central role in SFUSD's effort to plan, organize, and direct business services, financial services and other activities related to the fiscal health and effective operation of the District. First, I direct the day-to-day operations and work processes of SFUSD's Business Services Division, serving as a critical escalation point for decision and policy-making while maintaining and moving towards a compelling vision for the Business Services Division. Second, I design, articulate and execute policies and practices that ensure the responsible and strategic deployment of financial resources, working inside and outside of the District to understand SFUSD's financial landscape within the City & County of San Francisco and the State of

California. Third, I direct the preparation of SFUSD's financial reports and ensure appropriate controls and reporting of grant and contract management activities, manage processes for financial/budgetary forecasting and provide the District's lead negotiator with accurate and timely financial information relative to the collective bargaining process. Fourth, I ensure that effective internal controls are in place and in compliance with applicable federal, state and local regulatory laws and rules for financial and tax reporting.

4.      I submit this Declaration in support of SFUSD's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *Providing Equitable Services to Students and Teachers in Non-public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Equitable Services Rule" or the "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through SFUSD personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on SFUSD.

**General Overview of District**

5.      In 2019, SFUSD oversaw an estimated total of 133 schools, including 12 Early Education, 64 Elementary (TK-5th Grades), 5 County, 13 Middle Schools (6th-8th grades), 14 High Schools, 14 Charter Schools, and 3 Continuation Schools. SFUSD serves approximately 52,468 students, 41,692 are minorities, 28,556 are socioeconomically disadvantaged, 15,028 are English Learners, 2,064 are homeless, 6,275 are students with disabilities, and 254 are foster youth.

6.      During the 2019-20 school year, SFUSD received approximately $12,159,358.00 in Title I funds which was distributed to approximately 53 eligible schools.

3

7.      During the 2019-20, SFUSD's boundaries has about 117 nonpublic/private schools. Nonpublic/private schools received approximately $502,978.00 in Title I funds of which only approximately 22 receive Title I funds for services.

8.      In addition to its Title I funding and as outlined in SFUSD's Local Control and Accountability Plan ("LCAP"), SFUSD invests over $140 million of its General Fund to support high needs students each year. These funds are allocated directly to school sites that serve focal students in the form of both dollar allocations and additional staffing supports. SFUSD is equity focused and strives to maximize both the receipt and distribution of resources to those students in most need of additional support.

**Effects of the COVID-19 Pandemic on Education in the District**

9.      The COVID-19 pandemic has drastically impacted K-12 education in SFUSD.

10.      On or about March 12, 200, in response to the COVID-19 pandemic, SFUSD announced that it would close its schools beginning on or about March 16, 2020 through April 3, 2020, in order to protect the health and safety of its students and staff. On or about April 7, 2020, in consultation with public health officials across the region, SFUSD along with six Bay Area counties extended the in-person school closure through the conclusion of the 2019-20 school year.

11.      When SFUSD closed brick-and-mortar schools, SFUSD significantly stepped up operations to support students and families including: 1) providing free meals to students—breakfast, lunch and the addition of suppers (for example, on March 30, 2020, SFUSD served 24,000 meals); 2) launching the Phase 2 of SFUSD *Distance Learning Plan* website to provide options for learning that include variety of subject areas and increased support for English Learners, students with disabilities and diverse populations; 3) launching Phase 3 of Teacher-Led Distance Learning which included interactive distance learning; 4) loaning Chromebooks to

4

SFUSD students in grades 3-12 who did not have access to a computer during the day at home to support distance learning; 5) working with the City & County of San Francisco community-based organizations and local philanthropists to expand internet access for students in grades 3-12 who need WiFi to engage in SFUSD's *Distance Learning Plan*—as part of that effort, SFUSD distributed over 3,500 hotspots to families; 6) distributing over 10,000 learning kits, including over 30,000 books to PK-2 families; and 7) in partnership with the Kinsa Health, San Francisco Department of Public Health ("SFDPH") and University of California San Francisco ("UCSF") gave away free thermometers to help SFUSD families track health symptoms.

12. SFUSD was facing severe funding challenges and struggling to balance budgets prior to the COVID-19 outbreak. This funding challenge remains and has become more critical. The pandemic has brought about millions of unanticipated costs for SFUSD. SFUSD estimates that COVID-19 will result in nearly $16 million less local revenue for the District in the current year, including a smaller Public Education and Enrichment Fund ("PEEF") appropriation and less sales tax and interest income. Further, for the first time in many years, SFUSD no longer has an unallocated fund balance. In addition, the largest category of SFUSD's school aid is Local Control Funding Formula ("LCFF"), which SFUSD receives from the State of California. Faced with deep budgetary cuts because of the economic impact of the COVID-19 pandemic, California reduced the SFUSD's LCFF aid by approximately $12,000,000.00. Depending on the duration and severity of the COVID-19 induced recession, revenues will continue to be suppressed and possibly decline. Unless SFUSD identifies new revenue streams to offset this loss of funds, K-12 schools in the district will face reduced investment in their students.

**CARES Act Funds Allocated (or Distributed) to SFUSD for K-12 Education**

A.     <u>Elementary and Secondary School Emergency Relief (ESSER) Funds</u>

13.     On or about June 29, 2020, SFUSD applied for money from the local subgrant ESSER Fund.

14.     In September 2020, SFUSD anticipates an allocation of $10,511,000.00 from the ESSER Fund.

15.     If SFUSD distributes the ESSER moneys in the same manner that Title I funds are usually distributed for equitable services based on low-income nonpublic/private-school students, as the plain language of the CARES Act requires, then only an estimated $468,790.60 will be distributed for equitable services to eligible nonpublic/private-school students. This allocation will equal approximately $719.00 per Title I-eligible student for both public and nonpublic/private schools.

16.     However, using the proportional share calculation set forth in the Department's Guidance Document and in Option #2 (Total Enrollment Model) in the Rule, SFUSD would reserve an estimated $2,205,207.80 in ESSER funds to provide equitable services to nonpublic/private school students. Thus, under the Department's preferred proportional share calculation, an estimated $1,736,417.20, will be diverted from about 13,973 public school students to about 652 nonpublic/private school students (participating in CARES Act services). This allocation will equal approximately $594.42 per Title I-eligible student in public schools and an estimated $3,382.22 per Title I-eligible student in nonpublic/private schools. This disproportionate share of funding per Title I eligible student, amounting to an estimated 5.7 times more funding to each nonpublic/private student than public student, defies the intent of the Title I program.

B.      GEER Funds

17.      SFUSD anticipates receiving approximately $3,300,000.00 through the Learning Loss Mitigation Block Grant Fund/GEER Fund in September 2020. These funds are allocated to school districts based upon their number of students with disabilities. Like all Learning Loss Mitigation Grant funding, these funds must be used to offer instruction to students most heavily impacted by school closures. Examples of eligible expenses include: summer programs; extending the instructional school year; providing additional academic services for students such as materials and devices; counseling or mental health services; professional development opportunities; and access to school breakfast and lunch programs.

**The Department's Rule Significantly Harms SFUSD's K-12 Students**

18.      For every dollar that is diverted from public schools in SFUSD as a result of the Department's Guidance Document and Rule, SFUSD will have to cut down on expenses in other areas in order to balance the budget, including potentially investments in low-income students.

19.      The Department's Guidance and Rule will result in less funding to support public K-12 schools in SFUSD.

20.      If SFUSD calculates the proportional share of CARES Act funds for nonpublic/private school students under Option #1 (Title I Model) in the Rule, non-Title I schools in SFUSD receiving CARES Act funds will receive no funds. SFUSD oversee approximately 80 non-Title I schools that are eligible to receive CARES Act funds, but under Option #1 these schools would not receive any funding. Like all schools in SFUSD, these schools are equally impacted by the COVID-19 pandemic and would greatly benefit from the influx of CARES Act funds to assist them through the pandemic. Most significantly, the approximately 53 Title I schools in SFUSD would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule.

7

This prohibition would significantly impact the Title I schools as many are in desperate need of additional funding to cope with the pandemic, and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

21.     If SFUSD calculates the proportional share of CARES Act funds for nonpublic/private school students under Option #2 in the Rule, approximately $1,736,417.20 will be diverted from public schools to nonpublic/private school students, which represents 17.3% of SFUSD's total CARES Act funding for education. With a total of about $2,205,207.80 being directed to nonpublic/private schools, the approximate 652 Title I-eligible nonpublic/private school students will generate about $3,382.22 per student. This number is approximately 5.7 times the $594.42 generated per student for the 13,973 Title I-eligible students in public schools.

22.     For every estimated $540.00 diverted from the public schools (Title I or non-Title I schools), a student in SFUSD loses out on a needed internet-connected device that could allow the student to access online learning while schools are closed due to the pandemic. SFUSD currently funds approximately 8,000 hotspots for student use but anticipates needing more, not fewer points of connectivity.

23.     For every estimated $109,000.00 diverted from the public schools (Title I or non-Title I schools), SFUSD will lose support for a public-school teacher required to provide students with access to learning during the pandemic.

24.     Regardless of how SFUSD proportions the CARES Act funds, the Rule results in 1) SFUSD public schools losing critical funds to address the impact of the pandemic or 2) significantly restricts SFUSD ability to distribute funds to its most vulnerable students.

Declaration of M. Wallace

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and of my own personal knowledge.**

Executed on this 15th day of July, 2020 at San Francisco, California

Meghan Wallace
Chief Financial Officer
San Francisco Unified School District

9