1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL NEWMAN
    Senior Assistant Attorney General
3   SARAH E. BELTON
    Supervising Deputy Attorney General
4   REBEKAH A. FRETZ
    JAMES F. ZAHRADKA II
5   GARRETT M. LINDSEY (SBN 293456)
    Deputy Attorneys General
6     300 South Spring Street, Suite 1702
      Los Angeles, CA 90013
7     Telephone: (213) 269-6402
      E-mail: Garrett.Lindsey@doj.ca.gov
8   *Attorneys for Plaintiff State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

| | |
|---|---|
| 14 **STATE OF MICHIGAN, STATE OF** | Case No. 3:20-cv-04478-SK |
| 15 **CALIFORNIA, et al.,** | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' MOTION** |
| 16                          Plaintiffs, | **FOR PRELIMINARY INJUNCTION** |
| 17              **v.** | |
| 18 **ELISABETH D. DEVOS, in her official** | Judge:        Hon. Sallie Kim |
| 19 **capacity as the United States Secretary of** | Trial Date:   None set |
|    **Education, and UNITED STATES** | Action Filed: July 7, 2020 |
| 20 **DEPARTMENT OF EDUCATION,** | |
| 21                          Defendants. | |

22

23

24

25

26

27

28

---

Plaintiffs hereby respectfully request, pursuant to Federal Rule of Evidence 201, that this Court take judicial notice of the following documents.

1. Attached hereto as **Exhibit A** is a true and correct copy of a memorandum from the United States Department of Education (ED) entitled "Frequently Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER)," dated May 5, 2020. As of July 13, 2020, this memorandum is posted on ED's official website, at https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf.

2. Attached hereto as **Exhibit B** is a true and correct copy of an ED guidance document entitled "Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families," dated October 7, 2019. As of July 13, 2020, this memorandum is posted on ED's official website, at https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf.

3. Attached hereto as **Exhibit C** is a true and correct copy of an ED guidance document entitled "Providing Equitable Services to Students and Teachers in Non-Public Schools under the CARES Act Programs," dated April 30, 2020. This document was previously available on the United States Department of Education website, at https://oese.ed.gov/files/2020/04/FAQs-Equitable-Services.pdf, from which link the undersigned downloaded the document on June 22, 2020. As of July 13, 2020, this document was no longer available on ED's website. ED references this document with the above expired link in a Federal Register document entitled "CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools," 85 Fed. Reg. 39,480 (July 1, 2020).

4. Attached hereto as **Exhibit D** is a true and correct copy of a letter sent by Representative Robert C. Scott, Representative Rosa L. DeLauro, and Senator Patty Murray, to Secretary of Education Elisabeth D. DeVos, dated May 20, 2020. As of July 14, 2020, this letter was posted on the United States House of Representative's website, at https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf.

1

5.      Attached hereto as **Exhibit E** is a true and correct copy of a letter sent by Secretary of Education Elisabeth D. DeVos, to Carissa Moffat Miller, Executive Director of the Council of Chief State School Officers, dated May 22, 2020. As of July 13, 2020, this letter was posted on Education Week's website, at https://blogs.edweek.org/edweek/campaign-k-12/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%202020.pdf.

6.      Attached hereto as **Exhibit F** is a true and correct copy of an ED document entitled "Certification and Agreement for Funding under the Education Stabilization Fund Program Outlying Areas-State Educational Agency." As of July 13, 2020, this document is posted on ED's official website, at https://oese.ed.gov/files/2020/05/SEA-ESF-OA-Certification-and-Agreement.pdf.

7.      Attached hereto as **Exhibit G** is a true and correct copy of a Center for Disease Control (CDC) webpage entitled "COVID-19 in Racial and Ethnic Minority Groups," dated June 25, 2020. As of July 15, 2020, this webpage is available on the CDC's official website, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

8.      Attached hereto as **Exhibit H** is a true and correct copy of an ED document entitled "Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund)." As of July 13, 2020, this document is posted on ED's official website, at https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

9.      Attached hereto as **Exhibit I** is a true and correct copy of a letter sent by the Deputy Secretary of Education, Dr. Mitchell M. Zais, to the United States Comptroller General, Gene Dodaro, dated June 12, 2020. This letter is as attached as Appendix XIV, at page 375, of the United States Government Accountability Office (GAO) report entitled "COVID-19: Opportunities to Improve Federal Response and Recovery Efforts." As of July 13, 2020, that report is posted on GAO's official website, at https://www.gao.gov/assets/710/707839.pdf.

10.     Attached hereto as **Exhibit J** is a true and correct copy of an ED webpage entitled "Table 205.50: Private elementary and secondary enrollment, number of schools, and average tuition, by school level, orientation, and tuition: Selected years, 1999-2000 through 2011-12," prepared in September 2019. As of July 13, 2020, this webpage is available on ED's official website, at https://nces.ed.gov/programs/digest/d19/tables/dt19_205.50.asp.

11.     Attached hereto as **Exhibit K** is a true and correct copy of an ED document entitled "Non-Regulatory Guidance: Fiscal Changes and Equitable Services Requirements under the Elementary and Secondary Education Act of 1965 (ESEA), as amended by the Every Student Succeed Act (ESSA)," dated November 21, 2016. As of July 13, 2020, this document is posted on ED's official website, at https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf.

**Exhibits A, B, C, D, E, F, G, H, I, J and K** are judicially noticeable because government memoranda, bulletins, letters, statements, and opinions are matters of public record appropriate for judicial notice. *See Brown v. Valoff*, 422 F.3d 926, 933 n.9 (9th Cir. 2005) (judicially noticing an administrative bulletin); *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (court may take judicial notice of records and reports of state administrative bodies), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 (1991); *Interstate Nat. Gas. Co. v. S. Cal. Gas. Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (judicially noticing government agency records and reports).

**Exhibits A, B, D, F, G, H, I, J and K** are judicially noticeable because they are posted to official government websites. *See Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (judicially noticing information contained on a government website); *Paralyzed Veterans of Am. v. McPherson*, No. C 06–4670 SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008) (finding that courts commonly take judicial notice of information and documents on government websites, and citing cases from various jurisdiction). Thus, the statements of government department and agencies contained within these exhibits are not subject to reasonable dispute, as the statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201(b)(2).

3

Req. for Judicial Notice in Supp. of Pls.' Mot. for Prelim. Inj. (3:20-cv-4478-SK)

1  **Exhibit E** is also judicially noticeable because the statements of government officials or

2  entities that it contains are not subject to reasonable dispute, as the statements "can be accurately

3  and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

4  Evid. § 201(b)(2); *see also Blatt v. Pambakian*, No. 19-cv-7046, 2020 WL 821040, at *16 (C.D.

5  Cal. Jan. 9, 2020) (granting request for judicial notice of video of news interview that was

6  referenced in the complaint, because it is publicly available and from a source whose authenticity

7  cannot be questioned).

8

9

10  Dated:  July 17, 2020                    Respectfully submitted,

11                                           XAVIER BECERRA
                                             Attorney General of California
12                                           MICHAEL L. NEWMAN
                                             Senior Assistant Attorney General
13                                           SARAH E. BELTON
                                             Supervising Deputy Attorney General

14                                           */s/ Garrett Lindsey*

15                                           GARRETT LINDSEY
                                             JAMES F. ZAHRADKA II
16                                           REBEKAH A. FRETZ
                                             Deputy Attorneys General
17                                           *Attorneys for Plaintiff State of California*

18

19                                           DANA NESSEL
20                                           Attorney General of Michigan
                                             FADWA A. HAMMOUD
21                                           Solicitor General
                                             TONI L. HARRIS*
22                                           NEIL GIOVANATTI*
                                             Assistant Attorneys General
23                                           *Attorneys for Plaintiff State of Michigan*
                                             *Appearing Pro Hac Vice*
24

25

26

27

28

4

Req. for Judicial Notice in Supp. of Pls.' Mot. for Prelim. Inj. (3:20-cv-4478-SK)

Exhibit A

*Elementary and Secondary School Emergency Relief Fund*

# Frequently Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER Fund)

**PURPOSE OF THIS DOCUMENT**

The purpose of this document is to answer Frequently Asked Questions related to the Elementary and Secondary School Emergency Relief Fund (ESSER Fund). Under the ESSER Fund, established as part of the Education Stabilization Fund in the CARES Act,[1] State educational agencies (SEAs) will award subgrants to local educational agencies (LEAs) to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation.

This Frequently Asked Questions document seeks to answer questions that are not easily understood from a plain reading of Section 18003 and other parts of the CARES Act or the ESSER Fund Certification and Agreement (C&A). It was developed in direct response to questions that the Department has received from SEA and LEA grant administrators implementing the ESSER Fund program.

---

**Disclaimer**

Other than statutory and regulatory requirements included in the document, such as those pursuant to the authorizing statute and other applicable laws and regulations, the contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. In addition, it does not create or confer any rights for or on any person.

---

The U.S. Department of Education (Department) may provide additional or updated information, as necessary, on the Department's website at: https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/.

If you have questions that are not answered in this document, please e-mail ESSERF@ed.gov.

---

[1] The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law 116-136, 134 Stat. 281 (Mar. 27, 2020). All citations in this document are to the CARES Act, unless otherwise indicated. The provisions of the CARES Act relevant to the ESSER Fund and other Department of Education programs are available on the Department's website at https://oese.ed.gov/offices/education-stabilization-fund/.

**1. Who applies to the Department for ESSER formula funds?**

Only SEAs in the 50 States, Puerto Rico, and the District of Columbia apply directly to the Department for ESSER Funds. An SEA is the agency primarily responsible for the State supervision of public elementary schools and secondary schools.[2] For example, an SEA may be called the [State name] Department of Education or the [State name] Office of Public Instruction.

The Bureau of Indian Education and the Outlying Areas are not eligible to receive ESSER formula funds. Congress provided a separate set aside in the Education Stabilization Fund to provide funds to those entities.

**2. How do school districts or other entities access ESSER formula funds?**

School districts (LEAs) must apply to the relevant SEA. Every SEA must use at least 90 percent of its ESSER Fund grant to make subgrants to LEAs by formula based on FY 2019 Title I, Part A allocations. (For more information on allocating funds to LEAs, see the Technical Appendix.)

**3. What happens to the other 10 percent of ESSER funds?**

An SEA may retain 10 percent or less of its ESSER Fund grant (the "SEA Reserve"), to address emergency needs as determined by the SEA resulting from COVID-19, which may be addressed through the use of subgrants or contracts. As described below, from the SEA Reserve, the SEA may also use one-half of one percent of its total grant for administrative costs.

**4. Who is eligible to receive ESSER funds from the SEA Reserve?**

A wide range of entities, including LEAs and organizations serving students and families, may be a "subrecipient" of funds from the SEA Reserve. A "subrecipient" includes any entity that receives a subgrant or contract consistent with applicable State and Federal subgrant and procurement standards. Entities interested in learning more about an SEA's intended use of its reserve should contact the SEA.

**5. May an SEA reserve ESSER funds for administrative costs?**

Yes. An SEA may reserve ½ of 1 percent or less of its total ESSER allocation for administrative costs, including both direct and indirect administrative costs. This reservation must come from the SEA Reserve and is not subject to the requirement that funds be "awarded" within one year. Funds for administrative costs remain available to the SEA for obligation through September 30, 2022.

**6. Are ESSER funds a supplement to an LEA's ESEA Title I, Part A grant award?**

No. The ESSER Fund is a separate Federal program. ESSER funds must be awarded and tracked separately from Title I, Part A funds.

---

[2] The definition of SEA is from ESEA section 8101(49).

**7. What is the overall timeline for using ESSER funds?**



**Spring 2020**: The Department makes initial awards

**Spring 2021**: States return funds not awarded

**Sept. 30, 2021**: Last date the Department can make awards

SEAs make awards as soon as practicable

**Spring/Summer 2021**: The Department makes reallocation awards

**Sept. 30, 2022**: Last date SEA, LEA, or other subgrantee can obligate funds

**8. Is there a deadline by which an SEA must award ESSER funds to subrecipients?**

Yes. SEAs must award ESSER formula subgrants to LEAs within one year of receiving the State allocation. An SEA must also make awards with its SEA Reserve within one year of receiving the State allocation. Any funds that the SEA fails to award by the one-year deadline must be returned to the Department for reallocation consistent with the CARES Act.

**9. How long are ESSER funds available for obligation by subrecipients?**

ESSER funds are available for obligation by LEAs and other subrecipients through September 30, 2022, which includes the Tydings period (General Education Provisions Act §421(b)(1)).

**10. What is the difference between "awarding" and "obligating" funds?**

An SEA awards funds when it makes a subgrant to an LEA or, in the case of the SEA Reserve, when it enters into a subgrant or contract with a subrecipient. ESSER funds are obligated when the subrecipient commits those funds to specific purposes consistent with 34 C.F.R. § 76.707. If an SEA awards a contract from the SEA reserve, that is an obligation. In contrast, subgranting funds to an LEA or other subrecipient is not an obligation; rather, these funds are not obligated until the LEA or other subrecipient commits the funds to specific purposes.

**11. Is a charter school eligible to receive ESSER formula funds?**

A charter school that is an LEA, as defined in section 8101(30) of the ESEA, may receive an ESSER formula subgrant like any other LEA. A new or significantly expanded charter school LEA in the 2020-2021 school year is eligible to receive an ESSER formula subgrant in accordance with ESEA section 4306 and 34 CFR §76.792. (For more information on allocating funds to new charter schools, see the Technical Appendix.) A charter school that is not an LEA may not receive a formula subgrant, but it may receive support under ESSER through the LEA of which it is a part.

**12. If an LEA did not receive an FY 2019 Title I, Part A subgrant for school year 2019-2020, is it eligible to receive ESSER formula funds?**

No, the LEA is not eligible to receive a formula subgrant. The only exception is a new charter school LEA that did not exist in the 2019-2020 school year or a charter school LEA whose significant expansion makes it eligible for Title I, Part A funds in the 2020-2021 school year (see question 11 and the Technical Appendix). However, any LEA may receive ESSER funds from an SEA's Reserve, including those LEAs that are not eligible for a formula subgrant under the ESSER Fund.

**13. Must an LEA submit a local application to the SEA in order to receive ESSER formula funds?**

Yes. An LEA must file a local application with the SEA in order to receive an ESSER formula subgrant.[3] For information about what an SEA must include in its local application for an ESSER formula subgrant, please refer to the ESSER Fund Certification and Agreement.

**14. May an SEA restrict or limit LEA uses of ESSER formula funds?**

No. The ESSER Fund provides a broad, permissive list of allowable LEA activities in Section 18003(d). SEAs do not have the authority to limit the uses of ESSER formula funds.

**15. How much flexibility does an LEA have in determining the activities to support with ESSER funds?**

The ESSER Fund provides LEAs considerable flexibility in determining how best to use ESSER funds (see Section 18003(d)). For example, LEAs may use ESSER funds for personal protective equipment (PPE), cleaning and sanitizing materials, and similar supplies necessary to maintain school operations during and after the COVID-19 pandemic. Since learning can and should continue, the Department encourages LEAs to target ESSER funding on activities that will support remote learning for all students, especially disadvantaged or at-risk students, and their teachers.

---

[3] For further information, please see 34 C.F.R. § 76.301.

**16. Are an LEA's ESSER formula funds subject to the requirements of Title I, Part A of the ESEA (or other Federal education program requirements), if an LEA uses ESSER formula funds for an allowable activity under such program?**

No. Although an LEA receives ESSER formula funds via the Title I, Part A formula, ESSER formula funds are not Title I, Part A funds and are not subject to Title I, Part A requirements. The CARES Act authorizes a broad array of potential uses of ESSER formula funds under a number of Federal education statutes; no associated statutory requirements of any of those programs apply to ESSER funds.

**17. May an LEA use its ESSER formula funds to support any school in the district, regardless of a school's Title I, Part A status?**

Yes. The CARES Act does not define how an LEA distributes funds to schools. An LEA may support any school in the district or it may target funds based on poverty, indication of school needs, or other targeting measures.

**18. Is there any difference in the amount of funds, or allowable uses of funds, for a school that implements a schoolwide program under Title I, Part A as compared to a school that provides targeted support under Title I, Part A?**

No. The requirements of Title I, Part A do not apply to ESSER funds. An LEA may support any of its schools using ESSER funds for any allowable activities under 18003(d) without regard to Title I eligibility, program type, or funding.

**19. Are LEAs required to provide equitable services to nonpublic schools with ESSER funds?**

Yes. Please see the document "Providing Equitable Services to Students and Teachers in Non-Public Schools under the CARES Act Programs" for more information.

**20. Are ESSER funds subject to a supplanting prohibition?**

No. The ESSER Fund does not contain a supplanting prohibition. As a result, ESSER funds may take the place of State or local funds for allowable activities. However, the program does contain a Maintenance of Effort (MOE) requirement, which is designed to keep States from substantially reducing their support for K-12 education.[4]

---

[4] For further information, please see Section 18008 of the CARES Act. The Department will separately address the MOE requirement in a separate set of Frequently Asked Questions.

**21. May an SEA or LEA use ESSER funds for allowable costs incurred prior to receiving grant funds?**

Yes. An SEA and LEA may use ESSER funds for any allowable expenditure incurred on or after March 13, 2020, the date the President declared the national emergency due to COVID-19.

**22. Should SEAs and LEAs anticipate monitoring or auditing of ESSER funds?**

Yes. The Department will monitor the use of ESSER funds. In addition, ESSER funds are subject to audit requirements under the Single Audit Act and to review by the Government Accountability Office. The Department's Office of the Inspector General may audit program implementation, as may any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

**TECHNICAL APPENDIX: MAKING ESSER FORMULA SUBGRANTS TO LEAS**

This technical appendix has been prepared for the benefit of State administrators who are tasked with making formula subgrants to LEAs under the ESSER Fund.

**ESSER Requirement**

A State educational agency (SEA) must allocate at least 90 percent of its total ESSER Fund grant by formula to LEAs. The SEA must determine each LEA's ESSER allocation in proportion to the amount of funds the LEA received under Title I, Part A of the Elementary and Secondary Education Act of 1965 (ESEA) in the most recent fiscal year. (Section 18003(c) of the CARES Act).

**Title I, Part A Subgrants to LEAs**

For the purpose of allocating ESSER funds to LEAs, the following points regarding Title I, Part A subgrants apply:

- Federal fiscal year (FY) 2019 Title I, Part A subgrants that were awarded by each SEA to LEAs for the 2019-2020 school year are the most recent Title I, Part A funds on which an SEA bases ESSER Fund subgrants. Therefore, with the exception of Step 6 below relating to new or significantly expanded charter school LEAs in school year 2020-2021, an SEA has the data needed to calculate ESSER LEA allocations because the SEA has already determined the FY 2019 Title I, Part A LEA subgrant amounts.

- FY 2019 Title I, Part A subgrants are those that each SEA determined under Subpart 2 of Title I, Part A: that is, the aggregate of basic grants, concentration grants, targeted grants and education finance incentive grants for which each LEA was eligible after the SEA adjusted, in accordance with the regulations in 34 C.F.R. §§ 200.70-200.75[5] and § 200.100,[6] the LEA allocations on the Census list calculated by the Department.[7]

- The following are not part of FY 2019 Title I, Part A LEA subgrant amounts an SEA uses to calculate ESSER LEA allocations:
  - FY 2017 or 2018 carryover funds.
  - Funds reallocated to an LEA by the SEA under ESEA section 1126(c).
  - Funds an LEA received under ESEA section 1003 for school improvement.

---

[5] The regulations in 34 C.F.R. §§ 200.70-200.75 address adjusting for LEAs that are not on the Census list (such as charter school LEAs), applying the hold harmless after adjusting for LEAs that are not on the Census list, alternative allocations for LEAs under 20,000 total population, and special procedures for calculating concentration grants in small States [available at: https://www.ecfr.gov/cgi-bin/text-idx?SID=ea8f771199b0aa9a1f068857ea552084&mc=true&node=sg34.1.200_169.sg5&rgn=div7].

[6] The regulations in 34 C.F.R. § 200.100 address an SEA's reservation of funds for school improvement under ESEA section 1003, including application of the special rule in section 1003(h); funds for State administration under ESEA section 1004; and funds for direct student services under ESEA section 1003A [https://www.ecfr.gov/cgi-bin/text-idx?SID=ea8f771199b0aa9a1f068857ea552084&mc=true&node=se34.1.200_1100&rgn=div8].

[7] Additional information on the SEA adjustment process to determine LEA Title I, Part A subgrants is provided on pages 2-10 in the Department's nonregulatory guidance on ESSA fiscal changes [available at: https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf].

- o Funds an LEA received under ESEA section 1003A for direct student services.
- o Funds an LEA received to carry out Title I, Part D, Subpart 2 (i.e., funds generated by children in local institutions for delinquent children).
- o Reductions to an LEA's FY 2019 Title I, Part A subgrant due to a failure to meet the ESEA's maintenance of effort requirements in the preceding fiscal year and at least once in the five immediately preceding fiscal years.
- o Any adjustments from FY 2018 that an SEA made to FY 2019 Title I, Part A subgrant amounts.
- o FY 2019 Title I, Part A funds that an LEA declined.

**Steps to Calculate ESSER Subgrants to LEAs**

These steps describe the procedures an SEA follows to calculate the ESSER LEA allocations. An SEA can complete Steps 1 through 5 in order to make ESSER subgrants to existing eligible LEAs; the SEA completes Step 6 once it has determined whether any new charter school LEAs have opened for school year 2020-2021 or any existing charter school LEAs have significantly expanded for school year 2020-2021 (e.g., during the fall of 2020). (See ESEA section 4306). An example follows each step, with a combined example for Steps 2 and 3.

Please note that an SEA must complete these steps, including Step 6, and make subgrants to LEAs within one year of an SEA's receipt of ESSER funds; any funds not awarded to LEAs by that deadline must be returned to the Department for reallocation to other States. (See section 18003(f) of the CARES Act).

Step 1: The SEA determines the total amount of ESSER funds it has available to allocate to LEAs through the ESSER formula by:
- Determining the amount, if any, of ESSER funds it will retain for the SEA reserve (a maximum of 10 percent of its total ESSER Fund grant, including funds for State administration).
- Subtracting the SEA reserve amount from the SEA's total ESSER allocation to determine the total amount available for LEA subgrants; and
- If a State has charter school LEAs, subtracting from the total amount of ESSER funds available for LEA subgrants a reasonable amount to retain for new charter school LEAs or charter school LEAs that will significantly expand in school year 2020-2021 consistent with ESEA section 4306. (Temporarily retaining funds from the total amount of ESSER funds available for LEA subgrants for new charter school LEAs or charter school LEAs that will significantly expand in school year 2020-2021 will reduce the likelihood that an SEA will have to reduce the ESSER subgrants of other LEAs once the SEA has the data to calculate the ESSER subgrant of such charter school LEAs. See Step 6b.)

| Row | Category | Amount |
|---|---|---|
| *Row 1* | SEA's ESSER Allocation | $80,000,000 |
| *Row 2* | SEA Reserve *(10 percent of Row 1)* | $8,000,000 |
| *Row 3* | Amount of ESSER funds for LEA subgrants *(Row 1 minus Row 2)* | $72,000,000 |
| *Row 4* | Funds retained for new/significantly expanded charter school LEA subgrants | $1,000,000 |
| *Row 5* | **Total amount available to allocate to LEAs** *(Row 3 minus Row 4)* | **$71,000,000** |

Step 2: The SEA identifies each LEA's FY 2019 Title I, Part A subgrant amount (as described above under "Title I, Part A Subgrants to LEAs").

Step 3: The SEA adds the FY 2019 Title I, Part A LEA subgrants to determine the total amount of FY 2019 Title I, Part A subgrants.

Example of Step 2 and Step 3

| Step | LEA operating in school year 2019-2020 | FY 2019 Title I, Part A subgrant amount |
|---|---|---|
| 2 | LEA 1 | $10,904,500 |
| 2 | LEA 2 | $13,694,277 |
| 2 | LEA 3 (charter LEA) | $257,479 |
| 2 | LEA 4 (charter LEA) | $332,050 |
| 2 | LEA 5 | $5,771,821 |
| 2 | LEA 6 | $0 |
| 2 | LEA 7 | $3,765,959 |
| 2 | LEA 8 | $26,852,135 |
| 2 | LEA 9 | $2,449,979 |
| 2 | LEA 10 | $25,971,800 |
| 3 | **Total** | **$90,000,000** |

Step 4: The SEA divides each LEA's Title I, Part A subgrant amount (Step 2) by the total amount of FY 2019 Title I, Part A subgrants (Step 3) to determine the proportion of the ESSER formula funds that each LEA receives.

| LEA operating in school year 2019-2020 | LEA's FY 2019 Title I, Part A subgrant amount *(From Step 2)* | Total amount of FY 2019 Title I, Part A LEA subgrants *(From Step 3)* | Proportion of the ESSER formula funds that the LEA receives *(Step 2 divided by Step 3)* |
|---|---|---|---|
| LEA 1 | $10,904,500 | $90,000,000 | 0.1212 |
| LEA 2 | $13,694,277 | $90,000,000 | 0.1522 |
| LEA 3 (charter LEA) | $257,479 | $90,000,000 | 0.0029 |
| LEA 4 (charter LEA) | $332,050 | $90,000,000 | 0.0037 |
| LEA 5 | $5,771,821 | $90,000,000 | 0.0641 |
| LEA 6 | $0 | $90,000,000 | 0.0000 |
| LEA 7 | $3,765,959 | $90,000,000 | 0.0418 |
| LEA 8 | $26,852,135 | $90,000,000 | 0.2984 |
| LEA 9 | $2,449,979 | $90,000,000 | 0.0272 |
| LEA 10 | $25,971,800 | $90,000,000 | 0.2886 |

**Step 5**: The SEA multiplies the proportion identified in Step 4 by the portion of its ESSER funds that it will immediately distribute by formula as determined in Step 1 to calculate each LEA's ESSER subgrant.

Example of Step 5

| LEA operating in school year 2019-2020 | Proportion of the ESSER formula funds that the LEA receives *(From Step 4)* | Total amount of ESSER funds available to allocate to LEAs *(from Step 1)* | ESSER LEA subgrant *(Amount determined in Step 1 multiplied by Step 4)* |
|---|---|---|---|
| LEA 1 | 0.1212 | $71,000,000 | $8,602,439 |
| LEA 2 | 0.1522 | $71,000,000 | $10,803,263 |
| LEA 3 (charter LEA) | 0.0029 | $71,000,000 | $203,122 |
| LEA 4 (charter LEA) | 0.0037 | $71,000,000 | $261,951 |
| LEA 5 | 0.0641 | $71,000,000 | $4,553,325 |
| LEA 6 | 0.0000 | $71,000,000 | $0 |
| LEA 7 | 0.0418 | $71,000,000 | $2,970,923 |
| LEA 8 | 0.2984 | $71,000,000 | $21,183,351 |
| LEA 9 | 0.0272 | $71,000,000 | $1,932,761 |
| LEA 10 | 0.2886 | $71,000,000 | $20,488,865 |
| **Total** | | | **$71,000,000** |

Step 6: The SEA recalculates the ESSER LEA allocations after it determines whether there are any new charter school LEAs or any existing charter school LEAs that significantly expanded for school year 2020-2021 in accordance with the definition of "significant expansion of enrollment" in 34 C.F.R. § 76.787.[8]

Step 6a (applies only if for school year 2020-2021 there are no new charter school LEAs or charter school LEAs that significantly expanded in a State): The SEA allocates the amount it retained under Step 1 for potential new charter school LEAs to the LEAs to which it made ESSER subgrant allocations in proportion to those amounts.

Example of Step 6a

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|
| LEA operating in school year 2019-2020 | Proportion of ESSER formula funds that the LEA receives *(From Step 4)* | Initial ESSER LEA subgrant *(From Step 5)* | Amount SEA retained for new or significantly expanded charter LEAs *(from Step 1)* | ESSER LEA allocation of retained amount *(Column 4 multiplied by Column 2)* | Revised ESSER LEA subgrant *(Column 3 plus Column 5)* |
| LEA 1 | 0.1212 | $8,602,439 | $1,000,000 | $121,161 | $8,723,600 |
| LEA 2 | 0.1522 | $10,803,263 | $1,000,000 | $152,159 | $10,955,422 |
| LEA 3 (charter LEA) | 0.0029 | $203,122 | $1,000,000 | $2,861 | $205,983 |
| LEA 4 (charter LEA) | 0.0037 | $261,951 | $1,000,000 | $3,689 | $265,640 |
| LEA 5 | 0.0641 | $4,553,325 | $1,000,000 | $64,131 | $4,617,456 |
| LEA 6 | 0.0000 | $0 | $1,000,000 | $0 | $0 |
| LEA 7 | 0.0418 | $2,970,923 | $1,000,000 | $41,844 | $3,012,767 |
| LEA 8 | 0.2984 | $21,183,351 | $1,000,000 | $298,357 | $21,481,708 |
| LEA 9 | 0.0272 | $1,932,761 | $1,000,000 | $27,222 | $1,959,983 |
| LEA 10 | 0.2886 | $20,488,865 | $1,000,000 | $288,576 | $20,777,441 |
| **Total** | | **$71,000,000** | | **$1,000,000** | **$72,000,000** |

Step 6b (applies only if for school year 2020-2021 there are new charter school LEAs or charter school LEAs that significantly expanded in a State): The SEA recalculates its ESSER LEA allocations based on the total amount available for LEA subgrants in order to determine the ESSER subgrant amounts for a new charter school LEA or a significantly expanded charter school LEA and makes any necessary adjustments to the ESSER LEA subgrants that the SEA already awarded based on the calculations described in Steps 1 through 5.

---

[8] An SEA will implement Step 6 after the SEA determines whether there are any new charter school LEAs or charter school LEAs that significantly expanded for school year 2020-2021 based on receiving written notification from a charter school LEA at least 120 days prior to the date the school is scheduled to open or significantly expand. (See 34 C.F.R § 76.788). Thus, this step likely will not occur until fall 2020. It must occur within one year of the SEA's receipt of ESSER funds or the SEA must return the funds to the Department for reallocation to other States.

As background, for a newly opened charter school LEA or a charter school LEA that significantly expands for school year 2020-2021, an SEA does not have an actual FY 2019 Title I, Part A subgrant amount for the LEA that reflects either status. ESEA section 4306(a), however, requires, with respect to any funds that the Department allocates to States on a formula basis (including the ESSER fund), a State to:

> [T]ake such measures as are necessary to ensure that every charter school receives the Federal funding for which the charter school is eligible not later than [five] months after the charter school first opens, notwithstanding the fact that the identity and characteristics of the students enrolling in that charter school are not fully and completely determined until that charter school actually opens. The measures similarly shall ensure that every charter school expanding its enrollment in any subsequent year of operation receives the Federal funding for which the charter school is eligible not later than [five] months after such expansion.

In order to comply with ESEA section 4306(a), an SEA must determine an ESSER LEA subgrant allocation for a new or significantly expanded charter school in school year 2020-2021 by deriving what the charter school LEA's FY 2019 Title I, Part A allocation would have been based on the characteristics of the charter school LEA's students in school year 2020-2021. As detailed in the next paragraph, an SEA already derives this amount for calculating FY 2020 Title I, Part A allocations to comply with ESEA section 4306(c).

Independent of the CARES Act, as part of calculating a new or significantly expanded charter school LEA's FY 2020 Title I, Part A allocation, ESEA section 4306(c) requires an SEA, for purposes of implementing the Title I, Part A hold-harmless protections in ESEA sections 1122(c) and 1125A(f)(3) for a newly opened or significantly expanded charter school LEA, to derive a hold-harmless base under each Title I, Part A formula for FY 2019 that reflects the new or significantly expanded enrollment of the charter school LEA.[9] Therefore, in order to calculate the ESSER allocation of a new or significantly expanded charter school LEA, an SEA will consider such an LEA's FY 2019 Title I, Part A allocation as the sum of its hold harmless base under each Title I, Part A formula that the SEA calculates for FY 2020 Title I, Part A allocations in accordance with ESEA section 4306(c). An example of calculating the ESSER allocation for a new or significantly expanded charter school LEA and adjusting the ESSER subgrants an SEA already made (as shown in Steps 1-5) follows on the next page.

---

[9] For more information on ESEA section 4306(c) see pages 4-7 in the Department's nonregulatory guidance on ESSA fiscal changes [available at: https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf].

Example of Step 6b

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| LEA | Initial ESSER LEA subgrant (From Step 5) | FY 2019 Title I, Part A subgrant amount or ESEA Section 4306(c) FY 2019 derived Title I, Part A hold harmless base* | LEA proportion of Column 3 total (Column 3 LEA amount divided by Column 3 total) | Total amount for LEA subgrants (from Step 1) | Revised ESSER LEA subgrant (Column 5 multiplied by Column 4) | Difference between revised ESSER LEA subgrant and initial subgrant (Column 6 minus Column 2) |
| LEA 1 | $8,602,439 | $10,904,500 | 0.1209 | $72,000,000 | $8,704,257 | $101,818 |
| LEA 2 | $10,803,263 | $13,694,277 | 0.1518 | $72,000,000 | $10,931,130 | $127,867 |
| LEA 3 (significantly expanded charter LEA in school year 2020-2021) | $203,122 | $357,479* | 0.0040 | $72,000,000 | $285,349 | $82,227 |
| LEA 4 (charter LEA) | $261,951 | $332,050 | 0.0037 | $72,000,000 | $265,051 | $3,100 |
| LEA 5 | $4,553,325 | $5,771,821 | 0.0640 | $72,000,000 | $4,607,219 | $53,894 |
| LEA 6 | $0 | $0 | 0.0000 | $72,000,000 | $0 | $0 |
| LEA 7 | $2,970,923 | $3,765,959 | 0.0418 | $72,000,000 | $3,006,087 | $35,164 |
| LEA 8 | $21,183,351 | $26,852,135 | 0.2977 | $72,000,000 | $21,434,077 | $250,726 |
| LEA 9 | $1,932,761 | $2,449,979 | 0.0272 | $72,000,000 | $1,955,637 | $22,876 |
| LEA 10 | $20,488,865 | $25,971,800 | 0.2879 | $72,000,000 | $20,731,370 | $242,505 |
| LEA 11 (new charter LEA in school year 2020-2021) | $0 | $100,000* | 0.0011 | $72,000,000 | $79,823 | $79,823 |
| Total | $71,000,000 | $90,200,000** | | | $72,000,000 | $1,000,000 |

*Figure is the derived FY 2019 Title I, Part A hold harmless base that the SEA calculates in accordance with ESEA section 4306(c) for a charter school LEA that opens or significantly expands for school year 2020-2021.

**Figure does not equal the actual total of FY 2019 Title I, Part A subgrants from Step 2 due to the SEA's deriving hold harmless bases for the new and significantly expanded charter school LEAs, as required by ESEA section 4306(c).

Exhibit B



# Title I, Part A
## of the Elementary and Secondary Education
## Act of 1965, as Amended by the
## Every Student Succeeds Act:

## Providing Equitable Services to
## Eligible Private School Children,
## Teachers, and Families

## Updated Non-Regulatory Guidance

October 7, 2019

# Table of Contents

PURPOSE OF THE GUIDANCE ................................................................................................................. 6

INTRODUCTION ........................................................................................................................................ 7

**A.  CONSULTATION** ......................................................................................................................... 7
A-1.  What is consultation? ................................................................................................................. 7
A-2.  Who is responsible for initiating contact with private school officials regarding participation in the Title I program? ................................................................................................................................ 8
A-3.  What is an "Intent to Participate" form? ................................................................................... 8
A-4.  May an LEA set a deadline for private school officials to indicate their intent to participate? ........... 8
A-5.  How does an LEA determine which private schools to contact? ................................................. 8
A-6.  Who is responsible for initiating consultation? ......................................................................... 8
A-7.  When and how often does an LEA consult with private school officials? ................................... 8
A-8.  May a group of private school officials designate a single private school official to represent their interests? ... 9
A-9.  What topics must an LEA address during consultation? ............................................................ 9
A-10.  What is entailed in achieving "the goal of reaching agreement" between an LEA and appropriate private school officials? ................................................................................................................ 10
A-11.  What documentation of consultation must an LEA maintain? ................................................ 10
A-12.  Is other documentation that meaningful consultation has occurred helpful? .......................... 10
A-13.  Is there a specific time by which an LEA must obtain the signature of appropriate private school officials regarding written affirmation/results of agreement? ...................................................... 11
A-14.  What should an SEA do when an LEA has not provided it with written affirmations from private school officials? ................................................................................................................................... 11
A-15.  What assistance might an LEA need from private school officials to obtain information necessary to provide Title I services to eligible students in private schools? ......................................................... 11
A-16.  What is an LEA's obligation to consult with, and provide services to eligible students attending, a new private school that opens after the LEA's deadline for indicating an intent to participate? ....................... 12
A-17.  What is an LEA's obligation to provide equitable services under Title I if a private school declines to participate or does not respond to the LEA's request to consult? ....................................................... 12
A-18.  May a private school official request a copy of an LEA's Title I application? ......................... 12
A-19.  How might an SEA help foster positive working relationships between an LEA and private school officials to assist with consultation and program implementation? ..................................................... 12

**B.  EQUITABLE SERVICES ALLOCATIONS AND NOTICE, TIMEFRAME FOR OBLIGATIONS, AND ADMINISTRATIVE AND OTHER EXPENDITURES** ................................................ 13
*Allocations* .................................................................................................................................... 13
B-1.  May an LEA reserve funds off the top of its Title I allocation before it determines the proportional share for equitable services? ....................................................................................................... 13
B-2.  What does it mean for an LEA to determine the proportional share of Title I funds available for equitable services based on the total amount of Title I funds received by the LEA prior to any allowable expenditures or transfers of funds? .......................................................................................................... 13
B-3.  What information does an LEA need to calculate the proportional share under ESEA section 1117(a)(4)(A)? . 14
B-4.  How does an LEA calculate the proportional share of Title I funds available for equitable services in the next school year? ......................................................................................................................... 14
B-5.  How does an LEA determine participating Title I public school attendance areas? .................. 15
B-6.  What data does an LEA use when determining eligible Title I public school attendance areas? ........... 16
B-7.  How does an LEA determine the amount of Title I funds to be used for parent and family engagement activities for participating private school students? ................................................................. 16
B-8.  What are the options available for providing equitable services to private school children? ...... 16
B-9.  May an LEA make a unilateral decision to pool funds among several private schools to provide equitable services? ................................................................................................................................... 18
B-10.  After an LEA determines the proportional share, the administrative and indirect cost (if any) amounts (see B-36 and B-40) and, if applicable, the parent and family engagement activities amount (see B-7), how does the LEA allocate the remainder of the proportional share to provide equitable services? ....................... 18

B-11. How does an LEA determine the number of children, ages 5 through 17, who are from low-income families, reside in participating Title I public school attendance areas, and attend private schools? ..........................................19

B-12. How often must an LEA collect poverty data? ..............................................................................................21

B-13. May an LEA use more than one method of collecting poverty data on private school children? ...................21

B-14. If private school officials assist an LEA in obtaining data necessary for the LEA to determine the proportional share, how do LEA officials or auditors determine the accuracy of information retained by the private school officials? ......................................................................................................................................................................21

B-15. If an LEA has poverty data for children in a private school, regardless of whether the private school participates in Title I, does the LEA include the poverty data in calculating the proportional share? ........................21

B-16. If an LEA and appropriate private school officials agree to establish a pool or pools of Title I funds allocated for private school children and, later, one or more private schools in the pool decline services for eligible students enrolled in the school, what happens to the funds generated by children from low-income families in the private school(s)? ..................................................................................................................................................................22

B-17. When an LEA elects not to serve an eligible public school attendance area, as permitted under ESEA section 1113(b)(1)(D), what are the procedures for serving the private school children who reside in that attendance area? ..22

B-18. How are private school children identified as residing in a participating Title I public school attendance area if an LEA is operating under an open enrollment, desegregation, or magnet plan? ..............................................23

Special Consideration: Community Eligibility Provision ..........................................................................................23

B-19. What is CEP? ....................................................................................................................................................23

B-20. If a private school is a CEP school, does every child in the private school automatically generate Title I funds for equitable services? ...............................................................................................................................................23

B-21. Is an LEA's collection of poverty data on private school students affected by CEP data? ...............................23

B-22. How does an LEA determine the number of low-income private school children in participating Title I public school attendance areas if a private school participates in CEP? ..............................................................................24

Transferability and Title I Equitable Services ..........................................................................................................24

B-23. If, after timely and meaningful consultation, an LEA transfers funds into Title I under ESEA section 5103(b), are those funds subject to the proportional share in order to provide equitable services? ...........................................25

B-24. Under ESEA section 5103(b), after timely and meaningful consultation, may an LEA transfer funds into the Title I program solely to provide services for private school students? ........................................................................25

B-25. May an LEA, after timely and meaningful consultation, retain funds in a program from which it transfers funds to Title I solely to provide equitable services under that program? ....................................................................25

Timeframe for Obligations ........................................................................................................................................25

B-26. What is the purpose of the obligation of funds requirement given that an LEA may carry over funds from a given fiscal year and spend those funds in the succeeding fiscal year? ......................................................................25

B-27. May an LEA carry over unobligated funds despite the statutory requirement regarding obligation of funds? .26

B-28. How does the 15 percent carryover limitation in ESEA section 1127(a) apply to equitable services carryover? ...................................................................................................................................................................................26

B-29. When does an "obligation" occur? ....................................................................................................................26

B-30. How long does an LEA have to meet the obligation of funds requirement in ESEA section 1117(a)(4)(B)? ...27

B-31. May an LEA impose reasonable deadlines on private school officials to facilitate meeting the obligation of funds requirement in ESEA section 1117(a)(4)(B)? ...............................................................................................27

Notice of Allocations ................................................................................................................................................28

B-32. What information must an SEA include in the notice of allocation that the SEA must provide to private school officials? ....................................................................................................................................................................28

B-33. Is an SEA required to use a particular method to disseminate the notice of allocation? ...................................28

B-34. Is there a specific timeline for the SEA to disseminate the notice of allocation? ............................................28

B-35. Is an LEA required to provide private school officials with the amount of funds available for equitable services for private school students in a specific private school or pool of schools? ....................................................28

Administrative and Other Expenditures ....................................................................................................................29

B-36. How does an LEA reserve Title I funds for its administration of the Title I program to provide equitable services for private school students? ..........................................................................................................................29

B-37. May a third-party contractor hired by an LEA incur administrative costs? ......................................................29

B-38. For a Title I classroom in a private school, may Title I funds be used to purchase furniture? ..........................29

B-39. If eligible private school children need transportation from the private school to another site in order to be served by the Title I program, who is responsible for providing this transportation? ..................................................29

B-40. May an LEA charge indirect costs associated with providing equitable services to the proportional share of Title I funds available for equitable services? ............................................................................................................30

**C. DELIVERY OF EQUITABLE SERVICES**..................................................................................**30**

C-1. What private school students are eligible for Title I services?.................................................................30

C-2. Are preschool children in a private school eligible to receive equitable services under Title I? .........31

C-3. How are the criteria for identifying eligible children determined?.........................................................31

C-4. What are some of the educationally related criteria that an LEA may use to identify private school children who are most in need of Title I services?.................................................................................................................31

C-5. What are criteria an LEA may use for identifying private school children from preschool through grade 2 for Title I services?...............................................................................................................................................31

C-6. May Title I funds be used to identify eligible private school students?...................................................31

C-7. How does an LEA determine what services to provide to participating private school children?.....................31

C-8. May an LEA implement a schoolwide program in a private school?.......................................................32

C-9. If, after receiving an offer of equitable services, private school officials or parents choose to have participating children receive only some services, may an LEA provide only those services? .........................................32

C-10. When an eligible child resides in a participating Title I public school attendance area in one LEA and attends a private school in another LEA, which LEA is responsible for serving the child?.............................................32

C-11. May an LEA establish a minimum number of participating students in order to establish a Title I program in a private school? If so, what is the LEA's responsibility to serve children attending private schools with fewer than that minimum number?.....................................................................................................................................32

C-12. Who is responsible for planning and designing equitable services?.....................................................33

C-13. What does it mean to consolidate and use Title I funds in coordination with eligible funds available for equitable services under programs covered under ESEA section 8501(b) to provide services to eligible private school children in participating programs?.....................................................................................................33

C-14. How does the principle of supplement not supplant apply to equitable services under Title I? ......................33

C-15. What types of services are available for private school participants?.....................................................34

C-16. Must the LEA always use the funds allocated for private school children to provide instructional services?....34

C-17. In what subjects may an LEA provide services to participating students? ...........................................34

C-18. How might a Title I teacher coordinate Title I services with private school teachers for the benefit of participating private school students?.................................................................................................................35

C-19. To meet the equitable services requirements under Title I, may an LEA just provide a private school with instructional materials and supplies paid for with Title I funds? ...........................................................................35

C-20. When must Title I services for private school participants start?.............................................................35

C-21. Where may Title I services take place?.....................................................................................................35

C-22. May Title I services be provided in religiously affiliated private schools? ...........................................35

C-23. Must an LEA require the removal of religious symbols in private school classrooms in which Title I services are provided?.........................................................................................................................................36

C-24. Are private schools required to make space available for Title I services? ...........................................36

C-25. May a Title I teacher use the same textbooks as those used by the private school students in their regular classroom?............................................................................................................................................36

C-26. May private school officials order or purchase materials and supplies needed for the Title I program and be reimbursed by an LEA?.........................................................................................................................................36

C-27. May an LEA use a third-party contractor to provide equitable services? ...........................................36

C-28. May an LEA contract with a religious organization to provide equitable services?.................................36

C-29. What does it mean for a contractor to be independent of the private school in which it is providing equitable services?............................................................................................................................................37

C-30. May an LEA or a third-party contractor employ a private school teacher to provide Title I services to private school participants? .....................................................................................................................................37

C-31. Must teachers and paraprofessionals employed by an LEA to deliver or support the delivery of Title I equitable services meet any qualification requirements?.....................................................................................37

C-32. If an LEA contracts with a third-party provider, must the third-party provider employ Title I teachers and paraprofessionals who meet the State's qualification requirements?...................................................................37

C-33. Must a paraprofessional employed by an LEA to provide equitable services work under the direct supervision of a public school teacher?.....................................................................................................................................37

C-34. How does an LEA provide equitable services for parents and families of private school students participating in the Title I program? .....................................................................................................................................38

C-35. May an LEA use more than one percent of the proportional share for parental and family engagement? ........38

C-36. What are an LEA's responsibilities regarding Title I equitable services for teachers of private school participants?............................................................................................................................................38

C-37.  May private school officials arrange for Title I services and activities for staff who provide instruction to Title I participants and submit an invoice to the LEA for reimbursement? .........................................................................39
C-38.  May Title I funds be used to pay stipends to private school instructional staff who participate in Title I services and activities? ..............................................................................................................................................39
C-39.  May an LEA provide services and activities, such as professional development, to staff employed by an LEA who provide equitable services? ................................................................................................................................39

**D.    PROGRAM EVALUATION AND MODIFICATION**...............................................................................**39**
D-1.  In what subjects does an LEA assess private school children?......................................................................39
D-2.  May Title I funds be used to assess private school children? .........................................................................39
D-3.  May an LEA use a private school's assessment data to determine progress of the LEA's Title I program?.......39

**E.    STATE OMBUDSMAN**...............................................................................................................................**40**
E-1.  What are the roles and responsibilities of an ombudsman? ...........................................................................40
E-2.  What specific monitoring and enforcement responsibilities does an ombudsman have?....................................40
E-3.  Who may serve as an ombudsman? .............................................................................................................40
E-4.  What funds are available to support an ombudsman? ...................................................................................41

**F.    COMPLAINTS, STATE PROVISION OF EQUITABLE SERVICES, AND BYPASS** ...........................**41**
F-1.  What information must a formal written complaint to an SEA include? ..........................................................41
F-2.  What option is available to private school officials if an SEA does not answer their complaint in a timely manner? ..........................................................................................................................................................42
F-3.  If private school officials or another interested party are dissatisfied with an SEA's resolution of a complaint, what recourse is available? ...............................................................................................................................42
F-4.  May an SEA require a private school official to file a formal complaint with the LEA and await the LEA's resolution before filing a complaint with the SEA?............................................................................................42
F-5.  Under what circumstances is an SEA required to provide equitable services directly or through a third-party provider?..........................................................................................................................................................42
F-6.  If an SEA determines that it must provide equitable services in lieu of an LEA in accordance with ESEA section 1117(b)(6)(C), what funds does it use to provide the services?........................................................................42
F-7.  What is a "bypass"? ....................................................................................................................................43
F-8.  Under what circumstances may the Secretary determine that a bypass is appropriate?.....................................43
F-9.  How do private school officials request a bypass?.........................................................................................43
F-10.  How is a bypass implemented? ....................................................................................................................43

**PURPOSE OF THE GUIDANCE**

Since the initial passage of the Elementary and Secondary Education Act of 1965 (ESEA), private school students and teachers have been eligible to participate in the Title I, Part A (Title I) program. The reauthorization of the ESEA by the Every Student Succeeds Act (ESSA) continues the requirement that a local educational agency (LEA) that receives Title I funds provide equitable services to eligible private school students, their teachers, and their families.[1] This guidance is intended to be used in conjunction with the Title I statute and applicable regulations by both public and private school officials.[2]

This guidance supersedes the U.S. Department of Education (Department) guidance entitled *Title I Services to Eligible Private School Children, Non-Regulatory Guidance* (October 17, 2003); *Ensuring Equitable Services to Private School Children: A Title I Resource Tool Kit* (September 2006); and the equitable services guidance contained in *Non-Regulatory Guidance: Fiscal Changes and Equitable Services Requirements under the Elementary and Secondary Education Act of 1965 (ESEA), as Amended by the Every Student Succeeds Act (ESSA)* (November 21, 2016).

This guidance document only addresses Title I equitable services to eligible private school children, their teachers, and their families. The ESEA also includes other programs that require State educational agencies (SEAs) and LEAs to provide for the equitable participation of eligible private school students and their teachers and other educational personnel, including those programs governed by the Title VIII, Part F, Uniform Provisions,[3] which the Department will address in separate updated guidance.

The Department has determined that this guidance is significant guidance under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (2007). See https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2007/m07-07.pdf. Significant guidance is non-binding and does not create or impose new legal requirements. Pursuant to the Congressional Review Act (5 U.S.C. § 801 et seq.), the Office of Information and Regulatory Affairs designated this guidance as a "major rule," as defined by 5 U.S.C. § 804(2).

The Department provided a 32-day opportunity for the public to comment on a draft of this document and received over 500 comments. The Department has taken those comments into consideration in revising the draft document. If you are interested in commenting further on this guidance, please email your comments to EquitableServices@ed.gov or write to us at the following address: Office of Elementary and Secondary Education, 400 Maryland Avenue, SW, Washington,

---

[1] Unless otherwise noted, references and citations in this document to the ESEA are to the ESEA, as amended by the ESSA.

[2] This Title I, Part A non-regulatory guidance does not affect the requirements for providing equitable services to eligible parentally placed private school children with disabilities in accordance with section 612(a)(10)(A) of the Individuals with Disabilities Education Act (IDEA) and 34 C.F.R. §§ 300.130 through 300.144 of the IDEA, Part B regulations.

[3] Title VIII covers Title I, Part C (Education of Migratory Children); Title II, Part A (Supporting Effective Instruction); Title III, Part A (English Language Acquisition, Language Enhancement, and Academic Achievement); Title IV, Part A (Student Support and Academic Enrichment Grants); Title IV, Part B (21st Century Community Learning Centers); and Title IV, Part F, section 4631 (Project SERV). In addition, although not subject to the Title VIII equitable services provisions, Title IV, Part F, section 4644 (Supporting High-Ability Learners and Learning) requires, where appropriate, that the Department make provision for the equitable participation of private school students and teachers.

DC 20202. For further information about the Department's guidance processes, please visit www2.ed.gov/policy/gen/guid/significant-guidance.html.

## INTRODUCTION

The purpose of Title I of the ESEA is to provide all children significant opportunity to receive a fair, equitable, and high-quality education and to close educational achievement gaps. (ESEA section 1001). Each LEA that receives Title I funds identifies public school attendance areas and schools that have high concentrations of children from low-income families as eligible to participate in Title I programs. (ESEA section 1113).

ESEA section 1117 requires participating LEAs, in consultation with appropriate private school officials, to provide eligible children attending private non-profit elementary and secondary schools, their teachers, and their families with Title I services or other benefits that are equitable to those provided to eligible public school children, their teachers, and their families. Eligible private school children are children who reside in a participating Title I public school attendance area and are low achieving.

## A. CONSULTATION

### CONSULTATION IN GENERAL

An LEA must consult with appropriate private school officials during the design and development of the LEA's Title I program. The goal of consultation is agreement between the LEA and appropriate private school officials on how to provide equitable and effective programs for eligible private school children. (ESEA section 1117(b)(1)).

### A-1. What is consultation?

Timely and meaningful consultation with appropriate private school officials is an essential requirement in an LEA's implementation of an effective Title I program for eligible private school children, their teachers, and their families. Consultation involves discussions between public and private school officials on key topics that affect the ability of eligible private school students to participate equitably in Title I programs. Effective consultation provides a genuine opportunity for all parties to express their views and to have those views considered. Successful consultation establishes positive and productive working relationships, makes planning effective, continues throughout implementation of equitable services, and serves to ensure that the services provided meet the needs of eligible students and teachers. A unilateral offer of services by an LEA with no opportunity for discussion, or the application of a blanket rule, is not adequate consultation. Only after discussing key topics relating to the provision of Title I equitable services should an LEA make its final decisions with respect to those services.

Roles for private school officials during the consultation process include participating in consultation; assisting the LEA in obtaining information necessary to identify children from low-income families who reside in a participating Title I public school attendance area, including providing addresses, grade levels, and ages of such children; providing names, addresses, and grade levels of children who meet the criteria for participation eligibility; and suggesting ideas, program

designs, and modifications that meet the needs of their eligible children, their teachers, and their families. (See A-15).

**A-2.  Who is responsible for initiating contact with private school officials regarding participation in the Title I program?**
An LEA must annually contact officials of each private school with children who might reside in the LEA to determine whether those officials would like for their eligible students to participate in equitable services under Title I. (ESEA section 1117(b)(1); see A-5). If this does not occur, private school officials should contact the LEA and ask to speak with the individual(s) responsible for administering the Title I program. If a private school official contacts an LEA but receives no response, that official may also contact the State ombudsman for assistance. (See Section E).

**A-3.  What is an "Intent to Participate" form?**
An "Intent to Participate" form is a document that some LEAs send annually to private school officials to determine their interest in participating in Title I equitable services. The form might include a brief description of the programs for which equitable services are available as well as a list of allowable activities, services, and benefits. Some LEAs send this form by registered mail in order to document receipt of the form by private school officials. An LEA might also send such form by email with read receipt.

**A-4.  May an LEA set a deadline for private school officials to indicate their intent to participate?**
Yes. An LEA may set a reasonable deadline, taking into consideration private school schedules, for private school officials to indicate their intent to participate. An LEA should provide clear and sufficient notice of the deadline, identify potential consequences for not meeting the deadline, and give adequate time for private school officials to respond.

**A-5.  How does an LEA determine which private schools to contact?**
An LEA has a responsibility to contact all private schools within the district that might have students eligible to participate in Title I programs—i.e., students who live in a participating Title I public school attendance area in the LEA. An LEA also has a responsibility to contact private schools outside the district if the LEA has reason to believe students who reside in a participating Title I public school attendance area attend those schools. An LEA may not be aware, however, of every instance in which a student who resides in a participating Title I public school attendance area attends a private school outside of the district. Thus, if a private school has students it believes may be eligible for Title I services because they reside in a participating Title I public school attendance area in another LEA and the private school has not been contacted by that LEA, it would be prudent for private school officials to contact the LEA directly in order to ensure that their eligible students are considered for Title I services.

**A-6.  Who is responsible for initiating consultation?**
An LEA must initiate the consultation process. (ESEA section 1117(b)(1)). One way to accomplish this is for the LEA to extend an invitation to officials of each private school that indicates an intent to participate and to convene a meeting at a time and place determined in consultation with private school officials.

**A-7.  When and how often does an LEA consult with private school officials?**
Consultation between an LEA and private school officials must include early discussions to prepare

for the next school year so that there is a timely start of the Title I program. (ESEA section 1117(a)(3)(A), (b)(3)). To be timely and meaningful, consultation must occur during the design and development of such agency's programs and <u>before</u> the LEA makes any decision that affects the opportunity for eligible private school children, their teachers, and their families to participate in Title I programs. (ESEA section 1117(b)(3)). Consultation must also be ongoing throughout the school year to help ensure effective implementation, service delivery, and assessment of equitable services. (ESEA section 1117(b)(3)).

**A-8.  May a group of private school officials designate a single private school official to represent their interests?**
Yes. If a group of private schools will be represented by a single official, that representative should inform the LEA in writing that she/he will serve as the designated primary contact for such schools and provide a list of the private schools that she/he represents.

**A-9.  What topics must an LEA address during consultation?**
The ESEA requires an LEA to consult with private school officials on the following topics:
- How the children's needs will be identified;
- What services will be offered;
- How, where, and by whom the services will be provided;
- How the services will be academically assessed and how the results of that assessment will be used to improve those services;
- The size and scope of the equitable services to be provided to the eligible private school children, the proportion of funds that is allocated for such services, and how that proportion of funds is determined;
- The method or sources of data that are used to determine the number of children from low-income families in participating school attendance areas who attend private schools, including whether the LEA will extrapolate data if it uses a survey;
- How and when the LEA will make decisions about the delivery of services to eligible children, including a thorough consideration and analysis of the views of the private school officials on the provision of services through a contract with potential third-party providers;
- How, if the LEA disagrees with the views of the private school officials on the provision of services through a contract, it will provide in writing to such private school officials an analysis of the reasons why it has chosen not to use a contractor;
- Whether the LEA will provide services directly or through a separate government agency, consortium, entity, or third-party contractor;
- Whether to provide equitable services to eligible private school children by creating a pool or pools of funds with all of the funds allocated based on all the children from low-income families in a participating school attendance area who attend private schools or based on the children in the LEA's participating school attendance area who attend private schools with the proportion of funds allocated based on the number of children from low-income families who attend private schools (see B-8 and B-9);
- When, including the approximate time of day, services will be provided; and
- Whether to consolidate and use funds in coordination with eligible funds available for services to private school children under applicable programs, as defined in ESEA section 8501(b)(1), to provide services to eligible private school children participating in those programs (see C-13).

(ESEA section 1117(b)(1); 34 C.F.R. § 200.63).

Because an LEA must consult with appropriate private school officials during the design and development of the LEA's Title I program and before the LEA makes any decision that affects the opportunities of eligible private school students to participate (ESEA section 1117(b)(1), (3)), other topics of consultation must include, as appropriate:

- Administrative costs of providing equitable services (see B-36);
- Indirect costs (see B-40);
- Services and activities for teachers of participating private school students (see C-36);
- Family engagement activities (see C-34);
- Any funds available for carryover (see B-27); and
- Transferring funds from Title II, Part A or Title IV, Part A into Title I, Part A (see B-23 through B-25).

**A-10.  What is entailed in achieving "the goal of reaching agreement" between an LEA and appropriate private school officials?**
The "goal of reaching agreement" (ESEA section 1117(b)(1)) between an LEA and appropriate private school officials is predicated on the good faith efforts of all parties to reach agreement regarding the provision of equitable services. Meaningful consultation that results in agreement begins well before the decisions are made or services are implemented and provides a genuine opportunity for all parties to express their views, to have their views given serious, due consideration, and to discuss viable options for ensuring equitable participation of eligible private school students, teachers and other education personnel, and families. In the event of disagreement during the consultation process, an LEA and/or the appropriate private school officials may wish to contact the State ombudsman to help facilitate agreement.

**A-11.  What documentation of consultation must an LEA maintain?**
The ESEA requires an LEA to maintain, and provide to the appropriate entity, the following documentation about the consultation process:

- **Written Affirmation**: Private school officials must affirm in writing that consultation has occurred. Written affirmation also must provide the option for private school officials to indicate their belief that timely and meaningful consultation has not occurred or that the program design is not equitable with respect to eligible private school children. If private school officials do not provide such affirmation within a reasonable period, the LEA must forward the documentation that consultation has, or attempts at consultation have, taken place to the SEA. (ESEA section 1117(b)(5)).
- **Results of Agreement**: The LEA must document if consultation resulted in agreement between the LEA and appropriate private school officials, which may be reflected as part of the written affirmation described above, and provide evidence of such agreement, or lack thereof, to the ombudsman. (ESEA section 1117(b)(1)).
- **Reason for Disagreement** (if applicable): If the LEA disagrees with the views of the private school officials with respect to an issue discussed during consultation, the LEA must provide in writing to such private school officials the reasons why the LEA disagrees. (ESEA section 1117(b)(2)).

**A-12.  Is other documentation that meaningful consultation has occurred helpful?**
Yes. In addition to the required documentation discussed in A-11, it is also good practice for an LEA and appropriate private school officials to maintain a record of notes about topics addressed

and decisions made during consultation meetings. Retaining meeting agendas and sign-in sheets is also good practice. In order to verify that it has met the requirement for timely and meaningful consultation and has provided equitable services, as a best practice, an LEA may want to document that it has:

- Annually informed the private school officials of the opportunity to participate in the Title I program and the various services available;
- Engaged in timely consultation, allowing for meaningful discussion between the LEA and appropriate private school officials regarding services and other benefits;
- Identified the needs of private school students, teachers, and families;
- Allocated a per-pupil amount of funds for services to private school students, teachers, and families that is calculated from the proportional share in accordance with ESEA section 1117(a)(4)(A);
- Provided services, programs, materials, and resources;
- Evaluated programs and services for effectiveness; and
- Adequately addressed problems and formal complaints raised by private school officials.

**A-13.  Is there a specific time by which an LEA must obtain the signature of appropriate private school officials regarding written affirmation/results of agreement?**
No. The affirmation of consultation and results of agreement documents are generally signed when consultation on the planning and design of the next year's program has been completed. An SEA has the flexibility to require LEAs to submit the written affirmations and results of agreement at a specified time, so long as that specified time provides adequate opportunity for LEAs to engage in timely and meaningful consultation.

**A-14.  What should an SEA do when an LEA has not provided it with written affirmations from private school officials?**
If an LEA has not obtained a written affirmation signed by appropriate private school officials, an SEA may request that the LEA provide a reason for the lack of affirmation. In some cases, the reason may be that the private school officials did not want Title I services. However, if the reason is that there is a disagreement between the LEA and private school officials, the SEA may facilitate resolution of the differences.

**A-15.  What assistance might an LEA need from private school officials to obtain information necessary to provide Title I services to eligible students in private schools?**
An LEA is responsible for providing equitable services. Because an LEA may not have all necessary information available to do so, however, the LEA may need to request assistance from private school officials to obtain information or documentation that enables the LEA to meet its responsibilities. For example, to calculate the proportional share of funds available to provide equitable services, an LEA may need assistance from private school officials regarding which private school students are from low-income families and their addresses so the LEA can determine whether these students reside in a participating Title I public school attendance area. Similarly, to identify students who are eligible for equitable services (i.e., they reside in a participating Title I public school attendance area and are low-achieving), an LEA may need assistance in obtaining information on the academic performance of low-achieving private school students as well as their names, addresses, and grades to determine, in consultation with appropriate private school officials, what services will be provided. (See A-1). Private school officials may also need to identify eligible students who reside in an LEA different from the one in which the private school is located and

alert the relevant LEA of the students' potential eligibility. (See A-5).

**A-16. What is an LEA's obligation to consult with, and provide services to eligible students attending, a new private school that opens after the LEA's deadline for indicating an intent to participate?**
An LEA is generally responsible for contacting a new private school, along with all private schools, to determine its intent to participate. An LEA is not required to provide equitable services in the current year to eligible students who attend a new private school if the school opens after the LEA's deadline for indicating an intent to participate in Title I equitable services, but the LEA may do so.

**A-17. What is an LEA's obligation to provide equitable services under Title I if a private school declines to participate or does not respond to the LEA's request to consult?**
An LEA must be able to demonstrate that it made a good faith effort to contact all the private schools in the district and those outside the district that may enroll eligible private school students who reside in the district. (See A-2 through A-5). If a private school declines to participate in Title I programs or does not respond to an LEA's request to consult in the given timeframe regarding the provision of services in a particular year, the LEA has no further responsibility to provide equitable services to students in that school during that school year. The LEA must contact each private school every year, however, to determine the private school's intent to participate in Title I programs.

**A-18. May a private school official request a copy of an LEA's Title I application?**
Yes. Such an application is a matter of public record and is available for public review. An application can provide private school representatives with information that enhances consultation and helps them understand the scope of program activities within the LEA. An LEA should therefore make its Title I application available if a private school official requests it.

**A-19. How might an SEA help foster positive working relationships between an LEA and private school officials to assist with consultation and program implementation?**
There are a number of ways an SEA might help foster positive working relationships between an LEA and private school officials. The SEA's ombudsman, required under ESEA section 1117(a)(3)(B), is a valuable resource for fostering positive working relationships. The ombudsman serves as an SEA's primary point of contact for addressing questions and concerns from private school officials and LEAs regarding the provision of equitable services. (See Section E).

ESEA section 1603(b) also requires an SEA that receives Title I funds to create a State committee of practitioners (COP) to advise the SEA in carrying out its responsibilities under Title I. The COP must include representatives from LEAs as a majority of its members and must also include representatives of private school children. Thus, to assist with consultation and overall program implementation, an SEA can consider the advice it receives from its COP concerning equitable services to help foster positive working relationships between an LEA and private school officials.

An SEA might also consider establishing a private school working group comprised of SEA, LEA, and private school representatives to provide an organized forum for facilitating technical assistance, promoting promising practices for implementing equitable services, and addressing issues of mutual concern to public and nonpublic school communities. Although this is a best practice, unlike the COP or ombudsman, the ESEA does not require an SEA to establish such a working group.

## B.  EQUITABLE SERVICES ALLOCATIONS AND NOTICE, TIMEFRAME FOR OBLIGATIONS, AND ADMINISTRATIVE AND OTHER EXPENDITURES

*Allocations*

<table>
<tr><td align="center"><strong>ALLOCATING FUNDS FOR EQUITABLE SERVICES – IN GENERAL</strong></td></tr>
<tr><td>

The ESEA requires an LEA to:
- Ensure that its expenditures for equitable services are equal to the proportion of funds generated by children from low-income families who reside in participating Title I public school attendance areas and attend private schools; and
- Determine the proportional share of Title I funds available for equitable services for eligible private school children based on the total amount of Title I funds received by the LEA prior to any allowable expenditures or transfers of funds.

(ESEA section 1117(a)(4)(A); 34 C.F.R. § 200.64(a)(1)-(2)).
</td></tr>
</table>

### B-1.  May an LEA reserve funds off the top of its Title I allocation before it determines the proportional share for equitable services?

No. The ESEA requires an LEA to determine the proportional share of Title I funds available for providing equitable services <u>prior</u> to any expenditures or transfers of funds. (ESEA section 1117(a)(4)(A)(ii)).[4]

### B-2.  What does it mean for an LEA to determine the proportional share of Title I funds available for equitable services based on the total amount of Title I funds received by the LEA prior to any allowable expenditures or transfers of funds?

An LEA must apply the proportion used to calculate the proportional share to its entire Title I allocation (including any Title II, Part A or Title IV, Part A funds that an LEA transfers into Title I, Part A) before it reserves any funds for other purposes, including all reservations the ESEA requires or authorizes an LEA to take off the top of its Title I allocation, such as reservations for administration, parent and family engagement, children in institutions for neglected or delinquent children, homeless children and youth, and district-wide initiatives.

The following example illustrates how the equitable services proportional share and the reservations to serve homeless children and youth and children in local institutions for neglected children are based on an LEA's total Title I allocation.

As a first step, the LEA determines the amount of Title I funds that it must allocate for equitable services to eligible private school students and reserve for homeless children and youth and children in local institutions for neglected children based on the LEA's total Title I allocation. With respect to the equitable services allocation, in this example 10 percent of children from low-income families who reside in the LEA's participating Title I public school attendance areas attend private schools

---

[4] The ESEA also requires an LEA to base the required reservations to serve homeless children and youth and children in local institutions for neglected children, as well as the optional reservation to serve children in local institutions for delinquent children, on the LEA's total Title I allocation prior to any allowable expenditures or transfers. (ESEA section 1113(c)(3)(A)-(B)).

(proportional share); therefore, the LEA must allocate 10 percent of its total allocation for equitable services (Row 1 of the following table). Based on needs assessments and considering its total Title I allocation, the LEA also determines the reservation amounts for homeless children and youth and children in local institutions for neglected children (Rows 2 and 3). The LEA then determines the amount it is required to reserve for parent and family engagement under ESEA section 1116(a)(3)(A) and, based on the proportional share of that amount for public school students (i.e., 90 percent), reserves funds from the amount remaining after Step 1 for public school parent and family engagement (Row 4). Finally, from its remaining funds, the LEA makes any other optional reservations for public school Title I students and then allocates funds to schools in accordance with section 1113 of the ESEA.

| EXAMPLE: DETERMINING THE EQUITABLE SERVICES PROPORTIONAL SHARE AND REQUIRED TITLE I RESERVATIONS BASED ON AN LEA'S TOTAL TITLE I ALLOCATION OF $1,000,000 | | | | |
|---|---|---|---|---|
| Row | Activity | Amount | Basis | Amount of Allocation Remaining After Reservation |
| 1 | Equitable services | $100,000 (includes $1,000 to reflect the proportional share of parent and family engagement reservation) | Equitable share calculation based on the LEA's total Title I allocation ($1,000,000 * 10 percent) | $900,000 |
| 2 | Homeless children and youth | $105,000 | Needs assessment and the LEA's total Title I allocation | $795,000 |
| 3 | Children in local institutions for neglected children | $65,000 | Needs assessment and the LEA's total Title I allocation | $730,000 |
| 4 | Public school parent and family engagement reservation | $9,000 (based on proportional share of reservation) | Statutory requirement that an LEA with an allocation of at least $500,000 reserve one percent or more of the LEA's total Title I allocation | $721,000 |
| 5 | Optional reservations and required allocations to public school attendance areas | $721,000 | Statutory and regulatory requirements for optional reservations and allocations to schools and the funds remaining after the required reservations | $0 |

**B-3. What information does an LEA need to calculate the proportional share under ESEA section 1117(a)(4)(A)?**
An LEA needs the amount of its total Title I allocation and poverty data on children residing in participating Title I public school attendance areas who attend public and private schools.

**B-4. How does an LEA calculate the proportional share of Title I funds available for equitable services in the next school year?**
If not all participating Title I public school attendance areas are known for the next year:
Some LEAs, particularly those with public school attendance areas that may not receive Title I

funds each year, may not be able to determine their participating Title I public school attendance areas prior to calculating the equitable share. Such an LEA may determine the number of children from low-income families residing in each participating Title I public school attendance area who attend public schools and private schools in the current year and use these data to calculate the proportional share. For example, in planning for school year 2019-2020 allocations, to determine the proportional share, an LEA would use its school year 2018-2019 participating Title I public school attendance areas and the number of children from low-income families residing in those attendance areas using poverty data collected during the 2018-2019 school year. When actual participating Title I public school attendance areas are known for the 2019-2020 school year, the LEA would recalculate the proportional share and notify appropriate private school officials of any differences in the amount of funds generated by children from low-income families in each private school. Through consultation, the LEA may need to adjust the services it will provide to eligible private school students accordingly.

If all participating Title I public school attendance areas are known for the next year:
If an LEA has established its participating Title I public school attendance areas for the next school year, it would first determine the number of children from low-income families residing in each of these areas who attend public schools and private schools. For example, in planning for school year 2019-2020, if the LEA has determined the public school attendance areas that will receive Title I funds in the 2019-2020 school year, then it can also determine the number of children from low-income families residing in those attendance areas using poverty data collected during the 2018-2019 school year. (ESEA section 1117(a)(4)(A), (c)(1)).

To calculate the proportional share for equitable services, the LEA would determine the overall number of children from low-income families who reside in participating Title I public school attendance areas and who attend public schools and private schools. Using the proportion of children from low-income families who attend private schools, the LEA would determine the amount of funds available for equitable services based on that proportional share of the LEA's total Title I allocation. For example, an LEA with four Title I public school attendance areas and a total Title I allocation of $1,000,000 would determine the proportional share as follows:

| EXAMPLE – DETERMINING THE PROPORTIONAL SHARE | | | |
|---|---|---|---|
| Public School Attendance Area | # of Public School Low-Income Children | # of Private School Low-Income Children | Total # of Low-Income Children |
| A | 500 | 120 | 620 |
| B | 300 | 9 | 309 |
| C | 200 | 6 | 206 |
| D | 350 | 15 | 365 |
| TOTAL | 1,350 | 150 | 1,500 |
| PROPORTIONAL SHARE | 90% | 10% | |
| | $900,000 | $100,000 | |

**B-5. How does an LEA determine participating Title I public school attendance areas?**
ESEA section 1113(a) requires an LEA to allocate Title I funds to public school attendance areas or schools, identified as eligible and selected to participate, in rank order of poverty percentage based on the number of public school children from low-income families residing in each attendance area or school. An LEA first annually ranks its public school attendance areas or schools by poverty

percentage and then selects, in rank order, those areas that the LEA will serve. For areas or schools that exceed 75 percent poverty, the ESEA requires an LEA to serve those areas in rank order without regard to grade-span before serving any attendance area with a poverty percentage of 75 percent or below. If an LEA has sufficient funds to serve all areas or schools above 75 percent poverty and has Title I funds remaining, the ESEA permits the LEA to serve its other areas or schools in rank order of poverty by the LEA as a whole or by grade-span groupings. Among areas or schools with less than 75 percent poverty, this gives an LEA the flexibility to focus resources on certain grades.

**B-6. What data does an LEA use when determining eligible Title I public school attendance areas?**
In identifying and ranking eligible Title I public school attendance areas, ESEA section 1113(a)(5)(A) requires an LEA to use one (or a combination) of four sources of school-level poverty data: census; free or reduced-price lunch (FRPL), including FRPL data used to implement the Community Eligibility Provision (CEP); Temporary Assistance for Needy Families (TANF); and Medicaid.

**B-7. How does an LEA determine the amount of Title I funds to be used for parent and family engagement activities for participating private school students?**
ESEA section 1116(a)(3)(A) requires an LEA to reserve and spend at least one percent of its Title I allocation to carry out mandatory Title I parent and family engagement activities if the LEA's Title I allocation exceeds $500,000. This means that the ESEA requires such an LEA to reserve at least one percent from the proportional share allocated for equitable services and at least one percent of the total remaining amount for Title I activities in public schools. For example, an LEA's total Title I allocation is $1,000,000. From that amount, $100,000 (10 percent) is allocated for all Title I equitable services activities and $900,000 (90 percent) for all Title I activities in public schools. Therefore, with respect to equitable services, the LEA must spend at least one percent ($1,000 from the $100,000 proportional share) to provide engagement activities for the parents and families of participating private school students (leaving $99,000 for other equitable services activities).

If an LEA's Title I allocation does not exceed $500,000, the LEA may still reserve a portion of the proportional share to provide engagement activities for the parents and families of participating private school students. The amount reserved by the LEA would be based on timely and meaningful consultation with private school officials.

**B-8. What are the options available for providing equitable services to private school children?**
Consistent with ESEA section 1117(b)(1)(J), following consultation with, and the agreement of, private school officials (see B-9), an LEA may choose one or more of the following options for providing equitable services to eligible private school children with Title I funds:
1. School-by-School: Provide equitable services to eligible children in each private school with the Title I funds generated by the children from low-income families who reside in participating Title I public school attendance areas and attend that private school.
2. Pooling within an LEA: Provide equitable services to eligible children attending a private school that is part of a group of private schools (such as a group of schools under the authority of a single organization) by pooling the Title I funds generated by children from low-income families who reside in participating Title I public school attendance areas and attend a private school in the group. The LEA, in consultation with appropriate private

school officials, must establish criteria to determine the eligible private school students in greatest educational need to receive services. The services provided to eligible children attending a particular private school do not depend on the amount of funds generated by children from low-income families in that school; rather, the services are based on educational need. If private school officials representing different groups of private schools request pooling, the LEA may establish a separate pool for each requesting group.

3. <u>Pooling across LEAs</u>**:** Because eligibility for Title I services is based on a child's residence and not where the child attends school, it is common that multiple LEAs have a responsibility to provide services to eligible children who attend the same private school, making provision of those services through pooling across LEAs potentially more educationally effective and efficient than by each individual LEA providing services to eligible students in the same private school. Thus, multiple LEAs may pool the Title I funds generated by their private school children from low-income families who reside in a participating Title I public school attendance area to serve eligible low-achieving private school children who reside in those LEAs. In other words, low-achieving private school children in greatest need who reside in a participating Title I public school attendance area in any of the applicable LEAs may be served with the pooled funds. The LEAs, in consultation with appropriate private school officials, must establish criteria to determine the eligible private school students in greatest educational need to receive services.

The following example shows the differences among the school-by-school approach, pooling within an LEA, and pooling across LEAs. In this example:

➢ LEA A and LEA B have a responsibility to provide equitable services to low-achieving children who reside in a participating Title I public school attendance area within their boundary and attend Private Schools 1 and 2.
➢ Private school children from low-income families who reside in a participating Title I public school attendance area in LEA A generate $50,000 for equitable services in Private School 1 and $25,000 for equitable services in Private School 2.
➢ Private school children from low-income families who reside in a participating Title I public school attendance area in LEA B generate $5,000 for equitable services in Private School 1 and $1,000 for equitable services in Private School 2.

*Scenario 1: No pooling*

Eligible low-achieving private school children receive services based on the amount of Title I funds generated by children from low-income families in their school as determined by the LEA in which they live. For example, eligible private school children in Private School 1 who live in LEA A receive $50,000 in services while their Title I eligible classmates who live in LEA B receive only $5,000 in services. This is true even if there are more low-achieving students who reside in LEA B.

*Scenario 2: Pooling Title I funds among private schools within a single LEA*

Appropriate private school and LEA officials agree after consultation to pool Title I funds within LEA A and LEA B individually. There is $75,000 available to serve low-achieving private school children in both Private School 1 and Private School 2 who live in LEA A and $6,000 available to serve low-achieving private school children in both private schools who live in LEA B. Even if

there are more low-achieving children who reside in LEA B than LEA A, there is only $6,000 available to serve these students.

*Scenario 3: Pooling Title I funds among private schools across LEAs*

Appropriate private school and LEA officials agree after consultation to pool Title I funds across both LEA A and LEA B. There is then $81,000 available to serve, based on uniform criteria of educational need, the lowest-achieving eligible private school children who attend Private Schools 1 and 2 regardless of whether they reside in LEA A or LEA B and without regard to how much funds children from low-income families within their private school generate towards the pool. Eligible low-achieving children may receive Title I services even if their school has few or no children from low-income families who generate Title I funds.

**B-9. May an LEA make a unilateral decision to pool funds among several private schools to provide equitable services?**
No. As a general rule, ESEA section 1117 and 34 C.F.R. § 200.62 require an LEA to provide equitable services to eligible students who attend a private school (i.e., students who are low-achieving and reside in a participating Title I public school attendance area) with Title I funds generated by students from low-income families who reside in a participating Title I public school attendance area and who attend the school. In other words, an LEA must provide equitable services to eligible low-achieving students in a given school commensurate with the Title I funds generated by students from low-income families in the school.

Pooling is an alternative to this general rule (compare section 1117(b)(1)(J)(i) with 1117(b)(1)(J)(ii)) and permits an LEA, after timely and meaningful consultation with appropriate private school officials, to provide services to eligible low-achieving students among a group of schools with Title I funds generated by students from low-income families who reside in participating Title I public school attendance areas and who attend those schools. Which students to serve is determined, in consultation with appropriate private school officials, among all schools in the pool. Thus, students in a given school may not receive services commensurate with the funds generated by students from low-income families in the school; some may receive more services, and some may receive less. Because pooling is an alternative to the general rule, despite an LEA's authority to make the final decisions with respect to the services it will provide to eligible private school students (34 C.F.R. § 200.64(b)(4)), LEA and appropriate private school officials must agree through consultation for the LEA to pool Title I funds among a group of private schools because it impacts the services eligible students in a given private school would otherwise receive. Without such agreement, an LEA must follow the general rule in section 1117(b)(1)(J)(ii) and provide equitable services to eligible low-achieving students in each school commensurate with the funds generated by students from low-income families in that school.

**B-10. After an LEA determines the proportional share, the administrative and indirect cost (if any) amounts (see B-36 and B-40) and, if applicable, the parent and family engagement activities amount (see B-7), how does the LEA allocate the remainder of the proportional share to provide equitable services?**
An LEA subtracts from the proportional share the amounts needed for administration, indirect costs (if any), and parent and family engagement, if applicable, and divides the remainder by the total number of private school students from low-income families in participating Title I public school attendance areas to establish a per-pupil amount. The LEA then multiplies this per-pupil amount by

the number of private school students from low-income families that attend a participating private school (or a group of schools) to determine the amount available to serve eligible students in the school or, as applicable, group. This per-pupil amount will likely vary from the per-pupil amount the LEA uses to allocate its Title I funds to public schools under ESEA section 1113(c). This is primarily because, as discussed above in B-2, the ESEA requires an LEA to reserve funds for activities such as providing Title I services to homeless children and youth before allocating Title I funds to eligible public schools. In addition, in allocating Title I funds to public schools, an LEA may use different per-pupil amounts, consistent with ESEA section 1113(c) and 34 C.F.R. § 200.78(c).

Using the above examples, of the total $100,000 proportional share, the LEA has $99,000 for equitable services remaining after the $1,000 parent and family engagement reservation. The LEA then determines, after consultation with private school officials, to reserve three percent ($3,000) from the equitable share for administration and charges one percent ($1,000) for indirect costs, which results in $95,000 remaining and a per-child amount of $633.33 ($95,000/150 private school children from low-income families). Assuming that there are three participating private schools (Private Schools 1, 2, and 3) from which the 150 low-income children come and the LEA, after consultation, decides to provide services on a school-by-school basis, the following table shows the calculation to determine the amounts available from the $95,000 to serve eligible students in each school.

| Private school | Number of private school low-income children | Per-child amount ($95,000/150 low-income children) | Allocation for services in private school |
|---|---|---|---|
| 1 | 75 | $633.33 | $47,500 |
| 2 | 50 | $633.33 | $31,667 |
| 3 | 25 | $633.33 | $15,833 |
| **Total** | **150** | **$633.33** | **$95,000** |

On the other hand, if the LEA and appropriate private school officials agree to pool funds for the three schools, the LEA would combine the funds generated by low-income private school students in each of the three schools to create the pool. This would result in the availability of $95,000 to serve eligible children in greatest educational need in the three schools without regard to the specific amount of funds generated by low-income children in a particular school.

**B-11.  How does an LEA determine the number of children, ages 5 through 17, who are from low-income families, reside in participating Title I public school attendance areas, and attend private schools?**
The ESEA requires an LEA to determine an accurate count of children from low-income families who attend public and private schools and reside in participating Title I public school attendance areas in order to allocate the proportional share. With respect to private school students, the ESEA permits an LEA, based on timely and meaningful consultation, to use:
  1. The same measure of poverty used to count public school children. If the same measure of poverty used to count public school children is available for private school students (e.g., FRPL data) and an LEA concludes, after consultation with appropriate private school officials, that the data will yield an accurate count of private school students, the Department recommends that the LEA use the same measure.

2. <u>Comparable poverty data from a survey and allowing such survey results to be extrapolated if complete actual data are unavailable</u>. An LEA may use a survey to obtain poverty data comparable to those used for public school students. To the extent possible, the survey must protect the identity of families of private school students. (ESEA section 1117(c)(1)(B)). An LEA should not require that the private school officials give the names of low-income families. The only information necessary for an LEA to collect from such a survey of private school children is—

    (1) verification of residence in a participating Title I public school attendance area;

    (2) grade level and age of each child; and

    (3) income level of parents.

If, based on consultation with private school officials (see A-9), an LEA chooses to extrapolate the survey results to the private school's entire enrollment, the LEA will also need the private school's enrollment. For example, in a private school with an enrollment of 400, if an LEA receives survey data for 300 children that indicate that 150 children are from low-income families (50 percent), to extrapolate the results the LEA would multiply 400 by 0.5 to determine that there are 200 children in the school from low-income families.

3. <u>Comparable poverty data from a different source</u>. An LEA may use poverty data for private school children that are from a different source than the data it uses for public school children so long as the income threshold in both sources is generally the same. For example, an LEA uses FRPL data, but private school children do not participate in the free and reduced-price lunch program; however, private school officials are able to provide an LEA with a count of children who are from low-income families using other comparable sources of poverty data such as eligibility for means-tested tuition scholarship programs.

4. <u>Proportionality</u>. An LEA may apply the low-income percentage of each participating Title I public school attendance area to the number of private school children who reside in that school attendance area to derive the number of private school children from low-income families. To do this, an LEA will need the addresses, grade levels, and ages of those students attending private schools. For example, if the percentage of poverty in a public school attendance area is 60 percent and there are 50 private school children residing in the public school attendance area, the LEA would derive 30 private school children from low-income families who reside in the attendance area.

5. <u>An equated measure</u>. An LEA may use an equated measure of low-income by correlating sources of data—that is, determining the proportional relationship between two sources of data on public school children and applying that ratio to a known source of data on private school children. For example, an LEA uses FRPL data, but those data are not available for private school students. However, if TANF data are available, the LEA could determine an equated measure of poor children in private schools based on FRPL data by correlating the two sets of data as follows:

$$\frac{\text{TANF (public)}}{\text{FRPL (public)}} = \frac{\text{TANF (private)}}{\text{X (private)}}$$

In this example, the LEA may then use the equated number of private school children based on FRPL data ("X") as the number of private school children from low-income families. (ESEA section 1117(c)(1); 34 C.F.R. § 200.64(a)(3)(i)).

After consultation with private school officials occurs, an LEA has the final authority to decide which method it will use to calculate the number of children who are from low-income families and attend private schools. (ESEA section 1117(c)(1)).

**B-12.  How often must an LEA collect poverty data?**

ESEA section 1117(a)(4)(D) permits an LEA to determine the number of children from low-income families who attend private schools every year or every two years. Section 1117(b)(1)(F) requires an LEA to consult with appropriate private school officials about the availability of poverty data on private school children, and an LEA can determine whether it would be more feasible to collect biennially. This may reduce the burden of annually collecting poverty data from private schools, particularly if data are not readily available for students in a private school. It is also not necessary that an LEA use the same timeframe with regard to all private schools. For example, if some private schools have FRPL data available, the LEA could collect those data annually. For other private schools that rely on a survey, the LEA could collect data biennially.

**B-13.  May an LEA use more than one method of collecting poverty data on private school children?**

Yes. Although the preferred measure for obtaining poverty data on children in private schools is the same measure the LEA uses for public school children (e.g., school lunch data such as direct certification data), these data may not be available for each private school (e.g., if a private school does not participate in the school lunch program). Thus, it may be necessary for an LEA, after consultation with appropriate private school officials, to use more than one method of collecting data on children living in poverty among private schools or within a single school. However, the LEA must ensure that there are no duplicate counts and that the methods used have comparable income levels.

**B-14.  If private school officials assist an LEA in obtaining data necessary for the LEA to determine the proportional share, how do LEA officials or auditors determine the accuracy of information retained by the private school officials?**

If private school officials assist an LEA in obtaining data necessary for the LEA to determine the proportional share—e.g., by providing data on children from low-income families who reside in a participating Title I public school attendance area and attend the private school—they must maintain relevant data not provided to the LEA in their files. If LEA officials or auditors, as appropriate, wish to review the data, they may do so at the private school. The type of data will depend on the method an LEA decides to use, after timely and meaningful consultation with private school officials, to determine the poverty count of private school children. Examples of data might include student addresses, survey forms completed by families, or scholarship information.

**B-15.  If an LEA has poverty data for children in a private school, regardless of whether the private school participates in Title I, does the LEA include the poverty data in calculating the proportional share?**

Yes. The ESEA requires an LEA to base the proportional share on the number of children from low-income families who reside in participating Title I public school attendance areas. (ESEA section 1117(a)(4)(A)). Therefore, an LEA must include children from low-income families who attend any private school for which the LEA has poverty data (including private schools that participate in Title I and non-participating schools) and reside in participating Title I public school attendance areas in calculating the proportional share. The funds generated for equitable services by these children would be available to serve eligible children in participating private schools. (See B-10).

If an LEA does not have poverty data on children in non-participating private schools, then there is no obligation on the LEA to obtain these data to include in calculating the proportional share.

**B-16. If an LEA and appropriate private school officials agree to establish a pool or pools of Title I funds allocated for private school children and, later, one or more private schools in the pool decline services for eligible students enrolled in the school, what happens to the funds generated by children from low-income families in the private school(s)?**

The ESEA requires that an LEA consult with private school officials regarding the size and scope of equitable services to be provided to eligible private school children in a single school or pool of schools, the proportion of funds that is allocated for such services, and how that proportion of funds is determined. (ESEA section 1117(b)(1)(E)). Consistent with this requirement, if a private school that initially is part of a pool later declines services, an LEA must consult with appropriate private school officials regarding how funds generated by students in the school will be used. Generally, the funds generated remain within the pool, such as where a private school in a pool elects not to receive services because only one or two students in the school are eligible for services. However, after consultation with private school officials, an LEA might determine that the amount generated by children from low-income families who attend schools declining services results in a total amount for the pool that substantially exceeds the amount needed to provide equitable services to eligible children in the pool's participating schools (e.g., where a significant amount of funds is generated by students in schools declining services, but only a small number of eligible students attend other schools in the pool). In this situation, the LEA may allocate the excess funds to provide equitable services to eligible children in private schools that are not part of the pool. (Note that, unless there are no other participating private schools in the LEA, the LEA would not allocate any of the excess funds for services to public school students because the ESEA requires that all funds generated for equitable services remain a part of the overall private school proportional share. (ESEA section 1117(a)(4)(A)).)

**B-17. When an LEA elects not to serve an eligible public school attendance area, as permitted under ESEA section 1113(b)(1)(D), what are the procedures for serving the private school children who reside in that attendance area?**

An LEA may elect not to serve ("skip") an eligible public school attendance area or school that has a higher percentage of children from low-income families than other schools it elects to serve in certain circumstances. In implementing this provision, therefore, an LEA must determine which school attendance areas would have received Title I funds absent any skipping, include children from low-income families who reside in these attendance areas and attend private schools in calculating the proportional share under ESEA section 1117(a)(4)(A), and, from the proportional share, determine the amount of these funds that are available for services for eligible private school children residing in the skipped public school attendance area. If the LEA skips one or more of its higher-ranked school attendance areas, enabling the LEA to use Title I funds to serve a public school with a lower poverty percentage than the skipped school, ESEA section 1117(b)(1)(E) requires the LEA to consult with private school officials about whether eligible private school children residing in the additional served attendance area will receive services. The LEA is not required, however, to include private school students from low-income families who reside in the additional served attendance areas in calculating the proportional share.

**B-18.  How are private school children identified as residing in a participating Title I public school attendance area if an LEA is operating under an open enrollment, desegregation, or magnet plan?**
If an LEA identifies a public school as eligible on the basis of enrollment, rather than serving an eligible school attendance area, the LEA must, in consultation with private school officials throughout the district, determine an equitable way to identify eligible private school children. For example, the LEA may assign a private school child to the public school attendance area in which the child resides or to the public school that the child would have attended.

**Special Consideration: Community Eligibility Provision**
Detailed information regarding the Community Eligibility Provision (CEP) and the use of direct certification data in Title I is available in guidance issued by the Department in 2013 and revised in 2015 (available at https://www2.ed.gov/programs/titleiparta/15-0011.doc).

**B-19.  What is CEP?**
To be eligible for CEP, an LEA and/or school must meet a minimum level of "identified students" for free meals in the year prior to implementing CEP; agree to serve free breakfasts and lunches to all students; and agree to cover with non-Federal funds any costs of providing free meals to students above the amounts provided by Federal assistance.

**B-20.  If a private school is a CEP school, does every child in the private school automatically generate Title I funds for equitable services?**
No. Title I funds are generated to provide equitable services to eligible private school students on the basis of private school students from low-income families who reside in participating Title I public school attendance areas and not on the basis of all students in a private school. Accordingly, even if a private school is a CEP school and all students in the school are from low-income families, only those students who reside in a participating Title I public school attendance area would generate funds for Title I equitable services.

**B-21.  Is an LEA's collection of poverty data on private school students affected by CEP data?**
Possibly. As noted above, it is an LEA's responsibility, after consultation with private school officials, to identify the method it will use to determine the number of private school children from low-income families who reside in participating Title I public school attendance areas.

If an LEA uses National School Lunch Program (NSLP) data that include a mix of CEP data and FRPL data to allocate Title I funds to public school attendance areas and schools, and such data are also available for private school students, then the LEA would most likely use the NSLP data as the poverty measure it uses when calculating the amount of funds available for equitable services. If the same measures (e.g., CEP data and FRPL data) are not available for private school students, the LEA must use another measure of poverty. (See B-11 for options). If an LEA allocates Title I funds to its public schools based on their direct certification counts multiplied by 1.6,[5] the LEA may use a poverty measure with a poverty threshold for private school students equal to the CEP threshold it is using for public school students and multiplied by 1.6.

_____

[5] The 1.6 multiplier in the CEP statute provides an estimate of the percentage of students eligible for FRPL in participating CEP schools, groups of schools, or LEAs that is comparable to the poverty percentage that would be obtained in a non-CEP school.

**B-22.  How does an LEA determine the number of low-income private school children in participating Title I public school attendance areas if a private school participates in CEP?**
If a private school participates in CEP, and an LEA uses NSLP data to allocate Title I funds to public schools but has no public CEP schools, the LEA would most likely determine the number of low-income private school students by multiplying the number of directly certified students who live in a Title I participating public school attendance area and are enrolled in the private school by the 1.6 multiplier.

If, however, a private school participates in CEP and the LEA uses NSLP data to allocate Title I funds to public schools, with some or all public schools participating in CEP, the method for determining the number of low-income private school students would vary depending upon the specific method used to determine the number of low-income public school students. For example, if an LEA uses direct certification data multiplied by 1.6 for its public schools, it would use the same method for private CEP schools. Similarly, if an LEA uses direct certification data alone to determine the number of low-income students in its public schools, it would do the same to determine the number of low-income students in private CEP schools.

Under any of the above scenarios, if providing direct certification data is administratively burdensome for a CEP private school or, based on consultation, the LEA determines that it would not be appropriate for other reasons to use CEP data for private school students, the LEA instead could obtain comparable data on private school students through other means, such as a survey. (See B-11 for information on methods for determining the number of low-income students in private schools.)

### *Transferability and Title I Equitable Services*

ESEA section 5103 gives LEAs flexibility to transfer some or all of their funds under certain ESEA programs to other eligible ESEA programs. Under the transferability authority, LEAs can transfer funds received under Title II, Part A and Title IV, Part A into, for example, Title I, Part A. LEAs may not, however, transfer funds out of Title I, Part A. LEAs do not need prior approval from the Department to exercise the transferability authority, but before an LEA can transfer funds from a program subject to equitable services requirements, it must engage in timely and meaningful consultation with appropriate private school officials. (ESEA section 5103(e)(2)).

For more information, see the "Transferability" section in the *Non-Regulatory Guidance: Fiscal Changes and Equitable Services Requirements under the Elementary and Secondary Education Act of 1965 (ESEA), as Amended by the Every Student Succeeds Act (ESSA)* (November 21, 2016), available at https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf, and the *Guidance on the Transferability Authority*, which is based on the ESEA, as amended by the No Child Left Behind Act of 2001 (NCLB), but remains mostly applicable, except as modified by the Fiscal Changes guidance, available at www2.ed.gov/programs/transferability/finalsummary04.doc.

---

**CONSULTATION AND TRANSFERABILITY**

The ESEA requires an LEA, before transferring any funds, to engage in timely and meaningful consultation with appropriate private school officials and give due consideration to the views of these officials prior to making decisions regarding transfers. (ESEA section 5103(e)(2)).

---

**B-23.  If, after timely and meaningful consultation, an LEA transfers funds into Title I under ESEA section 5103(b), are those funds subject to the proportional share in order to provide equitable services?**

Yes. ESEA section 5103(e)(1) requires that transferred funds be subject to the rules and requirements applicable to the funds under the provision to which the funds are transferred. Therefore, an LEA must apply the proportional share calculation in ESEA section 1117(a)(4)(A) (see B-2) to any funds transferred into Title I. For example, if an LEA's initial Title I allocation is $1,000,000 and, after consultation, the LEA decides to transfer $50,000 from Title IV, Part A to Title I, the LEA will calculate the Title I proportional share based on its Title I allocation after the transfer ($1,050,000).

**B-24.  Under ESEA section 5103(b), after timely and meaningful consultation, may an LEA transfer funds into the Title I program solely to provide services for private school students?**

No. The ESEA does not authorize an LEA to transfer to the Title I program only the portion of funds available for services for private school students from one or more of the programs whose funds may be transferred. If an LEA decides to transfer funds, it must provide services to public and private school students and teachers in accordance with all of the requirements of the program(s) to which the funds are transferred. (ESEA section 5103(e)(1)).

**B-25.  May an LEA, after timely and meaningful consultation, retain funds in a program from which it transfers funds to Title I solely to provide equitable services under that program?**

No. Just as an LEA may not transfer funds to a particular program solely to provide equitable services, it may not retain funds solely for this purpose. Thus, if an LEA chooses to transfer its Title II, Part A or Title IV, Part A funds to Title I, it may not retain a portion of those funds solely to provide equitable services under Title II, Part A or Title IV, Part A. Rather, if an LEA decides to transfer funds into Title I, it must provide services to public and private school students, their teachers, and their families in accordance with all Title I requirements. (ESEA section 5103(e)(1)).

*Timeframe for Obligations*

| OBLIGATION OF FUNDS |
| --- |
| Funds allocated to an LEA for educational services and other benefits to eligible private school children, their teachers, and their families must be obligated in the fiscal year for which the funds are received by the LEA. (ESEA section 1117(a)(4)(B)). |

**B-26.  What is the purpose of the obligation of funds requirement given that an LEA may carry over funds from a given fiscal year and spend those funds in the succeeding fiscal year?**

The purpose of this requirement is to ensure that an LEA obligates the funds available under Title I to provide equitable services in the fiscal year for which the funds are appropriated so that eligible students, teachers and other educational personnel, and families receive the services to which they are entitled in a timely manner. This provision reinforces the requirement that an LEA conduct timely consultation with private school officials to design appropriate equitable services so that those services can begin at the beginning of the school year for which the funds are appropriated.

**B-27. May an LEA carry over unobligated funds despite the statutory requirement regarding obligation of funds?**

If an LEA is providing equitable services as required and meeting the obligation of funds requirement in ESEA section 1117(a)(4)(B), it generally should not have any, and certainly not significant, carryover. The ESEA, however, does not prohibit carryover of funds for equitable services and, in most cases, requires it. The following are examples of circumstances that could result in carryover of equitable services funds and how an LEA would use such carryover:

| Reason for Carryover | Use of Carryover |
| --- | --- |
| Services for eligible children in one or more private schools are delayed (e.g., based on a natural disaster, delayed consultation, inability to employ qualified personnel, or unexpected procurement challenges). As a result, the LEA is unable to fully provide required equitable services, and some funds are unobligated at the end of the Federal fiscal year. | The LEA must use the funds to provide equitable services to eligible children in the affected private schools the following year. |
| An LEA uses a third-party contractor to provide equitable services, and the invoiced amount for services in one of the private schools is $1,000 less than anticipated. Because this occurs late in the summer, the LEA is unable to responsibly obligate the funds prior to the end of the Federal fiscal year. | The LEA, in consultation with private school officials, must use these funds the following year to provide equitable services to students in the affected private school. If, after consultation, those private school officials decline such services, the LEA must add the funds to the proportional share available for equitable services to other participating private schools. If there are no other participating private schools, the funds may be used to provide Title I services in public schools. |

**B-28. How does the 15 percent carryover limitation in ESEA section 1127(a) apply to equitable services carryover?**

The 15 percent carryover limitation in ESEA section 1127(a) is calculated based on an LEA's total Title I allocation, including the portion allocated for equitable services. However, because an LEA generally must carry over any equitable services funds not obligated in accordance with ESEA section 1117(a)(4)(B), if an LEA exceeds the carryover limitation, and an SEA reduces the LEA's allocation as a result, such reduction may not come from the portion of carryover funds used to provide equitable services. An exception would be if one or more private schools declines all or a portion of services, and there are no other participating private schools. In this case, the SEA would consider the funds generated for the declined services when making a reduction to an LEA's allocation.

**B-29. When does an "obligation" occur?**

34 C.F.R. § 76.707 governs when an obligation of Federal funds by an SEA or LEA occurs.

The following table shows when a State or a subgrantee makes obligations for various kinds of property and services.

| If the obligation is for— | The obligation is made— |
|---|---|
| (a) Acquisition of real or personal property | On the date on which the State or subgrantee makes a binding written commitment to acquire the property. |
| (b) Personal services by an employee of the State or subgrantee | When the services are performed. |
| (c) Personal services by a contractor who is not an employee of the State or subgrantee | On the date on which the State or subgrantee makes a binding written commitment to obtain the services. |
| (d) Performance of work other than personal services | On the date on which the State or subgrantee makes a binding written commitment to obtain the work. |
| (e) Public utility services | When the State or subgrantee receives the services. |
| (f) Travel | When the travel is taken. |
| (g) Rental of real or personal property | When the State or subgrantee uses the property. |
| (h) A pre-agreement cost that was properly approved by the Secretary under the cost principles in 2 C.F.R. Part 200, Subpart E—Cost Principles | On the first day of the grant or subgrant performance period. |

**B-30.  How long does an LEA have to meet the obligation of funds requirement in ESEA section 1117(a)(4)(B)?**
The applicable fiscal year is the Federal fiscal year, which ends on September 30 of each year. Although the State in which an LEA is located may operate on a different fiscal year (e.g., July 1 through June 30), September 30 is the date by which an LEA must obligate funds for equitable services to meet ESEA section 1117(a)(4)(B). For example, with respect to fiscal year 2017 Title I funds that an LEA received for the 2017-2018 school year, the ESEA requires an LEA to have obligated all of the funds generated for equitable services by September 30, 2018. In other words, the obligation period does not end with the end of the school year or the State's fiscal year.

**B-31.  May an LEA impose reasonable deadlines on private school officials to facilitate meeting the obligation of funds requirement in ESEA section 1117(a)(4)(B)?**
Yes. An LEA—not private school officials—is responsible for ensuring that Title I funds are obligated in a timely manner. In some cases, however, action by private school officials is necessary for the LEA to meet this obligation. For example, if an LEA plans to reimburse private school teachers for the cost of Title I professional development selected by private school teachers from a menu of approved courses, during consultation it could establish a reasonable deadline by which private school staff must participate in applicable courses (e.g., by September 1 so that the LEA has time to process reimbursement requests before the end of the Federal fiscal year).

If a deadline is established in consultation and in the context of the requirement to obligate funds generated for equitable services in the current fiscal year, it would be reasonable for the LEA to inform private school officials that, if the deadline is not met and the private school officials have not notified the LEA of obstacles to meeting the deadline in a timely manner, the LEA may consider the private school to have declined services. Generally, however, the ongoing consultation required by the ESEA (ESEA section 1117(b)(3)) will help prevent this situation from occurring because consultation throughout the year provides an established forum for private school officials to alert the LEA if there are obstacles to meeting a deadline (e.g., a private school participant was unable to attend professional development due to an illness).

*Notice of Allocations*

> ### NOTICE OF ALLOCATION
>
> An SEA must provide notice in a timely manner to appropriate private school officials in the State of the allocation of funds for educational services and other benefits under Title I that an LEA has determined are available for eligible private school children, their teachers, and their families. (ESEA section 1117(a)(4)(C)).

### B-32.  What information must an SEA include in the notice of allocation that the SEA must provide to private school officials?
The ESEA requires an SEA to annually provide information on the amount of funds allocated for equitable services under Title I that each LEA responsible for providing equitable services has determined is available for eligible private school students, their teachers, and their families. (ESEA section 1117(a)(4)(C)).

### B-33.  Is an SEA required to use a particular method to disseminate the notice of allocation?
No. An SEA has flexibility to determine, in consultation with appropriate private school officials, an effective manner for disseminating the notice of allocation. An SEA may consider methods such as publicly posting this information on the SEA's website, using an email distribution list of private school officials, and other methods.

### B-34.  Is there a specific timeline for the SEA to disseminate the notice of allocation?
No. An SEA has flexibility to determine, in consultation with appropriate private school officials, a reasonable timeline for providing the notice of allocation. To ensure that the notice is provided in a timely manner, dissemination would generally occur prior to the beginning of the school year.

### B-35.  Is an LEA required to provide private school officials with the amount of funds available for equitable services for private school students in a specific private school or pool of schools?
Yes. As noted in A-9, the ESEA requires an LEA to consult with private school officials regarding the size and scope of the equitable services to be provided, the proportion of funds that is allocated for equitable services, and how that proportion is determined. (ESEA section 1117(b)(1)(E)). Given that consultation must occur well before allocations are finalized, it is likely that the initial discussions of this topic will be based on estimated allocations for the coming school year, which may be based on the prior year's allocations or preliminary allocations for the coming school year.

Once final allocations are available, the ESEA requires an LEA to provide this information to private school officials. In addition to addressing this topic during consultation, some LEAs provide this information through their website or in some other written form. This requirement is distinct from the notice of allocation requirement applicable to an SEA that is described in B-32.

*Administrative and Other Expenditures*

**B-36.  How does an LEA reserve Title I funds for its administration of the Title I program to provide equitable services for private school students?**
After consultation with private school officials, an LEA may reserve an amount from the proportional share that is reasonable and necessary for the LEA's administration of equitable services. (2 C.F.R. §§ 200.403(a) and 200.404[6]). (This term refers to administrative activities that are directly attributable to the equitable services program, such as the time an LEA's Federal programs director spends on equitable services; it does not refer to indirect costs, discussed below in B-40.) An LEA determines this amount separately from the amount of funds needed for the administration of the Title I program for students in public schools. ESEA section 1117(b)(1)(E) requires the LEA to consult with appropriate private school officials about the size and scope of the equitable services for eligible private school children. Therefore, because the amount of the proportional share used for administration directly affects the size and scope of equitable services, the LEA must consult with private school officials regarding the administrative costs for implementing equitable services before it decides the amount to reserve for this purpose. (See A-9.) If an LEA is considering charging indirect costs to the proportional share, as discussed below in B-40, this would also be a topic during consultation in addition to discussing administrative costs. (See A-9).

**B-37.  May a third-party contractor hired by an LEA incur administrative costs?**
Yes. A third-party contractor hired by an LEA to provide services to private school participants may incur administrative costs, which must come from the proportional share. The LEA and third-party contractor should identify in the contract the portion of the costs that are administrative.

**B-38.  For a Title I classroom in a private school, may Title I funds be used to purchase furniture?**
Yes. From the proportional share, following consultation with private school officials, an LEA may use Title I funds to purchase furniture for a Title I classroom in a private school if that cost is reasonable and necessary to provide equitable services. (2 C.F.R. § 200.403). If an LEA purchases furniture with Title I funds, only Title I participants may use it. (2 C.F.R. § 200.403). Furthermore, ESEA section 1117(d)(1) requires that title to materials, equipment, and property purchased with Title I funds be in a public agency and that a public agency administer the resources.

**B-39.  If eligible private school children need transportation from the private school to another site in order to be served by the Title I program, who is responsible for providing this transportation?**
If private school children eligible to receive equitable Title I services need to be transported from their private school to another site, the LEA, as the provider of equitable services, is responsible for

_____

[6] 2 C.F.R. Part 200 is the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance).

providing that transportation. It is not the responsibility of the private school or the participants' parents to provide the necessary transportation. The cost of such transportation is an administrative cost and is therefore paid from the proportional share. Thus, it is often beneficial for LEAs and private school officials to work together to facilitate the provision of Title I services at the private school site in order to reduce administrative costs and time away from the student's general course of instruction at the private school.

**B-40. May an LEA charge indirect costs associated with providing equitable services to the proportional share of Title I funds available for equitable services?**
Yes. The Uniform Guidance authorizes the charging of indirect costs by a recipient of Federal funds, including an LEA.[7] LEA officials must discuss indirect costs with private school officials during consultation because these costs affect the amount of the proportional share that is available to provide Title I services to eligible students, their teachers, and their families. (ESEA section 1117(b)(1)(E); A-9). In addition, a program that has a supplement not supplant requirement, like Title I, must use a restricted indirect cost rate.[8] Generally, an LEA with an approved restricted indirect cost rate may apply that rate to all its modified total direct costs,[9] including those it incurs to provide equitable services.

## C. DELIVERY OF EQUITABLE SERVICES

> ### ELIGIBLE CHILDREN
>
> An LEA must provide equitable services to the extent consistent with the number of eligible children identified under ESEA section 1115(c) in the school district served by an LEA who are enrolled in private elementary and secondary schools. (ESEA section 1117(a)(1)(A)).

**C-1. What private school students are eligible for Title I services?**
In general, to be eligible for Title I services, a private school child must reside in a participating Title I public school attendance area and must be identified by the LEA as low achieving on the basis of multiple, educationally related, objective criteria. (ESEA sections 1115(c)(1)(B) and 1117(a)(1)). In addition, children may be identified as eligible solely by virtue of their status as follows: homeless children; children who in the preceding two years had participated in Head Start, a literacy program under Title II, Part B, Subpart 2, a Title I preschool program, or a Title I, Part C (Migrant Education) program; and children in a local institution for neglected or delinquent children and youth or attending a community day program for such children. (ESEA section 1115(c)(2)(B)-(E)). Poverty is not a criterion for eligibility for services.

---

[7] The following Department website provides more information on indirect costs: https://www2.ed.gov/about/offices/list/ocfo/fipao/icgindex.html.
Indirect costs are costs incurred for a common or joint purpose that benefit more than one cost objective. Unlike costs for activities such as instruction to private school students supported by Title I, indirect costs cannot be readily identified with a particular activity without effort disproportionate to the results achieved.
[8] Information on a restricted indirect cost rate is available in the Uniform Guidance at: https://www.ecfr.gov/cgi-bin/text-idx?SID=589d821879191a0b6c36d1ce6ba3213a&mc=true&node=ap2.1.200_1521.vii&rgn=div9.
[9] The definition in the Uniform Guidance of modified total direct costs is available at: https://www.ecfr.gov/cgi-bin/text-idx?SID=7ea87d867721067872a6ab1f4b7a5834&mc=true&node=se2.1.200_168&rgn=div8.

**C-2. Are preschool children in a private school eligible to receive equitable services under Title I?**

ESEA section 1117 requires an LEA to provide equitable services to eligible elementary school children. As a result, unless State law considers preschool to be part of elementary education, an LEA is not required to provide equitable services to preschool children in a private school and low-income preschool children do not generate funds for such services. At the same time, if preschool children reside in a participating Title I public school attendance area and attend a private elementary school that is participating in the Title I program, the preschool children and their teachers and families may receive Title I services based on timely and meaningful consultation between the LEA and private school officials, taking into consideration the needs of the preschool children and other eligible children in the private school and the amount of funds available to provide services.

**C-3. How are the criteria for identifying eligible children determined?**

In consultation with private school officials, an LEA must establish multiple, educationally related, objective criteria to determine which private school children are eligible for Title I services, and, within the eligible group, identify those children in greatest academic need who will be served. (ESEA section 1115(a), (c)(1)(B)).

**C-4. What are some of the educationally related criteria that an LEA may use to identify private school children who are most in need of Title I services?**

An LEA, in consultation with appropriate private school officials, may use criteria such as achievement tests, teacher referrals and recommendations based on objective, educationally related criteria, grades, and more to identify private school children who are most in need of Title I services. (These criteria may differ from the criteria an LEA uses to identify public school students for services.)

**C-5. What are criteria an LEA may use for identifying private school children from preschool through grade 2 for Title I services?**

An LEA, in consultation with appropriate private school officials, may identify children from preschool through grade 2 for Title I services solely on the basis of criteria such as teacher judgment, interviews with parents, and developmentally appropriate measures. (ESEA section 1115(c)(1)(B)).

**C-6. May Title I funds be used to identify eligible private school students?**

Title I funds may not be used to identify private school children who are eligible to participate. These funds may, however, be used to select participants from among those who are eligible and to determine the specific educational needs of those children.

**C-7. How does an LEA determine what services to provide to participating private school children?**

An LEA, in consultation with appropriate private school officials, determines the appropriate Title I services based on the academic needs of the private school students. (ESEA section 1117(a)(1)(A); 34 C.F.R. § 299.64(b)(2)(i)). Title I services may be provided in subject areas or at grade levels that are different from those provided to public school students. These services must hold reasonable promise that the academic performance of private school participants will improve. (34 C.F.R. § 200.64(b)(2)(ii)(B)).

**C-8. May an LEA implement a schoolwide program in a private school?**
No. The provision of equitable services may not benefit a private school or the general needs of children in the private school and must be provided by employees of an LEA or through a contract by an LEA with an individual, association, agency, or organization that is independent of a private school. (ESEA section 1117(d); 34 C.F.R. § 200.66(b)(2)). Therefore, an LEA could not realistically operate a schoolwide program, which is designed to upgrade the entire educational program in a school, in a private school.

**C-9. If, after receiving an offer of equitable services, private school officials or parents choose to have participating children receive only some services, may an LEA provide only those services?**
Yes. The ESEA requires that an LEA offer equitable services to private school children (ESEA section 1117(a)), but not that private school children accept or participate in all those services. An LEA meets its responsibility to provide services even if the services are wholly or partially refused by private school officials or parents. Please note, however, that if an LEA includes other participating private schools, a private school's refusal of services does not reduce the proportional share of funds an LEA must use to provide equitable services. Additionally, the LEA must continue to offer equitable services each year and cannot presume to reduce the services offered based on what was accepted in the past.

**C-10. When an eligible child resides in a participating Title I public school attendance area in one LEA and attends a private school in another LEA, which LEA is responsible for serving the child?**
34 C.F.R. § 200.62(b)(1)(i) defines, in part, Title I eligible private school children as those who reside in a participating Title I public school attendance area of an LEA, regardless of whether the private school they attend is located in the LEA. Thus, the LEA in which a child resides is responsible for providing services to the child, but it may arrange to have services provided by the LEA in which the private school is located and reimburse that LEA for costs. The resident LEA, however, may not know the whereabouts of students who reside within its boundaries but attend a private school outside the LEA. Thus, private school officials may need to notify the resident LEA about the presence of eligible students who reside outside the boundaries of the LEA in which the private school is located. (See A-5).

**C-11. May an LEA establish a minimum number of participating students in order to establish a Title I program in a private school? If so, what is the LEA's responsibility to serve children attending private schools with fewer than that minimum number?**
ESEA section 1117(a) requires that an LEA provide for the participation, on an equitable basis, of eligible children enrolled in private schools. The requirement applies regardless of the number of children attending a private school; there is no minimum number. However, when the number of eligible children at one location is very small, the cost of establishing certain types of programs to serve them may be prohibitive, especially when these children may be from different grades or have different educational needs. In this case, an LEA, in consultation with private school officials, may consider other options. An LEA might adopt methods that are cost-effective for serving small numbers of students, such as take-home computer programs, individual tutoring programs, services and activities with the classroom teachers of low-achieving children who otherwise would receive Title I equitable services, or other strategies.

**C-12.  Who is responsible for planning and designing equitable services?**

After meaningful consultation with appropriate private school officials, an LEA is responsible for planning, designing, and implementing Title I equitable services for private school children and may not delegate that responsibility to the private schools or their officials. (ESEA section 1117(a)(1)(A), (b)(1), and (d); 34 C.F.R. § 200.64(b)(4)).

**C-13.  What does it mean to consolidate and use Title I funds in coordination with eligible funds available for equitable services under programs covered under ESEA section 8501(b) to provide services to eligible private school children in participating programs?**

In consultation with appropriate private school officials, an LEA must consider whether to consolidate and use Title I funds to provide equitable services to eligible private school children participating under Title I in coordination with funds for equitable services from programs covered under ESEA section 8501(b). (ESEA section 1117(b)(1)(L)). To coordinate the use of funds across programs does not mean that LEAs are able to consolidate funds across programs, through which the funds lose their program identity. LEAs are, however, able to use funds more efficiently.

Too often, the amount of funds available under Title I or Title VIII programs is not sufficient to provide robust equitable services under each program alone. If an LEA coordinates the use of funds from a variety of programs, however, the LEA can maximize the services it can provide and use all the funds more efficiently and effectively. Coordinating the use of Title I funds with the use of funds available from programs covered under Title VIII could greatly improve the equitable services available to Title I participating private school students. Such coordination would eliminate the silo approach in which an LEA consults with private school officials on each program individually and separately, without regard to whether the services could be more effective were they coordinated. Instead, through coordination, an LEA can provide a more cohesive delivery of equitable services.

For example, through coordination, an LEA with limited available funds might use Title I funds to provide instructional services to Title I-eligible participating private school students; use Title II funds to provide professional development to those students' teachers (as opposed to all teachers in a given school); use Title III funds to improve the English proficiency of English learners among the participating students; and use Title IV funds to provide necessary counseling services to the most-at-risk eligible students. Funds under each program would be used for allowable activities under each program; yet, through a coordinated effort, they could better serve in a comprehensive manner the needs of the most at-risk private school students.

**C-14.  How does the principle of supplement not supplant apply to equitable services under Title I?**

With respect to equitable services, 34 C.F.R. § 200.66 requires that an LEA use Title I funds to provide equitable services that supplement, and in no case supplant, the services that would, in the absence of Title I services, be available to participating private school children. The regulations make clear that an LEA must use Title I funds to meet the identified educational needs of participating private school children and not to meet the needs of the private school or the general needs of children in the private school. An LEA must also ensure that the equitable services it provides under Title I supplement services a private school would otherwise provide and may not replace the education for participating students that the private school provides all students.

**C-15. What types of services are available for private school participants?**

Services to improve the academic achievement for participating private school children may include, but are not limited to, the following:

- Instructional services provided by public school employees or third-party contractors;
- Expanded learning time, including before- and after-school programs;
- One-on-one tutoring;
- Summer school programs;
- Family literacy programs;
- Counseling programs;
- Mentoring programs;
- Computer-assisted instruction;
- Home tutoring;
- Instruction using take-home computers; and
- Any combination of the above.

In addition, teachers and families of participating private school students may participate, on an equitable basis, in services and activities provided with Title I funds. (ESEA section 1117(a)(1)(B)).

Title I services or other benefits, including materials and equipment, must be secular, neutral, and nonideological. (ESEA section 1117(a)(2)).

**C-16. Must the LEA always use the funds allocated for private school children to provide instructional services?**

No. After consultation with private school officials, an LEA may provide Title I services other than direct instruction if the provision of services—such as counseling, activities for staff to improve instruction, and parent engagement activities beyond what are otherwise required—is appropriate to assist those children identified as low achieving. This may be particularly appropriate in situations in which the funds allocated for private school children are not sufficient to provide instructional services. Regardless of the services provided, the LEA must measure the effect of the services on the academic achievement of participating children. (ESEA section 1117(a)(1)(A), (b)(1)(D)).

**C-17. In what subjects may an LEA provide services to participating students?**

In general, Title I services for public school students must be focused on helping eligible students meet challenging State academic standards in reading/language arts, mathematics, and science, proficiency in which is generally considered necessary for success in other subjects. (ESEA sections 1111(b)(1)(C) and 1115(b)(2)(A)). Private school students are not subject to a State's academic standards. However, the purpose of Title I equitable services is the same: to ensure that low-achieving private school students have the necessary skills to be successful in school. Accordingly, an LEA must focus services on helping to improve the academic achievement of eligible private school children who are most in need of those services (ESEA sections 1115(a), (c)(1)(B) and 1117(a)(3)(A)), which, in most cases, would mean providing services in reading/language arts, mathematics, and science. Services in other subjects are not prohibited; for example, where foreign language instruction is integral to a private school's academic program (e.g., a language immersion program), an LEA might integrate instruction in the foreign language as part of an overall strategy to improve academic achievement for eligible children.

**C-18.  How might a Title I teacher coordinate Title I services with private school teachers for the benefit of participating private school students?**

To facilitate the delivery of well-coordinated and high-quality services, a Title I teacher would likely meet and discuss the design of the Title I program with private school teachers of participating students to ensure that the Title I program supplements and is coordinated with the regular classroom instruction received by the private school participants. Such coordination should continue regularly throughout the provision of Title I services. For example, a private school classroom teacher could provide the Title I teacher with a copy of the weekly lesson plan in relevant subjects so that Title I instruction supports regular classroom instruction. On a weekly basis, for example, a regular classroom teacher could also provide the Title I teacher with a simple form indicating a child's individual needs and the content and skills being taught in the regular classroom, so that Title I services better meet the participating child's individual needs.

**C-19.  To meet the equitable services requirements under Title I, may an LEA just provide a private school with instructional materials and supplies paid for with Title I funds?**

No. Simply providing a private school with instructional materials and supplies does not meet the LEA's obligation to provide equitable services because it is neither a proper Title I program implemented by the LEA nor does it meet the requirement that services be equitable. (ESEA section 1117(a)(1)(A), (a)(3)(A)).

**C-20.  When must Title I services for private school participants start?**

The ESEA requires that the Title I program for private school participants be equitable and provided in a timely manner. (ESEA section 1117(a)(3)(A)). Therefore, the required consultation should begin early enough for the Title I program to start at the same time as the Title I program for public school participants, meaning generally at or near the beginning of each school year.

**C-21.  Where may Title I services take place?**

Title I services for private school participants may be provided at various locations, including the private school, neutral sites, or public schools. The ESEA requires LEA officials to consult with private school officials before any decision is made that affects the opportunities of private school students to participate in Title I services, such as the location of those services. (ESEA section 1117(b)(1)(C)). If appropriate space is available, services should be in the least disruptive and least expensive location, which is most times the private school that the participating children attend.

**C-22.  May Title I services be provided in religiously affiliated private schools?**

Yes. In the 1997 case of *Agostini v. Felton*, 521 U.S. 203 (1997), the U.S. Supreme Court held that Title I instructional services may be provided by public school employees in religiously affiliated private schools without violating the Establishment Clause of the United States Constitution. In doing so, however, an LEA must implement sufficient safeguards to ensure that its employees or contractors do not promote religion in the course of providing Title I services. For example, an LEA might provide Title I personnel with detailed instructions noting that Title I personnel are public employees and accountable only to their public school supervisors; that they may teach only students determined to be eligible by public school officials; that their materials and equipment may only be used in the Title I program; and that they may not introduce any religious matter into their teaching or become involved in the religious activities of the private school.

**C-23. Must an LEA require the removal of religious symbols in private school classrooms in which Title I services are provided?**
No. An LEA may use space in a private school to provide equitable services without requiring the removal or alteration of religious icons, scriptures, or other symbols.

**C-24. Are private schools required to make space available for Title I services?**
No. If space is not available, or if the private school chooses not to make its facilities available, the LEA must provide Title I services in another location. The extra costs of providing services at a location outside the private school would come from the proportional share of the LEA's Title I allocation available for equitable services.

**C-25. May a Title I teacher use the same textbooks as those used by the private school students in their regular classroom?**
Yes. A Title I teacher may use the same textbooks and materials as those used in the regular private school classroom so long as the textbooks and materials are secular, neutral, and nonideological, and the instructional services supplement and do not replace the instructional program in the participants' regular classrooms. (ESEA section 1117(a)(2); 34 C.F.R. § 200.66(a)).

**C-26. May private school officials order or purchase materials and supplies needed for the Title I program and be reimbursed by an LEA?**
No. Private school officials have no authority to obligate or receive Title I funds. The ESEA requires an LEA to maintain control of Title I funds, materials, equipment, and property. (ESEA section 1117(d)(1)). Thus, no Title I funds may be paid to a private school, even as reimbursement.

**C-27. May an LEA use a third-party contractor to provide equitable services?**
Yes. Following consultation, an LEA may provide Title I services directly or indirectly through contracts with individuals and public and private agencies, organizations, and institutions so long as those entities are independent of the private school in the provision of those services. (ESEA section 1117(d)(2)). The LEA remains responsible, however, for the oversight of the Title I program.

**C-28. May an LEA contract with a religious organization to provide equitable services?**
Yes. An LEA may enter into a contract with a religious organization to provide equitable services on the same basis as any other private entity. Although ESEA section 1117(d)(2)(B) currently indicates that a third-party contractor must be "independent…of any religious organization," the Department has determined that the specific requirement is unconstitutional in light of the U.S. Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), and has so informed Congress in a letter dated March 11, 2019, available at https://www2.ed.gov/policy/elsec/guid/secletter/190311.html. Accordingly, the Department will no longer enforce, apply, or administer the specific requirement in ESEA section 1117(d)(2)(B) that an equitable services provider be "independent . . . of any religious organization."

The Department will, however, continue to enforce all other provisions of ESEA section 1117, including the requirement that a contractor is independent of the private school for which it is providing services and that the educational services and other benefits being provided by the contractor are "secular, neutral, and nonideological." (ESEA section 1117(a)(2), (d)(2)(B)). In addition, as with all procurements using Title I funds, an LEA must continue to follow the procurement requirements under the Uniform Guidance at 2 C.F.R. §§ 200.317-200.326 and 3474.15. Furthermore, the control of funds and title to materials, equipment, and property purchased

with Title I funds must be with the LEA, and the LEA must administer such funds, materials, equipment, and property. (ESEA section 1117(d)(1)).

**C-29. What does it mean for a contractor to be independent of the private school in which it is providing equitable services?**
In general, whether a contractor is independent of a private school in the provision of equitable services depends on the extent to which the contractor has administrative or fiscal direction and control over the private school. For example, an administrative body that oversees a group of affiliated private schools and has control over the schools' curriculum and hiring policies would <u>not</u> be independent of a private school subject to its authority. As a result, an LEA would be prohibited from entering into a contract with the administrative body for the provision of equitable services to its affiliated schools. In contrast, a membership organization with no authority over the operations of its member schools likely would be considered independent of such schools.

**C-30. May an LEA or a third-party contractor employ a private school teacher to provide Title I services to private school participants?**
Yes, provided certain conditions are met. An LEA may hire a private school teacher to provide Title I services only if the teacher is independent of the private school in the provision of Title I services. The private school teacher must be employed by the LEA for Title I purposes outside of the time he or she is employed by the private school, and the private school teacher must be under the direct supervision of the LEA with respect to all Title I activities. (ESEA section 1117(d)(2)).

**C-31. Must teachers and paraprofessionals employed by an LEA to deliver or support the delivery of Title I equitable services meet any qualification requirements?**
Yes. The ESEA requires that teachers working in a Title I program must meet applicable State certification and licensure requirements. (ESEA section 1111(g)(2)(J)). In addition, ESEA section 1111(g)(2)(M) requires each State to ensure that its LEAs and schools continue to comply with the paraprofessional requirements in place on December 9, 2015, including those requirements under 34 C.F.R. § 200.58 and any State-specific requirements that were in place on that date.

**C-32. If an LEA contracts with a third-party provider, must the third-party provider employ Title I teachers and paraprofessionals who meet the State's qualification requirements?**
ESEA section 1111(g)(2)(J) requires that teachers working in a Title I program meet *applicable* State certification and licensure requirements. Thus, State law would govern whether teachers or paraprofessionals hired by a contractor to provide Title I equitable services must meet a State's certification and licensure requirements. An LEA would apply any qualification requirements to a contract for equitable services that it applies to a contract for services for public school students.

**C-33. Must a paraprofessional employed by an LEA to provide equitable services work under the direct supervision of a public school teacher?**
Under ESEA section 1119(g)(3)(A), as amended by NCLB, a paraprofessional working in a Title I program was not permitted to provide any instructional services to a student unless the paraprofessional was working under the direct supervision of a highly qualified public school teacher. That prohibition is not specifically included in the ESEA as amended by ESSA. However, the purpose of Title I remains the same: to improve the achievement of the lowest-achieving students and to close achievement gaps. Fulfilling that promise requires the most qualified personnel available. Accordingly, an LEA, in consultation with appropriate private school officials, must determine by whom equitable services will be provided in order to succeed in raising the

achievement of eligible private school students. Moreover, ESEA section 1111(g)(2)(M) requires each State to have professional standards for paraprofessionals working in a Tile I program. Those standards might include requirements regarding the responsibilities of paraprofessionals, such as what their duties may be and by whom they must be supervised.

### C-34.  How does an LEA provide equitable services for parents and families of private school students participating in the Title I program?
An LEA must ensure that parents and families of participating children participate, on an equitable basis, in services and activities developed pursuant to ESEA section 1116. (ESEA section 1117(a)(1)(B)). (See B-7). Activities for parents and families of private school participants must be planned and implemented after meaningful consultation with private school officials and parents and families. Examples of parent and family engagement include parent meetings; parent-teacher conferences; communication between the Title I teachers and parents on students' academic progress; parent education; parent training activities on how to work at home with children on content and skills; reasonable access to Title I staff to receive information about their child's progress; and private school parent representation on a district-wide private school working group. As appropriate, these activities may include light refreshments for parents and families at Title I meetings in order to facilitate attendance at those meetings.

### C-35.  May an LEA use more than one percent of the proportional share for parental and family engagement?
Yes. Based on consultation with private school officials, an LEA may use more than the one percent of the proportional share for parent and family engagement activities. (See B-7).

### C-36.  What are an LEA's responsibilities regarding Title I equitable services for teachers of private school participants?
An LEA must ensure that teachers of participating private school students have the opportunity to participate, on an equitable basis, in Title I services and activities. (ESEA section 1117(a)(1)(B)). Unlike under NCLB, an LEA is not required to set aside a specific percentage of its Title I allocation for professional development and, thus, there is no required percentage that must be spent for services and activities for private school teachers. Rather, an LEA must determine, in consultation with appropriate private school officials, the needs of private school instructional staff who teach Title I participating private school students in order to improve the academic outcomes for those students and use funds from the proportional share to provide appropriate services and activities, if needed. Such services and activities might include, for example, information on research-based reading and mathematics instruction, or effective instructional approaches to improving students' writing skills. Coaching in the private school classroom is also permissible as long as the coaching is focused on assisting private school instructional staff who provide instruction to Title I participating private school students with strategies designed to improve the academic achievement of those students and is done during a time when secular, neutral, and non-ideological subjects are being taught. For example, an academic coach might model strategies on how to target or differentiate instruction for Title I students. In providing Title I services and activities, an LEA must ensure that they are focused on improving the academic achievement of participating private school students and do not benefit the general instructional program of the private school. (34 C.F.R. § 200.66(b)).

**C-37.  May private school officials arrange for Title I services and activities for staff who provide instruction to Title I participants and submit an invoice to the LEA for reimbursement?**
No. Private school officials are not authorized to obligate or receive Title I funds.

**C-38.  May Title I funds be used to pay stipends to private school instructional staff who participate in Title I services and activities?**
Yes. Title I funds may be used to pay for stipends for private school instructional staff, if reasonable and necessary (e.g., time outside regular employment hours). An LEA must pay such stipends directly to the private school instructional staff and not to the private school.

**C-39.  May an LEA provide services and activities, such as professional development, to staff employed by an LEA who provide equitable services?**
Yes. An LEA may provide Title I services and activities, such as professional development, to LEA staff who provide instruction to eligible private school children. To the extent that an LEA is considering paying for such services and activities from the proportional share, it must consult with private school officials. In addition, if only a portion of the cost of such services is paid from the proportional share, the costs must be in proportion to the amount of time the teacher provides services to private school students compared to other instruction the teacher may provide.

## D.  PROGRAM EVALUATION AND MODIFICATION

An LEA must annually evaluate the Title I equitable services it provides to determine the progress being made in meeting participating students' academic needs. (ESEA section 1117(a)(1)(A), (b)(1)(D)). As part of this process, each year the LEA must consult with appropriate private school officials to determine how the services will be academically assessed and how the results of that assessment will be used to improve those services. (ESEA section 1117(b)(1)(D)). In measuring annual progress, the LEA has the flexibility to group children in a manner that will provide the most accurate information about their progress. For example, the LEA may decide to group children by instructional method, grade level, school, or other appropriate basis. If the Title I program for the private school participants does not make the expected annual progress, the LEA must make modifications to the Title I program.

**D-1.  In what subjects does an LEA assess private school children?**
An LEA normally would assess private school children in the subjects in which the LEA provides Title I services to those children.

**D-2.  May Title I funds be used to assess private school children?**
Yes, if the assessment is used only for Title I purposes. To the extent, however, that an assessment is conducted for other purposes, it may not be paid for from Title I funds.

**D-3.  May an LEA use a private school's assessment data to determine progress of the LEA's Title I program?**
Yes. Private school officials may provide an LEA with private school assessment data on participating students if they agree to do so following consultation. However, private school officials are not obligated to do this, and refusal by private school officials to provide these data does not release the LEA from its obligation to provide services and assess the progress of participating students.

# E. STATE OMBUDSMAN

<div style="border:1px solid #000; padding:10px;">

### OMBUDSMAN REQUIREMENT

To help ensure equitable services and other benefits for eligible private school children, teachers and other educational personnel, and families, an SEA must designate an ombudsman to monitor and enforce ESEA equitable services requirements under both Title I and Title VIII. (ESEA sections 1117(a)(3)(B) and 8501(a)(3)(B)).

</div>

## E-1. What are the roles and responsibilities of an ombudsman?

An ombudsman serves as an SEA's primary point of contact for addressing questions and concerns from private school officials and LEAs regarding the provision of Title I equitable services. In addition, the ESEA requires the ombudsman to monitor and enforce the Title I equitable services requirements and, thus, the ombudsman should have a significant role in the State's monitoring process. Furthermore, it is important that the ombudsman become familiar with information that the Department provides concerning equitable services. The following are examples of activities the ombudsman could undertake in fulfilling the roles and responsibilities of the position:

- Serve as a general resource for LEAs and private school officials, which may include conducting initial outreach to define ombudsman responsibilities.
- Develop, in partnership with other relevant SEA staff, monitoring protocols and participate in a sample of any monitoring activity.
- Provide technical assistance for SEA staff administering applicable programs, LEA staff, and private school officials.
- Establish a process for receiving results of agreement regarding consultation from LEAs. For example, the ombudsman might direct an LEA to provide the results of agreement on the same form as the affirmation of consultation. (ESEA section 1117(b)(1)).
- Participate in the State's Title I Committee of Practitioners (ESEA section 1603(b)) and, as applicable, a nonpublic school working group. (See A-19).

## E-2. What specific monitoring and enforcement responsibilities does an ombudsman have?

The primary responsibilities of an ombudsman are to monitor and enforce the equitable services requirements in Titles I and VIII of the ESEA in coordination with other SEA staff. Accordingly, an ombudsman should work with SEA staff administering Title I and programs covered under Title VIII to develop monitoring protocols applicable to the provision of equitable services under each program. The ombudsman should take an active role in the monitoring process, particularly with respect to the resolution of any findings regarding equitable services requirements under Titles I and VIII. The ombudsman should also play a role in responding to and resolving any complaints regarding equitable services that the SEA receives under its ESEA complaint procedures, which may include serving as the primary point of contact for complaints.

## E-3. Who may serve as an ombudsman?

An SEA has discretion in determining who to designate as an ombudsman. In determining the relevant qualifications, an SEA should consult with appropriate private school officials. Within most States there is a statewide private school coalition with representatives of the various private

schools within the State. An SEA might consider engaging such a private school coalition. An SEA should consider the following factors in determining who will serve as an ombudsman:

- **Knowledge:** Does the individual have sufficient experience and demonstrate thorough knowledge and understanding regarding the equitable services provisions, including the statute, regulations, and guidance, necessary to implement, monitor, and enforce the equitable services requirements under both Titles I and VIII?
- **Capacity:** Will the ombudsman work alone or in collaboration with other Federal program directors in the State? Does the individual have experience with integrating input from other technical experts and program specialists, including those at the Department, and communicating it to the appropriate audiences?
- **Impartiality:** Will the individual be able to carry out the ombudsman duties, including monitoring, enforcement, and resolving complaints, in a fair and impartial manner? Will the individual be able to provide guidance to LEAs and private school officials to facilitate the goal of reaching agreement when agreement cannot be achieved independently through consultation?

**E-4. What funds are available to support an ombudsman?**
An SEA may support its ombudsman using consolidated State administrative funds under ESEA section 8201. If an SEA does not consolidate State administrative funds, it may support its ombudsman using funds reserved for State administration under Title I and the covered programs under ESEA section 8501(b). Under these circumstances, however, the SEA must ensure that the ombudsman's salary is charged to each program based on the relative benefit received.  (2 C.F.R. § 200.405(a)).

## F. COMPLAINTS, STATE PROVISION OF EQUITABLE SERVICES, AND BYPASS

By engaging in timely and meaningful consultation and developing positive relationships with private school officials, an LEA can facilitate a cooperative environment. If private school officials believe that timely and meaningful consultation has not occurred, they should first discuss this matter with the LEA official responsible for coordinating the consultation, the LEA superintendent, or Title I program director. If the response at the local level is unsatisfactory, the private school official may contact the ombudsman and the responsible SEA official. In the event the problem is not resolved through those means, private school officials have the right to file a formal written complaint with the SEA.

| COMPLAINTS |
|---|
| A private school official shall have the right to file a complaint with the SEA when the official deems that the LEA has not engaged in consultation that was meaningful and timely, has not given due consideration to the views of the private school official, or has not made a decision that treats the private school students equitably. (ESEA section 1117(b)(6)(A)). |

**F-1. What information must a formal written complaint to an SEA include?**
A formal written complaint must include:
- A statement that an LEA has violated a requirement of the Title I statute or regulations with respect to equitable participation;

- The facts on which the statement is based and the specific statutory or regulatory requirement(s) allegedly violated; and
- The signature of the complainant. (34 C.F.R. § 299.12).

**F-2. What option is available to private school officials if an SEA does not answer their complaint in a timely manner?**

ESEA section 8503(a) requires an SEA to resolve a complaint in writing within 45 days. If an SEA does not resolve the complaint within 45 days, private school officials may appeal to the Department. (ESEA section 8503(b)).

**F-3. If private school officials or another interested party are dissatisfied with an SEA's resolution of a complaint, what recourse is available?**

Any interested party to a complaint (e.g., private school officials who filed the complaint or the LEA that is the subject of the complaint) may appeal an SEA's resolution to the Secretary. The appeal must be filed no later than 30 days following the SEA's resolution of the complaint (or its failure to resolve the complaint within 45 days). The Department investigates and resolves the appeal no later than 90 days after receipt of the appeal. (ESEA section 8503(b)).

**F-4. May an SEA require a private school official to file a formal complaint with the LEA and await the LEA's resolution before filing a complaint with the SEA?**

As part of its ESEA complaint procedures, an SEA may require an intermediate step (e.g., first filing a complaint with the LEA) prior to the SEA addressing the complaint. With respect to an equitable services complaint, however, the SEA's procedures must result in the SEA's final resolution of the complaint within 45 days of the private school official's initial filing of the complaint. (ESEA section 8503(a)).

**F-5. Under what circumstances is an SEA required to provide equitable services directly or through a third-party provider?**

An SEA must provide Title I equitable services directly or through contracts with public or private agencies, organizations, and institutions if the appropriate private school officials have: (1) requested that the SEA provide such services directly; and (2) demonstrated, in accordance with the SEA's procedures for filing a complaint, that an LEA has not met the requirements to provide equitable services. (ESEA section 1117(b)(6)(C)). In evaluating such a request, an SEA might include procedures that require private school officials to demonstrate that an LEA has substantially failed or is unwilling to provide equitable services before the SEA intervenes to provide equitable services directly or through a third-party provider, consistent with the standards the Secretary uses for a bypass under the equitable services requirements in Titles I and VIII. (ESEA section 8504; see F-8). An SEA should have transparent procedures for evaluating such requests and may also make available a standard template for requests.

**F-6. If an SEA determines that it must provide equitable services in lieu of an LEA in accordance with ESEA section 1117(b)(6)(C), what funds does it use to provide the services?**

An SEA may retain from the applicable LEA's Title I allocation the funds generated by eligible private school students from low-income families in the involved private school(s). The SEA may also retain from the proportional share of Title I funds generated for equitable services reasonable and necessary administrative costs for arranging the services.

**F-7.  What is a "bypass"?**

A "bypass" is a means by which the Department arranges for the provision of equitable services to private school students and teachers through a third-party provider.

**F-8.  Under what circumstances may the Secretary determine that a bypass is appropriate?**

If an LEA is prohibited by State law from providing Title I equitable services to eligible private school children, or if the Secretary determines that an LEA has substantially failed or is unwilling to provide equitable services, the Secretary will waive the LEA's responsibility to provide equitable services and arrange for the provision of services by another entity. (ESEA section 1117(e)(1)-(2)). In making the determination to bypass an LEA, the Secretary will consider one or more factors, including the quality, size, scope, and location of the program and the opportunity of private school children to participate in the program. (ESEA section 1117(e)(3)).

**F-9.  How do private school officials request a bypass?**

With respect to allegations that an LEA has not met the requirements of ESEA section 1117, private school officials must first file a complaint with the SEA and give the SEA the opportunity to resolve the complaint, including determining whether it should provide services directly. (ESEA section 1117(b)(6)(A)-(C)). If those officials are dissatisfied with the SEA's resolution, they may request that the Department bypass the LEA through an appeal of the SEA's determination. (ESEA section 8503(b)).

With respect to allegations that an LEA is prohibited by law from providing equitable services, private school officials may request a bypass from the Department without first going through the SEA. (ESEA section 1117(e)).

**F-10.  How is a bypass implemented?**

To implement a bypass, the Department generally enters into a contract with a third party and deducts funds from the SEA's Title I allocation. Accordingly, the SEA reduces the bypassed LEA's allocation.

Exhibit C

# PROVIDING EQUITABLE SERVICES TO STUDENTS AND TEACHERS IN NON-PUBLIC SCHOOLS UNDER THE CARES ACT PROGRAMS



**U.S. Department of Education**
**Washington, D.C. 20202**

**April 30, 2020**

**Purpose of this Document**

The purpose of this document is to provide information about equitable services for students and teachers in non-public schools under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law 116-136, 134 Stat. 281 (Mar. 27, 2020). The CARES Act authorized the Education Stabilization Fund (ESF), which is a new appropriation of approximately $30.75 billion that creates funding streams for several distinct education programs that address the impact of the Novel Coronavirus Disease 2019 (COVID-19) on educational services across the Nation. Under these programs, the U.S. Department of Education (Department) will make awards to Governors, State educational agencies (SEAs), and institutions of higher education (IHEs) to help States to prevent, prepare for, and respond to the devastating effects of COVID-19. The provisions of the CARES Act relevant to the ESF and other Department programs are available on the Department's website at https://oese.ed.gov/offices/education-stabilization-fund/.

Two programs in the ESF require a local educational agency (LEA) that receives funds to provide equitable services to students and teachers in non-public schools:
- The Governor's Emergency Education Relief Fund (GEER Fund) totaling $2,953,230,000 (Section 18002 of the CARES Act).
- The Elementary and Secondary School Emergency Relief Fund (ESSER Fund) totaling $13,229,265,000 (Section 18003 of the CARES Act).

Other than statutory and regulatory requirements included in the document, such as those pursuant to the authorizing statute and other applicable laws and regulations, the contents of the guidance do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. In addition, it does not create or confer any rights for or on any person.

The Department will provide additional or updated information as necessary on the Department's COVID-19 webpage: https://www.ed.gov/coronavirus. If you have questions that are not answered in this document, please e-mail COVID-19@ed.gov.

# Table of Contents

1. Does the requirement to provide equitable services to students and teachers in non-public schools apply to any programs under the CARES Act? .........................................1

2. What is a "non-public school" under the CARES Act programs?................................1

3. Is a for-profit non-public school eligible to receive equitable services for its students and teachers under the CARES Act programs? ................................................................1

4. Which LEA is responsible for providing equitable services to non-public school students and teachers under the CARES Act programs? ...................................................1

5. Must an LEA or another public agency maintain control of CARES Act funds used to provide equitable services? .............................................................................................2

6. Who is responsible for initiating the consultation process and how should it begin? ...2

7. How does an LEA that receives funds under the CARES Act programs provide equitable services "in the same manner as provided under section 1117 of the ESEA"? .3

8. Must an LEA offer to provide equitable services under the CARES Act programs to students and teachers in all non-public schools located in the LEA, even if a non-public school has not previously participated in equitable services under Title I, Part A or Title VIII of the ESEA?.........................................................................................................5

9. Are all students and teachers in a non-public school eligible to receive equitable services under the CARES Act programs? .......................................................................5

10. How does an LEA determine the proportional share of funds that must be reserved to provide equitable services to non-public school students and teachers under the CARES Act programs? ................................................................................................................6

    A. What is the base amount on which the proportional share is determined? ............6

    B. What data does an LEA use to determine the proportional share?........................6

    C. How does an LEA calculate the proportional share? .............................................6

11. After an LEA has determined the proportional share of funds for equitable services under each CARES Act program, how does it then determine the amount of funds available for services to students and teachers in individual non-public schools? ............7

12. Do the requirements in 34 C.F.R. § 200.66 apply to equitable services under the CARES Act programs? ......................................................................................................7

13. Is a non-public school whose students and teachers receive equitable services under the CARES Act programs a "recipient of Federal financial assistance"?..........................8

14. What services and benefits under the CARES Act programs are available to non-public school students and teachers?...............................................................................8

## Providing Equitable Services to Students and Teachers
## in Non-Public Schools under the CARES Act Programs

**1. Does the requirement to provide equitable services to students and teachers in non-public schools apply to any programs under the CARES Act?**

Yes. The CARES Act establishes two new funds to which equitable services requirements apply. Specifically, a local educational agency (LEA) that receives funds under either the Governor's Emergency Education Relief Fund (GEER Fund) (section 18002 of the CARES Act) or the Elementary and Secondary School Emergency Relief Fund (ESSER Fund) (section 18003 of the CARES Act) ("CARES Act programs" for purposes of this document) to provide equitable services to students and teachers in non-public schools in the same manner as provided under section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA). (Section 18005(a) of the CARES Act).

An institution of higher education or education-related entity that receives funds under the GEER Fund is not required to provide equitable services to students and teachers in non-public schools.

**2. What is a "non-public school" under the CARES Act programs?**

A "non-public school" means a non-public elementary or secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and (B) was in existence prior to the date of the qualifying emergency for the CARES Act programs. For purposes of this definition, the date of the qualifying emergency is March 13, 2020. (Section 18007(6) of the CARES Act).

**3. Is a for-profit non-public school eligible to receive equitable services for its students and teachers under the CARES Act programs?**

No. A for-profit non-public school is not eligible to receive equitable services for its students and teachers under the CARES Act programs. Section 18007(6) of the CARES Act defines a "non-public school" as a non-public elementary or secondary school. Section 18007(8) of the CARES Act incorporates the definitions in ESEA section 8101 for any terms not defined in the CARES Act. ESEA section 8101(19) and (45) defines "elementary school" and "secondary school," respectively, and specifies that they must be non-profit.

**4. Which LEA is responsible for providing equitable services to non-public school students and teachers under the CARES Act programs?**

The Department has determined that, under the CARES Act programs, the LEA in which a non-public school is located is responsible for providing equitable services to students and teachers in the school, as it is under most ESEA programs that require an LEA to provide equitable services. Outside of Title I, Part A, the responsibility typically falls on the LEA in which a non-public school is located because equitable services are generally available

to all students or teachers in the non-public school in the LEA and the LEA in which the school is located is closest and best able to meet the needs of students and teachers.

Title I, Part A of the ESEA is different; ESEA section 1117 sets forth a student residency requirement, rather than a school location requirement, for receipt of equitable services under Title I, Part A. Only low-achieving students who live in a participating Title I public school attendance area are eligible for services and, therefore, the LEA where students reside is responsible for providing equitable services. The CARES Act programs have no such residency requirement for eligibility for services. Rather, the CARES Act programs provide LEAs full discretion, unless funds are targeted for a specific purpose or population of public and non-public school students by the Governor under the GEER Fund or by an SEA through the SEA reserve under the ESSER Fund (see section 18003(e) of the CARES Act), to use CARES Act funds to provide educational services to students in public and non-public schools in the LEA through a broad range of allowable activities. Thus, providing equitable services with CARES Act funds is similar to other ESEA programs where equitable services are provided by the LEA in which a non-public school is located.

**5. Must an LEA or another public agency maintain control of CARES Act funds used to provide equitable services?**

Yes. Control of funds for services and assistance provided to non-public school students and teachers under the CARES Act programs, and title to materials, equipment and property purchased with such funds, must be in a public agency, and a public agency must administer such funds, materials, equipment, and property. In other words, no funds may go directly to a non-public school. In addition, services for non-public school students and teachers must be provided by a public agency directly or through contract with another public or private entity. (Section 18005(b) of the CARES Act).

**6. Who is responsible for initiating the consultation process and how should it begin?**

Similar to how an LEA provides equitable services under the ESEA, an LEA is responsible for initiating the consultation process. It must contact officials in all non-public schools in the LEA to notify them of the opportunity for their students and teachers to obtain equitable services under the CARES Act programs. Through this initial contact, the LEA can explain the services available under the CARES Act programs and how non-public school students and teachers can participate. If non-public school officials have not been contacted, they may contact the LEA or the State ombudsman to inquire about equitable services under the CARES Act programs.

If non-public school officials want equitable services for their students and teachers, the LEA must consult with those officials during the design and development of the LEA's programs and before the LEA makes any decision that affects the opportunity of non-public school students and teachers to participate in the activities funded under the CARES Act programs. If a non-public school declines to participate in the CARES Act programs or does not respond to an LEA's good-faith effort to make contact, the LEA has no further responsibility to provide equitable services to students or teachers in that school. The LEA, however, must be able to demonstrate that it made a good faith effort to contact all the non-public schools in the LEA.

**7. How does an LEA that receives funds under the CARES Act programs provide equitable services "in the same manner as provided under section 1117 of the ESEA"?**

An LEA that receives funds under the CARES Act programs must provide equitable services to students and teachers in a non-public school in the same manner as provided under section 1117 of the ESEA, as determined in consultation with representatives of non-public schools. (Section 18005(a) of the CARES Act). This requirement, on its face, necessitates that the Department interpret how the requirements of section 1117 apply to the CARES Act programs, given that an LEA under the CARES Act programs may serve all non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement. Unless the requirements of section 1117 would limit equitable services under the CARES Act programs, we conclude they apply as outlined below.

We have interpreted "in the same manner as under section 1117" in light of the significantly broader eligibility and uses of funds authorized under the CARES Act as compared to Title I, Part A, reasonably reconciling differences. In doing so, we gave meaning to section 1117(a)(3), which requires educational services and other benefits for students in non-public schools to be equitable in comparison to those for public school students. The services that an LEA may provide under the CARES Act programs are clearly available to *all* public school students and teachers, not only low-achieving students and their teachers as under Title I, Part A. Similarly, there is no limitation on residence in a participating Title I public school attendance area for services provided in public schools under the CARES Act programs. For CARES Act services to be equitable in comparison to public school students and teachers, it follows that the same principles must apply in providing equitable services to non-public school students and teachers.

The following describes how the provisions of ESEA section 1117 apply, reconciled, when necessary, to meet the purposes of the CARES Act programs:

- 1117(a)(1) – Under Title I, Part A, an LEA must provide equitable services to low-achieving students as defined in ESEA section 1115(c) who reside in a participating Title I public school attendance area and attend a non-public school and their teachers. Under the CARES Act programs, an LEA may provide equitable services with CARES Act funds to any students and teachers in non-public schools, unless limited by a Governor under section 18002 of the CARES Act or an SEA through the SEA's reserve under section 18003(e) of the CARES Act. (See Questions #8 and #9).
- 1117(a)(2) – Under both Title I, Part A and the CARES Act programs, an LEA must provide equitable services and other benefits, including materials and equipment, that are secular, neutral, and nonideological.
- 1117(a)(3)(A) – Under both Title I, Part A and the CARES Act programs, an LEA must provide services and other benefits for non-public school students and teachers in a timely manner that are equitable in comparison to the services and benefits provided for public school students and teachers.

- 1117(a)(3)(B) – Under Title I, Part A, an SEA must designate an ombudsman to monitor and enforce the equitable services requirements. An SEA must use the ombudsman also to monitor and enforce the requirements of the CARES Act programs that an LEA provide equitable services to students and teachers in non-public schools.
- 1117(a)(4)(A) – Under both Title I, Part A and the CARES Act programs, an LEA must determine the proportional share available to provide equitable services to students and teachers in non-public schools based on the total amount of funds an LEA receives prior to any allowable expenditures or transfers. Under the CARES Act programs, the LEA calculates the proportional share based on the number of children enrolled in each non-public school whose students or teachers participate in the CARES Act programs compared to the number of students enrolled in public schools in the LEA. The LEA makes this determination under each CARES Act program separately. (See Question #10).
- 1117(a)(4)(B) – Under Title I, Part A, an LEA must obligate funds available for equitable services in the fiscal year for which the funds are received by the LEA. An LEA must obligate CARES Act funds for equitable services in the fiscal years for which those funds are intended for services to address the impact of COVID-19.
- 1117(a)(4)(C) – Under both Title I, Part A and the CARES Act programs, an SEA must provide notice in a timely manner to appropriate non-public school officials in the State of the allocation of funds for educational services and other benefits that each LEA has determined are available for non-public school students and teachers.
- 1117(b)(1) – Under both Title I, Part A and the CARES Act programs, an LEA must consult with appropriate non-public school officials during the design and development of the LEA's activities on relevant issues such as those contained in this section of Title I, Part A. The LEA and non-public school officials shall both have the goal of reaching agreement on how to provide equitable and effective services and the LEA must transmit the results of that agreement to the ombudsman.
- 1117(b)(2) – Under both Title I, Part A and the CARES Act programs, if an LEA disagrees with the views of non-public school officials during consultation, the LEA must provide in writing to the non-public school officials the reasons why the LEA disagrees.
- 1117(b)(3) – Under both Title I, Part A and the CARES Act programs, consultation must occur before an LEA makes any decision that affects the opportunities of non-public students and teachers to receive equitable services. Meetings between the LEA and non-public school officials need not occur in person if they cannot be conducted due to closed schools or social distancing rules. In this case, the Department recommends LEAs and non-public school officials consult remotely.
- 1117(b)(4) – Under both Title I, Part A and the CARES Act programs, consultation must include discussion of service delivery mechanisms an LEA may use to provide equitable services.
- 1117(b)(5) – Under both Title I, Part A and the CARES Act programs, an LEA must maintain and provide to the SEA written affirmation signed by non-public

school officials that timely and meaningful consultation has occurred and, if non-public school officials do not provide such affirmation, the LEA must forward to the SEA the documentation that such consultation has, or attempts at such consultation have, taken place.

- 1117(b)(6) – Under both Title I, Part A and the CARES Act programs, non-public school officials have a right to file a complaint with the SEA; the SEA must provide services directly or through contracts if requested to do so by non-public school officials and the SEA determines that the LEA did not meet applicable requirements.

- 1117(c)(1) – Under Title I, Part A, to determine the proportional share, an LEA must calculate the number of children, ages 5 through 17, who are from low-income families and reside in a participating Title I public school attendance area. Because an LEA determines the proportional share based on enrollment in public and non-public schools under the CARES Act programs, the LEA need not collect poverty data from non-public schools (see Question #10 for information on determining the proportional share of CARES Act funds the LEA must reserve to provide equitable services to non-public school students and teachers).

- 1117(c)(2) – Under Title I, Part A, non-public school officials may file a complaint with the SEA if they dispute the count of children from low-income families. Because an LEA need not collect poverty data to determine the proportional share available for equitable services under the CARES Act programs, there would be no reason for non-public school officials to file a complaint regarding poverty data with the SEA.

- 1117(d) – Under Title I, Part A, control of funds and title to materials, equipment, and property must be in public agency. With respect to the CARES Act programs, this provision is superseded by section 18005(b) of the CARES Act, which also requires public control of funds. (See Question #5).

**8. Must an LEA offer to provide equitable services under the CARES Act programs to students and teachers in all non-public schools located in the LEA, even if a non-public school has not previously participated in equitable services under Title I, Part A or Title VIII of the ESEA?**

Yes. An LEA must offer to provide equitable services under the CARES Act programs to students and teachers in all non-public schools located in the LEA, even if a non-public school has not previously participated under Title I, Part A or Title VIII of the ESEA.

**9. Are all students and teachers in a non-public school eligible to receive equitable services under the CARES Act programs?**

Yes. All students and teachers in a non-public school are eligible to receive equitable services under the CARES Act programs, unless a Governor (under the GEER Fund) or an SEA (through the SEA reserve under the ESSER Fund) targets funds for a specific purpose or population of public and non-public school students. Unlike Title I, Part A, equitable services under the CARES Act programs are not based on residence in a participating Title

I public school attendance area and are also not limited only to low-achieving students and their teachers.

**10. How does an LEA determine the proportional share of funds that must be reserved to provide equitable services to non-public school students and teachers under the CARES Act programs?**

**A. What is the base amount on which the proportional share is determined?**

Under ESEA section 1117(a)(4)(A)(ii), an LEA must determine the proportional share available for equitable services from the total amount of Title I, Part A funds it receives prior to reserving funds for allowable expenditures such as administrative costs or districtwide expenditures, and before making allocations to participating public schools. Because section 18005(a) of the CARES Act requires an LEA to provide equitable services under the CARES Act programs "in the same manner as provided under section 1117," an LEA must use the total allocation it receives under each CARES Act program to determine the proportional share available for equitable services before reserving funds for other purposes.

**B. What data does an LEA use to determine the proportional share?**

An LEA uses enrollment data in non-public schools whose students and teachers will participate under the CARES Act programs compared to enrollment in public schools in the LEA to determine the proportional share. Under the CARES Act programs, services are available for all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area. An LEA that receives CARES Act funds uses those funds to provide educational services to students in both public and non-public schools through a broad range of allowable activities. Using enrollment to determine the proportional share from which to provide equitable services will contribute to the equitable treatment of children and teachers within the statutory universe of permissible uses for CARES Act dollars by allowing all students and teachers in a non-public school to receive services that are equitable compared to those available to all public school students and teachers. (See ESEA section 1117(a)(3)).

**C. How does an LEA calculate the proportional share?**

To calculate the proportional share for equitable services under the CARES Act programs, an LEA determines the overall number of children who are enrolled in public schools and non-public schools in the LEA that wish to participate under one or both CARES Act programs. Using the proportion of students who are enrolled in participating non-public schools, the LEA determines the amount of funds available for equitable services based on that proportional share of the LEA's total allocation under each CARES Act program separately. For example, an LEA receiving $100,000 under the GEER Fund and $900,000 under the ESSER Fund, and with 1,350 public school students and 150 non-public school students, would determine the proportional share as follows:

| EXAMPLE – DETERMINING THE PROPORTIONAL SHARE | | | |
|---|---|---|---|
| | Public | Non-Public* | Total |
| Enrollment | 1,350 | 150 | 1,500 |
| Proportion | 90% | 10% | 100% |
| Proportional Share GEER Fund | $90,000 | $10,000 | $100,000 |
| Proportional Share ESSER Fund | $810,000 | $90,000 | $900,000 |

*Non-public schools participating under the CARES Act programs.

**11. After an LEA has determined the proportional share of funds for equitable services under each CARES Act program, how does it then determine the amount of funds available for services to students and teachers in individual non-public schools?**

For consultation purposes, in order to determine what equitable services to provide to students and teachers in a given non-public school, an LEA, after reserving funds that are reasonable and necessary for administering equitable services under the CARES Act programs, would divide the remainder of the proportional share of funds available for equitable services by the total enrollment in non-public schools whose students and teachers will participate in each of the CARES Act programs to obtain a per-pupil amount. The LEA would then multiply that per-pupil amount by the enrollment in an individual non-public school to determine the amount of services the LEA can provide to students and teachers in that school. With agreement between the LEA and appropriate non-public school officials, the LEA may pool funds among a group of non-public schools and provide equitable services to students and teachers in non-public schools within the pool based on need without regard to how the funds were generated. (See ESEA section 1117(b)(1)(J)(i)).

**12. Do the requirements in 34 C.F.R. § 200.66 apply to equitable services under the CARES Act programs?**

No. The requirements in 34 C.F.R. § 200.66 do not apply to equitable services under the CARES Act programs. 34 C.F.R. § 200.66 is a Title I, Part A regulation that requires an LEA to provide Title I, Part A services that (1) supplement, and in no case supplant, the services that would, in the absence of Title I, Part A services, be available to participating non-public school students; and (2) only meet the needs of participating non-public school students and not the needs of the non-public school or the general needs of children in the non-public school. These provisions are necessary in the Title I, Part A context because equitable services must be supplemental to what non-public students otherwise receive and may only be provided to low-achieving students who reside in a participating Title I public school attendance area and attend a non-public school.

Equitable services under the CARES Act programs are much broader than under Title I, Part A. Equitable services under the CARES Act programs, by definition, may benefit a non-public school, such as purchasing supplies to sanitize and clean the facility, or all students in a non-public school, such as any activity authorized under the ESEA. Unlike Title I, they are not based on residence in a participating Title I public school attendance

area or limited only to low-achieving students. Moreover, the CARES Act does not have a supplement not supplant requirement.

**13. Is a non-public school whose students and teachers receive equitable services under the CARES Act programs a "recipient of Federal financial assistance"?**

No. A non-public school whose students and teachers receive equitable services under the CARES Act programs is not a "recipient of Federal financial assistance." A public agency must control and administer the CARES Act funds; in other words, no funds may go directly to a non-public school. (See Question #5). Thus, a non-public school is not a recipient of Federal financial assistance by virtue of its students and teachers receiving equitable services from an LEA under a CARES Act program. As a result, certain Federal requirements that apply to a recipient of Federal financial assistance are not directly applicable to a non-public school whose students or teachers receive equitable services under the CARES Act programs, unless the school otherwise receives Federal financial assistance for other purposes.

**14. What services and benefits under the CARES Act programs are available to non-public school students and teachers?**

In general, the services and benefits available to non-public school students and teachers are the same as those available to public school students and teachers. Specifically, the ESSER funds that flow to LEAs by formula may be used for a broad range of allowable activities. (See section 18003(d) of the CARES Act). The ESSER funds that an SEA may reserve for State purposes may also be used for a broad range of activities to address issues responding to COVID-19, unless the SEA decides to target them for a specific purpose or population of public and non-public school students. For example, an SEA could target the SEA reserve to provide technology to support distance learning for public and non-public school students from low-income families. (See section 18003(e) of the CARES Act). Similarly, a Governor may target GEER funds that it makes available to an LEA for a specific purpose or population of public and non-public school students. (See section 18002(c)(1) or (3) of the CARES Act).

In sum, equitable services permitted under sections 18002(c)(1) or (3), as applicable, and 18003(d) of the CARES Act must be available to best meet the needs of non-public school students and teachers, as determined through timely and meaningful consultation and consistent with any specific purposes established by a Governor under the GEER Fund or SEA through the SEA reserve under the ESSER Fund, regardless of the specific uses determined by the LEA to meet its own students' and teachers' particular needs.

As noted in Question #5, the control of any services or assistance provided to students and teachers in a non-public school, and title to materials, equipment, and property purchased with CARES Act funds, must be in a public agency and a public agency must administer those funds, materials, equipment, and property. A public entity must provide those services either directly or through a contract with a public or private entity.

Exhibit D

May 20, 2020

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C.  20202

Dear Secretary DeVos:

We write regarding the April 30, 2020 guidance issued by the U.S. Department of Education (Department) that seeks to repurpose hundreds-of-millions of taxpayer dollars intended for public school students to provide services for private school students, in contravention of both the plain reading of the statute and the intent of Congress.  The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), requires local educational agencies (LEA) receiving funds to use a portion of such funds to provide services to low-income students attending private schools that are equitable to services provided to students in public schools in the same manner as under section 1117 of Title I of the Elementary and Secondary Education Act (ESEA).  However, the Department broke with statutory requirements of the CARES Act and longstanding precedent of the equitable services provision in section 1117 of ESEA by issuing guidance that directs LEAs to use emergency relief funds for the provision of services to students at private schools regardless of their wealth or residence.  This action also contradicts the Department's equitable services non-regulatory guidance issued on October 7, 2019.[1]  We ask that you immediately revise your April 30 guidance, including Question 10 of the guidance document, to conform with section 1117 of ESEA as required by the CARES Act.

The Department's new policy will direct districts to allocate additional resources and services to wealthier private school students, thereby leaving a smaller amount of funds available to serve public school students.  In fact, the Department recently clarified that its redefinition of the equitable services provision was designed to provide more money for equitable services than is required to be provided for such services under section 1117 of ESEA, with a spokesperson claiming that "only providing money for low-income private school students would place private school teachers and students at an unfair disadvantage."[2]  Given that the guidance contradicts the clear requirements of the CARES Act, it will cause confusion among States and LEAs that will be uncertain of how to comply with both the Department's guidance and the plain language of the CARES Act.[3]

**The CARES Act requires LEAs to use emergency relief funds to provide equitable services based only on the number of low-income students at private schools.[4]**

The CARES Act provides over $13 billion in K-12 education aid, which goes to states and LEAs based on their Title I, Part A (Title I-A) funding allocation.  Since 1965, Title I-A has served as a vital source of support for

---

[2] Rebecca Kleln, *Betsy DeVos Makes Moves to Quietly Prop Up Private Schools,* HuffPost, May 7, 2020,
https://www.huffpost.com/entry/betsy-devos-school-privatization_n_5eb3335ac5b6526942a16176.
[3] The Elementary and Secondary Education Act of 1965, as amended, § 1115(c), 20 U.S.C. § 6315(c).
[4] *See generally* U.S. Department of Education, *Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (October 7, 2019).

disadvantaged students in schools with high concentrations of students from low-income families.  A LEA's Title I-A allocation is determined by a variety of factors, primarily the number and concentration of low-income students within the LEA.  Under ESEA section 1117, LEAs must set aside a share of their Title I-A funds to serve disadvantaged students attending private schools.  The amount of the set aside is based on the number of low-income students attending private schools who reside in participating school attendance areas within the LEA attendance area.[5]

In this context, Congress required any LEA receiving emergency coronavirus relief funds under sections 18002 and 18003 of the CARES Act[6] to provide equitable services "in the same manner as provided under section 1117 of the Elementary and Secondary Education Act of 1965."[7]  The statutory language and Congressional intent is clear: LEAs should use these emergency relief funds to provide equitable services *only* based on the number of low-income students attending private schools in their LEA, not all students attending private schools in the LEA.[8]  However, on April 30, the Department issued an interpretation of this requirement that, if implemented, would require LEAs to provide equitable services based on the number of all private school students, regardless of their families' income level.  This interpretation expands the amount of funding that LEAs must dedicate to providing equitable services to private school students, reduces public school students' share of funds, defies Congressional intent, and conflicts with the statutory requirements of the CARES Act.

**The Department's CARES Act Equitable Services guidance reinterprets ESEA diverting essential coronavirus relief funds away from public school students to private school students.**

Despite the clear direction from the CARES Act that LEAs must "provide equitable services in the same manner as provided under section 1117 of the ESEA," and the consistent interpretation of this section across decades and administrations,[9] the Department issued guidance re-interpreting equitable services under section 1117, solely as applied to the CARES Act.  Simply put, the Department is directing LEAs to provide equitable services in a *different* manner from that provided under section 1117 of ESEA, in direct contravention of the plain text of the CARES Act.

For context, there are two "equitable services" provisions in ESEA, section 1117, referenced in the CARES Act, and section 8501, absent from the CARES Act.  Section 1117 directs LEAs to provide equitable services only based on the number of low-income students, residing in eligible school attendance areas within the LEA, who attend private schools.[10]  Section 8501 directs LEAs to provide equitable services to **all** eligible private school students in various programs.[11]  Congress included the section 1117 reference of ESEA, located within Title I of ESEA, because the majority of K-12 funding allocated under the CARES Act is allocated via the Title I formula. By referencing section 1117, Congress explicitly and clearly directed LEAs to only provide equitable services based on the number of low-income students, **not** all eligible private school students, as would have been required had the CARES Act referenced section 8501.  However, the Department's guidance for CARES

---

[5] The Elementary and Secondary Education Act of 1965, as amended, § 1117(a)(4)(A)(i), 20 U.S.C. § 6320(a)(4)(A)(i)).

[6] This provision applied to both Governor's Emergency Education Relief Funds as well as Elementary and Secondary School Emergency Relief Funds. Section 18005.

[7] The Coronavirus Aid, Relief, and Economic Security Act, § 18005(a).

[8] *Id.*

[9] *See, e.g.,* U.S. Department of Education, *Ensuring Equitable Services to Private School Children: A Title I Resource Tool Kit* (Sept. 2006).

[10] *See* U.S. Department of Education, *Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance*, page 19-20 (October 7, 2019).

[11] The Elementary and Secondary Education Act of 1965, as amended, § 8501(b), 20 U.S.C. 7881(b).

Act equitable services chooses to ignore this explicit direction from Congress and instead directs LEAs to provide equitable services[12] based on the enrollment of "all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area," thus drastically inflating the amount of CARES Act funds that Congress required to be provided to equitable services.

According to America's school boards, superintendents, principals, teachers, and other stakeholders, the Department's guidance will ensure that "wealthy children in private schools are… used to generate the equitable services share of [CARES Act funding] for their private schools at the direct expense of low-income children remaining in public schools."[13]  Similarly, the Council of Chief State School Officers (CCSSO) told the Department that this guidance "could significantly harm the vulnerable students who were intended to benefit the most from the critical federal COVID-19 education relief funds Congress has provided."[14]

For example, if states follow this unauthorized guidance, Louisiana projects that it will spend more than 10 percent of its $286 million allocation in Elementary and Secondary School Emergency Relief Funds on students attending private schools.[15]  According to CCSSO, this is 267 percent more than it would have directed to private school students under the Department's longstanding interpretation of equitable services in section 1117 of ESEA, as explicitly required by the CARES Act.[16]  In total, Louisiana would spend $23 million on equitable services for private school students under the Department's new guidance, depriving public school students, including low-income students in public schools, of $14.4 million.

Similarly, Pennsylvania estimated that the Department's guidance "would roughly double Equitable Services reservations… [and] would impact districts of every type—large urban, small urban, suburban, and rural."  In one Pennsylvania district the Department's guidance would amount to an increase of more than 4000 percent "in support flowing from most disadvantaged to more advantaged students."  The Pennsylvania Secretary of Education referred to these outcomes as "clearly inequitable."[17]

We ask you immediately revise your April 30 guidance, including Question 10 of the guidance document to come into compliance with the CARES Act and section 1117 of ESEA. Further, it is imperative that the Department provide transparency about its interpretation of the equitable services provision and its inconsistency with long-standing requirements related to equitable services.  To that end, we request the Department please provide the following no later than June 3, 2020.

1) All internal Department communications regarding the interpretation of section 18005 of the CARES Act.
2) All communications between the Department and non-Department entities regarding the interpretation of section 18005 of the CARES Act.

---

[12] *See* U.S. Department of Education, Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs, page 4-6 (Apr. 30, 2020).
[13] The School Superintendents Association et al, Letter to Secretary DeVos (May 5, 2020).
[14] The Council of Chief State School Officers, Letter to Secretary DeVos (May 5, 2020).
[15] *See* Enclosure 1, State of Louisiana Department of Education, *Louisiana CARES Equitable Share Estimates.*
[16] The Council of Chief State School Officers, Letter to Secretary DeVos (May 5, 2020).
[17] Pedro A. Rivera, Pennsylvania Secretary of Education, Letter to Assistant Secretary for Elementary and Secondary Education, Frank T. Brogan (May 7, 2020) available at http://blogs.edweek.org/edweek/campaign-k-12/Letter%20to%20Secretary%20Brogan%20%282%29.pdf.

3) The name and number of states and LEAs that have requested information regarding the Department's interpretation of section of the CARES Act.
4) All requests made to the Department to revise, reinterpret, or otherwise reconsider its April 30, 2020 CARES Act equitable services guidance, including the names of the requesting individuals, organizations, or entities.
5) The amount of funds from the Education Stabilization Fund that would be allocated to equitable services for students attending non-public schools under the Department's October 7, 2019 equitable services guidance and the amount of funds from the Education Stabilization Fund that would be allocated to equitable services for students attending non-public schools under the Department's April 30, 2020 CARES Act equitable services guidance.

Please send all official information relating to this request to Tylease Fitzgerald, Majority Chief Clerk for the House Committee on Education and Labor, Amanda Beaumont, Minority Staff for the Senate Committee on Health, Education, Labor, and Pensions, Philip Tizzani, Majority Staff for the House Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, and Mark Laisch, Minority Staff for the Senate Appropriations Subcommittee on Labor, Health and Human Services, and Education, and Related Agencies.

Sincerely,

**ROBERT C. "BOBBY" SCOTT**
Chair
Committee on Education and Labor
U.S. House of Representatives

**ROSA L. DELAURO**
Chair
Committee on Appropriations
Subcommittee on Labor, Health, Human
  Services, and Related Agencies
U.S. House of Representatives

**PATTY MURRAY**
Ranking Member
Committee on Health, Education, Labor and
  Pensions
U.S. Senate

Ranking Member
Subcommittee on Labor, Health and Human
  Services, Education, and RelatedAgencies
Committee on Appropriations
U.S. Senate.

Exhibit E



May 22, 2020

Ms. Carissa Moffat Miller
Executive Director
Council of Chief State School Officers
One Massachusetts Ave, NW, Suite 700
Washington, DC  20001

Dear Ms. Miller:

Thank you for your May 5, 2020, letter on behalf of state education leaders from across the country, in which you challenged the U.S. Department of Education's (the Department's) non-regulatory guidance concerning equitable services under the Coronavirus Aid, Relief, and Economic Security (CARES) Act.

The Department disagrees with your interpretation of the law, but we appreciate that some of your constituents have a sincere difference of opinion.  As a result, we will be issuing a rule on the topic in the next few weeks and inviting public comments.  We trust that process will resolve any issues in plenty of time for the next school year.

In the meantime, the Department's guidance document (*Providing Equitable Services to Students and Teachers under the CARES Act Programs,* published April 30, 2020) will remain in effect and inform our enforcement of the CARES Act.  Please let your members know that, consistent with the law, they should be ensuring that local educational agencies (LEAs) are holding meaningful consultation with nonpublic school representatives.  If they or their district superintendents insist on acting contrary to the Department's stated position, they should, at minimum, put into an escrow account the difference between the amount generated by the proportional-student enrollment formula and the Title I, Part A formula.  That way, non-public school students and teachers can begin to receive at least some of the equitable services to which they are entitled.

For the record, we believe your membership fundamentally misunderstands the statutory text mandating equitable services.  The CARES Act is a special, pandemic-related appropriation to benefit *all* American students, teachers, and families.  There is nothing in the Act suggesting Congress intended to discriminate between children based on public or non-public school attendance, as you seem to do.  The virus affects everyone.

Your members ask us to read the phrase "equitable services in the same manner as provided under section 1117 of the ESEA of 1965" as if Congress simply incorporated the entirety of section 1117 by reference.  But this cannot be right.  It is not supported by the CARES Act's plain language, would improperly discriminate against an entire class of children, and prevent a reasoned and harmonious construction of the law giving effect to all relevant statutory provisions.

To be clear, the CARES Act is not a Title I program, although we see how Congress' use of the Title I, Part A formula as a first cut to distribute resources to LEAs through the Elementary and Secondary Schools Emergency Relief Fund (ESSER Funds) might be misleading to some.  To begin with, the CARES Act's student eligibility and use of funds provisions are significantly broader than those under Title I, Part A.  As you know, section 1117(a)(3) requires that educational services and other benefits for students in non-public schools must be equitable in comparison to those for public school students.  As you also know, the services that an LEA may provide under the CARES Act programs are clearly available to *all* public school students and teachers, not only low-income students and their teachers.  Similarly, there is no limitation on attending a Title I school to receive services under CARES Act programs.  Therefore, to make services equitable in comparison to public school students, it follows that the same principles must apply in providing equitable services to all non-public school students and teachers.

We also note the requirement to provide equitable services is "in the same manner as provided under section 1117."  By using the phrase "in the same manner," Congress appears to acknowledge that equitable services under the CARES Act cannot be provided exactly like Title I, Part A services, which makes sense given the CARES Act's particular funding structure (e.g. CARES Act eligibility is not limited by poverty, low-achievement, or residence as under section 1117) and separate consultation and public control of funds provisions, among other things.  Had it been otherwise, Congress would have simply and explicitly directed LEAs to provide equitable services under section 1117.  It did not do so, contrary to the assertion in your letter.

Given the practical interplay between the CARES Act and section 1117, it is reasonable to determine that the proportional share of CARES Act funds should be budgeted for equitable services based on enrollment.  It is worth noting that poverty is already accounted for in the LEA allocations under the ESSER Fund through the Title I, Part A formula.  Similarly, the Governor's Education Emergency Relief Fund (GEER Fund) state allocation is based significantly on each State's share of Title I formula children but is explicitly authorized and designed to serve all students and teachers.  In determining the share of CARES Act funds for equitable services based on enrollment, less than 10 percent of the funding nationwide will be provided for equitable services for non-public school students and teachers, with more than 90 percent of the funding directed to public school students and teachers.

We trust that LEAs understand their general obligations to provide equitable services to students and teachers in non-public schools when they accept money from the $13.2 billion ESSER Fund or the $3 billion GEER Fund.  Although I understand their reflex to share as little as possible with students and teachers outside of their control, I would remind states and LEAs that their non-public school peers have also been overwhelmed by COVID-19.  All students and teachers have had their learning disrupted.  A growing list of non-public schools have announced they will not be able to re-open, and these school closures are concentrated in low-income and middle-class communities.  I would encourage educators everywhere to be as concerned about those students and teachers as they are with those in public schools.

Again, the Department appreciates the opportunity to engage with you and your members.  We look forward to continuing to work together to assist state education leaders and LEAs as they implement the CARES Act programs.

Sincerely,

Betsy DeVos

Exhibit F

# U.S. Department of Education

# Certification and Agreement
## for Funding
### under the
## Education Stabilization Fund Program
## Outlying Areas-State Educational Agency

**CFDA Number: 84.425A**



# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Education Stabilization Fund (ESF), the U.S. Department of Education (Department) allocates funds to the Outlying Areas for the purpose of providing State educational agencies (SEAs), local educational agencies (LEAs), institutions of higher education, and other education-related entities with emergency assistance as a result of the Novel Coronavirus Disease 2019 (COVID-19).

**Funding**

The Department will award $153,750,000 to the Outlying Areas. Of this amount, $123,000,000 (80%) is made available to SEAs under this Certification and Agreement and $30,750,000 (20%) is made available to Governors under a separate Certification and Agreement.

The ESF amount awarded to Outlying Area SEAs under this Certification and Agreement is based on the same proportion that each Outlying Area received under part A of title I of the Elementary and Secondary Education Act of 1965, as amended (ESEA), in the most recent fiscal year. By statute, the Department used this same formula to make allocations to States under the Elementary and Secondary School Emergency Relief Fund.

For purposes of this Certification and Agreement, ESF funds awarded to SEAs in the Outlying Areas will be referred to as ESF-SEA funds.

**Eligibility**

SEAs in American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands.

**Timeline**

The Department encourages each SEA to award ESF-SEA funds within one year of receipt. The funds must be obligated by the SEA and subgrantees no later than September 30, 2022.

**Uses of Funds**

SEAs, and LEAs that receive subgrants, may use ESF-SEA funds for one or more of the purposes listed in section 18003(d) of the CARES Act (See Appendix A).[1] SEAs may also use ESF-SEA funds for emergency needs to address issues responding to COVID-19. These emergency needs may be addressed through direct services or through subgrants or contracts, including subgrants to LEAs. The SEA, and LEAs that receive subgrants, may reserve a reasonable and necessary amount of funds for administrative costs.

**Contact**

Email: esf.outlying@ed.gov

---

[1] SEAs may award subgrants of ESF-SEA funds to LEAs.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

## GENERAL INSTRUCTIONS

To receive ESF-SEA funds, SEAs must submit a signed PDF Certification and Agreement, by email, to the Department at esf.outlying@ed.gov no later than July 1, 2020.  The Certification and Agreement must include the following:

- A completed Certification and Agreement cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A)*

- Programmatic, fiscal, and reporting assurances.  *(Part B)*

- Information on the uses of the ESF-SEA funds. *(Part C)*

- Other assurances and certifications. *(Part D)*

## APPENDICES

Appendix A – Authorizing Statute
Appendix B – Outlying Area Allocation Data

# EDUCATION STABILIZATION FUND
## OUTLYING AREAS-STATE EDUCATIONAL AGENCY

### PART A:  CERTIFICATION AND AGREEMENT COVER SHEET
### (CFDA No. 84.425A)

State Educational Agency:

DUNS Number:

Legal Name:

Chief State School Officer:

SEA Contact for the Education Stabilization Fund:

Position and Office:

Mailing Address:

Telephone:

Email Address:

To the best of my knowledge and belief, all of the information and data in this Certification and Agreement are true and correct.   I acknowledge and agree that the failure to comply with all assurances and certifications in this document, all relevant provisions and requirements of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):

Telephone:

Signature of Chief State School Officer or Authorized Representative:

Date:

**EDUCATION STABILIZATION FUND**
**OUTLYING AREAS-STATE EDUCATIONAL AGENCY**

**PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES**

The Chief State School Officer (or his/her authorized representative) assures the following:

1.  The ESF-SEA funds will be used as follows:
    o   By the SEA and, where applicable, LEAs, for no more than what is reasonable and
        necessary for administrative costs;
    o   By the SEA for emergency needs to address issues responding to COVID-19; and
    o   By the SEA and, where applicable, LEAs, for one or more of the purposes listed in
        section 18003(d) of the CARES Act (see Appendix A).

2.  Equitable services, as determined through timely and meaningful consultation with non-public
    school officials, will be provided to students and teachers in non-public elementary and
    secondary schools in the same manner as provided under section 8501 of the ESEA.
    o   The SEA will ensure that a public agency will maintain control of ESF-SEA funds
        for services and assistance provided to a non-public school.
    o   The SEA will ensure that a public agency will have title to materials, equipment, and
        property purchased with ESF-SEA funds.
    o   The SEA will ensure that services to a non-public school with ESF-SEA funds will
        be provided by a public agency directly, or through contract with another public or
        private entity.

3.  The Outlying Area will comply with the maintenance-of-effort requirements in section 18008 of
    the CARES Act.

4.  The SEA and, where applicable, an LEA and any other entity that receives ESF-SEA funds will,
    to the greatest extent practicable, continue to compensate its employees and contractors during
    the period of any disruptions or closures related to COVID-19 in accordance with section 18006
    of the CARES Act.  CARES Act funds generally will not be used for bonuses, merit pay, or
    similar expenditures, unless related to disruptions or closures resulting from COVID-19.

5.  The SEA will comply with all reporting requirements, including those in section 15011(b)(2) of
    Division B of the CARES Act, and submit required quarterly reports to the Secretary at such
    time and in such manner and containing such information as the Secretary may require. (See
    also 2 CFR 200.327-200.329). The Secretary may require additional reporting, including: the
    methodology LEAs will use to provide services or assistance to students and staff in both public
    and non-public schools; demonstration of compliance by the LEAs or other entities with the use
    of funds requirements referenced in paragraph 1 of this part; and the specific uses of funds by
    the LEAs or other entities, such as any use of funds addressing the digital divide, including
    securing access to home-based connectivity and remote-use devices and related issues in
    supporting remote learning for all students, including disadvantaged populations.

6.  The SEA will submit to the Department, within 60 days of receiving ESF-SEA funds, a report
    that will include:

- A budget for the SEA's uses of funds for administration and for emergency needs to address issues related to COVID-19; and
- An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

7. The SEA will ensure that every recipient and subrecipient of ESF-SEA funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other Federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

Chief State School Officer or Authorized Representative (Typed Name):

Signature of Chief State School Officer or Authorized Representative:

Date:

**EDUCATION STABILIZATION FUND**
**OUTLYING AREAS-STATE EDUCATIONAL AGENCY**

**PART C:  USES OF ESF-SEA FUNDS**

The Department is interested in learning how and to what extent ESF-SEA funds will be used to support the ability of elementary and secondary schools to continue to provide educational services to their students. The Department requests the following:

1.  A description of how the SEA will:
    - Determine its most important educational needs as a result of COVID-19.
    - Establish a timeline for providing services and assistance to students and staff in both public and non-public schools.
    - Use ESF-SEA funds to promote remote learning.
    - Assess and address student learning gaps resulting from the disruption in educational services.

2.  The extent to which the SEA intends to support:
    - Technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in section 18003(d)(4) of the CARES Act; and
    - Remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

# EDUCATION STABILIZATION FUND
## OUTLYING AREAS-STATE EDUCATIONAL AGENCY

## PART D: OTHER ASSURANCES AND CERTIFICATIONS

The Chief State School Officer (or his/her authorized representative) assures or certifies the following:

- The SEA acknowledges that ESF-SEA funds awarded to the Outlying Area are subject to the fiscal year 2019 Department-wide Specific Conditions incorporated in the Grant Award Notification and will also be subject to fiscal year 2020 Department-wide Specific Conditions.

- The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders, and regulations.

- With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the Outlying Area will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR part 82, Appendix B); and the Outlying Area will require the full certification, as set forth in 34 CFR part 82, Appendix A, in the award documents for all subawards at all tiers.

- Any LEA receiving funding under this program will comply with the requirements of section 442 of the General Education Provisions Act (GEPA), 20 U.S.C. 1232e.

- To the extent applicable, entities that receive funding will comply with the requirements of section 427 of GEPA, 20 U.S.C. 1228a.

- The SEA and other recipients will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR 200.300-345) and Subpart E—Cost Principles (2 CFR 200.400-475) to ensure that ESF-SEA funds are being used for purposes that are reasonable, necessary, and allocable under the CARES Act.

- The SEA and other recipients will comply with the provisions of all applicable acts, regulations, and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the

Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

Chief State School Officer or Authorized Representative Signature:

Date:

## Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection

(a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

**Appendix B: Outlying Areas Allocation Data**
**ESF-SEA Fund**

| OUTLYING AREA | ALLOCATION[2] |
|---|---|
| **TOTAL** | **$123,000,000** |
| AMERICAN SAMOA | $38,321,932 |
| GUAM | $41,521,997 |
| NORTHERN MARIANA ISLANDS | $23,163,734 |
| VIRGIN ISLANDS | $19,992,337 |

---

[2] The allocation to the SEA of each Outlying Area is based on the formula used under the Elementary and Secondary School Emergency Relief (ESSER) Fund (based on the same proportion as each Outlying Area received under part A of title I of the ESEA in the most recent fiscal year)

Exhibit G

 Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

## Coronavirus Disease 2019 (COVID-19)

# COVID-19 in Racial and Ethnic Minority Groups

Updated June 25, 2020                                    Print

Long-standing systemic health and social inequities have put some members of racial and ethnic minority groups at increased risk of getting COVID-19 or experiencing severe illness, regardless of age. Among some racial and ethnic minority groups, including non-Hispanic black persons, Hispanics and Latinos, and American Indians/Alaska Natives, evidence points to higher rates of hospitalization or death from COVID-19 than among non-Hispanic white persons. As of June 12, 2020, age-adjusted hospitalization rates are highest among non-Hispanic American Indian or Alaska Native and non-Hispanic black persons, followed by Hispanic or Latino persons.

• Non-Hispanic American Indian or Alaska Native persons have a rate approximately 5 times that of non-Hispanic white persons,

• non-Hispanic black persons have a rate approximately 5 times that of non-Hispanic white persons,

• Hispanic or Latino persons have a rate approximately 4 times that of non-Hispanic white persons.

## Age-adjusted COVID-19-associated hospitalization rates by race and ethnicity, COVID-NET, March – June 13, 2020



☐ Age-adjusted rate    Reset

| Age-adjusted COVID-19-associated hospitalization rates by race and ethnicity | ✚ |
|---|---|

Download Table Data (csv)

While everyone is at risk of getting COVID-19, some people may be more likely to get COVID-19 or experience severe illness. COVID-19 is a new disease, and CDC is learning more about it and how it affects people every day. As we learn more, CDC will continue to update and share new information, including on what we know about those who are at increased risk for getting severely ill from COVID-19.

Where we live, learn, work, and play affects our health

The conditions in which people live, learn, work, and play contribute to their health. These conditions, over time, lead to different levels of health risks, needs, and outcomes among some people in certain racial and ethnic minority groups.

# Reducing the Impact of COVID-19 among Racial and Ethnic Minority Populations

History shows that severe illness and death rates tend to be higher for racial and ethnic minority populations during public health emergencies than for other populations. Addressing the needs of these populations in emergencies includes improving day-to-day life and harnessing the strengths of these groups. Shared faith, family, and cultural institutions are common sources of social support. These institutions can empower and encourage individuals and communities to take action to prevent the spread of COVID-19, care for those who become sick, and help community members cope with stress.

CDC has developed resources to help local resources to help local communities, schools, faith-based organizations and other groups and the people they serve during a pandemic.

## Want More Data by States?
CDC COVID Data Tracker

# CDC is also:

- Working with state, tribal, local, and territorial health departments and healthcare systems to **collect data** on the number of COVID-19 cases, hospitalizations, and deaths, and to understand which groups may be more at risk. This information can be used to better direct resources and care to address health disparities.

- Supporting **partnerships** between researchers, professional groups, community groups, tribal medicine leaders, and community members to share information to prevent COVID-19 in racial and ethnic minority communities.

- **Providing** considerations on how to prevent and slow the spread of COVID-19 in schools, workplaces, and communities, including organizations serving racial and ethnic minority groups.

> Webinar presenters discuss the actions their cities have taken to mitigate the disproportionate impact of COVID-19 on racial/ethnic minorities.

# Public health professionals can:

- **Collect, analyze, and report data** in ways that shed light on health disparities and drive solutions.
- **Communicate** often about COVID-19 and its impact on racial and ethnic minority communities in ways that are transparent and credible.

- **Work with other sectors**, such as faith, community, education, business, transportation, housing organizations, and spiritual and other leaders to share information and find ways to reduce social and economic barriers to slowing the spread of COVID-19.

- **Train** community health workers in underserved communities and tribal areas to educate and link people to free or low-cost health services.

- Link people to testing **and care** for COVID-19.

- Link more people to **healthcare services** for serious medical conditions, some of which increase the risk of getting severely ill and dying from COVID-19. For example, link people to services to access affordable medicines or to help follow care plans.

- **Provide information for** healthcare professionals and health systems to understand cultural differences among patients and how patients interact with providers and the healthcare system.
    - The National Standards for Culturally and Linguistically Appropriate Services in Health and Health Care ⤤ (The National CLAS Standards) aim to improve healthcare quality and health equity.

- **Use** evidence-based strategies to reduce health disparities. Racial and ethnic minority groups that have higher rates of disease and premature death than other groups before a health emergency are also most at risk for poor health during and after an emergency.

- **Learn more about** social determinants of health and how to improve health by changing the conditions where people live, learn, work, and play.

- Consider the social, cultural, health, and well-being needs and concerns of specific communities. **Aim to see things from their perspective**.

## Community organizations can:

- **Prioritize resources** for clinics, private practices, and other organizations that serve minority populations.

- Work across sectors to **connect people with services**, such as grocery delivery or temporary housing, that help them practice social distancing. Connect people to healthcare providers and resources to help them get medicines.

- Promote precautions, including the use of cloth face coverings. Follow CDC guidance to address spread of COVID-19 in crowded living areas and for people living in smaller spaces.

- Work with employers to modify policies to ensure that ill workers are not in the workplace and are not penalized for taking sick leave. Help to ensure employees are aware of and understand these policies.

- Help **stop the spread of rumors and misinformation** by providing information from trusted and credible sources.

- More information for community organizations

## Healthcare systems and healthcare providers can:

- **Use** CDC's standardized protocols and quality improvement guidance in hospitals and medical offices that serve people from racial and ethnic minority groups.

- Provide training to help providers **identify their implicit biases,** making sure providers understand how these biases can affect the way they communicate with patients and how patients react.

- **Train both providers and administrators** to understand how biases can affect their decision-making, including decisions about resources.

- Provide **medical interpreters**.

- Work with communities and healthcare professional organizations **to reduce cultural** barriers **to care.**

- **Connect patients with community resources** that can help older adults and people with underlying medical conditions follow their care plans. For example, help people get extra supplies and medicines and remind them to take their medicines.

- **Learn about social and economic conditions** ⧉ that may put some patients at increased risk for getting sick with COVID-19—for example, jobs that require more contact with the public.
- Promote a trusting relationship by **encouraging patients to call and ask questions.**
- More information for healthcare providers

## Everyone, regardless of race or ethnicity, can:

- **Follow CDC's guidance for seeking medical care** if you think you have been around someone with COVID-19 or have symptoms. Follow steps to prevent the spread of COVID-19 if you may have been exposed or are sick.
- **Take steps to protect yourself, your community, and others from getting COVID-19**, including those at increased risk of severe illness.
- **Take precautions** as you go about your daily life and attend events.
- **Learn to cope with stress** and help the people you care about and your community cope with stress to become stronger.
- **Find ways to connect** with your friends and family members and engage with your community while limiting face-to-face contact with others.

# Why Racial and Ethnic Minority Groups are at Increased Risk During COVID-19

Health differences between racial and ethnic groups result from inequities in living, working, health, and social conditions that have persisted across generations. In public health emergencies, such as the COVID-19 pandemic, these conditions can also isolate people from the resources they need to prepare for and respond to outbreaks.

## Living conditions

For many people from racial and ethnic minority groups, living conditions can contribute to health conditions and make it harder to follow steps to prevent getting sick with COVID-19 or to seek care if they do get sick.

- Many members of racial and ethnic minorities may be more likely to live in **densely populated areas** because of institutional racism in the form of residential housing segregation. In addition, overcrowding is more likely in tribal reservation homes and Alaska Native villages, compared to the rest of the nation. People living in densely populated areas and homes may find it harder to practice social distancing.
- **Racial housing segregation** is linked to health conditions, such as asthma and other underlying medical conditions, that put people at increased risk of getting severely ill or dying from COVID-19. Some communities with higher numbers of racial and ethnic minorities have higher levels of exposure to pollution and other environmental hazards.
- **Reservation homes are more likely to lack complete plumbing** when compared to the rest of the nation. This may make handwashing and disinfection harder.
- Many members of racial and ethnic minority groups live in neighborhoods that are **farther from grocery stores and medical facilities**, or may **lack safe and reliable transportation**, making it harder to stock up on supplies that would allow them to stay home and to receive care if sick.
- Some members of racial and ethnic minority groups may be more likely to **rely on public transportation**, which may make it challenging to practice social distancing
- People living in multigenerational households and multi-family households (which are more common among some racial and ethnic minority groups), may find it hard to protect older family members or isolate those who are sick if space in the household is limited.

- Some racial and ethnic minority groups are **over-represented in jails, prisons, homeless shelters, and detention centers**, where people live, work, eat, study, and recreate within congregate environments, which can make it difficult to slow the spread of COVID-19.

# Work circumstances

Some types of work and workplace policies can put workers at increased risk of getting COVID-19. Members of some racial and ethnic minority groups are more likely to work in these conditions. Examples include:

- **Being an essential worker**: The risk of infection may be greater for workers in essential industries, such as health care, meat-packing plants, grocery stores, and factories. These workers must be at the job site despite outbreaks in their communities, and some may need to continue working in these jobs because of their economic circumstances.

- **Not having sick leave**: Workers without paid sick leave may be more likely to keep working when they are sick.

- Income, education, and joblessness: On average, racial and ethnic minorities earn less than non-Hispanic whites, have less accumulated wealth, have lower levels of educational attainment, and have higher rates of joblessness. These factors can each affect the quality of the social and physical conditions in which people live, learn, work, and play, and can have an impact on health outcomes.

# Health circumstances

Health and healthcare inequities affect many racial and ethnic minority groups. Some of these inequities can put people at increased risk of getting severely ill and dying from COVID-19.

- Compared to non-Hispanic whites, Hispanics are almost 3 times as likely to be uninsured, and non-Hispanic blacks are almost twice as likely to be uninsured. In all age groups, blacks are more likely than non-Hispanic whites to report not being able to see a doctor in the past year because of cost. In 2017, almost 3 times as many American Indians and Alaska Natives had no health insurance coverage ☐ compared to non-Hispanic whites.

- People may not receive care because of distrust of the healthcare system, language barrier**s, or cost of missing work**.

- Compared to non-Hispanic whites, blacks experience **higher rates of chronic conditions at earlier ages and higher death rates**. Similarly, American Indian and Alaska Native adults are more likely to have obesity, have high blood pressure, and smoke cigarettes than non-Hispanic white adults. These underlying medical conditions may put people at increased risk for severe illness.

- **Racism, stigma, and systemic inequities** undermine prevention efforts, increase levels of chronic and toxic stress, and ultimately sustain health and healthcare inequities.

---

## More information

COVID-19: Tribal Communities

Schools, Workplaces & Community Locations

CDC's Office of Minority Health and Health Equity

Healthypeople.gov: Social Determinants of Health ☐

Health System Transformation and Improvement Resources for Health Departments

---

Strategies for Reducing Health Disparities

CDC's National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP) Health Equity

## Resources for COVID-19 data by race/ethnicity

CDC COVID Data Tracker

Centers for Disease Control and Prevention. COVIDView: A Weekly Surveillance Summary of U.S. COVID-19 Activity

Emory University. COVID-19 Health Equity Interactive Dashboard [↗]

The COVID Tracking Project. The COVID Racial Data Tracker [↗]

Coronavirus Disease 2019 (COVID-19)-Associated Hospitalization Surveillance Network (COVID-NET)

## References

- MMWR-Comparison of Hospitalized and Non-hospitalized Patients with COVID-19 in Metropolitan Atlanta, March – April 2020

- Gold JA, Wong KK, Szablewski CM, et al. Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 — Georgia, March 2020. MMWR Morb Mortal Wkly Rep 2020;69:545–550. DOI: http://dx.doi.org/10.15585/mmwr.mm6918e1 [↗]

- Price-Haygood EG, Burton J, Fort D, Seoane L. Hospitalization and Mortality among Black Patients and White Patients with Covid-19. N Engl J Med 2020. DOI: 10.1056/NEJMsa2011686

- Millet GA, Jones AT, Benkeser D, et al. Assessing Differential Impacts of COVID-19 on Black Communities. Annals of Epidemiology 2020. DOI: https://doi.org/10.1016/j.annepidem.2020.05.003 [↗]

- Azar KM, Shen Z, Romanelli RJ, et al. Disparities In Outcomes Among COVID-19 Patients In A Large Health Care System In California. Health Affairs 2020; 39(7). DOI: https://doi.org/10.1377/hlthaff.2020.00598 [↗]

- Kim SJ, Bostwick W. Social Vulnerability and Racial Inequality in COVID-19 Deaths in Chicago. Health Education & Behavior 2020. DOI: https://doi.org/10.1177/1090198120929677 [↗]

- Braveman P, Egerter S, Williams DR. The Social Determinants of Health: Coming of Age. Annual Review of Public Health 2011; 32: 381-398. DOI: https://doi.org/10.1146/annurev-publhealth-031210-101218 [↗]

Page last reviewed: June 25, 2020

Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

Exhibit H

# U.S. Department of Education

# Certification and Agreement
## for Funding under the
## Education Stabilization Fund Program
## Elementary and Secondary School Emergency Relief
## Fund (ESSER Fund)

### CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

**Paperwork Burden Statement**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpose**

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

# ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)

## STATE EDUCATIONAL AGENCY

## PART A: CERTIFICATION AND AGREEMENT COVER SHEET

State:                                          CFDA Number: 84.425D

Legal Name:                                     DUNS Number:

Chief State School Officer:                     Mailing Address:

State Contact for Elementary and Secondary School Emergency Relief Fund:

Position and Office:

Mailing Address:


Telephone:

Email address:

To the best of my knowledge and belief, all the information and data in this agreement are true and correct. I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.

Chief State School Officer or Authorized Representative (Typed Name):          Telephone:

Signature of Chief State School Officer or Authorized Representative:          Date:

# PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1.  The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2.  The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3.  The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
    The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4.  The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5.  The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
    - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
    - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
    - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6.  The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7.  The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act. In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8. The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9. The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
   - A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
   - An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: |
|---|---|

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
    - How the LEA will determine its most important educational needs as a result of COVID-19.
    - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
    - The extent to which the LEA intends to use ESSER funds to promote remote learning.
    - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

    The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

2. The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:
   - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and
   - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

# PART D: OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: |
|---|---|

**Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations**

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B:  STATE ALLOCATION TABLE

## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

Exhibit I

# Appendix XIV: Comments from the Department of Education



UNITED STATES DEPARTMENT OF EDUCATION

THE DEPUTY SECRETARY

June 12, 2020

<u>Via Email:</u>   emreyarrasm@gao.gov
              nowickij@gao.gov

Honorable Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, Northwest
Washington, DC 20548

Re:   Draft Report "COVID-19:  Opportunities to
      Improve Federal Response and Recovery Efforts"
      (GAO-20-625)

Dear Mr. Dodaro:

Thank you for the email of June 8, 2020, to Secretary DeVos providing an opportunity to review and comment on the draft report of the Government Accountability Office ("GAO") titled "COVID-19:  Opportunities to Improve Federal Response and Recovery Efforts" (GAO-20-625) and the three related appendices:

1. Education Stabilization Fund,
2. Emergency Financial Aid for College Students, and
3. Federal Student Loans.

I am pleased to respond on behalf of the Secretary and the Department of Education ("Department" or "ED").

**Summary**

The draft report is fundamentally flawed, inaccurate, incomplete, and unfair.

It fails to consider many relevant factors, some of which are summarized below. These include:

1. Implementation of the CARES Act was accomplished while the federal government was transitioning to remote work. This included not only the Department and the office of Federal Student Aid ("FSA"), but our partners at the Department of the Treasury and Federal Student Aid's more than 20,000 contractors. These were not *normal* times.

2. The CARES Act established 12 different grant programs, all with vague direction and different legislative language which needed to be interpreted and developed into detailed programs. This was a prodigious task.

3. Typical grant programs take six to 12 months to establish rules to assure accountability and transparency. These had to be applied to institutions of higher education, local education agencies, state education agencies, and state governments. Remarkably, these tasks were generally accomplished in two months.

4. Computer systems and software programs did not exist to accomplish many of the tasks directed by the CARES Act. These had to be developed on-the-fly, an enormous undertaking.

5. A requirement to administer and process more than 9,000 new grants, totaling around $29 billion, was imposed on a staff that was already administering 13,700 grants, totaling $45 billion. These 9,000+ new grants were issued within two months, in what can best be described as more than turbulent times—an amazing achievement.

6. By way of comparison, six months after the American Reinvestment and Recovery Act of 2009 ("ARRA") became law—a time when the national Capital Region was *not* closed due to a pandemic and when employees were *not* relegated to telework— the prior administration obligated 0% of the discretionary grant dollars and only 31% of total available funds.

Not only did the Department work diligently, tirelessly, and quickly in the face of unprecedented circumstances, as detailed above, it achieved great success in doing so. The Department delivered needed regulatory flexibility and significant resources with impressive speed, all while carefully guarding against waste, fraud, and abuse. In fact, the Secretary has spoken with every state school chief in America, nearly every governor, and countless other education leaders and political leaders across America, and she consistently hears praise for the Department's timely efforts and robust flexibility.

While the Department appreciates GAO's efforts, we believe strongly that GAO must spend more time on this report if it wants to paint a fair and accurate picture. As written, the report contains gaping holes that require additional work and analysis. The report greatly minimizes the effort the Department took to achieve the emergency mandate from Congress. To be frank, the report as it stands today is fundamentally flawed and misleading to Congress and the public.

In summary, the current GAO draft report is not only inaccurate, incomplete, and unfair, but is demeaning to the thousands of employees and contractors who worked nights and weekends from kitchen counters and dining room tables to disperse CARES Act dollars as quickly as possible to students and schools while maintaining appropriate accountability and transparency, and complying with existing statutes.

### Background

In enacting the Coronavirus Aid, Relief, and Economic Security Act [("CARES Act" or "Act"), Pub. L. No. 116-136 (March 27, 2020)], Congress intended for the Department to distribute the Education Stabilization Fund ("ESF"), as quickly as possible. The Fund included

multiple separate allocations and grant recipients. These included, among others, the Governor's Emergency Education Relief Fund ("GEER Fund"), the Elementary and Secondary School Emergency Relief Fund ("ESSER Fund"), and the Higher Education Emergency Relief Fund ("HEER Fund").

Congress also intended that grantees have substantial flexibility in the use of these dollars. I proudly note that the Department has made—for both K-12 and higher education—about 9,253 CARES Act grants (totaling $28.9 billion of the $31 billion appropriated) in the 11 weeks since enactment. The Department also provided substantial flexibility to grantees. This achievement is separate and apart from the regular grant-making of the Department which has averaged about 13,700 grants (totaling $45 billion) per year over the last three years.

The scant mention of the Department's diligence in the draft report and appendices paints an unfair and incomplete picture.

What is missing from the GAO draft report and appendices is the reality that Congress, through the CARES Act, created a new set of grant programs, each with separate rules targeted at states, school districts, and institutions of higher education. Under ordinary circumstances, for a single new grant program, the Department would have from several months to a year to develop grant applications and qualifying requirements, formulas for fund distribution, tables and rationales requiring approvals from the Office of Management and Budget, and guidance documents reflecting policy judgments that Congress often leaves to the Department to develop and publish. However, implementation of the CARES Act was done under circumstances that were far from ordinary.

By way of further background, I note the federal student loan provisions of the CARES Act required FSA to put in place broad-based flexibilities to assist virtually every borrower across the entire federally held student loan portfolio. This was an extraordinary effort by FSA and its numerous contract servicers and collection agencies that required the reengineering of programs, systems, and processes, including the development of software subroutines to accomplish new tasks.

This necessitated portfolio-wide changes—something that was never envisioned nor intended—all while transitioning FSA's own workforce and more than 20,000 contact center employees from a primarily brick-and-mortar model to a remote environment.

Working with a complex network of systems, contact centers, loan servicers, and collection agencies, FSA was able to suspend involuntary payments and quickly issue refunds to approximately 1.4 million borrowers, stop voluntary payments, and eliminate interest accrual across its entire portfolio of federally held loans. In essence, FSA accomplished the enormous task of modifying payment and other requirements for more than 40 million borrowers in a matter of weeks.

In addition, FSA is in the process of providing relief (e.g., changes to the academic calendar, approved leaves of absence, enrollment status changes, approval to offer distance learning, and other things designed to provide assistance to students whose terms have been

interrupted by the pandemic) to 6.8 million student aid recipients in an in-school status, attending approximately 6,000 schools, whose terms were interrupted by this global pandemic.

I have provided our responses to the three appendices (Education Stabilization Fund, Emergency Financial Aid for College Students, and Federal Student Loans) below.

**Education Stabilization Fund**

As you are aware, our Office of Elementary and Secondary Education ("OESE") oversees five grant programs under the CARES Act. These program total approximately $17 billion. They are:

1. the GEER (Governors') Fund;
2. the ESSER (K-12) Fund;
3. the Education Stabilization Fund Rethink K-12 Education Models Grant ("ESF-REM");
4. the Education Stabilization Fund Program Outlying Areas – Governors; and
5. the Education Stabilization Fund Program Outlying Areas – State Education Agencies.

Prior to the passage of the CARES Act, the Department had already announced flexibility waivers to all states regarding the assessment, accountability, and certain reporting requirements under the Elementary and Secondary Education Act ("ESEA"). This decisive action substantially reduced the burdens for states unable to administer their statewide assessments to students this spring. The Department also proactively responded to state concerns about grant requirements by announcing additional waivers on K-12 fiscal flexibility.

All 50 states, the District of Columbia, the Commonwealth of Puerto Rico, and the Bureau of Indian Education ("BIE") received initial approval of their accountability, assessment, and reporting waivers within 24 hours of submitting a request to the Department. All formal approval letters for those waivers were issued by April 1, 2020. Similarly, the Department granted initial approval of fiscal waivers within 24 hours of receipt of the states' requests. All formal approval letters for those waivers were issued by April 21, 2020. All approval letters are published on OESE's website.

Furthermore, we leveraged lessons learned from managing funds under the American Recovery and Reinvestment Act of 2009 ("ARRA"). In anticipation of enactment of the CARES Act, and to assist with the administration of the five K-12 programs, the Department established a detailed governance structure led by OESE's Disaster Recovery Unit. A key goal was to ensure a simplified application process and quick disbursement of funds.

As a result, 100 percent of the Governors' (GEER) funds, and the K-12 (ESSER) funds, and discretionary program funds were made available within 30 days of enactment. In addition, the Department was usually able to obligate GEER and ESSER awards within 24 hours, or within three days of approving an entity's application for funding. As of May 30, 2020, 102 awards out of a possible 104 were made to states' governors and chief state school officers. Four out of eight awards were made to the Outlying Areas. The remaining awards have not been made

because the Department has not yet received applications or because of challenges with the applications, not because of any obstacles at the Department.

For the Governors' and K-12 funds, once awards were made, the Department repurposed OESE's State and Grantee Relations ("SGR") unit to provide technical assistance and oversight to the grantees. This unit maintains well-established databases for tracking data on grantee inquiries and issues. They have also established processes and protocols for communicating with grantees, including post-award monitoring.

In order to provide stakeholders with the latest information on the Department's administration of the CARES Act, we launched a broad-based webpage of resources (COVID-19 ("Coronavirus") Information and Resources for Schools and School Personnel). Included on this page is key guidance to help K-12 school leaders better meet their instructional obligations, and to help parents easily access the information they need to make the best decisions for their children.

We are also encouraging stakeholders and others to submit any questions they may have to a dedicated mailbox, COVID-19@ed.gov. As of May 29, the Department had received 4,054 inquiries and closed 2,980—74 percent of those inquiries. By centrally managing these inquiries, the Department has been able to identify areas of elevated risk (e.g., potential unallowable uses of funds) and provide timely technical assistance. For example, the following Fact Sheets were developed in response to grantee questions:

- Repurposing Federal Equipment and Supplies to Combat COVID-19
- Frequently Asked Questions document on 'Maintenance of Effort' requirements in the CARES Act
- Addressing the Risk of COVID-19 While Serving Migratory Children
- Transferring State-and Local-Level Funds (Section 5103 of the ESEA)
  Providing Services to English Learners During the COVID-19 Outbreak

**Emergency Financial Aid for College Students**

Our Office of Postsecondary Education staff of approximately 53 program specialists typically administers around 5,000 grants and continuation awards each year. In the aggregate, this represents an annual investment of approximately $2 billion. In the days that followed passage of the CARES Act, the same group of people—who were also at the peak of activity in their regular grant-making activities, including managing 227 peer review panels for six regular grant programs, reviewing 4,510 annual progress reports for 24 regular grant programs, and issuing 3,450 non-competing continuation awards for 24 regular grant programs—created 17 new grant programs authorized by the CARES Act, including 11 programs associated with Title III and Title V of the Higher Education Act. This was an extraordinary achievement.

Among other things, the staff developed new allocation methodologies, interpreted vaguely worded "uses of funds" provisions, created new grant profiles for each new program in our G5 grant-funding system, met with the community of Minority Serving Institutions to understand their priorities for grants designated for their institutions, reviewed and approved

almost 12,000 Certification and Agreement (C&A) documents of institutions, worked with applicants to resolve more than 400 incomplete or incorrect C&A documents, and provided intensive technical assistance to those receiving funds for the first time. This represents a prodigious amount of work in a remarkably short period.

With respect to the new postsecondary discretionary grants, I have provided a timeline of the announcements of allocation availability, including:

- Higher Education Emergency Relief Funds – emergency grants to students (18004(a)(1)) (Announced on April 9, 2020)
- Higher Education Emergency Relief Funds – institutional relief funds (18004(a)(1) (Announced on April 21, 2020)
- Higher Education Emergency Relief Funds – Minority Serving Institutions, including 11 different programs authorized under Titles III and V of the Higher Education Act that served 1,750 minority serving institutions (Announced on April 30, 2020)
- Fund for the Improvement of Post-Secondary Education – formula funding to assist institutions that received less than $500,000 from other programs authorized by the CARES Act (Announced on April 30, 3030)
- HBCU Capital Financing Loan Deferments (to be announced, in addition to loan deferments implemented from the FY 2020 appropriations law)
- Fund for the Improvement of Post-Secondary Education – competitive grant program to assist institutions with additional needs related to coronavirus (to be announced)
- Emergency Relief Fund – Reinventing Workforce Preparation, a competitive grant program serving states hardest hit by coronavirus (administered by the Office of Career, Technical, and Adult Education, to be announced in coming days)

Allocating funds under some of these grant programs proved extremely time consuming because Congress directed the Department to use data we do not collect. These data include enrollments calculated in Full Time Equivalents and the numbers of students enrolled in online programs. To determine these numbers, the Department had to figure out how to crosslink three different data sets to approximate the distribution formula dictated by Congress.

Further complicating our efforts to quickly disburse funds was the structure of main campuses and branch campuses that, in some cases, required us to collect additional information from branch campuses that qualify as a Minority Serving Institution (MSI), when the main campus does not. Collecting those data necessitated creating a new "information collection request" and then getting approval from the Office of Management and Budget. In addition, some institutions qualified under more than one MSI program because they serve large populations of students from different minority groups. Thus, we needed to calculate the allocations for those institutions under each program for which they were eligible.

Our staff went above and beyond the call of duty, working around the clock and through many weekends, to ensure funds could be disbursed to institutions, and most importantly to students, in less than two weeks from the date on which the CARES Act became law.

Compare this to the prior administration: six months after ARRA became law, at a time when the National Capital Region was not closed due to a pandemic, and employees were not relegated to telework, they had obligated 0% of discretionary grant programs authorized by that Act and only 31% of the total funds made available by the ARRA. This comparison provides critical context that was missing from GAO's review.

I would be remiss without noting the Department's concern about GAO's inappropriate reliance on interviews with unnamed higher education organizations, and the use of their subjective views to inform GAO's report. The Department believes it issued sufficient information at the time we announced the availability of each funding opportunity, including emergency grants to students. This was achieved through public teleconference calls, plus a cover letter, and the C&A that were sent to all 5,136 eligible institutions. Those documents and calls made it abundantly clear that emergency cash grants to students are just that—cash grants to help students manage the unexpected costs of COVID-19 related disruptions.

Also missing from GAO's review was mention of the work that the Department initiated immediately in coordination with the Department of the Treasury to determine if and how those grants could be disbursed as "emergency assistance," and therefore be exempt from taxation and not included in a student's future calculation of estimated financial need. Treasury issued subsequent guidance clarifying that emergency assistance, in the form of emergency grants to students, was exempt from federal taxation.

The Department did not wish to dictate to schools how to disburse funds in general, which is why we avoided doing so in the C&A documents and other materials. However, institutions of higher education and the associations that represent them should be well aware of the federal statute [section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. § 1611)] that prohibits the distribution of public benefits to most non-citizens, such as "undocumented students, including those with Deferred Action for Childhood Arrivals (DACA) status" highlighted by GAO. There should have been no need to issue guidance telling schools that they had to follow laws not specifically waived or changed by the CARES Act. Nor could the Department have legally given institutions license to ignore the statutory prohibitions of this law as they distribute grants to students from appropriated federal funds. We believe it is best to ignore criticism for carrying out the law as written from those who wish the law were different, and we encourage GAO to do the same.

Also, since the CARES Act specifically references Title IV and the Fund for the Improvement of Post-Secondary Education, both of which point to section 484 of the Higher Education Act to define student eligibility criteria for federal grants, there should have been no question about which students would be eligible for funds. Many of the distribution details, including the specifics of how much each individual should receive when schools distributed emergency grants, were up to them, but the law has been clear for more than 20 years which students can and cannot receive such funds. Nonetheless, in response to an increasing number of

questions from the field about student eligibility, we provided additional clarification on the Department's view through subsequent guidance, including in FAQ documents. Claims that schools did not know that they could not give emergency grants to international students or undocumented students, or students not enrolled in Title IV eligible programs, are specious.

Furthermore, setting aside the application of 8 U.S.C. § 1611, the Department's guidance makes clear that the Title IV eligibility standard only applies to emergency financial aid grants to students, not to the institutional portion of HEER funds. Thus, institutions can ignore an individual's Title IV eligibility when using their institutional portion to benefit an enrolled individual outside of the emergency financial aid grant context. The Department has been clear that such guidance is not legally binding in any event. Third-hand reports from institutions through associations (and then through GAO) claiming that the guidance on the Title IV eligibility standard required them to entirely scrap their distribution plan ignores these flexibilities. However, in order to formalize the legally binding nature of the Title IV eligibility standard and to address the continued claims of confusion regarding how to determine Title IV eligibility for those not yet verified as eligible, the Department has employed the rulemaking process to produce an interim final rule on the subject that was recently submitted to the Federal Register to be officially published in the coming days.

Given the number of programs created by the CARES Act, and the complexity of those programs that resulted from vague, but different, legislative language describing each, the Department has fielded more than 10,000 questions from institutions of higher education or their representatives. We also had to move an additional 69 employees to the G5 technical assistance center to help answer technical questions, especially from new users. Further, we continue to provide FAQs and guidance in response to those questions.

In response to questions that we received from the field, the Department also issued additional guidance and FAQs on the following dates:

- March 17, 2020
- March 20, 2020
- April 1, 2020
- April 3, 2020
- April 21, 2020
- May 15, 2020
- May 19, 2020
- June 8, 2020

Had the Department tried to anticipate every question and develop guidance in anticipation of those questions in advance of announcing the availability of funds, we would probably have delayed the obligation of discretionary grant funds almost as long as the prior administration did following passage of the ARRA. We found no need to hold up the disbursement of funds to all institutions simply because some would need additional explanation of what a cash grant is, or which students are eligible for federal grants.

### Federal Student Loans

Regarding the Department's implementation of the federal student loan provisions under the CARES Act, our primary focus has been and will continue to be providing high quality service to the students we serve. The Department, including FSA, has worked tirelessly over the past two months—alongside our federal student loan servicers—to ensure that borrowers receive the benefits afforded them under the Secretary's initial directive of March 25, and later under the authority of the CARES Act, as discussed below.

At Secretary DeVos's direction, and prior to passage of the CARES Act, the Department initiated a variety of actions to support federal student loan borrowers. These efforts included:

1. waiving interest on all Department-held federal student loans;
2. placing all borrowers who were 31 days delinquent or greater into a special, non-capping administrative forbearance for 60 days; and
3. stopping all collection actions for defaulted student loan borrowers.

Many of those actions would later become major provisions of the Act.

*CARES Act Implementation Efforts*

Once the Act was signed into law, the Department acted quickly to implement its provisions. FSA issued extensive guidance, both formal and informal, to its loan servicers and Private Collection Agencies ("PCAs"). During this period, FSA has engaged with its servicers and PCAs daily—often multiple times each day—to ensure they are complying with the CARES Act and to answer any questions. FSA leadership participated in teleconferences with vendors' leadership and sent performance letters to vendors on April 13, 2020, detailing their specific progress on CARES Act implementation and reiterating expectations. Senior FSA leaders also visited the defaulted loan servicer, Maximus Federal Services ("Maximus"), in person, on May 11, 2020, to physically observe and confirm proper execution of our instructions.

It is worth noting that the significant programmatic and operational changes described above and expanded upon below were successfully implemented during a period of national emergency, when both internal Department operations and most of our loan servicing capacity were rapidly transitioning from traditional brick-and-mortar businesses to remote work environments. As the pandemic quickly unfolded in March, the Department took immediate action to assist its servicers in becoming telework ready.

*Suspending Involuntary Collections - Treasury Offset Program (TOP)*

A critical component of FSA's CARES Act implementation was to cease involuntary collection actions for borrowers with defaulted loans. To do so, FSA worked closely with its default servicer and PCAs to suspend collections and refund any money collected after March 13, 2020.

The Department strongly disagrees with GAO's characterization that the Department experienced "challenges" suspending Treasury offsets. On March 20, 2020, a week before the CARES Act became law, FSA requested that the Department of the Treasury suspend offsets on all federally held student loans and refund to borrowers all offsets as of March 13, 2020. At the time of the request, there were approximately $1.8 billion of offsets in process, representing more than 800,000 borrowers. All Treasury offset payments ceased soon thereafter.

As of June 8, 2020, FSA has transmitted requests to Treasury for refunds totaling more than $2.3 billion for more than one million unique borrowers, representing 99.8% of all outstanding Treasury offset refunds. FSA is working with Treasury to identify correct addresses for the remaining borrowers so their refunds can be mailed. Contrary to the implications of the draft report, more than 85% of the offset payments that were ultimately refunded were collected prior to passage of the CARES Act.

*Suspending Involuntary Collections - Administrative Wage Garnishment (AWG)*

FSA has also undertaken extensive efforts to stop employers from garnishing federal student loan borrowers' wages in violation of the CARES Act. It is important to note that employers outside of the Department garnish borrowers' wages, not FSA or the Department. FSA immediately notified all employers to stop garnishing wages and went further by providing multiple follow-up notices to those employers who failed to follow our initial instructions.

Specifically, on March 26, 2020, FSA instructed Maximus to begin notifying employers to stop wage garnishments for all federal student loan borrowers with federally held loans. Maximus was also directed to initiate refunds to borrowers of any garnishments received on or after March 13, 2020.

To meet the needs of the unprecedented nature of this national emergency and to comply with this directive, Maximus reengineered its processes and systems to facilitate the timely issuance of cancellation orders to approximately 115,000 employers. In compliance with FSA's directions, Maximus began making the necessary system and process changes that would allow it to automate the processes by which it notifies employers to stop wage garnishments and refund payments to affected borrowers. While completing the necessary system changes, Maximus also initiated an outbound calling campaign to those employers with the largest number of borrowers under wage garnishment orders to instruct them to cease all wage garnishments for FSA borrowers.

On April 18, 2020, Maximus began notifying employers by U.S. mail and email using the newly developed process. By April 23, 2020, less than 30 days after the Secretary ordered the Department to halt wage garnishments, Maximus had initiated notification, either by mail or telephone, to 98% of employers who had been actively garnishing wages, instructing them to stop garnishments for Department-held debt. The remaining 2% of employers either had invalid addresses in the system or borrowers who were associated with incorrect employers.

However, once Maximus issues a cancellation notice to a borrower's employer, the employer must take the final steps to implement the cancellation through its internal procedures

to stop withholding funds from the borrower's wages. Employers generally process the stop garnishment instruction using their normal payroll processes; thus, it can often take up to four weeks or even longer from the time the stop garnishment notice is transmitted to the employer until wages are no longer garnished.

Since April 23, FSA has instructed Maximus to take a variety of additional actions to reach employers who continue to improperly garnish borrowers' wages. In late April, Maximus began initiating calls to employers who continued to garnish borrowers' wages. Maximus continues to make those calls daily.

Because some employers had not immediately complied with the original stop garnishment notice, between May 9 and 11, 2020, Maximus sent a second round of stop garnishment notices to non-compliant employers. Also, between May 9 and 11, Maximus sent letters to borrowers who continued to have their wages garnished advising them that the Department had sent a stop garnishment order to their employer. This letter included a copy of the stop garnishment notice that borrowers could take to their employer to expedite the stopping of garnishment.

On May 15, 2020, Maximus sent a third round of stop garnishment notices to all employers who remained non-compliant. These notices were sent via certified mail, whereby the United States Postal Service confirms delivery.

While Maximus had contacted 98% of all employers by April 23, FSA's ongoing validation and verification efforts identified several employers who, due to discrepancies in Maximus' records, still needed to be contacted (e.g., employers who had invalid addresses in the system or borrowers who were associated with incorrect employers).

On May 16, 2020, Maximus sent stop garnishment notices to the remaining 2% of employers who had not previously received one. As of May 16, 2020, Maximus reported that it had notified, either by mail or telephone, 100% of employers who had been actively garnishing wages as of May 11, 2020, instructing them to stop garnishments for Department-held debt.

For the week ending on June 4, 2020, FSA received garnishment payments from approximately 2,500 employers, affecting only 1.5% percent of the total number of unique borrowers for which the Department has received an administrative wage garnishment payment since March 13, 2020.

Given the unprecedented volume of involuntary collections from the Treasury Offset Program and the administrative wage garnishment program (more than $2.4 billion) that required refunds during this period, on April 14, 2020, Maximus implemented an automated process that allowed FSA to expedite refunds for borrowers. This process has cut the time to complete a refund for borrowers with valid addresses on file from several weeks to about four to five business days from the date the garnishment is received at the Treasury Lockbox until the refund check can be mailed to the borrower by the Department of the Treasury.

In doing so, FSA has eliminated any backlog in refunds and is now processing refunds for borrowers with valid addresses in real time as they are received by FSA. As of June 8, 2020, FSA had issued more than $174 million in administrative wage garnishment refunds to borrowers whose wages were garnished. FSA and Maximus continue to daily monitor administrative wage garnishment payments to ensure all garnishments are stopped and refunds are issued.

*Communicating with Borrowers*

The Department also disagrees with GAO's conclusion that the Department faced challenges in providing borrowers with accurate and timely information during the initial weeks of implementation of the CARES Act. Within just 15 days of enactment, FSA successfully launched a portfolio-wide communications plan to reach out to more than 40 million student loan borrowers to inform them of the relief afforded to them under the Act.

Even prior to the passage of the CARES Act, FSA had developed a one-stop website (studentaid.gov/coronavirus) to answer borrower questions related to the COVID-19. From the time the website was launched on March 13, 2020—significantly, two weeks before enactment of the Act—this critical resource has been visited more than 3.5 million times by students, parents, schools, and key stakeholders. FSA continues to update the website on a regular basis as additional guidance becomes available.

As GAO correctly states, FSA "had to move quickly" after enactment to modify its contracts with the 11 loan servicers and other contact centers that handle student aid issues and develop messaging for the servicers to disseminate to all FSA borrowers.

To meet the aggressive notification deadlines of the Act, FSA promptly issued directives to its servicers requiring them to notify borrowers of the changes made to their accounts. These directives required all non-default loan servicers to apply a non-capping administrative forbearance to all borrower accounts and to notify borrowers when this action was completed. FSA provided the servicers with templates for these initial letter/email notifications to borrowers. Among other things, the notifications explained the actions the Department was taking to comply with the CARES Act, including placing borrowers' loans in administrative forbearance and changing their interest rates to 0%.

Similarly, FSA directed the default loan servicer to send notifications to all borrowers with defaulted loan balances and valid addresses on file. FSA also provided the default servicer with templates for these notifications. These notifications informed borrowers that all collections had been suspended. If applicable, the notices also informed borrowers that they were owed refunds.

FSA further required all servicers to update their websites and provided talking points and Questions & Answers to aid their customer service representatives' interactions with borrowers. In addition, FSA quickly developed and disseminated guidance for its various contact centers.

Unfortunately, GAO incorrectly implies that the need for servicers to update their systems and for FSA to modify servicers' contracts was due to some deficiency in service or oversight by FSA and thus resulted in borrowers receiving incorrect information. That is not true.

On the contrary, this is all how changes are made to FSA's servicing and contact center environments, even in the regular course of business. As to GAO's assertion that some borrowers initially received incorrect information, FSA moved as quickly as possible to stand-up new processes and ensure its servicers were prepared with clear and accurate information to provide to borrowers. Any quality issues identified through FSA's robust internal monitoring procedures were promptly identified and addressed.

*FSA's Oversight and Quality Assurance Efforts*

FSA had already begun developing its ability to respond effectively to the national emergency long before the CARES Act. FSA's existing oversight and quality assurance processes have allowed it to validate that federal student loan borrowers are receiving the full relief to which they were entitled under the CARES Act.

For example, in January of this year, FSA began a pilot designed to enhance servicer oversight and improve the customer experience for students and borrowers. FSA placed a team of liaisons onsite within four of its largest loan servicers, including its servicer who handles all defaulted loans. FSA has since assigned liaisons for the remaining loan servicers. These liaisons are continuously engaged with the servicers to share expectations and receive and provide feedback on COVID-19 activity.

In addition, FSA is building an enhanced quality assurance environment and internal control function within FSA. This team conducts independent assessments and validations of servicer compliance and performance through both planned and unplanned reviews. These efforts were in place prior to the COVID-19 emergency. They established a foundation that has enabled FSA to successfully implement the requirements of the CARES Act. As part of these efforts, FSA samples borrowers' accounts to ensure that servicers are properly implementing Department guidance.

FSA also conducts daily monitoring and oversight of all its servicers by, for example, monitoring their telephone interactions with borrowers. Through a "secret shopper" program, FSA staff place customer service calls to the servicers inquiring about the COVID-19 changes. If the response is inaccurate, FSA reports the error to the servicer for corrective action.

By March 23, 2020, FSA was monitoring key metrics and milestones daily. These metrics included operational reporting from each of its vendors, web analytics, and complaint, and social media tracking. These metrics cover areas such as vendor operations, customer listening, call volumes, answer times, number of calls dropped, and abandonment rates, among others.

These metrics have provided FSA leadership with insight into areas needing improvement and have informed decision-making on various operational issues. Reviewing these

data daily also allows FSA to identify larger trends, such as call volume spikes across all servicers, which can be compared to current events, such as the timing of program announcements. The reports can then be used to engage with our servicers and determine if there are general or servicer-specific issues that need to be addressed.

It is through these oversight efforts that FSA identified many of the opportunities for improvement that GAO referenced in its report. GAO fails to adequately acknowledge the improvements made to FSA's internal control environment in advance of this global pandemic.

Instead, GAO uses the findings of FSA's own internal oversight efforts to imply a slow response. These improvements and exhaustive oversight efforts are precisely what allowed FSA to react as quickly as it did, identify issues in real time, and implement improvements, all while ensuring appropriate stewardship of taxpayer resources.

*Credit Reporting*

For example, it was precisely these robust oversight and quality assurance efforts that recently allowed FSA to swiftly identify a negative change in the credit information that some federal student loan borrowers were experiencing, as displayed by a non-traditional third-party credit service company, Credit Karma.

Upon identifying this issue, FSA quickly partnered with the Consumer Financial Protection Bureau ("CFPB") to reach out to Credit Karma and to the provider of the underlying credit score displayed to the members, VantageScore. Immediately following those conversations with FSA and CFPB, VantageScore announced that it would change its treatment of deferments and forbearances.

FSA also directed the loan servicer, Great Lakes Educational Loan Services, Inc., to update its coding and send correction files to credit bureaus for all affected borrowers.

In addition, FSA proactively posted information on StudentAid.gov and used social media to inform customers that it was aware of the issue and taking steps to rectify the situation. FSA further assured customers the issue was not the result of some action FSA took and informed customers what action they could now take.

To date, FSA is not aware of any borrowers whose FICO® credit scores have been lowered because of implementation of the CARES Act mandatory administrative forbearance. (FICO® credit scores are used by the most financial institutions to underwrite credit, for example, mortgages, credit cards, and auto loans).

*Loan Rehabilitation*

Regarding loan rehabilitation, GAO stated that the Department "needed to clarify borrower communication and servicer procedures related to rehabilitating defaulted student loans during the period of student loan relief under the CARES Act and agency actions." This again

incorrectly implies that FSA somehow miscommunicated or failed to implement necessary programmatic procedures.

I note that the CARES Act changed the provisions of the loan rehabilitation program. After suspending payments in response to the CARES Act, FSA was required to implement changes to the loan rehabilitation program and communicate those changes to its customers.

*FSA Next Steps*

With much of the initial CARES Act implementation work completed, FSA will continue to monitor servicers' progress going forward to ensure they are meeting the needs of our customers.

In the meantime, FSA has also begun to turn attention to establishing a comprehensive communications' campaign to inform borrowers of their responsibilities and the resources available to assist them when they enter repayment on October 1, 2020. FSA will return borrowers to an appropriate repayment status and resume normal operations after September 30, 2020. We will use the same structured approach to implement these relief measures.

FSA has also begun reviewing its portfolio management and borrower repayment monitoring plan to ensure it is able to identify potential at-risk borrowers, closely monitor their repayment patterns, and intervene if they begin to fall behind in their repayment obligations.

Finally, I have enclosed technical comments for your consideration.

Thank you again for the opportunity to respond to the draft report and appendices. We remain happy to partner with GAO to help it have a more robust understanding of what has been done to date. If you have questions, please contact Kent Talbert at 202-403-4206.

Sincerely,

Mitchell M. Zais, Ph.D.

Enclosure

Exhibit J



**IES** **NCES** National Center for Education Statistics  ☰ MENU         Search  Go

## DIGEST of EDUCATION STATISTICS

2019 Tables and Figures                 All Years of Tables and Figures                 Most Recent Full Issue of the Digest

**Table 205.50.   Private elementary and secondary enrollment, number of schools, and average tuition, by school level, orientation, and tuition: Selected years, 1999–2000 through 2011-12**

[Standard errors appear in parentheses]

| School orientation and tuition | Kindergarten through 12th-grade enrollment[1] | | | | Total schools | Average tuition charged[2] (in current dollars) | | | | Average tuition charged[2] (in constant 2018-19 dollars[3]), total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | Elementary | Secondary | Combined | | Total | Elementary | Secondary | Combined | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| **1999-2000** | | | | | | | | | | |
| Total | 5,262,850 (131,001) | 2,920,680 (55,057) | 818,920 (24,302) | 1,523,240 (88,816) | 27,220 (239) | 4,980 (157) | 3,740 (249) | 6,080 (175) | 6,760 (261) | 7,450 (235) |
| Catholic | 2,548,710 (23,352) | 1,810,330 (18,134) | 616,200 (25,935) | 122,190 (15,613) | 8,100 (24) | 3,340 (57) | 2,600 (47) | 4,830 (92) | 6,890 (690) | 5,000 (384) |
| Other religious | 1,871,850 (86,782) | 831,060 (41,035) | 115,010 (10,981) | 925,780 (66,926) | 13,270 (237) | 4,440 (153) | 4,070 (130) | 6,400 (456) | 4,520 (280) | 6,640 (230) |
| Nonsectarian | 842,290 (61,373) | 279,290 (28,987) | 87,720 (11,774) | 475,270 (43,377) | 5,850 (76) | 11,120 (775) | 10,130 (1,921) | 14,450 (1,461) | 11,090 (801) | 16,640 (1,159) |
| **2003-04** | | | | | | | | | | |
| Total | 5,059,450 (104,287) | 2,675,960 (55,714) | 832,320 (54,051) | 1,551,170 (82,059) | 28,380 (262) | 6,600 (145) | 5,050 (120) | 8,410 (433) | 8,300 (290) | 8,980 (197) |
| Catholic | 2,320,040 (49,156) | 1,645,680 (41,231) | 584,250 (32,236) | 90,110 (14,746) | 7,920 (35) | 4,220 (96) | 3,530 (106) | 6,050 (131) | 5,800 (883) | 5,790 (131) |
| Other religious | 1,746,460 (63,090) | 714,860 (28,855) | 107,980 (33,776) | 923,630 (48,379) | 13,660 (203) | 5,840 (144) | 5,400 (161) | 9,540 (963) | 5,750 (230) | 7,950 (196) |
| Nonsectarian | 992,940 (71,519) | 315,430 (30,820) | 140,080 (27,556) | 537,440 (59,332) | 6,810 (136) | 13,420 (775) | 12,710 (468) | 17,410 (1,985) | 13,110 (480) | 18,260 (516) |
| **2007-08** | | | | | | | | | | |
| Total | 5,165,080 (104,435) | 2,462,980 (58,830) | 850,750 (38,553) | 1,851,550 (91,348) | 28,220 (328) | 8,550 (176) | 6,730 (181) | 10,550 (356) | 10,050 (372) | 10,230 (211) |
| Less than $3,500 | 1,122,300 (50,988) | 750,020 (35,402) | ‡ (†) | 342,100 (35,615) | 10,030 (344) | 2,710 (61) | 2,900 (54) | ‡ (†) | 2,350 (134) | 3,250 (73) |
| $3,500 to $5,999 | 1,790,410 (77,850) | 1,066,750 (45,444) | 143,510 (19,815) | 580,150 (53,528) | 9,110 (341) | 5,210 (42) | 5,220 (49) | 5,080 (80) | 5,210 (89) | 6,230 (50) |
| $6,000 to $9,999 | 1,155,290 (60,342) | 366,470 (37,396) | 455,840 (33,376) | 332,980 (36,574) | 4,460 (232) | 8,260 (101) | 9,230 (287) | 7,660 (105) | 8,030 (192) | 9,890 (120) |
| $10,000 to $14,999 | 503,380 (45,776) | 169,970 (26,731) | ‡ (†) | 237,850 (37,089) | 1,980 (154) | 13,640 (319) | 15,730 (696) | ‡ (†) | 12,910 (318) | 16,320 (382) |
| $15,000 or more | 593,900 (50,049) | 109,770 (19,246) | 125,660 (15,623) | 358,470 (41,060) | 2,650 (187) | 25,890 (768) | 25,360 (1,940) | 28,400 (1,327) | 25,180 (1,061) | 30,980 (918) |
| Catholic | 2,224,470 (49,385) | 1,457,960 (32,114) | 620,840 (32,581) | 145,680 (25,445) | 7,400 (34) | 6,020 (180) | 4,940 (212) | 7,830 (232) | 9,070 (964) | 7,200 (216) |
| Less than $3,500 | 619,410 (37,867) | 571,560 (34,303) | ‡ (†) | ‡ (†) | 2,810 (132) | 2,980 (55) | 3,010 (57) | ‡ (†) | ‡ (†) | 3,570 (65) |
| $3,500 to $5,999 | 826,120 (37,974) | 683,980 (32,576) | 111,770 (16,043) | ‡ (†) | 3,040 (131) | 4,900 (49) | 4,860 (57) | 5,150 (80) | ‡ (†) | 5,860 (58) |
| $6,000 to $9,999 | 607,980 (49,329) | 165,120 (28,123) | 395,900 (30,158) | ‡ (†) | 1,170 (102) | 7,680 (116) | 7,790 (240) | 7,650 (117) | ‡ (†) | 9,190 (139) |
| $10,000 to $14,999 | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) |
| $15,000 or more | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) |
| Other religious | 1,975,980 (81,216) | 709,730 (36,666) | 128,550 (15,136) | 1,137,700 (75,038) | 13,950 (282) | 7,120 (237) | 6,580 (241) | 10,490 (1,336) | 7,070 (359) | 8,510 (284) |
| Less than $3,500 | 430,010 (31,875) | 172,660 (14,154) | ‡ (†) | 252,490 (29,920) | 6,180 (291) | 2,520 (106) | 2,550 (167) | ‡ (†) | 2,510 (133) | 3,010 (127) |
| $3,500 to $5,999 | 860,370 (59,588) | 340,150 (27,800) | ‡ (†) | 489,390 (49,116) | 5,030 (255) | 5,370 (75) | 5,570 (111) | ‡ (†) | 5,270 (101) | 6,430 (90) |
| $6,000 to $9,999 | 384,850 (39,687) | 103,280 (15,561) | 57,150 (10,809) | 224,420 (33,273) | 1,640 (137) | 8,050 (155) | 8,810 (430) | 7,680 (188) | 7,790 (164) | 9,620 (186) |
| $10,000 to $14,999 | 167,770 (25,960) | ‡ (†) | ‡ (†) | ‡ (†) | 620 (83) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | 15,830 (479) |
| $15,000 or more | 132,980 (24,657) | ‡ (†) | ‡ (†) | ‡ (†) | 480 (91) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | 27,370 (1,260) |
| Nonsectarian | 964,830 (55,074) | 295,280 (25,191) | 101,370 (12,739) | 568,180 (48,321) | 6,860 (119) | 17,320 (555) | 15,940 (702) | 27,300 (1,506) | 16,250 (795) | 20,720 (664) |
| Less than $3,500 | 72,890 (10,998) | ‡ (†) | ‡ (†) | 59,910 (10,584) | 1,030 (125) | 1,410 (38) | ‡ (†) | ‡ (†) | 1,640 (467) | 1,930 (46) |
| $3,500 to $5,999 | 103,930 (18,494) | 42,610 (7,809) | ‡ (†) | ‡ (†) | 1,040 (143) | 4,290 (352) | 8,090 (687) | ‡ (†) | ‡ (†) | 7,520 (421) |
| $6,000 to $9,999 | 162,450 (24,872) | 98,070 (16,434) | ‡ (†) | ‡ (†) | 1,650 (168) | 10,960 (530) | 12,110 (792) | ‡ (†) | ‡ (†) | 13,120 (635) |
| $10,000 to $14,999 | 208,670 (29,194) | 77,450 (15,769) | ‡ (†) | 126,610 (25,784) | 1,150 (124) | 14,890 (567) | 17,750 (1,501) | ‡ (†) | 13,230 (336) | 17,810 (679) |
| $15,000 or more | 416,900 (39,779) | 71,360 (14,776) | 85,870 (13,205) | 259,670 (38,826) | 2,000 (175) | 26,500 (943) | 25,010 (1,422) | 31,220 (1,647) | 25,350 (1,304) | 31,700 (1,128) |
| **2011-12** | | | | | | | | | | |
| Total | 4,479,530 (105,651) | 2,133,810 (59,964) | 731,620 (53,646) | 1,614,100 (98,602) | 26,230 (541) | 10,740 (316) | 7,770 (211) | 13,030 (727) | 13,480 (753) | 11,960 (351) |
| Less than $3,500 | 618,710 (45,753) | 404,700 (36,956) | 42,580 (13,642) | 171,430 (23,140) | 7,950 (581) | 2,190 (112) | 2,410 (139) | 1,370 (392) | 1,870 (182) | 2,440 (125) |
| $3,500 to $5,999 | 1,351,550 (64,739) | 946,810 (56,403) | ‡ (†) | 364,520 (30,056) | 7,800 (326) | 5,300 (58) | 5,350 (67) | ‡ (†) | 5,250 (118) | 5,890 (65) |
| $6,000 to $9,999 | 1,167,820 (80,517) | 467,040 (41,842) | 275,980 (29,528) | 424,800 (62,852) | 5,070 (290) | 8,560 (124) | 9,090 (330) | 7,980 (172) | 8,360 (251) | 9,530 (138) |
| $10,000 to $14,999 | 534,560 (45,926) | 143,500 (18,976) | 208,750 (38,977) | 182,310 (36,985) | 1,840 (150) | 13,400 (207) | 15,050 (454) | 11,960 (225) | 13,750 (348) | 14,910 (231) |
| $15,000 or more | 806,880 (69,846) | 171,760 (25,237) | 164,090 (32,298) | 471,040 (65,345) | 3,570 (194) | 27,820 (951) | 24,020 (960) | 28,000 (2,487) | 29,140 (1,274) | 30,960 (1,059) |
| Catholic | 1,892,480 (59,899) | 1,244,480 (36,762) | 511,870 (43,761) | 136,130 (19,283) | 6,760 (39) | 6,890 (135) | 5,330 (128) | 9,790 (405) | 10,230 (1,230) | 7,670 (206) |
| Less than $3,500 | 307,610 (35,036) | 259,330 (33,704) | ‡ (†) | ‡ (†) | 1,730 (170) | 2,580 (123) | 2,690 (122) | ‡ (†) | ‡ (†) | 2,870 (137) |
| $3,500 to $5,999 | 781,420 (53,974) | 716,630 (50,060) | ‡ (†) | ‡ (†) | 3,070 (187) | 5,110 (68) | 5,120 (70) | ‡ (†) | ‡ (†) | 5,690 (76) |
| $6,000 to $9,999 | 516,660 (48,765) | 243,570 (35,924) | 234,460 (29,418) | ‡ (†) | 1,320 (126) | 7,830 (139) | 7,820 (210) | 9,970 (199) | ‡ (†) | 8,740 (155) |
| $10,000 to $14,999 | 221,150 (36,032) | ‡ (†) | 177,560 (34,919) | ‡ (†) | 440 (68) | 12,290 (240) | ‡ (†) | 12,020 (252) | ‡ (†) | 13,680 (267) |
| $15,000 or more | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) |
| Other religious | 1,604,900 (84,424) | 609,930 (38,479) | 116,660 (31,187) | 878,320 (77,923) | 13,040 (550) | 8,690 (397) | 7,960 (447) | 16,520 (2,288) | 8,160 (518) | 9,670 (442) |
| Less than $3,500 | 243,840 (25,511) | 136,240 (19,015) | ‡ (†) | 103,980 (13,231) | 5,190 (518) | 2,090 (156) | 1,840 (169) | ‡ (†) | 2,440 (169) | 2,330 (174) |
| $3,500 to $5,999 | 507,660 (38,017) | 214,270 (23,446) | ‡ (†) | 286,370 (28,337) | 4,280 (259) | 5,540 (101) | 5,980 (183) | ‡ (†) | 5,220 (123) | 6,170 (113) |
| $6,000 to $9,999 | 532,720 (61,948) | 144,110 (26,978) | 40,740 (7,928) | 347,870 (59,370) | 2,220 (228) | 8,460 (186) | 9,010 (269) | 8,030 (196) | 8,280 (260) | 9,420 (207) |
| $10,000 to $14,999 | 165,130 (32,486) | ‡ (†) | ‡ (†) | ‡ (†) | 630 (89) | 13,490 (359) | ‡ (†) | ‡ (†) | ‡ (†) | 15,020 (400) |
| $15,000 or more | 155,550 (33,371) | ‡ (†) | ‡ (†) | ‡ (†) | 720 (126) | 25,000 (2,243) | ‡ (†) | ‡ (†) | ‡ (†) | 27,820 (2,497) |
| Nonsectarian | 982,140 (67,032) | 279,400 (21,508) | 103,090 (19,049) | 599,650 (61,512) | 6,430 (68) | 21,510 (1,018) | 18,170 (906) | 25,180 (2,907) | 22,440 (1,503) | 23,940 (1,133) |
| Less than $3,500 | 67,260 (15,092) | ‡ (†) | ‡ (†) | 47,310 (14,470) | 1,040 (140) | 740! (†) | ‡ (†) | ‡ (†) | 490! (†) | 820! (317) |
| $3,500 to $5,999 | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | 580 (106) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) | ‡ (†) |
| $6,000 to $9,999 | 118,440 (21,597) | 79,370 (7,976) | ‡ (†) | ‡ (†) | 1,120 (128) | 13,140 (683) | 13,340 (683) | ‡ (†) | ‡ (†) | 13,500 (699) |
| $10,000 to $14,999 | 148,280 (33,642) | 59,130 (11,788) | ‡ (†) | 74,630 (16,406) | 770 (106) | 14,950 (418) | 15,960 (908) | ‡ (†) | 16,640 (465) | 16,640 (465) |
| $15,000 or more | 585,680 (66,696) | 135,780 (20,781) | 74,630 (16,406) | 395,200 (61,972) | 2,640 (165) | 29,160 (1,092) | 25,490 (1,219) | 32,120 (3,206) | 29,670 (1,368) | 32,450 (1,215) |

†Not applicable.

!Interpret data with caution. The coefficient of variation (CV) for this estimate is between 30 and 50 percent.

‡Reporting standards not met. Either there are too few cases for a reliable estimate or the coefficient of variation (CV) is 50 percent or greater.

[1] Only includes kindergarten students who attend schools that offer first or higher grade.

[2] Each school reports the highest annual tuition charged for a full-time student; this amount does not take into account discounts that individual students may receive. This amount is weighted by the number of students enrolled in each school and orientation.

[3] Constant dollars based on the Consumer Price Index (CPI), prepared by the Bureau of Labor Statistics, U.S. Department of Labor, adjusted to a school-year basis.

NOTE: Excludes schools not offering first or higher grade. Elementary schools have grade 6 or lower and no grade higher than 8. Secondary schools have no grade lower than 7. Combined schools include those that have grades lower than 7 and higher than 8, as well as those that do not classify students by grade level. Excludes prekindergarten students. Includes a small percentage of schools reporting tuition of 0; these private schools are often under contract to public school districts to provide special education services. Detail may not sum to totals because of rounding and cell suppression. Some data have been revised from previously published figures.

SOURCE: U.S. Department of Education, National Center for Education Statistics, Schools and Staffing Survey (SASS), "Private School Data File," 1999-2000, 2003-04, 2007-08, and 2011-12. (This table was prepared September 2019.)

2019 Tables and Figures                    All Years of Tables and Figures                    Most Recent Full Issue of the Digest

# IES   NCES   National Center for Education Statistics

Explore the Institute of Education Sciences

**IES**
Home
About
Publications
Data
Funding
News

**IES Centers**
NCEE
NCER
NCES
  Home
  About
  Programs
  Publications
  Data
  Data Training
  School Search
  News
  Kids' Zone
NCSER

**IES Policies and Standards**
Public Access Policy
Privacy and Security Policies
NCES Statistical Standards
Peer Review Process
ED Data Inventory

Contact Us

**U.S. Department of Education**

**Additional Resources**
ERIC
Sitemap
Organizational Chart

Exhibit K

Under the Congressional Review Act, Congress has passed, and the President has signed, a resolution of disapproval of the accountability and State plans final regulations that were published on November 29, 2016 (81 FR 86076). This guidance document is unaffected by that resolution and remains applicable.



# NON-REGULATORY GUIDANCE: FISCAL CHANGES AND EQUITABLE SERVICES REQUIREMENTS UNDER THE ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965 (ESEA), AS AMENDED BY THE EVERY STUDENT SUCCEEDS ACT (ESSA)

**November 21, 2016**

**Table of Contents**

INTRODUCTION ........................................................................................... 1

I.       TITLE I WITHIN-STATE ALLOCATIONS ..................................... 2

  A.    OVERVIEW.............................................................................. 2

  B.    STEPS TO ADJUST ED-DETERMINED TITLE I LEA ALLOCATIONS
        .................................................................................. 2

  C.    FREQUENTLY ASKED QUESTIONS ...................................10

II.      TITLE I WITHIN-DISTRICT ALLOCATIONS ...............................11

  D.    OVERVIEW............................................................................11

  E.    CHANGES TO TITLE I WITHIN-DISTRICT ALLOCATION
        REQUIREMENTS.................................................................11

  F.    FREQUENTLY ASKED QUESTIONS ...................................12

III.    TITLE II, PART A ALLOCATIONS.............................................13

  G.    OVERVIEW............................................................................13

  H.    FEDERAL AWARDS TO THE SEA .......................................13

  I.     SEA AWARDS TO LEAS ......................................................17

IV.    MAINTENANCE OF EFFORT REQUIREMENTS...........................19

  J.     OVERVIEW............................................................................19

  K.    CHANGES TO MAINTENANCE OF EFFORT REQUIREMENTS.......19

  L.    FREQUENTLY ASKED QUESTIONS ...................................21

V.      EQUITABLE SERVICES .........................................................23

  M.   OVERVIEW............................................................................23

  N.    COMMON EQUITABLE SERVICES REQUIREMENTS UNDER
        TITLES I AND VIII ..............................................................23

  O.    EQUITABLE SERVICES UNDER TITLE I............................29

P.     EQUITABLE SERVICES UNDER TITLE VIII ........................................33

**VI.    TRANSFERABILITY ..........................................................................39**

R.     OVERVIEW..................................................................................39

S.     TRANSFERS BY SEAS .............................................................39

T.     TRANSFERS BY LEAS ............................................................40

U.     FREQUENTLY ASKED QUESTIONS ....................................41

# INTRODUCTION

On December 10, 2015, President Obama signed into law the Every Student Succeeds Act (ESSA), which reauthorized the Elementary and Secondary Education Act of 1965 (ESEA). The ESSA makes a number of changes to certain fiscal requirements that existed in the ESEA, as amended by the No Child Left Behind Act of 2001 (NCLB), including changes to: Title I, Part A (hereafter Title I) within-State allocations; Title I within-district allocations; Title II, Part A allocations; maintenance of effort requirements; and transferability requirements. The ESSA also makes a number of changes to the equitable services requirements for private school students in Title I and Title VIII of the ESEA. This guidance document discusses these specific changes and is designed to support State educational agencies (SEAs), local educational agencies (LEAs), and schools in implementing the ESEA, as amended by the ESSA.[1] New or revised requirements are presented in a shaded box.

The changes made by the ESSA to the State formula-grant programs discussed in this guidance take effect beginning in the 2017−2018 school year. The Department is issuing guidance with respect to these specific changes now to provide SEAs, LEAs, and schools with timely information to support SEAs, LEAs, and schools in meeting their obligations under the ESEA for the 2017−2018 school year.

The U.S. Department of Education (Department) has determined that this guidance is significant guidance under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). See www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-07.pdf. Significant guidance is non-binding and does not create or impose new legal requirements.

If you are interested in commenting on this guidance, please email us your comments at OESE.guidance@ed.gov or write to us at the following address: Office of Elementary and Secondary Education, 400 Maryland Avenue, SW, Washington, DC 20202. For further information about the Department's guidance processes, please visit www2.ed.gov/policy/gen/guid/significant-guidance.html.

---

[1] Unless otherwise noted, all references to the ESEA in this document refer to the ESEA, as amended by the ESSA.

# I. TITLE I WITHIN-STATE ALLOCATIONS

## A. OVERVIEW

The ESSA made several changes to the ESEA regarding how an SEA adjusts the Department-determined Title I LEA allocations to account for differences between the Department's list of LEAs and the universe of LEAs within a State and to make State-level reservations. The ESEA now includes specific language requiring an SEA to calculate a hold-harmless amount for each formula that reflects the increased enrollment for a newly opened or significantly expanded charter school LEA, and contains new and revised State-level reservations that affect the final Title I LEA allocations calculated by an SEA. These changes take effect beginning with fiscal year (FY) 2017 Title I funds that the Department expects to award on July 1, 2017, for use primarily in the 2017–2018 school year.

The following describes, in chronological order, the steps for an SEA to follow to adjust the Department-determined Title I LEA allocations in a manner that is consistent with the ESEA. New requirements are presented in a shaded box. In general, for requirements that existed under the ESEA, as amended by NCLB, and continue under the ESEA, as amended by the ESSA, a link to previously-issued guidance or regulations is provided.

## B. STEPS TO ADJUST DEPARTMENT-DETERMINED TITLE I LEA ALLOCATIONS

### Step 1: Adjust formula counts[2]

If the LEAs in a State differ from the Department's list of LEAs (*e.g.*, due to the existence of charter school LEAs), an SEA must estimate the number of formula children and determine eligibility for each LEA not on the Department's list by following the procedures on pages 4-13 in the Department's 2003 within-State allocation guidance [available at: http://www.ed.gov/programs/titleiparta/seaguidanceforadjustingallocations.doc]. To carry out this process for a newly opened or significantly expanded charter school LEA, including projecting the formula count and enrollment, see Questions 48-52 in the Department's 2000 charter school allocation guidance [available at: http://www2.ed.gov/policy/elsec/guid/cschools/cguidedec2000.pdf ].

If a State's list of LEAs matches the Department's list of LEAs, the SEA begins with Step 3 of this guidance because Steps 1 and 2 only apply to States whose universe of LEAs includes one or more LEAs that are not on the Department's list. (In a situation in which the State list of LEAs and the Department's list of LEAs are identical, there are not any LEAs in addition to those on the Department's list for which an SEA would need to derive a formula count or apply the hold-harmless requirements, which are the activities covered in Steps 1 and 2.)

---

[2] If an SEA is unable to track children counted under the Title I formulas from a sending LEA to a receiving LEA, the SEA follows the special procedures on pages 19-24 in ED's 2003 within-State allocation guidance [available at: http://www.ed.gov/programs/titleiparta/seaguidanceforadjustingallocations.doc] to implement Step 1 and Step 2a.

**Step 2a: Adjust initial allocations based on adjusted formula counts**

An SEA must calculate Basic Grants, Concentration Grants, Targeted Grants, and Education Finance Incentive Grants for each eligible LEA that is not on the Department's list by using the adjusted formula count from Step 1 and adjusting the Department-determined allocations of LEAs on the Department's list.  To do so, the SEA follows the procedures on pages 14-18 in the Department's 2003 within-State allocation guidance [available at: http://www.ed.gov/programs/titleiparta/seaguidanceforadjustingallocations.doc].

**Step 2b: Apply the variable hold-harmless requirements of each formula**

An SEA must apply the variable hold-harmless requirements to the LEA allocations (including charter school LEAs) calculated in Step 2a for Basic Grants, Concentration Grants, Targeted Grants, and Education Finance Incentive Grants, as required by 34 CFR 200.73.

Description of the variable hold-harmless requirements:

- The hold-harmless percentage that an SEA applies to an LEA varies based on the percentage of formula children who reside within the LEA.

- Under the Basic Grants, Targeted Grants, and Education Finance Incentive Grants formulas, the hold-harmless guarantee only applies to an LEA that meets the eligibility criteria of the respective formula as determined in Steps 1 and 2a.

- Under the Concentration Grants formula, the hold-harmless guarantee applies to an LEA for four years after it last met the formula eligibility criteria.

- The following table summarizes the variable hold-harmless (left column) and how the hold-harmless applies under each formula (right column):

| Percentage of LEA formula children ages 5 to 17, inclusive, as a percentage of its total population of children ages 5 to 17, inclusive, and variable hold-harmless percentage | Hold-harmless applies on a formula-by-formula basis |
|---|---|
| (i)    30 percent or more: 95 percent<br><br>(ii)    15 percent or more but less than 30 percent: 90 percent<br><br>(iii)    Less than 15 percent: 85 percent | • To apply under Basic Grants, Targeted Grants, or Education Finance Incentive Grants, respectively, an LEA must meet the eligibility criteria for the respective formula.<br><br>• To apply under Concentration Grants, an LEA must meet the eligibility criteria in the current year or have met the criteria at least once in the four years prior to the current year. |

An SEA must apply the hold-harmless requirements using ratable reductions on a formula-by-formula basis.  If the amount of funds available under one of the formulas is enough to satisfy the guaranteed hold-harmless amount for each LEA, the SEA must ratably reduce LEAs that are above their guaranteed hold-harmless amounts in order to ensure that LEAs that are below their guaranteed hold-harmless amounts are raised to their hold-harmless levels and must repeat this process until no LEA in the State falls below its guaranteed hold-harmless amount.  If the

amount of funds available under one of the formulas is not enough to satisfy the guaranteed hold-harmless amount for each LEA, an SEA must ratably reduce all LEAs from their hold-harmless amounts to the amount of funds available under the formula.

---

### New ESEA Requirement

**Special Hold-Harmless Provisions for Newly Opened and Significantly Expanded Charter School LEAs**

For purposes of implementing the hold-harmless protections in sections 1122(c) and 1125A(f)(3) of the ESEA for a newly opened or significantly expanded charter school LEA, an SEA must calculate a hold-harmless base for the prior year that reflects the new or significantly expanded enrollment of the charter school LEA.

*(ESEA section 4306(c).)*

---

To ensure that each charter school LEA receives the applicable hold-harmless protection under Step 2b above, an SEA must generate a hold-harmless base for a newly opened or significantly expanded charter school LEA that reflects the new or significantly expanded enrollment of the charter school LEA. This provision is necessary to give effect to ESEA section 4306(a) that requires an SEA to take such measures as are necessary to ensure that every charter school LEA that newly opens or significantly expands its enrollment receives the Federal funding for which the charter school LEA is eligible, notwithstanding the fact that the identity and characteristics of the students enrolling in the charter school LEA are not fully and completely determined until the charter school LEA actually opens or significantly expands. Section 4306(a) ensures that each newly opened or significantly expanded charter school LEA receives an allocation that reflects its current student count even though allocations may be calculated before the identity and characteristics of the students enrolling in the charter school LEA are fully determined.

Because newly opened and significantly expanded charter school LEAs are treated differently under section 4306(a) from other LEAs, including other charter school LEAs, it is important to ensure that the operation of the hold-harmless protections in ESEA sections 1122(c) and 1125A(f)(3) do not unduly negate increases in Title I allocations based on the increased student population in the charter school LEAs. Accordingly, an SEA must generate a "prior year" base amount for each newly opened and significantly expanded charter school LEA in order to apply the 85, 90, or 95 hold-harmless percentage described above. With respect to newly opened charter school LEAs, this means creating a hold-harmless base where none exists. With respect to a significantly expanded charter school LEA, which is defined consistent with 34 CFR 76.787[3], this means adjusting the prior year's hold-harmless base to create a new base that reflects the increase in the formula count for the current year.

---

[3] Consistent with 34 CFR 76.787, "[s]ignificant expansion of enrollment means a substantial increase in the number of students attending a charter school due to a significant event that is unlikely to occur on a regular basis, such as the addition of one or more grades or educational programs in major curriculum areas. The term also includes any other expansion of enrollment that the SEA determines to be significant."

**Newly opened charter school LEA**

To determine the "prior year" base amount on which to apply the hold-harmless for a newly opened charter school LEA, an SEA would take the following sub-steps (for ease of explanation, the example assumes the SEA is making allocations for the 2017−2018 school year (SY)):

**Sub-Step A**:  Refer to the newly opened charter school LEA's initial allocation for SY 2017−2018 under each formula before application of the hold-harmless protections in ESEA sections 1122(c) and 1125A(f)(3) that the SEA determined in Step 2a of this guidance.  (Note that, if an SEA calculates these allocations for a new charter school LEA based on projected data used to derive a formula count in Step 1, the SEA must revise the allocations once actual data are available for the new charter school LEA.)  This amount will serve as the "prior year" (i.e., SY 2016−2017) base amount for the purpose of determining the guaranteed hold-harmless amount. In other words, the newly opened charter school LEA's "prior year" hold-harmless base under each formula for calculating the guaranteed hold-harmless amount is the same as the charter school LEA's initial allocation under each formula for SY 2017−2018.

**Sub-Step B**:  Based on the charter school LEA's derived formula count for SY 2017−2018 determined in Step 1 compared to its population of children ages 5 through 17 for SY 2017−2018, determine whether the newly opened charter school LEA's hold-harmless percentage will be 85, 90, or 95 percent of its "prior year" base amount.  (See hold-harmless table earlier in Step 2b that shows the variable hold-harmless percentages based on an LEA's percentage of formula children.)

**Sub-Step C**:  Multiply the initial allocation discussed in Sub-Step A for each formula by the appropriate hold-harmless percentage from Step 2b to determine the newly opened charter school LEA's hold-harmless amount.

This process will ensure that a newly opened charter school LEA is not disadvantaged by the fact that it had no Title I allocation in the prior year against which to apply the hold-harmless percentage.  The following chart illustrates how this process would work in the case of a newly opened charter school LEA that has a percentage of formula children that is greater than 30 percent:

| | (1)<br><br>SY 2016−2017 allocation | (2)<br><br>Initial SY 2017−2018 allocation determined in Step 2a* | (3)<br><br>Guaranteed hold-harmless amount (Col. (2) x 95% |
|---|---|---|---|
| Basic grant allocation | 0 | $92,534 | $87,907 |
| Concentration grant allocation | 0 | $21,900 | $20,805 |
| Targeted grant allocation | 0 | $48,798 | $46,358 |
| EFIG allocation | 0 | $42,620 | $40,489 |
|    Total Title I allocation | 0 | $205,852 | $195,559 |
| Current year formula count (Step 1 of this guidance) | | 168 | |
| SY 2017−2018 ages  5-17 population | | 432 | |
| Percentage of formula children | | 39% | |
| Hold-harmless percentage | | 95% | |

\* The amount shown in column 2 is also the proxy "prior year" hold-harmless base to be used for determining the guaranteed hold-harmless amount for ESEA sections 1122(c) and 1125A(f)(3) purposes.

An SEA must ensure that the 2017−2018 Title I allocation under each formula for a newly opened charter school LEA does not fall below the Column 3 amount.

**Significantly expanded charter school LEA**

To determine the "prior year" hold-harmless base for a significantly expanded charter school LEA[4], an SEA would take the following sub-steps (for ease of explanation, the example assumes the SEA is making allocations for SY 2017−2018):

**Sub-Step A**:  Compare the SY 2017−2018 derived formula count determined in Step 1 with the LEA's SY 2016−2017 derived formula count and calculate the percentage by which the SY 2017−2018 projected formula count has increased over the SY 2016−2017 actual formula count. (Note that if an SEA derived a formula count in Step 1 based on projected data, the SEA must revise the derived formula count once actual data are available for the significantly expanded charter school LEA.)

**Sub-Step B**:  Multiply the SY 2016−2017 allocation the charter school LEA received under each formula by the percentage increase calculated in Sub-Step A to determine the significantly expanded charter school LEA's adjusted "prior year" (SY 2016−2017) hold-harmless base amount.

**Sub-Step C**:  Based on the significantly expanded charter school LEA's derived formula count for SY 2017−2018 from Step 1 compared to its enrollment ages 5 through 17 for SY 2017−2018, determine whether the significantly expanded charter school LEA's hold-harmless percentage will be 85, 90, or 95 percent of its "prior year" base amount.  (See hold-harmless table earlier in Step 2b that shows the variable hold-harmless percentages based on an LEA's percentage of formula children.)

**Sub-Step D**:  Multiply the amount determined in Sub-Step B for each formula by the appropriate hold-harmless percentage determined in Sub-Step C to determine the significantly expanded charter school LEA's guaranteed hold-harmless amount.

The following chart illustrates how this process would work in the case of a significantly expanded charter school LEA that has a percentage of formula children that is at least 15 percent and less than 30 percent:

---

[4] If a charter school LEA has significantly expanded, but its number of formula children has decreased, the charter school's hold-harmless amounts would be its actual allocations from the prior year.

| | | (1)<br><br>SY 2016−2017 allocations | (2)<br><br>Percentage increase due to expanded enrollment in SY 2017−2018 (Line 9) | (3)<br><br>Adjustment to SY 2016−2017 base amount due to increase in formula count (Col. (1) x (2) | (4)<br><br>Adjusted SY 2016−2017 base amount to reflect increase in formula count (Col. (1) + (3)) | (5)<br><br>Hold-harmless percentage based on poverty percentage (Line 11) | (6)<br><br>Guaranteed hold-harmless amount for SY 2017−2018 allocation purposes (Col. (4) x (5)) |
|---|---|---|---|---|---|---|---|
| 1 | SY 2016−2017 actual formula count | 277 | | | | | |
| 2 | SY 2016−2017 Basic grant allocation | $119,541 | 52% | $62,161 | $181,702 | 90% | $163,532 |
| 3 | SY 2016−2017 Concentration grant allocation | $23,052 | 52% | $11,987 | $35,039 | 90% | $31,535 |
| 4 | SY 2016−2017 Targeted grant allocation | $62,938 | 52% | $32,728 | $95,666 | 90% | $86,099 |
| 5 | SY 2016−2017 EFIG allocation | $54,923 | 52% | $28,560 | $83,483 | 90% | $75,135 |
| 6 | Total Title I allocation | $260,454 | | | $395,890 | | $356,301 |
| | | | | | | | |
| 7 | SY 2017−2018 formula count (Step 1 of this guidance) | 420 | | | | | |
| 8 | Increase over SY 2016−2017 count (line 7 – Line 1) | 143 | | | | | |
| 9 | Percentage increase (Line 8 ÷ Line 1) | 52% | | | | | |
| 10 | SY 2017−2018 ages 5-17 population | 1,432 | | | | | |
| 11 | Poverty percentage (Line 7 ÷ Line 10) | 29% | | | | | |

Please see the *Dear Title I Director* guidance on applying the hold-harmless to newly opened or significantly expanded charter school LEAs that ED issued in 2013 for additional details [available at: http://www2.ed.gov/programs/titleiparta/charterschlallocationreq.pdf].

**Step 3: Determine LEA allocations prior to State reservations**

An SEA must sum each LEA's allocations for Basic Grants, Concentration Grants, Targeted Grants, and Education Finance Incentive Grants calculated in Step 2b to determine the LEA's Title I allocation prior to the State-level reservations described in Step 4.

**Step 4: State reservations**

**Step 4a: Reservation for school improvement**

---

### *New ESEA Requirement*

#### *FY 2017 School Improvement Reservation*

An SEA must ratably reduce the allocations of all LEAs calculated in Step 3, including newly opened and significantly expanded charter school LEAs, to reserve the greater of:

- Seven percent of the SEA's FY 2017 Title I award; or
- The sum of the total amount that the SEA reserved for school improvement under section 1003(a) from its FY 2016 Title I award (generally, 4 percent of that award) and the amount of the SEA's FY 2016 School Improvement Grants (SIG) allocation under section 1003(g).

        *(ESEA section 1003(a).)*

#### *Special Rule for FY 2018 and Subsequent Years' School Improvement Reservation*

An SEA must ratably reduce the allocations of all LEAs calculated in Step 3 to reserve the greater of the amounts described in the two bullets under FY 2017 <u>and</u> must also follow a special rule.

> *Special rule for FY 2018 and subsequent years' allocations*
> *In reserving funds under section 1003(a) from FY 2018 and subsequent years' allocations, an SEA may not reduce an LEA's Title I allocation below the prior year's amount. (ESEA section 1003(h).) It is possible that in some years this special rule will prevent an SEA from reserving the "full amount" for school improvement. (The term "full amount" refers to the figure described under the heading, "FY 2018 and Subsequent Years' School Improvement Reservation.")*

Questions 3 and 5 in the 2013 *Dear Title I Director* guidance [available at: http://www2.ed.gov/programs/titleiparta/charterschlallocationreq.pdf] provide information on how to implement the special rule for newly opened and significantly expanded charter school LEAs.

---

<u>*Step 4a Example*</u>

The following example shows how two hypothetical SEAs determine the section 1003(a) reservation amounts. (The example assumes that the special rule described above does not prevent an SEA from reserving the full amount for school improvement required by section 1003(a).) For SEA 1, seven percent of its current year Title I allocation (Column 7) is greater than the sum of its FY 2016 1003(a) reservation and FY 2016 SIG allocation (Column 5). Therefore, SEA 1 reserves the Column 7 figure, as shown in Column 8. Conversely, SEA 2's

sum of its FY 2016 1003(a) reservation and FY 2016 SIG allocation exceeds seven percent of its current year Title I allocation.  Therefore, SEA 2 reserves the Column 5 figure, as shown in Column 8.

| Col. 1 | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 | Col. 7 | Col. 8 |
|---|---|---|---|---|---|---|---|
| SEA | FY16 Title I-A allocation | FY16 1003(a) reservation *(4 percent of Col. 2)* | FY16 SIG allocation | Sum of FY16 1003(a) and FY16 SIG *(Col. 3 + Col. 4)* | Current Year Title I-A allocation | Seven Percent of Current Year Title I-A allocation | Current Year 1003(a) Reservation *(Greater of Col. 5 or Col. 7)* |
| SEA 1 | 200,000,000 | 8,000,000 | 5,000,000 | 13,000,000 | 210,000,000 | 14,700,000 | 14,700,000 |
| SEA 2 | 175,000,000 | 7,000,000 | 4,500,000 | 11,500,000 | 164,000,000 | 11,480,000 | 11,500,000 |

## Step 4b: Reservation for State administration

An SEA follows the description of this step on pages 32-33 in the Department's 2003 within-State allocation guidance [available at: http://www.ed.gov/programs/titleiparta/seaguidanceforadjustingallocations.doc].

To complete Step 4b, an SEA has two options:

- Proportionately reduce each LEA's total allocation even if an LEA receives less than 85, 90, or 95 percent of the total Title I, Part A amount allocated to it in the prior year (hold-harmless amount).

- Proportionately reduce the allocation of each LEA in the State (including the allocation for Part D, Subpart 2) that is above the LEA's guaranteed hold-harmless amount to bring up the allocation of LEAs below their hold-harmless amount.  Repeat this process as necessary until no LEA in the State falls below its guaranteed hold-harmless amount.

## Step 4c: Optional reservation for direct student services

> ### *New ESEA Optional Reservation for Direct Student Services*[5]
>
> After meaningful consultation with geographically diverse LEAs, an SEA may, but is not required to, reserve a maximum of three percent of its Title I allocation for direct student services (DSS).
>
> *(ESEA section 1003A(a)(1).)*

To reserve funds for DSS, an SEA must ratably reduce the allocations of all LEAs, including charter school LEAs.

---

[5] The Department expects to provide information in another forum (e.g., other guidance) about DSS.  This guidance focuses on how an SEA would make the reservation.

From the DSS reservation, an SEA may use up to one percent to administer DSS. (ESEA section 1003A(a)(2).) For example, if an SEA's DSS reservation is $1,000,000, it may use no more than $10,000 of the $1,000,000 to administer DSS (i.e., one percent of $1,000,000).

## C.    FREQUENTLY ASKED QUESTIONS

**C-1.    In implementing the special rule described in Step 4a in <u>FY 2018 and subsequent years</u>, what is an LEA's "prior year amount"?**

An SEA has options in what it considers as an LEA's prior year amount, as long as the SEA applies the same option to all LEAs during a given year. The prior year amount may be an LEA's allocation from the previous year at the end of Steps 3, 4a, 4b (if the SEA did not reserve funds for DSS in the prior year), or 4c (if the SEA reserved funds for DSS in the prior year). If, for FY 2018 and subsequent years, the SEA is unable to reserve the full amount under one of the options because of the special rule discussed in Step 4a, the SEA must choose an option that results in reserving the full amount unless none of the options result in reserving the full amount; if it is not possible under any option to reserve the full amount, the SEA must select the option that produces the reservation amount that is closest to the full amount.

**C-2.    If an SEA received the Department's approval under NCLB to use an alternative method to redistribute allocations to LEAs serving less than 20,000 total residents (small LEAs), may the SEA continue to do so?**

Yes, as long as the SEA continues to use the method approved by the Department. See pages 26-32 in the Department's 2003 within-State allocation guidance [available at: http://www.ed.gov/programs/titleiparta/seaguidanceforadjustingallocations.doc].

**C-3.    Does the ESEA continue the authority in NCLB for covered SEAs to use an alternative method to allocate Concentration Grant funds?**

Yes. Under section 1124A(b) of the ESEA, an SEA in a covered State (Alaska, Delaware, New Hampshire, Vermont, and Wyoming) may follow Steps 1-2 above for Concentration Grants or the steps listed in the second bullet under #3 on pages 31-32 in the Department's 2003 within-State allocation guidance [available at: http://www.ed.gov/programs/titleiparta/seaguidanceforadjustingallocations.doc].

**C-4.    May an SEA reserve funds for the State academic achievement awards program?**

No. Under the ESEA, as amended by NCLB, if an SEA's Title I allocation increased over the prior year's amount, the SEA had the option to reserve up to five percent of the increase to support the State academic achievement awards program. The ESEA, as amended by the ESSA, no longer permits this reservation.

## II. TITLE I WITHIN-DISTRICT ALLOCATIONS

### D.    OVERVIEW

An LEA may only use Title I funds in an eligible school attendance area (ESEA section 1113(a)(1)), which is a school attendance area in which the percentage of children from low-income families is —

- At least as high as the percentage of children from low-income families served by the LEA as a whole;
- At least as high as the percentage of children from low-income families in the grade span in which the school is located; or
- At least 35 percent.

  *(ESEA section 1113(a)(2).)*

Except as provided below, if Title I funds are insufficient to serve all eligible school attendance areas, an LEA must —

- Annually rank, without regard to grade spans, eligible school attendance areas in which the percentage of children from low-income families exceeds 75 percent (the "75 percent poverty threshold") from highest to lowest according to poverty percentage; and
- Serve the eligible school attendance areas in rank order.

  *(ESEA section 1113(a)(3).)*

### E.    CHANGES TO TITLE I WITHIN-DISTRICT ALLOCATION REQUIREMENTS

The ESSA added two requirements to the Title I within-district allocation requirements.

### E-1.    Ranking high schools

> ### *New ESEA Exception to the Ranking Requirement*
>
> An LEA may lower the poverty threshold to 50 percent for high schools served by the LEA.
>
>    *(ESEA section 1113(a)(3)(B).)*

An LEA must rank its schools above the 75 percent poverty threshold without regard to grade span and serve those schools in rank order of poverty before it serves any schools at or below the 75 percent poverty threshold.  Under the new ESEA exception, an LEA may, but is not required to, continue to serve (in rank order of poverty) high schools with poverty percentages between 50 percent and 75 percent before it either serves other schools with a poverty percentage of 75 percent or below or begins to rank and serve schools by grade span.  In other words, an LEA may serve high schools with 50 percent or more poverty before it serves any elementary or middle schools with a poverty percentage at or below 75 percent.

**E-2.   Eligibility of secondary schools using feeder pattern**

> ### New ESEA Provides Explicit Authority to Use Feeder Patterns to Determine the Poverty Percentages of Secondary Schools
>
> - For determining the number of children from low-income families in a secondary school, an LEA may estimate that number by applying the average percentage of students from low-income families in the elementary school attendance areas that feed into the secondary school to the number of students enrolled in the secondary school.
>
> - Before an LEA may use feeder patterns to determine the poverty percentage of secondary schools —
>
>   - The LEA must notify its secondary schools to inform them of the option.
>
>   - A majority of its secondary schools must approve the use of feeder patterns.
>
> *(ESEA sections 1113(a)(5)(B) and (C).)*

A "secondary school" means a "nonprofit institutional day or residential school (including a public secondary charter school) that provides secondary education, as determined under State law, except that the term does not include any education beyond grade 12." Depending on State law, a secondary school might include middle schools as well as high schools. (ESEA section 8101(45).)

For examples of how to use feeder patterns to establish a poverty percentage for secondary schools, see Question 10 on pages 12-15 in the Department's 2003 Title I within-district allocation guidance [available at http://www.ed.gov/programs/titleiparta/wdag.doc].

## F.   FREQUENTLY ASKED QUESTIONS

**F-1.   If an LEA participates in the National School Lunch Program's (NSLP) Community Eligibility Provision (CEP), is there information available on how the LEA may use NSLP data, including CEP data, to allocate Title I funds to schools?**

Yes. The within-district allocation section of the Department's 2015 Title I CEP guidance [available at http://www2.ed.gov/programs/titleiparta/15-0011.doc] provides options for how an LEA may use CEP data to allocate Title I funds to schools.

**F-2.   Have the requirements changed for allocating Title I funds to provide equitable services for eligible private school students and their teachers and families?**

Yes. See questions O-1 through O-4 in Section V of this guidance: Equitable Services.

## III.   TITLE II, PART A ALLOCATIONS

### G.     OVERVIEW

The ESSA modified the formulas by which the Department allocates Title II, Part A funds to SEAs and by which SEAs allocate those funds to LEAs.  The following sections provide details on the formula changes.

*This guidance, coupled with the Non-Regulatory Guidance for Title II, Part A:  Building Systems of Support for Excellent Teaching and Leading available at: http://www2.ed.gov/policy/elsec/leg/essa/essatitleiipartaguidance.pdf, supersedes the Department's previous guidance on Title II, Part A of the ESEA as amended by NCLB, entitled Improving Teacher Quality State Grants, issued on October 5, 2006.*

### H.     FEDERAL AWARDS TO AN SEA

All SEAs, the Bureau of Indian Education (BIE), and the Outlying Areas are eligible to receive funds provided under Title II, Part A.  (ESEA section 2101(a).)

<div style="border:1px solid">

**<u>New ESEA Changes to the Department's Allocations to SEAs</u>**

- The hold-harmless is phased out over a series of years starting with the FY 2017 allocations.

- The share of funds allocated based on ages 5 to 17 in poverty relative to the share of funds allocated based on ages 5 to 17 population increases, starting in FY 2018.

- State agencies for higher education (SAHEs) are no longer eligible to receive an allocation from the Department.

- SEAs are allowed to reserve additional funds for certain State activities for principals or other school leaders.

*(ESEA section 2101(b)-(c).)*

</div>

### H-1.   How the Department determines the amount of each State's Title II, Part A allocation

**Step 1:  Determine Allocations to the Outlying Areas and the BIE**

Prior to calculating State allocations, the Secretary reserves one-half of one percent of the annual Title II, Part A appropriation for allocations to the Outlying Areas, and one-half of one percent for an allocation to the BIE.  (ESEA section 2101(a)(1) and (2).)

The Secretary also may reserve up to one-half of one percent of the annual appropriation for evaluation activities.  (ESEA section 8601.)

**Step 2:  Determine allocations to States**

Under the ESEA, as amended by NCLB, the Department first allotted to each SEA the amount the SEA received for FY 2001 under the former Eisenhower Professional Development and Class-Size Reduction programs.  This was the "hold-harmless" amount.  This provision was in effect through FY 2016.  For the purposes of allocating funds to States under the ESEA, as amended by the ESSA, the Department will refer to this amount as the "base hold-harmless amount."

### Title II, Part A, Base Hold-Harmless Amount

| State | Base Hold-Harmless Amount | State | Base Hold-Harmless Amount |
|---|---|---|---|
| Alabama | 33,589,576 | Nevada | 10,014,069 |
| Alaska | 10,014,069 | New Hampshire | 10,014,069 |
| Arizona | 31,644,323 | New Jersey | 48,824,660 |
| Arkansas | 20,304,205 | New Mexico | 16,779,448 |
| California | 234,202,657 | New York | 179,135,506 |
| Colorado | 23,239,119 | North Carolina | 44,562,470 |
| Connecticut | 20,267,446 | North Dakota | 10,014,069 |
| Delaware | 10,014,069 | Ohio | 80,186,546 |
| District of Columbia | 10,014,069 | Oklahoma | 24,217,943 |
| Florida | 93,726,505 | Oregon | 20,368,786 |
| Georgia | 53,915,360 | Pennsylvania | 88,362,883 |
| Hawaii | 10,014,069 | Puerto Rico | 66,751,522 |
| Idaho | 10,014,069 | Rhode Island | 10,014,069 |
| Illinois | 87,593,173 | South Carolina | 25,971,288 |
| Indiana | 35,603,460 | South Dakota | 10,014,069 |
| Iowa | 16,625,275 | Tennessee | 35,360,499 |
| Kansas | 16,940,650 | Texas | 170,820,831 |
| Kentucky | 33,528,904 | Utah | 13,477,195 |
| Louisiana | 49,335,846 | Vermont | 10,014,069 |
| Maine | 10,014,069 | Virginia | 37,642,753 |
| Maryland | 31,112,729 | Washington | 34,547,334 |
| Massachusetts | 39,506,167 | West Virginia | 18,809,357 |
| Michigan | 86,285,253 | Wisconsin | 35,323,167 |
| Minnesota | 29,197,574 | Wyoming | 10,014,069 |
| Mississippi | 31,957,903 | American Samoa | 850,878 |
| Missouri | 36,567,509 | Guam | 1,985,135 |
| Montana | 10,014,069 | Northern Marianas | 484,843 |
| Nebraska | 10,291,012 | Virgin Islands | 1,635,517 |

> ### *Starting in FY 2017: the Department Must Apply the New Hold-Harmless Requirement*
>
> Starting in FY 2017, the base hold-harmless amount will be reduced each year by 14.29 percent. For the next few years, the amount of the State hold-harmless as a percentage of its base hold-harmless (the amount received for FY 2001 under the former Eisenhower Professional Development and Class-Size Reduction programs) is as follows:
>
> | Fiscal Year | Percentage of FY 2001 base hold-harmless allocated to State[6] |
> | --- | --- |
> | **FY 2017** | 85.71% |
> | **FY 2018** | 71.42% |
> | **FY 2019** | 57.13% |
> | **FY 2020** | 42.84% |
>
> *(ESEA section 2101(b)(1)(C).)*

For FY 2017, the amount of Title II, Part A funds that the Department allocates to each State after calculating the adjusted base hold-harmless amount for the State (excess funds) is determined by the following percentages, which are the same percentages in the ESEA, as amended by NCLB:

- 35 percent according to each State's population of children ages 5 through 17 relative to the number of these children in all States; and
- 65 percent according to each State's relative numbers of individuals ages 5 through 17 from families with incomes below the poverty line relative to the number of these children in all States.

The Department uses the most current data from the U.S. Census Bureau to make this calculation.

---

[6] Note that in any fiscal year for which the Title II, Part A appropriation is too small to permit allocations that equal at least each SEA's hold-harmless amounts, the Department will ratably reduce each SEA's allocation to the amount available for that fiscal year.

***Starting in FY 2018: the Department Must Apply New Percentages***

Beginning in FY 2018, new percentages are phased in.  The share of excess funds allocated on the basis of a State's relative number of children ages 5 through 17 from families with incomes below the poverty line increases and the share allocated on the basis of a State's relative number of children ages 5 through 17 decreases, as follows:

| Fiscal Year | Percentage based on population ages 5 through 17 | Percentage based on population ages 5 through 17 in poverty |
|---|---:|---:|
| FY 2017 | 35 | 65 |
| FY 2018 | 30 | 70 |
| FY 2019 | 25 | 75 |
| FY 2020 and subsequent years | 20 | 80 |

*(ESEA section 2102(b)(2)(B).)*

Each SEA must receive at least one-half of one percent of the excess amount.  (ESEA section 2101(b)(2)(B).)

## H-2.    SEA reservations from the State's Title II, Part A allocation

An SEA must first reserve at least 95 percent of the State's Title II, Part A award for subgrants to LEAs.  It may reserve the remainder of the State's Title II, Part A allocation for allowable State activities. From the remainder, no more than 1 percent of the total State allocation may be used for State administrative costs of carrying out the Title II, Part A program.  (ESEA section 2101(c)(2).)

In addition to the funds it reserves for State activities as calculated in the paragraph above, an SEA may also reserve up to 3 percent of the amount it initially reserved for LEA subgrants, and use these additional funds for allowable State activities for principals or other school leaders (for more information on the different activities states can support with this reservation, please refer to our previous guidance on Title II).  Thus, for an SEA that elects to reserve the *maximum* amount of Title II, Part A funds for State activities, the split of the total State allocation between LEA-level and SEA-level funds would be as follows:

- 92.15 percent for LEA subgrants; and

- 7.85 percent for State activities, which includes at least 2.85 percent (3 percent of 95 percent) for State activities for principals or other school leaders.  (ESEA section 2101(c)(1) through (c)(3).)

**Example:  A State receiving $10,000,000 that reserved the maximum allowable for State activities**

| State allocation:  $10,000,000 | | | |
|---|---|---|---|
| | **State activities funds** | | **LEA subgrant funds** |
| Initial amount reserved for State activities (5 percent of $10,000,000) | $500,000 | Initial amount reserved for LEA subgrants (95 percent of $10,000,000) | $9,500,000 |
| Maximum additional amount for State activities for principals or other school leaders (3 percent of $9,500,000) | + $285,000 | | - $285,000 |
| Maximum total amount for State activities | $785,000 | Minimum amount for LEA subgrants | $9,215,000 |

## I.    SEA AWARDS TO LEAS

An SEA continues to be responsible for determining LEA allocations and for ensuring the LEAs' provision of equitable services to private school students.  (See Section V of this guidance: Equitable Services.

> ### *New ESEA Change to LEA Awards:  No Hold Harmless*
>
> - The hold-harmless provision, based on the amount of funds an LEA received for FY 2001 under the former Eisenhower Professional Development and Class-Size Reduction programs, was eliminated.
>   *(ESEA section 2102(a).)*

### I-1.    How an SEA determines the amount of each LEA's subgrant

Beginning in fiscal year 2017, under the ESEA, there is no longer a "hold-harmless" provision governing the calculation of LEA subgrants.  An SEA, therefore, distributes funds to LEAs based solely on the following formula:
- 20 percent of the funds must be distributed to LEAs based on the relative numbers of individuals ages 5 through 17 who reside in the area the LEA serves (based on the most recent Census data, as determined by the Secretary); and

- 80 percent of the funds must be distributed to LEAs based on the relative numbers of individuals ages 5 through 17 who reside in the area the LEA serves and who are from families with incomes below the poverty line (based on the most recent Census data, as determined by the Secretary).  (ESEA section 2102(a).)

## I-2.    How an SEA may distribute any unclaimed LEA funds

Title II, Part A funds available for LEA use are considered unclaimed if or when one or more LEAs decide not to participate in the program, or agree that they cannot use all or a portion of the funds they receive.  An SEA may reserve these funds for State activities unless, in doing so, the SEA would end up reserving an amount of Title II, Part A funds for State activities that is in excess of the limits contained in ESEA section 2101(c)(1) – (3) (See Questions H-2 and H-3 in the above section on Federal Awards to an SEA); in such cases the SEA must redistribute any unclaimed funds to other LEAs.  However, it may exercise some flexibility in determining how this redistribution will occur.  For example, it may proportionally increase the subgrant amount provided to all participating LEAs.  Alternately, an SEA could establish special procedural and distribution criteria (subject to any State rulemaking requirements), and make these funds available to those LEAs that meet these criteria.

# IV.   MAINTENANCE OF EFFORT REQUIREMENTS

## J.      OVERVIEW

An LEA may receive funds under a covered program for any fiscal year only if the SEA finds that either —

- the combined fiscal effort per student; or
- the aggregate expenditures

of State and local funds with respect to the provision of free public education by the LEA for the preceding fiscal year was not less than 90 percent of the combined fiscal effort per student or aggregate expenditures for the second preceding fiscal year.  (ESEA section 1118(a) and 8521(a).)  If an LEA fails to maintain effort by falling below 90 percent of both the combined fiscal effort per student and aggregate expenditures (using the measure most favorable to the LEA), the SEA must reduce the LEA's allocation under a covered program in the exact proportion by which the LEA failed to maintain effort.  (ESEA section 8521(b).)

ED may waive the maintenance of effort requirement for an LEA if it determines that a waiver would be equitable due to —

- exceptional or uncontrollable circumstances; or
- a precipitous decline in the financial resources of the LEA.

  *(ESEA section 8521(c).)*

## K.      CHANGES TO MAINTENANCE OF EFFORT REQUIREMENTS

The ESEA, as amended by the ESSA, made several updates to the maintenance of effort provision.  Please note that provisions that did not change, including the information on expenditures to be included, expenditures to be excluded, and the definition of preceding fiscal year, are still available on page 11 of the 2008 Title I fiscal guidance [available at: http://www.ed.gov/programs/titleiparta/fiscalguid.doc] and remain applicable.

**K-1.    Updates to covered programs**

> ***Updated Programs to which the Maintenance of Effort Requirement Applies***
>
> - Title I, Part A – improving basic programs operated by LEAs
> - Title I, Part D – prevention and intervention programs for children and youth who are neglected, delinquent, or at-risk
> - Title II, Part A – supporting effective instruction
> - Title III, Part A –English language acquisition, language enhancement, and academic achievement
> - Title IV, Part B – 21st Century Community Learning Centers
> - Title V, Part B, Subpart 2 − Rural and low-income school program
> - Title VI, Part A, Subpart 1 − Indian education
>   *(ESEA sections 8101(11), 6118(c), 8521(a).)*

**K-2.    Reduction for failing to maintain effort**

An SEA must reduce an LEA's allocation under a covered program if the LEA fails to maintain effort. Prior to the ESSA, the reduction was made based on failing to maintain effort compared to the preceding fiscal year only.  Under the ESSA, the SEA has added flexibility and the reduction will be made based on the new requirement below.

> ***New Flexibility regarding Reduction of an LEA's Allocation for Failing to Maintain Effort***
>
> - An SEA must reduce an LEA's allocation under a covered program if the LEA fails to maintain effort in a given fiscal year and also failed to maintain effort in one or more of the five immediately preceding fiscal years.
>
> *(ESEA section 8521(b)(1).)*

**K-3.    Waiver for exceptional or uncontrollable circumstances**

The statute provides two bases (an exceptional or uncontrollable circumstances or a precipitous decline in the financial resources of an LEA) to warrant the Secretary's granting a waiver of maintenance of effort.  With respect to exceptional or uncontrollable circumstances, prior to the ESSA, the statute included the example of a natural disaster.  Under the ESSA, a new example was inserted so that exceptional or uncontrollable circumstances also include a change in the organizational structure of the LEA.  In addition to these two examples listed in the statute, there can be other instances of exceptional or uncontrollable circumstances that might warrant when a waiver request will be considered.

> ### *New Example for What Would Qualify an LEA to Receive a Waiver*
>
> - Exceptional or uncontrollable circumstances, such as a change in the organizational structure of the LEA.
>
>   *(ESEA section 8521(c)(1).)*

## L.     FREQUENTLY ASKED QUESTIONS

**L-1.   What are examples of a "change in the organizational structure of an LEA" that could potentially qualify an LEA for a waiver of the maintenance of effort requirement?**

Below is a list of examples for what a change in the organizational structure of an LEA might mean.

- An LEA changes its configuration.  For example:
  - The LEA merges with another LEA.
  - The LEA divides into two or more LEAs.
  - The LEA eliminates grade levels (e.g., previously served grades K-12 and now serves grades K-8)
- An LEA changes its management or operations structure to create economies of scale to be more efficient.  For example, each school in the LEA employs budget and fiscal management staff.  The LEA makes the decision to consolidate budget and fiscal management staff into a single team located in the central office.

**L-2.   How does a waiver of maintenance of effort affect an SEA's determination of whether an LEA failed to maintain effort for one or more of the five immediately preceding fiscal years?**

If an LEA receives a waiver of the maintenance of effort requirement from the Department for a given fiscal year, the LEA has effectively maintained effort for that fiscal year.  Accordingly, in determining whether the LEA had failed to maintain effort for one or more of the five immediately preceding fiscal years, the SEA would count the year in which the LEA received a waiver as a year of maintaining effort.

**L-3.   If an LEA wishes to request a waiver of maintenance of effort based on a change in its organizational structure, what evidence should an LEA provide to the Department to demonstrate that the change in organizational structure caused the LEA to fail to maintain effort?**

In requesting a waiver based on a change in its organizational structure, an LEA would need to provide evidence of that change and the reasons why the change caused the LEA to fail to maintain effort.  To explain the change in its organizational structure, the LEA might provide a narrative description of the change or a visual, organizational chart or map, if relevant.  The LEA would also need to explain why the change caused the LEA to fail to maintain effort.  In doing

so, the LEA might show its expenditures related to its organizational structure before and after the change to demonstrate that the change resulted in lower expenditures.

# V. EQUITABLE SERVICES

## M.    OVERVIEW

The ESEA includes separate provisions governing equitable services for eligible private school students, teachers and other educational personnel, and families under Title I and programs covered under Title VIII, Part F, Subpart 1, Uniform Provisions Subpart 1—Private Schools: Equitable Services for Private School Students, Teachers, and Other Educational Personnel (Title VIII).[7]  Many of those requirements remain unchanged from requirements under the ESEA as amended by NCLB.  The ESSA, however, made a number of significant changes.  Some of those changes are common to the equitable services requirements under both Title I and Title VIII; others are different.  Accordingly, Part N of this section addresses significant new requirements common to the equitable services provisions in Titles I and VIII; Part O focuses on significant changes to requirements under Title I; and Part P focuses on significant changes to requirements under Title VIII and the covered programs subject to those requirements.

Please note that, except as otherwise provided in this guidance, the existing non-regulatory guidance documents, *Title I Services to Eligible Private School Children* [available at: http://www2.ed.gov/programs/titleiparta/psguidance.doc] and issued on Oct. 17, 2003  and *Title IX, Part E Uniform Provisions, Subpart 1—Private Schools* [available at: http://www2.ed.gov/policy/elsec/guid/equitableserguidance.doc] and revised on Mar. 2009, remain applicable.

## N.    COMMON EQUITABLE SERVICES REQUIREMENTS UNDER TITLES I AND VIII

> ### *New Requirement: Ombudsman*
>
> To help ensure equitable services and other benefits for eligible private school children, teachers and other educational personnel, and families, an SEA must designate an ombudsman to monitor and enforce ESEA equitable services requirements under both Title I and Title VIII.
>
> *(ESEA sections 1117(a)(3)(B) and 8501(a)(3)(B).)*

### N-1.    What are the roles and responsibilities of an ombudsman?

An ombudsman should serve as an SEA's primary point of contact for addressing questions and concerns from private school officials and LEAs regarding the provision of equitable services under Titles I and VIII.  In addition, the ombudsman is required to monitor and enforce the

---

[7] Under the ESSA, the Title I equitable services requirements previously in section 1120 of the ESEA, as amended by NCLB, are now in section 1117 of the ESEA, as amended by the ESSA.  Similarly, the equitable services requirements previously in section 9501 of the ESEA, as amended by NCLB, are now in section 8501 of the ESEA, as amended by the ESSA.

equitable services requirements under Titles I and VIII and, thus, should have a significant role in the State's monitoring process.  Furthermore, the ombudsman should ensure that private school officials know how to contact the ombudsman.  The following are examples of activities the ombudsman could undertake in fulfilling the roles and responsibilities of the position:

- Serve as a general resource regarding equitable services requirements for both LEAs and private school officials, which may include conducting initial outreach to define the contours of the ombudsman's responsibilities.
- Develop, in partnership with other relevant SEA staff, monitoring protocols applicable to the provision of equitable services and participate in a sample of any monitoring activity.
- Provide technical assistance regarding equitable services requirements for SEA staff administering applicable programs, LEA staff, and private school officials.
- Establish a process for receiving documentation of agreement from LEAs consistent with the consultation requirement that the results of such agreement shall be transmitted to the ombudsman.  (ESEA section 1117(b)(1).)
- Participate in the State's Title I Committee of Practitioners (ESEA section 1603(b)) and, as applicable, nonpublic schools working group.

**N-2.   What specific responsibilities does an ombudsman have with respect to monitoring and enforcement?**

The primary responsibilities of an ombudsman  are to monitor and enforce the equitable services requirements in Titles I and VIII.  Accordingly, an ombudsman should work with SEA staff administering Title I and programs covered under Title VIII to develop monitoring protocols applicable to the provision of equitable services under each program.  To ensure that monitoring protocols are being followed, the ombudsman should take an active role in the monitoring process, particularly with respect to the resolution of any findings regarding equitable services requirements under Titles I and VIII.  The ombudsman also should serve as the primary point of contact for responding to and resolving any complaints regarding equitable services that the SEA receives under its ESEA complaint procedures.

**N-3.   Who may serve as an ombudsman?**

An SEA has discretion in determining who to designate as an ombudsman.  In determining the relevant qualifications of the ombudsman position, an SEA should consult with appropriate private school officials.  Within most States there is a statewide private school coalition with representatives of the various private schools within the State.  SEAs might consider engaging such private school coalitions.  An SEA should consider the following factors in determining who will serve as an ombudsman:

- **Knowledge:**  Does the individual have sufficient experience and demonstrate thorough knowledge and understanding regarding the equitable services provisions, including the statute, regulations, and guidance, necessary to implement, monitor, and enforce the equitable services requirements under both Titles I and VIII?
- **Capacity:**  Will the ombudsman work alone or in collaboration with other State Federal program directors?  Does the individual have experience with integrating input from other technical experts and program specialists, including those at the U.S. Department of Education, and communicating it to the appropriate audiences?

- **Impartiality:** Will the individual be able to carry out the ombudsman duties, including monitoring, enforcement, and resolving complaints, in a fair and impartial manner? Will the individual be able to provide guidance to LEAs and private school officials to facilitate the goal of reaching agreement when agreement cannot be achieved independently through consultation? (ESEA sections 1117(b)(1) and 8501(b)(1).)

**N-4.    What funds are available to support an ombudsman?**

If an SEA consolidates State administrative funds under ESEA section 8201, it may support its ombudsman using those funds. If an SEA does not consolidate State administrative funds, it nonetheless may support its ombudsman using funds reserved for State administration under Title I and the covered programs under ESEA section 8501(b). Under these circumstances, however, the SEA must ensure that the ombudsman's salary is charged to each program based on the relative benefit received. (2 CFR 200.405(a).)

**N-5.    What is the timeline for an SEA to designate an ombudsman?**

Under the Consolidated Appropriations Act, 2016, the equitable services requirements under the ESEA, as amended by NCLB, continue to apply through the 2016−2017 school year. However, an LEA must consult with private school officials to plan for the 2017−2018 school year before it makes any decision that affects the opportunity of eligible private school children, their teachers, and their families to participate in Title I or covered programs under Title VIII. Thus, an SEA should designate an ombudsman in sufficient time to be of assistance as LEAs and private school officials begin the consultation process for the 2017−2018 school year, which would generally occur in the late winter/early spring of 2017.

> ### *New Requirement: Obligation of Funds*
>
> Funds allocated to an LEA for educational services and other benefits to eligible private school children, teachers and other educational personnel, and families must be obligated in the fiscal year for which the funds are received by the LEA.
>
> *(ESEA sections 1117(a)(4)(B) and 8501(a)(4)(B).)*

**N-6.    What is the purpose of this requirement given that an LEA may carry over funds from a given fiscal year and spend those funds in the succeeding fiscal year?**

The purpose of this requirement is to ensure that an LEA uses the funds available under Title I or a covered program under Title VIII to provide equitable services in the fiscal year for which the funds were appropriated to ensure that eligible students, teachers and other educational personnel, and families receive the services to which they are entitled in a timely manner. This provision reinforces the requirement that an LEA conduct timely consultation with private school officials to design appropriate equitable services so that those services can begin at the beginning of the school year for which the funds are appropriated.

**N-7.    May an LEA carry over unobligated funds despite this new statutory requirement regarding obligation of funds?**

In general, to ensure that equitable services are provided in a timely manner, an LEA must obligate the funds allocated for equitable services under all applicable programs in the year for which they are appropriated.  (ESEA sections 1117(a)(4)(B) and 8501(a)(4)(B).)  There may be extenuating circumstances, however, in which an LEA is unable to obligate all funds within this timeframe in a responsible manner.  Under these circumstances, the funds may remain available for the provision of equitable services under the respective program during the subsequent school year.  In determining how such carryover funds will be used, the LEA must consult with appropriate private school officials.  (ESEA sections 1117(b) and 8501(c).)

> ### *New Requirement: Notice of Allocation*
>
> An SEA must provide notice in a timely manner to appropriate private school officials in the State of the allocation of funds for educational services and other benefits under each ESEA program that an LEA has determined are available for eligible private school children, teachers and other educational personnel, and families.
>
> *(ESEA sections 1117(a)(4)(C) and 8501(a)(4)(C).)*

**N-8.    What information must an SEA include in the notice of allocation that the SEA must provide to private school officials?**

An SEA must annually provide information on the amount of funds, by program, allocated for equitable services under Title I and each covered program under section ESEA section 8501(b) that each LEA responsible for providing equitable services has determined are available for eligible private school students, teachers and other educational personnel, and families.  Such documentation should indicate how the allocation was determined.

**N-9.    How should an SEA disseminate the notice of allocation?**

An SEA should consult with appropriate private school officials to determine an effective manner for disseminating the notice of allocation to appropriate private school officials, which may include notification through the ombudsman.  An SEA may consider methods such as publicly posting this information on the SEA's website, using an email distribution list of private school officials, or other method that will ensure that this information is available to appropriate private school officials.

**N-10.   When should an SEA disseminate the notice of allocation?**

An SEA should consult with LEAs and appropriate private school officials to determine a reasonable timeline for providing the notice of allocation.  In general, an SEA should ensure that the notice is provided prior to the beginning of the school year.

> ### *New Requirement: Compliance – State Services*
>
> An SEA must provide equitable services directly or through contracts with public or private agencies, organizations, or institutions, if appropriate private school officials have —
>
> - Requested that the SEA provide such services directly; and
> - Demonstrated that an LEA has not met applicable equitable services requirements in accordance with the procedures for making such a request, as prescribed by the SEA.
>
> *(ESEA sections 1117(b)(6)(C) and 8501(c)(6)(C).)*

**N-11.  Under what circumstances is an SEA required to provide equitable services in lieu of an LEA?**

An SEA must provide equitable services in lieu of an LEA if appropriate private school officials (1) have requested that the SEA do so; and (2) have demonstrated in accordance with the SEA's procedures for making such requests that the LEA has not met the equitable services requirements, as applicable, under ESEA section 1117 or 8501.

**N-12.  What should an SEA include in its procedures governing a request by private school officials for the SEA to provide equitable services directly or through a third-party provider?**

An SEA should consult with appropriate private school officials in developing procedures under which private school officials may request the SEA to provide equitable services in lieu of an LEA.  For example, it is likely that most instances of non-compliance with equitable services requirements by an LEA can be corrected with minimal intervention by the SEA.  Accordingly, consistent with the standards the Secretary must use for a bypass[8] (see ESEA section 8504) under the equitable services requirements in Titles I and VIII, an SEA might develop procedures that require private school officials to demonstrate that an LEA has substantially failed or is unwilling to provide equitable services before the SEA intervenes to provide equitable services directly or through a third-party provider.  An SEA should make available a standard template for requests and have transparent procedures for evaluating such requests.

---

[8] A bypass is a means by which the Secretary directly provides equitable services to private school students and teachers through a third-party provider.

---

> ### *Change to Existing Requirement: Consultation*
>
> The goal of consultation is agreement between the LEA and appropriate private school officials on how to provide equitable and effective programs for eligible private school children.
>
> *(ESEA sections 1117(b)(1) and 8501(c)(1), (5).)*

### N-13. What does "the goal of reaching agreement" between an LEA and appropriate private school officials entail?

The "goal of reaching agreement" between an LEA and appropriate private school officials is grounded in timely, meaningful, and open communication between the LEA and the private school officials on key issues that are relevant to the equitable participation of eligible private school students, teachers and other education personnel, and families in ESEA programs.

Meaningful consultation provides ample time and a genuine opportunity for all parties to express their views, to have their views seriously considered, and to discuss viable options for ensuring equitable participation of eligible private school students, teachers and other education personnel, and families. This assumes that the LEA has not made any decisions that will impact the participation of private school students and teachers in applicable programs prior to consultation, or established a blanket rule that precludes private school students and teachers from receiving certain services authorized under applicable programs. An LEA should consult with private school officials about the timeline for consultation and provide adequate notice of such consultation to ensure meaningful consultation and the likelihood that those involved will be well prepared with the necessary information and data for decision-making.

Successful consultation begins well before the implementation of services, establishes positive and productive working relationships, makes planning effective, continues throughout implementation of equitable services, and serves to ensure that the services provided meet the needs of eligible students and teachers.

## O.    EQUITABLE SERVICES UNDER TITLE I

> ### _Change to Existing Requirement:  Allocating Funds for Equitable Services_
>
> Expenditures for equitable services to eligible private school children, teachers and other educational personnel, and families must be equal to the proportion of funds allocated to participating public school attendance areas based on the number of children from low-income families who reside in those attendance areas and attend private schools.  An LEA must determine the proportionate share of Title I funds available for equitable services based on the total amount of Title I funds received by the LEA prior to any allowable expenditures or transfers of funds.
>
> _(See ESEA section 1117(a)(4)(A).)_

**O-1.    May an LEA reserve funds off the top of its Title I allocation before it allocates funds for equitable services?**

No.  An LEA must determine the amount of funds available for providing equitable services prior to any expenditures or transfers of funds.  This includes all reservations previously taken "off the top" of an LEA's Title I allocation, including reservations for administration, parental involvement, and district-wide initiatives.

**O-2.    How does an LEA determine the proportionate share of Title I funds available for all equitable services activities (i.e., administration, instruction, activities for parents and families of participating private school students, and professional development for teachers of participating private school students) now that this amount must be determined before any allowable expenditures or transfers of funds, including off-the-top reservations?**

Once an LEA has established the participating public school attendance areas (see B-1 and B-2 of the _Title I Services to Eligible Private School Children_ (Oct. 17, 2003)), it would first determine the number of children from low-income families residing in each participating public school attendance area who attend public schools and private schools.  The LEA would then determine the overall proportion of children from low-income families who reside in participating public school attendance areas and who attend public schools and private schools.  Using the proportion of children from low-income families who attend private schools, the LEA would determine the amount of funds available for equitable services based on that proportionate share of the LEA's total Title I allocation.  For example, an LEA with four Title I public school attendance areas and a total Title I allocation of $1,000,000 would determine the total amount available for all equitable services activities (proportionate share) as follows:

| EXAMPLE OF DETERMING THE AMOUNT OF TITLE I FUNDS FOR EQUITABLE SERVICES | | | |
|---|---|---|---|
| Public School Attendance Area | Number of Public School Low-Income Children | Number of Private School Low-Income Children | Total Number of Low-Income Children |
| A | 500 | 120 | 620 |
| B | 300 | 9 | 309 |
| C | 200 | 6 | 206 |
| D | 350 | 15 | 365 |
| **TOTAL** | **1,350** | **150** | **1,500** |
| PROPORTIONATE SHARE | 90% | 10% | |
| | $900,000 | $100,000 | |

**O-3.    How does an LEA reserve Title I funds for administering equitable services for private school students?**

From the proportionate share of Title I funds available to provide equitable services, an LEA may reserve an amount that is reasonable and necessary to administer equitable services.  An LEA determines this amount separately from the funds needed to administer the Title I program for students in public schools.  The LEA should discuss administrative costs for implementing equitable services during consultation with appropriate private school officials.

**O-4.    How does an LEA determine the amount of Title I funds to be used for parent and family engagement activities for participating private school students?**

ESEA section 1116(a)(3)(A) requires an LEA to reserve and spend at least 1 percent of its Title I allocation to carry out required Title I parent and family engagement activities if the LEA's Title I allocation exceeds $500,000.  To determine the minimum amount it must spend on parent and family engagement activities, an LEA must calculate 1 percent of its total Title I allocation.  The LEA then applies the proportionate share percentage for services to private school students in question O-2 to determine how much  it must spend for parent and family engagement activities for the families and parents of eligible private school students.  The LEA must then spend that amount from the proportion of its Title I allocation available for equitable services for private school students.  In other words, the LEA does not reserve a portion of its 1 percent reservation for parent and family engagement activities for participating private school students; rather, this amount comes from the proportionate share that the LEA already determined under question O-2.

---

EXAMPLE OF EQUITABLE SERVICES FOR PARENTS AND FAMILIES

---

An LEA's total Title I allocation is $1,000,000.  From that amount, $100,000 (10 percent) is allocated for all Title I equitable services activities and $900,000 (90 percent) for all Title I activities in public schools.  One percent of the LEA's total Title I allocation is $10,000 ($1,000,000 x .01).  Therefore, it must spend $1,000 (10% of $10,000) from the $100,000 allocated for all equitable services activities to provide equitable services for the parents and

families of participating private school students and reserve $9,000 (90% of $10,000) from the $900,000 available for Title I activities in public schools for the parents and families of participating public school students.

| EXAMPLE OF EQUITABLE SERVICES FOR PARENTS AND FAMILIES OF ELIGIBLE PRIVATE SCHOOL CHILDREN | | | |
|---|---|---|---|
| LEA's Title I allocation | 1% for parent and family engagement | Proportionate share for equitable services for parents and families (based on example under question O-4 | Source of funds for equitable services for parents and families (proportionate share under question O-4 = $100,000) |
| $1,000,000 | $10,000 | $1,000 ($10,000 x 10%) | $100,000 − $1,000=$99,000 remaining for instruction and professional development |

> ### New Requirement: Transmitting Agreement on Consultation to the Ombudsman
>
> The results of agreement following consultation must be transmitted to the SEA's equitable services ombudsman.
>
> *(ESEA section 1117)(b)(1).)*

## O-5.  How should an LEA transmit the result of agreement on consultation?

The ombudsman should establish a process for receiving documentation of agreement from each LEA consistent with the consultation requirement that the results of such agreement shall be transmitted to the ombudsman.  (ESEA section 1117(b)(1).)  For example, the ombudsman may direct an LEA to document agreement on the same form the LEA uses to document affirmation of consultation and submit that form to the ombudsman.

> ### *Changes to Existing Requirement: Consultation*
>
> The topics subject to consultation have been expanded to include the following:
>
> - How the proportion of funds allocated for equitable services is determined.
>
> - Whether the LEA will provide services directly or through a separate government agency, consortium, entity or third-party contractor.
>
> - Whether to provide equitable services to eligible private school children by pooling funds or on a school-by-school basis.
>
> - When, including the approximate time of day, services will be provided.
>
> - Whether to consolidate and use funds available for Title I equitable services in coordination with eligible funds available for equitable services under programs covered under section 8501(b) to provide services to eligible private school children in participating programs.
>
> - The written affirmation that consultation has occurred must provide the option for private school officials to indicate such officials' belief that timely and meaningful consultation has not occurred or that the program design is not equitable with respect to eligible private school children.
>
> *(ESEA section 1117(b)(1).)*

**O-6.** **Have the options available for using funds to provide equitable services under Title I changed under the ESSA?**

No. The only change is that the statute now specifies that an LEA must consult with private school officials regarding whether to provide services by pooling or on a school-by-school basis. For an explanation of pooling under Title I, see *Title I Services to Eligible Private School Children* (Oct. 17, 2003, Questions B-16-18 [available at http://www2.ed.gov/programs/titleiparta/psguidance.doc].

**O-7.** **What does it mean to consolidate and use Title I funds in coordination with eligible funds available for equitable services under programs covered under ESEA section 8501(b) to provide services to eligible private school children in participating programs?**

In consultation with appropriate private school officials, an LEA must consider whether to consolidate and use Title I funds to provide equitable services to eligible private school children participating under Title I in coordination with funds for equitable services from programs covered under ESEA section 8501(b). Coordinating the use of Title I funds with the use of funds available from programs covered under Title VIII could greatly improve the equitable services available to Title I participating private school students. Too often, the amount of funds available under Title I or Title VIII programs is not sufficient to provide robust equitable services. If an LEA coordinates the use of funds from a variety of programs, however, the LEA can maximize the services it can provide and use all the funds more efficiently and effectively.

For example, through coordination, an LEA with limited available funds might use Title I funds to provide instructional services to Title I-eligible participating private school students; use Title II funds to provide professional development to those students' teachers (as opposed to all teachers in a given school); use Title III funds to improve the English proficiency of English learners among the participating students; and use Title IV funds to provide necessary counseling services to the most-at risk eligible students. Funds under each program would be used for allowable activities under each program; yet, through a coordinated effort, they could better serve in a comprehensive manner the needs of the most at-risk private school students. Such coordination would eliminate the silo approach through which an LEA consults with private school officials on each program individually and separately, without regard to whether the services could be more effective were they coordinated, resulting in a non-cohesive delivery of equitable services by the LEA.

**P.      EQUITABLE SERVICES UNDER TITLE VIII**

In addition to the equitable services provisions under Title I, Part A contained in ESEA section 1117, a number of other programs include equitable services requirements. Those programs are listed below. The equitable services requirements that apply to those programs are contained in ESEA section 8501.

---

### *Change to Existing Requirement:  Updates to Programs Covered Under Title VIII*

ESSA updated the covered programs to include the following:

- Title I, Part C − Education of migratory children
- Title II, Part A − Supporting effective instruction state grants
- Title III, Part A − English language acquisition, language enhancement, and academic achievement
- Title IV, Part A − Student support and academic enrichment grants
- Title IV, Part B − 21st Century Community Learning Centers
  *(ESEA section 8501(b).)*

---

> ### *Change to Existing Requirement: Complaint Process for Participation of Private School Children – Time Limit*
>
> The timeframe that an SEA has for responding to a complaint from parents, teachers, or other individuals concerning violations of ESEA section 8501 regarding the participation by private school children and teachers is 45 days. In addition, the Secretary must investigate and resolve an appeal of an SEA's resolution of a complaint within 90 days.
>
> *(ESEA section 8503.)*

> ### *Changes to Existing Requirement:  Consultation*
>
> The topics subject to consultation have been expanded to include the following:
>
> - How the amount of funds available for equitable services is determined.
> - Whether the agency, consortium, or entity responsible for providing equitable services will provide those services directly or through a separate government agency, consortium, or entity, or through a third-party contractor.
> - Whether to provide equitable services to eligible private school participants (1) by creating a pool or pools of funds with all of the funds allocated under programs covered under section 8501(b) or (2) on a school-by-school basis based on each the proportionate share of funds available to provide services in each school.
> - Documentation:  Each LEA shall maintain in the agency's records, and provide to the SEA involved, a written affirmation signed by officials of each participating private school that the meaningful consultation required by this section has occurred.  The written affirmation shall provide the option for private school officials to indicate such officials' belief that timely and meaningful consultation has not occurred or that the program design is not equitable with respect to eligible private school children.  If such officials do not provide such affirmation within a reasonable period of time, the LEA shall forward the documentation that such consultation has, or attempts at such consultation have, taken place to the SEA.
>
> *(ESEA section 8501(c).)*

**P-1.**   **Have the options available for using funds to provide equitable services changed under the ESSA?**

No.  An LEA continues to have the option of expending funds for equitable services on a school-by-school basis or by pooling.  The only change is that the statute now specifies that an LEA must consult with private school officials regarding these options.  For an explanation of pooling under Title VIII applicable programs, see *Title IX, Part E Uniform Provisions, Subpart 1— Private Schools* (Revised Mar. 2009), Question F.10 [available at http://www2.ed.gov/policy/elsec/guid/equitableserguidance.doc.question.].

> ### Change to Existing Requirement:  Applicability of Equitable Services under Title II, Part A
>
> The requirements in section 9501(b)(3) of the ESEA, as amended by NCLB, limiting the applicability of the equitable services requirements for Title II, Part A to funds used by the LEA to provide professional development to teachers and others has been removed.
>
> *(ESEA section 8501(b).)*

**P-2.**  **How does an LEA determine the amount required for Title II, Part A equitable services to private school teachers and other educational personnel now that this amount must be determined based on the LEA's total Title II, Part A allocation?**

The amount an LEA must reserve to provide equitable services for private school teachers and other educational personnel for Title II, Part A services is based on the LEA's total Title II, Part A allocation, less administrative costs.  The LEA determines the amount of funds available for Title II, Part A equitable services for private school teachers and other educational personnel by calculating, on a per-pupil basis, the amount available for all public and private school students enrolled in participating private elementary and secondary schools in areas served by the LEA (regardless of a student's residency), taking into consideration the number and needs of the children, their teachers and other educational personnel to be served.

| EXAMPLE OF FORMULA TO DETERMINE AMOUNT FOR TITLE II, PART A EQUITABLE EXPENDITURES | |
|---|---|
| **A.  Number of Students** | |
| A1:  LEA Enrollment | 900 |
| A2:  Participating Private Schools Enrollment | 100 |
| A3:  Total Enrollment = A1 + A2 | 1,000 |
| **B.  Title II, Part A Allocation** | |
| B1:  Total LEA Allocation | $1,000,000 |
| B2:  Administrative Costs (for public and private school programs) | $50,000 |
| B3:  LEA Allocation Minus Admin  Costs = B1-B2 | $950,000 |
| **C.  Per Pupil Rate** | |
| C1:  B3 divided by A3 | $950 |
| **D.  Equitable Services** | |
| Amount LEA must reserve for equitable services for private school teachers and other educational personnel = A2 x C1 | $95,000 |

**P-3.    What types of activities may an LEA now provide to private school participants?**

An LEA may continue to use Title II, Part A funds to provide professional development activities for teachers, principals, and other school leaders to address the specific needs of their students.  Additionally, there may be other permissible uses of Title II, Part A funds for the benefit of private school participants.  Any use of Title II, Part A funds for the benefit of private school participants must:

- Be an allowable local use of Title II, Part A funds under the authorizing statute.  (ESEA section 2103(b)(3).)
- Meet the specific needs of students enrolled in a private school, and not the school itself.  Title II, Part A funds may not be used to meet the needs of a private school or the general needs of the students enrolled in the private school.  In some instances, however, a program or activity that primarily benefits a private school's students (because it addresses specific, rather than general, needs of the students) will also incidentally benefit the school. (34 CFR 76.658.)
- Ensure that the public agency (*e.g.*, an LEA) responsible for providing equitable services retains control of the funds used to provide such services.  In addition, equitable services must be provided by either an employee of the public agency or through a contract by the public agency with an individual, association, agency, or organization.  These employees, individuals, associations, agencies, or organizations providing the services must be independent of the private school and any religious organization and the employment or contract must be under the control and supervision of the public agency.  (ESEA section 8501(d).)

Equitable services under Title II, Part A may not be used for class-size reduction (ESEA section 2103(b)(3)(D)) in a private school because contracts for private school teachers and staff would be inconsistent with the requirements in ESEA section 8501(d) regarding public control of funds and the supervision and control of employees or contractors.

**P-4.    Have the options available for using funds to provide State-level equitable services under Title II, Part A changed?**

Section 2101(c)(1) of the ESEA allows the SEA to reserve up to five percent of its overall Title II, Part A allocation for State-level activities (defined in ESEA section 2101(c)(4)); and section 2101(c)(3) allows the SEA to reserve an additional amount of not more than three percent of the amount otherwise reserved for LEA subgrants for State-level principal or other school leader activities.  Under section 8501(a)(1), the SEA has responsibilities to implement equitable services for private school teachers and other educational personnel to the extent that it reserves any funds under these provisions for State-level activities.  The SEA determines the amount of Title II, Part A funds that it must reserve for equitable services to private school teachers and other educational staff by calculating, on a per-pupil basis, the amount available for all public and private school children in the area of the State to be served, taking into consideration the number and needs of the children, their teachers and other educational personnel to be served.  (ESEA section 8501(a)(4)(A).)

State-level activities in which private school teachers may participate should be determined in consultation between the SEA and appropriate private school representatives.  But as with the permissible uses of Title II, Part A funds an LEA makes available for equitable services (see

question P-3e), any activity an SEA provides to private school participants under Title II, Part A must primarily benefit the children enrolled in the private school, not the school itself.  Similarly, as with LEAs, the SEA may not use Title II, Part A funds to meet the general needs of the private school unless providing activities that primarily benefit the private school's students (because it addresses specific, rather than general, needs of the students) also incidentally benefit the school.  (See 34 CFR 76.658.)

## Q.    FREQUENTLY ASKED QUESTIONS UNRELATED TO ESSA CHANGES

**Q-1.    Does a private school student's participation in a Federal or State private school choice program affect that private school student's eligibility for ESEA equitable services?**

No.  Participation in a Federal or State private school choice program does not affect a private school student's eligibility for ESEA equitable services.  Although most students enrolled in private schools pay their tuition with private funds, there are some instances in which public funds may support a student's tuition (*e.g.*, through a Federal or State scholarship or scholarship-type program or a State education savings account (ESA)).  Regardless of the source of funds paying a private school student's tuition, a student is eligible for equitable services under the ESEA if the student meets the eligibility requirements of the respective program.

**Q-2.    Are equitable services for children with disabilities under the Individuals with Disabilities Education Act (IDEA) affected by the ESSA?**

No.  The ESSA did not change the IDEA's requirements on equitable services for children with disabilities.  Therefore, the changes to the equitable service requirements under the ESEA, including new or changed provisions regarding the notice of allocation, consultation, the timeline for obligation of funds, the direct provision of equitable services by the SEA in cases of non-compliance, and the SEA's use of an ombudsman do not apply to equitable services under the IDEA.  The Department's Office of Non-Public Education maintains a website containing resources on the IDEA's equitable service requirements, which are located at http://www2.ed.gov/about/offices/list/oii/nonpublic/programs2.html.

# VI.  TRANSFERABILITY

**R.     OVERVIEW**

Under the ESEA, SEAs and LEAs may transfer funds they receive by formula under certain programs to other programs to better address State and local needs.  The ESSA amended the transferability authority by changing the programs from and to which an SEA or LEA may transfer funds and removing limits on the amount of funds that may be transferred.  This guidance addresses those changes.

Except as provided in this guidance, the *Guidance on the Transferability Authority* [available at www2.ed.gov/programs/transferability/finalsummary04.doc] remains applicable.

**S.      TRANSFERS BY SEAS**

**S-1.      Updates to programs from which funds may be transferred**

> ***Updated Programs from which an SEA May Transfer Funds Allocated for State-level Activities***
>
> - Title II, Part A − Supporting effective instruction state grants
> - Title IV, Part A − Student support and academic enrichment grants
> - Title IV, Part B − 21st Century Community Learning Centers
>   *(ESEA section 5103(a)(1).)*

An SEA may not transfer funds it receives under any other ESEA program.

**S-2.    Updates to programs to which funds may be transferred**

---

***Updated Programs to which an SEA May Transfer Funds Allocated for State-level Activities***

- Title I, Part A – Improving basic programs operated by LEAs

- Title I, Part C – Education of migratory children

- Title I, Part D – Prevention and intervention programs for children and youth who are neglected, delinquent, or at-risk

- Title II, Part A – Supporting effective instruction state grants

- Title III, Part A – State grants for English language acquisition and language enhancement

- Title IV, Part A – Student support and academic enrichment grants

- Title IV, Part B – 21st Century Community Learning Centers

- Title V, Part B – Rural education

*(ESEA section 5103(a).)*

---

**T.    TRANSFERS BY LEAS**

**T-1.    Updates to programs from which an LEA may transfer funds**

---

***Updated Programs from which an LEA May Transfer Funds***

- Title II, Part A – Supporting effective instruction state grants

- Title IV, Part A – Student support and academic enrichment grants

*(ESEA section 5103(b)(2).)*

---

An LEA may not transfer funds it receives under any other ESEA program.

**T-2.**     **Updates to programs to which an LEA may transfer funds**

> ### _Updated Programs to which an LEA May Transfer Funds_
>
> - Title I, Part A – Improving basic programs operated by LEAs
> - Title I, Part C – Education of migratory children
> - Title I, Part D − Prevention and intervention programs for children and youth who are neglected, delinquent, or at-risk
> - Title II, Part A − Supporting effective instruction state grants
> - Title III, Part A – State grants for English language acquisition and language enhancement
> - Title IV, Part A − Student support and academic enrichment grants
> - Title V, Part B – Rural education
> - *(ESEA section 5103(b).)*

## U.     FREQUENTLY ASKED QUESTIONS

**U-1.**     **Is there a limit on the amount of funds for State-level activities an SEA may transfer?**

No.  An SEA may transfer all or a portion of the funds allocated for State-level activities under each of the programs listed under S-1 above.

**U-2.**     **May an SEA transfer administrative funds?**

No.  Under each of the programs listed under S-1 above, an SEA allocates funds separately for authorized State-level activities and for program administration.  An SEA may transfer only the funds it allocates for authorized State-level activities; it may not transfer funds that it separately allocates for administration.

**U-3.**     **Is there a limit on the amount of funds an LEA may transfer?**

No.  An LEA may transfer all or a portion of funds it receives under each of the programs listed under T-1 above.

**U-4.**     **What are the responsibilities of an SEA or LEA for the provision of equitable services to private school children and teachers with respect to funds being transferred?**

Excluding Title I, Part D and Title V, Part B, each program covered by the transferability authority is subject to the equitable services requirements under Title I or VIII, which may not be waived.  (ESEA section 8401(c)(5).)  Before an SEA or LEA may transfer funds from a program subject to equitable services requirements, it must engage in timely and meaningful consultation

with appropriate private school officials.  (ESEA section 5103(e)(2).)  With respect to the transferred funds, the SEA or LEA must provide private school students and teachers equitable services under the program(s) to which, and from which, the funds are transferred, based on the total amount of funds available to each program after the transfer.

**U-5.    May an SEA or LEA transfer only those funds that are to be used for equitable services to private school students or teachers?**

No.  An SEA or LEA may *not* transfer funds to a particular program solely to provide equitable services for private school students or teachers.  Rather, an SEA or LEA, after consulting with appropriate private school officials, must provide equitable services to private school students and teachers based on the rules of each program and the total amount of funds available to each program after a transfer.  (See ESEA section 5103(e).)