HUSCH BLACKWELL LLP
Donald J. Mizerk Esq., (CA Bar No. 208477)
John W. Borkowski (IL Bar No. 6320147) (*pro hac pending*)
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538
Fax: (312) 655-1501
don.mizerk@huschblackwell.com

Attorneys for Amicus Curiae
COUNCIL OF THE GREAT CITY SCHOOLS

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

<table>
<tr><td>

**STATE OF MICHIGAN, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF NEW MEXICO, STATE OF WISCONSIN, THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, BOARD OF EDUCATION FOR THE CITY OF CHICAGO, CLEVELAND MUNICIPAL SCHOOL DISTRICT, AND SAN FRANCISCO UNIFIED SCHOOL DISTRICT,**

Plaintiffs,

**v.**

**ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,**

Defendants.

</td><td>

Civil Case No.3:20-cv-04478-JD

**THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. James Donato

Trial Date: None set

Action Filed: July 7, 2020

</td></tr>
</table>

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone:+ (317) 576-1538

1

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF INTEREST ............................................................................ 1

SUMMARY OF ARGUMENT ............................................................................ 2

BACKGROUND ................................................................................................. 3

ARGUMENT ...................................................................................................... 4

I.   The Department Unlawfully Replaced the Equitable Services Allocation Method Adopted by Congress with Its Own Preferred Approach. ................................... 4

    A.   The Department's funding formula erroneously considers *all* private school students rather than only *low-income* students residing in the district. ................................................................................................. 5

        i.   Congress expressly declined to require public school districts to allocate equitable services funding on the basis of *all* students in private schools rather than "eligible" or low-income students. ........................... 6

        ii.   Congress also required that equitable services funding be allocated on the basis of student residence................................................................... 8

    B.   There were good reasons for Congress to choose the specific allocation formula that it did............................................................................................ 8

    C.   There is bi-partisan support that Congress's intent was that funds be allocated based on the Title I formula................................................................... 11

II.   The Chaotic Manner in which the Department has Acted Has Delayed the Distribution of Critical Resources and Placed School Districts in Legal Jeopardy.......... 12

    A.   The Guidance created unnecessary confusion for school districts and put them at legal risk. ................................................................................. 13

    B.   The Rule effectively mandates the Department's flawed interpretation and increases confusion and hardship for school districts............................................ 15

    C.   The Department's inconsistent interpretation also has resulted in delay in the distribution of critical resources.................................................................. 18

III.   The Interim Final Rule Adopted by the Department Would Divert Hundreds of Millions of Dollars from Public Schools to Private Schools with Devastating Consequences for School Districts and their Students. ................................... 20

    A.   The Amount of Funds Diverted is Substantial.......................................... 20

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

    B.     The Diversion would Deprive Millions of Public School Students of Critical Resources and Life-Saving Services during the Pandemic ...................... 22

**CONCLUSION** ....................................................................................................... 24

**CERTIFICATE OF SERVICE** ............................................................................... 25

**HUSCH BLACKWELL LLP**
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-2458

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Statutory Authorities</u>

20 U.S.C. § 6320 ................................................................................................ 5

20 U.S.C. § 7881 ................................................................................................ 7

20 U.S.C. § 3401 note ................................................................................ *passim*

CARES Act, PL 116-136, 134 Stat 281 (codified in scattered titles and sections of
    U.S.C.) ............................................................................................... *passim*

### <u>Rules and Regulations</u>

CARES Act Programs; Equitable Services to Students and Teachers in Non-Public
    Schools, 85 Federal Register, 39479 (July 1, 2020) ................................... 1

Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Federal
    Register, 20811 (April 15, 2020) ............................................................... 9

### <u>Additional Authorities</u>

Memorandum from Congressional Research Service to House Comm. on Educ. and
    Labor (July 1, 2020) ................................................................................. 12

Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's
    Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA ISSUE
    BRIEF (July 16, 2020) ......................................................................... 21, 23

Letter from Betsy DeVos, Sec'y, U.S. Dep't of Educ., to Carissa Moffat Miller, Exec.
    Dir., Council of Chief State Sch. Officers (May 22, 2020) ...................... 15

Letter from Carissa Moffat Miller, Exec. Dir., Council of Chief State Sch. Officers, to
    Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 5, 2020) ......................... 16

Letter from Carissa Miller, Exec. Dir., Council of Chief State Sch. Officers, to Lamar
    Alexander, U.S. Congress (June 24, 2020) ............................................... 18

Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus
    Funds to Private Schools*, POLITICO (June 1, 2020) ............................ 16, 17

Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans*, THE
    WASHINGTON POST (July 6, 2020) .............................................................. 9

Letter from Robert C. "Bobby" Scott, Rosa L. DeLauro, and Patty Murray, U.S.
    Congress, to Betsy DeVos, Sec't of Educ. (May 20, 2020) ...................... 11

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

iii

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

Texas Educ. Agency, *Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs* (updated July 9, 2020) .................................................................................................. 19

Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private School Students*, EDUCATION WEEK (May 26, 2020) ................................................. 16

Andrew Ujifusa, *Sen. Alexander Splits from Betsy DeVos on COVID-19 Aid to Help Private Schools*, EDUCATION WEEK (May 21, 2020)............................................. 12

U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* (April 23, 2020) ........................ 13

U.S. Dep't of Educ., *Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (Oct. 7, 2019) ............................ 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HUSCH BLACKWELL LLP**
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

## STATEMENT OF INTEREST

*Amicus curiae*, the Council of the Great City Schools ("Council"), is a coalition of 76 of the nation's largest urban public school systems and is the only national organization exclusively representing the needs of urban public schools. Founded in 1956 and incorporated in 1961, the Council serves as the national voice for urban educators and provides a forum to share best practices. The Council is composed of school districts with enrollments greater than 35,000 students located in cities with a population exceeding 250,000. Districts located in the largest city of any state are also eligible for membership based on urban characteristics. The Council's member districts have a combined enrollment of over 8.2 million students. Headquartered in Washington, D.C., the Council promotes urban education through research, instruction, management, technology, legislation, communications, and other special projects.

The Council and its members are deeply concerned that the U.S. Department of Education's ("Department") recently announced interim final rule ("Rule") regarding the provision of equitable services under emergency relief funds will divert hundreds of millions of dollars of desperately needed funds away from their primary intended recipients, public schools serving at-risk students. *See* CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg. 39,479 (July 1, 2020). Through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Congress in March 2020 appropriated approximately $16 billion that could be used to support elementary and secondary education, including $13 billion specifically to allow school districts to address needs arising out of the COVID-19 pandemic. The Act expressly required those funds to be allocated pursuant to well-established formulas under Title I of the Elementary and Secondary Education Act ("ESEA"), 20 U.S.C. § 6301 *et seq.*, including a requirement for school districts to reserve funding to provide "equitable services" to students and teachers in private schools based on the number of low-income students residing in the district and attending private schools. In disregard of this clear directive, the Rule adopted by the Department would force school districts to allocate funds not based on *low-income* private school students *residing* in the districts, but based on *all* students attending private schools in the district *wherever* they live. The Department has

1

unlawfully adopted an interpretation of the CARES Act equitable services requirement that is directly contrary to both the plain language of the Act and to Congressional intent.

The Council submits this brief to underscore the outrageousness of the Department's actions and their potentially devastating impact on public school districts struggling to find ways to operate safely and effectively during the COVID-19 pandemic.

## SUMMARY OF ARGUMENT

The Department has tried to unlawfully rewrite important emergency legislation to support its own spending priorities rather than those of Congress. In particular, the Department seeks to divert hundreds of millions of dollars that Congress intended to support public schools grappling with the pandemic, including thousands of schools in Council member districts, to private schools, regardless of the financial need of private school students.

In the CARES Act, Congress appropriated approximately $13 billion directly for use by elementary and secondary schools and directed school districts to allocate a portion of that money to provide equitable services to private schools based on the number of low-income students residing in the district and attending private schools. While an early version of the bill would have allocated funds to private schools based on their total enrollment of district resident students, Congress rejected that approach and instead directed that funds be allocated based on a well-established Title I formula, which has been in use for many years. This made sense in part because Congress already had allocated significant resources to private schools, but not to most public schools, in the form of forgivable loans under the Paycheck Protection Program ("PPP"), CARES Act § 1102, and also had made a variety of tax credits available to private schools but not public school districts.

Moreover, congressional leaders on both sides of the aisle have made clear that Congress intended the requirement that school districts provide "equitable services" under the CARES Act to be based on low-income private school students residing in their districts and not on all private school students regardless of their affluence or their residence. Likewise, the non-partisan Congressional Research Service concluded this is the proper interpretation of the CARES Act.

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 476-6568

2

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1358

Not only is the Department's attempt to rewrite the CARES Act substantively wrong, it has also been done in a chaotic manner that itself has been damaging to public school districts. More than a month after the Act was passed, the Department first issued non-binding regulatory guidance directing that equitable services should be provided to private schools based on their total enrollment. *See* Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs, (April 30, 2020) ("Guidance"). Many states and school districts, seeing that this "interpretation" directly contradicted the language of the Act, indicated that they would not follow it in making their allocations under that CARES Act. In response, two months later, and more than three months after the enactment of the Act, the Department, without notice and comment, adopted the Rule that effectively required the immediate adoption and implementation of its "interpretation" of the CARES Act's equitable services requirement as first set forth in the Guidance. As a result, more than three months after the enactment of the Act, most states and school districts have not yet been able to allocate the desperately needed resources appropriated by Congress to schools.

Even more significantly, the approach demanded by the Department will divert hundreds of millions of dollars from public schools to private schools, regardless of the financial need of their students. The effect on Council members, their schools, and the students they serve will be devastating. This money is needed to fund counselors, social workers and nurses and to purchase equipment like computers, faces masks, thermometers, hand sanitizer and COVID-19 tests. The need to protect the safety of students and faculty today is paramount. Moreover, many of the schools in Council member districts serve disadvantaged communities where schools must address the digital divide in order to equitably provide on-line educational opportunities. The Department's unlawful rewrite of the CARES Act severely undermines this critical work.

## BACKGROUND

The CARES Act authorized the Department to create three categories of Education Stabilization Funds ("ESF") grants that would be administered through state education agencies ("SEAs"). One of these, the Elementary and Secondary School Emergency Relief ("ESSER") CARES Act § 18003, provides CARES Act funds earmarked specifically for school districts.

The ESSER Fund was designed to provide flexible support directly to school districts, as outlined in a non-exhaustive list of broad possible uses in the CARES Act. *Id*. at § 18003(d).[1]

The purpose of section 18003 of the CARES Act was to provide financial support to schools, students, and teachers in light of the COVID-19 pandemic. Most of this money is directed to states and public school districts, but—as with other federal grants—a certain portion of the funding must be used to provide equitable services to non-public school students and teachers. The CARES Act, in section 18005, *expressly* states that the funding must be allocated "in the same manner" as it is allocated in section 1117 of the ESEA, which has long been commonly known as the Title I funding formula. Yet, the Department's initial Guidance, and then its Rule, both suggest and then effectively mandate a different, more generous, formula for the funding of private schools with money Congress allocated for public schools.

## ARGUMENT

### I.      The Department Unlawfully Replaced the Equitable Services Allocation Method Adopted by Congress with Its Own Preferred Approach.

The CARES Act, as enacted, is clear that the allocation for private schools is to be based on their low-income population residing in the relevant school district just like Title I equitable service calculations. Indeed, Congress did not adopt a draft bill that specifically would have provided equitable services for private school students and teachers based on total private school enrollment, as the Department's Rule attempts to do. Moreover, Congress rejected that allocation methodology justifiably as low-income and minority communities, like those served by Title I, have been disproportionately affected by the pandemic, and because the CARES Act and other emergency legislation also provide additional resources to private schools that are not available to public school districts. Finally, there is bi-partisan and non-partisan support for the view that

---

[1] CARES Act, PL 116-136, 134 Stat 281. Because the CARES Act was codified in scattered titles of the United States Code, including as statutory notes, and for ease of reference, all CARES Act provisions enacted in Public Law 116-136, 134 Stat. 281, are cited herein simply as CARES Act § ____. CARES Act sections 18003 and 18005 are codified at 20 U.S.C. § 3401 note.

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 376-2358

Congress intended the allocations to be done according to the Title I formula, just like the Act says.

**A.** **The Department's funding formula erroneously considers** *all* **private school students rather than only** *low-income* **students residing in the district.**

Allocation of CARES Act funds with respect to private schools is statutorily and expressly tied to the well-established formula set forth in Title I. Under the CARES Act, school districts receiving funding under the Act "shall provide equitable services **in the same manner** as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools." CARES Act § 18005 (emphasis added). Section 1117 of the ESEA, or Title I, requires schools to provide equitable services "[t]o the extent consistent with **the number of** *eligible* **children . . . in the school district** . . . who are enrolled in private" school. 20 U.S.C. § 6320(a)(1) (emphasis added). Title I requires that "[e]xpenditures for educational services and other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance areas **based on the number of children from low-income families who attend private schools.**" *Id.* § 6320(4)(A)(i) (emphasis added). Congress and the Department have long been aware of this methodology and, as recently as October 2019, the Department instructed school districts to "[e]nsure that its expenditures for equitable services [under Section 1117 of Title I] are equal to the proportion of funds generated by children from low-income families who reside in participating Title I public school attendance areas and attend private schools."[2]

The Department's directive in two of the three ostensible options under its interim final rule—that CARES Act funds should be provided to private schools on the basis of the *number of students attending private school within the school district's boundaries,* regardless of where those students live, rather than on the basis of the *number of low-income students residing in the school district's jurisdiction*—is expressly contrary to the statute for two reasons.

---

[2] U.S. Dep't of Educ., *Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf (emphasis added) ("October 2019 Guidance").

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 476-2458

i.  **Congress expressly declined to require public school districts to allocate equitable services funding on the basis of *all* students in private schools rather than "eligible" or low-income students.**

First, the use of *all* students rather than *low-income* students is not supported by the legislative history of the Act. An early version of the bill would have expressly allocated funds to private schools based on their total enrollment. The enacted CARES Act *rejected* this approach, instead calling for the use of the Title I formula. Under that earlier version of the bill (as under the Department's Rule), hundreds of millions of dollars would have been diverted away from public schools who truly need those funds and towards private schools who do not. Congress refused to adopt this approach when it chose instead to enact a bill that specifically refers to Section 1117 of the ESEA, recognizing that funds to support private schools should be based on the number of *low-income* students, not based on *all* students at private schools.[3]

Specifically, an early draft of the appropriations provision of the CARES Act, received by *amicus curiae* on March 22, 2020, included a section titled "Assistance to Non-Public Schools," which provided as follows:

> SEC. 18005. (a) IN GENERAL.— A local educational agency receiving funds under sections 802 or 803 shall provide equitable services to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools. The level of such services *shall reflect the proportion of students residing within the boundaries of the local educational agency who attend non-public schools*.

*See* Exhibit A, Declaration of Jeff Simering; Exhibit A-1, HEN20279 (emphasis added).   This language is not present in the enacted bill. Rather, the enacted CARES Act mandates that the familiar Title I formula be used:

> SEC. 18005. (a) IN GENERAL. — A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services ***in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools***, as determined in consultation with representatives of non-public schools.

[3] Significantly, Section 8501 of the ESEA, which does, in fact, direct equitable services to all eligible private school students regardless of residence status, is *not* referenced in the CARES Act.

6

CARES Act § 18005(a) (emphasis added). Congress knew how to write an allocation formula like the one that the Department wants. Indeed, it did write one. It just chose not to enact that version into law.

The directive to use the formula set forth in section 1117 of the ESEA—which, as explained above, requires equitable services to be provided to private schools in a proportionate share reflecting the number of low-income students residing within the boundaries of the school district or "local educational agency" ("LEA")—permits less money to flow to private schools than would have occurred under the previous draft of the CARES Act; the proportionate share is not based on *all* the students residing in the district's jurisdiction or even the Title I schools' attendance areas that attend private schools, but only those low-income students who do.

The difference between these two versions of the bill—the earlier draft basing equitable services on *the proportionate share of all private school students residing in the LEA* and the later enacted bill basing equitable services on *the number of low-income students residing in participating Title I attendance areas*—is of critical importance. The Department's Rule may track early development of the CARES Act, but entirely fails to follow its *enacted* provisions.

Moreover, there are two formulas in ESEA. In section 1117, equitable services are provided based on the number of low-income students. In contrast, the equitable services provision in section 8501 does *not* require school districts to base private schools' proportional share on the number of low-income children living in the district who attend private school. *See* 20 U.S.C. § 7881(b). Again, if Congress had wanted equitable services to be provided based on *all* students in private schools, it would have enacted the earlier-drafted formula, or referenced section 8501 of ESEA which applies to part C of Title I, part A of Title II, part A of Title IV, and part B of Title IV, rather than section 1117 which applies only to part A of Title I. The choice to use section 1117 was clear and unambiguous.

In enacting the CARES Act, Congress thus declined to use a formula which would allow for *more* money to flow through public schools to serve private schools than is allowed by the longstanding method set forth in section 1117 of the ESEA. The Department's position is not

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-5458

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

only contrary to the plain language of the CARES Act, but also to clear Congressional intent as demonstrated by the Act's context and legislative history.

ii.     **Congress also required that equitable services funding be allocated on the basis of student residence.**

Second, the Department's position that the proportionate share is based on *the number of students who attend a private school that is located in the district*—rather than the *number of low-income students residing in the district who attend a private school*—impermissibly requires that the proportionate share be based not on which students *live* in the district, but which students *attend* private schools in the district. As with the use of *all* private school students in the formula rather than only *low-income* students, the use of *students who attend private school in the district, regardless of where the students reside* leads to more money diverted to private schools. It is also plainly inconsistent with the text of the CARES Act and the ESEA.

This distinction matters: LEAs receive local tax revenue from persons living in their district, but not from those outside it. Under the Department's interpretation, public schools are required to take money dedicated to the students who both reside in *and* attend school in their district and allocate it instead to students who may reside elsewhere—and pay taxes elsewhere—but attend *private schools* in the district. Ignoring the residency requirement of Section 1117 of the ESEA, as expressly required by the CARES Act, reflects the Department's arbitrary and unlawful interpretation.

Congress expressly chose to require that equitable services be provided to private schools "in the same manner" as that required in Title I, or section 1117 of ESEA. The Department cannot override the statutory text of the CARES Act, and its interpretation must be declared arbitrary and capricious.

B.     **There were good reasons for Congress to choose the specific allocation formula that it did.**

First, it is well documented that the COVID-19 pandemic is disproportionately affecting low-income and minority communities. As the primary source of federal support for elementary and secondary education, Title I targets precisely these communities, many of whom are located

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 476-6438

8

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 476-5458

in Council member districts. It also makes sense, for this same reason, to allocate resources based on *low-income* students rather than all students and to focus on the students in private schools *residing* in these urban areas rather than those that may be commuting to those private schools from affluent suburbs. Indeed, in some Council member districts near state borders, students commute from other states to attend expensive private schools. Thus, allocating resources where they are most needed, which Congress did, makes sense.

Second, allocating these CARES Act funds to private schools based on their total enrollment and thereby dramatically increasing their proportionate allocation would have been unreasonable and unfair for Congress to do, because private schools are eligible for other federal resources that public school districts are not. For example, the CARES Act also created the Paycheck Protection Program ("PPP"), through which the Small Business Administration ("SBA") provided loans to certain small businesses, including private schools. CARES Act § 1102. These loans will be fully forgiven by the SBA. CARES Act § 1106. Under the PPP, all small businesses, as well as all tax-exempt non-profit organizations described in section 501(c)(3) of the Internal Revenue Code, are eligible to receive loans. CARES Act § 1102(a)(2)(D).[4] The 500-employee cap as well as the inclusion of Section 501(c)(3) nonprofits opened the door for private schools to secure PPP loans to the tune of millions of dollars. Just in Council member school districts alone, over 75 private schools each received over a million dollars from the PPP, with some individual schools receiving close to 10 million dollars.[5]

Here are a few examples of such schools:[6]

| School Name | City, State | PPP Loan Range |
|---|---|---|
| St. Ann's School | NYC, NY | $5–$10 million |
| Columbia Grammar and Preparatory School | NYC, NY | $5–$10 million |

[4] *See also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (April 15, 2020) (the SBA interim final rule regarding implementation of CARES Act §§ 1102, 1106).

[5] Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans*, THE WASHINGTON POST (July 6, 2020), https://www.washingtonpost.com/graphics/2020/business/sba-ppp-data/?utm_campaign=wp_main&utm_medium=social&utm_source=twitter&itid=lk_inline_manual_5; *see also* Exhibit B.

[6] *See* Exhibit B (citations contained therein).

9

| School Name | City, State | PPP Loan Range |
|---|---|---|
| Poly Prep Country Day School | NYC, NY | $5–$10 million |
| Albuquerque Academy | Albuquerque, NM | $2–$5 million |
| Head-Royce School | Oakland, CA | $2–$5 million |
| Francis Parker School | San Diego, CA | $2–$5 million |
| De Paul College Prep | Chicago, IL | $1–$2 million |
| Cincinnati Hills Christian Academy | Cincinnati, OH | $2–$5 million |
| Sidwell Friends School | Washington, D.C. | $5–$10 million |
| St. Louis University High School | St. Louis, MO | $2-$5 million |
| Bishop Lynch High School | Dallas, TX | $2–$5 million |
| Antonian College Preparatory High School | San Antonio, TX | $1–$2 million |
| Christopher Columbus High School | Miami, FL | $2–$5 million |
| Central Catholic High School | Portland, OR | $2–$5 million |

In addition to the benefit of these substantial sums in forgivable loans, private schools are also eligible for tax credits that are not available to public school districts. For example, private schools benefit from payroll tax credits under the Families First Coronavirus Response Act (the "FFCRA"), signed by President Trump on March 18, 2020. PL 116-127, March 18, 2020, 134 Stat 178, Division G, §§ 7001–7005. The FFCRA provides small and midsize employers refundable tax credits that reimburse them, dollar-for-dollar, for the cost of providing paid sick and family leave wages to their employees for leave related to COVID-19. *Id*. §§ 7001 ("Payroll Credit for Required Paid Sick Leave"), 7003 ("Payroll Credit for Required Paid Family Leave"). Similarly, private schools, but not public school districts, also benefit from the Employee Retention Credit, which is a refundable tax credit against certain employment taxes equal to 50 percent of the qualified wages an eligible employer pays to employees after March 12, 2020, and before January 1, 2021. CARES Act, § 2301. Eligible employers can get immediate access to the credit by reducing employment tax deposits they are otherwise required to make. *Id*. For each employee, wages (including certain health plan costs) up to $10,000 can be counted to determine the amount of the 50% credit. *Id*. § 2301(a)(b)(1). Congress clearly has provided many significant COVID-19-related financial benefits to private schools that it has not provided to public school districts.

Thus, for at least two obvious reasons, it made sense for Congress to reject a bill that would have allocated CARES Act resources to private schools based on their total enrollment and to instead mandate the Title I allocation methodology. In contrast, the Rule adopted by the

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-2548

Department is not only unlawful (as discussed above in section I.A.) but also unfair and unreasonable (as discussed further below in sections II and III).

### C.      There is bi-partisan support that Congress's intent was that funds be allocated based on the Title I formula.

Even if in some manner the relevant text of the CARES Act were ambiguous—which it is not—and the legislative history were unpersuasive—which it is not—the drafters of the bill themselves have clearly indicated that it was their intent in drafting and passing the bill that equitable services be provided to private schools using the Title I funding formula.

For example, on May 20, 2020, three Democratic congressional leaders—Representative Bobby Scott, Representative Rosa DeLauro, and Senator Patty Murray—wrote to Secretary DeVos, stating:

> [T]he Department broke with statutory requirements of the CARES Act and longstanding precedent of the equitable services provision in section 1117 of ESEA by issuing guidance that directs LEAs to use emergency relief funds for the provision of services to students at private schools regardless of their wealth or residence. This action also contradicts the Department's equitable services non-regulatory guidance issued on October 7, 2019.

Exhibit C.[7] The members, all of whom are Congressional committee chairs or ranking members on committees specific to education and/or appropriations, went on to say, "[t]he statutory language and Congressional intent is clear: LEAs should use these emergency relief funds to provide equitable services only based on the number of low-income students attending private schools in their LEA, not all students attending private schools in the LEA." *Id.* This Congressional intent was confirmed by senior Republican Senator Lamar Alexander, chairman of the Senate Committee on Health, Education, Labor, and Pensions and former U.S. Secretary of Education, the next day. On May 21, 2020, Senator Alexander was asked about the

---

[7] Letter from Robert C. "Bobby" Scott, Rosa L. DeLauro, and Patty Murray, U.S. Congress, to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020) (available at https://edlabor.house.gov/imo/media/doc/2020-5-z0%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf and attached hereto at Exhibit C).

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

Department's Guidance, and said, "I thought, and I think most of Congress thought, that money from the CARES Act would be distributed in the same way that Title I is distributed."[8]

Moreover, the non-partisan Congressional Research Service ("CRS") undertook an extensive analysis of the text of the CARES Act and its legislative history and concluded that "a straightforward reading of section 18005(a) based on its text and context suggest that the CARES Act requires LEAs [school districts] to follow section 1117's method for determining the proportional share, and thus to allocate funding for services for private school students and teachers based on the number of low income children attending private schools." Memorandum from Congressional Research Service to House Comm. on Educ. and Labor 2 (July 1, 2020) (attached hereto as Exhibit D). The CRS further concluded that the relevant number for this calculation is the "number of private-school children from low-income families residing in the LEA's participating public school attendance areas." *Id.* at 3.

Thus, Congress clearly intended that the funds provided to school districts under the CARES Act be proportionately shared with private schools *based on the number of low-income students residing in the school district's Title I school attendance areas*. This clear Congressional intent, supported by the statutory text itself as well its context and legislative history, is controlling. The Department does not have any authority to depart from that clear intent or to rewrite the plain language of the Act.

## II. The Chaotic Manner in which the Department has Acted Has Delayed the Distribution of Critical Resources and Placed School Districts in Legal Jeopardy.

Besides being an unlawful abuse of agency authority resulting in significant harms— including the potential deprivation of hundreds of millions of dollars of much-needed funds for our nation's most vulnerable students, as detailed in Section III below—the Department's arbitrary and *ad hoc* actions also have led to considerable confusion that has delayed the distribution of critical resources. The Department's interpretation of the Act has constantly

---

[8] Andrew Ujifusa, *Sen. Alexander Splits from Betsy DeVos on COVID-19 Aid to Help Private Schools*, EDUCATION WEEK (May 21, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/alexander-devos-COVID-aid-private-schools-CDC-reopening.html.

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-4548

shifted since its enactment. For example, the Rule issued on July 1, 2020 contains *new* substantive requirements that differ both from those in the Act (enacted in March), the Department's initial notice, the Department's April 30, 2020 Guidance. Moreover, by virtue of its interim nature, the Rule also creates the possibility for yet additional changes in the Department's policy after the 30-day comment period. Throughout this period of uncertainty, however, the Department has consistently done one thing: presented school districts with an impossible choice between compliance with its current "interpretation" or with the actual terms of the Act. If school districts do the former, they forfeit hundreds of millions of dollars to private schools and also run the risk of violating certifications that they will follow the allocation requirements of the Act. If they do the latter, they risk penalties from the Department. The Department's actions over the last four months thus have created an untenable situation.

**A.   The Guidance created unnecessary confusion for school districts and put them at legal risk.**

Congress passed the CARES Act on March 27, 2020. Section 18002(a) of the Act mandated: "[T]he Secretary *shall* make Emergency Education Relief grants to the Governor of each State with an approved application"; "*shall* issue a notice inviting applications not later than 30 days of enactment of this Act"; and "*shall* approve or deny applications not later than 30 days after receipt." CARES Act § 18002(a) (emphasis added).

Accordingly, on April 23, 2020, the Department published a notice which included a "Deadline for Transmittal of Certification and Agreement" of "[n]o later than July 1, 2020." *See* U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* at 2 (April 23, 2020)[9] (the "Notice"). The Notice also indicated that "[e]ach SEA's Certification and Agreement will be processed as it is received and funds will be obligated on a rolling, expedited basis with the expectation that State educational agencies (SEAs) and local educational agencies (LEAs) will also use every effort to expend the funds quickly to address exigent student needs." *Id.* The Notice emphasized the

---

[9] Available at https://oese.ed.gov/files/2020/04/ESSER-Fund-Notice-Final.pdf.

urgency of applying for and utilizing the emergency funding to address challenges of educating students in a remote learning environment, stating:

> Consistent with section 18003(d) of the CARES Act, LEAs may use ESSER funds to address the impact that COVID19 has had, and continues to have, on elementary and secondary schools across the Nation. The Department encourages SEAs that use funds for remote learning to make strategic investments that promote student achievement through long-term improvements in infrastructure and operations so that students may receive educational services whether or not school campuses are open or closed.

*Id.* at 4. With respect to equitable services, the Notice restated the text of section 18005(a), without any indication that it would be deviating from the approach recently reaffirmed[10] in its 2019 Title I equitable services guidance. *See Id.* at 6 ("An SEA must ensure that an LEA that receives an ESSER Fund subgrant provides equitable services to students and teachers in non-public schools located within the LEA in the **same manner as provided under section 1117 of the ESEA** . . . .") (emphasis added).[11]

Consistent with the Act, the Notice included "Certification and Agreement" instructions, requiring each applicant to "provide an assurance that it will comply with all requirements that apply to the ESSER Fund," including the statute's equitable services provision. Relevant here, the certification form required applicants for CARES Act funds to:

- "allocate [ESSER] funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019";

- "ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act"; and

- "***ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same***

---

[10] *See* October 2019 Guidance, *supra* n. 2.

[11] Although the equitable services provision of the Notice indicated that, "[t]he Department will provide additional guidance to LEAs on equitable services requirements," *id.*, no reasonable state or school district could have predicted the Department's arbitrary conditions imposed on the provision of ESSSER funds first in the Guidance on April 30 and then in the Rule issued on July 1.

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-2458

*manner as provided under section 1117 of the ESEA*, as determined through timely and meaningful consultation with representatives of non-public schools."[12]

Thus, as of April 23, 2020, school districts and states were led to believe by the plain language of the Act and by the form released by the Department that equitable services allocations under the CARES Act would employ the Title I methodology. Initial planning proceeded based on that understanding and many states and school districts, including Council members, executed certifications that they would comply. It was not until the non-binding Guidance was issued on April 30, 2020 (more than a month after the Act was enacted) that school districts had any idea the Department might encourage a different approach.

As a result, school districts face legal risk if they fail to follow the allocation method set forth in the Act, as they have certified that they will. On the other hand, if they follow the Act and not Department's "interpretation" as originally announced in the Guidance, they face potential penalties from the Department and possible challenges from private schools based on the Department's position. Either way, the Department has put school districts in an impossible situation.

**B.     The Rule effectively mandates the Department's flawed interpretation and increases confusion and hardship for school districts.**

Recognizing the significant hardships the Guidance imposed on school districts, multiple educational associations, spearheaded by the Council of Chief State School Officers ("CCSSO"), alerted the Department of its flawed interpretation of the CARES Act and put the Department on notice of the significant confusion and harm the Guidance was causing for both states and school districts. *See* Letter from Carissa Moffat Miller, Exec. Dir., CCSSO, to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 5, 2020).[13] Rather than mitigate the damage already done by withdrawing and/or amending the Guidance, the Department doubled down, accusing the CCSSO of

---

[12] U.S. Dep't of Educ., *Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund)* at 2–3 (April 2020), https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

[13] *Available at* https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

15

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-4458

1   "improperly discriminat[ing] against an entire class of children," despite the fact that Congress,

2   not the CCSSO, had selected the allocation formula.[14]

3          Therefore, many states and school districts subsequently decided to follow the statute and

4   to expressly reject the approach outlined in the Guidance. According to one report,[15] a number of

5   states led by both Republican and Democratic governors rejected the Department's

6   interpretation. For example, Oklahoma, Mississippi, Indiana, Maine, Washington, Pennsylvania,

7   New Mexico and Wisconsin, all began calculating allocations according to the plain text of the

8   statute. New Mexico, for example, in a letter from its Public Education Department to

9   superintendents and charter school heads stated it would follow the plain language of the CARES

10  Act stating "[t]his advisory aligns with the plain language of the CARE Act and is consistent

11  with longstanding equitable services calculations under Title I criteria, as well as U.S.

12  Department of Education's interpretations of the [ESEA] over decades and as recently as

13  October 2019." Mem. from State of New Mexico Public Educ. Dep't 5 (May 14, 2020) (attached

14  hereto as Exhibit E).

15          In early June, ten states indicated they would or were likely to follow the Department's

16  guidance.[16] States such as Colorado, Illinois and Ohio have followed the Department's

17  cautionary directive in its letter response to CCSSO[17] and advised school districts to calculate the

18

19

20  [14] *See* Letter from Betsy DeVos, Sec'y, U.S. Dep't of Educ., to Carissa Moffat Miller, Exec. Dir., CCSSO    (May    22,    2020)    (hereinafter    "DeVos    Letter")

21  https://blogs.edweek.org/edweek/campaign-k-
    12/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%20

22  20.pdf; *see also* Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private
    School Students*, EDUCATION WEEK (May 26, 2020), https://blogs.edweek.org/edweek/campaign-

23  k-12/2020/05/devoscovid-aid-private-school-students-rule.html)

24  [15] *See* Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus
    Funds    to    Private    Schools*,    POLITICO    (June    1,    2020),

25  https://www.politico.com/newsletters/morning-education/2020/06/01/meet-acts-new-top-
    executive-788066.

26  [16] *Id.*

27  [17] *See* DeVos Letter, *supra* n. 13, at 1  ("If they or their district superintendents insist on acting
    contrary to the Department's stated position, they should, at minimum, put into an escrow

28  account the difference between the amount generated by the proportional-student enrollment
    formula and the Title I, Part A formula.").

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

equitable share based on students in poverty, but to set aside the difference in funding in an escrow account.[18] Other states remained unsure and are still waiting to see what happens.

In response, however, more than three months after the CARES Act was enacted, the Department concluded its Guidance was inadequate and it adopted the Rule. On July 1, 2020, the Department published the Rule in the Federal Register without notice and comment and made it effective immediately. 85 Fed. Reg. 39,479. In so doing, the Department added yet another layer of confusion and complexity to Congress's simple mandate to "make Emergency Education Relief grants to the Governor of each State with an approved application." *See* CARES Act § 18002(a).

Indeed, instead of merely codifying the already flawed and inequitable approach suggested by the Guidance, the Rule effectively created two ostensible choices for school districts with respect to how to calculate the proportional share of CARES Act funds for equitable services. However, neither of these "choices" is viable. Rather, both choices are effectively "poison pills," as explained in detail in the Plaintiffs' brief. S*ee* Dkt. 25-3 at 7:27–8:28. Under the Rule, school districts can either (1) follow the Department's preferred approach, in violation of the Act, and forfeit a substantial share of their funds for the benefit of private schools, but maintain their congressionally-granted discretion with respect to how to spend the remaining funds; or (2) maintain the full funding intended for public schools under the CARES Act, but give up the ability to serve all of their students and adhere to severe restrictions on how the money can be spent.

Neither option is allowed by the Act, as discussed above, and neither one is workable for school districts. First, the funds allocated are desperately needed by school districts trying to reopen during the pandemic. COVID-19 has drastically affected public education in the United States. School districts across the nation were ordered to close and transition to online learning in the spring, incurring significant additional expenses to ensure all students (particularly low-income students like many of those served by Council members) had adequate access to necessary technology. Since then, states throughout the country have faced declining revenue

[18] Quilantan, *supra* n. 14.

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1518

and corresponding budget cuts, including billions of dollars in reduction to funding for public education. These cuts come at the same time when the additional costs of re-opening schools safely, according to protocols recommended by the Center for Disease Control ("CDC"), are estimated by the CCSSO to amount to somewhere between $158 and $245 billion.[19] School districts cannot afford to lose any resources at this time.

Similarly, it is impractical for school districts, including Council members, to give up their ability under the CARES Act to use these funds with flexibility in any school in which they are needed. Some of the emergency funds authorized by Congress are desperately needed precisely to make up for lost state and local revenue, an approach complicated if not made unworkable by the Rule, particularly if a school district follows the Act's allocation method rather than the Department's. Likewise, as discussed in Section III below, resources to open schools safely like personal protective equipment for schools opening for in-person instruction or technology to support online instruction are needed at all schools and not only Title I schools, but the Rule would restrict districts from using the funds in this manner, unless they adopt the Department's allocation method. As a result, the Rule does not give school districts any actual choice.

The Rule also increases the legal pressure on school districts because it purports to be legally binding, even though it directly contradicts the Act. And, to make matters worse, as an interim rule, the Rule itself is subject to further modification by the Department. In sum, the Rule exacerbates the problems for school districts caused by the Guidance and further underscores the arbitrary nature of the Department's approach to equitable services under the CARES Act.

C.     **The Department's inconsistent interpretation also has resulted in delay in the distribution of critical resources.**

In addition to causing unnecessary confusion and uncertainty regarding an otherwise clear and unambiguous statutory entitlement, the Department's unclear and shifting "guidance"

---

[19] Letter from Carissa Miller, Exec. Dir., CCSSO, to Lamar Alexander, U.S. Congress (June 24, 2020) (available at https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf).

18

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 476-6358

has resulted in unacceptable delay in school districts' ability to apply for and access these much-needed resources.

First, because of the changing interpretations and the introduction of entirely new formulas for calculating the proportionate share under the Guidance and then the Rule, there is little to no consensus or clarity regarding the actual dollar amounts available for school districts to rely on in order to plan appropriately for their use. Because of the Department's actions, the academic (and fiscal) year during which the pandemic first began disrupting delivery of in-person education and other operations has now expired without school districts having access to congressionally-appropriated emergency funds to cover expenditures back to March. In addition, with each new interpretation, school districts have been required to re-analyze and re-assess current budgets, undermining school administrators' ability to focus on the real emergencies at hand: initially, the continuation of high-quality education with schools closed and, now, the safe return of students and teachers to schools (if possible) in the midst of a global pandemic.

Second, under the CARES Act, as under Title I, school districts must engage in a consultation process with private schools in order to provide appropriate services to students in those private schools.[20] With each new interpretation from the Department, school districts have had to delay, restart, or repeat this consultation process, which has harmed not only students in public school districts, but also disadvantaged students in private schools who should be benefitting from these resources. In some states, like Texas, state educational authorities have gone so far as to expressly require school districts to restart a consultation requirement based on the Department's July 1 Rule.[21] As mandated by the Act, it is critical for school districts to

---

[20] *See* CARES Act § 18005(a) (requiring LEAs to provide equitable services "in consultation with representatives of non-public schools"); *see also* Notice, *supra* note n.7, at 6 ("An SEA must ensure that an LEA that receives an ESSER Fund subgrant provides equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, *as determined through timely and meaningful consultation with representatives of non-public schools*.") (emphasis added).

[21] *See* Texas Educ. Agency, *Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs* 3 (updated July 9, 2020), https://tea.texas.gov/sites/default/files/covid/COVID-19-CARES-Act-Equitable-Services-FAQ.pdf ("If consultation has already been completed and the district is changing the calculation option, the consultation process must be reopened. The revised consultation process must be

19

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 476-6158

engage in a meaningful consultation process with private school representatives to ensure that the funds are utilized in an effective way.

The Department's chaotic deployment of its preferred policy position through the Guidance and then the Rule has unnecessarily delayed that process to the detriment of school districts and private schools nationwide.

## III.   The Interim Final Rule Adopted by the Department Would Divert Hundreds of Millions of Dollars from Public Schools to Private Schools with Devastating Consequences for School Districts and their Students.

If the approach to CARES Act equitable services allocations suggested in the Guidance and mandated by the Rule is allowed to stand, it would divert hundreds of millions of dollars away from public school districts that are already facing massive budget cuts and exacerbate the challenges of operating safely and effectively during an ongoing global pandemic. The consequences of this diversion would be devastating for students and teachers nationwide, including the millions in Council member districts.

### A.   The Amount of Funds Diverted is Substantial.

The approach towards equitable service allocations suggested and then mandated by the Department would dramatically increase the percentage of the funds appropriated by Congress under the CARES Act to support elementary and secondary education that flow to private schools, regardless of the number of low-income students they serve. For example, the proportion of CARES Act allocations going to private schools would increase in member districts polled by the Council, in one district by as much at 1280%. *See* Exhibit. F, Declaration of Manish Naik; Exhibit F-1. The diversion of funds to private schools, regardless of need, would dramatically reduce the funds available to public school districts like members of the Council. In polling its members this week, the Council received 16 reliable responses which indicated that the dollar amount lost to private schools in these districts would range from about $628,000 to $6,485,000. *See* Exhibit F ¶¶ 3-6; Exhibit F-1. The total amount lost by these

documented. TEA recommends extending consultation timeline to ensure the new requirements are discussed with private school officials.").

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 526-1458

districts would be approximately $33,337,000. *Id.* Three other Council members, the New York City Department of Education, the Chicago Public Schools, and the San Francisco Unified School District, all of whom are Plaintiffs in this case, disclosed in written testimony that they would lose about $53,000,000, $10,170,000, and $1,740,000 respectively. *See* Exhibit F ¶¶ 7, 9 (citing Dkt. 35-2, Declarations of Lindsey Oates, Dr. Janice K. Jackson and Meaghan Wallace). If the amount of CARES Act funding lost through the Department's approach was similar in other school districts relative to their total low-income population, the Council projects that its member districts would lose a total about $292,000,000 of these much-needed, emergency resources. *Id.* ¶ 11.

Moreover, the Council's 76 members, though relatively large in size are just a small fraction of the public school districts in the United States. An analysis of the effect of the Department's approach on the 185 school districts in Texas alone, for example, indicates that those districts would collectively lose about $38 million in CARES Act funds.[22]

The allocation method effectively mandated by the Rule would also divert resources from private schools that serve a large number of low-income students. In Cleveland, for example, where a large number of low-income students attend private schools because of Ohio's voucher program, Council member the Cleveland Metropolitan School District ("CMSD") estimates that most private schools will lose money under the Department's methodology, favoring a select few who serve few low-income students. *Id.* ¶¶ 13-14. Overall the cumulative effect of the allocating funds for equitable services based on total enrollment in Cleveland's private schools would be to divert about $822,952 away from CMSD's public schools, reallocate approximately $890,000 away from 47 non-public schools with high poverty, and redirect approximately $1.7 million to 16 private schools with low numbers of high poverty students. *Id.* ¶¶ 14-15.

The overall effect of the Department's approach is thus to divert hundreds of millions of dollars of critically needed funds away from public school districts serving low-income

---

[22] Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA ISSUE BRIEF (July 16, 2020), https://www.idra.org/wp-content/uploads/2020/07/Cutting-Public-School-Relief-Funds-to-Subsidize-Private-Schools-IDRA-Issue-Brief-July-16-2020.pdf ("IDRA Issue Brief").

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-4438

communities and millions more away from private schools serving high percentages of low-income students. This is not how Congress wanted to support educators' efforts to address the pandemic.

**B.**    **The Diversion would Deprive Millions of Public School Students of Critical Resources and Life-Saving Services during the Pandemic.**

The diversion of these substantial funds away from school districts is depriving millions of students of exactly the resources these funds were supposed to support. The funds made available through the CARES Act were intended, once allocated, to be used for purposes such as purchasing sanitization and cleaning supplies, purchasing personal protective equipment for teachers and students, and planning for and coordinating long-term closures including by providing portable meals and technology services. These are critical resources necessary during this pandemic that are being deprived from millions of students in Council member districts.

The Council polled its member districts and asked them to list the consequences of the losses suffered due to the diversion of significant funds away from public schools and into the hands of private schools. Exhibit F, ¶¶ 3-4. Here are five salient examples:

- **Broward County Public Schools**: Because $540,000 has been diverted to private school funding, the District was not able meet the technology needs of schools as they transitioned to a virtual environment. It also had to reduce funds for professional development and instructional materials.

- **Baltimore City Public Schools**: If the District must provide the additional $2,419,639 to private schools this will reduce the number of students that can receive a Chromebook to support distance learning by 6,050. Alternatively, the District would have to reduce the number of students that can be provided a semester of tutoring by 3,252.

- **Charleston County School District**: This District was not able to provide the childcare services that the district's teachers needed to support online instruction. It also will not be

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 576-1458

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (317) 376-3458

able to purchase sufficient PPE to support reopening. In addition, it will struggle to provide Wi-Fi devices for students living in areas with limited internet capability.

- **District of Columbia Public Schools:** The $1.8M this District will lose could purchase 2,100 additional laptop devices for low-income students to support their virtual learning. $400,000 could provide mentoring and tutoring services for 400 at-risk students. $1.2M could purchase internet connectivity for one year for 5,000 low-income students.

- **Portland Public Schools:** This District would need to cut more than $628,000 from needed Chromebooks, safety supplies and materials, and other resources as well.

The analysis of Texas school districts discussed earlier shows a similar impact across the school districts in that state. The study concludes that the $38 million lost by those districts could "have been used to fund hundreds of counselors, social workers and nurses and to purchase equipment like facemasks and hand sanitizer. It could have been used to support remote learning and other critical services for students and teachers." IDRA Issue Brief at 1.

As positive COVID-19 test results rise throughout numerous places in the country, school districts are faced with an impossible choice made even more difficult by this diversion of funds: do we start school in-person without enough face masks and personal protective equipment or do we start school remotely when often large portions of the student body have neither internet connectivity or laptop devices to allow them to work remotely? This dilemma was intended to be at least partially alleviated by the availability of CARES Act funds. Instead, the Department's unlawful Guidance and Rule exacerbate the problem by depriving public schools of necessary funds. If the language of the CARES Act itself is properly followed, then Council member districts would have significantly more funds available to help address current conditions by providing resources necessary for safe in-person instruction and/or equitable remote learning.

The challenges facing public school districts today are real and the potential consequences are grave. School districts are addressing unprecedented issues with scarce resources. The Department's attempt to divert hundreds of millions of dollars should not be

23

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

allowed to make these difficult tasks even more challenging. The funds these districts stand to

lose under the Department's arbitrary interpretation, if freed up by this Court's injunction, would

allow them better to address the challenges of the COVID-19 pandemic, as Congress intended.

## <u>CONCLUSION</u>

For all of these reasons, the Council of the Great City Schools respectfully suggests that

Plaintiffs' motion for preliminary injunction should be granted.


Dated: July 24, 2020                                  Respectfully submitted,

                                                      HUSCH BLACKWELL LLP

                                                      /s/ *Donald J. Mizerk*
                                                      Donald J. Mizerk (CA Bar No. 208477)
                                                      John W. Borkowski (IL Bar No. 6320147)
                                                      Mary Deweese (IL Bar No. 6326512)
                                                      *Pro hac vice motions pending*
                                                      120 South Riverside Plaza, Suite 2200
                                                      Chicago, Illinois 60606
                                                      Phone: (312) 526-1538
                                                      Fax: (312) 655-1501
                                                      don.mizerk@huschblackwell.com
                                                      john.borkowski@huschblackwell.com
                                                      mary.deweese@huschblackwell.com


                                                      Paige Duggins-Clay (TX Bar No. 24105825)
                                                      *Pro hac vice motion pending*
                                                      111 Congress Avenue, Suite 1400
                                                      Austin, Texas 78701
                                                      Phone: (512) 472-5456
                                                      Fax: (512) 479-1101
                                                      paige.duggins-clay@huschblackwell.com


                                                      Aleksandra O. Rushing (MO Bar No. 68304)
                                                      Shmuel B. Shulman (MO Bar No. 71175)
                                                      *Pro hac vice motions pending*
                                                      190 Carondelet Plaza, Suite 600
                                                      St. Louis, Missouri 63141
                                                      Phone: 314-345-6275
                                                      Fax: 314-480-1505
                                                      aleks.rushing@huschblackwell.com
                                                      shmuli.shulman@huschblackwell.com

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538

1

### **CERTIFICATE OF SERVICE**

2

The undersigned certifies that on the 24th day of July, 2020, a copy of the above and

3

foregoing document was filed with the Clerk of Court using the CM/ECF system which sent

4

electronic notification of such filing to all those individuals currently electronically registered

5

with the Court.

6

7

/s/     *Donald J. Mizerk*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538

THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (3:20-cv-04478-JD)

# EXHIBIT A

HUSCH BLACKWELL LLP
Donald J. Mizerk Esq., (CA Bar No. 208477)
John W. Borkowski (IL Bar No. 6320147) (*pro hac pending*)
120 South Riverside Plaza, Suite 2200
Chicago, Illinois  60606
Phone:  (312) 526-1538
Fax:  (312) 655-1501
don.mizerk@huschblackwell.com

Attorneys for Amicus Curiae
COUNCIL OF THE GREAT CITY SCHOOLS

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF MICHIGAN, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF NEW MEXICO, STATE OF WISCONSIN, THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, BOARD OF EDUCATION FOR THE CITY OF CHICAGO, CLEVELAND MUNICIPAL SCHOOL DISTRICT, AND SAN FRANCISCO UNIFIED SCHOOL DISTRICT,**<br><br>                    Plaintiffs,<br><br>**v.**<br><br>**ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,**<br><br>                    Defendants. | Civil Case No.3:20-cv-04478-JD<br><br><br><br><br><br><br><br>**DECLARATION OF JEFFREY SIMERING IN SUPPORT OF THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF**<br><br><br><br>Judge: Hon. James Donato<br>Trial Date:  None set<br>Action Filed: July 7, 2020 |

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois  60606
Phone:  (312) 526-1538

I, Jeffrey Simering, do hereby swear upon my oath that the following statements are true and correct to the best of my knowledge, information and belief, and that I could competently testify as follows if called upon to do so:

1. I am the Director of Legislative Services for the Council of Great City Schools. I have served in this position since 1994.

2. My responsibilities include interacting with Congress on education-related legislation and appropriations as a registered lobbyist, interacting with various federal executive departments and agencies on education policy and financial assistance to schools, working with other education associations and coalitions on both federal legislation and administrative policies, and advising urban school districts that are members of the Council of the Great City Schools on the implementation of federal education laws.

3. On March 22, 2020, I received a draft of Division B of the CARES Act from the Committee for Education Funding, a coalition of some 100 education organizations that engages in and coordinates lobbying activities to increase federal education funding. The draft is identified as HEN20279 and stamped S.L.C., meaning it is an Office of Senate Legislative Counsel draft. This draft had no bill or amendment number and was not dated.

4. Exhibit A-1 to this declaration contains a true and accurate copy of an excerpt (pp. 1, 97-104) from the draft of Division B of the CARES Act I received on March 22, 2020.

5. Based on my review of the legislative history of the CARES Act, the HEN20279 draft was circulated among selected senators on March 22, 2020 and included both a $20 billion appropriation for an Education Stabilization Fund and an equitable services provision [section 18005] to ensure proportionate services were provided to private

school students. This Division B draft was circulated together with a Division A draft of the CARES Act containing tax and other health and economic relief provisions.

6.   The HEN20279 draft of Division B of the CARES Act included the appropriations provisions for the pending third major congressional coronavirus relief legislation.  The draft included specific Education Stabilization funding for school districts as well as included an "equitable services" provision [section 18005] designed to provide services – in contrast to direct funding – for private school students who reside in the school district jurisdictional area.

7.   At Section 18005(a) of the draft bill (p. 102), local educational agencies (LEAs) were directed to provide equitable services to students and teachers in non-public schools based based on the "the proportion of students residing within the boundaries of the [LEA] who attend non-public schools." Operationally under this draft, the ratio of "all" private school students to "all" students (both public and private) residing in the school district's jurisdiction provides the basis on which to determine the proportionate share of the CARES Act education funds to be expended on the private school students.

8.   The initial Senate version of the CARES Act was introduced on March 19, and titled S.3548. This initial version did not contain federal elementary and secondary education funding nor contain an equitable services provision. An alternative House bill was introduced on March 23, and titled H.R. 6379. H.R. 6379, Division A, Title VIII, contained a $50 billion education appropriation as a State Fiscal Stabilization Fund, but did not contain an equitable services provision.

9.   On March 25, Senator McConnell ultimately introduced Amendment 1578 in the nature of a substitute to H.R. 748, which became the final version of the CARES Act. Procedurally, the Senate took from the desk a previously House-passed bill, H.R. 748 (to

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-4538

2

repeal the excise tax on high cost employer-provided health insurance plans), replacing the House bill's contents with Senator McConnell's CARES Act Amendment 1578 and passing it on March 27. The House of Representatives then passed the Senate amendment to H.R. 748 on March 27. This was later signed by the President that same day, becoming Public Law 116-136. The enacted CARES Act includes a $30.75 billion Education Stabilization Fund and a provision [section 18005] that equitable services be provided to private school teachers and students "in the same manner as provided under sec. 1117 of ESEA." [Congressional Record Vol. 166, #59, pp. 2143-43].

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 23, 2020

_____

Jeffrey Simering

# EXHIBIT A - 1

# DIVISION B—EMERGENCY AP-PROPRIATIONS FOR CORONAVIRUS HEALTH RE-SPONSE AND AGENCY OPER-ATIONS

The following sums are hereby are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2020, and for other purposes, namely:

TITLE I

DEPARTMENT OF AGRICULTURE

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $750,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That the funding made available under this heading in this Act shall be used for conducting audits and investigations of projects and activities carried out with funds made available in this Act to the Department of Agriculture to prevent, prepare for, and respond to coronavirus, domestically or internationally; *Provided further*, That such amount is designated by the Congress as being for an

1  the Governor does not award within one year of receiving

2  such funds and the Secretary shall reallocate such funds

3  to the remaining States in accordance with subsection (b).

4       ELEMENTARY AND SECONDARY SCHOOL EMERGENCY

5                       RELIEF FUND

6       SEC. 18003. (a) GRANTS.—From funds reserved

7  under section 101(b)(2), the Secretary shall make elemen-

8  tary and secondary school emergency relief grants to each

9  State educational agency.

10      (b) ALLOCATIONS TO STATES.—The amount of each

11 grant under subsection (a) shall be allocated by the Sec-

12 retary to each State in the same proportion as each State

13 received under Title II-A of the Elementary and Sec-

14 ondary Education Act ("ESEA") of 1965 in the most re-

15 cent fiscal year.

16      (c) SUBGRANTS TO LOCAL EDUCATIONAL AGEN-

17 CIES.—Each State shall allocate not less than 80 percent

18 of the grant funds awarded to the State under this section

19 as subgrants to local educational agencies (including char-

20 ter schools that are local educational agencies) in the State

21 in proportion to the amount of funds such local edu-

22 cational agencies and charter schools that are local edu-

23 cational agencies received under title I of the ESEA of

24 1965 in the most recent fiscal year.

98

1    (d) USES OF FUNDS.—A local educational agency

2  that receives funds under this title may use the funds for

3  any of the following:

4        (1) Any activity authorized by the ESEA of

5        1965 (20 U.S.C. 6301 et seq.), the Individuals with

6        Disabilities Education Act (20 U.S.C. 1400 et seq.)

7        ("IDEA"), the Adult Education and Family Lit-

8        eracy Act (20 U.S.C. 1400 et seq.), the Carl D. Per-

9        kins Career and Technical Education Act of 2006

10       (20 U.S.C. 2301 et seq.) ("the Perkins Act"), or

11       subtitle B of title VII of the McKinney-Vento Home-

12       less Assistance Act (42 U.S.C. 11431 et seq).

13       (2) Coordination of preparedness and response

14       efforts of eligible entities with State, local, Tribal,

15       and territorial public health departments, and other

16       relevant agencies.

17       (3) Providing principals and others school lead-

18       ers with the resources necessary to address the

19       needs of their individual schools.

20       (4) Activities coordinated with State, local,

21       Tribal, and territorial public health departments to

22       detect, prevent, or mitigate the spread of infectious

23       disease or otherwise respond to a qualifying emer-

24       gency.

1    (5) Developing and implementing procedures

2    and systems to improve the preparedness and re-

3    sponse efforts of eligible entities.

4    (6) Training and professional development for

5    staff of the eligible entity on sanitation and mini-

6    mizing the spread of infectious diseases.

7    (7) Purchasing supplies to sanitize and clean

8    the facilities of an eligible entity, including buildings

9    operated by local educational agencies.

10    (8) Planning for long-term closures, including

11    planning for how to provide meals to eligible stu-

12    dents, how to provide technology for virtual instruc-

13    tion to all students, how to provide guidance for car-

14    rying out requirements under the Individuals with

15    Disabilities Education Act (20 U.S.C. 1401 et seq.)

16    and how to ensure other educational services can

17    continue to be provided consistent with all Federal,

18    State, and local requirements.

19    (9) Purchasing educational technology (includ-

20    ing hardware, software, and connectivity) for stu-

21    dents who are served by the eligible entity, including

22    low-income students and students with disabilities,

23    which may include assistive technology or adaptive

24    equipment.

100

1          (10) Providing mental health services and sup-
2     ports.

3          (11) Other activities that are necessary to
4     maintain the operation of and continuity of services
5     in local educational agencies, including hiring third-
6     party entities to provide such services, and con-
7     tinuing to employ existing staff of the local edu-
8     cational agency.

9     (e) STATE FUNDING.—With funds not otherwise allo-
10    cated under subsection (c), a State may reserve not more
11    than 1/2 of 1 percent for administrative costs and the re-
12    mainder to carry out grants or contracts for emergency
13    needs as determined by the chief education officer of the
14    State to address issues responding to coronavirus.

15        (f) REALLOCATION .—A State shall return to the
16    Secretary any funds received under this section that the
17    State does not award within 1 years of receiving such
18    funds and the Secretary shall reallocate such funds to the
19    remaining States in accordance with subsection (b).

20    HIGHER EDUCATION EMERGENCY RELIEF FUND

21        SEC. 18004. (a) IN GENERAL.—The Secretary shall
22    allocate funding under this section as follows:

23        (1) 90 percent to each eligible institution of
24    higher education to prevent, prepare for, and re-

Case 3:20-cv-04478-JD   Document 47-1   Filed 07/24/20   Page 42 of 92
HEN20279                                                                    S.L.C.

101

1    spond to coronavirus, domestically or internationally

2    by apportioning it—

3        (A) 75 percent according to the relative

4            share of full-time equivalent enrollment of Fed-

5            eral Pell Grant recipients; and

6        (B) 25 percent according to the relative

7            share of full-time equivalent enrollment of stu-

8            dents who were not Federal Pell Grant recipi-

9            ents.

10    (2) 5 percent for parts A and B of title III,

11    part A of title V, and subpart 4 of part A of title

12    VII to address needs directly related to coronavirus.

13    (3) 5 percent for part B of title VII of the Higher

14    Education Act for institutions of higher education to

15    address needs directly related to coronavirus.

16    (b) DISTRIBUTION.—The funds made available to

17 each institution under subsection (a)(1) shall be distrib-

18 uted by the Secretary in the same manner as the Secretary

19 otherwise distributes Federal Pell Grant funding to each

20 institution under the Higher Education Act of 1965 (20

21 U.S.C. 1001 et seq.).

22    (c) USES OF FUNDS.—An institution of higher edu-

23 cation receiving funds under this section may use the

24 funds received to cover any costs associated with the clo-

25 sure or significant changes to the delivery of instruction

102

1 due to the coronavirus and shall use no less than 50 per-

2 cent of such funds to provide emergency grants to stu-

3 dents for expenses directly related to coronavirus and the

4 disruption of campus operations.

5      ASSISTANCE TO NON-PUBLIC SCHOOLS

6      SEC. 18005. (a) IN GENERAL.—A local educational

7 agency receiving funds under sections 802 or 803 shall

8 provide equitable services to students and teachers in non-

9 public schools, as determined in consultation with rep-

10 resentatives of non-public schools. The level of such serv-

11 ices shall reflect the proportion of students residing within

12 the boundaries of the local educational agency who attend

13 non-public schools.

14     (b) PUBLIC CONTROL OF FUNDS.—The control of

15 funds for the services and assistance provided to a non-

16 public school under subsection (a), and title to materials,

17 equipment, and property purchased with such funds, shall

18 be in a public agency, and a public agency shall administer

19 such funds, materials, equipment, and property and shall

20 provide such services (or may contract for the provision

21 of such services with a public or private entity).

22     CONTINUED PAYMENT TO EMPLOYEES

23     SEC. 18006. A local educational agency, State, or

24 other entity that receives funds under this heading shall,

25 to the greatest extent practicable, continue to pay its em-

103

1 ployees and contractors during the period of any disrup-

2 tions or closures related to coronavirus.

3                        DEFINITIONS

4     SEC. 18007. Except as otherwise provided in this

5 title, as used in this title—

6          (1) the terms "elementary education" and "sec-

7      ondary education" have the meaning given such

8      terms under State law;

9          (2) the term "institution of higher education"

10      has the meaning given such term in section 102 of

11      the Higher Education Act of 1965 (20 U.S.C.

12      1002);

13          (3) the term "Secretary" means the Secretary

14      of Education;

15          (4) the term "State" means each of the 50

16      States, the District of Columbia, and the Common-

17      wealth of Puerto Rico;

18          (5) any other term used that is defined in sec-

19      tion 8101 of the Elementary and Secondary Edu-

20      cation Act of 1965 (20 U.S.C. 7801) shall have the

21      meaning given the term in such section.

22              GALLAUDET UNIVERSITY

23     For an additional amount for "Gallaudet University",

24 $7,000,000, to remain available through September 30,

25 2021, to prevent, prepare for, and respond to coronavirus,

1 domestically and internationally, including to help defray
2 the expenses directly caused by coronavirus and to enable
3 grants to students for expenses directly related to
4 coronavirus and the disruption of university operations:
5 *Provided*, That such amount is designated by the Congress
6 as being for an emergency requirement pursuant to sec-
7 tion 251(b)(2)(A)(i) of the Balanced Budget and Emer-
8 gency Deficit Control Act of 1985.

9 STUDENT AID ADMINISTRATION

10 For an additional amount for "Student Aid Adminis-
11 tration", $40,000,000, to remain available through Sep-
12 tember 30, 2021, to prevent, prepare for, and respond to
13 coronavirus, domestically and internationally, for carrying
14 out part D of title I, and subparts 1, 3, 9 and 10 of part
15 A, and parts B, C, D, and E of title IV of the HEA, and
16 subpart 1 of part A of title VII of the Public Health Serv-
17 ice Act: *Provided*, That such amount is designated by the
18 Congress as being for an emergency requirement pursuant
19 to section 251(b)(2)(A)(i) of the Balanced Budget and
20 Emergency Deficit Control Act of 1985.

21 HOWARD UNIVERSITY

22 For an additional amount for "Howard University",
23 $13,000,000, to remain available through September 30,
24 2021, to prevent, prepare for, and respond to coronavirus,
25 domestically and internationally, including to help defray

# EXHIBIT B

# PAYCHECK PROTECTION PROGRAM ("PPP") LOANS TO PRIVATE SCHOOLS

*Select Examples*

| Location | School Name | PPP Loan Amount | Citation |
|---|---|---|---|
| Albuquerque, NM | Albuquerque Academy | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020).[1] |
| Arlington, TX | Newman International Academy | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Atlanta, GA | Atlanta International School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Aurora, CO | Regis Jesuit High School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Austin, TX | Hyde Park Baptist School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Austin, TX | Regents School of Austin | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Baltimore, MD | The Park School of Baltimore | $2 -$5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Baltimore, MD | St. Elizabeth School | $1 -$2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Bloomfield Hills, MI | The Roeper School | $1-$2 million | Ruth Conniff, Small business loan data show big payday for private schools that also get public funds, Wisconsin Examiner (Jul. 10, 2020).[2] |
| Buffalo, NY | Nichols School of Buffalo | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Cambridge, MA | Buckingham Browne & Nichols School | $2 - $5 million | J Dwinell, & J Battenfeld, Payroll Protection Program loan list a who's who of Massachusetts employers, Boston Herald (Jul. 9, 2020, 7:39 AM).[3] |
| Chicago, IL | DePaul College Prep | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Cincinnati, OH | Cincinnati Country Day School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Cincinnati, OH | Cincinnati Hills Christian Academy | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Cleveland, OH | St. Joseph Academy | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Dallas, TX | Bishop Lynch High School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Dallas, TX | June Shelton School and Evaluation Center | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |

## PAYCHECK PROTECTION PROGRAM ("PPP") LOANS TO PRIVATE SCHOOLS

*Select Examples*

| Location | School Name | PPP Loan Amount | Citation |
|---|---|---|---|
| Denver, CO | Strive Preparatory Schools | $5– $10 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Denver, CO | Denver Academy | $1 -$2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Detroit, MI | Detroit County Day School | $2-$5 million | Heather Catallo, Private schools receive millions in PPP loans from federal government, WXYZ (Jul. 17, 2020, 9:09 PM).[4] |
| Detroit, MI | University of Detroit Jesuit High School and Academy | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Fort Worth, TX | All Saints Episcopal School of Fort Worth | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Fort Worth, TX | Southwest Christian School, Inc. | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Grosse Pointe Woods, MI | University Liggett School | $2-$5 million | Ruth Conniff, Small business loan data show big payday for private schools that also get public funds, Wisconsin Examiner (Jul. 10, 2020). |
| Groton, MA | Lawrence Academy | $2 - $5 million | J Dwinell, & J Battenfeld, Payroll Protection Program loan list a who's who of Massachusetts employers, Boston Herald (Jul. 9, 2020, 7:39 AM). |
| Houston, TX | St. Francis Episcopal School of Houston | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Houston, TX | First Baptist Academy of Houston | $1 -$2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Los Angeles, CA | Westside Neighborhood School | $2 -$5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Manhattan, NY | The City and Country School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Miami, FL | Christopher Columbus High School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Miami, FL | Miami Country Day School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Miami, FL | Scheck Hillel Community School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Miami, FL | Westminster Christian Private School | $2 -$5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |

2

## PAYCHECK PROTECTION PROGRAM ("PPP") LOANS TO PRIVATE SCHOOLS

### Select Examples

| Location | School Name | PPP Loan Amount | Citation |
|---|---|---|---|
| Milwaukee, WI | Marquette University High School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Milwaukee, WI | Academy of Excellence | $350K - $1 million | Ruth Conniff, Small business loan data show big payday for private schools that also get public funds, Wisconsin Examiner (Jul. 10, 2020). |
| Milwaukee, WI | Divine Savior Holy Angels High School | $1 - $2 million | Ruth Conniff, Small business loan data show big payday for private schools that also get public funds, Wisconsin Examiner (Jul. 10, 2020). |
| Milwaukee, WI | Atlas Preparatory Academy | $350K - $1 million | Ruth Conniff, Small business loan data show big payday for private schools that also get public funds, Wisconsin Examiner (Jul. 10, 2020). |
| Minneapolis, MN | Minnehaha Academy | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Nashville, TN | Franklin Road Academy | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Newton, MA | The Fessenden School | $2 - $5 million | J Dwinell, & J Battenfeld, Payroll Protection Program loan list a who's who of Massachusetts employers, Boston Herald (Jul. 9, 2020, 7:39 AM). |
| NYC, NY | St. Ann's School | $5-$10 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM).[5] |
| NYC, NY | Poly Prep Country Day School | $5-$10 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Packer Collegiate Institute | $5-$10 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Berkeley Carroll School | $5-$10 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Columbia Grammar & Preparatory School | $5-$10 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | United Nations International School | $5-$10 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Fordham Preparatory School | $2-$5 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Grace Church School | $2-$5 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Brooklyn Friends School | $2-$5 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Friends Seminary | $2-$5 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |

3

## PAYCHECK PROTECTION PROGRAM ("PPP") LOANS TO PRIVATE SCHOOLS

### Select Examples

| Location | School Name | PPP Loan Amount | Citation |
|---|---|---|---|
| NYC, NY | Bay Ridge Prep School | $1-$2 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Blue School | $1-$2 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| NYC, NY | Staten Island Academy | $1-$2 million | E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post ( Jul. 7, 2020, 3:41 PM). |
| Oakland, CA | Head-Royce School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Oakland, CA | Redwood Day School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Oklahoma City, OK | Bishop McGuiness Catholic High School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Pittsburgh, PA | Shady Side Academy | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Pontiac MI | Notre Dame Preparatory School and Marist Academy | $1.7 million | Heather Catallo, Private schools receive millions in PPP loans from federal government, WXYZ (Jul. 17, 2020, 9:09 PM). |
| Portland, OR | Central Catholic High School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Portland, OR | St. Mary's Academy | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Rochester, NY | Alendale Columbia School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Sacramento, CA | Christian Brother High School of Sacramento | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| San Antonio, TX | Antonian College Preparatory High School | $1- $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| San Antonio, TX | Central Catholic High School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| San Diego, CA | Francis Parker School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| San Diego, CA | St. Augustine's School of San Diego | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |

## PAYCHECK PROTECTION PROGRAM ("PPP") LOANS TO PRIVATE SCHOOLS

*Select Examples*

| Location | School Name | PPP Loan Amount | Citation |
|---|---|---|---|
| San Francisco, CA | Sacred Heart Cathedral Preparatory | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| San Francisco, CA | Archbishop Riordan High School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| San Francisco, CA | Drew School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| St. Louis, MO | Cor Jesu Academy | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| St. Louis, MO | St. Louis Charter School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| St. Louis, MO | St. Louis University High School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| St. Paul, MN | St. Paul Academy and Summit School | $2 - $5 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Tulsa, OK | Riverfield Country Day School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Washington, DC | Sidwell Friends School | $5 - $10 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |
| Washington, DC | Sheridan School | $1 - $2 million | S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020). |

### Links to Citations

[1] S Rich, J Fox, J Crump, A Gregg, A Blanco, & A Ba Tran, SBA data: Business that received PPP loans, Washington Post (Jul. 6, 2020), https://www.washingtonpost.com/graphics/2020/business/sba-ppp-data/?utm_campaign=wp_main&utm_medium=social&utm_source=twitter&itid=lk_inline_manual_5

[2] Ruth Conniff, Small business loan data show big payday for private schools that also get public funds, Wisconsin Examiner (Jul. 10, 2020), https://wisconsinexaminer.com/2020/07/10/small-business-loan-data-show-big-payday-for-private-schools-that-also-get-public-funds/

[3] J Dwinell, & J Battenfeld, Payroll Protection Program loan list a who's who of Massachusetts employers, Boston Herald (Jul. 9, 2020, 7:39 AM), https://www.bostonherald.com/2020/07/08/payroll-protection-loan-list-a-whos-who-of-massachusetts-employers/

[4] Heather Catallo, Private schools receive millions in PPP loans from federal government, WXYZ (Jul. 17, 2020, 9:09 PM), https://www.wxyz.com/news/coronavirus/private-schools-receive-millions-in-ppp-loans-from-federal-government

[5] E Bowden, & L Eustachewich, Elite NYC private schools received millions in PPP loans: SBA, New York Post (Jul. 7, 2020, 3:41 PM), https://nypost.com/2020/07/07/elite-nyc-private-schools-received-millions-in-ppp-loans-sba/

# EXHIBIT C

# Congress of the United States
## Washington, D.C. 20515

May 20, 2020

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C.  20202

Dear Secretary DeVos:

We write regarding the April 30, 2020 guidance issued by the U.S. Department of Education (Department) that seeks to repurpose hundreds-of-millions of taxpayer dollars intended for public school students to provide services for private school students, in contravention of both the plain reading of the statute and the intent of Congress.  The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), requires local educational agencies (LEA) receiving funds to use a portion of such funds to provide services to low-income students attending private schools that are equitable to services provided to students in public schools in the same manner as under section 1117 of Title I of the Elementary and Secondary Education Act (ESEA).  However, the Department broke with statutory requirements of the CARES Act and longstanding precedent of the equitable services provision in section 1117 of ESEA by issuing guidance that directs LEAs to use emergency relief funds for the provision of services to students at private schools regardless of their wealth or residence.  This action also contradicts the Department's equitable services non-regulatory guidance issued on October 7, 2019.[1]  We ask that you immediately revise your April 30 guidance, including Question 10 of the guidance document, to conform with section 1117 of ESEA as required by the CARES Act.

The Department's new policy will direct districts to allocate additional resources and services to wealthier private school students, thereby leaving a smaller amount of funds available to serve public school students.  In fact, the Department recently clarified that its redefinition of the equitable services provision was designed to provide more money for equitable services than is required to be provided for such services under section 1117 of ESEA, with a spokesperson claiming that "only providing money for low-income private school students would place private school teachers and students at an unfair disadvantage."[2]  Given that the guidance contradicts the clear requirements of the CARES Act, it will cause confusion among States and LEAs that will be uncertain of how to comply with both the Department's guidance and the plain language of the CARES Act.[3]

**The CARES Act requires LEAs to use emergency relief funds to provide equitable services based only on the number of low-income students at private schools.[4]**

The CARES Act provides over $13 billion in K-12 education aid, which goes to states and LEAs based on their Title I, Part A (Title I-A) funding allocation.  Since 1965, Title I-A has served as a vital source of support for

---

[2] Rebecca Kleln, *Betsy DeVos Makes Moves to Quietly Prop Up Private Schools,* HuffPost, May 7, 2020, https://www.huffpost.com/entry/betsy-devos-school-privatization_n_5eb3335ac5b6526942a16176.
[3] The Elementary and Secondary Education Act of 1965, as amended, § 1115(c), 20 U.S.C. § 6315(c).
[4] *See generally* U.S. Department of Education, *Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (October 7, 2019).

The Honorable Betsy DeVos
May 20, 2020
Page 2

disadvantaged students in schools with high concentrations of students from low-income families.  A LEA's Title I-A allocation is determined by a variety of factors, primarily the number and concentration of low-income students within the LEA.  Under ESEA section 1117, LEAs must set aside a share of their Title I-A funds to serve disadvantaged students attending private schools.  The amount of the set aside is based on the number of low-income students attending private schools who reside in participating school attendance areas within the LEA attendance area.[5]

In this context, Congress required any LEA receiving emergency coronavirus relief funds under sections 18002 and 18003 of the CARES Act[6] to provide equitable services "in the same manner as provided under section 1117 of the Elementary and Secondary Education Act of 1965."[7]  The statutory language and Congressional intent is clear: LEAs should use these emergency relief funds to provide equitable services *only* based on the number of low-income students attending private schools in their LEA, not all students attending private schools in the LEA.[8]  However, on April 30, the Department issued an interpretation of this requirement that, if implemented, would require LEAs to provide equitable services based on the number of all private school students, regardless of their families' income level.  This interpretation expands the amount of funding that LEAs must dedicate to providing equitable services to private school students, reduces public school students' share of funds, defies Congressional intent, and conflicts with the statutory requirements of the CARES Act.

**The Department's CARES Act Equitable Services guidance reinterprets ESEA diverting essential coronavirus relief funds away from public school students to private school students.**

Despite the clear direction from the CARES Act that LEAs must "provide equitable services in the same manner as provided under section 1117 of the ESEA," and the consistent interpretation of this section across decades and administrations,[9] the Department issued guidance re-interpreting equitable services under section 1117, solely as applied to the CARES Act.  Simply put, the Department is directing LEAs to provide equitable services in a *different* manner from that provided under section 1117 of ESEA, in direct contravention of the plain text of the CARES Act.

For context, there are two "equitable services" provisions in ESEA, section 1117, referenced in the CARES Act, and section 8501, absent from the CARES Act.  Section 1117 directs LEAs to provide equitable services only based on the number of low-income students, residing in eligible school attendance areas within the LEA, who attend private schools.[10]  Section 8501 directs LEAs to provide equitable services to **all** eligible private school students in various programs.[11]  Congress included the section 1117 reference of ESEA, located within Title I of ESEA, because the majority of K-12 funding allocated under the CARES Act is allocated via the Title I formula. By referencing section 1117, Congress explicitly and clearly directed LEAs to only provide equitable services based on the number of low-income students, **not** all eligible private school students, as would have been required had the CARES Act referenced section 8501.  However, the Department's guidance for CARES

---

[5] The Elementary and Secondary Education Act of 1965, as amended, § 1117(a)(4)(A)(i), 20 U.S.C. § 6320(a)(4)(A)(i)).
[6] This provision applied to both Governor's Emergency Education Relief Funds as well as Elementary and Secondary School Emergency Relief Funds. Section 18005.
[7] The Coronavirus Aid, Relief, and Economic Security Act, § 18005(a).
[8] *Id.*
[9] *See, e.g.,* U.S. Department of Education, *Ensuring Equitable Services to Private School Children: A Title I Resource Tool Kit* (Sept. 2006).
[10] *See* U.S. Department of Education, *Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance,* page 19-20 (October 7, 2019).
[11] The Elementary and Secondary Education Act of 1965, as amended, § 8501(b), 20 U.S.C. 7881(b).

The Honorable Betsy DeVos
May 20, 2020
Page 3

Act equitable services chooses to ignore this explicit direction from Congress and instead directs LEAs to provide equitable services[12] based on the enrollment of "all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area," thus drastically inflating the amount of CARES Act funds that Congress required to be provided to equitable services.

According to America's school boards, superintendents, principals, teachers, and other stakeholders, the Department's guidance will ensure that "wealthy children in private schools are… used to generate the equitable services share of [CARES Act funding] for their private schools at the direct expense of low-income children remaining in public schools."[13]  Similarly, the Council of Chief State School Officers (CCSSO) told the Department that this guidance "could significantly harm the vulnerable students who were intended to benefit the most from the critical federal COVID-19 education relief funds Congress has provided."[14]

For example, if states follow this unauthorized guidance, Louisiana projects that it will spend more than 10 percent of its $286 million allocation in Elementary and Secondary School Emergency Relief Funds on students attending private schools.[15]  According to CCSSO, this is 267 percent more than it would have directed to private school students under the Department's longstanding interpretation of equitable services in section 1117 of ESEA, as explicitly required by the CARES Act.[16]  In total, Louisiana would spend $23 million on equitable services for private school students under the Department's new guidance, depriving public school students, including low-income students in public schools, of $14.4 million.

Similarly, Pennsylvania estimated that the Department's guidance "would roughly double Equitable Services reservations… [and] would impact districts of every type—large urban, small urban, suburban, and rural."  In one Pennsylvania district the Department's guidance would amount to an increase of more than 4000 percent "in support flowing from most disadvantaged to more advantaged students."  The Pennsylvania Secretary of Education referred to these outcomes as "clearly inequitable."[17]

We ask you immediately revise your April 30 guidance, including Question 10 of the guidance document to come into compliance with the CARES Act and section 1117 of ESEA. Further, it is imperative that the Department provide transparency about its interpretation of the equitable services provision and its inconsistency with long-standing requirements related to equitable services.  To that end, we request the Department please provide the following no later than June 3, 2020.

1) All internal Department communications regarding the interpretation of section 18005 of the CARES Act.
2) All communications between the Department and non-Department entities regarding the interpretation of section 18005 of the CARES Act.

---

[12] *See* U.S. Department of Education, Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs, page 4-6 (Apr. 30, 2020).
[13] The School Superintendents Association et al, Letter to Secretary DeVos (May 5, 2020).
[14] The Council of Chief State School Officers, Letter to Secretary DeVos (May 5, 2020).
[15] *See* Enclosure 1, State of Louisiana Department of Education, *Louisiana CARES Equitable Share Estimates.*
[16] The Council of Chief State School Officers, Letter to Secretary DeVos (May 5, 2020).
[17] Pedro A. Rivera, Pennsylvania Secretary of Education, Letter to Assistant Secretary for Elementary and Secondary Education, Frank T. Brogan (May 7, 2020) available at http://blogs.edweek.org/edweek/campaign-k-12/Letter%20to%20Secretary%20Brogan%20%282%29.pdf.

The Honorable Betsy DeVos
May 20, 2020
Page 4

3) The name and number of states and LEAs that have requested information regarding the Department's interpretation of section of the CARES Act.
4) All requests made to the Department to revise, reinterpret, or otherwise reconsider its April 30, 2020 CARES Act equitable services guidance, including the names of the requesting individuals, organizations, or entities.
5) The amount of funds from the Education Stabilization Fund that would be allocated to equitable services for students attending non-public schools under the Department's October 7, 2019 equitable services guidance and the amount of funds from the Education Stabilization Fund that would be allocated to equitable services for students attending non-public schools under the Department's April 30, 2020 CARES Act equitable services guidance.

Please send all official information relating to this request to Tylease Fitzgerald, Majority Chief Clerk for the House Committee on Education and Labor, Amanda Beaumont, Minority Staff for the Senate Committee on Health, Education, Labor, and Pensions, Philip Tizzani, Majority Staff for the House Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, and Mark Laisch, Minority Staff for the Senate Appropriations Subcommittee on Labor, Health and Human Services, and Education, and Related Agencies.

Sincerely,

**ROBERT C. "BOBBY" SCOTT**
Chair
Committee on Education and Labor
U.S. House of Representatives

**ROSA L. DELAURO**
Chair
Committee on Appropriations
Subcommittee on Labor, Health, Human
   Services, and Related Agencies
U.S. House of Representatives

**PATTY MURRAY**
Ranking Member
Committee on Health, Education, Labor and
   Pensions
U.S. Senate

Ranking Member
Subcommittee on Labor, Health and Human
   Services, Education, and RelatedAgencies
Committee on Appropriations
U.S. Senate.

# EXHIBIT D



**MEMORANDUM**                                                                July 1, 2020

**To:**        House Committee on Education and Labor

**From:**

**Subject:**   **Analysis of the CARES Act's Equitable Services Provision**

This memorandum[1] responds to your request for an analysis of section 18005 of the Coronavirus Aid,
Relief, and Economic Security Act (CARES Act)—the equitable services section—which concerns
assistance to non-public elementary and secondary school students and teachers.[2] Specifically, the
memorandum analyzes whether section 18005(a) requires local educational agencies (LEAs),[3] such as
public school boards, to reserve funding for services to private school students and teachers using the
method for determining the "proportional share" set forth in section 1117 of the Elementary and
Secondary Education Act of 1965 (ESEA); that is, based on the number of children from *low-income*
families (low-income children) attending private schools.[4] On July 1, 2020, the Department of Education
(Department) issued an interim final rule (IFR) authorizing—and in certain circumstances directing—
LEAs to use an alternative method to determine the proportional share based on *total enrollment* in
private schools, reasoning that the CARES Act did not mandate "a rigid application of section 1117."[5]

Part I of the memorandum begins by summarizing the equitable services requirements in the CARES Act
and the ESEA. Part II discusses the competing interpretations of section 18005(a) that have emerged since

---

[1] Information in this memorandum is drawn from publicly available sources and is of general interest to Congress. As such, all or
part of this information may be provided by CRS in memoranda or reports for general distribution to Congress. Your
confidentiality as a requester will be preserved in any case.

[2] Pub. L. No. 116-136, div. B, § 18005 (Mar. 27, 2020). Because the slip law is not yet available, this memorandum is based on
the text of the Act as shown in the enrolled bill. *See* H.R. 748, 116th Cong., https://www.congress.gov/116/bills/hr748/BILLS-
116hr748enr.pdf [hereinafter CARES Act].

[3] The CARES Act defines an LEA by reference to 20 U.S.C. § 7801. CARES Act § 18007(8). In general, an LEA is "a public
board of education or other public authority legally constituted within a State for either administrative control or direction of, or
to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or
other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an
administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 7801(30).

[4] *See* No Child Left Behind Act of 2001, tit. I, § 101, Pub. L. No. 107-110, 115 Stat. 1439, 1508 (adding § 1120, later
renumbered to § 1117, to the ESEA) (codified as amended at 20 U.S.C. § 6320).

[5] CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg. 39,479, 39,480
(interim final rule with request for comments) (effective July 1, 2020) [hereinafter IFR]; *see also* Dep't of Educ., *Secretary
DeVos Issues Rule to Ensure CARES Act Funding Serves All Students*, ED.GOV (June 25, 2020) (issuing draft text of the IFR).

the CARES Act's enactment, including the Department's position as set forth in the IFR. Part III analyzes the meaning of section 18005(a). It first discusses the possible meanings of key terms used in that section before analyzing the provision's meaning as a whole. Part III then considers the provision's context within the CARES Act and against the broader background of the ESEA's equitable services requirements. This part concludes with a discussion of the limited legislative history of the equitable services section in the CARES Act.

As discussed in detail below, a straightforward reading of section 18005(a) based on its text and context suggests that the CARES Act requires LEAs to follow section 1117's method for determining the proportional share, and thus to allocate funding for services for private school students and teachers based on the number of low-income children attending private schools. However, for the reasons discussed in Part IV, if, in a legal challenge to the IFR, a court were to instead find that section 18005(a) is not clear on this point, additional analysis is required to evaluate what, if any, deference a court might accord to the Department's contrary interpretation.[6]

# I. Equitable Services Requirements in the CARES Act and the ESEA

The CARES Act established three emergency relief funds to be administered by the Secretary of Education, two of which—the Governor's Emergency Education Relief (GEER) Fund and the Elementary and Secondary School Emergency Relief (ESSER) Fund—are relevant to this discussion.[7] Both funds may be used to provide grants to states for various authorized purposes, and both are subject to an equitable services requirement as discussed below.

## CARES Act and Section 18005

The GEER Fund provides funds, based on a statutory formula, to state governors to "provide emergency support" to LEAs that a state educational agency has deemed "most significantly impacted by coronavirus" to support the LEAs' "on-going functionality" and continued provision of educational services to their students.[8] The CARES Act does not further specify any particular formula under which GEER Fund grants are to be distributed to LEAs.

Under the ESSER program, at least 90% of grants made to state educational agencies must be subgranted to LEAs in proportion to the amount of funds those LEAs received in the most recent fiscal year under part A of title I of the ESEA (Title I-A funds).[9] Ordinarily, LEAs receive Title I-A allocations based in part on the number of students from families below the federal poverty level;[10] they use such allocations to provide "assistance to meet the special needs of educationally disadvantaged children" and fund "supplementary educational and related services to low-achieving and other students attending elementary and secondary schools with relatively high concentrations of students from low-income families."[11] While the CARES Act provides that an LEA receives ESSER funds based on its most recent Title I-A share, the statute allows the LEA to use those ESSER funds for a broader set of purposes than ordinary Title I-A funds, including for: "[a]ny activity authorized by the ESEA of 1965"; a range of coronavirus response

---

[6] See infra "Conclusion and Additional Considerations."

[7] CARES Act §§ 18002–18004; see also CRS Report R46378, CARES Act Education Stabilization Fund: Background and Analysis, by Rebecca R. Skinner et al.

[8] CARES Act § 18002(c)(1).

[9] Id. § 18003(c).

[10] 20 U.S.C. § 6333(a), (c)(1).

[11] CRS Report R45141, Analysis of the Elementary and Secondary Education Act Title I-A Allocation Formulas: Factors, Design Elements, and Allocation Patterns 1, by Rebecca R. Skinner and Leah Rosenstiel.

measures; support for "the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth"; and necessary activities to maintain the LEA's operations and continuity of services.[12]

Section 18005(a) of the CARES Act—the equitable services provision—requires an LEA receiving GEER or ESSER funds (relief funds) to "provide equitable services *in the same manner as* provided under section 1117 of the ESEA . . . to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools."[13]

## ESEA and Sections 1117 and 8501

Ordinarily, ESEA section 1117 (codified at 20 U.S.C. § 6320) requires an LEA to use a portion of its Title I-A funds to provide certain services to eligible children in the school district served by that LEA[14] who are enrolled in private elementary and secondary schools.[15] The portion of an LEA's Title I-A funds to be used under section 1117 is based on the number of private-school children from low-income families residing in the LEA's participating public school attendance areas.[16] Although poverty data is used to determine private schools' *proportional share*, the Department of Education does not consider poverty to be a criterion for *eligibility to receive services*.[17] Instead, "eligible children" for purposes of section 1117 include certain students at risk of failing to meet the state's academic standards and "[c]hildren who are economically disadvantaged, children with disabilities, migrant children or English learners."[18] A Department regulation further specifies that eligible children must also reside in a Title I-A public school attendance area within that LEA and attend private schools inside or outside that LEA.[19] Under the ESEA, the services and benefits covered by section 1117 are: "special educational services, instructional services . . . , counseling, mentoring, one-on-one tutoring, or other benefits under [Title I-A] (such as . . . mobile educational services and equipment) that address their needs."[20]

---

[12] CARES Act § 18003(d).

[13] *Id.* § 18005(a) (emphasis added). The CARES Act defines "non-public school" as "a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and (B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section." *Id.* § 18007(6). Because CARES Act section 18007 incorporates the meaning of terms defined in section 8101 of the ESEA, *id.* § 18007(8), non-public schools are limited to *nonprofit* elementary and secondary schools. *See* 20 U.S.C. § 7801(19), (45). For simplicity, this memorandum refers to "non-public schools" as "private schools."

[14] For brevity, the memorandum refers to attendance areas within an LEA's boundaries as being "within the LEA" and schools located outside that area as being "outside the LEA."

[15] *See* 20 U.S.C. § 6320(a)(1).

[16] *Id.* § 6320(a)(4)(A); *see also* 34 C.F.R. § 200.64(a)(1).

[17] *See* Dep't of Educ., Providing Equitable Services to Eligible Private School Children, Teachers, and Families 30 (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf [hereinafter Title I-A Equitable Services Guidance].

[18] 20 U.S.C. § 6315(c); *see also id.* § 6320 (directing LEAs to provide equitable services "[t]o the extent consistent with the number of eligible children identified under section 1115(c) [(20 U.S.C. § 6315(c))]").

[19] 34 C.F.R. § 200.62(b); Title I-A Equitable Services Guidance, *supra* note 17, at 8.

[20] 20 U.S.C. § 6320(a)(1)(A).

ESEA section 1117 imposes a number of requirements,[21] most of which are directed at LEAs and which are divided into five subsections.[22] Because the structure and wording of these requirements is important to the statutory interpretation analysis, the relevant requirements are summarized below.

Subsection (a) sets out "general requirement[s]" relating to the nature of the services that LEAs must provide to private school students and the method for determining the amount of funding to allocate to services for private school students.[23]

Paragraph (1), captioned "In general," states that LEAs must:

- "provide" the special educational and instructional services listed above;

- to "eligible children identified under section 1115(c) in the school district served by [the LEA] who are enrolled in private elementary schools and secondary schools";[24]

- "on an equitable basis";

- "individually or in combination, as requested by the [appropriate private school] officials to best meet the needs of such children";[25] and

- "after timely and meaningful consultation with appropriate private school officials."

Paragraphs (2) and (3) specify that services and benefits must be:

- "secular, neutral, and nonideological";

- "equitable in comparison to services and other benefits" for participating public school children; and

- "provided in a timely manner."

Paragraph (4), captioned "Expenditures," states, inter alia, that expenditures for services and benefits to eligible private school students must be "equal to the proportion of funds allocated to participating school attendance areas based on the number of children from *low-income* families who attend private schools."[26]

---

[21] Provisions in section 1117 that use the word "shall" appear to introduce a mandatory requirement, whereas provisions that use the word "may" appear to give the agency discretion to choose between two or more options. *Compare, e.g.*, 20 U.S.C. § 6320(b)(1) (stating that an LEA *shall* consult with appropriate private school officials during the design and development of such agency's programs") (emphasis added), *with id.* § 6320(a)(5) (stating that an LEA "*may* provide services under this section directly or through contracts with public and private agencies, organizations, and institutions"). *See* Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."). Accordingly, this memorandum uses the term "must" in paraphrasing provisions that use the word "shall" where the context indicates that the provision is mandatory.

[22] 20 U.S.C. § 6320(a)–(e).

[23] *Id.* § 6320(a).

[24] The language "such children" in (a)(1)(A) appears to refer back to the opening phrase: "To the extent consistent with the number of eligible children identified under section 1115(c) in the school district served by [an LEA] who are enrolled in private elementary schools and secondary schools." 20 U.S.C. § 6320(a)(1). *Cf.* Sullivan v. Finkelstein, 496 U.S. 617, 627 (1990) ("The phrase 'such additional evidence' [in the second half of the sixth sentence] refers in turn to the 'additional evidence' mentioned in the first half of the sixth sentence.").

[25] Section 1117 also requires the LEA to "ensure that teachers and families of the children participate, on an equitable basis, in services and activities developed pursuant to section 1116 [(20 U.S.C. § 6318)]," relating to parent and family engagement. 20 U.S.C. § 6320(a)(1)(B).

[26] *Id.* § 6320(a)(4)(A)(i) (emphasis added).

Paragraph (5), captioned "Provision of Services," states that the LEA may provide services "directly or through contracts with public and private" entities.

Subsection (b) contains detailed "consultation" requirements for LEAs, beginning with the mandate to "consult with appropriate private school officials during the design and development of such agency's programs" with "the goal of reaching agreement on how to provide equitable and effective programs for eligible private school children."[27] Among other topics, the consultation process must include:

- "the size and scope of the equitable services to be provided to the eligible private school children, the proportion of funds that is allocated under subsection (a)(4)(A) for such services, and how that proportion of funds is determined";[28] and

- "the method or sources of data that are used under subsection (c) and section 1113(c)(1) to determine the number of children from low-income families in participating school attendance areas who attend private schools."[29]

Subsection (c), titled "Allocation for equitable service to private school students," gives an LEA "final authority . . . to calculate the number of children, ages 5 through 17, who are from low-income families and attend private schools" through one of four calculation methods.[30]

Subsection (d) on the "Public control of funds," while not directed at LEAs specifically, mandates in paragraph (1) that a public agency control and administer Title I-A funds.[31] Paragraph (2) of this subsection, captioned "Provision of services," requires services under section 1117 to be provided by employees of a public agency or through a public agency's contract with another entity that is independent of the private school or a religious organization.[32]

Subsection (e) provides a bypass mechanism through which the Secretary of Education must arrange for the provision of equitable services to eligible children if an LEA is prohibited by law from providing equitable services to private school children or has substantially failed, or is unwilling, to do so.[33]

Section 1117 is not the only equitable services requirement in the ESEA. As discussed in more detail in Part III's section on "Statutory Context," section 1117 provides the equitable services requirements for Title I-A funds, while section 8501 of the ESEA contains similar requirements for programs under other titles of the ESEA. However, unlike section 1117, section 8501 does *not* require LEAs to base private schools' proportional share on the number of low-income children living in Title I-A attendance areas who attend private schools.[34] Instead, section 8501 provides that "[e]xpenditures for educational services and other benefits provided under this section for eligible private school children, their teachers, and other educational personnel serving those children *shall be equal, taking into account the number and educational needs of the children to be served, to the expenditures for participating public school children.*"[35]

---

[27] *Id.* § 6320(b)(1).

[28] *Id.* § 6320(b)(1)(E).

[29] *Id.* § 6320(b)(1)(F).

[30] *Id.* § 6320(c).

[31] *Id.* § 6320(d)(1).

[32] *Id.* § 6320(d)(2).

[33] *Id.* § 6320(e).

[34] *See id.* § 7881(a)(4)(A).

[35] *Id.* (emphasis added).

## II. Competing Interpretations of Section 18005(a)

In interpreting section 18005(a) of the CARES Act, disputes have arisen as to what it means for LEAs to "provide equitable services *in the same manner* as provided under section 1117 of the ESEA."[36] In guidance issued on April 30, 2020 (April 30th guidance), the Department interpreted section 18005(a) of the CARES Act to give the Department discretion to harmonize the Act's equitable services provision with its counterpart in the ESEA.[37] To give "meaning to" the ESEA's equity provision—that services and benefits for eligible private school children be "*equitable in comparison*" to services and other benefits for public school children—the Department concluded that it must account for "the significantly broader eligibility and uses of funds authorized under the CARES Act as compared to [ESEA] Title I, Part A."[38] In the April 30th guidance, the Department initially advised LEAs to base the proportional share on *total enrollment* in participating private schools in the LEA, rather than the number of *low-income* children living in Title I-A attendance areas in the LEA and attending private schools inside or outside the LEA.[39]

In response to objections from "[a] number of states," the Department later revised its instructions in the July 1, 2020 IFR to offer LEAs options for determining the proportional share.[40] Under the IFR, an LEA that spends CARES Act relief funds *only* on services for schools participating in Title I-A has three options for determining the proportional share.[41] Specifically, an LEA receiving CARES Act relief funds may determine the proportional share:

>  (1) based on total enrollment in participating private schools,[42] consistent with the April 30th guidance;

>  (2) using the proportional share the LEA calculated under section 1117(a)(4)(A) for the 2019–2020 school year,[43] which would have been based on low-income children living in Title I-A attendance areas and attending private schools inside or outside the LEA; or

>  (3) based on the number of low-income children attending private schools located in the LEA that plan to participate in CARES Act programs.[44]

---

[36] CARES Act § 18005(a). *See* Cory Turner, *DeVos Faces Pushback Over Plan to Reroute Aid to Private School Students*, NPR (May 21, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/05/21/860352150/devos-faces-pushback-over-plan-to-reroute-aid-to-private-school-students.

[37] *See* Dep't of Educ., Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs at 3 (Apr. 30, 2020), https://web.archive.org/web/20200625106043/https://oese.ed.gov/files/2020/04/FAQs-Equitable-Services.pdf [hereinafter April 30th Guidance] ("This requirement, on its face, necessitates that the Department interpret how the requirements of section 1117 apply to the CARES Act programs, given that an LEA under the CARES Act programs may serve all non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement.").

[38] *Id.*

[39] *Id.* at 4, 6. *See, e.g.*, Tex. Educ. Agency, Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs (updated June 4, 2020), https://tea.texas.gov/sites/default/files/covid/COVID-19-CARES-Act-Equitable-Services-FAQ.pdf ("Using the proportion of students who are enrolled in participating [private] schools [located within the LEA's boundaries], the LEA determines the amount of funds available for equitable services based on that proportional share of the LEA's total allocation under each CARES Act program separately.").

[40] IFR, 85 Fed. Reg. at 39,480.

[41] *Id.* at 39,482 (explaining that "the LEA has two options in addition to using enrollment to determine the proportional share").

[42] *Id.* at 39,488 (to be codified at 34 C.F.R. § 76.665(c)(1)(i), (c)(1)(ii)).

[43] *Id.* (to be codified at 34 C.F.R. § 76.665(c)(1)(i)(A)).

[44] *Id.* (to be codified at 34 C.F.R. § 76.665(c)(1)(i)(B)). This option differs from the current method for determining the Title I-A proportional share, which is based on the number of low-income students *living in Title I-A attendance areas in the LEA* who attend private school, regardless of whether their private school is located *inside or outside of the LEA*. *See id.* at 39,481 (stating that "[u]nder Title I, funds for equitable services are generated by students from low-income families who reside in a

However, if an LEA provides services with CARES Act relief funds to *any* non-Title I-A school, the LEA *must* base the proportional share on total enrollment in participating private schools.[45] The Department concluded that it is authorized to promulgate these regulations "in the exercise of [its] interpretive discretion," because the CARES Act's "in the same manner as" language is "facially ambiguous."[46]

In contrast to the Department's interpretation, some federal lawmakers and state officials have argued that the CARES Act *requires* LEAs to base relief funds for equitable services on the number of low-income children attending private schools, and that the Department does not have discretion to depart from this allocation method.[47] In support of this view, they cite the expenditure provision in ESEA section 1117(a)(4),[48] which, as noted, bases eligible private school students' proportional share of services on the number of low-income children attending private schools.[49]

## III. Analysis of Section 18005(a)

Interpreting section 18005(a) begins with the section's text, starting with the meaning of key phrases from that text.[50] These phrases must not be analyzed in isolation, but instead be read with a view toward how they "relate to each other" and their place in the overall statutory scheme.[51] Legislative history can inform the analysis but generally will not override an interpretation that is clearly expressed in the statutory text.[52]

### Meaning of Key Language

CARES Act section 18005(a)'s meaning depends, in large part, on the meaning of the phrases "*provide equitable services*" and "*in the same manner as provided under section 1117*." However, the Act does not define key terms such as "provide," "equitable services," or "manner."[53] The Supreme Court has said that when a statutory term is not defined, it generally should be given its "ordinary meaning"—typically, its dictionary definition.[54] Whether a term's dictionary definition applies—or which one of several possible

---

participating Title I public school attendance area and attend a non-public school (citing 20 U.S.C. § 6320(a)(4)(A)(i) and 34 C.F.R. § 200.64(a)).

[45] *Id.* at 39,488 (to be codified at 34 C.F.R. § 76.665(c)(1)(ii)).

[46] *Id.* at 39,481.

[47] *See, e.g.*, Letter to LEA Superintendents et al. from Jennifer McCormick, Superintendent of Public Instruction, Ind. Dep't of Educ. 1 (May 12, 2020), https://www.doe.in.gov/sites/default/files/grants/final-language-equitable-share-cares-51220.pdf ("This final decision ensures that the funds are distributed according to Congressional intent and a plain reading of the law, which prioritizes communities and schools with high-poverty who are at most risk and in need of the additional funds."); Minn. Dep't of Educ., *CARES Act Funding Information*, https://education.mn.gov/MDE/dse/health/covid19/cares/ (last visited July 1, 2020) ("[T]here has been some confusion around the language and intent of the CARES Act and the guidance provided by the U.S. Department of Education. The state of Minnesota has decided to follow the intent and language of the law and distribute the federal funds to nonpublic schools, according to the number of children living in low-income households to prioritize those students with the greatest need.").

[48] *See* Letter to Betsy DeVos, Sec. of Educ., from Robert C. Scott, Chair, H. Comm. on Educ. & Labor et al. 2 n.5 (May 20, 2020), https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf.

[49] 20 U.S.C. § 6320(a)(4)(A).

[50] *See* Babb v. Wilkie, 140 S. Ct. 1168, 1172 (2020) (stating that to resolve a dispute over the proper interpretation of a statute, the Court "start[s] with the text of the statute"). *See infra* "Meaning of Key Language."

[51] *Babb*, 140 S. Ct. at 1168 ("To explain the basis for our interpretation, we will first define the important terms in the statute and then consider how they relate to each other."). *See infra* "Statutory Context."

[52] Bostock v. Clayton Cty., 590 U.S. ---, No. 17-1618, slip op. at 24 (2020). *See infra* "Legislative History."

[53] *See* CARES Act § 18007 (defining terms for purposes of §§ 18001–06).

[54] *See* Kouichi Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

definitions was intended—depends on the context in which the term is used.[55] For example, a term's ordinary meaning may not apply if the word or phrase is a term of art because it has a technical or settled meaning in the relevant subject area or legal field.[56]

## *"Provide Equitable Services"*

The first question is what it means for an LEA to "provide equitable services," a phrase which is not defined in the CARES Act or the ESEA.[57] The word "provide" can have different meanings depending on the context. Most commonly, it means either: (1) "to supply or make available (something wanted or needed)" (e.g., "*provide* the children with free balloons"); or (2) "to have as a condition" or "stipulate" (e.g., "the contract *provides* that certain deadlines will be met").[58] Because the object of "provide" is "equitable services," the context of the provision suggests that Congress intended the first meaning (i.e., to supply or make available). Neither the CARES Act nor the ESEA expressly defines "equitable services," and the Supreme Court has not interpreted the phrase.[59] However, two separate sections of the ESEA contain "equitable services" requirements: sections 1117 and 8501.[60] Both sections require LEAs to provide services to eligible children attending private schools that are "equitable in comparison to services and other benefits for [participating] public school children."[61] And both sections appear to use the term "equitable services" as a shorthand for this concept in subsequent provisions of the same section.[62]

Accordingly, section 18005(a)'s directive for LEAs to "provide equitable services" appears to mean, at a minimum, that LEAs must "supply or make available" services to private school students that are "equitable in comparison to services and other benefits for [participating] public school children."[63] "Equitable," in ordinary usage, means "having or exhibiting equity"—that is, "freedom from bias or favoritism"—or "dealing fairly and equally with all concerned."[64] Thus, standing alone, the directive to "provide equitable services" suggests that LEAs must provide unbiased, fair, and equal services to private school students, which could speak to the quality *or* the quantity of those services. However, CARES Act section 18005(a) expressly references ESEA section 1117, and as explained *infra* in the section on

---

[55] *See* Yates v. United States, 574 U.S. 528, 537 (2015) (plurality opinion) ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.").

[56] *See, e.g.*, Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 297 (2006) (declining to interpret "costs" according to its "ordinary usage" as expenses incurred because "'costs' is a term of art that generally does not include expert fees" (internal quotation marks and citation omitted)); Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989) (noting that the term "scope of employment" is a "widely used term of art in agency law").

[57] *See* CARES Act § 18007; 20 U.S.C. § 7801.

[58] *Provide*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/provide (last visited July 1, 2020).

[59] *See* CARES Act § 18007. *But cf.* Wheeler v. Barrera, 417 U.S. 402, 407 n.6, 415 n.11, 419 (1974) (interpreting 45 C.F.R. § 116.19(b), which at that time required LEAs to provide "comparable" services to private school students) ("The choice of programs is left to the State with the proviso that comparable (not identical) programs are also made available to eligible private school children.").

[60] 20 U.S.C. §§ 6320, 7881.

[61] *Id.* §§ 6320(a)(3)(A), 7881(a)(3)(A).

[62] *E.g.*, 20 U.S.C. § 6320(b)(1)(E), (J), (b)(4), (c) (caption only); *id.* § 7881(a)(3)(B), (c)(1)(E), (H), (c)(4). *See* IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005) (observing "the normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning").

[63] *See* Azar v. Allina Health Servs., 139 S. Ct. 1804, 1812 (2019) (reasoning that when the same term is used "in the same or related statutes," courts do not "lightly assume" that Congress intended for the term to have different meanings across those provisions).

[64] *Equitable*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/equitable (last visited July 1, 2020); *Equity*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/equity (last visited July 1, 2020).

"Statutory Context," ESEA section 1117 includes a significant amount of detail on how LEAs are to provide services to eligible private school students in an unbiased, fair, and equal manner in the context of Title I-A. Therefore, the term "equitable services" may be interpreted with the context of the ESEA in mind, and with an eye towards how "equitable services" are understood in that section specifically.[65]

## "In the Same Manner as Provided Under Section 1117"

Because the phrase "in the same manner" does not appear to be a term of art with a settled meaning,[66] one must consider the ordinary meaning of the words "same" and "manner" before construing them together and alongside the reference to section 1117.[67] The ordinary meaning of the word "same" appears to be settled as meaning "identical." *Merriam-Webster* defines the word "same," in the first instance, as: (1) "resembling in every relevant respect"; and (2) "conforming in every respect—used with *as*."[68] The legal dictionary *Black's Law Dictionary* similarly defines the word as "identical or equal" or "resembling in every relevant respect."[69] Section 18005(a) uses the term "same" in conjunction with the word "as"— "in the *same* manner *as* provided under section 1117"—suggesting the "conforming in every respect" definition might apply here.[70] But the adjective "same" also modifies the noun "manner" and must be considered in that context.[71]

The ordinary meaning of the word "manner" is not nearly as uniform as the meaning of "same."[72] *Merriam-Webster* defines "manner" in three different ways, as: (1) "a characteristic or customary mode of

---

[65] *See* United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) (explaining that a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear"). *Cf.* FCC v. AT&T Inc., 562 U.S. 397, 407–08 (2011) ("The meaning of 'personal privacy' in Exemption 7(C) [of the Freedom of Information Act (FOIA)] is further clarified by the rest of the statute. Congress enacted Exemption 7(C) against the backdrop of pre-existing FOIA exemptions, and the purpose and scope of Exemption 7(C) becomes even more apparent when viewed in this context.").

[66] *See, e.g.*, Ass'n of Irritated Residents v. EPA, 790 F.3d 934, 948 (9th Cir. 2015) (suggesting that "'in the same manner'" could be "a procedural or substantive requirement"); United States v. Lewis Cty., 175 F.3d 671, 677–78 (9th Cir. 1999) (reasoning that "[t]he requirement that federally-held property be subject to taxation 'in the same manner' as other property" could "refer to the time when the tax is due, the manner of valuation, or any number of other elements of the state taxing process" (quoting 7 U.S.C. § 1984)). *But see* Wilder's S.S. Co. v. Low, 112 F. 161, 164 (9th Cir. 1901) ("[T]he phrase 'in the same manner' has a well-understood meaning in legislation, and that meaning is not one of restriction or limitation, but of procedure. It means by similar proceedings, so far as such proceedings are applicable to the subject-matter.").

[67] *See* Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

[68] *Same*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/same (last visited July 1, 2020).

[69] *Same*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[70] *See Same*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/same (last visited July 1, 2020) (giving as examples of this usage: "eat the *same* rations as the captain" and "gave him the *same* answer as before").

[71] *Cf.* Booth v. Churner, 532 U.S. 731, 738–39 (2001) (interpreting the phrase "until such administrative remedies as are available have been exhausted" and reasoning: "While the modifier 'available' requires the possibility of some relief for the action complained of . . ., the word 'exhausted' has a decidedly procedural emphasis. It makes sense only in referring to the procedural means, not the particular relief ordered. . . . [O]ne 'exhausts' processes, not forms of relief . . . .").

[72] For example, in 2020, a panel of the U.S. Court of Appeals for the D.C. Circuit interpreted the Federal Death Penalty Act's requirement that executions be conducted "'in the manner prescribed' by state law," exploring whether "manner" referred only to the execution method or to both the method and the "precise procedures" for carrying it out. *In re* Fed. Bureau of Prisons' Execution Protocol Cases, 955 F.3d 106, 111 (D.C. Cir. 2020) (per curiam), *cert. denied sub nom.* Bourgeois v. Barr, No. 19-1348 (June 29, 2020). The judges turned to dictionary definitions of the word "manner" but ultimately emphasized the context in which Congress used this language. *See id.* (Katsas, J., concurring) (arguing that the statute's "text, structure, and history show that 'manner' refers only to the method of execution"); *id.* (Rao, J., concurring) (arguing that "'manner'. . . cannot be interpreted in isolation" because it "is a broad, flexible term whose specificity depends on context"); *id.* (Tatel, J., dissenting) (agreeing "with Judge Rao that the term 'manner' refers to more than just general execution method" but analyzing the statutory context

acting" (e.g., "custom"); (2) "a mode of procedure or way of acting" (e.g., "fashion");[73] or (3) a "method of artistic execution or mode of presentation" (e.g., "style").[74] While the 2019 edition of *Black's Law Dictionary* does not define "manner," a previous edition defined the term as a "way, mode, method of doing anything, or mode of proceeding in any case or situation."[75] *Ballentine's Law Dictionary* also lists "method" as a possible meaning.[76] While these definitions differ, they all connote the *way* someone or something operates.[77] And courts gauging the ordinary meaning of the phrase "in the same manner as" appear to agree. For instance, in a 1998 decision, the U.S. Court of Appeals for the First Circuit (First Circuit) interpreted a federal law allowing a court to enforce a restitution order "in the same manner as a judgment in a civil action."[78] The defendant in a criminal action argued that to enforce a restitution order against him, the United States first had to obtain a judgment in a civil action.[79] The court disagreed, opining that "[s]uch a reading impermissibly reads the 'in the same manner as' language out of the statute."[80] The court held that a "restitution order may be enforced in *like manner* as a civil judgment; it need not be reduced first to a civil judgment."[81] To determine how an order could be enforced in a "like manner," the court consulted the rule of civil procedure governing "the mechanism" for enforcing a judgment for monetary payment.[82] As the First Circuit decision illustrates, use of the "same manner" does not suggest that equitable services under the CARES Act and Title I-A share all of the same characteristics: only that they must be provided in a "like manner" or according to the same "mechanism."[83]

A question remains as to whether the manner or way of providing equitable services should be assessed by looking at (1) how LEAs *customarily* provide services under section 1117, with, perhaps, LEAs' past practices as Title I-A funding recipients serving as that custom, or (2) the specific *procedures* in section 1117 itself. Because section 18005(a) expressly references section 1117, the more likely meaning—one that gives effect to that cross-reference—is that LEAs must follow the "methods" or "procedures" for providing equitable services specified in section 1117. In *NFIB v. Sebelius*, the Supreme Court interpreted an Affordable Care Act provision stating that the "penalty" for noncompliance with the Act's individual mandate "shall be assessed and collected *in the same manner as* an assessable penalty under subchapter B of chapter 68," which, in turn, specified that penalties "shall be assessed and collected in the same manner as taxes."[84] The Supreme Court agreed with the government that this language was "a directive only to the Secretary of the Treasury to use the same 'methodology and procedures' to collect

---

and purpose to determine whether state procedures were included).

[73] The unabridged version adds to this usage "the mode or method in which something is done or happens." *Manner*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/manner (last visited July 1, 2020).

[74] *Manner*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/manner (last visited July 1, 2020).

[75] *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 114 (Katsus, J., concurring) (quoting *Manner*, BLACK'S LAW DICTIONARY (6th ed. 1990)).

[76] *Manner*, BALLENTINE'S LAW DICTIONARY (2010) ("Way of performing or executing; method; custom; habitual practice.").

[77] *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 130 (Rao, J., concurring) ("'Manner' may therefore refer to a general way of doing something or the more specific way in which an action is carried out.").

[78] *See* United States v. Timilty, 148 F.3d 1, 3 (1st Cir. 1998) (internal quotation marks omitted) (quoting 18 U.S.C. § 3663(h)(1)(B)).

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.* at 5.

[83] *Cf. id.* at 3, 5.

[84] Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 545 (2012) (internal quotation marks omitted) (quoting 26 U.S.C. § 5000A(g)(1) (emphasis added); 26 U.S.C. § 6671(a)).

the penalty that he uses to collect taxes."[85] To determine which provisions governed the methodology and procedures for collecting taxes, the Court looked to the "chapters of the Internal Revenue Code providing the Secretary authority to assess and collect taxes, and generally specifying the means by which he shall do so."[86] The Court then concluded that the statute's "command that the penalty be 'assessed and collected in the same manner' as taxes is best read as referring to those chapters and giving the Secretary the same authority and guidance with respect to the penalty."[87] The *NFIB* decision suggests that when the phrase "in the same manner" references a specific provision in law, that specific reference supplies the methods or procedures for the agency to follow. Accordingly, the phrase "in the same manner as provided under section 1117" in section 18005(a) means, at a minimum, that LEAs must provide equitable services in the same *way* as under section 1117, and likely means according to identical *methods* or *procedures*.[88]

In its recent IFR, the Department reasons that "Congress did not need to add the words 'in the same manner' if it simply intended to incorporate 'section 1117 of the ESEA of 1965' by reference in the CARES Act," suggesting that Congress did not intend to require "mechanistic[]" compliance with *all* of section 1117's requirements.[89] To avoid rendering the words "in the same manner" superfluous, the Department construes the phrase to authorize the Department to "harmonize" section 1117's requirements with other statutory provisions and to bypass requirements that are, in the Department's view, "inconsistent" with the appropriations for relief funds in the CARES Act.[90]

The Department correctly gives effect to the language "in the same manner";[91] but reading the phrase "in the same manner as provided under section 1117" to allow the Department to read certain procedural requirements *out of* section 1117 is not the most natural reading of that language.[92] Moreover, interpreting "same manner" to incorporate section 1117's process-oriented requirements does not render the word "manner" superfluous. Reading "in the same manner" as "in the same way" preserves key distinctions between CARES Act relief funds and Title I-A funds. As the Department points out, CARES Act relief funds can be used for a broader range of services than the Title I-A special education and instructional services and materials discussed in section 1117.[93] And, as the Department further observes, the beneficiaries of equitable services under the CARES Act do not appear to be limited to "eligible children" within the meaning of section 1117.[94] By directing LEAs to provide equitable services "in the same

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *See* United States v. Young, 458 F.3d 998, 1007 (9th Cir. 2006) ("Congress knows how to define terms when it wants to give them specific definitions at odds with everyday understanding.").

[89] IFR, 85 Fed. Reg. at 39,481.

[90] *Id.* at 39,479, 39,482.

[91] *See* Maine Cmty. Health Options v. United States, 590 U.S. ---, 140 S. Ct. 1308, 1323 (2020) (noting that the Court hesitates to adopt an interpretation of a congressional enactment that renders other statutory language superfluous).

[92] *See* Gabelli v. SEC, 568 U.S. 442, 448 (2013) (applying the "most natural reading of the statute" instead of the alternative construction advanced by the government).

[93] *See* 20 U.S.C. § 6320 (authorizing funds to private school students for "special educational services, instructional services . . . , counseling, mentoring, one-on-one tutoring, or other benefits *under this part* . . . that address their needs" (emphasis added)); IFR, 85 Fed. Reg. at 39,481 ("[T]he CARES Act is a separate appropriation allowing separate permissible uses of taxpayer funds.").

[94] *See* 20 U.S.C. § 6320(a)(1)(A) (stating that "to the extent consistent with the number of *eligible children identified under section 1115(c)* in the school district served by a local educational agency who are enrolled in private elementary schools and secondary schools, a local educational agency shall . . . provide *such children*, on an equitable basis . . . special educational services, instructional services . . ., or other benefits . . . that address their needs"); IFR, 85 Fed. Reg. at 39,480 (reasoning that "services under the CARES Act programs can be available for all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area").

manner as" provided under section 1117, Congress likely meant to indicate *how* LEAs should provide equitable services with relief funds rather than *for what* or *to whom*—questions largely addressed in the sections establishing the relief funds.[95] But it does not necessarily follow from this observation that "manner" refers to all the ways in which LEAs provide services under section 1117 *except for* how LEAs determine the proportional share,[96] particularly when, as explained below, statutory context suggests that the method of determining the proportional share is part of the "manner" of providing services.[97]

## Statutory Context

To determine whether CARES Act section 18005(a)'s reference to the manner of providing services under ESEA section 1117 includes that section's expenditure determination, it is necessary to look at CARES Act section 18005 as a whole, ESEA section 1117 as a whole, and section 1117's place in the broader context of the ESEA's equitable-services requirements.[98]

### *CARES Act Section 18005*

As shown in the annotated text below, section 18005 addresses two requirements—consultation and public control of funds—that are also covered in section 1117.

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A[n] [LEA] receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, **[1]** as determined in consultation with representatives of non-public schools.

(b) **[2]** PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

While some of the language in the consultation clause and the public control subsection echoes section 1117's text, such redundancy may reflect Congress's emphasis of these requirements. And differences between the CARES Act relief funds and Title I-A funds may account for the separate treatment of these provisions. As explained below, these observations about section 18005's structure do not undermine, and in some instances seem to reinforce, the view that "manner" refers to section 1117's procedures, including its method for determining the proportional share.

---

[95] *Cf.* United States v. Timilty, 148 F.3d 1, 3 (1st Cir. 1998) ("A restitution order may be enforced in *like manner* as a civil judgment; it need not be reduced first to a civil judgment.").

[96] *See* IFR, 85 Fed. Reg. at 39,481 (stating that: "By definition, the provisions in section 1117 relating to funding and eligibility for services, e.g., section 1117(a)(1)and(4) and (b)(1)(E) and (J)(ii), are inapposite in a CARES Act frame. However, the provisions in section 1117 relating to the 'manner' in which services are delivered, e.g., section 1117(a)(2), (3), and (b)(1)(A)-(D), (F)-(I), and (K), arguably do fit within and can be applied under the CARES Act.").

[97] For this reason, the Department's observation that Congress could have used a different formulation—"as provided in"—to achieve a result the Department thinks Congress *did not intend* is beside the point. *See id.* In any event, even if Congress's meaning could have been conveyed with fewer words, that does not necessarily mean that the text of section 18005(a), as written, is ambiguous. *See* Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004) (favoring a construction in which the text is plain but contains surplusage versus one in which there is no surplusage but the text is ambiguous).

[98] *See* United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").

## Consultation

While the effect of section 18005(a)'s consultation clause is not entirely clear, to the extent it suggests anything about providing services in the same "manner" as section 1117, it is that determining the proportional share based on low-income children is normally part of the Title I-A consultation process. It is possible that, in referring to consultation separately, Congress intended to impose a general meet-and-confer requirement in place of section 1117(b)'s specific consultation requirements.[99] Another plausible reading is that Congress intended to emphasize the need for consultation in accordance with section 1117 as part of the process of providing equitable services. The structure of the consultation clause—"as determined in consultation with representatives of non-public schools"—appears to track the general directive in section 1117(a) that LEAs provide services to eligible private school students "after timely and meaningful consultation with appropriate private school officials."[100] Those general references to consultation have little meaning without section 1117(b), which specifies the topics to be covered in the consultation.[101] Notably, those topics include a discussion of "the size and scope of the equitable services to be provided to the eligible private school children, the proportion of funds that is allocated under subsection (a)(4)(A) for such services, and how that proportion of funds is determined."[102] But the "proportion of funds" is not left entirely to the public and private school officials' discretion. In particular, the consultation must include "the method or sources of data that are used under subsection (c) and section 1113(c)(1) to determine *the number of children from low-income families* in participating school attendance areas who attend private schools."[103] And the parties must discuss:

> whether to provide equitable services to eligible private school children—
>
> (i) by creating a pool or pools of funds with all of the funds allocated under subsection (a)(4)(A) based on *all the children from low-income families* in a participating school attendance area who attend private schools; or
>
> (ii) in the agency's participating school attendance area who attend private schools with the proportion of funds allocated under subsection (a)(4)(A) based on *the number of children from low-income families* who attend private schools.[104]

---

[99] It is unclear whether the Department views section 18005(a)'s consultation clause as displacing or incorporating section 1117(b). In the IFR, the Department cites the consultation clause as evidence that Congress did not intend to incorporate section 1117's requirements "wholesale." IFR, 85 Fed. Reg. at 39,481. However, the Department also concludes in the IFR that "[c]onsultation must be 'in the same manner' as conducted under section 1117" and adopts all of section 1117's consultation requirements *except for* those relating to determining the proportional share based on low-income children. *Id.* at 39,482; *see also id.* at 39,488 (to be codified at 34 C.F.R. § 76.665(b)(2)) (stating that "[c]onsultation must occur in accordance with section 1117(b) of the ESEA, except to the extent inconsistent with the CARES Act and this section, such as section 1117(b)(1)(E) and (J)(ii)").

[100] 20 U.S.C. § 6320(a)(1)(A). The comma separating the consultation clause suggests that the language "as determined in consultation with representatives of non-public schools" modifies the whole requirement that LEAs "provide equitable services in the same manner as provided under section 1117 . . . to students and teachers in nonpublic schools." *Cf.* Bingham, Ltd. v. United States, 724 F.2d 921, 925 n.3 (11th Cir. 1984) ("Where the modifier *is* set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' states that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent."). Moreover, if the clause modified only the immediately preceding words "students and teachers," it would direct the parties to "determine[]" students and teachers, which makes less sense grammatically than a requirement that the parties agree on the way to provide equitable services.

[101] *See* Rimini Street, Inc. v. Oracle USA, Inc., 586 U.S. ---, 139 S. Ct. 873, 881 (2019) ("If one possible interpretation of a statute would cause some redundancy and another interpretation would avoid redundancy, that difference in the two interpretations can supply a clue as to the better interpretation of a statute. But only a clue. Sometimes the better overall reading of the statute contains some redundancy.").

[102] 20 U.S.C. § 6320(b)(1)(E).

[103] *Id.* § 6320(b)(1)(F) (emphasis added).

[104] *Id.* § 6320(b)(1)(J) (emphasis added).

Thus, ordinarily the consultation process under ESEA section 1117 includes the question of *how* to calculate the number of low-income children who attend private schools, but not *whether* to base private schools' proportional share on low-income children, which is a separate statutory requirement addressed in sections (a)(4)(A) and (c).

## Public Control of Funds

Congress separately addressed the public control of funds in section 18005(b), authorizing a public agency to "provide" equitable services with CARES Act relief funds itself or to "contract for the provision of such services with a public or private entity."[105] The inclusion of subsection (b) suggests that Congress intended for this more specific public control language to control over ESEA section 1117(d) on the public control of funds;[106] otherwise, subsection (b) would be superfluous.[107] However, it does not follow from this observation that Congress did not intend to require general adherence to section 1117's procedures for providing equitable services, including section 1117's method for determining the proportional share.[108] Congress may have included a separate public control provision for clarity. ESEA section 1117(d) applies only to the "control of funds provided under this part" (i.e., Title I-A funds) and "title to materials, equipment, and property purchased with such funds."[109] CARES Act section 18005(b), in contrast, applies to the "control of funds for the services and assistance provided to a non-public school under subsection (a)" (i.e., CARES Act equitable services), and "title to materials, equipment, and property purchased with such funds."[110] Additionally, section 18005(a) imposes the "same manner" requirement directly on LEAs, whereas the public control subsection, as in section 1117 of the ESEA, requires that a "public agency" control and administer the federal funds.[111]

## The Rule Against Surplusage

In the Department's view, the "separate consultation requirement in section 18005(a)" and "public control of funds provision in section 18005(b)" signal that Congress did not intend "to incorporate 'section 1117 of the ESEA of 1965' wholesale into the CARES Act"—otherwise these provisions would be superfluous.[112] The "rule against surplusage," a canon of statutory interpretation, counsels that the reader "should not interpret any statutory provision in a way that would render it or another part of the statute inoperative or redundant."[113] But the rule assists the reader "only where a competing interpretation gives effect 'to every clause and word of a statute'" and "avoids excess language."[114] Here, the Department concludes that many of section 1117's consultation requirements describe the "manner" of providing services for purposes of the CARES Act even though section 18005(a) refers to consultation separately.[115]

---

[105] CARES Act § 18005(b).

[106] *See* Gozlon-Peretz v. United States, 498 U.S. 395, 407 (1991) ("A specific provision controls one of more general application.").

[107] Corley v. United States, 556 U.S. 303, 314 (2009) (describing "one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'" (internal citations omitted)).

[108] *See infra* notes 112–19 and accompanying text.

[109] 20 U.S.C. § 6320(d)(1).

[110] CARES Act § 18005(b).

[111] *Compare* CARES Act § 18005(b), *with* 20 U.S.C. § 6320(d).

[112] IFR, 85 Fed. Reg. at 39,481.

[113] CRS Report R45153, *Statutory Interpretation: Theories, Tools, and Trends* 28, by Valerie C. Brannon.

[114] Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 106 (2011) (citation omitted).

[115] IFR, 85 Fed. Reg. at 39,481 ("[T]he provisions in section 1117 relating to the 'manner' in which services are delivered, e.g., section 1117(a)(2), (3), and (b)(1)(A)-(D), (F)-(I), and (K), arguably do fit within and can be applied under the CARES Act.").

Because the Department's construction does not "avoid[] excess language," the overlap between section 18005 and section 1117 is "both inescapable and unilluminating."[116]

Moreover, the Department does not explain why separately addressing consultation and public control undercuts—rather than *reinforces*—the interpretation that Congress intended to adopt section 1117's method of determining the proportional share. As explained in Part I, section 1117 contains five subsections. If "manner" refers to neither consultation nor public control of funds, that leaves three subsections: subsection (a) "General requirement"; subsection (c) "Allocation for equitable service to private school students"; and subsection (e) "Standards for a bypass."[117] Section 1117's expenditure determination is part of subsection (a)'s general requirements.[118] And subsection (c) is dedicated entirely to the calculation methods for determining the number of low-income children to be used to determine the equitable share and the complaint process for contested calculations.[119] Accordingly, if Congress intended for "manner" to mean something *other than* consultation and public control, then the manner of providing equitable services must be found among section 1117's *remaining* requirements, many of which govern the method for determining the proportional share.

### Section 1117

Section 1117's text and structure suggest that the "manner" of providing equitable services is broader than simply the delivery (i.e., supplying) of those services and instead encompasses all of the procedures in section 1117 that govern the way in which LEAs make services available to private schools students. The first subsection in section 1117, titled "General requirement," establishes the basic framework for providing equitable services.[120] Paragraph (1) states that after consulting with private school officials, an LEA must "provide" services to eligible private school children "on an equitable basis."[121] This paragraph is immediately followed by the three requirements in paragraphs (2) through (4): (2) that services be "secular, neutral, and nonideological"; (3) that services be "equitable in comparison to services and other benefits for [participating] public school children" and "provided in a timely manner"; and (4) that expenditures for services "be equal to the proportion of funds allocated to participating local school attendance areas based on the number of children from low-income families who attend private schools."[122] Each of the requirements in paragraphs (2) through (4), including the expenditure determination, appears to elaborate on *the way* to "provide" services "on an equitable basis."[123] Indeed, section 1117 refers to the result of the expenditure determination (i.e., the proportional share) as the "equitable share."[124] And the Department's Title I-A equitable services regulations state, in a section captioned "Services on an equitable basis," that "[s]ervices are equitable if," in addition to other standards, "the LEA . . . [m]eets the equal expenditure requirements under paragraph (a) of this section"—referring to the proportional share.[125]

---

[116] Seila Law, LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ---, slip op. at 34 (2020) (plurality opinion) (concluding that the inclusion of a severability clause with respect to one part of a larger statute did not affect the reach of a severability clause applicable to the entire statute despite the redundancy).

[117] 20 U.S.C. § 6320(a), (c), (e).

[118] *Id.* § 6320(a)(4)(A).

[119] *Id.* § 6320(c).

[120] *Id.* § 6320(a).

[121] *Id.* § 6320(a)(1)(A).

[122] *Id.* § 6320(a)(2)–(4).

[123] *Id.* § 6320(a)(1)(A).

[124] *Id.* § 6320(a)(4)(D).

[125] 34 C.F.R. § 200.64(b); *see also id.* § 200.64(a)(1) ("Funds expended by an LEA under this subpart for services for eligible

While narrower interpretations of the "manner" of providing services under section 1117 are also possible, there are persuasive reasons to reject these alternative readings. For example, one could read the "manner" of providing services under section 1117 to be limited to that section's directive to provide services "in a timely manner"[126] or to the two paragraphs expressly captioned "provision of services."[127] The Department does not take such a constrained view of the text and instead distinguishes the expenditure provision in section 1117(a)(4) from provisions "relating to the 'manner' in which services are *delivered*, e.g., section 1117(a)(2), (3), and (b)(1)(A)–(D), (F)–(I), and (K)," which, in the Department's view, "arguably do fit within and can be applied under the CARES Act."[128] But had Congress wanted only certain paragraphs of section 1117 to apply to the CARES Act, it could have referenced them directly.[129] Moreover, many of the provisions the Department cites, instead of specifying *how* services should be delivered, describe the *nature* of the services themselves,[130] or the required topics for *consultation* before the delivery of services.[131]

In its recent IFR, the Department reasons that achieving "equity" under the CARES Act requires a different method for determining the proportional share.[132] Specifically, the Department states that "[i]f the CARES Act does not limit services based on residence and poverty, then it stands to reason that an LEA should not use residence and poverty to determine the proportional share of available funds for equitable services to non-public school students."[133] This argument may elevate a general conception of equity—parity between "similarly situated" students in public and private schools[134]—over the specific procedures set out in section 1117 for providing equitable services. The differences in the populations to be served by relief funds and Title I-A funds would support a different input for determining the proportional share if section 1117's *allocation* method was based on Title I-A's *eligibility* criteria. Under section 1117, however, the expenditure determination and the eligibility criteria to receive services are separate determinations.[135] Several categories of students qualify for Title I-A equitable services independent of income status, including certain students at risk of failing to meet the state's academic standards, "children with disabilities," "migrant children," and "English learners."[136] But under

---

private school children in the aggregate must be equal to the proportion of funds generated by private school children from low-income families who reside in participating public school attendance areas . . . .").

[126] Section 1117 uses the word "manner" only once in connection with the provision of services, stating that services "shall be provided in a timely manner." 20 U.S.C. § 6320(a)(3)(A). *Cf. id.* § 6320(a)(4)(C) (requiring state educational agencies to notify private school officials of LEAs' expenditures determinations in a "timely manner").

[127] *See* 20 U.S.C. § 6320(a)(5), (d)(2); No Child Left Behind Act of 2002, tit. I, § 101, Pub. L. No. 107-110, 115 Stat. 1439, 1509–10.

[128] IFR, 85 Fed. Reg. at 39,481 (emphasis added).

[129] *See* NLRB v. SW Gen., Inc., 580 U.S. ---, 137 S. Ct. 929, 938–39 (2017) ("Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line. Congress used that structure in the [statute] and relied on it to make precise cross-references. When Congress wanted to refer only to a particular subsection or paragraph, it said so." (internal citations omitted)).

[130] *See* 20 U.S.C. § 6320(a)(2) ("Such educational services or other benefits, including materials and equipment, shall be secular, neutral, and nonideological.").

[131] *See id.* § 6320(b)(1)(A)–(B) (requiring consultation to include "issues such as . . . how the children's needs will be identified; [and] . . . what services will be offered").

[132] IFR, 85 Fed. Reg. at 39,481.

[133] *Id.* at 39,482–43.

[134] *Id.* at 39,481.

[135] *Compare* 20 U.S.C. § 6320(a)(1) (defining eligibility by cross-referencing § 6315(c), which is broader than low-income children), *with id.* § 6320(a)(4) and (c) (defining proportional share for expenditures expressly in terms of "the number of children from *low-income* families" (emphasis added)).

[136] Section 1117 states that LEAs must provide services "[t]o the extent consistent with the number of eligible children identified under section 1115(c) [*id.* § 6315(c)] in the school district served by a local educational agency who are enrolled in private

section 1117(a)(4)(A)(i), an LEA still determines private schools' proportional share based *only* on the number of low-income children attending those schools.[137] Therefore, even under Title I-A, the proportional share for equitable services is determined based on a metric—low-income status—that is under-inclusive of all eligible children. As a result, the fact that the CARES Act relief funds may serve a wider swath of students and teachers does not necessarily resolve whether Congress intended to depart from section 1117's express directive to count low-income children as the way (i.e., manner) to determine the equitable share.

The Department observes that "Congress has already taken poverty into consideration in allocating CARES Act funds to LEAs" because an "LEA receives ESSER funds based on its proportionate share of Title I funds" and "40 percent of the GEER funds a Governor receives is based on the State's share of Title I formula children."[138] But ESEA section 1117 itself accounts for family income in the distribution of equitable services *even though* the underlying Title I-A funds originally were allocated to states based in part on family income.[139] There is no inherent tension in Congress directing the equitable share of a fund that is, at least in part, income-based to be distributed based on income. That, in the Department's words, "Congress targeted both ESSER and GEER funds to high-poverty areas to reflect their need,"[140] suggests, if anything, that calculating the proportional share for services to private school students and teachers based on the proportion of low-income students living in those areas is consistent with the statutory scheme.

*ESEA Section 8501*

Expanding the lens further to consider the equitable services standards that existed before the CARES Act reinforces the conclusion that, under a straightforward reading of the statute, the CARES Act adopts section 1117's specific method for determining what is an equitable amount of expenditures. As noted, the ESEA contains two equitable services sections: section 1117, which applies to Title I-A funds, and section 8501, which applies to other programs.[141] While their eligibility criteria is program-specific, these sections are similarly structured and their general requirements relating to the nature of the services provided and "provision of services" paragraphs largely mirror each other.[142] However, the sections differ in their expenditure determinations. Section 1117's expenditure allocation, as noted, is based on the number of low-income children within the LEA who attend private schools.[143] In contrast, section 8501's allocation is equal to "the expenditures for participating public school children," accounting for "the number and educational needs of the children to be served."[144] As implemented, this means that in

elementary schools and secondary schools." *Id.* § 6320(a)(1). Section 1115(c) defines the eligibility criteria. *Id.* § 6315(c).

[137] *Id.* § 6320(a)(4)(A)(i).

[138] IFR, 85 Fed. Reg. at 39,482 (citing CARES Act § 18003(c) and § 18002(b)(2)).

[139] *See supra* Part I.

[140] IFR, 85 Fed. Reg. at 39,482.

[141] *Compare id.* § 6320, *with id.* § 7881.

[142] *Compare id.* § 6320(a)(2), (a)(3), (a)(5), *and* (d)(2), *with id.* § 7881(a)(2), (a)(3), (a)(5), *and* (d)(2).

[143] *Id.* § 6320(a)(1)(A).

[144] *Id.* § 7881(a)(4)(A). One consultation requirement in subsection (c)(1)(H) references the option of pooling funds for services "based on" low-income children in private schools, but in guidance interpreting the consultation provisions, the Department did not interpret this requirement to engraft an allocation based on low-income onto the general expenditure provision in (a)(4)(A). *See* Dep't of Educ., Non-Regulatory Guidance: Fiscal Changes and Equitable Services Requirements Under the Elementary and Secondary Education Act of 1965 (ESEA), as Amended by the Every Student Succeeds Act (ESSA), at 34 (Nov. 21, 2016), https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf [hereinafter Equitable Services Requirements Under ESEA] ("The topics subject to consultation have been expanded to include the following: . . . Whether to provide equitable services to eligible private school participants (1) by creating a pool or pools of funds with all of the funds allocated under programs covered under section 8501(b) or (2) on a school-by-school basis based on each the proportionate share

general, LEAs compare the number of participating public school children with the number of participating private school children.[145] Accordingly, had Congress wanted LEAs to determine private schools' share of CARES Act relief funds based on the number of participating students, rather than the number of low-income children, while retaining language about neutrality and equity,[146] Congress could have cited ESEA section 8501 in CARES Act section 18005.[147]

In addressing the costs of implementing the IFR, the Department appears to acknowledge the similarities between section 8501's method of determining the proportional share and the enrollment method promulgated in the IFR:

> For LEAs using CARES Act funds to serve students and teachers in both Title I and non-Title I schools, the interim final rule requires the use of enrollment data to determine the proportional share. For the majority of these LEAs, enrollment data should already be available for non-public schools that participate in equitable services under ESEA programs other than Title I. Equitable services under those programs are governed by section 8501 of the ESEA, which requires in determining expenditures for equitable services that an LEA take into account the number of non-public school students to be served. In complying with this requirement, an LEA customarily obtains enrollment data from participating non-public schools. For such LEAs, complying with the interim final rule accordingly imposes no additional burden with respect to those schools.[148]

The Department suggests that using total enrollment in participating private schools effectuates Congress's intent to provide "equitable services" under the CARES Act, notwithstanding Congress's specific reference to the "manner" of providing services under section 1117 (i.e., like Title I-A).[149] Yet, it is unclear why, if Congress wanted to equalize expenditures based on participation alone, it did not simply cite the very section applicable to "ESEA programs other than Title I[-A]" in which "an LEA customarily obtains enrollment data from participating [private] schools."[150] That Congress cited section 1117 instead of section 8501 or another ESEA program, tends to support the view that Congress wanted LEAs to use section 1117's method of determining expenditures for private schools' equitable share of services.[151]

## Legislative History

Where a question of federal law turns on statutory language that is unclear, courts have sometimes looked to the legislative history of the provision in question to clarify its meaning.[152] Common sources of legislative history include conference and committee reports, Members' statements during consideration

---

of funds available to provide services in each school.").

[145] For example, in the Title II-A program, which is subject to section 8501, the Department has instructed LEAs to "determine[] the amount of funds available for . . . equitable services for private school teachers and other educational personnel by calculating, on a per-pupil basis, the amount available for all public and private school students enrolled in participating private elementary and secondary schools in areas served by the LEA (regardless of a student's residency), taking into consideration the number and needs of the children, their teachers and other educational personnel to be served." See, e.g., Equitable Services Requirements Under ESEA, supra note 144, at 35.

[146] See, e.g., 20 U.S.C. § 7881(a)(2)–(3)(A).

[147] See Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995) (instructing that a statute should be "interpreted as a symmetrical and coherent regulatory scheme").

[148] IFR, 85 Fed. Reg. at 39,485.

[149] See id. at 39,481.

[150] See id. at 39,485.

[151] See Azar v. Allina Health Servs., 587 U.S. ---, 139 S. Ct. 1804, 1813 (2019) ("Congress's choice to include a cross-reference to one but not the other of the APA's neighboring exemptions strongly suggests it acted 'intentionally and purposefully in the disparate' decisions." (citation omitted)).

[152] E.g., Blum v. Stenson, 465 U.S. 886, 896 (1984).

of the legislation, and the record of Congress's deliberations when enacting a law.[153] However, the Supreme Court has noted that "legislative history is not the law," and while *clear* legislative history can clarify ambiguities in statutory text, ambiguous legislative history cannot "muddy clear statutory language."[154] Additionally, the Court has characterized *post-enactment* legislative history[155] as "not a legitimate tool of statutory interpretation" because it cannot have had an effect on the congressional vote.[156]

In the case of the CARES Act, the legislative record appears to be silent as to the intent of section 18005. The legislation originally introduced as the CARES Act, S. 3548, did not contain a title on elementary and secondary education funding and, consequently, did not include any equitable services language.[157] The text of the relief fund provisions, including section 18005, was added in an amendment in the nature of a substitute, and passed by the House and Senate through a different legislative vehicle, H.R. 748, without any committee reports. Although summaries of the bill's final language and floor statements reference the relief funds generally, no mention of the equitable services provision is made.[158]

## IV. Conclusion and Additional Considerations

For the reasons discussed above, section 18005(a)'s text and context suggest that the most straightforward reading of the provision is that it requires LEAs to follow section 1117's method for determining the proportional share and thus to allocate funding for services for private school students and teachers based on the number of low-income children attending private schools. However, if a court were to conclude that the statute is ambiguous with respect to the method of determining the proportional share, that would then require the court to address whether the Department is entitled to deference under *Chevron*[159] or a related doctrine—questions that this memorandum does not analyze.[160]

The question addressed in this memorandum—whether the CARES Act can be plausibly read to require LEAs to apply section 1117's method of determining the proportional share—is relevant under a *Chevron* analysis because the first step of that analysis is whether "the intent of Congress is clear" on the issue in question.[161] If so, the court does not reach the second question of whether the agency's interpretation was reasonable, because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[162] If, however, "the language of the statute is open or ambiguous—that is, if

---

[153] *See* CRS Report R45153, *supra* note 113, at 36–41.

[154] Bostock v. Clayton Cty., 590 U.S. ---, No. 17-1618, slip op. at 24 (2020); Azar v. Allina Health Servs., 139 S. Ct. at 1814 (citing Epic Sys. Corp. v. Lewis, 584 U.S. ---, 138 S. Ct. 1612, 1631 (2018); Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011)).

[155] Examples of post-enactment legislative history in this case may include statements by Members of Congress expressing their views of a provision after it has become law, or subsequent legislation considered by Congress. *See, e.g.*, Turner, *supra* note 36; H.R. 6800, § 10604 (amending section 18005 of the CARES Act).

[156] Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011).

[157] Similarly, a competing House version under consideration at the same time as the CARES Act would have created a state fiscal stabilization fund in the Department of Education, but did not include an express equitable services provision akin to section 18005(a). *See* H.R. 6379, 116th Cong. (2020).

[158] Cong. Rec. H1823, H1852, H1862 (Mar. 27, 2020); Senate Appropriations Committee, *$340 Billion Surge in Emergency Funding to Combat Coronavirus Outbreak*, at 15–16 (Mar. 25, 2020), https://www.appropriations.senate.gov/imo/media/doc/Coronavirus%20Supplemental%20Appropriations%20Summary_FINAL.pdf.

[159] Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

[160] *Cf.* Ass'n of Irritated Residents v. EPA, 790 F.3d 934, 948 (9th Cir. 2015) ("The statute itself does not clearly state whether 'in the same manner' is a procedural or substantive requirement. Because Congress has not directly spoken to the issue at hand, the court will proceed to the second *Chevron* step.").

[161] *Chevron*, 467 U.S. at 842.

[162] *Id.* at 842–43.

Congress left a 'gap' for the agency to fill," then under *Chevron*, a court must uphold the agency's interpretation "as long as it is reasonable."[163] Thus, the statutory interpretation analysis in this memorandum is part of the first step, but not necessarily the entirety of the *Chevron* analysis.

In these circumstances, there are at least three additional questions related to deference that must be considered to complete the analysis. Because the IFR took effect before a formal notice-and-comment period, the first question is whether the IFR is entitled to *Chevron* deference.[164] Assuming *Chevron* applies, the second question is whether section 1117 unambiguously forecloses the Department's interpretation. Moreover, assuming the text of section 18005 is ambiguous and a court proceeds to step two, an examination must occur as to whether the Department's interim regulations reflect a "reasonable" interpretation of the CARES Act. And finally, if a court concludes that the IFR is not entitled to *Chevron* deference, a court may still have to consider whether the IFR "merit[s] some deference" under other judicial doctrines.[165] A memorandum analyzing these additional considerations can be prepared upon request.

---

[163] Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 89 (2007) (citing *Chevron*, 467 U.S. at 842–43).

[164] The Supreme Court has distinguished between "notice-and-comment rulemaking," which is eligible for *Chevron* review, and less formal interpretations like nonbinding guidance documents, which typically are not. Christensen v. Harris Cty., 529 U.S. 576, 587 (2000). While the IFR contains regulations with the force of law and the Department has solicited comments on the IFR, the IFR took effect immediately upon publication before a formal notice-and-comment period. *See* IFR, 85 Fed. Reg. at 39,479. *See generally* OFFICE OF FED. REGISTER, A GUIDE TO THE RULEMAKING PROCESS 9 (2011) (noting that an interim final rule "becomes effective immediately upon publication," but that in "most cases, the agency stipulates that it will alter the interim rule if warranted by public comments"). At least one federal court has analyzed an interim rule under the *Chevron* framework. *See* Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv., 416 F. Supp. 2d 92, 99 (D.D.C. 2006).

[165] *See* United States v. Mead Corp., 533 U.S. 218, 234 (2001) ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." (internal citations omitted) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139–40 (1944))).

# EXHIBIT E



**STATE OF NEW MEXICO**
**PUBLIC EDUCATION DEPARTMENT**
**300 DON GASPAR**
**SANTA FE, NEW MEXICO 87501-2786**
Telephone (505) 827-5800
www.ped.state.nm.us

RYAN STEWART, Ed.L.D.
SECRETARY OF EDUCATION

MICHELLE LUJAN GRISHAM
GOVERNOR

May 14, 2020

**MEMORANDUM**

**TO:**      Superintendents and State Charter School Leaders

**FROM**    Gabriel C. Baca, Director – Student, School and Family Support Bureau (signature on file)

**RE:**      **Funds available under Coronavirus Aid, Relief and Economic Security (CARES) Act through the Elementary and Secondary School Education Relief Fund (ESSER), Index 24301**

---

Dear Superintendents and State Charter Leaders,

Thank you for providing continued learning opportunities for students and steadfast leadership and support for your hard-working employees and contractors during this time.

The purpose of this memo is to inform you of the opportunity to apply for funds through the Elementary and Secondary School Education Relief Fund (ESSER Fund), a component of the recently enacted Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub.L. 116–136.

## Background:

The ESSER Fund is a highly flexible federal program designed to provide local education agencies (LEAs) with funding to meet a diverse array of educational and COVID response related needs. By law, awards from the ESSER Fund are based on LEAs' proportional share of final 2019-20 Title I, Part A allocations received.

## Allowable Uses of Funding:

LEAs may use ESSER Fund awards for:

1. Purchasing educational technology including assistive technology or adaptive equipment;
2. Professional development for educators or families to support remote/distance learning activities;
3. Providing mental health services and supports;
4. Activities that address the unique needs of low-income children;
5. Activities that address the unique needs of students with disabilities;
6. Activities that address the unique needs of English learners;
7. Activities that address the unique needs of Native American students;
8. Activities that address the unique needs of Non-Native American racial and ethnic minorities;

CARES Act ESSER Fund Guidance Memo
May 14, 2020
Page **2** of **6**

9. Support for homeless or foster youth;
10. Purchasing supplies to sanitize and clean facilities operated by the LEA;
11. Other activities necessary to maintain the operation of and continuity of services in the LEA and continuing to employ existing staff, including purchasing personal protective equipment for students and staff;
12. Planning and implementing summer learning and supplemental afterschool program activities;
13. Providing resources for principals and others school leaders to address school-specific needs;
14. Career and Technical Education;
15. Adult Education;
16. Family Literacy;
17. Coordination of preparedness and response efforts of the LEA with state, local, tribal, and territorial public health departments, and other relevant agencies, to prevent, prepare for, and respond to coronavirus;
18. Procedures and systems to improve the preparedness and response efforts of the LEA;
19. Training and professional development for LEA staff on sanitation and minimizing the spread of infectious diseases;
20. Planning and coordination during long-term closures, including how to provide meals to eligible students, how to provide online learning technology to all students, how to provide guidance on meeting IDEA requirements, and how to ensure other educational services can continue to be provided consistent with federal, state, and local requirements; and
21. Other activities authorized under ESEA.

The following are not allowable uses of ESSER funds:
- Lobbying;
- Subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs;
- Expenditures related to state or local teacher or faculty unions or associations; and
- Bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

## Statewide Priorities:

With the close of this school year upon us and planning underway for the uncertainties and complexities that we will face in the year to come, the PED is working to align federal and state funding efforts to meet the needs of students, staff, families, and stakeholders during each of the phases outlined below. While the use of the ESSER Fund award is flexible, it is critical that all LEAs keep student and staff safety and teaching and learning at the forefront of decision-making. The PED strongly encourages each LEA to plan for how these resources can be used to ensure that critical program and infrastructure elements are in place to allow for a safe return to school and to mitigate interruptions to the learning process caused by COVID-19. These priorities include:

- **Closing the digital divide** through the purchase and distribution of digital devices, through the support of home internet connectivity for all students, and through the professional development and instructional coaching needed by educators to facilitate remote learning;
- **Supporting the social and emotional needs** of students, families, and staff;
- **Supporting the needs of students with disabilities and at-risk students**, both during the building closure and when students transition back into school buildings; and
- **Providing personal protective equipment** for all staff and students, as well as ensuring that schools are fully cleaned, sanitized, and stocked with cleaning supplies.

We hope that the ESSER Fund award will enable you to "look forward" and "rise" in ways that work for your local community. As the disruption in our education system is disproportionately impacting our most vulnerable students, including low-income children, children with disabilities, English learners, Native American students, other racial and ethnic minorities, students experiencing homelessness, and foster care youth, we encourage you to especially consider these students as you use the ESSER Fund award for students' education.

## Application for Funds:

The PED has endeavored to make the application for funding a simple and straightforward process for LEAs. The application you will submit to gain access to ESSER funding will be completed using SharePoint. Detailed instructions on completing the application are available when you log in to the SharePoint application.

We recommend that you call an emergency board meeting, per your policy, and request approval for the:

- ESSER Fund Application;
- Initial Budget BAR for 2019-20; and
- Initial budget amount for 2020-21.

2019-20 Budget Authority: When you submit your application, you will also submit an "Initial Budget" Budget Adjustment Request (IB BAR) via the Operating Budget Management System (OBMS) to establish budget authority for this fund for 2019-20. Please upload a copy of the 24301 ESSER Planning Allocation Table for SY19-20 with your IB BAR. The table is listed under FY 19-20 Initial Awards and may be downloaded from:
https://webnew.ped.state.nm.us/bureaus/administrative-services/awards-and-carryover/

CARES Act ESSER Fund Guidance Memo
May 14, 2020
Page **4** of **6**

Once your application and budget are approved, you may charge allowable pre-award costs to this grant (through journal entry) from as early as March 13, 2020. **This will only be allowable during FY2019-20.** Therefore, if you have eligible expenditures affecting FY19-20, you must seek board approval and submit a BAR for FY19-20**.**

2020-21 Budget Authority: You may also include 100% of your ESSER Fund award amount in your 2020-21 OBMS budget. This step is necessary in order to establish budget authority for the 2020-21 school year. You will not have to submit a separate application for 2020-21. If you do not include the 24301 ESSER Fund Planning Allocation Table amount for FY20-21 in your 2020-21 initial budget in OBMS, your access to these funds will be delayed during the 2020-21 school year. Pre-award costs cannot be reimbursed in FY20-21.

The total ESSER Fund award cannot exceed 100% of your planning award. *Track expenditures carefully in 2019-20 so that you will not overspend - as you will have 100% budget authority during each fiscal year for the same award.* Final award balances will be calculated after the first reporting period in FY20-21 with carryover award letters to be issued in the fall.

As part of your application, you will be asked to respond to the following:

1. Provide a description of the steps the LEA will take to ensure compliance with Section 427 of the General Education Provision Act (GEPA), 20 U.S.C. 1228a. The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede access to, or participation in, the program(s) for which you are submitting this funding request.
2. Describe how the LEA will determine its most important educational needs as a result of COVID19.
3. Explain how the LEA intends to use the ESSER Fund award to promote remote learning. Due to the nature of the pandemic and COVID-19 itself, it is likely that we may need to continue, or return to, distance learning in the future. Please explain how your intended use of ESSR funds will support ongoing remote learning.
4. Outline the LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
5. Describe how the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.
6. Describe how you will utilize the ESSER Fund award to target additional supports and services for your At-Risk student populations (English Learners, Students with Disabilities, Native American Students, Low Income Students, Students with high mobility, and Homeless/Foster Children).

Your Title I Director/Contact has access to the application in Sharepoint today. The application is due June 1, 2020. Extensions will be granted if needed, and you will not lose the funds allocated to your LEA. I encourage you to submit your application and IB BAR as soon as possible.

This program will be administered by the Student, School and Family Support Bureau. Staff will work with you on your application submission and approval. Please see the attached list for the name of your contact in my bureau.

## Program Requirements:

Quarterly reporting on the use of funds will be required of all LEAs. Some details are provided in the assurances included in the application. The United States Department of Education has committed to releasing additional details in the near future.

Please note the following requirement around continuation of employment when receiving ESSER funds:

*An entity receiving ESSER funds must, to the greatest extent practicable, continue to compensate its employees and contractors during the period of any disruptions or closures related to COVID19*

*in compliance with Section 18006 of Division B of the CARES Act. In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity.*

There is no requirement for site allocations for these funds – LEAs may use their discretion when determining how to allocate funds among school sites. The PED strongly encourages all LEAs to ensure at a minimum that all schools, including locally authorized charter schools, are equipped to provide remote learning through digital technology and that all schools have sufficient PPE for all students and staff and cleaning supplies to open school safely. All expenditures must be reasonable, necessary, and allocable under the CARES Act.

There is no requirement that these funds be used to supplement and not supplant existing funding.

Funds allocated to school districts are subject to equitable services under Sec. 1117 of the Elementary and Secondary Education Act of 1965 (ESEA) (and require consultation).  Consultation for equitable services must occur as soon as practicable, and must be completed and documented before Requests for Reimbursement (RFRs) will be approved by NMPED for the 2020-21 school year.

## New Mexico Public Education Department's Advisory to School Districts for the Determination of Equitable Services Calculations under the CARES Act:

The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub.L. 116–136, requires school districts that receive awards under the Elementary and Secondary School Emergency Relief (ESSER) Fund to provide equitable services to students and teachers in non-public schools using Title I criteria in the Elementary and Secondary Education Act of 1965.  See Section 18005(a) of the CARES Act.  In compliance with the CARES Act, school districts are advised to determine equitable services dollar amounts based on the number of children from low-income families in each participating non-public school in the attendance area boundaries of Title I schools within the school district.

This advisory aligns with the plain language of the CARES Act and is consistent with long-standing equitable services calculations under Title I criteria, as well as U.S. Department of Education's (ED) interpretations of the Elementary and Secondary Education Act of 1965 over decades and as recently as October 2019.  See https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

ED'S April 30, 2020 non-binding guidance, titled "Providing Equitable Services to Students and Teachers under the Coronavirus Aid, Relief, and Economic Security (CARES) Act Programs", advocates for calculations based on the number of total student enrollment at participating non-public schools instead of the number of students from low-income families at such schools, which is inconsistent with Title I.  Since ED'S April 30, 2020 non-binding guidance document presents an alternative interpretation of the CARES Act that does not align with the State's reading of the CARES Act, it is not being followed.

The New Mexico Public Education Department's advisory is permissible under ED'S April 30, 2020 non-binding guidance document, which notes:

> "Other than statutory and regulatory requirements included in the document, such as those pursuant to the authorizing statute and other applicable laws and regulations, **the contents of the guidance do not have the force and effect of law and are not meant to bind the public in any way**. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. **In addition, it does not create or confer any rights for or on any person.**"  (Emphasis added.)

In accordance with the New Mexico Public Education Department's advisory, school districts shall take the following steps to calculate equitable services dollar amounts for participating non-public schools under the CARES Act:

CARES Act ESSER Fund Guidance Memo
May 14, 2020
Page **6** of **6**

1)   School districts shall contact *all* non-public schools within their geographic boundaries to ask whether they wish to receive equitable services under the <u>CARES Act</u>.

2)   To help determine which students live within Title I attendance areas and who are from low-income families, non-public schools that wish to receive equitable services under the <u>CARES Act</u> will collect the following data:
   a.   Student addresses;
   b.   Student grade levels; and
   c.   Student poverty information.

3)   Only those students who live within Title I attendance areas and who are from low-income families will generate an equitable share.  Title I attendance areas are determined by the public schools the school district served during the 2019-2020 school year.

4)   Since children who enroll in non-public schools live in many different school districts, school districts may transfer the equitable share funds to one another to form a "Lead District" that will deliver the equitable services on behalf of the non-public school(s), as in the Title I equitable share process.

If you have any questions about this advisory, please contact me at <u>gabriel.baca2@state.nm.us</u> or (505) 670-8402.


cc:     Secretary of Education, Ryan Stewart, Ed.L.D.
        Deputy Secretary Dr. Hand, Policy, Resource & Accountability
        Deputy Secretary Dr. Perea Warniment, Teaching, Learning & Assessment
        Deputy Secretary Delgado, Finance & Operations
        Deputy Secretary Bobroff, Identity, Equity & Transformation
        Deputy Secretary Sandoval, Academic Engagement and Student Success
        Allison Briceño, Managing Director
        Alan Brauer, Director of Charter Schools
        Marian Rael, Director of Administrative Services
        Susan Lucero, Bureau Chief, Administrative Services Division, Fiscal Grants Management Bureau
        Title I Directors and Contacts
        Business Managers

# EXHIBIT F

HUSCH BLACKWELL LLP
Donald J. Mizerk Esq., (CA Bar No. 208477)
John W. Borkowski (IL Bar No. 6320147) (*pro hac pending*)
120 South Riverside Plaza, Suite 2200
Chicago, Illinois  60606
Phone:  (312) 526-1538
Fax:  (312) 655‑1501
don.mizerk@huschblackwell.com

Attorneys for Amicus Curiae
COUNCIL OF THE GREAT CITY SCHOOLS

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF MICHIGAN, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF NEW MEXICO, STATE OF WISCONSIN, THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, BOARD OF EDUCATION FOR THE CITY OF CHICAGO, CLEVELAND MUNICIPAL SCHOOL DISTRICT, AND SAN FRANCISCO UNIFIED SCHOOL DISTRICT,** | Civil Case No.3:20-cv-04478-JD |
| Plaintiffs, | **DECLARATION OF MANISH NAIK IN SUPPORT OF THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF** |
| **v.** | |
| **ELISABETH D. DEVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,** | Judge: Hon. James Donato |
| | Trial Date:  None set |
| | Action Filed: July 7, 2020 |
| Defendants. | |

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois  60606
Phone : (312) 526-1538

I, Manish Naik, do hereby swear upon my oath that the following statements are true and correct to the best of my knowledge, information and belief, and that I could competently testify as follows if called upon to do so:

1. I am the Manager of Legislative Services for the Council of Great City Schools ("Council"). I have served in this position since 1999.

2. I focus on legislative issues affecting the Council and its 76 member districts, including Title I of the Elementary and Secondary Education Act ("Title I") and federal appropriations.

3. The Council sent a survey to general counsel, legislative staff, and Title I directors of its member districts on July 20, 2020. Those district personnel were asked to voluntarily provide information relating to the provision of equitable services under the CARES Act and specifically the impact of different allocation methodologies.

4. Sixteen districts responded to the survey in what appeared, based on the data maintained by the Council about those districts, to be a full and accurate manner:  Baltimore City Public Schools; Clark County School District; Cleveland Metropolitan School District; DC Public Schools; Jefferson County Public Schools; Kansas City Public Schools; Miami-Dade County Public Schools; Minneapolis Public Schools; Oakland Unified School District; Portland Public Schools; Sacramento City Unified School District; Saint Paul Public Schools; San Antonio Independent School District; San Diego Unified School District; Seattle Public Schools; and the School District of Palm Beach County.

5. Based on those survey responses, myself and my colleague, Moses Palacios, the Council's Legislative and Research Manager, created a spreadsheet estimating, for each district, the amount of CARES Act funding that would be dedicated to equitable services based on two possible formulas: the Title I formula at Sec. 1117 of ESEA, as required

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538

1

under the CARES Act; and the formula set forth by the Department of Education in its interim final rule regarding equitable services under the CARES Act (the "Rule"). We calculated the difference between the dollar amounts allocated for equitable share under each formula. This difference represents the financial loss suffered by each district as a result of requiring equitable share to be calculated on the basis of all students, rather than low-income students.

6. A true and accurate copy of that spreadsheet is attached hereto as Exhibit F-1.

7. I also reviewed the Amended Complaint and Motion for Preliminary Injunction filed on July 17 and July 20, 2020 by Plaintiffs in *State of Michigan, et al., v. DeVos,* No.3:20-cv-04478-SK (N.D. Cal.), including the declarations attached to the Appendix in Support of Motion for Preliminary Injunction (Doc. 35-2). These declarations include those of Council member districts New York City Department of Education, Chicago Public Schools, and San Francisco Unified School District.

8. The 16 member districts that responded to the Council survey indicated that an additional $33.37 million in CARES Act funding, above that which would be allocated to private schools using the formula in Section 1117 of ESEA, would be diverted to private schools as a result of the Rule. *See* Exhibit F-1.

9. An additional $64.9 million above what is required by the Section 1117 formula will be diverted to private schools based on the information provided in the declarations of New York City ($53 million), Chicago ($10.17 million), and San Francisco ($1.74 million).

10. The total loss to these 19 member districts is $98.28 million. This $98.28 million is above and beyond the $135.44 million that would be allocated to private schools if equitable services were based on low-income students, rather than all students.

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538

2

11. Based on the Census poverty data used to determine the Fiscal Year 2019 Title I allocations that were the basis for CARES Act funding, these 19 school districts represent approximately 33.7% of all the low-income 5-17 year old children residing in school districts in the Council's membership. The Council estimates that the amount of additional CARES Act funding diverted to private schools based on the formula set forth in the Rule is similar in other urban school districts relative to their total low-income populations. As such, the Council projects that its member districts would lose a total of about $292 million of the much-needed, emergency resources provided to them under the CARES Act if the formula set forth in the Department's Rule is to be followed.

12. On July 20, 2020, member-district Cleveland Metropolitan School District ("CMSD") sent additional information to the Council regarding how the Rule would specifically impact low-income students at both public and private schools in that district.

13. A large number of low-income students in the district attend private schools, as a result of Ohio's voucher program. CMSD informed the Council that 75% of private schools in the district would benefit (*i.e.*, receive more CARES Act funding) if the Title I formula were used, instead of the formula set forth in the Department's Rule.

14. Specifically, the district estimated that, if the equitable services were allocated on the basis of all students rather than low-income students, the impact on private schools would be as follows: (1) reallocation of approximately $890,000 away from 47 private schools with a high number of low-income students; and (2) reallocation of approximately $1.7 million to 16 private schools with a low number of low-income students.

15. The Council projects that $822,952 would be reallocated from public schools to private schools in CMSD. *See* Exhibit F-1.

16. Based on survey results and CMSD's estimates, both public schools in the district *and* the private schools in the district that serve most of the low-income students who attend private schools would be negatively impacted by the diversion of resources to private schools under the Rule.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>July 24, 2020</u>                                    _____

                                                                                Manish Naik

HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538

4

# EXHIBIT F-1

# The Council of Great City Schools

*Member District Survey Results Regarding Equitable Services under the CARES Act*

July 2020

| | Estimated CARES Act Allocation | Equitable Services Amount Based on Low-Income Students | Equitable Services Amount Based on All Students | Increase in Equitable Services Amount | Percent Increase |
|---|---|---|---|---|---|
| Baltimore City Public Schools | $ 48,392,781.00 | $ 1,451,783.43 | $ 3,871,422.48 | $ 2,419,639.05 | 167% |
| Clark County School District | $ 83,968,770.00 | $ 714,849.84 | $ 2,311,069.32 | $ 1,596,219.48 | 223% |
| Cleveland Metropolitan School District | $ 31,202,407.12 | $ 4,294,120.62 | $ 5,117,072.80 | $ 822,952.18 | 19% |
| District of Columbia Public Schools | $ 21,749,742.49 | $ 914,306.89 | $ 2,802,901.17 | $ 1,888,594.28 | 207% |
| Jefferson County Public Schools | $ 30,378,113.00 | $ 328,032.90 | $ 5,009,148.39 | $ 4,681,115.49 | 1427% |
| Kansas City Public Schools | $ 6,485,116.76 | $ 1,366,388.24 | $ 7,851,505.00 | $ 6,485,116.76 | 475% |
| Miami-Dade County Public Schools | $ 119,240,142.00 | $ 11,096,816.00 | $ 14,143,364.00 | $ 3,046,548.00 | 27% |
| Minneapolis Public Schools | $ 18,705,817.00 | $ 1,426,394.00 | $ 2,576,676.00 | $ 1,150,282.00 | 81% |
| Oakland Unified School District | $ 14,493,191.00 | $ 156,526.46 | $ 2,160,000.00 | $ 2,003,473.54 | 1280% |
| Portland Public Schools | $ 8,276,718.94 | $ 574,208.05 | $ 1,202,325.66 | $ 628,117.61 | 109% |
| Sacramento City Unified School District | $ 15,770,510.00 | $ 192,400.00 | $ 1,636,181.00 | $ 1,443,781.00 | 750% |
| Saint Paul Public Schools | $ 19,974,429.00 | $ 346,822.34 | $ 1,677,438.45 | $ 1,330,616.11 | 384% |
| San Antonio Independent School District | $ 21,164,881.00 | $ 318,763.00 | $ 1,774,854.00 | $ 1,456,091.00 | 457% |
| San Diego Unified School District | $ 30,512,782.00 | $ 411,923.00 | $ 2,345,268.00 | $ 1,933,345.00 | 469% |
| Seattle Public Schools | $ 10,709,835.00 | $ 364,434.00 | $ 2,048,749.00 | $ 1,684,315.00 | 462% |
| The School District of Palm Beach County | $ 39,918,975.60 | $ 1,516,921.07 | $ 2,317,187.15 | $ 800,266.08 | 53% |
| **Grand Total** | **$ 520,944,211.91** | **$ 25,474,689.84** | **$ 58,845,162.42** | **$ 33,370,472.58** | **131%** |