Rick Esenberg (Wis. Bar #1005622)
*Luke N. Berg (Wis. Bar #1095644)
Elisabeth Sobic (Wis. Bar #1103379)

Wisconsin Institute for Law & Liberty
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-7361 | Fax: (414) 727-6385
luke@will-law.org

Mark W. Bucher (Cal. Bar #210474)
California Policy Center
18002 Irvine Blvd., Suite 108
Tustin, CA 92780-3321
Phone: (714) 313-3706

*Attorneys for Amici* Council for American Private Education, National Catholic Educational Association, Agudath Israel of America, Council of Islamic Schools in North America, Association of Christian Schools International, Association of Christian Teachers and Schools, WELS Commission on Lutheran Schools, Wisconsin Council of Religious & Independent Schools, School Choice Wisconsin Action, California Catholic Conference, Michigan Catholic Conference, Michigan Association of Non-Public Schools, Pennsylvania Catholic Conference, Pennsylvania Affiliate of the Council for American Private Education, American Federation for Children, Foundation for Excellence in Education, Inc., Catholic Education Partners, Great Lakes Education Foundation, Rio Grande Foundation, Commonwealth Foundation, School Choice Wisconsin, Colorado Catholic Conference, Colorado Association of Private Schools, Indiana Non-Public Education Association, Midsouth Association of Independent Schools, Catholic Conference of Oklahoma, Texas Private Schools Association, James Madison Institute, Mississippi Center for Public Policy, Nevada Policy Research Institute, Roughrider Policy Center, Rhode Island Center for Freedom & Prosperity

*Additional Signatures Below for the Following Amici*: Wisconsin Catholic Conference, EdChoice, Liberty Justice Center, Mackinac Center for Public Policy, Buckeye Institute, Goldwater Institute

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF MICHIGAN, et al., | No. 3:20-cv-4478-JD |
| Plaintiffs, | **AMICI PRIVATE SCHOOL ASSOCIATIONS' AND ADVOCACY GROUPS' AMICUS BRIEF IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PRELIMINARY INJUNCTION** |
| v. | |
| ELISABETH D. DEVOS, et al., | Date:          July 29, 2020 |
| Defendants. | Time:          12:00 p.m.<br>Judge:          Hon. James Donato<br>Trial Date:          None set<br>Action Filed:          July 7, 2020 |

---

* Pro Hac Vice Application Pending

1

**TABLE OF CONTENTS**

2   INTRODUCTION ......................................................................................................1

3   IDENTITY AND INTEREST OF AMICI .................................................................2

4   ARGUMENT ............................................................................................................6

5      I.   The CARES Act Requires an "Equitable" Distribution Between Public and Private

6          Schools, Contrary to Plaintiffs' Interpretation ...................................................6

7      II.  The Same Harm and Public Interest Arguments Raised by Plaintiffs Cut Equally in

8          the Opposite Direction When Private Schools Are Considered .........................11

9      III. Private Schools Are an Integral Part of Education Across the Country ............................13

10  CONCLUSION........................................................................................................15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Cases**

*Bd. of Educ. v. Allen*,

     392 U.S. 236 (1968) .......................................................................................... 13

*Gundy v. United States*,

     139 S. Ct. 2116 (2019) ....................................................................................... 9

*Legacy Emanuel Hosp. & Health Ctr. v. Shalala*,

     97 F.3d 1261 (9th Cir. 1996) ........................................................................... 8

*Loughrin v. U.S.*,

     573 U.S. 351 (2014) ................................................................................... 7, 11

*S.E.C. v. McCarthy*,

     322 F.3d 650 (9th Cir. 2003) ..................................................................... 7, 11

*Wayman v. Southard*,

     23 U.S. (10 Wheat.) 1 (1825) .......................................................................... 9

**Statutes**

20 U.S.C. § 6314 ...................................................................................................... 8

20 U.S.C. § 6315 ...................................................................................................... 8

20 U.S.C. § 6320 .................................................................................... 7, 8, 9, 10

CARES Act § 18002 ......................................................................................... 6, 7, 10

CARES Act § 18003 ..................................................................................... 6, 7, 9, 10

CARES Act § 18005 ..................................................................................... 7, 8, 9, 10

CARES Act § 5001 ................................................................................................. 12

**Other Authorities**

A. Egalite & P. Wolf, *A Review of Empirical Research on School Choice,* 91 Peabody

     Journal of Education 441 (2016) .................................................................... 15

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................ 7, 8, 11

C. DeAngelis & P. Wolf, *Private School Choice and Character: More Evidence from*

     *Milwaukee*, EDRE Working Paper 2019-03 (2019) ....................................... 15

Coronavirus Relief Fund: Guidance for State, Territorial, Local, and Tribal Governments,
  United States Department of the Treasury (Updated June 30, 2020) .............................. 12

*COVID-19 Permanent Private School Closures*, Cato Institute,
  https://www.cato.org/covid-19-permanent-private-closures ............................................. 12

*Fast Facts: Public and Private School Comparison*, National Center for Education
  Statistics ................................................................................................................. 14

*FY 2019–20: School Aid*, Michigan House Fiscal Agency (Oct. 2, 2019) ................................... 13

J. Cowen, et al., *Student Attainment and the Milwaukee Parental Choice Program: Final
  Follow-up Analysis*, School Choice Demonstration Project (Feb. 2012) ......................... 14

Libby Sobic & Jessica Holmberg, *In This Together: How private and public charter
  schools are serving their families and communities during the COVID-19 crisis*,
  WILL (Mar 27, 2020) ................................................................................................ 14

P. Wolf & M. McShane, *Is the Juice Worth the Squeeze? A Benefit/Cost Analysis of the
  District of Columbia Opportunity Scholarship Program*, 8 Education Finance and
  Policy 74 (2013) ........................................................................................................ 15

P. Wolf, *Do Voucher Students Attain Higher Levels of Education? Extended Evidence
  from the Milwaukee Parental Choice Program*, Urban Institute (Feb. 2018) ................. 15

*Private School Statistics at a Glance*, CAPE, https://www.capenet.org/facts.html .................... 13

Robert C. Enlow, *The K-12 Financial Cliff: What States Could Face if Students Switch
  Schooling Sectors*, EdChoice (Apr. 20, 2020) ................................................................ 12

Sarah D. Sparks, *Catholic School Closures Rise Amid COVID-19, Recession*, Ed Week
  (June 9, 2020) ........................................................................................................... 11

*School Safety Report*, School Choice Wisconsin (2014) .............................................................. 14

**Rules**

34 C.F.R. § 76.665 ...................................................................................................................... 9

**INTRODUCTION**

The CARES Act provides $16 billion in federal funding to support both public and private elementary and secondary schools impacted by the ongoing COVID-19 pandemic. Congress gave the Department of Education precise instructions for how to allocate these funds among States and among local school districts within States. It also required that money allocated to a district be shared between public and private schools. But instead of specifying the precise way that this was to be done, Congress directed the Department to ensure that private school students receive "equitable" services to those provided public school students using CARES Act funds. To that end, the Department developed a simple and sensible rule that offers States and local school districts two alternatives for distributing these funds while ensuring an "equitable" distribution between public and private schools. If a State or local school district uses CARES Act funds to benefit *all* students, then under the rule the funds must be distributed proportionally based on the total number of students in public and private schools. If, on the other hand, a State or local school district selects to use CARES Act funds to provide services that benefit only low-income or at-risk students or schools, then under the rule the funds may be allocated based on the proportion of such students in public and private schools.

Plaintiffs, a group of States and public school districts, ask this Court to invalidate the Department's sensible rule and instead impose an inequitable distribution that would favor public schools to the detriment of private schools and the students they serve. And Plaintiffs' entire case rests on a textual argument that violates a basic canon of statutory construction—that different words mean different things, *especially* in the same sections of the same Act dealing with the same general issue. Plaintiffs here want the Department to be required to distribute money between public and private schools in proportion to how funds are distributed to states and among local districts. Congress could have done that, but it did not. It specifically used different words to address the different allocation among private and public schools within a district, referencing the requirement for equity. The Department, quite wisely, decided that equity would turn on the uses to which these funds are being put. If spent only on Title I students, then allocation in proportion to these students is equitable. If spent on all students, then allocation in keeping with a private

1  school's share of all students meets that requirement.

2       Plaintiffs also unfairly suggest that the Department's rule unlawfully diverts millions of

3  CARES Act funds away from public schools, while completely ignoring the effect their requested

4  injunction would have on private schools, which face the same challenges due to the COVID-19

5  crisis. Amici file this brief to call this Court's attention to the flaws in Plaintiffs' legal theory and

6  to highlight the harms an injunction will have on private schools. For the reasons discussed herein,

7  Amici request the Court deny Plaintiffs' motion for a preliminary injunction.

8  **IDENTITY AND INTEREST OF AMICI[1]**

9       The United States has over 33,000 private schools, with over five million students. Amici

10  are 38 associations and advocacy groups that represent and support private schools and their

11  families in Wisconsin, Arizona, Arkansas, California, Colorado, Florida, Illinois, Indiana,

12  Louisiana, Michigan, Mississippi, Nevada, New Mexico, North Dakota, Ohio, Oklahoma,

13  Pennsylvania, Rhode Island, Tennessee, Texas, and throughout the nation. Amici include Catholic,

14  Orthodox Jewish, Islamic, Lutheran, other Christian, and independent secular schools, and

15  collectively serve millions of students:

16  - **Council for American Private Education** (CAPE) is a coalition of national organizations

17     and state affiliates serving private elementary and secondary schools. CAPE member

18     organizations represent about 80 percent of private school enrollment nationwide.

19  - **National Catholic Educational Association** (NCEA) is a professional membership

20     organization representing almost 150,000 Catholic educators serving more than 1.7 million

21     students in Catholic elementary and secondary schools. NCEA serves as a national voice

22     for Catholic schools, which are ministries of the Catholic Church in America.

23  - **Agudath Israel of America**, founded in 1922, is a national grassroots Orthodox Jewish

24     organization. Agudath Israel serves as a liaison between government at the federal, state,

25     and local levels and the entire spectrum of Orthodox Jewish educational institutions in the

26     United States, including approximately 750 day schools educating over 250,000 students.

---

[1] No counsel for a party authored this brief in whole or part, nor did any person or entity, other than amicus or its counsel, make a monetary contribution to the preparation or submission of this brief.

- **Council of Islamic Schools in North America** (CISNA) is committed to promoting quality education at Islamic schools through advocacy, accreditation services, and professional development. CISNA has 101 member schools serving 23,000 students.

- **Association of Christian Schools International** (ACSI) is a nonprofit association providing support services to 2,500 Christian preschools and elementary and secondary schools and 90 post-secondary institutions in the U.S., including 32 in Michigan alone.

- **Association of Christian Teachers and Schools** is a national association of roughly 200 Christ-centered, Bible-based schools, serving over 26,000 students throughout the country.

- **WELS Commission on Lutheran Schools** exists to provide resources, support, and training for starting and strengthening Lutheran schools of the Wisconsin Synod. WELS schools educate over 42,000 students in its 434 schools located in 33 states.

- **Wisconsin Council of Religious & Independent Schools** (WCRIS) is a nonprofit, nonpartisan, membership organization representing 100,000 children and more than 10,000 teachers and staff in 600 K-12 schools across Wisconsin since 1974.

- **Wisconsin Catholic Conference** (WCC), led by the Roman Catholic bishops of Wisconsin, is the public policy voice of the Catholic Church throughout the state and represents the nearly 280 Catholic schools in Wisconsin serving roughly 53,000 students.

- **School Choice Wisconsin Action** is a membership organization that advocates on behalf of the 342 private schools participating in the Wisconsin Private Parental Choice Programs.

- **California Catholic Conference** (CCC) is the public policy arm of the Catholic Church in California and speaks on behalf of California's two archdioceses and ten dioceses, which include over 500 elementary and 100 secondary schools with roughly 208,000 students.

- **Michigan Catholic Conference** (MCC) is a Michigan nonprofit membership corporation founded in 1963 that serves as the official voice of the Catholic Church in Michigan on matters of public policy, including education issues, and provides various services to the 222 Catholic schools, with over 50,000 students, throughout the State of Michigan.

- **Michigan Association of Non-Public Schools** (MANS) was formed in 1972 as a service provider and association of nonpublic schools in Michigan and serves 455 schools and their

- 3 -

Amicus Br. of Private School Associations and Advocacy Groups in Support of Defs. (3:20-cv-4478-JD)

students to ensure they receive required services relating to health, safety, and welfare.

- **Pennsylvania Catholic Conference** (PCC) is an association of the eight Latin Rite and the two Byzantine Rite Dioceses in Pennsylvania. Pennsylvania Catholic schools have for over two centuries served generations of immigrants, the underprivileged, and the marginalized, and currently serve roughly 130,000 students.

- **Pennsylvania Affiliate of the Council for American Private Education** (PACAPE) is a nonpartisan association representing 90% of the private school community in Pennsylvania, which serves over 200,000 students and 50,000 teachers and staff.

- **American Federation for Children** (AFC) is a 501(c)(4) issue advocacy organization with state-based chapters in 11 states that seeks to empower families, especially lower-income families, with the freedom to choose the best K-12 education for their children.

- **Foundation for Excellence in Education, Inc.** ("ExcelinEd") is a national nonprofit, nonpartisan organization founded in 2008 whose mission is to build an American educational system that equips every child to achieve his or her individual potential.

- **EdChoice** is a 501(c)(3) nonpartisan, nonprofit organization and national leader in educational-choice research, legal defense and education, fiscal analysis, and policy development, whose mission is to advance educational freedom and choice for all.

- **Catholic Education Partners** works with state Catholic conferences, Bishops and other clergy, school leaders and families, and others to advance policies that allow more families to access Catholic education, while protecting the autonomy and integrity of schools.

- **Liberty Justice Center** is an Illinois-based, nonprofit, nonpartisan, public-interest law firm that seeks to protect fundamental rights through precedent-setting litigation, including its defense of parental choice in education in legal settings nationwide.

- **Mackinac Center for Public Policy** is a Michigan-based, nonpartisan research and educational institute committed to expanding opportunities for Michigan student success by empowering families with access to a variety of effective educational options.

- **Great Lakes Education Foundation** is a Michigan-based foundation committed to researching and promoting educational opportunity for every Michigan family.

- **Rio Grande Foundation** is New Mexico's free market public policy think tank that advocates for educational choice and improved student outcomes in the K-12 system.

- **Buckeye Institute** is an Ohio-based nonpartisan, nonprofit organization founded in 1989 as an independent research and educational institution. The Buckeye Institute has been a longtime proponent of public policy solutions for education reform.

- **Commonwealth Foundation** is an issue-based nonprofit in Pennsylvania that aims to advance public policies that empower parents to choose the best school for their child's needs, regardless of race, income, or zip-code.

- **School Choice Wisconsin** is a Wisconsin-based, nonprofit policy and advocacy organization that seeks to empower parents by developing, supporting, and promoting the ideas and policies that create vibrant, quality options in K-12 education in Wisconsin.

- **Colorado Catholic Conference** (CCC) represents the four Colorado bishops and three dioceses in public policy, advancing Catholic social teaching and the common good, including on behalf of the 54 Catholic schools in Colorado and their nearly 14,000 students.

- **Colorado Association of Private Schools** (CAPS) is an association of 65 private schools operating in Colorado, whose primary mission is to preserve the independence of Colorado's private schools and to uphold parental choice in education.

- **Indiana Non-Public Education Association** was established in 1974 as a membership association for non-public schools in Indiana. Today, the membership includes about 400 schools, including religious and independent secular schools.

- **Midsouth Association of Independent Schools** is an association representing 122 private schools in Arkansas, Mississippi, Louisiana, and Tennessee, with over 40,000 students.

- **Catholic Conference of Oklahoma** (CCO) represents the Catholic Church in Oklahoma in all matters concerning public policy. In that role, CCO advocates for polices that aid the 35 Catholic schools in Oklahoma that educate more than 5,000 students.

- **Texas Private Schools Association** is a Texas-based association that represents roughly 900 accredited private schools throughout Texas, serving over 250,000 students.

- **Goldwater Institute** is an Arizona-based nonpartisan public policy and research

1    foundation, with a principal goal of defending the right of parents to choose the best
2    educational options for their children, including private options when they see fit.

3    • **James Madison Institute** (JMI) is Florida's premier free-market think tank. Founded in
4    1987 by Dr. Stan Marshall, a former president of Florida State University, JMI has long
5    been a proponent of free-market solutions in K-12 and higher education.

6    • **Mississippi Center for Public Policy** is a Mississippi-based think tank that believes in
7    parents' right to direct their children's education and advocates for policy solutions to
8    expand public and private educational opportunities for Mississippi children.

9    • **Nevada Policy Research Institute** (NPRI) is a Nevada-based nonpartisan education and
10   research organization fighting to empower parents with the freedom to choose the
11   educational options that best suit their children's unique needs.

12   • **Roughrider Policy Center** is a North Dakota–based think tank committed to expanding
13   opportunities for student success by empowering families with access to a variety of
14   educational options, using high quality research to inform policymakers and the public.

15   • **Rhode Island Center for Freedom & Prosperity** is Rhode Island think tank that has
16   worked to advance Education Savings Accounts and other policies promoting educational
17   freedom to empower citizens to lift their quality of life via educational opportunities.

18                                    **ARGUMENT**

19   **I.    The CARES Act Requires an "Equitable" Distribution Between Public and Private**
20   **Schools, Contrary to Plaintiffs' Interpretation**

21        The CARES Act appropriates roughly $16 billion for grants to support both public and
22   private schools impacted by the COVID-19 pandemic, via two separate funds: the Elementary and
23   Secondary School Emergency Relief (ESSER) Fund and the Governor's Emergency Education
24   Relief (GEER) Fund. *See* Coronavirus Aid, Relief, And Economic Security Act ("CARES Act"),
25   H.R. 748, 116th Cong. (2020), §§ 18002, 18003. The provisions establishing these funds each
26   adopt precise formulas for how the money is to be allocated among States and among school
27   districts within a State. For the ESSER fund (which accounts for approximately 82% of the $16
28   billion), grants "shall be allocated … to each State *in the same proportion as* each State received

- 6 -

under [Title I] in the most recent fiscal year." CARES Act § 18003(b). And for local districts within a State, ESSER funds shall be distributed "*in proportion to* the amount of funds such local educational agencies … received under [Title I] in the most recent fiscal year." CARES Act § 18003(c). Similarly, the CARES Act directs that GEER funds shall be allocated to each State using a precise formula: "60 percent on the basis of their relative population" and "40 percent on the basis of their relative number of children under section 1124(c) of [Title I]." CARES Act § 18002(b). Thus, the plain language requires that CARES Act disbursements for States and local school districts must directly incorporate, either in whole or in part, the Title I formulas.

Section 18005 of the CARES Act then provides that any "local educational agency receiving funds under sections 18002 [GEER Fund] or 18003 [ESSER Fund]" must provide "equitable services" to "students and teachers in non-public schools." CARES Act § 18005(a). Put differently, funds allocated to a district must be equitably shared with private schools. Unlike the subsections just described for the allocations among States and among local school districts— which directly import the Title I formulas with phrases like "in the same proportion as"—Section 18005 provides that these "equitable services" shall be supplied to private schools "in the *same manner as* provided under section 1117 of [Title I]." Like other parts of Title I, Section 1117 contains a formula for the allocation of funds to private schools, *see* 20 U.S.C. § 6320(a)(4)(A), so Congress *could have* said, like it did for the inter-State and inter-district allocations, that CARES Act funds should be distributed between public and private schools "in the same proportion as" under Section 1117. But it did not. Instead, it said that private schools shall be provided "equitable services" "in the *same manner as*" Section 1117 of Title I.

Why the difference? A foundational canon of statutory construction is that "different term[s] denote[ ] a different idea." *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012); *Loughrin v. U.S.*, 573 U.S. 351, 357 (2014); *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words") (collecting cases). This canon is most relevant where, like here, two closely related subsections of the same act, dealing with the same basic question (allocation of funds between States and districts versus between public and

private schools), use very different phrases. *See* Scalia & Garner, *supra*, at 173; *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) ("the use of different terms in adjacent provisions … creates a presumption that [Congress] intended the terms to have different meanings"). So the phrase "in the same manner as" must mean something different than "in the same proportion as." The interpretive question for the Department, and for this Court, is what does "in the same manner as" mean?

Fortunately, there is a relatively simple explanation. Due to certain differences between the CARES Act and Title I, a wholesale incorporation of Section 1117's allocation formula would actually *undermine* Congress's primary goal of ensuring that private school students receive "equitable services" to those provided to public school students. Thus Congress used more flexible language—"in the same manner"—to allow the Department to determine how to distribute these funds "equitably." Further background on Title I and the CARES Act helps to illustrate the point.

Title I is a program designed to provide academic and supportive services directly to low-income and at-risk students or at-risk public schools, *see* 20 U.S.C. §§ 6314; 6315(c). Section 1117, the section referenced in § 18005 of the CARES Act, requires services for similar students in private schools. The core principle underlying Section 1117 is that private school students should receive similar services to those provided to public school students. Indeed, Section 1117 says this directly: "Educational services and other benefits for such private school children shall be equitable in comparison to services and other benefits for public school children participating under this part." 20 U.S.C. § 6320(3)(A). And Section 1117 repeats the word "equitable" in ten other places: (a)(1)(A) ("on an equitable basis"); (a)(1)(B) (same); (a)(4)(D) ("equitable share"); (b)(1) ("equitable and effective programs"); (b)(1)(E) ("equitable services"); (b)(1)(J) (same); (b)(4) (same); (c) (same); (b)(5) ("equitable").

There is an important difference, however, between Title I and the CARES Act. Title I services are provided directly to low-income and at-risk students or are part of programs within at-risk schools, 20 U.S.C. §§ 6314; 6315(c), whereas CARES Act funds may be used to benefit all students, regardless of whether the students themselves or their schools would qualify under Title I. Such uses include "provid[ing] technology for online learning to *all* students," "training and

professional development for staff" about "minimizing the spread of infectious diseases," "purchasing supplies to sanitize and clean the facilities," "planning for and coordinating during long-term closures," "providing principals and others school leaders with the resources necessary to address the needs of their individual schools," and "other activities that are necessary to maintain the operation of and continuity of services" such as "continuing to employ existing staff." CARES Act §§ 18003(d)(3), (6), (7), (8), (12). CARES Act funds can *also* be used for Title I services provided directly to at-risk students or schools but the funds are not restricted to that.

Given that CARES Act funding can be used to support schools in a way that benefits all students, Congress realized that it could not both mechanically apply the Title I allocation formula—as it did for the allocations among States and districts—and at the same time ensure that private schools receive "equitable services." Thus, Congress instead used more flexible language, directing the Department to adopt a public-private allocation "in the same manner as" section 1117, while leaving to the Department to "fill up the details." *Gundy v. United States*, 139 S. Ct. 2116, 2136 (2019) (Gorsuch, J., dissenting) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). And the Department's interim rule does so in a way most consistent with the heart of Section 1117, namely that the funds provided to private schools are "equitable in comparison to services and other benefits for public school children." 20 U.S.C. § 6320(3)(A). The Department's Rule gives school districts flexibility in how they use CARES Act funds, but requires an allocation that will preserve an "equitable" distribution: if CARES Act funds are used to benefit all students, then the funds must be distributed in proportion to the total number of students in public and private schools; alternatively, if used to benefit only Title I students or schools, then the funds may be distributed in proportion to the number of Title I students. 34 C.F.R. § 76.665(c).[2]

To give a simple example, if a State or local school district decides to use CARES Act funds to help schools "provide technology for online learning to *all* students," § 18003(d)(8), the cost of that will obviously be a function of the total number of students in the school, not just the number of Title I students. The only way to guarantee an "equitable service" for private schools,

---

[2] Some Amici believe the most "equitable" approach would be an allocation based on the total number of students and submitted comments to the Department to that effect. Still, the Department's middle-ground approach is far more equitable than what Plaintiffs argue for.

as required by § 18005(a), would be a proportional grant towards virtual learning technology for "all" of their students as well. So too with many of the other approved uses of CARES Act funds. The costs of "training and professional development for staff" and "other activities that are necessary to … continuing to employ existing staff," § 18003(d)(6), (12), depend on the number of staff, which is most closely correlated with the total number of students in the school. And the costs of "purchasing supplies to sanitize and clean the facilities," or other "resources necessary to address the needs of their individual schools," § 18003(d)(3), (7), depend on the physical size of the school, which, again, is most closely correlated with the total number of students in the school.

Plaintiffs ask this Court to interpret the CARES Act to require a public-private allocation that is calculated exclusively based on the number of Title I students, while allowing public schools to use those funds to benefit *all* students. That interpretation is not only not required by the text of CARES Act, it is actually inconsistent with the Act, because private schools would not receive "equitable services," as required directly by § 18005(a), nor would such a distribution be "in the same manner as" Section 1117, which heavily emphasizes that services to public and private school students should be equivalent, 20 U.S.C. § 6320(3)(A). Plaintiffs then depart even further from the CARES Act requirement that private school students receive "equitable services" to their public school counterparts, arguing that private schools *may not even use* CARES Act funds for the same purposes as public schools. *See* Dkt. 35:7. Plaintiffs perhaps recognized that if private schools can use CARES Acts funds for the same uses (and nothing in the CARES Act supports Plaintiffs' argument that they cannot), then it would not be "equitable" to mechanically apply the Title I formula to the public-private allocation. In any event, this surprising argument further underscores that Plaintiffs are attempting to twist the language of the CARES Act in a way that would harm private schools and undo Congress's expressed intent.

All of Plaintiffs' arguments ultimately boil down to a single flawed textual theory: that the phrase "in the same manner" is equivalent to "in the same proportion." That cannot be the correct interpretation. If that's what Congress intended, it could have said so directly, *using the exact same language* it used just two sections earlier to establish the allocations among States and among local school districts within a State. *See* CARES Act § 18003(b) ("in the same proportion as"); *id*. §

18003(c) ("in proportion to"); *id*. § 18002(b) ("on the basis of"). By equating "in the same manner" with "in the same proportion," Plaintiffs' interpretation violates the different-words-have-different-meanings canon of statutory construction. *See* Scalia & Garner, *supra* at 170; *Loughrin*, 573 U.S. at 357; *McCarthy*, 322 F.3d at 656.

This Court should deny Plaintiffs' preliminary injunction motion on this basis alone.

**II.     The Same Harm and Public Interest Arguments Raised by Plaintiffs Cut Equally in the Opposite Direction When Private Schools Are Considered**

In the harm and public interest sections of their preliminary injunction brief, Plaintiffs paint a one-sided picture of the Rule's effect on public schools, while completely ignoring the concomitant effect on private schools if this Court were to grant their injunction. Dkt. 35:27–30. This case involves a fixed pot of funds and the allocation of that money between public and private schools, so all of Plaintiffs' arguments about harm and the public interest cut in the opposite direction with the exact same force with respect to private schools. Thus, none of these factors cut in favor of a preliminary injunction.

Private schools have been hit equally hard by the COVID-19 pandemic. Like public schools, private schools have incurred "significant expenditures" to "transition to remote learning," and "to procure PPE, deep-clean schools, and take other proactive measures to allow for safer in-person instruction." Dkt. 35:3–4; *see* Sarah D. Sparks, *Catholic School Closures Rise Amid COVID-19, Recession*, Ed Week (June 9, 2020)[3] (noting the unexpected costs of "cleaning and supplies"). Like public schools, private schools also need assistance "respond[ing] to the myriad urgent challenges posed by the COVID-19 pandemic." Dkt. 35:29. If the Court grants Plaintiffs' requested injunction, private schools (like those represented by the Amici) will suffer the same "imminent and irreparable harm" to their schools and the students they serve that Plaintiffs allege will occur without an injunction: they "will lose over $150 million" in CARES Act funds (in just the jurisdictions represented by the Plaintiffs), Dkt. 35:27, that Congress intended should go to them, *supra* Part I.

In fact, the situation is in many ways worse for private schools than for public schools,

---

[3] https://www.edweek.org/ew/articles/2020/06/09/catholic-school-closures-rise-in-wake-of.html

because private schools do not have the guaranteed tax funding that public schools do. As a result, unlike public schools, many private schools have already been forced to close due to the crisis. The Cato Institute has been tracking private school closures since March and has so far documented 107 permanent school closures as a result of the crisis, schools that collectively served over 16,000 students. *See COVID-19 Permanent Private School Closures*, Cato Institute, https://www.cato.org/covid-19-permanent-private-closures (last checked July 23, 2020).

Moreover, if the students that attended these schools transfer to public schools, it could impose significant additional costs on public school systems and state and local governments, further undercutting Plaintiffs' argument that providing equitable relief to private schools harms the public school system. Cato estimates, for example, that if all of the over 16,000 students served by the already closed private schools switched to public school, it would cost taxpayers roughly $252 million to educate those additional children. And that's just counting the schools that have already closed. EdChoice estimated that if just 10% of private-school students were to migrate back into the public system, state and local budgets throughout the U.S. would need to come up with an additional $6.7 *billion*. *See* Robert C. Enlow, *The K-12 Financial Cliff: What States Could Face if Students Switch Schooling Sectors*, EdChoice (Apr. 20, 2020).[4]

Plaintiffs' repeated suggestion that private schools are less in need of relief because they have access to "other funding sources under the CARES Act" (namely the Paycheck Protection Program), *e.g.* Dkt. 35:3, 25, 30, is a red herring. There are also other CARES Act funds that public schools have access to that private schools do not. The "Coronavirus Relief Fund," for example (CARES Act § 5001), appropriates $150 billion for States and local governments and is available to cover "expenses to facilitate distance learning, including technological improvements, in connection with school closings to enable compliance with COVID-19 precautions." *See* Coronavirus Relief Fund: Guidance for State, Territorial, Local, and Tribal Governments, United States Department of the Treasury (Updated June 30, 2020).[5] And, of course, as already noted,

---

[4] https://www.edchoice.org/engage/the-k-12-financial-cliff-what-states-could-face-if-students-switch-schooling-sectors/

[5] https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Guidance-for-State-Territorial-Local-and-Tribal-Governments.pdf

1  public schools have access to funding through taxes, unlike private schools.

2      In fact, to give just one example, Michigan public schools receive annual funding of

3  approximately $15 *billion. See FY 2019–20: School Aid*, Michigan House Fiscal Agency (Oct. 2,

4  2019).[6] Under the Department's rule, private schools in Michigan would receive about $21.6

5  million CARES Act funding if all students were counted equally, but only $5.1 million if Plaintiffs'

6  lawsuit prevails. Dkt. 35-2:10. The $16.5 million difference, while a mere fraction of funding for

7  Michigan's public schools, could be significant in the ability of private schools in Michigan to

8  maintain viability and to provide the safe learning environment expected. So too for other States.

9      Plaintiffs also argue that the public interest or balancing portion of the preliminary

10  injunction test cuts "overwhelmingly" and "heavily" in favor of an injunction, Dkt. 35:29—as

11  though private schools do not serve the same societal interest in educating the next generation.

12  Plaintiffs may believe that public schools are the best model for education and that private schools

13  are a less desirable education system, but many parents, teachers, researchers, policy-makers, and,

14  yes, legislators, disagree. And the legislative decision is obviously what matters. This court is not

15  free to weigh the competing claims of public and private schools. Congress has done that. It has

16  decided that funds for relief to schools impacted by COVID-19 should be distributed "equitably"

17  between public and private schools. The Department's rule does that, whereas Plaintiffs seek an

18  inequitable distribution that would favor public schools to the detriment of students in private

19  schools. The Court should reject Plaintiffs' flawed reading and deny their injunction motion.

20  **III.   Private Schools Are an Integral Part of Education Across the Country**

21      "Private education has played and is playing a significant and valuable role in raising

22  national levels of knowledge, competence, and experience." *Bd. of Educ. v. Allen*, 392 U.S. 236,

23  247 (1968). Roughly 5.7 million students, 10% of all U.S. students, attend a private school in the

24  United States. *See Private School Statistics at a Glance*, CAPE, https://www.capenet.org/

25  facts.html (last checked July 23, 2020). The nearly 35,000 private schools provide safe, high

26  quality educational options for families who are seeking a different educational environment for

27  their child. While private schools are sometimes unfairly stereotyped as havens for the wealthy, in

---

[6] http://legislature.mi.gov/documents/2019-2020/billanalysis/House/pdf/2019-HLA-4242-34E55109.pdf

- 13 -

Amicus Br. of Private School Associations and Advocacy Groups in Support of Defs. (3:20-cv-4478-JD)

reality, many private schools serve economically disadvantaged areas and families of modest means. According to the National Center for Education Statistics, over 20% of private school students nationally come from poor and near-poor families. *See Fast Facts: Public and Private School Comparison*, National Center for Education Statistics.[7] For generations, private schools have provided communities with options for their children's education, emphasizing not only academic success, but overall character and spiritual development. There has been a resurgence of private school education over the last thirty years as States pass tax credits, tax deductions, scholarships, and voucher programs that help low-income families access private schools.

Private schools are more than just a place where students go to learn. They create a community that serves the entire family and, in most cases, the surrounding neighborhood. The COVID-19 pandemic emphasized these schools' roles in the community. In Milwaukee, Wisconsin, for example, a local private school provided thousands of free meals each week to any child who needed access to food, regardless of what school they attended. *See* Libby Sobic & Jessica Holmberg, *In This Together: How private and public charter schools are serving their families and communities during the COVID-19 crisis*, WILL (Mar 27, 2020).[8]

One of the primary advantages of private schools is that parents can choose the educational environment that is best suited to their child's unique needs. Families from all income brackets seek out private schools for this very reason. And academic research has proven that for many families, the private school option leads to invaluable long-term benefits for their children. In Wisconsin, academic studies have found that private schools are safer on average than traditional public schools. *See School Safety Report*, School Choice Wisconsin (2014).[9] Students attending these schools receive an education that leads to increased rates of high-school graduation, college acceptance, and college graduation. J. Cowen, et al., *Student Attainment and the Milwaukee Parental Choice Program: Final Follow-up Analysis*, School Choice Demonstration Project (Feb. 2012)[10]; P. Wolf, *Do Voucher Students Attain Higher Levels of Education? Extended Evidence*

---

[7] https://nces.ed.gov/fastfacts/display.asp?id=55
[8] https://medium.com/@willlawandliberty/in-this-together-5362a18ef01
[9] http://schoolchoicewi.org/wp-content/uploads/2017/02/SCW-SafetyReport-2014-update.pdf
[10] http://www.uaedreform.org/downloads/2012/02/report-30-student-attainment-and-the-milwaukee-

1     *from the Milwaukee Parental Choice Program*, Urban Institute (Feb. 2018).[11] Similar randomized

2     controlled trial evaluations have been done across the country, and all but two found significant

3     positive or no differences on student academic achievement, compared to their public school peers.

4     *See* A. Egalite & P. Wolf, *A Review of Empirical Research on School Choice,* 91 Peabody Journal

5     of Education 441 (2016).[12] Studies have also found that school choice helps build student

6     character, reducing involvement in criminal activity and incidences of paternity suits. *See* C.

7     DeAngelis & P. Wolf, *Private School Choice and Character: More Evidence from Milwaukee*,

8     EDRE Working Paper 2019-03 (2019), *available on* SSRN.[13] All of these benefits come at a lower

9     cost to taxpayers per student. *See* P. Wolf & M. McShane, *Is the Juice Worth the Squeeze? A*

10     *Benefit/Cost Analysis of the District of Columbia Opportunity Scholarship Program*, 8 Education

11     Finance and Policy 74 (2013).[14]

12         Congress historically has, and continues to, recognize the importance of private schools as

13     a vital part of the education sector. The pandemic significantly impacted *all* K-12 schools and the

14     CARES Act was intended to help schools, both public and private, continue to serve students. The

15     Department's rule is a continuation of that intent and commitment to ensuring that all families can

16     access the school of their choice, and is a correct and appropriate implementation of the underlying

17     requirements of the CARES Act.

**CONCLUSION**

19         For these reasons, Amici urge this Court to reject Plaintiffs' invitation to enjoin the

20     Department's sensible and equitable rule and instead impose an inequitable distribution that would

21     favor public schools to the detriment of private schools and their students.

22         Dated: July 29, 2020

---

parental-choice-program-final-follow-up-analysis.pdf

[11] https://www.urban.org/sites/default/files/publication/96721/do_voucher_students_attain_ higher_levels_of_education.pdf

[12] https://www.tandfonline.com/doi/citedby/10.1080/0161956X.2016.1207436

[13] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3335162

[14] https://www.mitpressjournals.org/doi/10.1162/EDFP_a_00083

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Respectfully Submitted,*

/s/ Luke N. Berg

WISCONSIN INSTITUTE FOR LAW & LIBERTY
RICK ESENBERG (Wis. Bar #1005622)
*LUKE N. BERG (Wis. Bar #1095644)
ELISABETH SOBIC (Wis. Bar #1103379)
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
luke@will-law.org

Mark W. Bucher (Cal. Bar #210474)
California Policy Center
18002 Irvine Blvd., Suite 108
Tustin, CA 92780-3321
Phone: (714) 313-3706

*Attorneys for Council for American Private Education,
National Catholic Educational Association, Agudath
Israel of America, Council of Islamic Schools in North
America, Association of Christian Schools International,
Association of Christian Teachers and Schools, WELS
Commission on Lutheran Schools, Wisconsin Council of
Religious & Independent Schools, School Choice
Wisconsin Action, California Catholic Conference,
Michigan Catholic Conference, Michigan Association of
Non-Public Schools, Pennsylvania Catholic Conference,
Pennsylvania Affiliate of the Council for American
Private Education, American Federation for Children,
Foundation for Excellence in Education, Inc., Catholic
Education Partners, Great Lakes Education Foundation,
Rio Grande Foundation, Commonwealth Foundation,
School Choice Wisconsin, Colorado Catholic Conference,
Colorado Association of Private Schools, Indiana Non-
Public Education Association, Midsouth Association of
Independent Schools, Catholic Conference of Oklahoma,
Texas Private Schools Association, James Madison
Institute, Mississippi Center for Public Policy, Nevada
Policy Research Institute, Roughrider Policy Center,
Rhode Island Center for Freedom & Prosperity*

*Additional Signatures on the Following Page*

---

* Pro Hac Vice Application pending.

| | |
|---|---|
| /s/ Leslie Davis Hiner | /s/ Kim Wadas Vercauteren |
| LESLIE DAVIS HINER* (Ind. Bar No. 8465-49) | KIM WADAS VERCAUTEREN* |
| EDCHOICE, INC. | (Wis. Bar No. 1045323) |
| 111 Monument Circle Suite 2650 | WISCONSIN CATHOLIC CONFERENCE |
| Indianapolis, IN 46204 | 131 W. Wilson Street, Suite 1105 |
| (317) 681-0745 | Madison, WI 53703 |
| leslie@edchoice.org | (608) 257-0004 |
| *Attorneys for EdChoice* | kim@wisconsincatholic.org |
| | *Attorneys for Wisconsin Catholic Conference* |
| /s/ Patrick J. Wright | |
| PATRICK J. WRIGHT* (MI Bar No. P54052) | /s/ Daniel R. Suhr |
| MACKINAC CENTER FOR PUBLIC POLICY | DANIEL R. SUHR* (Wis. Bar No. 1056658) |
| 140 West Main Street | LIBERTY JUSTICE CENTER |
| Midland, MI 48640 | 190 S. LaSalle St. Suite 1500 |
| (989) 631-0900 | Chicago, IL 60603 |
| wright@mackinac.org | (312) 263-7668 |
| *Attorneys for Mackinac Center for Public Policy* | dsuhr@libertyjusticecenter.org |
| | *Attorneys for Liberty Justice Center* |
| /s/ Timothy Sandefur | /s/ Jay R. Carson |
| TIMOTHY SANDEFUR* (Cal. Bar No. 224436) | JAY R. CARSON* (Ohio Bar No. 0068526) |
| SCHARF-NORTON CENTER FOR | THE BUCKEYE INSTITUTE |
| CONSTITUTIONAL LITIGATION AT THE | 88 East Broad Street, Suite 1300 |
| GOLDWATER INSTITUTE | Columbus, Ohio 43215 |
| 500 E. Coronado Rd. | (614) 224-4422 |
| Phoenix, AZ 85004 | J.Carson@BuckeyeInstitute.org |
| (602) 462-5000 | *Attorneys for the Buckeye Institute* |
| litigation@goldwaterinstitute.org | |
| *Attorneys for the Goldwater Institute* | |

---

\* Not formally appearing. Above-signed counsel is authorized to appear as counsel of record for noticing/ECF purposes.

**ATTESTATION REGARDING SIGNATURES**

Pursuant to Local Rule 5-1(i)(3), I hereby attest that I have obtained concurrence in the filing of this Amicus Brief from all of the signatories above. I am also authorized to appear as counsel of record for noticing/ECF purposes for all Amici, including those with additional attorney signatures above.

/s/ Luke N. Berg
LUKE N. BERG

Dated: July 29, 2020