UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF MICHIGAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BETSY DEVOS, et al.,<br><br>Defendants. | Case No. 3:20-cv-04478-JD<br><br>**ORDER RE PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 35 |

This case arises out of the funding provisions for elementary and secondary schools in the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) of 2020. Plaintiffs, who are eight states, the District of Columbia, and four municipal school districts, have sued under the United States Constitution and the Administrative Procedure Act to block an interim final rule promulgated by defendants, the Secretary of Education and the United States Department of Education (the Department), that imposed a variety of conditions on how the CARES Act funds should be shared by public and private schools. Dkt. No. 24. Plaintiffs also moved for a preliminary injunction prohibiting enforcement of the interim final rule pending a full disposition of the case on the merits. Dkt. No. 35. The injunction is granted.

**BACKGROUND**

The salient facts are undisputed. The CARES Act was enacted on March 27, 2020, to provide trillions of dollars in financial relief, and other assistance, to Americans suffering from the coronavirus pandemic and its economic fallout. Dkt. No. 24 ¶ 2, Dkt. No. 68 at 1. The CARES Act earmarked approximately $16 billion to help elementary and secondary schools maintain their operations and provide effective education during the pandemic. Dkt. No. 35 at 1, Dkt. No. 68 at 2.

The CARES Act channeled the distribution of this funding through two programs. The Governor's Emergency Education Relief (GEER) Fund provides state governors with funding to distribute in their discretion to the local educational agencies most severely impacted by the coronavirus. Coronavirus Aid, Relief, and Economic Security Act, P.L. No. 116-136 (Mar. 27, 2020), § 18002. The Elementary and Secondary School Emergency Relief (ESSER) Fund allocates funds to each state "in the same proportion as each State received under part A of title I of the [Elementary and Secondary Education Act] of 1965 in the most recent fiscal year." *Id.* § 18003(b).

Section 18005 of the CARES Act directs local educational agencies (LEAs) to share a portion of GEER and ESSER funds with private schools. The allocation of public funds to private schools has long been a feature of the Elementary and Secondary Education Act of 1965 (ESEA), 20 U.S.C. § 6301 *et seq.* (2015). LEAs have historically used a formula in Section 1117 of the ESEA to calculate the funding to be shared with private schools. The formula in Section 1117 states that a private school located within a Title I-eligible area may receive a portion of the LEA's Title I funds "based on the number of children from low-income families who attend" the private school. *Id.* § 6320(a)(4)(A)(i). In effect, the share of Title I funds awarded to private schools is determined by the number of low-income children attending private schools in Title I-eligible areas.

The CARES Act expressly incorporated Section 1117 in connection with the distribution of the GEER and ESSER funding. Section 18005(a) of the CARES Act instructs LEAs receiving GEER or ESSER funds to "provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools."

The parties' dispute is largely grounded in their disagreement over Congress's intent in incorporating Section 1117. The lawsuit and the injunction motion turn on the meaning of the phrase "in the same manner as provided under section 1117."

In response to Section 18005(a), LEAs began to formulate GEER and ESSER allocations to private schools based on Section 1117. *See, e.g.*, Dkt. No. 35-2 at 9, 59, 132. This work

2

became uncertain when the Department indicated that the interpretation of Section 18005(a) required additional "clarity." Dkt. No. 35-3 at 66. On April 30, 2020, the Department published its views on Section 18005(a) in a non-binding guidance document entitled "Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs" (the Guidance). Dkt. No. 35-3 at 65. The Guidance instructed LEAs to calculate the funds to be shared with private schools on the basis of "the overall number of children who are enrolled in public schools and non-public schools in the LEA that wish to participate under one or both CARES Act programs." *Providing Equitable Services* at 6. Put more plainly, the Department directed that private schools should get a share based on their overall student population, and not just their number of low-income students.

The Guidance prompted a torrent of responses. The Chairs of the United States House of Representatives Committee on Education and Labor, and Committee on Appropriations, and the Ranking Member of the United States Senate Committee on Health, Education, Labor and Pensions, voiced concerns to the Department that it was implementing a share formula at odds with Section 18005(a) and Section 1117. *See* Dkt. No. 35-3 at 79. A number of state and local public education officials represented by the Council of Chief State School Officers expressed the same concerns, and advised the Department that the Guidance would cause significant adverse financial and operational impacts on public schools. *See* Dkt. No. 35-3 at 82.

On July 1, 2020, the Department issued an interim final rule (the Rule) that adopted and to a degree expanded the directives in the Guidance. *See* "CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools," 85 Fed. Reg. 39479 (July 1, 2020) (to be codified at 34 C.F.R. pt. 76). As an interim final rule, the Rule went into immediate effect without a notice-and-comment period. *Id*.

The Department stated that the Rule was intended to resolve "a critical ambiguity" in Section 18005(a). 85 Fed Reg. at 39479. In the Department's view, the "context" of the CARES Act was the harm inflicted on "*all* of our Nation's students" by the pandemic. *Id*. (emphasis in original). A "mechanistic application" of the share formula in Section 1117 would award funds to private schools based only on their low-income students, and not all of their students. *Id*. Because

3

1   the Department believed that the use of the formula in Section 1117 would be inconsistent with
2   the concern for all students implicit in the CARES Act, it concluded that "the phrase 'in the same
3   manner as provided under section 1117' does not simply mean 'as provided under section 1117.'"
4   *Id*. The Department also noted certain consultation and funding control terms overlapped in
5   Section 18005(a) and Section 1117, which it saw as another indication that "in the same manner"
6   meant something other than what those words would ordinarily denote. *Id*. at 39481.

7   The Department invoked "our interpretive authority under *Chevron U.S.A., Inc., v. Natural
8   Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984)," to implement a different share formula to
9   govern the distribution of funds to private schools. *Id*. at 39479. The Rule presented LEAs with
10  two options. Under the first option, LEAs could use the low-income student formula in Section
11  1117, but only if they limited CARES Act funding to public and private schools that were already
12  participating in Title I funding. 85 Fed Reg. at 39488. School districts could not use CARES Act
13  funding for district-wide measures that would also benefit schools not participating in Title I
14  funding. Dkt. No. 35 at 23. LEAs would also have to comply with "supplement-not-supplant"
15  requirements, meaning they could not use CARES Act funding to replace or exceed state and local
16  funding allocations. 85 Fed Reg. at 39488.

17  The second option would allow LEAs to avoid these limitations but only if they followed
18  the method in the Department's Guidance and shared funds with private schools based on the total
19  number of students enrolled, and not on the total number of low-income students attending private
20  schools. *Id.*

21  In response to the Rule, over 100 members of the House and Senate again stated concerns
22  that the Department was not adhering to the text of Section 18005(a). *See, e.g.,* Dkt. No. 73-1 at
23  1-4. They noted that public schools in their home states would lose millions of dollars they would
24  otherwise be entitled to if the Rule were enforced. *See, e.g.*, Dkt. No. 73-1 at 31. A report by the
25  nonpartisan Congressional Research Service observed that "a straightforward reading of section
26  18005(a) based on its text and context suggests that the CARES Act requires LEAs to follow
27  section 1117's method for determining the proportional share, and thus to allocate funding for
28  services for private school students and teachers based on the number of low-income children

4

attending private schools." Cong. Research Serv., 7-5700, *Analysis of the CARES Act's Equitable Services Provision* 2 (July 1, 2020). The Department indicated it is considering these and other responses to the Rule, and plans to release a final rule at some point in the future. Dkt. No. 81 (August 18, 2020 hearing transcript (Hrg. Tr.)) at 34:3.

Plaintiffs are the States of Michigan, California, Hawaii, Maine, Maryland, New Mexico, Pennsylvania, and Wisconsin; the District of Columbia; and the New York City Department of Education, Chicago Public Schools, the Cleveland Municipal School District Board of Education, and the San Francisco Unified School District. Dkt. No. 24 ¶¶ 27-39. They assert six legal claims against the Department and Secretary of Education Betsy DeVos, for violation of separation of powers principles; ultra vires action; violation of the Spending Clause, Article I, Section 8, Clause 1 of the United States Constitution; and three separate violations of the Administrative Procedure Act, 5 U.S.C. § 706 (2012). *Id*. ¶¶ 155-195.

On July 20, 2020, plaintiffs moved for a preliminary injunction barring enforcement of the Rule. Dkt. No. 35. The Department opposed the injunction request. Dkt. No. 68. The Court heard oral argument on the motion on August 18, 2020. Dkt. No. 77.[1]

## DISCUSSION

### I. LEGAL STANDARDS

Preliminary injunctions are "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Id*. at 20; *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (same). In our circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in his or her favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th

---

[1] Non-parties The Council of the Great City Schools, and 38 private school associations and advocacy groups, have asked to file amicus briefs. Dkt. Nos. 47, 60. The requests are granted.

5

Cir. 2018); *Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d 737, 740 (9th Cir. 2011). At "an irreducible minimum," the party seeking the injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Airbnb, Inc. v. City and Cnty. of San Francisco*, 217 F. Supp. 3d 1066, 1072 (N.D. Cal. 2016) (citation omitted); *see also Garcia*, 786 F.3d at 740.

## II. THE INJUNCTION FACTORS

### A. Likelihood of Success on the Merits

The parties agree that the merits inquiry turns on whether the Rule was a permissible interpretation of the phrase "in the same manner as provided for in section 1117 of the ESEA of 1965" in CARES Act Section 18005(a). *See* Dkt. No. 35 at 12-13, Dkt. No. 68 at 7. The Department does not dispute the ripeness or justiciability of plaintiffs' claims, as it has in other CARES Act cases. *See*, *e.g.*, *State of Washington v. DeVos*, ___ F. Supp. 3d ___, No. 2:20-cv-0182-TOR, 2020 WL 3125916, at *4-8 (E.D. Wash. June 12, 2020).

Plaintiffs may show a likelihood of success on the merits by demonstrating that the Rule is likely to be held an unlawful administrative action under the APA. As the APA provides in pertinent part, the Court shall:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be --
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
> >
> > . . .
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

5 U.S.C. § 706(2). Plaintiffs contend that the Rule is substantively unlawful under Sections 706(2)(A) and (C) because it is "not in accordance with" Congress's mandate to allocate GEER and ESSER funds to non-public schools "in the same manner" as in Section 1117 of the ESEA, and so is necessarily "in excess of statutory jurisdiction, authority, or limitations." Dkt. No. 24 at 56.

The point is well taken. As in all contested questions of statutory interpretation, "[o]ur analysis begins and ends with the text." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). We give Congress's words their ordinary and everyday meaning, and may consult dictionary definitions to ensure a plain interpretation. *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019). When construing a statute, a virtuoso feat of analysis is neither required nor particularly useful. "[T]he plain, obvious, and rational meaning of a statute is always to be preferred" to interpretations that only "an acute and powerful intellect would discover." *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925). The ultimate goal of construction is to give effect to Congress's purpose in enacting the statute. "In every case, 'it is the intent of Congress that is the ultimate touchstone.'" *Barr*, 941 F.3d at 940 (quoting *Arizona v. United States*, 567 U.S. 387, 453 (2012) (Alito, J., concurring and dissenting in part)).

The words Congress used in Section 18005(a) of the CARES Act are familiar and uncomplicated, to say the least. In everyday usage, "same" means "corresponding so closely as to be indistinguishable," and "conforming in every respect," particularly when used in a sentence with "as." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/same (last viewed Aug. 26, 2020). "Manner" means "a mode of procedure or way of acting." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/manner (last viewed Aug. 26, 2020). Taken together, to do something "in the same manner" is to perform an action using a method or procedure that is identical to that used in another action. This straightforward construction has been adopted in other statutory interpretation contexts. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 545-46 (2012) ("in the same manner" means "to use the same methodology and procedures") (internal quotation omitted).

Consequently, Congress's intent in Section 18005(a) is plain as day. Congress expressly directed local educational entities such as plaintiffs "to provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-

7

public schools."[2]  This command unambiguously requires plaintiffs to calculate the non-public school portion of the GEER and ESSER funds they receive under Section 18005(a) according to the formula in Section 1117 of the ESEA, which is "based on the number of children from low-income families who attend private schools."  20 U.S.C. § 6320(a)(4)(A)(i).  The statute's quintessentially plain language, and the "surgical precision" with which Congress incorporated Section 1117 into Section 18005(a), leave no room for any other reading.  *See Navajo Nation v. Dep't of Health & Human Servs.*, 325 F.3d 1133, 1139-40 (9th Cir. 2003).

In light of these factors, one might wonder, as Justice Scalia did in similar circumstances, how "[c]ould anyone maintain with a straight face that [Section 18005(a)] is unclear?"  *King v. Burwell*, 576 U.S. 473, 510 (2015) (Scalia, J., dissenting).  The Department does not argue that the words in Section 18005(a) are themselves ambiguous or unclear in any way.  To the contrary, counsel for the Department acknowledged during the hearing that such a contention would be hard to support.  Hrg. Tr. at 29:15-18.  Instead, the Department said that the Rule was necessary to resolve "a critical ambiguity in section 18005(a)," namely an alleged tension between the focus on low-income students in Section 1117 and the fact that the pandemic has affected "*all* our Nation's students."  85 Fed. Reg. at 39479 (emphasis in original).

The Department relies entirely on "context," as opposed to anything inherent in the words Congress used, for this contention.  In the Department's view, the CARES Act was intended to benefit all students; given that context, "it is inequitable to apportion expenditures for private schools on the basis of low-income students, when public school districts may use their share of CARES Act funds to benefit all schools and students."  Dkt. No. 68 at 10.  On this basis, and virtually nothing else, the Department concluded that "the phrase 'in the same manner as provided under section 1117' does not simply mean 'as provided under section 1117.'"  85 Fed. Reg. at 39479.

---

[2] Although eight of the plaintiffs are states, their LEAs make the final apportionment and distribution of funds to private schools in their area.  *See* Dkt. No. 24 at 34-38.  The states have filed this complaint both on behalf of their LEAs, and based on the risk of state-wide harm to their students.  *Id.*

8

1    This is "interpretive jiggery-pokery" in the extreme. *King*, 576 U.S. at 506 (Scalia, J.,
2    dissenting). The Department's conclusion that "in the same manner" does not mean "in the same
3    manner" invites immediate doubts. Why did Congress go out of its way to incorporate Section
4    1117 if it did not intend for its formula to be used in Section 18005(a)? If Congress did not mean
5    to use the formula in Section 1117, wouldn't it simply have omitted any reference to it in the first
6    place? But since Congress expressly referred to Section 1117, what exactly does the Department
7    think that means?

8    These and other material questions are left unanswered by the Department. Instead, the
9    Department simply demands that the Court defer to the Rule under the *Chevron* doctrine. *See* Dkt.
10   No. 68 at 9-10; 85 Fed. Reg. at 39479. The courts "often apply the two-step framework
11   announced in *Chevron*" to determine the validity of an agency's interpretation of a statute. *King*,
12   576 U.S. at 485 (citing *Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). "This
13   approach 'is premised on the theory that a statute's ambiguity constitutes an implicit delegation
14   from Congress to the agency to fill in the statutory gaps.'" *Id*. (quoting *FDA v. Brown &
15   Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). When those circumstances are in
16   evidence, the courts will defer to the agency's interpretation of the statute. *Chevron*, 467 U.S. at
17   843.

18   The problem for the Department is that it cannot make it past step one, which asks whether
19   the statute is ambiguous. When Congress has spoken clearly, as it did in Section 18005(a), "that is
20   the end of the matter." *Chevron*, 467 U.S. at 843. An executive agency like the Department has
21   no authority to rewrite Congress's plain and unambiguous commands under the guise of
22   interpretation, and no deference is owed when an agency acts in contravention of a statute. *Id*. at
23   842-43; *see also Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) (agency may not
24   promulgate rules or guidelines that are inconsistent with an unambiguous statute). To hold
25   otherwise "would deal a severe blow to the Constitution's separation of powers," which provides
26   that Congress makes the laws and the President, through executive agencies like the Department,
27   "'faithfully execute[s]' them." *Utility Air*, 573 U.S. at 327 (quoting U.S. Const., Art. II, § 3); *see*
28

*also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (the Executive Branch is not authorized "to enact, to amend, or to repeal statutes.").

The Department's main response to these well-established principles is to rely heavily on the Supreme Court's opinion in *King*. *See* Dkt. No. 68 at 8-9. The Department embraces *King* for the proposition that "the meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context." *King*, 576 U.S. at 486 (internal quotation omitted); Dkt. No. 68 at 8-9. That is the ostensible legal grounds for the Department's contention that the "context" of the CARES Act trumps Congress's instruction to use the share formula in Section 1117 to apportion GEER and ESSER funds to private schools.

This is not a tenable theory. The Department misreads *King* as granting agencies the freedom to disregard Congress's words based on the *gestalt* of a statute. Nothing in *King* supports such a radical revision of administrative law. *King* was a case about Congress's plan for tax credits under the Affordable Care Act. After conducting a deep and thorough analysis of the ACA as a whole, the Supreme Court concluded that Congress intended a broader scope for the tax credit provision than a "natural" reading of the words might initially suggest. *King*, 576 U.S. at 486-92. In reaching this holding, the majority opinion took pains to underscore that it reviewed the ACA as a whole to effectuate Congress's intent, and not "undo what it has done." *Id*. at 498. That is because "[i]n a democracy, the power to make the law rests with those chosen by the people." *Id*.

The Department's argument departs from *King* at virtually every turn. The Department did not present a detailed analysis of the overall structure of the CARES Act to support its conclusion about Congress's intent. It merely declared that Section 1117 "is inconsistent with the CARES Act in several crucial respects," without identifying a section or other provision in the CARES Act that might evidence a conflict. Dkt. No. 68 at 5. The Department posited an inconsistency, but did not prove one. That is lightyears away from the analysis done in *King*.[3]

---

[3] It appears that the Department made much more of an effort at statutory analysis in a related case, *Washington v. DeVos*, Case No. 2:20-cv-1119-BJR (W.D. Wash.). Even so, the district court there had no trouble rejecting its discussion. *See State of Washington*, ___ F. Supp. 3d ___, No. 2:20-cv-1119-BJR, 2020 WL 4922256 (W.D. Wash. Aug. 21, 2020).

The Department's overall approach is also wholly at odds with *King's* teaching about effectuating Congress's intent. The Department highlights "context" not to further Congress's mandate in Section 18005(a) but to cancel it altogether. The Supreme Court expressly cautioned against this kind of activism. "Reliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself.'" *King*, 576 U.S. at 497-98 (quoting *Palmer v. Massachusetts*, 308 U.S. 79, 83 (1939)). The Department may prefer to give CARES Act funds to private schools more generously than Congress provided, but it is Congress who makes the law, and an "agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Utility Air*, 573 U.S. at 325; *see also Wisconsin Cent. Ltd. v. United States*, 138 S.Ct. 2067, 2073 (2018) (the Department cannot rewrite a statute "'under the banner of speculation about Congress might have' intended.").

The Department's other arguments in defense of the Rule are equally unavailing. Its contention about "superfluity" is not persuasive. It is true that Section 18005(a) and Section 1117 use virtually identical language to require school districts to consult with private schools on how equitable services should be provided, and for public schools to maintain control over funding. *See* Dkt. No. 68 at 8. But it is not at all apparent why this overlap indicates that "the phrase 'in the same manner' must mean that § 18005 incorporates something less than every provision of § 1117," as the Departments says. *Id*. The canon advising that interpretations should avoid surplusage and superfluity is a "preference" that "is not absolute." *King*, 576 U.S. at 475 (internal quotation omitted). Even if there were a few instances of inartful drafting in Section 18005(a), that by no means creates an ambiguity which might justify a wholesale rewriting of the share formula. That is all the more true because the overlapping provisions are external to the formula itself.

The Department's reliance on a general delegation of discretion to implement the Education Code also is misplaced. *See* Dkt. No. 68 at 9. It would be "anomalous" indeed to conclude that Congress specified the allocation formula with surgical precision in Section

11

18005(a) only to allow the Department to change or even depart from it as a matter of general administrative authority. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

In addition, the Department overlooks the fact that Section 18005(a) is a formula grant that does not allow for agency modifications. *See* Hrg. Tr. at 8:6-7 (agreeing at the hearing that Section 18005(a) is a formula grant). A formula grant awards funds based on a statutory formula that specifies how they will be allocated among eligible participants. *See Barr*, 941 F.3d at 935; *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). It is the opposite of a discretionary grant, which might allow an agency to impose conditions and guidelines of its own. *See Barr*, 941 F.3d at 942. Because Congress set the exact formula for the expenditures on non-public schools by incorporating Section 1117, the Department had no authority to impose its own conditions. *Id*. (agency-created conditions are "antithetical to the concept of a formula grant.").

Consequently, plaintiffs have established that they are likely to prevail on their claim that the Rule must be set aside under Sections 706(2)(A) and (C) of the APA. They have also established that there was no ambiguity in Section 18005(a) for the Department to fill in, and so its sole duty was to "'give effect to the unambiguously expressed intent of Congress.'" *Utility Air*, 573 U.S. at 326. The Department went well beyond its statutory authority by trying to replace the share formula mandated by Congress in Section 18005(a) with one of its own choosing. *Id*.

This is enough to find that the merits inquiry weighs in plaintiffs' favor. The Court need not take up plaintiffs' other contentions with respect to whether the Department provided an adequate period of notice and comment before promulgating the Rule, or acted arbitrarily and capriciously in ignoring evidence about the Rule's impacts. The Court also declines at this time to reach the constitutional argument plaintiffs assert under the Spending Clause. *See Jean v. Nelson*, 472 U.S. 846, 854 (1985); *United States v. Kaluna*, 192 F.3d 1188, 1197 (9th Cir. 1999) ("courts are not 'to decide questions of a constitutional nature unless absolutely necessary to a decision of the case'") (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)).

### B.  Irreparable Harm

Plaintiffs have demonstrated a likelihood of irreparable harm. They submitted a number of substantial declarations detailing, often on a district and school-level basis, the financial and

operational harms enforcement of the Rule would inflict.  The Court's task in evaluating this evidence was made considerably easier by the fact that the Department does not meaningfully dispute it.  Counsel for the Department forthrightly acknowledged at the hearing that plaintiffs would sustain measurable financial and budgetary hardships under the Rule.  *See* Hrg. Tr. at 34:17-18.

Since irreparable harm is largely conceded by the Department, the Court will highlight just some of plaintiffs' evidence, mainly for the sake of illustration.  Michigan, for example, submitted evidence that it had planned to reserve $5,107,921 in ESSER funds for private schools according to Section 1117 calculations, but that the Rule would require it to divert $21,604,648.63 to private schools -- over four times as much.  Dkt. No. 35-2, Ex. 1 at 6.  Losing $16,496,727.63 of federal funding to private schools would be the equivalent of laying off 466 teachers from public schools in Flint, Michigan.  Dkt. No. 35-2, Ex. 1 at 10.  As much as 33% of Grand Rapids, Michigan's total ESSER funding would be sent to private schools under the Rule's option two calculations.  *Id.*

The Oakland Unified School District has resorted to private donations of food and education technology for low-income students while waiting for its CARES Act funding.  Dkt. No. 35-2, Ex. 3 at 10-11.  The district cannot use its CARES Act funds for these same purposes because the Rule's supplement-not-supplant requirement bars it from replacing other sources of funding like private donations.  *Id.*  To comply with the Rule, the district has had to mothball $2.2 million in CARES Act funding -- money that the district would use now for students returning to school.  *Id.* at 9.

Wisconsin schools had to choose between diverting over $4 million of CARES Act funding to private schools or abandoning district-wide coronavirus preparation such as sanitizing school buses.  Dkt. No. 35-2, Ex. 11 at 10.  Wisconsin also estimates that its Department of Public Instruction will need to devote approximately 7,000 hours of work between July 1 and September 30 to planning and budgeting in response to the Rule.  Dkt. No. 35-2, Ex. 11 at 8.  Other plaintiffs have also reported serious disruptions to their budgets and planning efforts.

1      These impacts amount to irreparable harm.  *See*, *e.g.*, *Certain Named and Unnamed Non-Citizen Children and Their Parents v. Texas*, 448 U.S. 1327, 1332-33 (1980) (finding that delaying or hampering students' participation in school is considered an irreparable harm). Economic injuries in the APA are deemed irreparable because plaintiffs are unable to recover money damages.  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 854 (9th Cir. 2020).  The Ninth Circuit has held that disruptions to budget plans also are a cognizable irreparable harm.  *Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017).  Consequently, the irreparable harm inquiry weighs in plaintiffs' favor.

### C. Balance of Hardships and the Public Interest

The balance of hardships and the public interest are considered together in this case.  *See E. Bay Sanctuary Covenant*, 964 F.3d at 854 ("When the government is a party, the third and fourth preliminary injunction factors merge.") (citing *Drakes Bay Oyster Co. v. Jewell*, 743 F.3d 1073, 1092 (9th Cir. 2014)).  There is a strong public interest in ensuring that the laws duly enacted by elected representatives are not undermined by agency actions.  *See id.* at 855 (citing *Maryland v. King*, 567 U.S. 1301, 1301 (2012)).  There is also a strong public interest in safeguarding our nation's public schools from the pandemic, and giving school districts access to the funds that Congress authorized for this very purpose.  "Providing public schools ranks at the very apex of the function of the state."  *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

To be sure, there is a public interest in sharing CARES Act funds with private schools, as the Department suggests.  That is what Congress provided for in Section 18005(a), and the evidence before the Court also indicates that private schools have had access to additional funding under the Paycheck Protection Program.  Dkt. No. 35 at 25.  But allowing the Department to rewrite the statutory formula for sharing education funds is manifestly not in the public interest.  *See E. Bay Sanctuary Covenant*, 964 F.3d at 855.  Consequently, the balance of hardships and public interest inquiries for injunctive relief weigh in plaintiffs' favor.

**CONCLUSION**

A preliminary injunction is granted as follows.

(1)  The United States Department of Education, Secretary Betsy DeVos, and their officers, agents, employees, attorneys, and any person acting in concert with them, or at their behest, and who has knowledge of this injunction, are preliminarily enjoined from implementing or enforcing against plaintiffs the provisions in the Guidance (April 30, 2020) or the interim final rule, 85 Fed. Reg. 39479 (July 1, 2020).  The injunction will remain in place pending further order of the Court.

(2)  Plaintiffs are excused from posting a bond under Federal Rule of Civil Procedure 65(c).

The Court sets a case management conference for September 17, 2020, at 10:00 a.m.  A joint case management statement is due by September 10, 2020.

**IT IS SO ORDERED.**

Dated:  August 26, 2020

JAMES DONATO
United States District Judge